**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| **DANIEL LEWIS LEE,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Case No. 2:19-cv-468** |
| | ) | |
| **WARDEN, USP-TERRE HAUTE,** | ) | **CAPITAL CASE** |
| **UNITED STATES OF AMERICA,** | ) | **EXECUTION SCHEDULED FOR** |
| | ) | **DECEMBER 9, 2019** |
| Respondents. | ) | |

---

### PETITION FOR WRIT OF HABEAS CORPUS

---

MORRIS H. MOON
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Petitioner Daniel Lewis Lee

Dated: September 26, 2019

**Preliminary Statement Regarding Citations and Designations**

Petitioner Daniel Lewis Lee shall be referred to throughout this pleading as Petitioner or Mr. Lee. Respondents shall be referred to as the Government. Citations to documents filed in the district court criminal docket, *United States v. Lee*, No. 4:97-cr-00243 (E.D. Ark.), shall be designated as "Doc. No." Citations to the consecutively-paginated trial transcript shall be designated as "Tr." Citations to the attached exhibits shall be designated as "Exh."

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………...1

ARGUMENT……………………………………………………………………………...5

I.  MR. LEE IS ENTITLED TO § 2241 RELIEF BECAUSE HIS DEATH SENTENCE
    WAS BASED UPON A SIXTH AMENDMENT VIOLATION WHICH EVADED
    § 2255 REVIEW…………………………………………………………………..6

    A.  The psychopathy/PCL-R evidence, which dominated the penalty phase at the
        1999 trial, was neither scientific nor reliable…………………………………...7

    B.  Trial counsel failed to meet the prevailing standard at the time for challenging
        the PCL-R………………………………………………………………………....9

    C.  Trial counsel's deficient performance was prejudicial…………………………..12

        1.    *Haynes* and *Stitt*: What could have been done in *Lee*……………………12

        2.    But for trial counsel's deficient performance, there is a reasonable
              probability that the outcome of the sentencing proceeding would have
              been different…………………………………………………………………15

    D.  Mr. Lee's court-appointed § 2255 counsel's ineffectiveness denied him the
        opportunity to remedy the trial error…………………………………………..19

        1.    Post-conviction counsel bungled the litigation…………………………..19

        2.    § 2255 counsel's errors led the court to make a procedural ruling
              foreclosing full merits review of the IAC claim……………..................20

    E.  The Supreme Court has now crafted a remedy for prisoners whose post-
        conviction counsel bungled a substantial ineffectiveness claim, but the Eighth
        Circuit interpreted § 2255 so as to preclude Mr. Lee from utilizing it…..............23

        1.    Federal prisoners must have a meaningful opportunity to vindicate their
              Sixth Amendment trial rights………………………………………….24
              a.  *Section 2255 is the "initial-review collateral proceeding" for
                  federal prisoners..*……………………………………………...24
              b.  *Implementing the* Trevino *remedy in federal cases*………………….25

        2.    For Daniel Lee, section 2255 has proved an ineffective vehicle for
              obtaining judicial review of his IAC claim……………………………......27

i

II.   BECAUSE § 2255 HAS BEEN FOUND TO BE AN INADEQUATE AND
      INEFFECTIVE REMEDY UNDER THE CIRCUMSTANCES OF HIS CASE,
      MR. LEE IS ENTITLED UNDER § 2255'S SAVINGS CLAUSE TO TURN TO
      § 2241……...............................................................................................................30

      A.   The Seventh Circuit has found § 2241 jurisdiction in a range of circumstances
           where 28 U.S.C. § 2255 has proved ineffective to vindicate the denial of a
           constitutional right……………………………………………………........31

      B.   Because it has, under these circumstances, denied Mr. Lee his "one meaningful
           opportunity" to litigate his substantial claim of trial counsel's ineffectiveness,
           the § 2255 remedy has proved inadequate in this case……………………….......36

      C.   Resort to the savings clause in Mr. Lee's case would maintain the limited nature
           of the remedy……………………………………………………………………...39

III.  THE GOVERNMENT SUPPRESSED EVIDENCE ABOUT MR. LEE'S PRIOR
      CONVICTION THAT PREJUDICED HIS SENTENCING PROCEEDINGS…………41

      A.   The Government relied on aggravating evidence that Daniel Lee had committed
           a prior murder and escaped justice…………………………………………………...42

           1.    The Government's false allegations at the capital trial…………………..43

           2.    The truth……………………………………………………………………….45

      B.   The Government violated *Brady v. Maryland* by portraying Mr. Lee as having
           been guilty of a prior murder……………………………………………………...47

           1.    The suppressed evidence was favorable to Mr. Lee……………………..48

           2.    The evidence was suppressed by the Government………………………49

           3.    The suppressed evidence was material…………………………………...51

      C.   Mr. Lee's death sentence was obtained in violation of *Napue v. Illinois* and
           *Giglio v. United States*………………………………………………………………….56

           1.    The Wavra evidence was false and/or misleading………………..…….57

           2.    The Government knew or should have known the Wavra evidence
                 was false and/or misleading…………………………………………...57

           3.    The Wavra evidence was material…………………………………………58

ii

D.  Section 2255 has proved an ineffective vehicle for adjudicating Mr. Lee's misconduct claims…………………………………………………………………………59

IV. ANY INTERPRETATION OF §§ 2255(e) AND 2241 THAT WOULD PRESENT AN ABSOLUTE BAR TO MR. LEE'S CLAIMS WOULD RESULT IN AN UNCONSTITUTIONAL SUSPENSION OF THE WRIT………………………………63

CONCLUSION……………………………………………………………………………65

REQUEST FOR RELIEF……………………………………………………………………67

STATEMENT PURSUANT TO LOCAL CRIMINAL RULE 38-2…………………………..68

CERTIFICATE OF SERVICE………………………………………………………………69

iii

> *Still, the end result leaves me with the firm conviction that justice was not served in this particular case, solely with regard to the sentence of death imposed on Daniel Lewis Lee. Suffice it to say that, now, more than ever, I agree with my following statement, made in concluding that I was unable to grant Lee post-conviction relief under existing law:*
>
> *That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case.*

Letter of District Court Judge G. Thomas Eisele, Nov. 7, 2014 (quoting *United States v. Lee*, No. 4:97-CR-00243-GTE, 2008 U. S. Dist. LEXIS 109771, at *185 (E.D. Ark. Aug. 28, 2008)).[1]

> [*I*]*t is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of [a prior] murder, the outcome of the [capital] sentencing would have been different.*

District Court Judge Leon Holmes, *United States v. Lee*, No. 4:97-cr-00243-JLH, slip op. at 14 (E.D. Ark. Feb. 26, 2019).

## INTRODUCTION

There are two reasons Daniel Lee was sentenced to die when his far more culpable codefendant's life was spared. First, the jury was told that Mr. Lee had committed a prior murder and gotten away with it and second, a psychologist's test said he was a "psychopath" who would be a danger in the future. Both of these assertions are false. Two separate federal judges have found based on these two different grounds that Danny Lee's death sentence violates the Constitution and should be invalidated. Unfortunately, both judges also believed they were barred from granting relief because of structural problems in Mr. Lee's § 2255 proceedings. This Court has the power to consider these claims pursuant to § 2241 and ensure that Mr. Lee is not executed in the face of findings that his death sentence is unconstitutional.

Mr. Lee and his co-defendant Chevie Kehoe were jointly tried before the late Honorable

---

[1] *See* Exh. A (Letter of District Court Judge G. Thomas Eisele, November 7, 2014).

G. Thomas Eisele in the Eastern District of Arkansas in 1999 and convicted of participating in a

pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act,

commonly known as RICO. Although the jury rendered acquittals on numerous alleged

racketeering acts, it convicted them of the 1996 murders of William Mueller, his wife Nancy

Mueller, and her daughter Sarah Powell. From the outset, the Government recognized that Mr.

Kehoe was the instigator of the offense and the far more culpable actor. The RICO charges

alleged that Mr. Kehoe sought to create a white separatist organization. He was indicted as the

"leader" of this attempt, the "primary planner and decision maker" while Mr. Lee was his

subordinate (in the prosecutor's words at trial, his "faithful dog").[2] Mr. Kehoe was indicted for a

string of violent offenses, including two murders, the attempted murder of two police officers,

and an armed robbery, as well as for purchasing land for his "enterprise" and transporting stolen

goods; Mr. Lee was accused of assisting him in one offense in this purported enterprise, and he

was acquitted of it.[3] The guilt phase of the joint trial was largely about the white supremacist

beliefs held by Mr. Kehoe and his felonious family, with a constant focus on Chevie Kehoe's

acts and aspirations. This is no gloss by Lee's counsel: it was the case the FBI investigated and

the prosecution presented. In the words of the trial judge:

> All who review the record will recognize the unequal and disparate roles that
> Kehoe and Lee played in their horrific crime spree, which Kehoe directed and Lee
> joined intermittently. Kehoe recruited Lee. Kehoe was the charismatic leader; Lee
> the obedient follower. Lee "participated in the murder of the adults, *but would
> have no part in the killing of [8-year-old] Sarah Powell so Kehoe had done it
> alone*." There was no question that Kehoe was the more culpable of the two.[4]

---

[2] Tr. 6821.

[3] Mr. Lee was charged with assisting Mr. Kehoe in a bombing of the Spokane City Hall. The jury
ultimately acquitted both of them on that charge.

[4] Exh. A (Letter of District Court Judge G. Thomas Eisele, November 7, 2014) (citing a finding
by the Eighth Circuit in *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004) (emphasis added)).

When jurors returned a life verdict in Mr. Kehoe's case, everyone—including the victims' family members, the U.S. Attorney, the line prosecutors, the Department of Justice attorneys who were assisting in the prosecution, and the law enforcement agents who were working the case—agreed that Mr. Lee's case should also be resolved with a life sentence.[5] But the decision of the local U.S. Attorney was overruled by Main Justice in Washington, and the Government was forced to proceed to a penalty phase against Mr. Lee.[6]

Leading the Government's punishment phase case was prosecuting attorney Lane Liroff, a California prosecutor who was working as part of Main Justice's Capital Crimes Unit.[7] The centerpiece of Liroff's case for a death sentence was that Lee was a clinically-diagnosed "psychopath" who would be a future danger in prison if sentenced to life without possibility of release. To support this argument, prosecutor Liroff told the jury about a psychological test that the Government's expert had given Lee known as the Hare Psychopathy Checklist-Revised ("PCL-R"). According to the Government, the results "diagnosed" Mr. Lee as an incurable psychopath whose "condition" virtually guaranteed that he would be a danger to others in the

---

[5] *See* Doc. No. 824 (May 10, 1999 Transcript); Doc. No. 878 (June 29, 1999 Transcript).

[6] *See United States v. Lee*, 89 F. Supp. 2d 1017, 1032-35 (E.D. Ark. Mar. 21, 2000) (Memorandum Opinion and Order regarding Future Dangerousness and the Death Penalty Protocol), *rev'd*, 274 F.3d 485 (8th Cir. 2001).

[7] Mr. Liroff is no stranger to controversy. California courts vacated a first-degree murder conviction he secured in 1996 based on his failure to disclose exculpatory evidence, *see Pham v. Terhune*, No. C 02-1348-PJH, 2008 WL 787123 (N.D. Cal. Mar. 20, 2008), and he was named in a study on prosecutorial misconduct published by the Northern California Innocence Project in 2010. *See* Sue Dremann, '*Misconduct' Prosecutor Liroff defends his record* (last visited Sep. 24, 2019), <https://www.paloaltoonline.com/news/2010/10/20/misconduct-prosecutor-liroff-defends-his-record >. In 2010, fellow prosecutors and the California Government Attorneys Association went so far as to protest a potential commendation, pointing to a long history of questionable behavior including a month-long suspension for unethical actions. *See* Tracey Kaplan, *DA's retirement plaque exposes bitter rift* (last visited Sep. 24, 2019), <mercurynews.com/2010/12/0-7/das-retirement-plaque-exposes-bitter-rift/>.

3

future if not executed. Bolstering the purported accuracy of the test was a prior crime. Here the Government informed the jury that Danny Lee had committed a murder as a teenager, but that he had "gotten away" with it because the Oklahoma state prosecutors at the time gave him a "gift" by allowing him to plead to robbery. This was a powerful message to give to jurors at the penalty phase: Danny Lee got away with one murder, don't let it happen again.

The proceeding concluded with a perverse result: although the Government had proved during a months-long trial that Mr. Kehoe was the more culpable of the two men, both in the enterprise as a whole and in the capital offense, the jury spared his life, but sentenced Mr. Lee to die. Judge Eisele's uneasiness with the result in Mr. Lee's case was well founded. In the years since trial, the Government's guilt-phase case against Mr. Lee has begun to unravel,[8] and with the passage of time, the inequities of the disparate punishments meted out for Daniel Lee and his co-defendant have come into starker view. In fact, since his sentencing counsel for Mr. Lee have discovered that both the PCL-R evidence and the Government's allegation about a prior murder are false. The very Government expert who gave the PCL-R to Mr. Lee has disavowed its use and attested that it should never have been used in a capital case. Indeed, Mr. Lee remains the only person on federal death row whose sentence depended on the PCL-R. Mr. Lee's counsel have also learned that the prosecutors in Oklahoma never gave him a "gift"; in fact, the charge against him was ordered dismissed by a judge after an evidentiary hearing. Mr. Lee has continued to seek redress in the courts for these injustices but the Government has repeatedly relied on procedural obstacles to keep the federal courts from granting relief.

Mr. Lee now turns to this Court. Two distinct constitutional violations have been found

---

[8] For example, the Government's claim to the jury that a hair taken from a hat linked to the crime matched Mr. Lee was proven false by subsequent DNA testing. Exh. B (Serological Research Institute Mitochondrial DNA Report).

4

prejudicial by federal judges. Yet Mr. Lee faces imminent execution because the § 2255 statute has proved inadequate and ineffective to remedy those violations. In light of the unique circumstances present in his case, Daniel Lee asks this Court to exercise its jurisdiction under § 2241 and allow him to show that his death sentence, secured in violation of basic constitutional guarantees, cannot stand.

### ARGUMENT

Mr. Lee presents this Court with two distinct sets of claims, each cognizable under § 2241. In the pages that follow, he explains why he is entitled to relief on each. In Sections I & II, Mr. Lee sets out the relevant facts supporting his first legal issue, the Sixth Amendment violation. He shows how the PCL-R dominated the Government's case for future danger and for death, and how both his trial and his post-conviction counsel failed him on this key issue. He then demonstrates how the § 2255 statute has operated to preclude consideration of his Sixth Amendment claim, showing why, under these circumstances, he is entitled to rely on § 2241 as a vehicle for obtaining relief. Both the underlying merits of Mr. Lee's IAC claim and the lack of an opportunity to raise it are unusually clear in this case. The federal district court judge who presided over the trial found unequivocally that Mr. Lee likely would not have been sentenced to death had a proper challenge been made. And a reviewing judge of the Eighth Circuit strongly dissented from the denial of relief on the grounds that the reasoning of recent Supreme Court decisions compels review under these circumstances. Mr. Lee now seeks that review in this Court pursuant to 28 U.S.C. § 2241.

In Section III, Mr. Lee presents his claims regarding the false Oklahoma evidence, one pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and one under *Napue v. Illinois,* 360 U.S. 264 (1959), based on an intertwined set of facts. In this section, Mr. Lee first provides this Court

5

with the relevant factual background before discussing the merits of both the *Brady* and the *Napue* violations. Mr. Lee then explains why § 2241 appropriately allows for review of these claims. The need for relief here is also uniquely compelling: A district court judge explicitly found that had the suppressed evidence been "disclosed at trial…the outcome of [Mr. Lee's] sentencing would have been different." *United States v. Lee*, No. 4:97-cr-00243-JLH, slip op. at 14 (E.D. Ark. Feb. 26, 2019). However, Mr. Lee has no recourse for this misconduct violation in § 2255, where the Eighth Circuit has held that claims affecting only the death-sentencing portion of trial cannot be raised in a second or successive petition. This is true even where, as here, the claim's untimeliness is caused by the Government's continued suppression.

Daniel Lee thus presents this Court with two fatal errors, which two district judges already deemed prejudicial, but for which the § 2255 statute provides no avenue for relief.

## I.    MR. LEE IS ENTITLED TO § 2241 RELIEF BECAUSE HIS DEATH SENTENCE WAS BASED UPON A SIXTH AMENDMENT VIOLATION WHICH EVADED § 2255 REVIEW.

Mr. Lee's trial counsel failed to raise the available challenge to the PCL-R that would in all probability have resulted in its never having being presented to the jury; his initial post-conviction attorneys compounded that error by not properly raising that failure in collateral proceedings; and access to a newly announced available remedy for that Sixth Amendment violation was denied him under the § 2255 statute. Thus, a substantial, likely dispositive constitutional violation has evaded federal court review, through no fault of Mr. Lee's. As demonstrated below, § 2241 proceedings in this Court remain the sole bulwark against an unconstitutional execution.

**A.      The psychopathy/PCL-R evidence, which dominated the penalty phase at the 1999 trial, was neither scientific nor reliable.**

Mr. Lee's death sentence rests on a bogus "diagnosis" presented to the jury as scientific fact. The PCL-R, central to the Government's case for the "future dangerousness" aggravator and thus for death, should never have been used to establish any individual's purported future danger in prison or suitability for execution.

The PCL-R was administered to Daniel Lee by the Government's psychologist and expert witness, Dr. Thomas Ryan. Dr. Ryan wrote a report, which was provided to defense counsel, stating that based on Mr. Lee's score on the PCL-R, he was able to label him (in medical terms) a "psychopath" who would pose a future danger in prison. The Government did not present Dr. Ryan's expert opinion in its case-in-chief. Instead, it elicited the facts in full during its cross-examination of the defense expert, Dr. Mark Cunningham, and effectively used him to advance the Government's theory that Dr. Ryan's clinical diagnosis of Mr. Lee as a "psychopath" revealed that, at his core, Mr. Lee was and would remain a violent and dangerous person if allowed to live.

Indeed, nearly the entire prosecution case for future dangerousness was presented through the defense expert. [9] DOJ Prosecutor Lane Liroff first asked Dr. Cunningham to explain that

---

[9] As the presiding judge noted after the trial, in hindsight:

> [It was] now apparent from the Government's opening statement and the brevity of its own direct case on the issue of future dangerousness that the Government intended from the beginning to make its most compelling showing of future dangerousness through its cross-examination of Dr. Cunningham and its "rebuttal" testimony of Dr. Ryan.

*United States v. Lee*, 89 F. Supp. 2d 1017, 1031 (E.D. Ark. Mar. 21, 2000) (Memorandum Opinion and Order Regarding Future Dangerousness and the Death Penalty Protocol), *rev'd on other grounds*, 274 F.3d 485 (8th Cir. 2001). *See also id*. at 1019-20, 1023 (noting that "the Government's case-in-chief was brief," that the "Government's cross-examination of Dr. Cunningham was extensive" and that the Government "focused almost exclusively on future dangerousness in its cross-examination of Dr. Cunningham.").

"psychopathy" is an accepted term in the field of forensic psychology and "psychopath" an acknowledged psychological label. Tr. 7754. He then had the expert testify in depth about the PCL-R itself: how it is scored, how its various domains map onto the characteristics of a psychopath (lack of remorse, impulsivity, poor behavioral control); and how the PCL-R is considered "the standard for the assessment of criminal psychopathy in North America." Tr. 7754, 7796, 7804-06, 7811.

The prosecution, still through Dr. Cunningham, then gave the jury a comprehensive picture of what the PCL-R is and how it is used to reach a clinical diagnosis of psychopathy. The jury heard the defense expert explain the PCL-R in scientific terms and were told that the test could determine through scores across multiple domains whether a person had capability for remorse or the ability to control his behavior in the future. Tr. 7804-06. By using the defense expert, the Government not only accomplished the work of its own expert but also added the aura of dispassionate infallibility that scientific evidence presents. *See e.g. Satterwhite v. Texas,* 486 U.S. 249, 259 (1988). Significantly, the jurors learned that individuals scoring high enough on the PCL-R to be designated as psychopaths were substantially more likely to commit future acts of violence than the general population – i.e., that the PCL-R was an accurate predictor of future dangerousness. Tr. 7809. Perhaps most damning for a prisoner on trial for his life, they were told that those who score high enough on the PCL-R to be diagnosed as "[p]sychopaths do not appear amenable to treatment." Tr. 7819.

Then the Government stuck the diagnosis to Daniel Lee. The prosecutor extensively cross-examined the expert about various alleged acts and incidents in Mr. Lee's life that purportedly corresponded to the domains of the PCL-R, including impulsivity and acts of violence. *See*, *e.g.,* Tr. 7750-53; 7777-83; 7788-90; 7809-10. Ultimately, Dr. Cunningham was

8

asked to testify that that Dr. Ryan, the Government's expert, had given Mr. Lee the PCL-R and determined that he was a psychopath:

> He clearly identified him by his scoring of the PCL-R as falling into the psychopathy range based on a single standard error of measurement.

Tr. 7827.

Having led the defense witness in detail through the mechanics of the psychopathy test, the credentials of the expert who gave it, and the poor prognosis for Defendant Danny Lee, the prosecutor had little left to do on this when his own expert took the stand on rebuttal, though he was sure to have Dr. Ryan remind the jury at the end of his testimony that the PCL-R results were valid and accurate. Tr. 7949-50.

However, contrary to what the jury was told, these conclusions were unfounded. When properly challenged in another capital trial shortly thereafter, Dr. Ryan disavowed all use of the PCL-R to prove future danger in prison and retracted his reliance on it in capital cases. As discussed *infra*, had defense counsel raised the challenges that were standard practice at the time of Mr. Lee's trial, Dr. Ryan would have abandoned its use to prove Daniel Lee's future dangerousness, and Dr. Cunningham could not have been used to support it. The jury would therefore not have heard the spurious evidence and, in the words of the trial court, it is "very questionable" whether Mr. Lee would have been sentenced to death. *Lee*, 89 F. Supp. 2d at 1031.

**B.      Trial counsel failed to meet the prevailing standard at the time for challenging the PCL-R.**

Although the challenge was available to them at the time of trial, Lee's counsel unreasonably failed to investigate and then contest the use of the PCL-R against him. *See Strickland v. Washington*, 466 U.S. 668 (1984) (ineffectiveness test is comprised of two prongs, one establishing counsel's deficient performance and the other the prejudice caused by their acts

or omissions); *Wiggins v. Smith*, 539 U.S. 510 (2003) (deficient sentencing performance due to unreasonable failures to investigate). The lawyers were on notice that the Government might introduce psychopathy evidence in the case. They knew Dr. Thomas Ryan had administered the PCL-R to Mr. Lee. They were aware of his opinion that their client's score on that instrument indicated that he would be violent in prison, a devastating conclusion for a capital defendant. They shared those results and opinion with their own expert, Dr. Mark Cunningham. But they did not investigate or prepare. They did not question the probity of the PCL-R or examine whether it could in fact reliably predict a defendant's future dangerousness in prison. This failure proved fatal to their client.[10]

Had they performed appropriately, trial counsel would have found a readily available challenge that would have prevented the jury from hearing anything about Dr. Ryan's PCL-R testing and diagnosis. Scientific studies were being conducted as early as 1997 examining whether there was any relationship between psychopathy scores and the incidence of violent behavior by incarcerated men. *None of these studies reported a scientifically valid relationship.* The sheer absence of any scholarly support for its ability to prove future danger in prison spoke volumes.  In light of the lack of proof the scientific literature afforded at the time, prominent experts condemned testimony pointing to such a correlation. As one leading expert on the PCL-R stated:

> [I]n 1999 a claim that a high PCL-R score indicated a high risk of future violence
> in federal prison was not only made in the absence of any empirical support, it
> actually contradicted the published, available scientific evidence on the subject at
> that time. Under these circumstances, at the time of Mr. Lee's 1999 trial, an
> expert could not ethically and responsibly have asserted that a high PCL-R score

---

[10] The only objection that trial counsel raised to the psychopathy and future dangerousness testimony was a weak evidentiary one -- that the Government's elicitation of that testimony during its cross-examination of Dr. Cunningham and Dr. Ryan's rebuttal testimony "exceeded the scope" of Dr. Cunningham's direct examination. *Lee,* 89 F. Supp. 2d at 1021-32; Tr. 7659, 7746, 7755, 7758.

10

was predictive of whether an inmate would be violent in a U.S. prison.

Exh. C (Declaration of John F. Edens, Ph.D.) at ¶7. As the then President of the American

Psychological Association has put it:

> Dr. Ryan's reliance on the PCL-R to predict future dangerousness in prison was unsupported by empirical evidence, did not present an appropriate application of generally accepted ethical principles applicable to psychologists, and violated the generally accepted standards of forensic psychological practice.

Exh. D (Declaration of Donald N. Bersoff Ph.D., J.D.) at ¶¶ 12-16. In other words, the PCL-R

was not designed, nor scientifically validated, to do what the prosecution at this trial, *without any*

*defense objection,* claimed that it could – which was predict a capital defendant's future

dangerousness in prison.

At the time of Mr. Lee's trial, it was standard practice by the defense bar to challenge the

use of the PCL-R. *See e.g. United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000) (noting

that Barnette filed *in limine* challenge to reliability of PCL-R prior to his 1998 trial); *United*

*States v. Bullock*, No. 3:98-cr-00150-JRS-1 (E.D. Va. Jan. 14, 1999) at Dkt. No. 190

(highlighting challenge to PCL-R based on unreliability of its use). Yet instead of disputing the

use of the PCL-R in Mr. Lee's case, the defense essentially capitulated to it. They did not

examine the uses to which the test could validly be put or even research the relevant literature.

They did not question whether there really was any "science" behind the prosecutor's claim that

it proved Danny Lee would be a danger if kept alive in prison. They therefore did not file a

motion *in limine* on this basis. They did not object when the prosecution used its own defense

expert witness to argue that the purported "psychopathy diagnosis" proved their client would be

a future danger. They neglected to do any of this despite the power of the future danger

aggravator in a capital case and of expert opinion in any case. Their sole objection to the

questioning of Dr. Cunningham about the PCL-R was on the ground that the Government's cross

11

exceeded the scope of the direct.[11] This was deficient performance pursuant to *Strickland*.

### C.     Trial counsel's deficient performance was prejudicial.

This omission proved costly to Mr. Lee. Had defense counsel disputed the test's probity

and reliability and raised the issue pretrial, the jury would never have heard the damning PCL-R

evidence. It would have been excluded from the case because Dr. Ryan, in response, would have

withdrawn his opinion on the matter entirely. This is not a matter of speculation; we know this

based on Dr. Ryan's actions and testimony in two other federal capital proceedings from the

same period: *United States v. Haynes*, No. 8:98-cr-00520-PJM-1 (D. Md.), and *United States v.*

*Stitt,* No. 2:98-cr-00047-RAJ-RJK-1 (E.D. Va.).[12]

### 1.     *Haynes* and *Stitt*: What could have been done in *Lee*

The *Haynes* case was tried in the District of Maryland in May of 2000. Dr. Ryan was

retained by the Government to perform a risk assessment of capital defendant Willis Haynes

using the PCL-R and to give expert testimony about Haynes's future dangerousness based on his

psychopathy score (the same purpose for which it was used in *Lee*). After receiving Dr. Ryan's

pre-trial report, defense counsel moved to exclude any expert testimony regarding the PCL-R.

---

[11] The trial court did not strike the testimony. However, when this same point was raised by the defense in a motion for new trial, it agreed and vacated Lee's death sentence. The Eighth Circuit reversed that ruling, but, significant for this action, it did so on the explicit understanding that *the PCL-R was in fact probative of future danger*. *See United States v. Lee*, 274 F.3d 485, 495 (8th Cir. 2001) (stating that any error in admitting the psychopathy testimony did not result in "unfair prejudice" precisely because "Lee's potential psychopathy was probative of his future dangerousness,"). As noted above, trial counsel's evidentiary objection accepted as accurate the predicate fact that a psychopathy score was probative of future dangerousness in prison, when, in fact, the *opposite* was true. Defense counsel's failure to investigate the instrument thus prejudiced their client on appeal as well.

[12] *Stitt v. United States*, 369 F. Supp. 2d 679, 699-700 (E.D. Va. 2005). Dr. Ryan's reversal of his prior views on this matter came to light as part of the proceedings in another federal capital case, *United States v. Willis Haynes,* No. 8:98-cr-00520-PJM-1 (D. Md.), which was tried in the District of Maryland in the year following the Lee case. *See infra*.

Trial counsel argued that such evidence was unscientific and not probative of future dangerousness in prison. The defense motion was supported by five affidavits from prominent clinical and forensic psychologists who attested that there was no scientific basis for claiming that a high PCL-R score supported a future dangerousness determination for a person who would remain in prison, and that Dr. Ryan's claims to the contrary violated professional standards of ethics for psychologists.[13] After reviewing the defense challenge, Dr. Ryan voluntarily withdrew his expert report, and he did not testify regarding the PCL-R or psychopathy at the trial.

After the *Haynes* case, Dr. Ryan provided a sworn declaration as part of the § 2255 proceedings in *United States v. Stitt*. Most significantly here, the *Stitt* case had been tried in the Eastern District of Virginia in 1998, the year *before* Mr. Lee's trial. Dr. Ryan was the Government's expert witness at that 1998 trial; he had administered the PCL-R to the defendant and testified about Mr. Stitt's future dangerousness based on his psychopathy score. At the subsequent § 2255 proceeding, Dr. Ryan repudiated the expert testimony he gave at the trial in 1998. He disavowed the notion that a capital defendant's PCL-R score is predictive of his future dangerousness in prison. As he explained, delving into the issue after the *Haynes* lawyers alerted him to the problems with the PCL-R, he determined that he had to withdraw his opinion.

> The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes*. In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. *I then determined that I would withdraw my report. As a result, no testimony about psychopathy or the PCL-R was introduced at that*

---

[13] Those affidavits are attached as Exh. E (Affidavits submitted in *United States v. Haynes*).

*trial.*

Exh. F (Declaration of Thomas V. Ryan, Ph.D.) (hereafter "Ryan Dec.") at ¶ 6 (emphasis added).

Dr. Ryan made clear that this same evidence was available at the time of Stitt's trial in 1998 and Stitt's trial counsel could have confronted him with it at that time:

> Although the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial, no such challenge was brought by defense counsel. The challenge in *Haynes* rested on the fact that the existing scientific literature did not demonstrate a relationship between PCL-R scores and prison violence sufficient to conclude that a high scorer would likely be dangerous in prison. The *Haynes* motion was filed approximately 18 months after the trial in *Stitt.*

Ryan Dec. at ¶7.[14]

If a persuasive challenge was feasible as of 1998, it was available in 1999 as well. Had Daniel Lee's trial counsel investigated and made the same objection to the use of the PCL-R to prove the future danger aggravator, Dr. Ryan would have come to the same conclusion that he did in *Haynes* and he would have withdrawn his report and opinions.[15] As Dr. Ryan's findings provided the sole basis for the Government's elicitation of the psychopathy evidence during Dr. Cunningham's cross-examination, withdrawal of his report and opinion, as in *Haynes,* would have resulted in a very different penalty phase for Mr. Lee – one without any evidence or

---

[14] S*ee also* Ryan Dec. at ¶8 ("It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.").

[15] Dr. Ryan has further stated that having been alerted to the fact that his prior conclusions lacked scientific basis, he no longer relies on the PCL-R to assess future dangerousness in capital cases:

> Since withdrawing my report in the *Haynes* case, I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies.

Ryan Dec at ¶10.

14

argument that medical experts had determined he was a "psychopath" who would be an uncontrollable danger even if incarcerated for the rest of his life.

**2. But for trial counsel's deficient performance, there is a reasonable probability that the outcome of the sentencing proceeding would have been different.**

The trial judge's conclusion that without the PCL-R evidence Daniel Lee would likely not have been sentenced to death, *Lee,* 89 F. Supp. 2d. at 1031, is amply supported by the trial record. The prosecutor relied heavily on the PCL-R throughout the penalty phase. He told the jury in opening that his

> psychological profile [ ] in the end will convince you that as he sits here today and will be in the future, Mr. Lee is a dangerous man. *That, ladies and gentlemen, is a lot of what this trial will be about.*

Tr. 7379 (emphasis added). The use of the term "psychological profile" here was not colloquial. Throughout the trial, the Government asked the jurors to think of the evidence of psychopathy in scientific, medical terms: "In the end, what the evidence that will be presented will establish is that *Mr. Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use*." Tr. 7381 (emphasis added). The Government also explicitly argued that the PCL-R test established Mr. Lee's future dangerousness: "We will prove in this case to you that Mr. Lee, *because of his psychological profile*, who he is and who he will be for years to come, is dangerous and will continue to be dangerous." Tr. 7383 (emphasis added).[16]

Significantly, the prosecution urged the jury from the outset to filter all of the aggravating evidence it would hear through the "diagnosis" of psychopathy. It offered evidence of Mr. Lee's

---

[16] *See also* Tr. 7381 ("[E]ven if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous."); Tr. 7382 ("Mr. Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person."); Tr. 7379 ("And during this trial then we balance his life, those he has hurt or will hurt in the future[.]").

alleged prior bad acts[17] as not merely of historical significance, but also as proof that the man

before them was a psychopath and that this was consistent with someone of this profile:

> The evidence that will be presented in this trial is going to help you understand
> that Mr. Lee, this man who sits right here in this courtroom, is a violent and
> dangerous man. He thrives on this stuff. *That is part of his profile*. Even if you
> sent him to prison for the rest of his life, he will be a threat for a long, long time.

Tr. 7381 (emphasis added). This point was hammered home in closing, as the jury was told to

view all of Mr. Lee's purported "prior bad acts" as being symptomatic of, and consistent with, a

diagnosis of psychopathy:

> Can't we all now, with the benefit of hindsight, look at this and see, my God, look
> at what the *diagnosis* was. … This man is at risk to re-offend violently.

Tr. 7968 (emphasis added).

It is not difficult to see the effect this presentation would have had on a sentencing jury.

As a preliminary matter, the PCL-R was presented as hard, "scientific" evidence. If any juror

found "future danger" a vague or difficult concept, the predictive test made it concrete.

Moreover, this was the only aggravating evidence in the case to come from an expert, giving the

imprimatur of science and reliability to a future dangerousness determination.[18] The substantial

---

[17] Compounding this problem was an especially damaging one: the prosecution told the jury that one of those prior acts was a murder. This was a specious claim and the Government knew it. *See infra.*

[18] The Supreme Court has repeatedly noted the heightened role experts play for jurors in assessing future danger.

> [The effect on the jurors] was heightened due to the source of the testimony. Dr. Quijano
> took the stand as a medical expert bearing the court's imprimatur. The jury learned at the
> outset of his testimony that he held a doctorate in clinical psychology, had conducted
> evaluations in some 70 capital murder cases. . . . Reasonable jurors might well have
> valued his opinion concerning the central question before them. See *Satterwhite v. Texas*,
> 486 U.S. 249, 259, 108 S. Ct. 1792, 100 L.Ed.2d 284 (1988) (testimony from "a medical
> doctor specializing in psychiatry" on the question of future dangerousness may have
> influenced the sentencing jury)).

amount of time the Government spent questioning that expert about the PCL-R underscored its essential role in the case for death.[19]

The persuasive power of the test and the attendant psychological label have led courts in federal capital prosecutions to warn of its prejudicial effect. *See, e.g., Barnette*, 211 F.3d at 811, 825 (4th Cir. 2000) (expert testimony that PCL-R score predicted defendant's future danger in prison "was as damning as it could be"); *Stitt v. United States,* 369 F. Supp. 2d 679, 699-700 (E.D. Va. 2005) (court finds it "clear that the jury might have reached a different verdict" had Dr. Ryan's psychopathy evidence not been admitted);[20] *United States v. Sampson*, 335 F. Supp. 2d 166, 220 & 222 n.27 (D. Mass. 2004) (prohibiting Government expert from using term "psychopath" in federal capital case, noting likely prejudicial effect even where instruction given, as well as the weight juries give to expert testimony on future dangerousness).

Contrasting the Lee penalty phase with that of his codefendant is also telling. Chevie Kehoe was known for a far more aggravated history of violence than could be claimed for Danny Lee. Mr. Kehoe had a string of charged murders and attempted murders behind him, including those of confederates no longer trusted, and had previously burglarized the Muellers' home. Among the worst of his crimes was the attempted murder of two Wilmington, Ohio police officers during a routine traffic stop, where Kehoe shot thirty-three rounds at the officers, firing directly at them in their cars, and then engaging in another shoot-out during a subsequent

---

*Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 777 (2017). *See also id.* at 776 ("Here was hard statistical evidence -- from an expert -- to guide an otherwise speculative inquiry.") and *id.* at 777 (evidence can be particularly damaging to jury when given through the defense's own expert).

[19] *Lee,* 89 F. Supp. 2d. at 1019, 1020 (Government's case-in-chief "brief;" its examination of the defense expert, "extensive").

[20] The district court ultimately granted relief in *Stitt* on a different error.

chase.[21] Despite the litany of his prior violent acts, [22] including against law enforcement, the jury did *not* find that he would be a danger in the future against prison guards or anyone else. A key difference was that the Government never used expert testimony or a scientific basis to claim that Mr. Kehoe was an unredeemable psychopath.

In the end, any question over whether the PCL-R evidence was central to the Lee case may have been answered by the trial judge himself, who found it "very questionable whether the jury would have given Defendant Lee the death penalty" without it. *Lee*, 89 F. Supp. 2d at 1031.[23] The same judge presided over both the Lee and Kehoe joint guilt phase trial and their individual sentencing proceedings (as well as Mr. Lee's post-conviction challenge) and was thus particularly well suited to assess the evidence across the board.

Given the focus of the prosecution; the influence of scientific, expert testimony on jurors; the different sentences given to the two co-defendants; the explicit finding of the presiding judge; and the concurring views of other courts on the power of this evidence, there can be little doubt that Danny Lee was prejudiced by the use of the PCL-R against him. But for the introduction of this evidence, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

---

[21] *United States v. Kehoe,* 310 F.3d 579, 585 (8th Cir. 2002).

[22] The prosecution's evidence was also that Kehoe killed young Sarah Powell alone.

[23] In a post-trial order, the district court judge carefully analyzed the role of the PCL-R at Danny Lee's sentencing trial. His analysis, however, began from an assumption that the psychopathy evidence was *valid* since no evidence or argument to the contrary had been presented to him. The court could thus speak to its powerful effect, but not to the impropriety of its very use to begin with. This avoidable error followed the case into the Eighth Circuit. *See Lee*, 274 F.3d at 495.

### D.    Mr. Lee's court-appointed § 2255 counsel's ineffectiveness denied him the opportunity to remedy the trial error.

In light of the above, Daniel Lee would have had a very strong claim that his trial lawyers' failures to challenge the use of the PCL-R against him constituted ineffective assistance of counsel under *Strickland.* The proper vehicle for addressing trial counsel's ineffectiveness in federal cases is litigation pursuant to 28 U.S.C. § 2255. *See Massaro v. United States*, 538 U.S. 500, 505 (2003) (holding that federal prisoners should ordinarily raise ineffective assistance of counsel claims in a motion pursuant to § 2255 because it is "the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial."). Unfortunately for Mr. Lee, the representation provided him by his court-appointed § 2255 counsel on this key claim was also woefully deficient. He was deprived of his one and only[24] meaningful opportunity for review and redress of his trial counsel's failure by habeas counsel's subsequent errors.

### 1.    Post-conviction counsel bungled the litigation.

Habeas counsel's failure to comply with basic § 2255 obligations cannot be disputed. Despite clear circuit rules establishing how § 2255 pleadings should be filed, Mr. Lee's counsel failed to present the district court with evidence available to establish the Sixth Amendment claim. This was not a strategic decision: they knew there was evidence available, including sworn statements from Dr. Ryan that could prove the claim. *See* Declarations of Laurence Komp, Esq., and David A. Ruhnke, Esq., at ¶¶10-11, attached as Exhs. G & H. They were aware that national experts had found no link between a high PCL-R score and the likelihood of future

---

[24] Where state petitioners have two opportunities to litigate post-conviction claims – first in state habeas, and then in federal – § 2255 litigants are provided only the single federal forum for collateral review.

violence in prison. They knew of the *Haynes in limine* motion laying out the various reasons for excluding any evidence suggesting such a connection. *Id.* at ¶ 12. (The motion "provided detailed factual, scientific and legal analyses as to why the PCL-R could not reliably predict future dangerousness in prison."). Despite the fact that counsel "had reviewed the materials containing the [*in limine*] motion filed in *Haynes* [they] pled none of its detailed factual information in support of the claim." *Id.* at ¶ 15. They failed to reach out to experts to obtain information, affidavits, or testimony. *Id.* at ¶ 15. Although leading figures in the field of forensic psychology were available to testify to these issues – and to the fact that the same arguments were available to trial counsel in 1999 and earlier – collateral counsel failed to present them to the court in a timely manner.

This omission was not a reasoned decision but was based on a misunderstanding of the law. As both counsel later acknowledged:

> There was no strategic or tactical rationale for not asserting the readily available facts in support of [] the claim [] that the "Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants;" nor was there a strategic or tactical rationale for not obtaining and appending supporting documentation to our Motion from any of the forensic psychologists who had demonstrated their willingness to challenge Dr. Ryan's particular use of the PCL-R, based on the fact that such use was scientifically unsupportable, and violated professional and ethical standards. *We thought that by pleading the issue we had met the requirements of § 2255.*

*Id.* at ¶ 17 (emphasis added).

### 2.    § 2255 counsel's errors led the court to make a procedural ruling foreclosing full merits review of the IAC claim.

After the § 2255 motion was denied, post-conviction counsel attempted to present the supporting evidence for the Sixth Amendment claim by way of a reconsideration motion filed pursuant to Federal Rule of Civil Procedure 59(e). The district court made painfully clear, however, that it was foreclosed from considering Mr. Lee's claim at this point because of habeas

counsel's failure to follow proper procedure. As the district court held, and the Court of Appeals subsequently agreed, in only belatedly presenting the evidence in a post-judgment reconsideration motion, collateral counsel had failed to comply with a settled Eighth Circuit procedural rule barring the use of Rule 59(e) motions "to introduce new evidence which could have been offered or raised prior to the entry of judgment." *United States v. Lee*, 792 F.3d 1021, 1025 (8th Cir. 2015) (quoting *United States v. Metro. St. Louis Sewer Dist.*, 4404 F.3d 930, 934 (8th Cir. 2006)). This procedural failure left the judge with no choice but to dismiss the claim.

The district court's considerable frustration is apparent from its ruling. It admonished counsel repeatedly for "fail[ing] to adequately present facts sufficient to support [the] ineffective assistance of counsel claims," *Lee*, 2010 U.S. Dist. LEXIS 145997 at *3 and for having "failed" in their "obligation" to demonstrate the need for a hearing. *Id.* at *12-*13. A good part of its opinion was spent cataloguing the ways in which habeas counsel's representation on this issue was deficient:

- Counsel failed to properly "specify all the grounds for relief available … and state the facts supporting each ground" as the law required. *Id*. at *7.

- Counsel failed "to provide sufficient information…to permit the Court to evaluate both the performance and prejudice prongs of the…ineffective assistance standard." *Id*. at *10-11.

- Counsel's "conclusory statement" that the Government's expert, subsequent to Mr. Lee's trial, had "stopped using the PCL-R to evaluate future dangerousness" was "not sufficient to place the Court on notice of the full argument" later urged in the 59(e) motion. *Id*.

Lamenting that counsel were unaware of their obligations under the Rules Governing § 2255 Proceedings to provide supporting evidence, the court noted the many chances it had given them to establish the Sixth Amendment claim. *Id*. at *5 ("The Court was purposefully lenient in permitting the parties to expand the record as they wished before taking up the merits of [the]

21

motion," even permitting habeas counsel to conduct "any and all" requested discovery); *id*. at \*6 (counsel failed to act when the court gave them "one final opportunity" to submit "additional legal authority" or "argument in support of the grounds for relief" then pending); *id.* at \*11-\*12 (habeas counsel were "on notice of the law and pleading requirements for § 2255 motions," and the court "specifically advised that it would determine based on the submissions whether an evidentiary hearing was required."); *id*. at \*12 ("Finally, before ruling, the Court provided Petitioner with yet another opportunity to submit anything he wished in support of his Petition."); *see also id.* at \*17 (counsel "offers no explanation" as to why the documentation was not submitted until the Rule 59 (e) motion). Rarely has a court commented so directly on the failures of collateral counsel.

All the district court could do at the Rule 59 stage was castigate counsel and enter final judgment denying relief. Judge Eisele, who presided over both Mr. Lee's capital trial and his § 2255 proceedings, expressed bafflement as to why habeas counsel had failed to timely provide key evidence regarding the PCL-R claim during the § 2255 proceeding:

> Petitioner offers no explanation for why such affidavits or other supporting information were not provided to the Court before it ruled on his original motion for § 2255 relief. Had they been, the Court might have determined that an evidentiary hearing was required. *However, the Court is foreclosed by existing legal principles from considering the information now*, absent permission and direction from the Eighth Circuit to do so.

*United States v. Lee*, No. 4:06-CV-1608-GTE, 2010 U.S. Dist. LEXIS 145997 at \*14-15 (E.D. Ark. Dec. 22, 2010) (order denying motion for reconsideration) (emphasis added).

22

**E.      The Supreme Court has now crafted a remedy for prisoners whose post-conviction counsel bungled a substantial ineffectiveness claim, but the Eighth Circuit interpreted § 2255 so as to preclude Mr. Lee from utilizing it.**

However, shortly after Mr. Lee's § 2255 proceedings were completed, the Supreme Court made a narrow but significant change in the law regarding the failures of post-conviction counsel. In *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court held that a habeas petitioner must receive "a meaningful opportunity to present a claim of ineffective assistance of trial counsel" in an initial-review collateral proceeding. *Trevino*, 133 S. Ct. at 1921. Driving these holdings was a fundamental concern with a defendant's Sixth Amendment right to the effective assistance of counsel at trial. *Martinez*, 566 U.S. at 12 (right to effective counsel "bedrock principle," "foundation" of adversary system). When that right has been denied, the forum in which a defendant may seek relief is an "initial-review collateral proceeding," as it "provide[s] the first occasion to raise a claim of ineffective assistance [of trial counsel]." *Id.* at 8. The Court reasoned that because the right to effective trial counsel is fundamental, the initial-review collateral proceeding must allow for "meaningful review of a claim of ineffective assistance of trial counsel." *Trevino*, 569 U.S. at 425.

The *Martinez* Court ruled that if that "initial review" proceeding is itself "undertaken with ineffective counsel," the right to effective trial counsel will not be vindicated. *Martinez*, 566 U.S. at 14. Absent an equitable remedy to excuse the most serious errors of habeas counsel, "a lawyer's failure to raise an ineffective-assistance-of-trial-counsel claim during initial-review collateral proceedings could . . . deprive a defendant of any review of that claim at all." *Trevino*, 569 U.S at 423. The Court therefore developed guidelines for determining how the *Martinez/Trevino* rule would operate. A post-conviction movant could gain review of his otherwise forfeited claim if he could meet five requirements – (1) the issue was procedurally

23

barred from review in an initial-review proceeding; (2) the issue concerned a Sixth Amendment claim; (3) the claim was "substantial;" (4) the procedural ruling was attributable to the acts or omissions of collateral counsel; and (5) collateral counsel was ineffective under the standards of *Strickland*. *Martinez* and *Trevino* produced a sea change in the law and practice, allowing for the first time for a challenge, under limited circumstances, to the representation afforded by counsel in an initial-review collateral proceeding.

### 1.    Federal prisoners must have a meaningful opportunity to vindicate their Sixth Amendment trial rights.

These five requirements were all met in Mr. Lee's case. *Trevino*'s principles are no less applicable in federal cases, but the Eighth Circuit's interpretation of the § 2255 process denied Mr. Lee any chance to give them effect.

### a.    Section 2255 is the "initial-review collateral proceeding" for federal prisoners.

There is no question that a § 2255 is an initial-review collateral proceeding. It is the first (and only) time a federal prisoner can challenge his conviction or sentence based on evidence outside his trial record, and thus his first opportunity to allege violations of his rights based on the conduct of his counsel or the prosecution. *See Massaro v. United States*, 538 U.S. 500, 504-507 (2003) (allegations of trial counsel ineffective assistance best raised in § 2255 motion); *Trevino,* 569 U.S. at 428 (citing *Massaro* for proposition that initial consideration of ineffectiveness claims should occur in collateral review). If the § 2255 proceeding is undertaken with ineffective counsel, a federal prisoner may be deprived of an opportunity, in contravention of *Martinez* and *Trevino*, to have a court properly consider whether his Sixth Amendment trial right was violated. Indeed, if § 2255 counsel is ineffective in presenting such a claim, counsel's errors "could . . . deprive a defendant of any review of that claim at all."

24

While the two Supreme Court decisions dealt with state court systems, the federal collateral process serves the identical function. Both state and federal prisoners face the same potential harm *Martinez* and *Trevino* identified: that post-conviction counsel's errors at an initial-review collateral proceeding might forfeit proper consideration of a substantial IAC claim. *See Ramirez v. United States,* 799 F.3d 845, 853 (7th Cir. 2015) ("the situation of a federal petitioner is the same as the one the Court described in *Trevino*: as a practical matter, the first opportunity to present a claim of ineffective assistance of trial or direct appellate counsel is almost always on collateral review, in a motion under section 2255"); *id.* at 854  ("We see no reason to distinguish between actions at the state level that result in procedural default and the consequent loss of a chance for federal review, and actions at the federal level that similarly lead to a procedural default that forfeits appellate review.");[25] *United States v. Sheppard*, 742 Fed. Appx. 599 (3rd Cir. 2018) (discussing *Martinez* issues occurring in § 2255 proceedings); *Cano v. Warden USP - Terre Haute*, No. 2:17-cv-00441-JMS-MJD, 2018 WL 3389746 (S.D. Ind. July 12, 2018).

### b.      Implementing the **Trevino** *remedy in federal cases*

That federal prisoners on initial collateral review may rely on *Trevino* follows from the language and holding of the case itself; what mechanism is available for giving effect to that remedy presents a more challenging question. Two circuits have suggested that in a case where § 2255 proceedings have been completed, a Rule 60(b) motion is appropriate. *See Ramirez,* 799

---

[25] Any distinction about who is entitled to the remedy should in fact favor federal prisoners because application of the remedy in § 2255 proceedings requires no federal intrusion into state court judgments. *See Ramirez*, 799 F.3d at 854 ("[I]f review were to be more restricted on either the state or federal side, federalism concerns suggest that it would be the state side."). *See also Lee*, 811 F.3d at 273 n.1 (Kelly, J., dissenting from denial of rehearing) ("It may even be less problematic to excuse procedural defaults in federal post-conviction proceedings, since doing so does not implicate concerns about thwarting the states' interests in the finality of their judicial processes."); *see also id.* (noting that the procedural rule at issue in Mr. Lee's § 2255 proceeding was "a judicially-created federal one. If we were to excuse it, the only framework of procedural rules we would impinge on is our own, not another sovereign's.").

F. 3d at 849 (motion was "not a disguised second or successive motion under section 2255.…Ramirez is not trying to present a new reason why he should be relieved of either his conviction or his sentence, as provided in 28 U.S.C. § 2255(a). He is instead trying to reopen his existing section 2255 proceeding and overcome a procedural barrier to its adjudication."); *United States v. Sheppard*, 742 Fed. Appx. at 602 (*Martinez* claim arising after federal prisoner's original § 2255 proceedings have concluded may be pursued through Rule 60(b) motion to reopen judgment).

The *Ramirez* case is particularly instructive here. In that case, movant's § 2255 counsel – like Mr. Lee's – raised an IAC claim that trial counsel was ineffective for not presenting state court records that would have reduced his sentence. *Ramirez*, 499 F. 3d at 849-50. Section 2255 counsel, however, *also* failed to proffer the same records and the § 2255 motion was denied. *See Ramirez v. United States*, No. 11-cv-719-JPG, 2016 U.S. Dist. LEXIS 34656 at *4 (S.D. Ill. Mar. 17, 2016) (holding that merits of IAC claim could not be reached because movant "failed to attach the underlying records").[26]

After *Martinez* and *Trevino* were decided, Mr. Ramirez filed a pro se Rule 60(b) motion arguing that § 2255 counsel's ineffectiveness precluded him from receiving a proper merits determination of his IAC claim. *Ramirez*, 799 F.3d at 849. The district court denied the motion, but the Seventh Circuit reversed, holding that Mr. Ramirez was entitled to re-open his § 2255 proceeding and have his IAC claim adjudicated on a full record. It observed that although § 2255 counsel had properly "sought to remedy [trial counsel's] failures in a motion under section 2255,

---

[26] *See also Ramirez*, 799 F.3d at 849 ("The district judge denied the [§ 2255] motion … because, he wrote, Ramirez (still) had not produced any documents to show that he had been convicted of reckless assault and thus had not shown that he was prejudiced by counsel's omission."). Section 2255 counsel subsequently also failed to inform his client of the denial, file any post-judgment motions, or file a notice of appeal. *Id*.

post conviction counsel failed to remedy that critical omission" because she, too, failed to produce those same records. *Id*. at 850. Thus, despite raising a substantial IAC claim, § 2255 counsel's omission resulted in "a procedural barrier to its adjudication." *Id*.

The *Ramirez* Court recognized that *Martinez* and *Trevino* provided a remedy for § 2255 counsel's failures. Those decisions fundamentally changed the Supreme Court's "approach to claims of ineffective assistance of counsel at initial-review collateral proceedings" and determined that an equitable remedy should be available to overcome certain types of procedural barriers to the adjudication of an IAC claim – namely, procedural barriers imposed as a result of post-conviction counsel's ineffectiveness. *Id*. at 848-50. For Ramirez and other federal prisoners, a motion to reopen the judgment afforded access to the new remedy.

### 2. For Daniel Lee, section 2255 has proved an ineffective vehicle for obtaining judicial review of his IAC claim.

The difference between the prisoners in *Ramirez* and *Sheppard* and Daniel Lee is that Mr. Lee was prevented from using Rule 60(b) as a vehicle for seeking the redress afforded by *Martinez* and *Trevino.* Satisfying the jurisdictional requirements of *Gonzalez v. Crosby*, 545 U.S. 524 (2005) should have been straightforward -- numerous circuit courts, including the Eighth Circuit Court of Appeals, had already found Rule 60(b) to be an appropriate vehicle for remedying the defect in the collateral proceeding[27] that *Martinez* and *Trevino* had identified.[28]

---

[27] The *Gonzalez* decision distinguishes between "proper" Rule 60(b) motions, which raise a defect in the integrity of the post-conviction proceedings, and those that seek adjudication of a claim on the merits, which are considered successive. *Gonzalez*, 545 U.S. at 532. *See also Buck*, 137 S. Ct. at 778-779 (change in law under *Trevino* significant element in Buck's proper Rule 60(b) motion).

[28] *See Williams v. Delo*, No. 13-2058, slip op. at 1 (8th Cir. Sept. 23, 2013) (reversing district court's denial of a Rule 60(b) motion); *Cox v. Horn*, 757 F.3d 113, 115 (3d Cir. 2014) (remanding to district court for determination of 60(b) motion on the merits, implicitly finding jurisdiction to hear the motion); *Adams v. Thaler*, 679 F.3d 312, 319 (5th Cir. 2012); *McGuire v. Warden*, 738 F.3d 741 (6th Cir. 2013) (deciding 60(b) motion on the merits, implicitly finding jurisdiction to hear the motion); *Cook v. Ryan*, 688 F.3d 598, 608 (9th Cir. 2012).

The Eighth Circuit nevertheless rejected that rationale in Mr. Lee's case for the sole reason that he is a *federal,* not a state, prisoner.

In refusing to hear his claim, the Eighth Circuit concluded that although collateral counsel's omission in litigating a Sixth Amendment claim in *state* post-conviction can constitute a defect in the integrity of that proceeding for purposes of *Gonzalez*, the same could not be said of an identical omission by habeas counsel in a § 2255 proceeding. In the Eighth Circuit's view, *Martinez* and *Trevino* cannot apply in a federal context. *See United States v. Lee*, 792 F.3d 1021, 1024 (8th Cir. 2015) (*Martinez* and *Trevino* do not "[extend] to federal review of claims not adequately raised *in an initial § 2255 proceeding*") (emphasis added). Those decisions were "inapposite" to Mr. Lee's case because "they involved federal habeas review of state court decisions under § 2254," *id.*, and his case "did not involve a procedural default of the type discussed in *Trevino* and *Martinez.*"[29] *Id.* at 1025. The Eighth Circuit therefore deemed Mr. Lee's Rule 60(b) motion successive and affirmed the district court's ruling that it lacked jurisdiction.

Shortly after the Eighth Circuit released its opinion, the Seventh Circuit issued its decision in *Ramirez.*[30] Pointing to the circuit split, Mr. Lee sought rehearing in his case. His petition was denied, but now over a strong dissent on the question of whether federal prisoners

---

[29] By "type" the court presumably meant a default that occurs in state habeas – which, for § 2254 petitioners, is the initial collateral review proceeding. For federal prisoners, § 2255 is the first and only post-conviction process available.

[30] Despite the strikingly similar fact patterns in *Ramirez* and *Lee* -- each case involved the same type of § 2255 counsel error (failure to present records in support of an IAC claim), the same type of harm as a result of that error (a procedural barrier that foreclosed full merits review of the IAC claim) and the same type of vehicle used to remedy that harm (a Rule 60(b) motion) – Mr. Ramirez was allowed to utilize the *Trevino* remedy to obtain meaningful § 2255 review of his IAC, but Mr. Lee was not.

should have recourse to *Martinez* and *Trevino*. Taking note of the Seventh Circuit's analysis, dissenting Judge Jane Kelly wrote:

> If *Martinez* and *Trevino* have an animating principle, it is that a prisoner must have at least one opportunity to present a claim that trial counsel was ineffective -- and to present it with the assistance of effective counsel . . . .  In this case, if one grants that Lee's § 2255 counsel was ineffective in failing to attach the evidence in support of his ineffectiveness claim to his petition, Lee will have completed his journey through the court system without ever having had a chance to present a colorable ineffective assistance of trial counsel claim to a court with the aid of an effective lawyer -- which seems to be exactly the problem that *Martinez* and *Trevino* sought to remedy.

*United States v. Lee*, 811 F.3d 272, 273 (8th Cir. 2015) (Kelly, J., dissenting from denial of rehearing).

The *Lee* dissent recognized that unlike the process for state prisoners, federal proceedings allow for only a single layer of post-conviction review, thus requiring some other procedural process if the *Martinez/Trevino* doctrine is to be given effect. *See id.* at 275 ("Lee's case presents a difficult procedural issue, with a potentially meritorious claim of effective assistance of counsel underlying it."). The majority, however, did not revisit its holding that § 2255 did not afford Lee recourse to the *Martinez/Trevino* remedy.[31]

---

[31] The *Ramirez* decision attempted to distinguish *Lee* by charging him with a failure to seek authorization for successive litigation and faulting his counsel for lacking diligence. *Ramirez*, 799 F.3d at 854. In her subsequent opinion, Judge Kelly explained why this interpretation of Lee was in not in fact an accurate one.

First, as Judge Kelly noted, Mr. Lee, like Mr. Ramirez, was not necessarily required to seek authorization. The dissent appropriately saw the question as whether a Rule 60(b), post-*Martinez* and *Trevino*, would properly be attacking "a defect in the federal habeas proceedings' integrity and therefore constitute a 'true' Rule 60(b) motion." *Lee*, 811 F.3d at 274. If a Rule 60(b) motion "based in part on post-conviction counsel's failure to attach documents necessary to support his ineffectiveness of trial counsel claims" is a "valid" use of Rule 60(b), then precertification by the court of appeals under section 2244(b) (3) is not required; as in *Ramirez*, the district court would have jurisdiction to hear the Rule 60(b) motion in the first instance. *Id*. The dissent would have had the court proceed to this threshold inquiry in *Lee*.

Second, although *Ramirez* characterizes the failure to present supporting evidence in support of the IAC claim as a matter of *Mr. Lee's* lack of diligence, the issue actually was the same as in *Ramirez*:

The divergent outcomes in *Ramirez* and *Lee* turned on a different understanding by the Seventh and Eighth Circuits of how Rule 60(b) motions could function in applying *Trevino* to § 2255 cases. *Compare Lee*, 792 F.3d at 1022-25, *with Ramirez*, 799 F.3d at 850. See also *Lee*, 811 F.3d at 275 (Kelly, J., dissenting from denial of rehearing) ("Whether a Rule 60(b) motion such as [Lee's], *filed in the course of § 2255 proceedings*, could ever provide a means for bringing meritorious ineffectiveness of counsel claims to the courts' attention for the first time is an important question—one that another court of appeals has answered in the affirmative. *Ramirez*, 799 F.3d at 850-52.") (emphasis added). In assessing whether § 2241 jurisdiction is proper in this case, this Court is bound by the Eighth Circuit's interpretation that § 2255 is unavailable to Mr. Lee.

**II.     BECAUSE § 2255 HAS BEEN FOUND TO BE AN INADEQUATE AND INEFFECTIVE REMEDY UNDER THE CIRCUMSTANCES OF HIS CASE, MR. LEE IS ENTITLED UNDER § 2255'S SAVINGS CLAUSE TO TURN TO § 2241.**

Mr. Lee plainly has a strong claim for relief on ineffectiveness grounds: had his trial counsel performed competently, challenging the Government's reliance on false evidence to establish its key aggravating factor, it is at least reasonably likely that he (like his co-defendant) would not have been sentenced to death. Had his § 2255 counsel litigated the issue properly, it is just as likely that the post-conviction court would have provided relief. When the Supreme Court announced a narrow remedy for just this kind of failure by post-conviction counsel, Mr. Lee diligently sought to avail himself of it, just as state prisoners successfully had done. But, although his case meets the requirements necessary to invoke the *Martinez* remedy, he was told

---

whether *"§ 2255 counsel was ineffective* in failing to attach the evidence in support of his ineffectiveness claim to his petition." 811 F.3d at 273 (emphasis added). There is no material distinction between *Ramirez* and *Lee* in this respect; just as Mr. Ramirez's § 2255 counsel raised an IAC claim but failed to present evidence in support of it, so too did Mr. Lee's counsel. The two litigants were in fact identically situated.

that recourse to *Martinez* was categorically unavailable for those in § 2255.

The remedy afforded him by § 2255 has thus proved inadequate to "test the legality" of his sentence of death. 28 U.S.C. § 2255 (e). Under these circumstances, Mr. Lee may turn to § 2241 for redress.

### A.     The Seventh Circuit has found § 2241 jurisdiction in a range of circumstances where 28 U.S.C. § 2255 has proved ineffective to vindicate the denial of a constitutional right.

Section 2255(e) sets out what is known as the "savings clause." On the rare occasions when the ordinary operation of the § 2255 statute is neither adequate nor effective to test the legality of a conviction or sentence, the savings clause allows the federal prisoner to do so through a motion filed pursuant to 28 U.S.C. § 2241. A § 2241 motion functions neither as substitute for § 2255 litigation nor an end-run around the successor bars of § 2255(h). Section 2255(e) instead provides a "safety valve," a way for a federal prisoner to pursue a viable claim that § 2255 is not otherwise equipped to resolve.

The Seventh Circuit has described § 2255(e) inadequacy variously as a "glitch" in the remedy, *Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008), a "lacuna" in its functioning, *Webster v. Daniels*, 784 F.3d 1123, 1138 (7th Cir. 2015), or a "structural problem" in § 2255 that forecloses "even one round of effective collateral review" of the claim. *Taylor v. Gilkey,* 314 F.3d 832, 835 (7th Cir. 2002). To invoke jurisdiction under § 2241, Mr. Lee must show that § 2255 has proved inadequate or ineffective to "test the legality" of his sentence of death. 28 U.S.C. § 2255(e). *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001) (something more than an inability to satisfy § 2255(h) is necessary to invoke the savings clause; prisoner must show that the § 2255 remedy has proved inadequate or ineffective). The petitioner files his § 2241 in the district of incarceration, not conviction. 28 U.S.C. §§ 2242, 2243. For Daniel Lee, on death row

31

in Terre Haute, that is the Southern District of Indiana, with the Seventh Circuit providing the governing law.

To determine whether § 2255 has proved inadequate or ineffective, the Seventh Circuit does not employ a single, overarching test. Inadequacy is demonstrated when § 2255 is "so configured as to deny a convicted defendant any opportunity for judicial rectification" of a fundamental defect in his conviction or sentence; when the "essential function" served by habeas corpus is impaired "by the limitations on the use of the remedy provided in section 2255." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998). Therefore, a petitioner with claims of the sort that "justif[y] collateral review, [but do not] justify sequential collateral attacks under [§ 2255(h)]" may be able to pursue them via § 2241. *Taylor*, 314 F.3d at 835 (internal citations omitted).

The Seventh Circuit has found § 2241 jurisdiction available in a limited number of cases but a variety of situations. While each case or line of cases, such as *Davenport* and its progeny, discusses specific conditions necessary for § 2241 review, the cases read together do not establish any single rigid "test" for when § 2255 will be deemed inadequate. On the contrary, the need for §2241 review arises from the particular way in which § 2255 has proved inadequate under the unique circumstances of the individual case. Close scrutiny of the case law finding § 2241 jurisdiction reveals one common theme: Where courts are confronted with a claim of fundamental injustice unreviewable under § 2255, they have adopted a flexible approach to § 2241 review. *See Beason v. Marske,* 926 F.3d 932, 935 (7th Cir. 2019) (citing *Webster* and noting "differing emphases in our caselaw interpreting *Davenport* and concluding that '[a]ll of these decisions hold, nevertheless, that there must some kind of structural problem with section 2255 before 2241 becomes available.'")

One of the first comprehensive decisions issued by the Circuit on § 2241 was *In re*

32

*Davenport*. There the court was asked to consider whether two petitioners in a consolidated case could avail themselves of the savings clause. The first, Mr. Davenport, was denied; the court found that he could have raised his challenge to the armed career criminal sentencing enhancement earlier and that § 2255 thus had not proved ineffective for him. Petitioner Nichols, however, had had no such opportunity. He contended that his conviction for using a firearm in connection with a drug offense could not stand because the Supreme Court in *Bailey v. United States,* 516 U.S. 137 (1995) had ruled – only after his § 2255 was completed – that "use" did not include mere possession (as in his case), and then rendered that decision retroactive to cases like his. *See Bousley v. United States,* 523 U.S. 614 (1998). As Mr. Nichols was unable to rely on the § 2255 statute, he could not satisfy the provisions of § 2255(h) (2) (allowing a second petition to be filed only where a rule of constitutional law, rather than statutory construction, is made retroactive). The circuit court held that § 2255 was *not* an adequate vehicle for protecting his rights. The court then reasoned that to obtain § 2241 jurisdiction in that context, a litigant had to satisfy various prerequisites relevant under the circumstances – that there had been a change of law, made retroactive by the Supreme Court, that eluded § 2255's successor standards.

The facts of *Davenport* and the language it employed led some district court judges at the time to view § 2241 jurisdiction as limited to the circumstances present there – i.e., claims implicating innocence (because Nichols was essentially "innocent" of the firearms offense). *See In re Davenport,* 147 F.3d at 609-610. However, in subsequent cases, when faced with restricted § 2255 review arising out of a different set of facts, the Seventh Circuit went on to hold that § 2241 can also be an appropriate mechanism for challenging the constitutionality of a prisoner's sentence. In *Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013), for example, the petitioner argued that he had been improperly designated as a career offender but could not have raised the issue

33

during § 2255 proceedings because the relevant Supreme Court decision had not yet been released. Rejecting the lower court's insistence on a showing of innocence to invoke the savings clause, the Seventh Circuit held instead that the misapplication of the sentencing guidelines in Brown's case "represents a fundamental defect that constitutes a miscarriage of justice corrigible in a § 2241 proceeding." *Id.* at 588. The *Brown* decision rejected the Indiana district court's restrictive interpretation, explaining that the text of the savings clause "does not limit its scope to testing the legality of the underlying criminal conviction." *Id.*

A very different sentencing issue confronted the court in *Garza v. Lappin.* Mr. Garza argued that his sentence was in violation of international human rights law after he had obtained a judgment to that effect from the Inter-American Commission on Human Rights. The Seventh Circuit concluded that because that decision came after Garza's § 2255 proceedings, only then creating a judicially enforceable right, he could not have raised the issue earlier; nor did his treaty-based arguments qualify as a basis for a successive petition under § 2255(h). *Garza*, 253 F.3d at 922-23. Finding § 2255 to be inadequate in these circumstances, the court allowed him to proceed under § 2241. *See id.* at 923 ("Section 2255 therefore does not now and has never provided an adequate avenue for testing Garza's present challenge to the legality of his sentence.").[32]

More recently in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (*en banc*), the Seventh Circuit sitting *en banc* again found § 2241 jurisdiction because of the unique manner in which § 2255 precluded review of a viable claim. In Mr. Webster's case, evidence was

---

[32] The court was careful to distinguish between determining jurisdiction under § 2241 and assessing the relative merits of a claim. "Although this argument is extremely problematic on its merits, we must not confuse lack of substantive merit with lack of jurisdiction. It is not so frivolous as to destroy jurisdiction at the threshold." *Garza*, 253 F.3d at 923. *See also Webster v. Daniels*, 784 F.3d 1123, 1145-46 (7th Cir. 2015) (*en banc*) (distinguishing between jurisdictional and merits determinations).

discovered after his Texas capital § 2255 proceedings were concluded that established that he was intellectually disabled and therefore ineligible for the death penalty. He sought authorization in the Fifth Circuit to file a successive motion under § 2255(h)(1) claiming he was innocent of the death penalty. Reading the language of § 2255(h)(1) narrowly, the Fifth Circuit concluded that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, i.e., capital murder." *In re Webster*, 605 F.3d 256, 257 (5th Cir 2010). Thus, despite the fact he was ineligible for execution, the Fifth Circuit held that § 2255 could afford him no opportunity to present his claim. In a concurring opinion, one of the judges on the panel remarked on the injustice of this result: If he could present his evidence to a court, Mr. Webster would certainly be found intellectually disabled and ineligible for the death penalty, but § 2255(h) closed the courthouse doors to him. The structure of the statute thus produced an "absurdity" and a "Kafkaesque result" that would require the courts to "condone … an unconstitutional punishment." *Id.* at 259-60 (Wiener, J., concurring).

Following denial of *certiorari* by the Supreme Court, Mr. Webster filed a petition under § 2241 in the district of his incarceration, the Southern District of Indiana, based on the new evidence. Both the district court and a panel of the Seventh Circuit denied jurisdiction because he could not meet the requirements of § 2255(h). The *en banc* court reversed. Under these circumstances, the court held, there was a "lacuna" in § 2255 that failed to account for the narrow set of cases, such as Mr. Webster's, that presented issues of constitutional ineligibility for execution. *Webster,* 784 F. 3d at 1138.[33] The court was careful to distinguish § 2255's successor

---

[33] The *en banc* Seventh Circuit explained that while it might have come to a different conclusion on interpreting that section of the statute, it was bound by the interpretation given by the Fifth Circuit in

35

provision, meant to deter repeated habeas petitions with its narrow focus on innocence of the offense, from the separate ambit of the savings clause, which applies when "the remedy by motion is inadequate or ineffective to test the legality of the [prisoner's] *detention*." *Id.* (emphasis in original). Given that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence," and that "there is no reason to assume that our procedural system is powerless to act in such a case," the court held that there was no bar against resort to § 2241 in cases such as Webster's. *Id.* at 1139.

The Seventh Circuit has demonstrated, in cases like *Garza, Brown* and *Webster,* that there is no one legal test to determine if § 2241 review should be available. Rather, these cases show that a court must carefully review the specific facts and allegations before it and, where the petitioner has been diligent but a "lacuna" or "glitch" in the law prevents review, craft a remedy narrowly tailored to address the specific harm alleged. These cases further indicate that when it appears that rectifying fundamental constitutional error has been precluded by operation of the § 2255 statute, a flexible approach is warranted. This analysis is consistent with that of other federal circuits. *See e.g., Poindexter v. Nash*, 333 F.3d 372, 378 (2nd Cir. 2003); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002); *In re Jones*, 226 F.3d 328, 333–34 (4th Cir. 2000); *In re Dorsainvil*, 119 F.3d 245, 251–52 (3d Cir. 1997).

> **B.**     **Because it has, under these circumstances, denied Mr. Lee his "one meaningful opportunity" to litigate his substantial claim of trial counsel's ineffectiveness, the § 2255 remedy has proved inadequate in this case.**

There is plainly a "glitch" in the operation of the § 2255 statute when it comes to Danny Lee's ineffectiveness claim. The Supreme Court has ruled that a prisoner may now excuse an

---

ruling on the § 2255(h) issue, and had to approach the § 2241 question accordingly. *Webster*, 784 F.3d. at 1134 n. 4 & n. 5.

omission on a substantial Sixth Amendment issue in his post-conviction litigation if collateral counsel provided ineffective representation on that issue. *See Martinez, supra; Trevino*, *supra*. As the federal § 2255 statute is also an "initial collateral review proceeding," Mr. Lee should have been able to avail himself of those decisions. *See Massaro*, 538 U.S. at 504-507.

But the structure of the federal collateral statute, as interpreted by the Eighth Circuit, is precluding him from doing so. Because a judgment had already issued in his case when *Trevino* was decided, Lee had to rely on a post-judgment motion to avail himself of the remedy.[34] Yet the Eighth Circuit, interpreting *Martinez* and *Trevino* as applying only to state prisoners with state-imposed procedural obstacles,[35] treated his Rule 60(b) motion as a successive petition that could not meet the requirements of § 2255(h). Nor is there any other mechanism within § 2255 that provides a path for adjudication of Mr. Lee's Sixth Amendment claim. His Rule 60(b) motion was rejected, and he cannot seek relief under the successor provisions of § 2255: his Sixth Amendment claim neither establishes his innocence of the offense (§ 2255(h)(1)), nor does it rest on a new rule of constitutional law (§ 2255(h)(2)).

Mr. Lee has a substantial Sixth Amendment claim that his trial counsel gravely failed him in not properly challenging the false PCL-R "future danger" evidence. Had this challenge been made, his jury would never have heard this evidence. And as the presiding judge contemporaneously noted, absent its introduction, it was "very questionable whether the jury would have [imposed] the death penalty." *Lee*, 89 F. Supp. 2d at 1031. The plain failures of his post-conviction counsel, catalogued by the presiding judge and precluding him from considering

---

[34] *See Buck,* 137 S. Ct. at 771, 777-78 (discussing why, as Mr. Buck's § 2254 petition had already been denied, a Rule 60(b) motion to reopen was appropriate).

[35] In determining the availability of § 2241 jurisdiction, this Court must accept the Eighth Circuit's decision that Rule 60(b) is unavailable to Mr. Lee due to the structure of a § 2255 action. *Webster*, 784 F. 3d at 1134 n.4.

the Sixth Amendment claim, then deprived Mr. Lee of the one chance at relief for this error that collateral review is designed to provide.

Daniel Lee was therefore denied a reasonable opportunity to obtain a reliable judicial determination of his Sixth Amendment claim during his § 2255 proceeding. The Seventh Circuit has found "inadequacy" in analogous circumstances. *See Webster*, 784 F.3d at 1136 (finding § 2255 inadequate and ineffective where it denies a prisoner "a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence"); s*ee also In re Davenport,* 147 F.3d at 610 (statute deemed inadequate where petitioner Nichols could not use a first § 2255 motion to obtain relief on a basis not yet provided by law, but was then precluded from doing so in a second motion after the law changed); *Garza,* 253 F.3d at 922-23 (judicially enforceable right emerged only after completion of § 2255).

This is one of those "rare circumstances in which the operation of the successive petition rules absolutely prevent[s]"[36] Mr. Lee from accessing an available remedy and establishing a right to relief. As in *Davenport, Garza* and *Webster*, Mr. Lee appears to have a right without a remedy. *See Lee*, 811 F.3d at 273 (Kelly, J, dissenting from denial of rehearing). There must, however, be *some* forum in which Mr. Lee can receive a meaningful opportunity to present his Sixth Amendment claim. Absent resort to the savings clause, Mr. Lee may be executed without having had his substantial Sixth Amendment claim adjudicated by any court. In fact, if his claim is construed to be beyond the scope of the savings clause, it will produce an untenable result: similarly situated *state* prisoners will have a remedy to redress a *federal* constitutional violation despite habeas counsel's ineffectiveness, while *federal* prisoners will not.

---

[36] *Garza*, 253 F.3d at 922.

**C.** **Resort to the savings clause in Mr. Lee's case would maintain the limited nature of the remedy.**

Unlike the cases of state prisoners, who may rely on *Martinez* to raise entirely new Sixth Amendment claims at their § 2254 proceeding that were defaulted for not being raised in the initial state habeas, Mr. Lee's case implicates a much narrower class of Sixth Amendment claims. The unfair and irrational result of his § 2255 proceeding was created, as Judge Eisele acknowledged, by the "peculiar and special circumstances of this particular case." *Lee*, 2008 U.S. Dist. LEXIS 109771 at *185.

That is, Mr. Lee's § 2241 petition concerns a Sixth Amendment claim that was, in fact, raised in the § 2255 proceeding in district court, but foreclosed from review due to habeas counsel's deficient representation. Critically, this procedural ruling occurred *prior* to the Supreme Court's decisions in *Martinez* and *Trevino*, thus leaving the judge no recourse at the time beyond castigating post-conviction counsel for their incompetent performance. After *Trevino* was decided, Mr. Lee diligently sought to rely on it but the Eighth Circuit refused to allow him to utilize Rule 60(b), the only legal avenue left him in § 2255 at that point.

This set of circumstances is not likely to recur. The remedy Mr. Lee seeks here would not extend to a § 2241 petition seeking to raise an entirely new Sixth Amendment claim that had not previously been raised at the time of the § 2255 proceeding. He seeks redress for the unique unfairness in his case: where habeas counsel committed an error that precluded proper consideration of a pleaded substantial IAC claim and *Trevino* was decided *after* the district court no longer had jurisdiction. Under these circumstances, § 2255 has proved an inadequate and ineffective remedy to redress the Sixth Amendment violation and resort to the savings clause is

appropriate.[37]

Moreover, a litigant's ability to invoke § 2241 in this manner is of course also constrained by the demanding requirements of *Martinez* itself.[38] Mr. Lee is able to satisfy these requirements: his habeas counsel unreasonably failed to present evidence in support of a substantial Sixth Amendment claim at his initial-review collateral proceeding; this failure was neither strategic nor tactical; their errors led to the imposition of a procedural ruling precluding full merits review of a pivotal Sixth Amendment claim. Habeas counsel's ineffectiveness was also prejudicial: but for counsel's error, the district court would not have been foreclosed from considering the evidence that irrefutably supported the Sixth Amendment claim. Indeed, at least one reviewing judge has determined that Mr. Lee has met all the requirements of *Martinez,* including that his claim was "potentially meritorious" and deserving of further consideration. *Lee*, 811 F.3d at 275 (Kelly, J, dissenting from denial of rehearing). There is a reasonable probability that the outcome of the § 2255 proceeding would have been different had it not been undertaken with ineffective counsel.

Rarely will a court be faced with this set of circumstances. Here, the jury heard prejudicial false evidence establishing future dangerousness because of trial counsels' failures. Ill-prepared § 2255 counsel then badly mishandled the claim preventing the judge from reviewing the full claim. After completion of the § 2255 the Supreme Court released a pivotal decision providing habeas petitioners with a remedy. A subsequent circuit court interpretation of

---

[37] A number of § 2241 decisions involve cases where an applicable and pivotal Supreme Court case was released after the prisoner's § 2255 proceeding had concluded. *See, e.g., Beason v. Marske*, 926 F. 3d 932 (7th Cir. 2019); *In re Davenport*, 147 F.3d 605 (7th Cir. 1998).

[38] See *Martinez,* 566 U.S. at 14-16 (setting out limited nature of remedy and citing its five prerequisites). Additionally, meeting the *Martinez* requirements still "does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id*. at 17

the § 2255 statute precluded reconsideration. Under these circumstances, § 2255 has proved ineffective and inadequate to address a significant, remediable constitutional error: that trial counsel failed to challenge dangerous junk science at their client's capital sentencing. This Court therefore has jurisdiction pursuant to the savings clause to review the merits of the claim.

**III.   THE GOVERNMENT SUPPRESSED EVIDENCE ABOUT MR. LEE'S PRIOR CONVICTION THAT PREJUDICED HIS SENTENCING PROCEEDINGS.**

The improper reliance on junk science at his capital sentencing and counsel's failure to object to its prejudicial use against him form the basis of Mr. Lee's first claim to § 2241 jurisdiction. A second basis has more recently come to light. As part of its case for proving Mr. Lee was a dangerous "psychopath," the Government presented evidence at the penalty phase that, as a teenager, Daniel Lee had committed another murder – and had gotten off with a plea to robbery due to the largesse of the state prosecutors at the time. The Government told the jury that Mr. Lee had gotten this "gift" but squandered it and didn't reform: he did not deserve another chance. Devastating to be sure to a man facing the ultimate punishment – but also false. The truth was hardly charitable to the Government: In fact, the Oklahoma judge who presided over Mr. Lee's preliminary hearing dismissed the murder charge for lack of probable cause after hearing the state's evidence. These facts were known by the Government and the Oklahoma law enforcement witnesses who participated in Mr. Lee's federal capital trial. Despite that, the Government failed to disclose this exculpatory information to the defense and also presented misleading evidence to the capital jury. The Government successfully hid the truth for so long that Mr. Lee was unable to press the point in his § 2255 litigation.

Mr. Lee sets out below the facts establishing the violation of his rights and the grounds on which he seeks review of this issue as well through the savings clause. He alleges two separate legal claims, one pursuant to *Brady v. Maryland*, and another under *Napue v. Illinois*,

both based on this Government misconduct at his sentencing phase. Because the two claims arise from the same set of operative facts, Mr. Lee first presents this Court with the relevant factual and procedural background before laying out the legal argument for each.

### A.       The Government relied on aggravating evidence that Daniel Lee had committed a prior murder and escaped justice.

Shortly after appointment, trial counsel filed several motions asking the Government for all favorable information in its possession. Doc. Nos. 28, 31. The Government responded that it "recognize[d] its obligation under *Brady v. Maryland*," and would "provide all *Brady* material as required by law." Doc. No. 55 at 2. The prosecutors further stated that they would "treat this motion as continuing." *Id.*

At a pretrial conference on April 9, 1998, the prosecution represented to the court that the "bulk" of the *Brady* material had been disclosed. 4/9/98 Tr. at 32.[39] Based on those assurances, the court entered an order dismissing Mr. Lee's *Brady* motion as moot. The court also directed the prosecution to continue fulfilling its obligation to disclose material information if any relevant evidence emerged. Doc. No. 145 at 1, 3. The prosecution produced no additional *Brady* material pursuant to this order.

Several months later, after the Government moved to amend its notice of intent to seek a death sentence against Mr. Lee, Doc. No. 224, trial counsel renewed their requests for *Brady* material as to any issues relevant to sentencing. Doc. Nos. 258, 259, 260. The Government responded that it had nothing further to disclose. Doc. No. 327 at 1; *see also* Doc. No. 288 at 2.

---

[39] The pretrial record is transcribed in separate volumes according to the hearing date.

42

### 1.      The Government's false allegations at the capital trial

By the time the Government reached Mr. Lee's penalty phase proceeding, it had a considerable problem on its hands. The jury had already sentenced Chevie Kehoe to life without possibility of release, despite the fact that the Government had spent the entirety of the guilt-phase proceeding, through its evidence and arguments, showing that Mr. Kehoe was the more culpable party. In fact, the jury did not even find the future dangerousness aggravator despite his extensive criminal history. Indeed – further supporting the showing of materiality -- the Eighth Circuit opined that the jury's rejection of that aggravator in Mr. Kehoe's case accounted for why it sentenced him to life and Mr. Lee to death. *See United States v. Lee*, 715 F.3d 215, 223 (8th Cir. 2013).

Because the decision of the Eastern District of Arkansas U.S. Attorney's office to drop the death penalty was vetoed by their superiors in Washington, D.C., the Arkansas federal prosecutors were compelled to seek a death sentence against Mr. Lee. *See Lee*, 89 F. Supp. 2d at 1032-35. To obtain one, the Government settled on a strategy of proving that Mr. Lee was a clinically diagnosed "psychopath" who was predisposed to violence and would be a danger to the lives and safety of others if not sentenced to death. To bolster this aggravating factor of "future dangerousness" in the jurors' eyes, the prosecution relied heavily on one prior bad act -- Danny Lee's purported responsibility for the 1990 murder of Joseph Wavra in Oklahoma.

According to the prosecution, Mr. Lee shared responsibility for a murder committed at a house party by his cousin David Patton. The prosecution's narrative was that, although Mr. Patton actually killed the victim Joseph Wavra, Mr. Lee was equally culpable for the crime. To prove its point, the prosecutors presented selective witnesses and evidence from the Oklahoma proceedings. The Government then told the jury that Mr. Lee was not convicted solely because

43

the Oklahoma prosecutors chose to offer him the "gift" of a second chance and allowed a plea to a lesser offense.

Prosecutor Liroff used the state plea agreement as a leitmotif to convince the jury to sentence the now adult Daniel Lee to die in the federal Arkansas trial. The Government presented the murder charge and robbery conviction as evidence of Mr. Lee's guilt and the Oklahoma state attorney's beneficence, when in fact they knew (or should have known) that it was neither. Mr. Liroff told the jury:

> [Mr. Lee] got a gift in that case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to get off with just a robbery.

Tr. 7383. As proof, the Government introduced a certified copy of Mr. Lee's Oklahoma state court conviction for the crime of robbery, as well as a certified copy of Mr. Patton's Oklahoma state court conviction for the crime of murder. Tr. 7470.

Throughout his closing argument to the jury, Mr. Liroff emphasized that there was no question that Danny Lee had committed the Wavra murder. Tr. 7963 ("legally and morally the blood of Joey Wavra's hands is on Daniel Lee"); Tr. 7964 ("[Daniel Lee] has an earlier murder under his belt . . . has a prior victim's blood on his hands"); Tr. 7963-64 ("Usually you commit a murder, and you get sent away for a very long time. … Daniel Lee got a do over."). The pointed implication was that Mr. Lee had unfortunately been allowed to get away with murder by the local Oklahoma prosecutors, but that the Federal Government would not make the same mistake here, and neither should the jurors.

Mr. Liroff highlighted the commission of the Wavra murder as a "drastic distinction" between him and his co-defendant that justified sentencing Mr. Lee to death, even though he was the less culpable actor in the Mueller murders and the jury had just given Mr. Kehoe life imprisonment. Tr. 7962. Mr. Liroff repeatedly emphasized that the Wavra murder proved that,

44

unlike his co-defendant, Mr. Lee was a "psychopath" who "even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous." Tr. 7381-82; *see also* Tr. 7959; 7962-64; 7970; 7974-75; 7991. Indeed, far from merely proving the "future dangerousness" aggravator, Mr. Liroff argued that this difference in the respective backgrounds of Mr. Lee and his co-defendant also justified rejecting Mr. Lee's proposed statutory mitigating factor, that "another person, equally culpable in the crimes, will not be punished by death." Tr. 7969-70. Mr. Lee and Mr. Kehoe were not equal, argued the Government, because "[t]here's no prior Joey Wavra as to Chevie. There is as to Lee." Tr. 7970. The jury was persuaded: all twelve jurors found that the "future dangerousness" aggravator had been proven in Mr. Lee's case, but only three jurors found that the mitigating factor had been established – despite the Government's own consistent position that Danny Lee had a played a far lesser role in the crime. *See* Exh. I (Penalty Phase Verdict Form) at 6, 8. The jury thereafter sentenced Mr. Lee to death.

### 2. The truth

Only after post-conviction proceedings were concluded has it come to light that the Oklahoma scenario Mr. Liroff provided the Arkansas jury turned the truth on its head. Initially only Mr. Patton, an older cousin of Mr. Lee's whom Mr. Lee looked up to, was arrested and charged with Mr. Wavra's murder. Following Mr. Patton's arrest, Mr. Lee gave two statements to local law enforcement denying any involvement in the actual murder, but corroborating the state's suspicions about Mr. Patton. At Mr. Patton's preliminary hearing on September 28, 1990, a seventeen-year-old, lawyerless Mr. Lee was called by the prosecution as a state's witness against his cousin. Rather than providing testimony consistent with his previous two statements, Mr. Lee instead gave a different account, one in which he tried to shift responsibility away from

45

his cousin and asserted that he was much more involved in the events leading to Mr. Wavra's death.[40] Although he had taken the stand to testify as a state's witness, the judge ordered the sheriff to take young Mr. Lee into custody pending murder charges.[41] The teenager told Patton, "I love you," before he was taken away to lock-up.[42]

On December 13, 1990, just a few short months after Mr. Patton's preliminary hearing,

---

[40] Debra Carter, a friend of both Mr. Lee's and Mr. Patton's, was present at Mr. Patton's preliminary hearing when Mr. Lee testified. As she has noted, it was clear to her that Mr. Lee, who was "younger than Patton and looked up to" and "idolized" him, exaggerated his role in the Wavra murder in an effort to reduce his cousin's culpability:

> I was there when Danny took the stand and incriminated himself. It was shocking to see Danny, this seventeen year old kid, who had no idea what he was doing, talking himself up like that on the stand for no reason other than to pretend to be a man and try to take some heat off of Patton. It was terrible to see Danny talk himself into trouble in the courtroom that day.

Exh. J (Declaration of Debra Carter) at ¶16. Indeed, Ms. Carter spoke with Mr. Lee soon after Mr. Patton's arrest, and he told her that it was Mr. Patton who "took Wavra outside the house and beat the hell out of him; Patton then got nervous and took Wavra down into the sewer and stabbed him to death because he was scared Wavra would be able to identify everyone that was at [the house party] that night." *Id*. at ¶¶12-13. According to Ms. Carter, "Patton was a big guy, at 6'2", and I doubt he needed any help taking Wavra down into the sewer." *Id*. at ¶14. (Notably, Ms. Carter's observations are entirely consistent with other evidence suggesting a long pattern of Mr. Lee's falsely claiming "credit" for criminal acts in order to make himself appear tough. *See*, *e.g*., Exh. K (Canadian County Juvenile Court Report) ("He is diliberately [sic] sabotaging his treatment by claiming to have participated in very violent activities during leaves. This [sic] far these 'confessions' have been proven to be bogus .…").

[41] Oklahoma state prosecutor Brad Miller, who was lead counsel on the Patton case, has a checkered past. Like that of Lane Liroff, Mr. Miller's conduct in murder cases has been denounced by reviewing courts. Two Oklahoma capital convictions and death sentences Mr. Miller secured (only a few years after the Wavra case) were reversed because Prosecutor Miller enticed a witness to testify falsely in exchange for favorable treatment and intimidated juvenile witnesses into lying on the stand. *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009); *Powell v. Mullin,* No. CIV-00-1859-C, 2006 WL 249632 (W.D. Okla. 2006). The Oklahoma State Bar suspended Mr. Miller's license to practice for 180 days as a sanction. *State ex rel. Oklahoma Bar Ass'n v. Miller*, 309 P.3d 108 (Okla. 2013). Notably, the bar found that Miller coerced the false testimony of juveniles and took no steps to "secure parental consent and/or notification, to advise them of their rights, to secure or advise of representation of counsel, or to appoint counsel for them." *Id*. at 115.

[42] The Government read into evidence Mr. Lee's testimony at his cousin's preliminary hearing. However, it omitted portions of the transcription, including this exchange between Mr. Lee and his cousin.

Mr. Lee had had his own preliminary hearing on the murder charge the State had brought against him. The presiding judge was not impressed. After taking into account all of the evidence, including Mr. Lee's prior testimony at his cousin's preliminary hearing, the state court found that the crime of "Murder I" was "not established by the evidence." Exh. L (Excerpts, Oklahoma County District Court No. CF-90-5292).[43] Based on his review of all the prosecution's evidence, the judge took the unusual step of recommending dismissal of the homicide charge altogether and encouraging the State to "consider refiling on the charge of Robbery I," *id*., a crime the young Mr. Lee might be deemed guilty of. The State agreed, and Mr. Lee subsequently pleaded guilty to a robbery charge that involved taking Mr. Wavra's keys without his consent.

A judicial ruling that the prosecution could not even establish probable cause on a murder charge is a far cry from the Government's presentation that Daniel Lee was "legally and morally" guilty of Mr. Wavra's murder and essentially got to walk away from it due to prosecutorial charity. The Government's insistence at the penalty phase that Danny Lee had "gotten away" with one murder and should not be given such a "gift" again was, as the Government knew or should have known, a perversion of the truth.

**B.     The Government violated *Brady v. Maryland* by portraying Mr. Lee as having been guilty of a prior murder.**

According to the Supreme Court, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or

---

[43] The full facts surrounding the resolution of Mr. Lee's state case are not evident in the Oklahoma court records. However, from a billing record submitted to the court by Mr. Lee's attorney and attached as an exhibit here, it is clear that a preliminary hearing was held in Mr. Lee's case and the presiding judge ruled that the state's evidence was insufficient to establish probable cause. The billing record itself is not the subject of Mr. Lee's misconduct claims. Rather, it is offered as proof that the Government withheld information from the defense about what really happened and presented its case in a false light to the jury.

47

because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). In the context of a *Brady* violation, prejudice means that the suppressed evidence was "material." *Id*. All of these elements are met here.

The previously undisclosed facts establish that the jury was falsely told that Mr. Lee was legally responsible for the murder of Joseph Wavra, and that he had gotten away with the crime when the state prosecutors gave him a sweetheart plea deal to the less severe offense of robbery. This omission was not inconsequential. As the Arkansas federal district court recently held, if the Government had timely disclosed this exculpatory information there is a reasonable probability that the result of the sentencing proceeding would have been different. *United States v. Lee*, No. 4:97-cr-00243-JLH, slip op. at 14 (E.D. Ark. Feb. 26, 2019) ("In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different.").[44]

### 1.    The suppressed evidence was favorable to Mr. Lee.

As noted earlier, the Wavra murder was a key factual underpinning to the Government's argument that Mr. Lee was a dangerous psychopath who would continue to harm others unless sentenced to death. Thus, the suppressed evidence of the Oklahoma judge's early rejection of any murder charge in the Wavra matter and the fact that the State's case against Mr. Lee collapsed of its own weight was unquestionably favorable to Mr. Lee's defense because it undermined the future dangerousness aggravator.

---

[44] Because the Government had succeeded in suppressing the truth for so long, the Arkansas district court was unable to provide the relief Mr. Lee sought pursuant to § 2255. *See infra.*

An available state court record demonstrates that there was a judicial finding that the State's evidence was insufficient to sustain a murder charge against Mr. Lee. This would have specifically rebutted a predicate fact alleged as part of the future dangerousness aggravator found by the jury: that Mr. Lee was culpable for the 1990 murder of Joseph Wavra. *See* Exh. I (Penalty Phase Verdict Form). Moreover, the suppressed evidence contradicted the Government's powerful penalty phase argument that Mr. Lee had "gotten away" with murder when he pleaded guilty to robbery. The suppressed information demonstrates that the robbery plea was not a "gift." It was instead the prosecution's only reasonable option after a state court judge recommended that the murder charge be dismissed and substituted with a charge that its own evidence could support.

### 2. The evidence was suppressed by the Government.

Despite defense counsel's pre-trial requests for any *Brady* material as to punishment, the Government did not disclose its knowledge of the favorable information on the judicial findings following Mr. Lee's preliminary hearing, or about the real circumstances surrounding his guilty plea.

The Government obtained the Oklahoma state court records on the Wavra case as part of its pre-trial investigation. It introduced a portion of those records as part of its case-in-chief at the penalty phase proceedings. *See* Tr. 7418-19 (Government's Exhibit 1103, transcript of Mr. Lee's testimony at 9/28/90 preliminary hearing in the matter of State v. John David Patton); Tr. 7470 (Government's Exhibit 1108, judgment and sentence in the District Court of Oklahoma County, the State of Oklahoma, for Daniel Lee, for the crime of robbery); *id*. (Government's Exhibit 1109, conviction for John Patton in the State of Oklahoma for the crime of first-degree murder). The Government certainly was aware of the procedural history and the real reason why Daniel

49

Lee's murder charge had to be dropped.

The federal prosecutors also actively enlisted the help of local Oklahoma law enforcement officials in their capital case against Mr. Lee. The Government called as a witness in its case-in-chief one of the detectives who investigated the Wavra incident, Detective Randall Yarbrough. Tr. 7389-90. The Government also consulted with Ron Mitchell, the Oklahoma City Police Department detective who conducted the interrogation of Mr. Lee in the Wavra case. Tr. 7349-50. These detectives had to have been aware that Mr. Lee's separate preliminary hearing there led to a judicial finding that he could not be held liable for the homicide.

As the Supreme Court has made clear, the *Brady* rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Thus, any knowledge by the Oklahoma authorities regarding the disposition of Mr. Lee's case in the Wavra matter must be imputed to the Government. *Id.* at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."). *See also United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (imputing knowledge in state hands to federal prosecutors because of degree of cooperation and interaction among the various authorities during the general course of the investigation).

Finally, trial counsel for Mr. Lee has averred that the information was indeed suppressed, as the Government never shared any of these facts with the defense during the capital trial. Had it done so, counsel would have used the truth to rebut any claim by the prosecutors that their client had committed a murder and then "gotten away" with murder. Exh. M (Declaration of Jack T. Lassiter) at ¶¶ 13-15.

### 3.     The suppressed evidence was material.

Few facts could be more devastating to the defense in a murder case than that the client

had killed before; at the penalty phase of a capital case, such evidence is lethal. In this case, there

is a reasonable probability that the outcome of Mr. Lee's sentencing would have been different

absent the Government's misconduct. Indeed, the first and only judge to have reviewed the new

evidence came to that conclusion:

> In light of the government's reliance on the Wavra murder during sentencing, it is
> reasonably likely that, if it had been disclosed at trial that the Oklahoma court
> found the evidence insufficient to establish that Lee was guilty of murder, the
> outcome at sentencing would have been different.

*Lee*, No. 4:97-cr-00243-JLH, slip op. at 14 (E.D. Ark. Feb. 26, 2019) (finding materiality but

also holding relief unavailable in § 2255).

The Wavra murder was the key prior bad act upon which the Government focused in its

penalty phase case-in-chief: of the five witnesses that it called, four were put on the stand to

testify about the Wavra murder. Tr. 7389-7418; 7456-61. Moreover, almost half of the

Government's penalty phase presentation in chief was spent reading into evidence the transcript

of Mr. Lee's testimony at his cousin's September 28, 1990, preliminary hearing. Tr. 7418-56.[45]

Similarly, the Wavra murder was a focus of every argument the Government made to the

jury during Mr. Lee's penalty phase to support its central "future dangerousness" case. During

his opening statement, Mr. Liroff explicitly framed the Wavra murder as a significant piece of

evidence it would offer to justify a death sentence in this proceeding, notwithstanding the jury's

decision to sentence the more culpable Chevie Kehoe to life. As Mr. Liroff put it, there were

---

[45] While evidence about the PCL-R made up the bulk of the penalty phase, the prosecution used
the *defense* expert, in a lengthy cross-examination, as the conduit for that damning diagnosis and
extended analysis. *See supra*. The Wavra incident was the core of the Government's shorter but still
powerful case-in-chief.

critical differences in the respective backgrounds and "life experiences" of the two that should lead the jury to punish Mr. Lee more harshly; namely, that Danny Lee had killed someone when he was only seventeen years old. Tr. 7381-82. Significantly, the teenaged Mr. Lee's involvement in the Wavra murder became a key proving point that the PCL-R results were correct, and that this defendant was a lifelong "psychopath" who would continue to be a danger to others if not sentenced to die:

> The last aggravating factor that you will consider is the factor, the nonstatutory factor, called future dangerousness. What this means is that the evidence presented to you in this case as to Mr. Lee means that even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous. …

> That is part of his profile. Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time.

> In the end, what the evidence that will be presented will establish is that Mr. Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use. What you will also learn is some five and a half years ago, before Mr. Lee helped kill the Mueller family, Mr. Lee helped kill another person, Joseph John Wavra, in Oklahoma. Mr. Lee was then just 17 years old. …

> Mr. Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person.

Tr. 7381-82.

From the very start of the penalty phase, the prosecution advanced the theory that Mr. Lee had escaped justice for the Wavra murder and that jurors should draw a straight line that ran from that crime to the Mueller murders:

> Now, few of us in life get an opportunity for a second chance. But Mr. Lee did. And he *got a gift in that case from the prosecutors* in Oklahoma. They gave him a plea bargain. And this allowed him to *get off with just a robbery*. He got minimal jail time. And he was given that opportunity to walk out that door with a second chance. Unfortunately, that doorway led him eventually to Tilly, Arkansas.

Tr. 7383 (emphasis added).

52

Prosecutor Liroff emphasized these same themes in his closing argument to the jurors, again pointing to Mr. Lee's dangerousness as the reason why they should not give him the same sentence as his co-defendant:

> Now, I'm talking legally about the concept of future dangerousness. And that was an issue in Mr. Kehoe's trial. Mr. Lee is not Mr. Kehoe. Mr. Lee is different. And you are charged with the responsibility of judging them separately. If you believe he is a dangerous and violent man, then I suggest you have a responsibility to consider this in determining his penalty.

Tr. 7959.

> An example of that is that behavior that happened during the Joey Wavra murder. You should be very troubled by that. *And that alone illustrates this drastic distinction on several levels between Danny Lee and Chevie Keho*e. . . . And you saw Danny Lee, the man he was back then. And he's the same man that sits over there. He is the same man who during this trial has that hair trigger volatility that will make him say or do something at that instant, regardless of any consequences because it's damn the consequences.

Tr. 7962 (emphasis added). The Government repeatedly cited the Wavra murder as a critical fact that proved Mr. Lee would be a future danger. *See* Tr. 7964 ("The other aspect of the Wavra murder that's of absolute importance is because it communicates to you, and it says to you something about that aggravating factor of future dangerousness."); Tr. 7975 ("the future dangerousness, the prior crime against Joey Wavra").

That Mr. Lee "got away" with the Wavra murder through the largesse of the local prosecutors was a principal prosecution theme. *See* Tr. 7972 ("How about that DA in Oklahoma who let him get off with a robbery?"). Indeed, one of the Government's most potent arguments in persuading the jury to impose a death sentence, despite having spared Mr. Kehoe, was that Mr. Lee had "fooled" the criminal justice system once before when he "got off" with that "incredible" plea deal, but despite getting a second chance, he never changed his murderous ways:

One important aspect of this is this. When this happened, Lee got this incredible, this incredible deal, this plea bargain in the end, pled guilty to a robbery. How many of you, how many of you in your life have thought back. . . . And sometimes in the middle of the night you sit back and you think about things that you've done, places you've been, self-confession time.

. . . *Usually you commit a murder*, and you get sent away for a very long time. And you don't get an opportunity for a do over. It's done. You made a horrible mistake, and you can't do anything about it. And you can't say, Gee, I wish I hadn't done that so I could get back on my life and have an opportunity to make amends. Danny Lee got a do over. He got the opportunity to say, my God, what have I done? Look where all this led me. He had the opportunity to say, I made a mistake, but I got an opportunity to turn myself around. And that's incredibly monumental.

It is rare for a *murderer* like Danny Lee to stand before a jury who is about to determine his death penalty, *who has an earlier murder under his belt, who has a prior victim's blood on his hands*. You know the expression. Fool me once, shame on you. Fool me twice, shame on me. And that's the first aspect of this Wavra *murder* that I think is terribly important and I think you should consider in distinguishing Lee from Kehoe because Lee has been here before. Lee has stood in the court of justice. Lee has had the opportunity to regret, and Lee has had that opportunity to change his ways.

Tr. 7963-64 (emphasis added). The prosecutor delivered an unmistakable message to the jury — Danny Lee had already had one chance to redeem himself after a murder and he shouldn't be getting another. The death penalty was warranted for him.

The Government also used the alleged earlier murder to diminish the power of the mitigation the defense presented. Specifically, the defense presented evidence at sentencing that Mr. Lee's mental capacity was impaired, and that he suffered from neurological deficits and brain dysfunction. According to the Government, this was merely a ploy by defense counsel to come up with an excuse for why Mr. Lee did not change his ways after the Wavra murder. The jury was told it ought not fall for this tactic; Mr. Lee had already received "a full quota of earthly grace" when he was given a lenient plea deal, and his failure to make a change in his life was his own choice and not because of "all this mental stuff." Tr. 7991.

54

I'm over there thinking, why is Ms. Compton putting on all this proof, and why do we have to go to the trouble to rebut this proof? It didn't make any sense to me. But it makes sense now after I've heard the arguments. It all made sense to me. Mrs. Compton knew that her situation, even though Chevie Kehoe was the leader, her situation in defending Danny Lee was way different than Professor Sullivan's situation when he tried to argue for the life of Chevie Kehoe. And it was way different because of the Wavra murder. It was way different because Danny Lee had his opportunity before. He had a chance to come in and take a look at his life, as [AUSA] Lane [Liroff] pointed out to you, and say "I will make a change." And he didn't. And I just believe that Ms. Compton realized that given that basic fact she couldn't sell grace to you. She had to go to all this mental stuff. . . .

I submit to you that Mr. Lee has had a full quota of earthly grace. Now as to heavenly grace, that's between him and his maker. I submit to you, though, that as far as earthly grace is committed, he's had his full quota.

*Id.*

Faced with Chevie Kehoe's undeniably greater role in the offense and his own history of violence, Mr. Liroff then used the Wavra murder to rebut the statutory mitigating factor that an equally culpable person would not be punished by death:

And this is a mitigating factor, that "another person equally culpable will not be punished by death." If you look at it, it doesn't say who that is. But there's no question what we are talking about here. We are talking about Chevie Kehoe. . . . Things are not equal. Things are not the same. People are different. Chevie is not Danny.

The most obvious, and the most glaring difference is this. It all comes under the heading of "future dangerousness." . . . There's no evidence of the prior dangerousness. *There's no prior Joey Wavra as to Chevie. There is as to Mr. Lee.*

Tr. 7969-70 (emphasis added). There is no question that the Government's aggressive use of the Wavra murder to attack Mr. Lee's mitigation case was effective: despite the Government's own evidence that Chevie Kehoe was not simply *equally* culpable, but actually *more* culpable given that he alone killed the child Sarah Powell, only three jurors found that this mitigating factor was proven. *See* Exh. I (Penalty Phase Verdict Form) at 8.

The suppressed information concerning Mr. Lee's true role in that crime was material.

There could hardly be a more powerful rejoinder to the Government's claim that Mr. Lee was "legally and morally" guilty of killing Mr. Wavra than an official state court adjudication finding the opposite. The suppressed evidence gives lie to the inflammatory claim that Mr. Lee was given a prosecutorial "gift" that allowed him to "get away" with the Wavra murder.

      **C.**      **Mr. Lee's death sentence was obtained in violation of *Napue v. Illinois* and *Giglio v. United States*.**

Prosecutors violate due process by presenting material testimony that is false or that creates a false impression, or by allowing such testimony to stand uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements that are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v Dept. of Corrections*, 572 F.3d 1327, 1333 (11th Cir. 2009) ("The *Giglio* rule applies to explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury while questioning a witness.") (internal quotation marks and citation omitted). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154. Indeed, truth and accuracy, especially in a capital case, is of the utmost importance even when a specific prosecutor acts in good faith. *Id*. at 153.

Under *Napue* and its progeny, a violation is established if: (1) the testimony in question was misleading; (2) the Government knew or should have known the testimony was misleading; and (3) the testimony was material. As set forth below, the use of the Wavra "murder" violated this aspect of due process as well.

### 1.   The Wavra evidence was false and/or misleading.

As described above, the Government's penalty phase presentation falsely conveyed the impression that (1) Mr. Lee was guilty of a prior murder; and (2) his guilty plea to robbery was an inexplicable and unfortunate "gift" by local prosecutors. The Government's penalty phase presentation was particularly misleading because it was premised on the notion that one need look no further than Mr. Lee's own sworn testimony at his cousin's preliminary hearing to establish these facts. But though the transcript that was read to the jury was certainly damning, the true story of how the case came to be resolved through a robbery plea presented a wholly different tale from the one the Government told.

Indeed, the force of Mr. Lee's prior Oklahoma testimony is considerably diminished when considered in its true context: a state court reviewing the totality of the evidence, including that very testimony, determined that there was insufficient evidence for the state to carry its burden of proof of probable cause on the murder charge. *At best*, Mr. Lee could have been convicted of robbing Mr. Wavra, which is what he pled to: stealing his keys.

### 2.   The Government knew or should have known the Wavra evidence was false and/or misleading.

For the same reasons articulated above, the Government knew or should have known that the Wavra evidence was false and/or misleading. It had clearly sought and obtained relevant Oklahoma state court records concerning the Wavra matter. Moreover, the Oklahoma City Police Department assisted the Government in its capital prosecution of Mr. Lee and provided it with information concerning the Wavra matter. It is simply inconceivable that the lead detectives pursuing the Wavra murder -- one of whom conducted the interrogation of Mr. Lee -- were unaware that a state court had found whatever evidence they had gathered in support of the Lee murder charge was insufficient. Indeed, any knowledge by the police concerning the Wavra

57

matter that was favorable to Mr. Lee is clearly attributable to the Government. *Kyles*, 514 U.S. at 437.[46]

### 3.    The Wavra evidence was material.

All of the reasons articulated above showing that the suppressed evidence was material to Mr. Lee's penalty-phase defense under *Brady* apply with even greater force to show why the *Napue*/*Giglio* violation was not harmless beyond a reasonable doubt. The representation at trial that Mr. Lee was "legally and morally" guilty of the Wavra murder, a central theme of the penalty phase presentation, carried the imprimatur of official state court records that seemingly established that fact. Similarly, the claim that Mr. Lee escaped a conviction for that murder because local prosecutors gave Mr. Lee a "gift" of a reduced charge of robbery was made by a federal prosecutor who was presumably knowledgeable about plea negotiations in criminal cases. Thus, the jury could reasonably have felt entitled to rely with confidence on these representations and believe that Mr. Lee had, in fact, gotten away with the Wavra murder, and that the psychopathy diagnosis had a basis in his criminal history.

The suppressed evidence would have eliminated any such confidence. Armed with the actual facts, it is reasonably likely that the jury would not have found the "future dangerousness" aggravator nor failed to find and weigh the mitigating truth that the more culpable actor was

---

[46] It should be noted that even if the evidence supporting Mr. Lee's claim was all publicly available, the Government would still have been required to correct the false testimony. *See United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("But the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false."). Bolstering false testimony as the prosecutors did in argument here is also prohibited. *See United States v. O'Keefe,* 128 F.3d 885, 894-95 (5th Cir. 1997) ("[E]ven when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument . . . or the defense is unable to utilize the information . . . or when the government thereafter asks misleading questions.") (internal citations omitted).

receiving a life sentence. Hence, there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury" in returning a death sentence, *United States v. Agurs*, 427 U.S. 97, 103 (1976), and Mr. Lee is entitled to relief.

### D.   Section 2255 has proved an ineffective vehicle for adjudicating Mr. Lee's misconduct claims.

Mr. Lee's *Brady* and *Napue* claims are meritorious. Indeed, a federal judge has already held that if the truth about Mr. Lee's prior conviction had not been suppressed, there is a reasonable probability that he would not have been sentenced to death. Yet despite this, Mr. Lee has been unable to obtain judicial review of his claims because of a "glitch" in the statute: the structure of § 2255 does not allow him access to a remedy for this constitutional violation because the newly discovered evidence of misconduct undermines the *sentence*, rather than the *conviction*. *Cf. In re Lott*, 366 F.3d 431, 434 (6th Cir. 2004) (authorizing successive application where "the evidence as a whole…makes a prima facie showing of constitutional *Brady* error that, if proved in the district court, may be sufficient to cause the fact finder to reach the conclusion beyond a reasonable doubt that the petitioner was not guilty of premeditatedly murdering the victim."); *Quezada v. Smith*, 624 F.3d 514, 522 (2d Cir. 2010) (granting authorization on *Brady*/*Giglio* claim where applicant made prima facie showing that he would not have been convicted); *Blackman v. Davis*, 909 F.3d 772, 780 (5th Cir. 2018) (denying authorization of *Brady* claim where "totality of the evidence does not prove clearly and convincingly, even with the additional impeachment [evidence], that a reasonable jury would have been swayed to acquit Blackman.")

The structural problem in the operation of § 2255 in Mr. Lee's case was not of his making. The § 2255 statute prevented the Arkansas district court from granting relief once the truth was uncovered solely because the Government successfully concealed its misconduct until

well after the conclusion of the initial § 2255 proceedings. Despite multiple requests for the disclosure of *Brady* information—including in the § 2255 motion itself[47]—the Government consistently, and falsely, indicated that any relevant discovery had already been provided prior to the trial. *See Banks v. Dretke*, 540 U.S. 668, 695 (2004) (reasonable for defendant to rely on prosecution's "full disclosure representation" and to assume it would not "stoop to improper litigation conduct" at capital sentencing). Its continued misconduct thus deprived Mr. Lee of a "reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his . . . sentence" in his initial § 2255 proceeding. *Beason,* 926 F. 3d at 935. *See also Webster*, 784 F.3d at 1140 (newly discovered evidence existed before the time of trial but was not available at the time of the first § 2255 motion because Government failed to disclose it to defense); *Garza*, 253 F.3d at 923 (finding that it was "literally impossible" for the petitioner to have challenged his death sentence at the time of his first § 2255 motion because no judicially cognizable treaty obligation not to execute the petitioner existed at that time).

By the time the suppressed evidence in Mr. Lee's case was uncovered, the only mechanism for obtaining § 2255 review of his *Brady* and *Napue* claims was by way of a second or successive motion pursuant to §§ 2255(h)(1) or (2). Under § 2255(h)(1), such a motion must contain "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder *would have found the movant guilty of the offense*." (emphasis added.) Mr. Lee's newly discovered evidence, however, is not cognizable under this provision; although it establishes that no reasonable factfinder would have sentenced him to death, it does not implicate the conviction.

---

[47] See Doc. No. 1118-1 at 7 n.3.

The Eighth Circuit, agreeing with several other circuits, has interpreted § 2255(h)(1) to include only those motions that challenge a movant's guilt, not those addressing even a sentence secured through deception. *Davis v. Kelley*, 854 F.3d 967, 971 (8th Cir. 2017) (refusing to allow successive *Atkins* claim because petitioner has "not asserted an actual-innocence claim"). *See also In re Dean*, 341 F.3d 1247, 1249 (11th Cir. 2003) ("As Dean's application only challenges his sentence and not whether he is guilty of the offense, we find that it does not satisfy the newly discovered evidence exception for filing a successive § 2255 motion."); *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997) (successive motion for post-conviction relief may not be filed on basis of newly discovered evidence unless the motion challenges the petitioner's conviction and not merely his sentence). Thus, according to the Eighth Circuit, § 2255 provides no relief for a movant, such as Mr. Lee, who establishes the Government continued to suppress evidence throughout trial, appeal and post-conviction, because it affects his death sentence alone not his conviction.

Government misconduct can directly influence the outcome at either the guilt or penalty phase, yet if the Government is successful in concealing the evidence long enough, § 2255 provides no avenue to consider the latter. Even where the newly discovered evidence establishes (as it does here) that, but for that misconduct, no reasonable factfinder would have sentenced the prisoner to *death*, no remedy is available if the Government can hide its misconduct until after the first round of post-conviction review. The failure to provide any opportunity for judicial rectification of so fundamental a defect in a prisoner's sentence renders § 2255 "inadequate" or "ineffective" for purposes of § 2255(e)'s savings clause. *See Webster*, 784 F.3d at 1139 ("It is fairly possible to read section 2255(e) as encompassing challenges to both convictions and sentences that as a structural matter cannot be entertained by use of the 2255 motion. To hold

61

otherwise would lead in some cases … to the intolerable result of condoning an execution that violates the Eighth Amendment.").

Indeed, as *Davenport* recognized, whether § 2255 is inadequate or ineffective depends on whether it allows the petitioner "a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction *and sentence*." *In re Davenport*, 147 F.3d at 609 (emphasis added). *See also Webster*, 784 F.3d at 1136 ("arguments addressing the fundamental legality of a sentence could be entertained, not just those attacking a conviction") (internal quotation marks and citation omitted). Where a prisoner has been deprived of that opportunity, § 2241 must provide a failsafe. *See id.* at 1137-39 (rejecting claim that Congress did not intend to permit the savings clause to be used for anything other than claims of actual innocence of the underlying offense); *Garza*, 253 F.3d at 922.

To hold otherwise would have deleterious implications for habeas practice. It would essentially reward the Government for managing to conceal *Brady* evidence about a prisoner's death sentence until after the first § 2255 proceeding had concluded. If § 2241 were then held to be unavailable, the Government would be immunized from judicial review of any misconduct it employed to secure a sentence of death. Such a rule is inconsistent with the purpose of the Great Writ. *Cf. Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("The State here nevertheless urges, in effect, that 'the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence,' . . . . A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").

This case presents exceptional circumstances: Mr. Lee is awaiting execution; he has proven that his death sentence was obtained through Government misconduct; and a federal court has determined that the misconduct was prejudicial in that he would have not otherwise

62

have been sentenced to death. Section 2255 is unavailable to him because the Government was able to suppress the evidence long enough to trigger the successor provisions of § 2255 and thus deprive him of a remedy. The savings clause of § 2255 exists to prevent such an injustice.

IV.    **ANY INTERPRETATION OF §§ 2255(e) AND 2241 THAT WOULD PRESENT AN ABSOLUTE BAR TO MR. LEE'S CLAIMS WOULD RESULT IN AN UNCONSTITUTIONAL SUSPENSION OF THE WRIT.**

The United States Constitution forbids Congress from suspending the writ of habeas corpus except during periods of invasion or rebellion. U.S. Const. art. I, § 9, cl. 2. ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). When Congress enacted § 2255, and later amended it under the Antiterrorism and Effective Death Penalty Act (AEDPA), it did not eliminate federal prisoners' access to the Great Writ. As the Supreme Court explained in *Holland v. Florida*:

> When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the "writ of habeas corpus plays a vital role in protecting constitutional rights." . . .  It did not seek to end every possible delay at all costs. . . . The importance of the Great Writ, the only writ explicitly protected by the Constitution . . . , along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.

560 U.S.631, 649 (2010) (citations omitted*). See also United States v. Hayman*, 342 U.S. 205, 223 (1952) (noting that § 2255's "inadequate or ineffective" language preserves habeas for federal prisoners); *INS v. St. Cyr*, 533 U.S. 289, 298-314 (2001) (referencing constitutional questions that would be presented under the Suspension Clause if habeas relief were unavailable, and concluding that, at the "absolute minimum," "the Suspension Clause protects the writ 'as it existed in 1789'").

Congress thus retained a "safety hatch" in the form of § 2255(e)'s savings clause to

prevent the possibility of the suspension of the writ for federal prisoners. *See In re Davenport*, 147 F.3d at 609 ("[I]f section 2255 proved in a particular case not to be an adequate substitute for habeas corpus, the prisoner could seek habeas corpus. This would block any argument that Congress was suspending the writ."). As numerous courts have noted, if the savings clause cannot operate as intended, as a failsafe mechanism to prevent injustice where, as here, § 2255 is unavailable, then the writ of habeas corpus is unconstitutionally suspended. *See Triestman v. United States*, 124 F.3d 361, 378 n.21 (2d Cir.1997) (noting potential Suspension Clause issues if collateral review precluded when "Congress has arguably cut off all post-conviction relief for a claim of actual innocence that was based on the existing record and that could not have been effectively brought previously."); *In re Dorsainvil*, 119 F.3d at 248 ("Were no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent as a result of a previously unavailable statutory interpretation, we would be faced with a thorny constitutional issue."); *Martinez-Villareal v. Stewart*, 118 F. 3d 628, 635 (9th Cir. 1997) (Nelson, J., concurring), *aff'd* 523 U.S. 637 (1998) (AEDPA "unconstitutionally suspends the writ of habeas corpus . . . in an unambiguous fashion, by prohibiting the consideration of claims in second or successive petitions that do not fit the exceptions found in § 2244(b)(1) and (2)" and that cannot otherwise be raised); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1190 (E.D. Mich. 2001) (finding that utilizing the one-year statute of limitations in AEDPA to deny relief to a petitioner who can demonstrate factual innocence would constitute violation of the Suspension Clause).

Mr. Lee's Petition meets the plain language and purpose of both § 2255(e) and § 2241. He has established Fifth and Sixth Amendment violations that render his death sentence unconstitutional. Ordinarily, such violations are redressable under § 2255. But where, as here,

§ 2255 is unavailable, through no fault of Mr. Lee's, § 2241 is the only avenue for review. Under these circumstances, denying review under § 2241 would result in no review at all of claims establishing the unconstitutionality of Mr. Lee's death sentence, and would therefore constitute an unconstitutional suspension of the writ.

## CONCLUSION

Petitioner Daniel Lee presents this Court with an unusual set of circumstances. His trial lawyers failed to challenge the use of a test at his capital sentencing which, without scientific support, purported to prove he would be a danger in the future. Had they challenged the use of the test, the Government's expert would have disavowed his reliance on it as he did in other capital cases. Mr. Lee's § 2255 lawyers, given the chance to show how he was harmed by trial counsel's poor performance on the central issue at his sentencing, mishandled their own representation. Their failure to follow governing procedure prevented the post-conviction judge from reviewing the claim and led to denial of the § 2255 motion. When a remedy emerged for that failure in the form of new Supreme Court rulings, Mr. Lee moved diligently to avail himself of it, only to have the Eighth Circuit rule that the structure of § 2255 did not permit him to proceed.

Mr. Lee found the courthouse doors closed to him – despite the fact that the Government has never defended the use of this facially prejudicial test, that the presiding judge found he would not likely have been sentenced to death without that specious evidence, and that similarly situated state prisoners would have been entitled to review of their lawyer's prejudicial failures under precisely the same circumstances. Mr. Lee then discovered that the Government had made another false claim at his penalty phase, insisting that he had gotten away with a prior murder due to prosecutorial leniency when in fact a judge had recommended dismissal of an inflated charge those prosecutors could not possibly prove. Once again § 2255 was found inadequate to address an

egregious error at his sentencing. Once again a federal district court ruled that Mr. Lee would not likely have been sentenced to death absent that error.

Under these exceptional circumstances, Mr. Lee turns to § 2255's savings clause and to this Court for relief. He asks this Court to find jurisdiction pursuant to 28 U.S.C. § 2241, and to hold that the Government cannot execute a man on the bases of false evidence that even it cannot defend.

## REQUEST FOR RELIEF

For all of the above reasons, Petitioner requests that the Court provide the following

relief:

1. That Respondents be ordered to respond to this Petition;

2. That Petitioner be permitted to file a Reply and/or a Traverse;

3. That leave to conduct discovery be granted if necessary to prove the facts as alleged in this Petition;

4. That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact; and

5. That habeas relief from Petitioner's sentence of death be granted.


Respectfully submitted,


Morris H. Moon
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
(301) 344-0019 (fax)
Morris_Moon@fd.org

George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855 (phone)
(301) 344-0019 (fax)
George_Kouros@fd.org

## STATEMENT PURSUANT TO LOCAL CRIMINAL RULE 38-2(c)

Pursuant to Local Criminal Rule 38-2(c), Petitioner identifies the following other legal actions, by cause number and jurisdiction, challenging the sentence challenged in the current petition, as well as any corresponding relevant judicial opinion, memorandum, or order.

I. **Motion for New Trial**
    A.     *United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark.)
        Relevant opinion:     89 F.Supp.2d 1017 (E.D. Ark 3/21/00)
    B.     *United States v. Daniel Lewis Lee,* No. 00-1975 (8th Cir.)
        Relevant opinion:     274 F.3d 485 (8th Cir. 2001)

II. **Direct Appeal**
    A.     *United States v. Daniel Lee*, No. 02-2389 (8th Cir.)
        Relevant opinion:     374 F.3d 637 (8th Cir. 2004)

III. **Motion to Vacate Pursuant to 28 U.S.C. § 2255**
    A.     *United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark.)
        Relevant opinions:
            1.     Docket No. 1163 (E.D. Ark. 8/28/08) (Order denying § 2255 motion)
            2.     Docket No. 1189 (E.D. Ark. 12/22/10) (Order denying motion to reconsider pursuant to Fed. R. Civ. P. 59)
            3.     Docket No. 1249 (E.D. Ark. 3/18/14) (Order denying motion to reopen judgment pursuant to Fed. R. Civ. P. 60(b))

    B.     *United States v. Daniel Lee*, No. 11-1380 (8th Cir.)
        Relevant opinion:     715 F.3d 215 (8th Cir. 2013) (affirming denial of § 2255 motion)

    C.     *United States v. Daniel Lee*, No. 14-2843 (8th Cir.)
        Relevant opinions:
            1.     792 F.3d 1021 (8th Cir. 2015) (affirming denial of Rule 60(b) motion)
            2.     811 F.3d 272 (8th Cir. 2015) (Kelly, J., dissent from denial of rehearing)

IV. **Second-in-time Motion to Vacate Pursuant to 28 U.S.C. § 2255**
    A.     *United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark.)
        Relevant opinion:     Docket No. 1313 (E.D. Ark. 2/26/19) (Opinion and order denying § 2255 motion and certificate of appealability)

## CERTIFICATE OF SERVICE

I certify that on September 26, 2019**,** the foregoing *Petition for Writ of Habeas Corpus* was filed electronically with the Clerk of the Court via CM/ECF, and further certify that service was made via Federal Express on the following:

Michael Gordon
Assistant United States Attorney
U.S. Attorney's Office
425 West Capitol, Suite 500
Little Rock, AR 72201

Warden, USP-Terre Haute
U.S. Penitentiary
4700 Bureau Road South
Terre Haute, IN 47802

George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855 (phone)
(301) 344-0019 (fax)
George_Kouros@fd.org

*Counsel for Petitioner Daniel Lee*

69