# EXHIBIT D

<u>Declaration of Donald N. Bersoff, Ph.D., J.D., Pursuant to 28 U.S.C. § 1746</u>

I, Donald N. Bersoff, Ph.D, J.D., hereby declare the following:

1. I am the 2013 President of the American Psychological Association (APA). I have been a member of the APA since 1965 and was elected a fellow in 1974. I was granted Diplomate status from the American Board of Professional Psychology in 1974. Since 1997 I have presented annual workshops on the ethics and professional standards of forensic testimony for the American Academy of Forensic Psychology. From 1980-1981 I served as president of the American Psychology-Law Society and I am a Fellow of that group.

2. I am currently a Professor Emeritus at the Drexel University's Earle Mack School of Law and an Adjunct Professor of Psychology at Drexel University.

3. From April 2007 to August 2012, I served as a tenured Full Professor at the Earle Mack School of Law and the Department of Psychology. In those capacities I was the Director of the J.D./Ph.D. Program in Law & Psychology. Since August of 2001 I have been Professor Emeritus at Villanova University School of Law.

4. From January 1990 to August 2001 I was a tenured Full Professor at the Villanova University School of Law and the Department of Psychology of MCP Hahnemann University (the latter, now merged with Drexel University). In those capacities, I directed their J.D./Ph.D. Program in Law & Psychology.

5. I have been a faculty member at several other universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and Ohio State University.

6. I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

7. From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee, and conducted all appeal hearings from decisions of the Ethics Committee. From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the 1992 APA Ethical Principles of Psychologists and Code of Conduct (Code of Ethics). From 1994-1997 I served on the APA's eleven member elected Board of Directors. Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics Committee that led to expulsion or stipulated resignation of APA members. I served on the Council of Representatives again, between 1999-2001, and served as chair of the APA's Policy and Planning Board (1999-2000).

8. I am the author of Ethical Conflicts in Psychology, originally published by the APA in 1995, and now in its fourth edition (2008). I am about to prepare the fifth edition at the request of the publisher. It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

9. In all, I have published four texts, 26 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of these publications and presentations concern ethical, legal, and policy issues in psychology.

2

10.   I also serve as an expert witness in cases involving the ethical conduct of psychologists. In that capacity I have been retained – at times on a *pro bono* basis – in civil and licensure board cases, and on occasion in death penalty cases.

11.   I have a particular interest in the use and misuse of social science evidence in the legal system. I have presented and written on this issue extensively.  In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges in Denver, Colorado, on The Application of *Daubert* to Forensic and Social Science Evidence. In March and April of 1996, at the Sixth Annual National Symposium on Mental Health and the Law, and at the American Psychology-Law Society, I presented papers on the admissibility of expert psychological testimony. In March 2000, I served as chair of a symposium on the impact of *Daubert* on the admissibility of social science evidence, and I presented a paper on that topic at the biennial meeting of the American Psychology-Law Society.  In October 2000, I moderated an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute of Justice, the Criminal Justice Section of the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation, in collaboration with the National Academy of Sciences and the Federal Judicial Center. I was the counsel of record for a Group of American Law Professors, submitting an *amicus curiae* brief in the original *Daubert* case before the United States Supreme Court in 1993.  In June 2011, I presented a paper, Admissibility of Mental Health Testimony after *Daubert,* at a conference on Forensic Trends:  Psychiatric and Behavioral Issues, in Washington, DC.

12.   I have been retained by counsel for Daniel Lee in the instant matter, for the purpose of advising whether the basis for a legal challenge to government expert Dr. Thomas V.

3

Ryan's use of the PCL-R to predict Mr. Lee's future dangerousness in prison existed at the time of Mr. Lee's May 1999 penalty phase hearing. Counsel for Mr. Lee have informed me that in an earlier proceeding in this matter, a question arose regarding whether the basis for such a challenge existed in 1999, since Dr. Ryan did not reject the PCL-R as an effective predictor of future conduct until 2000, when a legal challenge was raised by counsel in a different case, *United States v. Willis Haynes.* As I played a role in the *Haynes* matter, having provided a declaration at the request of defense counsel, I address here the question of whether such a challenge could have been raised one year earlier, in 1999.

13.    As I explain below, the basis for a challenge to the PCL-R existed at the time of Mr. Lee's trial in 1999.   In fact, Dr. Ryan himself has acknowledged that the basis for such a challenge existed *before* 1999. He did so in a sworn declaration I have reviewed, which was offered in post-conviction proceedings involving an even earlier death penalty trial, *United States v. Richard Stitt.* In Mr. Stitt's post-conviction proceeding, Dr. Ryan disavowed his trial testimony that Mr. Stitt's high PCL-R score rendered him likely to commit acts of violence in prison. The *Stitt* matter was tried in 1998.

14.    In the *Stitt* declaration, Dr. Ryan stated that "the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial [in 1998]." Thomas V. Ryan, *Stitt* Declaration, paragraph 6.

15.    Dr. Ryan explained further that in 1998, at the time he testified in *Stitt,*

> [i]t was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence."

(Ryan, *Stitt* declaration, paragraph 9).

4

16. The reason that the basis for a challenge to the PCL-R existed in 1998 and persisted through 1999[1], rests on the fact that the scientific research conducted through those dates did not support using the PCL-R to predict an individual's future dangerousness in prison. Had a challenge to the use of the PCL-R for the purpose of predicting future dangerousness in prison been raised in 1999, I would have provided the same opinion I provided a year later in the 2000 case of *United States v. Willis Haynes* (mentioned above), i.e., that Dr. Ryan's reliance on the PCL-R to predict future dangerousness in prison was unsupported by empirical evidence, did not present an appropriate application of generally accepted ethical principles applicable to psychologists, and violated the generally accepted standards of forensic psychological practice.

17. In 2000, in the *Haynes* case, I, along with four other psychologists, provided expert opinions relating to Dr. Ryan's use of the PCL-R as a basis for predicting that the defendant would be a future danger in prison. The four other psychologists were all highly credentialed leaders in the field of forensic psychology whose expertise included violence risk assessment and who had deep knowledge of the research literature relating to the PCL-R. They offered opinions about the state of the science and whether it supported predictions of the sort offered by Dr. Ryan. Although their conclusions were based on the state of the science in the year 2000, as described above and detailed further below, their statements described equally well the state of the science in 1999, as they focused on the fact that Dr. Ryan's proposed testimony exceeded what the research done to date could support. I was asked to rely on their individual and collective expertise and determine whether Dr. Ryan's proposed testimony was consistent with prevailing

---

[1] In fact, to this day, the scientific research in this area does not support the use of the PCL-R in this manner.

professional standards governing forensic psychologists and whether such testimony could meet the legal requirements of *Daubert*.

18.    Each of the four risk assessment subject matter experts stated that while the PCL-R was useful for some purposes, it was not scientifically defensible to use it to predict the likelihood of an individual's future dangerousness in federal prison, due to the lack of empirical research establishing its reliability and validity for that purpose. Each explained that there was no research base to support the conclusion Dr. Ryan drew concerning the PCL-R and risk of future prison violence. Relevant portions of the *Haynes* declarations include the following.

a.    Dr. Stephen David Hart noted that "to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the (sic) North America;"

b.    Dr. Kirk Heilbrun stated that "[c]urrently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual's score on the instrument is related to the likelihood that this individual will commit acts of violence or aggression while in a secure prison environment;"

c.    Dr. Norman Poythress knew of "no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness in a maximum security prison." He found "it is inappropriate to

conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores;"

d. Dr. John F. Edens expressed "significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated."

19. In forming my opinion in the *Haynes* matter I relied on the opinions of Drs. Hart, Heilbrun, Poythress and Edens, as well as the APA's Code of Ethics[2] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[3] ("Specialty Guidelines"), and my research on the application of *Daubert* to forensic psychological testimony. One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that only empirically-supported and generally accepted scientific conclusions are presented to a court. The forensic psychologist's status as a credentialed expert can have a profound impact on jury decision-making. For this reason, and to protect the integrity of the profession, the forensic expert's opinion must be firmly grounded in science, based on objective empirical research which has yielded observable and measurable results. I concluded then, and affirm now, that linking a high PCL-R score to a greater likelihood of institutional violence did not represent an appropriate application of generally accepted ethical principles, and violated the generally accepted standards of psychological practice. I also concluded then, and affirm now, that Dr. Ryan's conclusions were inadmissible under *Daubert*.

---

[2] APA, Ethical Principles of Psychologists and Code of Conduct, 47 Amer. Psychologist 1597 (1992). The Ethics Code was revised in 2010 and is retrievable at http://www.apa.org/ethics/code/index.aspx.

[3] Committee on Ethical Guidelines for Forensic Psychologists, 15 L. & Hum. Behav. 655 (1991). The Specialty Guidelines were revised in 2012 and adopted as APA policy. They can be found at 68 Amer. Psychologist 7 (2013).

20.  It is my understanding that Dr. Ryan withdrew his report, and that no testimony about the PCL-R was offered at the *Haynes* trial.  To the best of my knowledge, after the litigation in *Haynes*, no prediction of future dangerousness predicated on the PCL-R has been admitted in any federal capital case.

21.  The absence of empirical support establishing a connection between a high PCL-R score and elevated risk of violent behavior in prison existed in May of 1999, at the time of Mr. Lee's penalty phase proceeding. For this reason, in May of 1999 there was a basis for a successful challenge to the use of the PCL-R as misleading and scientifically unsupportable.

I declare under the penalty of perjury that the foregoing is true and correct.

_____
Donald N. Bersoff, Ph.D., J.D.
September  13 , 2013

8