IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DANIEL LEWIS LEE, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 2:19-CV-00468-JPH-DLP |
| | ) | Capital Case |
| WARDEN USP TERRE HAUTE, | ) | Execution Scheduled for Dec. 9, 2019 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondents. | ) | |

———————

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DANIEL LEWIS LEE'S PETITION FOR A WRIT OF HABEAS CORPUS**

———————

JOSH J. MINKLER
United States Attorney
Southern District of Indiana

MICHAEL GORDON
Assistant United States Attorney
Eastern District of Arkansas

BRIAN A. BENCZKOWSKI
Assistant Attorney General

MATTHEW S. MINER
Deputy Assistant Attorney General

JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1260
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................. 3

STATEMENT ...................................................................................... 3

    I.    Procedural Overview ........................................................ 3

    II.    The Murders........................................................................ 6

    III.    Trial and Sentencing ......................................................... 8

        A.    Guilt Phase .......................................................... 9

        B.    Penalty Phase .................................................... 11

    IV.    Postconviction Proceedings........................................... 16

    V.    The Present Habeas Petition........................................... 18

ARGUMENT ...................................................................................... 18

    I.    The Saving Clause of § 2255(e) Forecloses the Claims in Lee's Habeas Petition................................................ 19

        A.    Background: The Saving Clause ....................... 19

        B.    The Saving Clause Forecloses the Claims in Lee's Habeas Petition ...................................... 27

            1.    The Saving Clause Does Not Permit Lee's Ineffective-Assistance Claim .................................. 28

            2.    The Saving Clause Does Not Permit Lee's *Brady* and *Napue* Claims................................. 35

            3.    There Is No Danger of Violating the Suspension Clause .................................................. 37

    II.    The Ineffective-Assistance Claim Lacks Merit........................... 38

        A.    Background.................................................. 39

i

1.   Trial................................................................................... 39

2.   Post-Trial Motion for a New Sentencing Hearing................................................................... 43

3.   First § 2255 Motion ............................................. 44

4.   Subsequent § 2255 Motion ................................... 48

B.   Argument........................................................................ 49

III.   The *Brady* and *Napue* Claims Lack Merit................................. 59

A.   Background...................................................................... 59

1.   Sentencing Hearing.............................................. 59

2.   The § 2255 Motion Filed in 2018........................... 62

B.   Argument........................................................................ 64

1.   The *Brady* Claim Lacks Merit................................ 65

   a.   The Government Did Not Suppress Evidence ...................................................... 65

   b.   Lee Fails to Establish that the Fee Application Is Favorable or Material............. 68

2.   The *Napue* Claim Lacks Merit ............................... 73

   a.   Lee Fails to Demonstrate that the Government Knowingly Presented False Evidence at Trial .......................................... 73

   b.   No Reasonable Likelihood Exists That the Alleged Falsity Affected the Jury's Verdict..... 76

CONCLUSION................................................................................. 77

CERTIFICATE OF SERVICE........................................................... 78

ii

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DANIEL LEWIS LEE,    )
            )
    Petitioner,  )
            )  No. 2:19-CV-00468-JPH-DLP
v.         )
            )  (Capital Case)
WARDEN USP TERRE HAUTE,  )
UNITED STATES OF AMERICA,  )
            )
    Respondents.  )

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DANIEL LEWIS
LEE'S PETITION FOR A WRIT OF HABEAS CORPUS**

The government submits this response to Daniel Lewis Lee's petition

for a writ of habeas corpus under 28 U.S.C. § 2241. The Court should deny

the petition for the reasons stated below.

**INTRODUCTION**

Petitioner Daniel Lewis Lee and fellow white supremacist Chevie

Kehoe committed three murders in 1996 in connection with their efforts to

establish an independent nation of white supremacists in the Pacific

Northwest. After a jury trial in the United States District Court for the

Eastern District of Arkansas, they were convicted of three counts of capital

murder. There was no dispute at the trial that Kehoe was the leader and Lee

his follower, but the jury, after separately weighing the specific aggravating

iii

and mitigating factors that pertained to Lee and Kehoe individually, as required by the Federal Death Penalty Act, sentenced Kehoe to life imprisonment and Lee to death. The jury found, among other things, that Lee would be a danger to others in the future but that Kehoe would not. The jury also rejected Lee's arguments that he should not receive the death penalty because Kehoe was the leader and the jury had sentenced Kehoe to life imprisonment. And while it rejected Lee's claims that mental impairment and a troubled upbringing mitigated against the death penalty, it credited Kehoe's contention that a life sentence was justified because his dysfunctional family indoctrinated him into white supremacy at a young age and he had the capacity to live a productive life in prison.

The federal judge who presided over the trial of Lee and Kehoe made it clear that he disagreed with the jury's determination that Lee but not Kehoe should receive the death sentence. The court, however, did not find that any constitutional violation infected Lee's sentencing hearing. To the contrary, Lee's conviction and sentence have been reviewed extensively by the district court in the Eastern District of Arkansas and the Eighth Circuit, and no judge has concluded that Lee's death sentence suffers from a constitutional infirmity. Lee is therefore flatly wrong when he claims that "[t]wo separate federal judges have found based on . . . two different grounds that Danny Lee's death sentence violates the Constitution and should be invalidated."

2

Pet. 1; *see also* Pet. 4-5 ("Two distinct constitutional violations have been found prejudicial by federal judges.").[1] That is simply not so.

In this habeas petition, Lee attempts to raise a claim of ineffective assistance of counsel and *Brady* and *Napue* claims, all of which he raised in the district court in Arkansas and were either rejected on the merits (in one form or another) or foreclosed by the gatekeeping provisions for second or successive motions for relief under 28 U.S.C. § 2255. The "saving clause" of § 2255(e)—which requires federal prisoners to collaterally attack their conviction in a § 2255 motion except in limited circumstances—precludes Lee from asserting these claims in a habeas petition under § 2241. And even if the saving clause were to permit Lee's habeas petition, the claims in the petition fail on the merits. Lee's petition can be denied on either or both of those grounds.

## STATEMENT

### I.    Procedural Overview

This capital murder case has a long procedural history. In 1999, a federal jury in the Eastern District of Arkansas recommended that Lee

---

[1] "Pet." refers to the habeas petition at issue in this case. "Ex." refers to exhibits attached to that petition. "Dkt." refers to docket entries in the criminal case against Lee in the Eastern District of Arkansas, *United States v. Lee*, No. 97-CR-243 (E.D. Ark.). "Tr." refers to the transcript from Lee's 1999 trial in that court. For the Court's convenience, the government has attached the transcripts from Lee's sentencing hearing.

receive the death penalty for the three murders he committed in January 1996. In 2000, the Arkansas district court (Judge G. Thomas Eisele) granted Lee's post-trial motion for a new sentencing hearing. *United States v. Lee*, 89 F. Supp. 2d 1017 (E.D. Ark. 2000). The Eighth Circuit reversed and reinstated the death sentence, *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001), and the Supreme Court denied certiorari, *Lee v. United States*, 537 U.S. 1000 (2002).[2] The Eighth Circuit then affirmed Lee's conviction and sentence on direct appeal, *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), and the Supreme Court again denied certiorari, *Lee v. United States*, 545 U.S. 1141 (2005).

In June 2006, Lee filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. Dkt. 1118. The Arkansas district court denied the motion and a motion for reconsideration. *United States v. Lee*, No. 97-CR-243, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008); *United States v. Lee*, No. 97-CR-243, 2010 WL 5347174 (E.D. Ark. Dec. 22, 2010). The Eighth Circuit affirmed. *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013). The Supreme Court denied certiorari. *Lee v. United States*, 135 S. Ct. 72 (2014).

---

[2] While the motion for a new sentencing hearing was pending, the Eighth Circuit granted a petition for a writ of mandamus prohibiting subpoenas to then-Attorney General Janet Reno and then-Deputy Attorney General Eric Holder. *In re United States*, 197 F.3d 310 (8th Cir. 1999).

In September 2013, Lee filed a motion that he titled a motion for relief from judgment under Federal Rule of Civil Procedure 60. The Arkansas district court (Judge Leon Holmes, who by then had taken over the case after Judge Eisele's retirement) concluded that it lacked jurisdiction because the motion in substance amounted to a second or successive motion for relief under § 2255 and Lee failed—as required by 28 U.S.C. § 2255(h)—to seek (let alone obtain) precertification from the court of appeals that the motion contained newly-discovered evidence providing compelling proof of his innocence or a new rule of constitutional law made retroactive by the Supreme Court on collateral review. *United States v. Lee*, No. 97-CR-243, 2014 WL 1093197 (E.D. Ark. Mar. 18, 2014). The Eighth Circuit affirmed. *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015). The Supreme Court denied certiorari. *Lee v. United States*, 137 S. Ct. 1577 (2017).

In September 2018, Lee filed another motion for collateral relief under § 2255, and the Arkansas district court again denied the motion on the ground that it lacked jurisdiction over an uncertified second or successive motion for relief under § 2255. Dkt. 1313. Lee applied for a certificate of appealability in the Eighth Circuit, and the government filed a court-ordered response on October 7, 2019. Lee's application in that case is still pending. *Lee v. United States*, No. 19-2432 (8th Cir.).

5

In the meantime, the United States scheduled Lee's execution for December 9, 2019, and on September 26, 2019, Lee filed a petition for a writ of habeas corpus in this Court under 28 U.S.C. § 2241. Lee asserts two arguments that he raised in prior § 2255 motions. *See* Pet. 6-18, 41-63.

## II.   The Murders

Lee and Chevie Kehoe were members of a white supremacist organization known as the Aryan Peoples' Republic, or the Aryan Peoples' Resistance (APR), which Kehoe founded for the purpose of establishing an independent nation of white supremacists in the Pacific Northwest. *Lee*, 374 F.3d at 641. In January 1996, expecting to find valuable property, Kehoe and Lee traveled from Washington to the Arkansas home of William Mueller, a gun dealer who owned a large collection of weapons and ammunition. *Id.* When Mueller arrived home with his wife Nancy and their eight-year-old daughter Sarah Powell, Lee and Kehoe overpowered and incapacitated the Muellers and then questioned Sarah Powell about the location of cash, guns, and ammunition. *Id.* at 641-42. After taking weapons worth about $30,000 and $50,000 in cash and coins, Lee and Kehoe shot the three victims with a stun gun, placed plastic trash bags over their heads, and sealed the bags with duct tape to asphyxiate them. *Lee*, 2008 WL 4079315, at *4 n.52. Kehoe and Lee taped rocks to the three victims and threw them into the nearby Illinois

6

Bayou. *Lee*, 374 F.3d at 641-42; *United States v. Kehoe*, 310 F.3d 579, 590 (8th Cir. 2002), *cert. denied*, 538 U.S. 1048 (2003).

Lee and Kehoe returned to Washington with property they stole from the Muellers, *see Lee*, 374 F.3d at 642, and Lee confessed to Kehoe's mother Gloria Kehoe, telling her that "Bill [Mueller] was one tough son of a bitch because he fought so hard" and that Nancy Mueller was "dumb . . . because she . . . helped put the trash bag on her head," *Kehoe*, 310 F.3d at 590 (internal quotation marks omitted). Lee further confessed that Chevie Kehoe gave him $1000 and a rifle for participating in the robbery and murders and that he and Kehoe disposed of the bodies by weighing them down with rocks and throwing them in a river. *Id*. Lee also told James Wanker, who lived at the motel where Lee resided after the murders, that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83. Lee made a similar statement to Wanker's wife Dalvine Wanker, telling her that "he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. Chevie Kehoe separately confessed to his mother Gloria, saying that he and Lee had murdered William and Nancy Mueller but that he had murdered Sarah Powell by himself because Lee was unwilling to kill the girl. *Lee*, 374 F.3d at 642; *Lee*, 2008 WL 4079315, at *4.

Lee and Kehoe panicked after learning, in December 1996, that a friend had been arrested in possession of one of Mueller's guns and that an ATF agent had asked if the friend had purchased the gun from Kehoe. Tr. 2794-95, 2799, 4980. The men fled and went their separate ways: Lee to Oklahoma, where his mother lived, *see* Tr. 4980, and Kehoe to Montana and then elsewhere, meeting up with his brother Cheyne Kehoe, *see* Tr. 5318-20. Chevie Kehoe confessed again to Cheyne that he and Lee had murdered the Muellers. Tr. 5326-31; *see Kehoe*, 310 F.3d at 584-85.

Gloria and Cheyne Kehoe eventually cooperated with law enforcement and provided information about storage units used by Chevie Kehoe in Montana and Idaho where police found, among other things, property stolen from the Muellers, including display cases that William Mueller had used at gun shows and a key fitting the handcuffs found on Mueller's dead body. Tr. 3378-3403, 3479, 3610-28, 3650; *see Kehoe*, 310 F.3d at 585. Lee's and Kehoe's fingerprints were recovered from one of Mueller's display cases recovered from the Idaho storage unit. Tr. 3710.

### III.   Trial and Sentencing

Lee and Kehoe were charged with conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d); and three capital

counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The government provided notice of its intent to seek the death penalty against both defendants for each of the three murders. *Lee*, 374 F.3d at 642.

### A.    Guilt Phase

Lee and Kehoe were tried together before a jury. *See Lee*, 2008 WL 4079315, at *2. After a two-month trial, the jury found them guilty on all counts. *Id.*

To prove that Lee committed the murders with Kehoe, the government introduced evidence showing, among other things, the following: Kehoe and Lee lived in Washington State in January 1996. *See, e.g.*, Tr. 2772-73. They traveled together in January 1996 and stopped at Lee's mother's house in Oklahoma, leaving on January 10, 1996, the day before the Muellers were murdered. Tr. 2618-20, 2633. Kehoe and Lee arrived back in Washington three or four days later, flush with cash and in possession of property owned by the Muellers. Tr. 2610, 2620-22, 2896, 2900-01, 2916, 3710. Kehoe and Lee both separately confessed in detail to Kehoe's mother, Gloria: both men admitted that they killed the Muellers, and Kehoe said that he killed Sarah Powell because Lee was unwilling to kill the eight-year-old girl. Tr. 4971-75. Lee also told James and Dalvine Wanker—his neighbors in Washington— that he had gone "down south" and "taken care" of people down there, or, more specifically, had "wrapped them up, taped them, and [thrown] them in

9

the swamp." Tr. 4082-83, 4093. Later, Lee and Kehoe both fled Washington after they learned that law enforcement authorities were asking questions that linked Kehoe with property stolen from the Muellers. Tr. 2794-95, 2799, 4980. Chevie Kehoe subsequently confessed again to his brother Cheyne that he and Lee had killed the Muellers. Tr. 5326-31; *see Kehoe*, 310 F.3d 584-85. After investigators discovered property stolen from the Muellers in a storage unit used by Chevie Kehoe, Lee's fingerprints were found on one of those stolen items. Tr. 3380-3403, 3610-28, 3650, 3710; *see Kehoe*, 310 F.3d at 592.

The district judge who presided over the trial later observed that an "abundance of evidence support[ed] the guilt phase convictions," and the "bare facts alone can not convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee." *Lee*, 2008 WL 4079315, at *7. "While the bulk of the evidence at trial related to Kehoe," Judge Eisele concluded, "the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in the murders was well-founded." *Id.*; *see also Lee*, 374 F.3d at 645 (concluding that any error in admitting Chevie Kehoe's confession to his mother to prove Lee's guilt was harmless beyond a reasonable doubt in light of the "large amount of evidence presented against Lee at trial"). The court also noted that "there was no question about

10

Kehoe and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower." *Lee*, 2008 WL 4079315, at *7.[3]

### B.    Penalty Phase

After the guilt phase, separate hearings were held to determine whether each defendant should receive the death penalty for the three capital murders. *See* Tr. 7169-7337 (Kehoe sentencing hearing); Tr. 7367-8022 (Lee sentencing hearing). The Federal Death Penalty Act, 18 U.S.C. §§ 3591-3593, required the jury to determine, at each hearing, whether aggravating factors proved by the government sufficiently outweighed any mitigating factors proved by the defendants to justify the death penalty. *See generally United States v. Purkey*, 428 F.3d 738, 749, 761 (8th Cir. 2005). At both hearings, the government argued that five aggravating factors supported imposition of the death penalty: (1) Lee and Kehoe murdered the Muellers in expectation of receiving something of pecuniary value, (2) they murdered the Muellers after

---

[3] Lee is flatly incorrect when he contends that "[i]n the years since trial, the Government's guilt-phase case against Mr. Lee has begun to unravel." Pet. 4 & n.8. Lee relies on one small item in the government's proof, noting that the government introduced evidence at trial that a hair found in a raid cap linked to the murders was consistent with Lee's hair, and that later DNA testing established that the hair did not belong to Lee. But as the district court concluded in denying Lee's § 2255 motion, where Lee raised this issue, there is no basis to conclude that the "outcome [of the trial] would have been different if [Lee's] counsel would have obtained [the DNA] testing and disproved [Lee] as the source of the hair found in the raid cap." *Lee*, 2008 WL 4079315, at *25.

11

substantial planning and premeditation, (3) Sarah Powell was a vulnerable victim, (4) they killed or attempted to kill more than one person during a single criminal episode, and (5) they would be a danger in the future to the lives and safety of others. Tr. 7175, 7373; *see* 18 U.S.C. § 3592(c).

At Kehoe's sentencing hearing, which took place first, the jury unanimously decided against a sentence of death for each of the three murders and in favor of life imprisonment without the possibility of release. Tr. 7328-37. The jury rejected several of the government's aggravating factors, including that Kehoe would be a danger to others in the future and that he had committed the murders after substantial planning. *Lee*, 715 F.3d at 219. In addition, one or more jurors found the existence of each of Kehoe's 16 mitigating factors, including that Kehoe was the product of a dysfunctional family, that he was influenced by his parents to accept extremist political views, and that he could live a productive life in prison. *Id.*

The United States then proceeded with Lee's sentencing hearing. *See In re United States*, 197 F.3d at 311-12. The government's emphasis at Lee's sentencing hearing was the aggravating factor of his future dangerousness. *See* Tr. 7379-84. The government introduced evidence showing that in 1990 Lee severely beat an individual named Joey Wavra, forced Wavra down a manhole into a storm sewer, and retrieved a knife for his cousin, who repeatedly stabbed Wavra and slit his throat. Tr. 7394-96, 7401-07, 7412-15,

12

7441-46. Lee was initially charged with first degree murder but pleaded guilty to robbery and received a suspended sentence. Tr. 7470; *see* 5/10/1999 Vol. 43C Tr. 17-19. The government also introduced the testimony of a prison guard who stated that Lee screamed and yelled and threatened to kill her after she told Lee he could not leave his cell to call his lawyer. Tr. 7462-67.

Lee claimed 14 mitigating factors, including that Kehoe had not been sentenced to death. *See* Tr. 7373-75. The emphasis of the defense presentation, however, was that Lee suffered from mental impairment due to his troubled upbringing. *See, e.g.*, Tr. 7385-88. Lay witnesses, including Lee's mother, testified about his past, much of which included repeated violent behavior. *See, e.g.*, Tr. 7485-7553. The defense also called two expert witnesses, Mark Cunningham, Ph.D., and Kevin Bianchini, Ph.D. Tr. 7651-7895. Dr. Bianchini testified that Lee suffered from "[n]onpsychotic mental disorder following organic brain damage," which he characterized as "a very generic general term to describe brain damage." Tr. 7869. Dr. Cunningham testified about Lee's past, which included repeated acts of violence, and his "adverse development life experiences," Tr. 7661, and he testified that, in his opinion, Lee "experienced many traumatic and adverse life experiences that fundamentally shaped him . . . neurologically, psychologically, socially, emotionally and ethically, and that . . . contributed to his involvement in this offense," Tr. 7742.

13

As discussed in more detail below, the topic of psychopathy came up during the government's cross-examination of Dr. Cunningham. *See infra* pp. 39-42. Before trial, the government had provided the defense with an expert report from Thomas Ryan, Ph.D., in which Dr. Ryan assessed Lee's future dangerousness by, among other things, administering a psychological test called the Hare psychopathy checklist revised (PCL-R). *See* Tr. 7755, 7825-27. During trial, Lee filed a motion in limine asking the district court to exclude testimony about future dangerousness (including psychopathy) during cross-examination of Dr. Cunningham and also during rebuttal testimony by Dr. Ryan. *See* Tr. 7755, 7830. The district court permitted the government to cross-examine Dr. Cunningham about psychopathy, and he testified, among other things, that psychopathy test results were "not useful" in predicting future dangerousness in prison. *See infra* pp. 41-42. The district court later concluded that it permitted cross-examination to go too far on the topic of psychopathy and granted Lee's "motion in limine with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote." Tr. 7836. The government accordingly did not raise this topic during the testimony of its rebuttal witness, Dr. Ryan, who instead testified that Lee did not suffer from brain damage or mental illness and did not express remorse about his violent conduct. Tr. 7907-18, 7929-31.

14

During closing arguments, the government argued that the evidence introduced at the sentencing hearing, and the evidence of Lee's offense conduct introduced during the guilt phase of the trial, showed that Lee was a dangerous and volatile man who had a propensity toward violence and lacked remorse. Tr. 7956-60. The government emphasized the "sheer number of times that he's engaged in [violent] behavior." Tr. 7957. The government argued that Lee's involvement in the Wavra murder exemplified Lee's violence and volatility, showed that he had "no sense of conscience," and distinguished Lee from Kehoe because Lee escaped the Wavra incident without significant punishment and had the "opportunity to regret" and "change his ways" yet failed to do so. Tr. 7961-64, 7969-70, 7974-75. The government argued that Lee failed to prove any mitigating factors. Tr. 7964-73. With respect to Lee's claim that he should not receive the death sentence because Kehoe received life imprisonment, the government argued that Kehoe and Lee were different individuals with different circumstances, and in particular, Lee would be a danger to others in the future, and furthermore, in contrast to Kehoe, Lee had received "the opportunity to go repeatedly through the system" and "to meet with something positive and constructive." Tr. 7969-70.

The jury concluded that the evidence established all of the aggravating factors alleged by the government except for one, *i.e.*, that Lee committed the

15

murders after substantial planning and premeditation. Ex. I at 4-7. The jury largely rejected Lee's mitigation case, with one or more of the jurors finding the existence of only five of the 14 mitigating factors claimed by Lee. *Id.* at 7-9. The jurors unanimously rejected the contention that Lee had a mental impairment that should weigh against application of the death penalty. *Id.* at 8-9. The jurors also unanimously rejected as a mitigating factor Lee's contention that he was a follower and under the influence of Kehoe. *Id.* at 9. Only three of the jurors found as a mitigating factor that an equally culpable person would not be punished by death. *Id.* at 8. After weighing the aggravating and mitigating factors, the jury unanimously decided to impose a sentence of death for each of the three murder charges. Tr. 8019-22.

## IV.    Postconviction Proceedings

As summarized above in the procedural overview, after Lee's conviction and sentencing, he obtained extensive post-conviction review in both the Arkansas district court and the Eighth Circuit. He challenged his conviction and sentence in a post-trial motion for a new sentencing hearing, on direct appeal, and on collateral review under 28 U.S.C. § 2255. *See supra* pp. 3-6.

As relevant here, and as discussed in more detail below, Lee attempted on several occasions to overturn his death sentence on the basis of the psychopathy-related cross-examination of Dr. Cunningham. Lee first filed a post-trial motion for a new sentencing hearing based in part on the district

16

court's admission of the testimony. *See Lee*, 274 F.3d at 496; *Lee*, 89 F. Supp. 2d at 1029-31. Lee then asserted multiple iterations of a claim that he received ineffective assistance of counsel at sentencing because his lawyers did not competently object to the psychopathy-related cross-examination. He raised this claim in his § 2255 motion filed in 2006, Dkt. 1118, at 33-34; in a motion to reconsider the denial of his § 2255 motion, Dkt. 1165, at 19-22; and in a subsequent § 2255 motion filed in 2013, Dkt. 1230, at 29-45. The district court rejected this claim on the merits in Lee's § 2255 motion, *see Lee*, 2008 WL 4079315, at *46-*48, and determined that it lacked jurisdiction to consider subsequent motions raising the claim without precertification from the court of appeals under 28 U.S.C. § 2255(h), *see Lee*, 792 F.3d at 1022-24.

In 2018, Lee filed another § 2255 motion claiming, as relevant here, that newly discovered evidence showed that the government suppressed favorable evidence at his sentencing hearing, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and also used false evidence to obtain the death penalty, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Dkt. 1297, at 52-61. As described in more detail below, Lee argued that the government failed to turn over a document from the Oklahoma court case in which Lee was charged with murdering Joey Wavra but later pleaded guilty to robbery. Dkt. 1297, at 6, 22. The district court denied the motion, concluding that Lee was required to first obtain precertification from the

17

court of appeals under 28 U.S.C. § 2255(h). Dkt. 1313, at 14-17. Lee has applied for a certificate of appealability in the Eighth Circuit, and his application is currently pending. *Lee v. United States*, No. 19-2432 (8th Cir.). Lee has not sought precertification from the court of appeals under 18 U.S.C. § 2255(h).

## V.    The Present Habeas Petition

Lee's habeas petition in this Court raises two claims that he raised in prior § 2255 motions in the Eastern District of Arkansas. He asserts once again that he received ineffective assistance of counsel at sentencing because his lawyers failed to adequately object to the psychopathy-related cross-examination of Dr. Cunningham. Pet. 6-18. And he renews the argument that the government failed to turn over a document from the Oklahoma court case, and also that the document shows that the government presented false evidence at his sentencing hearing. Pet. 41-59.

## ARGUMENT

Lee's habeas petition is foreclosed by the saving clause of 28 U.S.C. § 2255(e), which makes § 2255 the exclusive means for a federal prisoner to collaterally attack his conviction and sentence except in narrow circumstances not present here. The claims in Lee's habeas petition also fail on the merits. This Court may deny the petition on either or both grounds.

18

## I.   The Saving Clause of § 2255(e) Forecloses the Claims in Lee's Habeas Petition

The federal collateral review statute, 28 U.S.C. § 2255, provides the exclusive vehicle for federal prisoners to challenge their conviction or sentence on collateral review unless § 2255 is "inadequate or ineffective to test the legality of [their] detention." 28 U.S.C. § 2255(e). Lee's claims do not fall within that narrow exception, and therefore his habeas petition must be dismissed with prejudice. *See Prevatte v. Merlak*, 865 F.3d 894, 901 (7th Cir. 2017).

### A.   Background: The Saving Clause

1.   Prior to 1948, federal prisoners could collaterally attack a final judgment by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2241. Habeas petitions by federal prisoners collaterally attacking their convictions or sentences under § 2241 had to be filed in the judicial district in which the prisoner was confined, creating significant administrative problems. *See United States v. Hayman*, 342 U.S. 205, 211-14 (1952). In 1948, in order to alleviate these problems, Congress created a substitute "motion" remedy for federal prisoners, codified at 28 U.S.C. § 2255, which channeled collateral attacks by federal prisoners to "the more convenient forum" of the sentencing court, *id.* at 219, while affording a remedy "identical in scope to federal habeas corpus," *Davis v. United States*, 417 U.S. 333, 343 (1974).

19

The 1948 legislation also included an exclusivity proviso confirming that this new motion remedy was to be used in lieu of, not in addition to, the § 2241 habeas remedy. The proviso states that district courts "shall not . . . entertain[]" a federal prisoner's petition for a writ of habeas corpus except in cases where § 2255 was shown to be "inadequate or ineffective to test the legality of [the prisoner's] detention." 28 U.S.C. § 2255(e). This portion of § 2255 is commonly referred to as the "saving clause." *See, e.g., Boumediene v. Bush*, 553 U.S. 723, 776 (2008).

2.   The saving clause was largely dormant until 1996, when Congress restricted the grounds on which federal prisoners may file second or successive § 2255 motions through the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1214, 1220. AEDPA limited the availability of successive § 2255 motions to cases involving either (1) persuasive new evidence that the prisoner was factually not guilty of the offense or (2) a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review. 28 U.S.C. § 2255(h); *cf. Tyler v. Cain*, 533 U.S. 656, 661-62 (2001) (interpreting the state-prisoner analogue to § 2255(h)). AEDPA did not provide for successive § 2255 motions based on other grounds, including statutory decisions issued after denial of the defendant's first § 2255 motion. *See Bruce v. Warden*

20

*Lewisburg USP*, 868 F.3d 170, 179 (3d Cir. 2017) ("No exception exists for new non-constitutional rules[.]").

Around the same time as AEDPA's enactment, the Supreme Court decided *Bailey v. United States*, 516 U.S. 137 (1995), which adopted a narrow construction of the requirement under 18 U.S.C. § 924(c) that an offender must "use" a firearm during and in relation to a drug-trafficking crime. The Court concluded that "use" requires more than mere possession and instead "requires evidence sufficient to show an active employment of the firearm by the defendant." *Id.* at 143 (emphasis omitted). Following *Bailey*, in circuits that previously had given § 924(c) a broader interpretation, a number of criminal defendants sought collateral relief arguing that their convictions were no longer valid because they had been convicted of conduct that § 924(c) did not proscribe. *See, e.g.*, *In re Dorsainvil*, 119 F.3d 245, 248-52 (3d Cir. 1997).

Defendants who had sought and been denied collateral relief under § 2255 prior to *Bailey* could not file a second or successive § 2255 motion because statutory claims are not included among the narrow circumstances in which AEDPA permitted second or successive motions. *See* 28 U.S.C. § 2255(h). Those defendants therefore sought relief in habeas petitions under § 2241, arguing that the saving clause permitted the petitions because § 2255 was "inadequate or ineffective to test the legality of [their] detention." 28

21

U.S.C. § 2255(e); *see, e.g., Triestman v. United States*, 124 F.3d 361, 373-74 (2d Cir. 1997). A number of courts accepted versions of this argument, including the Seventh Circuit in *In re Davenport*, 147 F.3d 605 (7th Cir. 1998).

3.      The *Davenport* case encompassed appeals by two federal prisoners. The first prisoner, Davenport, was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and was subject to a 15-year mandatory minimum sentence under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). 147 F.3d at 607. After the denial of his first § 2255 motion, Davenport sought to challenge his ACCA sentence on the ground that his 1981 burglary conviction did not qualify as an ACCA predicate. *Id.* The Seventh Circuit held that Davenport could not challenge his ACCA sentence in a habeas petition under § 2241 because "[h]e had a chance to raise the question about the 1981 burglary conviction when he appealed from his conviction for being a felon in possession and later when he filed a section 2255 motion challenging the conviction." *Id.* at 609. "Nothing in 2255 made the remedy provided by that section inadequate to enable Davenport to test the legality of his imprisonment," the court explained; "[h]e had an unobstructed procedural shot at getting his sentence vacated." *Id.*

The second prisoner, Nichols, was convicted of violating § 924(c), and after he unsuccessfully attacked his conviction in a § 2255 motion, the

22

Supreme Court decided *Bailey*, which narrowly construed § 924(c) and abrogated prior Seventh Circuit precedent that had adopted a broader reading of the statute. 147 F.3d at 607, 610. The Seventh Circuit determined that § 2255 was inadequate and ineffective to test the legality of his detention in these circumstances. *Id.* at 610-12. He was "being held in prison for a nonexistent crime," and he could not have raised his claim in his direct appeal or his first § 2255 motion because of then-binding Seventh Circuit precedent that *Bailey* later abrogated. *Id.* at 610. He also could not raise his claim in a second or successive § 2255 motion because he did not rely on newly discovered evidence of his innocence or a new rule of constitutional law. *Id.* "Nichols never had a reasonable chance to correct an error that is corrigible retroactively," the court explained. *Id.* at 611. The court determined that "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion," and the court made clear that the change in law must apply retroactively and "must be a change that eludes the permission in section 2255 for successive motions." *Id.*

"In *Davenport*'s wake," the Seventh Circuit has "established a three-part test to determine whether a petitioner satisfies § 2255(e)'s savings clause." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019). In order to

23

assert a claim for relief in a habeas petition under § 2241, a federal prisoner "must establish that (1) the claim relies on a statutory interpretation case, not a constitutional case, and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice." *Id.* (internal quotation marks omitted). The court has recognized that cognizable miscarriages of justice include conviction for a nonexistent offense (as in *Davenport*); erroneous application of a mandatory minimum sentence, *see Chazen*, 938 F.3d at 856; and erroneous calculation of a mandatory Sentencing Guidelines range, *see Brown v. Caraway*, 719 F.3d 583, 587-88 (7th Cir. 2013).

4.     The Seventh Circuit has found the saving clause satisfied in only two additional circumstances. *See Fulks v. Krueger*, No. 2:15-CV-00033, 2019 WL 4600210, at *4 (S.D. Ind. Sept. 20, 2019) (concluding that capital defendant's habeas petition was barred by saving clause).

First, in *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), the defendant was convicted of operating a continuing criminal enterprise and sentenced to death after the jury at his sentencing hearing was presented with evidence about uncharged murders the defendant committed in Mexico. *Id.* at 919-20. After his conviction and sentence were affirmed on direct appeal and the

24

district court denied his motion for collateral relief under § 2255, the Inter-American Commission on Human Rights ruled that introducing evidence of the uncharged murders violated the defendant's rights as set out in the American Declaration of the Rights and Duties of Man. *Id.* at 920. The defendant filed a § 2241 habeas petition seeking invalidation of his death sentence on the ground that the United States was bound by treaty to abide by the Commission's decision. *Id.* The Seventh Circuit determined that the saving clause permitted the habeas petition. *Id.* at 921-23. The court concluded that the defendant's "situation is closely analogous to that of Nichols" in the *Davenport* case because "it was literally impossible for him to have raised [his claim] at any time earlier than April 4, 2001, the date of the Commission's decision," and "[t]he argument therefore could not have been raised in his direct appeals or in his first § 2255 motion." *Id.* at 922-23.

Second, in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc), the defendant was convicted of kidnapping resulting in death and sentenced to death after the district court found, based on evidence presented at the sentencing hearing, that the defendant was not "mentally retarded" and therefore was not exempt from eligibility for the death penalty under 18 U.S.C. § 3596(c). *Id.* at 1124-25, 1130-31. While the defendant's § 2255 motion was pending, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which "held that the Eighth Amendment—not just a statute—

25

prohibits the execution of the intellectually disabled." *Webster*, 784 F.3d at 1132. After the denial of the *Atkins* claim in the defendant's § 2255 motion, he obtained new evidence in support of his intellectual-disability claim that existed at the time of his trial but had been unavailable to him (purportedly because of missteps by the Social Security Administration in producing documents). *Id.* at 1132-34. Because the defendant could not satisfy AEDPA's gatekeeping requirements for second or successive § 2255 motions—because he did not rely on new evidence of innocence or a new rule of constitutional law—he filed a § 2241 habeas petition raising an *Atkins* claim on the basis of that new evidence. *Id.* at 1134-35.

The Seventh Circuit determined that in these circumstances there was a "structural problem" or "lacuna" in § 2255 and therefore the saving clause permitted the defendant's habeas petition. 784 F.3d at 1135-44. Construing the saving clause, the court determined that a prisoner claiming that the Constitution makes him "categorically ineligible for the death penalty, based on newly discovered evidence, may not be barred from doing so by section 2255." *Id.* at 1140. "But this rule cannot apply to all newly discovered evidence," the court explained, "or else there would never be any finality to capital cases involving either the intellectually disabled or minors." *Id.* The court concluded that the rule applied to newly discovered evidence that "existed before the time of the trial" and was unavailable "despite diligence

26

on the part of the defense," not because of "missteps by" the defense. *Id.*

(emphasis omitted); *see id.* at 1141 (defendant must present "previously

existing evidence . . . that counsel did not uncover despite diligent efforts").

The court anticipated that it will be a "rare case" in which these conditions

are satisfied. *Id.* at 1140.

**B.      The Saving Clause Forecloses the Claims in Lee's Habeas
          Petition**

As noted, Lee's habeas petition asserts an ineffective-assistance claim

and *Brady* and *Napue* claims. These claims do not fall within the narrow

categories of habeas claims that the Seventh Circuit has concluded are

permitted by the § 2255 saving clause.[4]

---

[4] In the government's view, the Seventh Circuit's cases applying the saving clause—including *Davenport*, *Garza*, and *Webster*—are incorrectly decided. The government agrees with the Tenth Circuit's decision in *Prost v. Anderson*, 636 F.3d 578 (10th Cir. 2011) (Gorsuch, J.), *cert. denied*, 565 U.S. 1111 (2012), the Eleventh Circuit's en banc decision in *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076 (11th Cir.) (en banc), *cert. denied*, 138 S. Ct. 502 (2017), and the dissent in *Webster*, 784 F.3d at 1146-54 (Easterbrook, J., dissenting), which concluded that the saving clause does not permit a defendant to challenge his conviction or sentence in a § 2241 habeas petition on the basis of an intervening judicial decision or newly discovered evidence. *See* Pet. for Cert., *United States v. Wheeler*, No. 18-420 (Sup. Ct.) (denied Mar. 18, 2019), 2018 WL 5017116. The government recognizes that binding Seventh Circuit precedent forecloses this argument but notes the government's position to preserve the issue for further appellate review if warranted.

### 1.    The Saving Clause Does Not Permit Lee's Ineffective-Assistance Claim

The saving clause precludes Lee from raising a Sixth Amendment claim that he received ineffective assistance of counsel at sentencing because his lawyers did not adequately challenge cross-examination of his expert witness about psychopathy. Lee plainly had the opportunity to raise that claim in his first § 2255 motion and, as discussed below, did in fact raise a variation of that claim. The saving clause does not permit Lee to use a § 2241 habeas petition to raise new evidence or argument in support of that previously-raised claim.

The Seventh Circuit's decisions in *Davenport* and *Garza* do not assist Lee. Lee does not rely on a judicial ruling that he could not invoke in his first § 2255 motion. To the contrary, Lee asserts a garden-variety ineffective assistance claim based on longstanding Sixth Amendment standards that go as far back as *Strickland.*

*Webster* also does not assist Lee. His ineffective assistance claim does not rely on any newly discovered evidence, let alone evidence demonstrating that he is categorically ineligible for the death penalty. To the contrary, Lee acknowledges (Pet. 19-20) that all the evidence required to assert the ineffective-assistance claim he now raises in his § 2241 habeas petition was available at the time of his first § 2255 motion.

28

Lee nonetheless contends (Pet. 19-20, 36-38) that the saving clause permits him to raise this ineffective-assistance claim in a habeas petition because his § 2255 lawyers were negligent for failing to raise the claim adequately. But § 2255 is not inadequate or ineffective when a defendant could have raised a claim in his first § 2255 motion but failed to do so because of mistake or negligence. *See Poe v. LaRiva*, 834 F.3d 770, 772 (7th Cir. 2016) (explaining that the saving clause "generally requires 'a structural problem in § 2255 [that] forecloses even one round of effective collateral review,' unrelated to the petitioner's own mistakes") (quoting *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002)). As the First Circuit has explained, "where a prisoner had an opportunity to present his claim properly in his first § 2255 petition, but failed to do so, any 'ineffectiveness' of his current § 2255 petition is due to him and not to § 2255." *United States v. Barrett*, 178 F.3d 34, 53 (1st Cir. 1999). No structural problem in § 2255 prevented Lee from raising the ineffective-assistance claim in his first § 2255; to the contrary, by his own account, it was he (via his lawyers) who "bungled" it. Pet. 19. Lee is largely in the same position as the defendant in *Davenport* who failed to raise an available challenge to his ACCA sentence in his first § 2255 motion and therefore could not file a § 2241 habeas petition raising that same claim. *See* 147 F.3d at 609. The same result is warranted here.

29

*Webster* further establishes that negligence in failing to raise a claim in a first § 2255 motion does not make § 2255 inadequate or ineffective to test a defendant's detention. *Webster* holds that the saving clause may permit a habeas petition asserting a claim of categorical ineligibility for the death penalty based on new evidence, but the defendant must show that his lawyers made "diligent efforts" to uncover the evidence before trial. *Webster*, 784 F.3d at 1141. The saving clause does not apply if the defendant failed to uncover the evidence because of "missteps by . . . [defendant's] counsel." *Id.* at 1140. It would make little sense to conclude that attorney negligence in raising a claim in a first § 2255 motion renders § 2255 inadequate or ineffective but not attorney negligence in seeking out evidence at the time of trial.

Sound policy supports the conclusion that negligent failure to raise a claim in a first § 2255 motion does not render § 2255 inadequate or ineffective. A rule to the contrary would largely negate the limitations on second or successive § 2255 motions that Congress enacted in AEDPA. Petitioners easily could characterize the failure to raise an available claim in a § 2255 motion as negligent so that the claim may be raised in a habeas petition, circumventing § 2255(h)'s gatekeeping provisions for second or successive § 2255 motions.

30

Lee's reliance (Pet. 23-30, 36-37) on *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), is misplaced. Those cases define the judge-made doctrine of procedural default, which provides, as relevant here, that a state prisoner attacking his conviction or sentence in federal court in a habeas petition under 28 U.S.C. § 2254 may procedurally default a claim of ineffective assistance at trial by not raising that claim adequately during state review proceedings, including on state collateral review. *See Davila v. Davis*, 137 S. Ct. 2058, 2064-65 (2017). "Because a prisoner does not have a constitutional right to counsel in state postconviction proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default." *Id.* at 2062. In *Martinez* and *Trevino*, however, the Supreme Court "announced a narrow exception to [this] general rule." *Id.* In those cases, the Supreme Court determined that state prisoners in jurisdictions that require a defendant to raise an ineffective-assistance claim for the first time on collateral review may overcome a procedural default by state collateral counsel—and therefore obtain their first shot for relief in federal court—if their state collateral counsel were ineffective for failing to preserve their claims of ineffective assistance at trial. *Martinez*, 566 U.S. at 9; *Trevino*, 569 U.S. at 429.

Thus, a state prisoner attacking his conviction and sentence in a federal habeas petition under § 2254 may raise claims of ineffective

31

assistance at trial and may attempt to overcome any procedural default through *Martinez* and *Trevino*. But after the district court denies the petition, in order to file a petition that raises new ineffective-assistance claims, the prisoner must satisfy AEDPA's plain-text requirements for second or successive petitions. *See* 28 U.S.C. § 2244(b) (rules for second or successive petitions filed by state prisoners). And negligence by the attorney who represented the state prisoner in his federal § 2254 proceeding does not allow the prisoner to raise a new claim in a second or successive petition. *See, e.g.*, *Brooks v. Bobby*, 660 F.3d 959, 962-63 (6th Cir. 2011) (per curiam); *Franqui v. Florida*, 638 F.3d 1368, 1373 (11th Cir. 2011). *Martinez* and *Trevino*, involving the proper application of the judge-made procedural default doctrine, do not apply in that situation and do not alter the statutory standard for second or successive petitions. *See Jones v. Ryan*, 733 F.3d 825, 836 (9th Cir. 2013) (*Martinez* does not alter standards for second or successive § 2254 petition).

   *Martinez* and *Trevino* provide no basis to conclude that § 2255 was "inadequate or ineffective," 28 U.S.C. § 2255(e), to test the validity of Lee's sentence. Like state prisoners, federal prisoners also have no constitutional right to assistance of counsel on collateral review under § 2255, *Oliver v. United States*, 961 F.2d 1339, 1343 (7th Cir. 1992), and claims by federal prisoners that they received ineffective assistance at trial generally "should

32

be pursued in a collateral proceeding under 28 U.S.C. § 2255." *United States v. Moody*, 770 F.3d 577, 582 (7th Cir. 2014). But in contrast to state prisoners, federal prisoners, such as Lee, after receiving direct review of their convictions and sentences in a federal court of appeals, may raise any and all claims of ineffective assistance at trial for the first time in a § 2255 motion; federal prisoners do not suffer procedural default for failing to raise ineffective-assistance claims prior to their first § 2255 motion. *See Massaro v. United States*, 538 U.S. 500, 503-05 (2003); *Fuller v. United States*, 398 F.3d 644, 648 (7th Cir. 2005). Lee therefore had an opportunity to raise any ineffective assistance claims he wanted to assert in his first § 2255 motion. There was no structural problem in § 2255 that impeded Lee from raising in his first § 2255 motion any claim of ineffective assistance at trial that he wished. *Martinez* and *Trevino* are simply inapplicable here and provide no basis to conclude otherwise.[5]

---

[5] Because Lee's extensive discussion of *Martinez* and *Trevino* is not pertinent to whether the § 2255(e) saving clause permits Lee's habeas petition, the government does not discuss these matters in detail here. We note briefly, however, that the government disagrees with much of that discussion and analysis. For example, because of differences between § 2254 and § 2255, *Martinez* and *Trevino* have no viable application in § 2255 proceedings, and in both types of proceedings, *Martinez* and *Trevino* do not provide an end-run around AEDPA's statutory limitations on second or successive filings. *See generally* U.S. Br. in Opp. at 10-13, *Lee v. United States*, 137 S. Ct. 1577 (2017) (No. 15-8942), 2017 WL 1397828 (discussing the government's position on the application of *Martinez* and *Trevino* in

In short, Lee's reliance on *Martinez* and *Trevino* is creative but obscures the actual substance of his argument. According to Lee, the only impediment to raising the ineffective assistance claim in his first § 2255 motion was the negligence of his § 2255 lawyers. Attorney negligence, however, is not a "structural problem" or "lacuna" in § 2255 that prevented him from raising the ineffective-assistance claim. Lee had an "unobstructed procedural shot" at raising that claim in his first § 2255 motion. *Davenport*, 147 F.3d at 609. The applicable law was settled, all of the relevant facts were available, and Lee could raise any claim of ineffective assistance he wished. Like the ACCA defendant in *Davenport*, Lee simply did not avail himself of the opportunity to raise the ineffective-assistance claim. There is no basis to

---

§ 2255 proceedings). Although there is some language in *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015), suggesting a broader application of *Martinez* and *Trevino*, that case is best understood as applying the rule that a lawyer's abandonment, not mere negligence, is a defect in § 2255 proceedings that permits relief from judgment under Federal Rule of Civil Procedure 60(b). *See Adams v. United States*, 911 F.3d 397, 411 (7th Cir. 2018) (distinguishing *Ramirez* because Ramirez's "attorney abandoned him"); *Lombardo v. United States*, 860 F.3d 547, 559 (7th Cir. 2017) (explaining that "*Ramirez*'s holding is best construed as resting on abandonment"); *see also* U.S. Br. in Opp., *Lee v. United States*, 137 S. Ct. 1577 (2017), 2017 WL 1397828, at *12-*13 (discussing *Ramirez* as a case of abandonment). This Court need not delve it the nuances of these arguments, however, because for present purposes it suffices to say that negligence of a defendant's § 2255 counsel does not establish a structural problem in § 2255 that renders the statute inadequate or ineffective, and neither *Martinez* nor *Trevino* establishes otherwise.

34

conclude that § 2255 was "inadequate or ineffective" to test the validity of Lee's conviction or sentence.

### 2. The Saving Clause Does Not Permit Lee's *Brady* and *Napue* Claims

Lee's *Brady* and *Napue* claims are similarly barred by the saving clause of § 2255(e). Lee does not claim that an intervening judicial decision permits him to raise his *Brady* and *Napue* claims and therefore the circumstances that justified saving-clause relief in *Davenport* and *Garza* are not present here. Lee instead contends (Pet. 59-63) that the saving clause permits him to raise the *Brady* and *Napue* claims in a habeas petition because he challenges his death sentence on the basis of newly discovered evidence. His arguments, however, do not withstand scrutiny.

To be sure, the Seventh Circuit held in *Webster* that a defendant "who proposes to show that he is categorically ineligible for the death penalty, based on newly discovered evidence, may not be barred from doing so by section 2255." *Webster*, 784 F.3d at 1140. But in order to avoid "concerns about creating too large an exception to the exclusivity of section 2255," the court identified only narrow circumstances in which the saving clause permits federal prisoners to raise such claims in a habeas petition, *id.*, and Lee's *Brady* and *Napue* claims do not fall within those narrow circumstances.

35

First, the evidence that Lee alleges is newly discovered—a fee application filed in Oklahoma state court—was available to Lee before his trial, and to the extent Lee did not obtain the evidence at that time, it was because of "missteps" or lack of "diligence" by the defense. *Webster*, 784 F.3d at 1140. As discussed in more detail below, the fee application was publicly available and readily obtainable upon request. *See infra* pp. 65-67. This evidence therefore cannot justify resort to the saving clause.

Second, Lee does not contend that the new evidence "show[s] that he is categorically ineligible for the death penalty" under the Constitution. *Webster*, 784 F.3d at 1140. Lee does not claim, for example, that the Eighth Amendment categorically prohibits his execution because he was a minor or intellectually disabled. *See id.* at 1140-41. Rather, Lee claims that the government failed to turn over evidence and presented false evidence that affected the jury's evaluation of aggravating and mitigating factors and may have caused the jury to impose the death sentence. *Webster* does not permit Lee to raise these claims.

In *Webster*, the court concluded that because the Supreme Court had not decided that the Eighth Amendment barred execution of minors or the intellectually disabled at the time that Congress enacted AEDPA's restrictions on second or successive § 2255 motions, there is a reason to construe the saving clause to permit habeas petitions raising those claims

36

based on newly-discovered evidence. *See* 784 F.3d at 1139. *Brady* and *Napue*, however, are longstanding decisions, and defendants have long raised *Brady* and *Napue* claims on the basis of newly discovered evidence. If Congress had meant to allow defendants to raise such claims in second or successive § 2255 motions, it could have expressly provided as much in AEDPA. Instead, AEDPA permits second or successive motions based on newly discovered evidence, but only if that evidence, if credited, would establish the defendant's innocence by "clear and convincing evidence." 28 U.S.C. § 2255(h)(1). Thus, defendants may raise *Brady* and *Napue* claims based on newly discovered evidence in second or successive § 2255 motions, but only if they present compelling evidence of their innocence. *See United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011) (per curiam). Allowing the *Brady* and *Napue* claims that Lee asserts in this case to proceed under the saving clause would effectively void these congressionally-mandated limitations.

### 3. There Is No Danger of Violating the Suspension Clause

There is no danger that disallowing Lee's habeas claims will offend the Suspension Clause of the Constitution. *See Morales v. Bezy*, 499 F.3d 668, 670 (7th Cir. 2007); *Taylor*, 314 F.3d at 835; *Lindh v. Murphy*, 96 F.3d 856, 867-68 (7th Cir. 1996) (en banc), *reversed on other grounds*, 521 U.S. 320

37

(1997). Lee had the opportunity to raise the ineffective assistance claim in his first § 2255 motion, and the Constitution does not require more. *Davenport*, 147 F.3d at 610. Insofar as Lee's *Brady* and *Napue* claims are foreclosed by AEDPA's restriction on second or successive § 2255 motions, even assuming a broad construction of the Suspension Clause, those restrictions "do not amount to a 'suspension' of the writ." *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing analogous provisions of 28 U.S.C. § 2254).

## II.    The Ineffective-Assistance Claim Lacks Merit

Even assuming the saving clause permits Lee to raise his ineffective-assistance claim in this habeas petition, the claim lacks merit. Lee has not shown that he received ineffective assistance at trial as a result of the strategy his trial lawyers pursued to limit cross-examination of defense expert Dr. Cunningham about psychopathy and to preclude the government from introducing evidence about psychopathy during its rebuttal case. This Court can deny the petition on this ground as well.[6]

---

[6] In the government's view, the saving clause is jurisdictional. *See United States v. Wheeler*, 886 F.3d 415, 424-25 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1318 (2019). The Seventh Circuit has held, however, that the saving clause is not jurisdictional and that the failure to meet its standards requires dismissal with prejudice, *see, e.g.*, *Prevatte*, 865 F.3d at 901; *see also Cordaro v. United States*, 933 F.3d 232, 240 n.2 (3d Cir. 2019) (explaining that "[o]nly the Seventh Circuit Court of Appeals has held that § 2255(e) is not jurisdictional").

## A.   Background

Lee's psychopathy-related claim of ineffective assistance is fact-intensive, and the psychopathy issue has come up in various iterations at numerous points during the lengthy litigation of this case in the Arkansas district court and in the Eighth Circuit. We therefore explain the factual and procedural background in detail.

### 1.   Trial

Prior to Lee's sentencing hearing, the government informed defense counsel that it would "not introduce mental health evidence during its case-in-chief in the penalty phase." *Lee*, 89 F. Supp. 2d at 1019 (emphasis omitted). The government explained that it "would only use this evidence to rebut any mental health evidence introduced by the defendant in his case-in-chief." *Id.*

During its case-in-chief at Lee's sentencing hearing, the government, as described above, put on evidence of Lee's future dangerousness, including evidence about the Wavra murder. *See supra* pp. 12-13. Consistent with its pretrial notice, the government did not introduce mental-health evidence during its case-in-chief, but after Lee's expert, Mark Cunningham, Ph.D., testified about Lee's mental health on direct examination, the government cross-examined Dr. Cunningham on that subject. As relevant here, the government elicited testimony that Dr. Cunningham had reviewed a report

39

by the government's expert, Dr. Thomas Ryan, in which Dr. Ryan had identified petitioner as falling into the psychopathy range under the Hare psychopathy checklist revised (PCL-R), a test developed by well-respected psychologist Dr. Robert Hare to determine whether an individual meets the criteria to be categorized as a "psychopath." Tr. 7754, 7782-84, 7797, 7825-27.

Lee filed a motion in limine asking the district court to exclude testimony by Dr. Cunningham (during cross-examination) or Dr. Ryan (during rebuttal) about psychopathy or Lee's future dangerousness, arguing that those were improper topics for cross-examination or rebuttal because Dr. Cunningham had not performed a risk assessment or testified about Lee's future dangerousness. *See Lee*, 274 F.3d at 489-90; Tr. 7746-47; 5/13/1999 Tr. 9. The government responded that it did not intend to present evidence about Dr. Ryan's risk assessment of Lee (which included his view that Lee's diagnosis as a psychopath using the Hare PCL-R meant he would be a danger to others in prison) but that Dr. Cunningham's testimony on direct examination had opened the door to certain questions pertaining to psychopathy. 5/13/1999 Tr. 2-7. The district court voir dired Dr. Cunningham and determined that the government would be permitted to cross-examine Dr. Cunningham about conclusions he could draw from the investigation he performed, but the court would "cut off" questioning if the government went into "areas that [Dr. Cunningham] didn't do and didn't investigate." *Id.* at 27.

40

The government elicited testimony from Dr. Cunningham that the Hare checklist was useful to assess the risk of future violence in the community but that it had "not yet been shown to be predictive of correctional institutional violence." Tr. 7812; *see* Tr. 7806-07 (testifying that "[t]here's a greater risk of violence in the community with [a] high score" on the Hare checklist, but "[i]t has not been clearly demonstrated that there is evidence that a high score is associated with violence in an institution and in fact there are some studies that don't find any association between the two"). Dr. Cunningham stated that "even though 25 percent of the guys in higher security prisons can be diagnosed as psychopaths, the base rate, the rate of serious violence that occurs in those facilities is very low and is much lower than what would be occurring, profoundly lower, than what would be occurring in this population in the community." Tr. 7819. Dr. Cunningham testified that he had used the Hare checklist to examine a defendant in a capital case in 1996 because at the time he "was not adequately familiar with how little research there was associated with the PCL-R with institutional conduct," and so he thought it "had predictive significance for institutional behavior." Tr. 7828. According to Dr. Cunningham, however, he subsequently "studied it more thoroughly and became aware of substantial weaknesses in that part of the research, and as a result [he] quit using the instrument in capital cases." *Id.* Dr. Cunningham testified that he "did not find it to be

41

adequately research supported to tell me . . . how is this person going to act in prison, or how is he going to behave on old age parole, because there's insufficient research with that group as well." Tr. 7828-29. As a result, Dr. Cunningham "discontinued using" the Hare checklist in capital cases. Tr. 7829.

After Dr. Cunningham's testimony, the district court confirmed that Lee's counsel had interposed an ongoing objection to cross-examination of Dr. Cunningham about psychopathy. Tr. 7832. The court stated that it had "probably permitted the government to go much farther on cross-examination than is proper." Tr. 7836. The court then granted Lee's "motion in limine with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote, on the basis that such would not be proper rebuttal." Tr. 7836.

Accordingly, when the government subsequently called Dr. Ryan as a rebuttal witness, he did not testify about his diagnosis of Lee as a psychopath or offer an opinion that Lee's diagnosis as a psychopath showed that he posed a risk of future dangerousness while in prison. *See* Tr. 7906-7931. The government also did not mention psychopathy during closing arguments. *See* Tr. 7956-75, 7988-92.

42

### 2.   Post-Trial Motion for a New Sentencing Hearing

The district court granted Lee's post-trial motion for a new sentencing hearing, concluding, as relevant here, that the cross-examination of "Dr. Cunningham went well beyond the mitigation evidence raised by Dr. Cunningham on direct and ultimately became an expanded encore presentation of the Government's case for future dangerousness." *Lee*, 89 F. Supp. 2d at 1028. The Court found that "[w]hile the psychopath evidence may, to a certain extent, have been proper cross-examination as it was an alternate explanation for [Lee's] alleged violence, the presentation of the psychopath evidence turned into future dangerousness and risk assessment evidence, thus going beyond the scope of proper cross-examination." *Id.* at 1029-30. Because "Lee chose neither to perform a risk assessment analysis nor to present rebuttal evidence on the future dangerousness aggravating factor," the Court concluded, he was "ill-equipped to handle the Government's discussion of psychopathy." *Id.* at 1030. The Court held that "[i]n failing to restrict the Government's statements and inquiries regarding psychopathy more than it did, the Court erred, and, as a result, Defendant Lee did not receive a fair sentencing hearing." *Id.* at 1031.

The Eighth Circuit reversed and reinstated Lee's death sentence, concluding, as relevant here, that the district court did not err in allowing the government to elicit testimony from Dr. Cunningham "on the issue of

43

psychopathy," even if the testimony exceeded the scope of Dr. Cunningham's direct examination. *Lee*, 274 F.3d at 495. The court explained that the "Federal Death Penalty Act (FDPA) erects very low barriers to the admission of evidence at capital sentencing hearings" and allows a district court to "exclude evidence only 'if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.'" *Id.* at 494 (quoting 18 U.S.C. § 3593(c)) (emphasis omitted). The court concluded that "Lee's potential psychopathy was probative of his future dangerousness." *Id.* at 495. The court further concluded that no "threat of unfair prejudice" existed because "Lee opened the door to testimony concerning psychological diagnosis" by "introducing a mental health expert in defense." *Id.*

### 3.    First § 2255 Motion

1.    After the district court reinstated the death penalty on remand and the court of appeals affirmed Lee's conviction and sentence on direct appeal, *see Lee*, 374 F.3d at 654, Lee filed a motion to set aside, reduce, or vacate his sentence under 28 U.S.C. § 2255, Dkt. 1118. As relevant here, Lee claimed that he received ineffective assistance of counsel at sentencing because his lawyers "failed to fully and continuously object during the government's improper cross-examination" of Dr. Cunningham. Dkt. 1118, at 33. According to Lee, "the government exceeded the proper scope of cross examination and made Dr. Cunningham their own expert witness on the

44

issue of [his] future dangerousness." *Id.* Lee asserted in a footnote that Dr. Ryan no longer believes that the Hare psychopathy checklist is "an appropriate instrument to be utilized in evaluating the future danger of capital defendants," but Lee did not offer any evidence in support of that assertion. *Id.* at 34 n.14.

2. The district court denied Lee's § 2255 motion. *Lee*, 2008 WL 4079315, at *1. As relevant here, the court rejected Lee's claim that his counsel had been ineffective in failing to seek to limit the government's cross-examination of Dr. Cunningham. *Id.* at *46-*47. The court noted that "[t]he subject of Dr. Cunningham's testimony has received extensive scrutiny, both post-trial and on appeal." *Id.* at *46. The court explained that "[t]rial counsel performed exactly as [Lee] now argues that they should have—by interposing a continuing objection to said cross-examination of Dr. Cunningham." *Id.* The court observed that "the merits of this issue, which have been ruled on by the Eighth Circuit, may not be revisited on collateral review." *Id.* And the court explained that "trial counsel may not be faulted because their best efforts to limit Dr. Cunningham's testimony on cross-examination"—by not having Dr. Cunningham "perform any risk assessment or offer any testimony on direct as to a formal diagnosis of future dangerousness"—"failed." *Id.* at *47.

Lee filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e), asserting numerous grounds for rehearing. Dkt. 1165. As

45

relevant here, Lee argued for the first time that he had received ineffective assistance of counsel at sentencing because his counsel did not object to the psychopathy testimony elicited during cross-examination of Dr. Cunningham as "scientifically invalid and non-probative of the issue of future dangerousness." Dkt. 1165, at 20. Petitioner attached affidavits from psychologists stating their view that the research is insufficient to conclude that the Hare psychopathy checklist accurately predicts future dangerousness in prison. *See* Dkt. 1165-7. Petitioner also attached an affidavit from Dr. Ryan stating that he no longer believed that the Hare checklist was an appropriate tool to assess an individual's future dangerousness in prison. Dkt. 1165-4.

The district court denied the reconsideration motion. *United States v. Lee*, No. 97-CR-243, 2010 WL 5347174, at *1 (E.D. Ark. Dec. 22, 2010). The court determined that some of the claims, including petitioner's ineffective-assistance claim about the psychopathy evidence and cross-examination of Dr. Cunningham, amounted to second or successive motions for postconviction relief under 28 U.S.C. § 2255. *Id.* at *5-*6; *see* 28 U.S.C. § 2255(h). The court also rejected on the merits Lee's ineffective-assistance argument based on Dr. Ryan's new affidavit, explaining that the affidavit describes Dr. Ryan revising his views in the "Spring of 2000," but petitioner was sentenced in May 1999, and petitioner "has not explained" how his

46

sentencing counsel could be deficient in failing to challenge the "scientific underpinnings" of the checklist "almost one year before Dr. Ryan himself rejected the PCL-R as an effective predictor of future conduct." *Id.* at \*6.

3. The district court granted a certificate of appealability with respect to whether Lee's death sentence was unconstitutionally arbitrary because Chevie Kehoe received a life sentence, and the Eighth Circuit granted a certificate of appealability on one additional issue. *Lee*, 715 F.3d at 217. The Eighth Circuit denied Lee's application as to all other issues, including as to whether petitioner's sentencing counsel were ineffective because they failed to seek exclusion of testimony about "psychopathy and concomitant predisposition towards violence" as "scientifically invalid" and therefore inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Motion to Expand Certificate of Appealability 78, *United States v. Lee*, No. 11-1380 (8th Cir. June 20, 2011).

The Eighth Circuit then affirmed the denial of Lee's § 2255 motion. *Lee*, 715 F.3d at 217. As relevant here, although the court had denied a certificate of appealability on the issue, Lee argued that "the government's evidence of future dangerousness was premised on junk science." *Id.* at 224. The court determined that this issue was "beyond the scope of our certificate of appealability," but it went on to state that "we have previously concluded

47

that there was no 'threat of unfair prejudice' from the elicitation in this case of psychopathy evidence by the government during sentencing." *Id.* The court "conclude[d] that the jury properly considered the aggravating factors advanced by the government in determining that Lee should be sentenced to death." *Id.*

### 4. Subsequent § 2255 Motion

Lee then filed a motion for relief from judgment under Federal Rule of Civil Procedure 60(b), again asserting that sentencing counsel were ineffective because they failed to challenge, as "unreliable and scientifically invalid," testimony that diagnosis as a psychopath demonstrates a risk of future dangerousness in prison. Dkt. 1230, at 46; *see id.* at 29-48. Invoking the Supreme Court's decisions in *Martinez v. Ryan*, *supra*, and *Trevino v. Thaler*, *supra*, Lee argued that he was entitled to raise this claim in a Rule 60(b) motion—and the motion was not subject to the limitations on second or successive § 2255 motions in 28 U.S.C. § 2255(h)—because the lawyers in his § 2255 proceedings were negligent in failing to raise the claim adequately. Dkt. 1230, at 12-22.

The district court dismissed the motion for lack of jurisdiction, concluding that the motion amounted to an uncertified second or successive motion for collateral relief under 28 U.S.C. § 2255, and the Eighth Circuit affirmed. *Lee*, 792 F.3d at 1022. The court noted petitioner's

48

acknowledgement "that his counsel made the claim in his initial § 2255 petition," albeit without sufficient "evidentiary support." *Id.* at 1023. The court then explained that, under the Supreme Court's decision in *Gonzalez v. Crosby*, 545 U.S. 524 (2005), a Rule 60(b) motion seeking to reopen a claim to cure "omissions by federal habeas counsel" is a second or successive § 2255 motion. *Id.* at 1023-24. The court rejected Lee's reliance on *Martinez* and *Trevino*, concluding that those cases were "inapposite." *Id.* at 1024-25.

### B.    Argument

Lee once again contends (Pet. 7-18) that he received ineffective assistance of counsel at sentencing because his lawyers failed to argue that an individual's diagnosis as a psychopath using the Hare checklist does not provide a "reliable" or "scientifically valid[]" basis to conclude that the individual would present a risk of future dangerousness in prison. This is the same argument he raised in his first § 2255 motion (albeit incompletely) and then raised again with additional evidence and arguments in a reconsideration motion and a Rule 60(b) motion. The claim is without merit. Lee does not meet the standards for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

"To succeed on his Sixth Amendment claim of ineffective assistance of counsel," a defendant must "demonstrate both elements of the test announced in *Strickland*." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017).

49

The defendant must first "show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "The central question in this analysis is not whether counsel's conduct deviated from best practices or most common custom, but instead, whether an attorney's representation amounted to incompetence under prevailing professional norms." *Delatorre*, 847 F.3d at 845 (internal quotation marks omitted). As a general matter, "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The defendant must then "affirmatively prove prejudice," which means he must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94. Lee cannot satisfy either prong of this standard.

Lee contends (Pet. 9-15) that his lawyers performed below prevailing professional norms because they failed to challenge the expert report they received from government expert Dr. Thomas Ryan before trial. That report, as relevant here, contained two components: (1) a diagnosis of Lee as a psychopath using the Hare psychopathy checklist revised (PCL-R); and (2) Dr. Ryan's opinion that Lee's diagnosis as a psychopath meant he would present a higher risk of future dangerousness in prison. Lee does not appear

50

to question the validity of his diagnosis as a psychopath. Nor does he dispute

that an individual's diagnosis as a psychopath provides a scientifically valid

basis to conclude that the individual would present a heightened risk of

dangerousness to others "in the community." Tr. 7806, 7807, 7809, 7810, 7812

(Dr. Cunningham testimony); *see* Tr. 7815 ("The psychopathy check list is

state-of-the-art if you are looking at likelihood of criminal activity and violent

recidivism in the community among white males through midlife."). Lee

argues, however, that the "scientific literature" did not provide a basis to

draw a scientifically valid conclusion that diagnosis as a psychopath means a

heightened risk of dangerousness to others "in prison." Pet. 10. Lee claims

(Pet. 12) that his lawyers should have presented Dr. Ryan with that scientific

literature, and had they done so, Dr. Ryan would have withdrawn his opinion

about Lee's future dangerousness in prison, as he apparently did when

confronted with that information in a later case in 2000.[7]

---

[7] Lee in substance argues that an expert opinion linking psychopathy and future dangerousness in prison would not make it through the gatekeeping requirements for expert opinion testimony in Federal Rule of Evidence 702 and *Daubert*. Lee provides, for example, a 2013 affidavit from the then-president of the American Psychological Association stating that opinion testimony linking psychopathy and future dangerousness would not meet *Daubert*'s requirements because "it was not scientifically defensible to use [the Hare checklist] to predict the likelihood of an individual's future dangerousness in federal prison, due to the lack of empirical research establishing its reliability and validity for that purpose." Ex. D. Nonetheless, Lee does not expressly rely on Rule 702 or *Daubert* in his petition (although

51

The fundamental flaw in Lee's argument is that there was no expert opinion evidence at Lee's trial—by Dr. Ryan or anyone else—that his diagnosis as a psychopath showed he would be a danger to others in prison. Dr. Ryan's expert report was not presented to the jury, and after the Court granted Lee's motion in limine, Dr. Ryan was precluded from testifying during rebuttal about "the issue of psychopathy" and "the Hare psychopathy test." Tr. 7836. Dr. Ryan therefore did not offer an opinion that Lee's diagnosis as a psychopath meant he would be a danger to others in prison. Thus, even if Lee's counsel had prevailed on Dr. Ryan to "disavow[] the notion that a capital defendant's PCL-R score is predictive of his future dangerousness in prison," Pet. 13, that disavowal would not have changed any of the evidence that actually was introduced at Lee's trial. The jury did not hear any evidence that Dr. Ryan—or any other expert—linked Lee's psychopathy with future violence in prison.

To the contrary, evidence about psychopathy came in only through Lee's own expert witness, Dr. Cunningham, during cross-examination by the government, and Dr. Cunningham's testimony was entirely consistent with the "scientific literature" that Lee now strenuously claims is correct and "scientifically valid." Dr. Cunningham acknowledged that a diagnosis as a

_____

he did in prior filings), and for good reason: The Federal Rules of Evidence do not apply at federal capital sentencing hearings. *See Lee*, 274 F.3d at 495.

52

psychopath using the Hare checklist was associated with a high risk of violence in the community. *See, e.g.*, Tr. 7806, 7807, 7809, 7810, 7812, 7815. But he repeatedly emphasized that the test had "not yet been shown to be predictive of correctional institutional violence." Tr. 7812; *see* 7806-07, 7815-16, 7818-19, 7828-29. Dr. Cunningham made clear his view that, although "[t]here's a greater risk of violence in the community with [a] high score" on the Hare checklist, "[i]t has not been clearly demonstrated that there is evidence that a high score is associated with violence in an institution and in fact there are some studies that don't find any association between the two." Tr. 7807. This is exactly what Lee contends the jury should have been told.

Lee therefore cannot show that his lawyers performed deficiently or that he was prejudiced by his counsel's performance. Lee's lawyers strenuously sought to keep out psychopathy evidence at Lee's sentencing hearing. *See, e.g.*, 5/13/99 Tr. 9 (arguing that "psychopath" is a "very pejorative term"). To that end, Lee's lawyers did not offer evidence about Lee's future dangerousness during the defense case and instead focused on proving mitigating factors that, according to the defense, weighed against a death sentence. This strategy allowed defense counsel to object to cross-examination of Dr. Cunningham about Lee's psychopathy on the grounds that it was outside the bounds of proper cross-examination. It also allowed defense counsel to contend that the government's expert witness, Dr. Ryan,

53

should not be allowed to testify on rebuttal about Lee's diagnosis as a psychopath. Trial counsel's strategy eventually succeeded when the district court adopted the defense position and excluded evidence "of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote." Tr. 7836. And as a result, the jury never heard any expert opinion testimony linking psychopathy and future dangerousness in prison.

To be sure, before the Court fully adopted the defense position, the government was permitted to ask Dr. Cunningham questions about psychopathy. But as Judge Eisele concluded, "trial counsel may not be faulted because their best efforts to limit Dr. Cunningham's testimony on cross-examination failed." 2008 WL 4079315, at *47. More important for present purposes, however, as a result of the efforts of Lee's lawyers at trial, Dr. Ryan was precluded from offering the testimony that, according to Lee, would have been "false" and "scientifically invalid," *i.e.*, testimony that Lee's diagnosis as a psychopath meant he was more likely to be a danger to others in prison. In other words, as a result of the strategy pursued by Lee's lawyers at trial, the expert opinion testimony that Lee contends would have been scientifically invalid and unreliable was never offered to the jury. Instead, what the jury did hear, through Dr. Cunningham, is testimony that Lee contends is correct. In short, Lee's trial lawyers, by pursuing the strategy that Lee now criticizes,

54

kept out the opinion testimony that Lee now contends would have been scientifically invalid.

Lee suggests (Pet. 7-9) that the questions asked by the government during cross-examination of Dr. Cunningham effectively told the jury that his diagnosis as a psychopath meant he would be dangerous in prison. According to Lee, Dr. Ryan provided the opinion in his expert report that Lee "would pose a future danger in prison," and although "[t]he Government did not present Dr. Ryan's expert opinion in its case-in-chief," "it elicited the facts in full during its cross-examination of the defense expert, Dr. Mark Cunningham," Pet. 7, and "contrary to what the jury was told, these conclusions were unfounded," Pet. 9. Lee's argument, however, does not take into account the actual evidence presented to the jury. The jury was instructed that "[t]he statements, the arguments, questions and comments by the lawyers" were not evidence. Tr. 7013; *see United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019) (jury presumed to follow instructions). And all of the actual evidence about psychopathy came in through Lee's expert witness, Dr. Cunningham, who, as described above, repeatedly emphasized that psychopathy indicated future dangerousness in the "community" but that he felt there was insufficient basis to conclude that it meant future dangerousness in prison. The jury therefore was told exactly what Lee contends it should have been told.

55

Another flaw in Lee's argument is that it is far from clear that the strategy he says his lawyers should have pursued at trial would have been any more successful in keeping out evidence of psychopathy than the strategy his lawyers actually implemented. The "reliability" argument that Lee claims his lawyers should have asserted at trial is inconsistent with the Federal Death Penalty Act and the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983).

In *Barefoot*, the Court rejected the argument, supported by the American Psychiatric Association, that expert opinion testimony about future dangerousness is too unreliable to be admissible at capital sentencing hearings. *Id.* at 896-903. The Court concluded that the "adversary process" could be "trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness." *Id.* at 901. Relevant evidence "should be admitted and its weight left to the fact finder, who would have the benefit of cross examination and contrary evidence by the opposing party." *Id.* at 898. Consistent with *Barefoot*, the Federal Death Penalty Act "erects very low barriers to the admission of evidence at capital sentencing hearings." *Lee*, 274 F.3d at 494. The Federal Death Penalty Act broadly permits the presentation of relevant information and then allows the parties an opportunity to "rebut any information received at the hearing" and "to present argument as to the adequacy of the information." 18 U.S.C. § 3593(c); *see Lee*, 274 F.3d at 496.

56

The statute allows "more rather than less evidence during the penalty phase" and leaves it to the adversarial system to test that evidence. *Lee*, 374 F.3d at 648. This system "increases reliability by providing full and complete information about the defendant and allowing for an individualized inquiry into the appropriate sentence for the offense." *Id.* Courts applying the Federal Death Penalty Act and *Barefoot* have specifically concluded that the reliability standards for expert testimony under *Daubert* and Federal Rule of Evidence 702 do not determine the admissibility of an expert opinion about future dangerousness at a capital sentencing hearing. *United States v. Fields*, 483 F.3d 313, 341-42 (5th Cir. 2007).

Lee cannot show that his lawyers performed deficiently by pursuing an alternative strategy to keep out the psychopathy evidence and avoiding a reliability argument that would have faced a steep uphill battle under *Barefoot* and the Federal Death Penalty Act. Lee notes (Pet. 11) that before his trial, lawyers in two other capital cases had challenged the Hare checklist as "unreliabl[e]," but he does not acknowledge that only one of those cases (*Barnette*) went to trial, and in that case, the challenge failed and the jury heard evidence about psychopathy. *See United States v. Barnette*, 211 F.3d

57

803 (4th Cir. 2000).[8] In fact, on appeal in *Barnette*, the Fourth Circuit assumed for purposes of its decision that Federal Rule of Evidence 702's relevance and reliability requirements for scientific expert opinion testimony applied at a capital sentencing hearing, *id.* at 815, and it concluded that the Hare checklist meets the rule's "standard for admissibility," *id.* at 815-16. Lee's lawyers did not perform deficiently by forgoing a strategy that had failed at a prior capital trial.[9]

In short, Lee cannot show that his sentencing counsel performed deficiently or that he was prejudiced by the way his counsel performed at sentencing. The strategy his lawyers pursued at sentencing was successful in keeping out the opinion testimony that Lee claims his lawyers should have

---

[8] Psychopathy evidence was also admitted at a 1998 capital sentencing in *Stitt v. United States*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005). In fact, in that case, unlike here, Dr. Ryan provided opinion testimony that the defendant's diagnosis as a psychopath using the Hare checklist meant the defendant would likely present a risk of future dangerousness in prison. *Id.* at 699. In ruling on a § 2255 motion several years later, the district court concluded that Dr. Ryan's later disavowal of this opinion did not provide a basis to grant the defendant a new sentencing hearing. *Id.* at 699-700. The defendant was granted a new sentencing hearing on different grounds. *See United States v. Stitt*, 552 F.3d 345, 348 (4th Cir. 2008).

[9] In *Barnette*, the court ordered a new sentencing hearing, not because evidence about the Hare psychopathy checklist was introduced at the hearing, but because the district court had denied the defendant an opportunity to rebut that evidence by calling Dr. Cunningham to testify on sur-rebuttal. 211 F.3d at 823-24. Lee does not (and cannot) contend that he lacked an opportunity to rebut the psychopathy evidence at his trial, which all came out through Dr. Cunningham himself.

58

attacked on grounds of scientific reliability. The alternative strategy he claims his lawyers should have pursued would not have changed the evidence admitted at his sentencing hearing and very well could have resulted in the admission of even more evidence about psychopathy. When evaluating attorney performance under *Strickland*, courts should not "second-guess an attorney's performance with the benefit of hindsight." *McAfee v. Thurmer*, 589 F.3d 353, 356 (7th Cir. 2009). That admonition is particularly apt here. The strategy that Lee's trial counsel pursued was sound and well within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

## III.   The *Brady* and *Napue* Claims Lack Merit

As explained above, the saving clause forecloses the *Brady* and *Napue* claims in Lee's habeas petition. But even assuming the saving clause were to permit Lee to raise those claims here, they are without merit.

### A.   Background

#### 1.   Sentencing Hearing

As noted, at Lee's sentencing hearing, the government argued that Lee's future dangerousness was an aggravating factor that weighed in favor of imposing the death penalty. *See, e.g.*, Tr. 7381-82, 7959. To prove Lee's future dangerousness, the government presented proof of, among other things, Lee's involvement in the murder of an individual named Joey Wavra.

*See* Tr. 7389-7461, 7470. In short, Lee and his cousin David Patton brutally assaulted Wavra at a party and forced him down a manhole where Patton repeatedly stabbed and killed Wavra with a knife that Lee had retrieved and handed down to Patton in the manhole.

To prove the facts of the Wavra incident, the government presented testimony from an officer in the Oklahoma City police department who arrived at the scene of the Wavra murder, Tr. 7389-98; the forensic pathologist who performed the autopsy on Wavra, Tr. 7398-07; Brian Compton, who attended the party at which the murder took place and observed Lee assaulting Wavra, Tr. 7408-18; and Rochelle Ezzi, a friend of Lee's who later talked to him about the incident, Tr. 7457-61. The government also introduced into evidence court records showing that Patton was convicted of first degree murder and that Lee pleaded guilty to robbery, Tr. 7470, as well as a transcript of Lee's testimony at a preliminary hearing in the murder case against Patton, Tr. 7418-56.

The evidence established that Lee and his cousin, David Patton, attended a social gathering with Wavra in Oklahoma in July 1990 where the attendees consumed drugs and alcohol. Tr. 7408-12, 7421-25. Wavra angered Lee by, among other things, urinating on the host's couch. Tr. 7412-13, 7426-31, 7456. Lee and Patton physically beat the intoxicated Wavra—Lee hit Wavra repeatedly with his hands and feet and a wooden stick—and then

forced Wavra down into a manhole. Tr. 7412-14, 7426-40. There was "talk of a coin toss to see if [Wavra] would live or die." Tr. 7414. Patton went down the manhole with Wavra while Lee retrieved a rope and a knife and handed them down to Patton in the manhole. Tr. 7414-15, 7440-44. Lee placed Wavra's clothing in a plastic garbage bag after Patton threw them up from the manhole. Tr. 7444-45. Patton spent about another half hour down in the manhole with Wavra and used the knife to stab Wavra repeatedly in the body and slash open his throat, killing him. Tr. 7395-96, 7403-07, 7446. Patton was convicted of first-degree murder in Oklahoma state court, and Lee pleaded guilty to robbery. Tr. 7470. Lee later told a friend in 1995 that he and "his cousin years back had beat somebody up real bad and slit his throat, and they weren't sure if the guy died from beating him up or from slashing his throat." Tr. 7458.

In closing arguments, the government argued that Lee's past conduct showed that he was violent and volatile and presented a danger to others in the future. Tr. 7956-64. As relevant here, the government argued that "[a]n example of that is that behavior that happened during the Joey Wavra murder." Tr. 7962.

The government argued that Lee "was the one who beat" Wavra, "the one who hit him," "the one who kicked him," "the one who opened the manhole," "the one who forced him to go down," "the one who brought the

61

rope," and "the one who took the knife and gave it to his cousin to do the beating." Tr. 7962. The government acknowledged that Lee "didn't wield that knife" but argued that Lee knew "what he was doing" by "taking the knife and giving it to" his cousin and "suggest[ed]" that "both legally and morally the blood of Joey Wavra's hands is on Danny Lee." Tr. 7962-63. The government stated that Lee "got this . . . incredible deal," a "plea bargain," and "pled guilty to a robbery." Tr. 7963. The government argued that "[u]sually you commit a murder, and you get sent away for a very long time," "[a]nd you don't get the opportunity for a do over," but Lee "got a do over." Tr. 7963-64. "He got the opportunity to say, my God, what have I done? Look where all this led me. He had the opportunity to say, I made a mistake, but I got an opportunity to turn myself around." Tr. 7964. The government argued that the jury "should consider" these circumstances "in distinguishing Lee from Kehoe because Lee has been here before." Tr. 7964. "Lee has stood in the court of justice. Lee has had the opportunity to regret, and Lee has had that opportunity to change his ways." Tr. 7964.

### 2.     The § 2255 Motion Filed in 2018

In 2018, Lee filed a § 2255 motion in the Eastern District of Arkansas claiming the government failed to turn over a document from the Oklahoma legal proceedings in the Wavra case. Dkt. 1297, at 6, 22, 52-54. The specific document was a two-page application from Lee's appointed counsel for

attorney's fees. Ex. L. The document contained the following notation: "The matter came on for hearing before Judge Hall; District Attorney called witness; hearing held; Court finds crime of Murder I not established by evidence; Court reccomends [sic] a Dismissal of Murder I charges and State consider [sic] refiling on charge of Robbery I." Ex. L at 2.

Lee claimed that this document was exculpatory *Brady* material because it showed that he did not plead guilty to robbery as a result of a favorable plea bargain with the government but rather because a judge found there was insufficient evidence to charge him with first-degree murder. Dkt. 1297, at 6, 52-59. Lee also asserted that the document showed that the government introduced false evidence at trial, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), when it stated during closing arguments at Lee's sentencing hearing that Lee had received a favorable plea deal. Dkt. 1297, at 59-64. According to Lee, he did not need to obtain precertification for a second or successive § 2255 motion from the court of appeals under 28 U.S.C. § 2255(h) because the Oklahoma court document satisfied the *Brady* materiality standard. Dkt. 1297, at 23-30.

The district court concluded that Lee's § 2255 motion was a second or successive motion whether or not his claims relied on newly discovered evidence that was material under the *Brady* standard, and therefore, before filing the motion, Lee had to obtain precertification from the court of appeals

63

that the motion contained compelling evidence of his innocence or a new rule of constitutional law that the Supreme Court had made retroactive on collateral review. Dkt. 1313, at 14-17. The court concluded that it lacked jurisdiction to consider Lee's claim because he had not obtained precertification. *Id.* at 17. The district court nonetheless stated in dicta that "assuming that the Oklahoma state court held at a preliminary hearing that the evidence was insufficient to establish probable cause that Lee was guilty of murdering Joey Wavra," that evidence would be material under the *Brady* standard because there is a reasonable likelihood the evidence would have changed the outcome of the sentencing hearing. *Id.* at 14.

The district court denied a certificate of appealability. Dkt. 1313, at 20. An application that Lee filed for a certificate of appealability remains pending in the Eighth Circuit.

### B.   Argument

Lee renews the *Brady* and *Napue* arguments he raised in his § 2255 motion in the Arkansas district court in 2018. Pet. 41-63. Lee claims that the government failed to turn over his lawyer's fee application from the Wavra case in Oklahoma. According to Lee, the document shows that a judge dismissed the first-degree murder charge against him for insufficient evidence and not that he pleaded guilty pursuant to a favorable plea deal with prosecutors, as the government asserted during closing arguments. Had

the jury known these purportedly accurate facts, Lee claims, there is a reasonable likelihood the jury would have sentenced him to life imprisonment. As a result, Lee contends, the government's failure to turn over the fee application violated *Brady*. Lee also contends that the government knowingly presented false evidence at his sentencing hearing, in violation of *Napue*, by asserting that he received a favorable plea deal. These arguments do not withstand scrutiny.

### 1. The *Brady* Claim Lacks Merit

To establish a *Brady* violation, a defendant must show that (1) the government suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial. *United States v. Shields*, 789 F.3d 733, 746-47 (7th Cir. 2015). Lee fails to satisfy these requirements.

### a. The Government Did Not Suppress Evidence

Evidence is suppressed for purposes of *Brady* when "the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005); *see Long v. Pfister*, 874 F.3d 544, 550 (7th Cir. 2017) (en banc) ("[T]here is no disclosure obligation under *Brady* if the defense easily could have found the information, even if it didn't find it in fact."). The government

65

does not suppress publicly-available court documents that the defendant "could have accessed . . . at any point before . . . trial through the exercise of due diligence." *Shields*, 789 F.3d at 746-47.

Thus, even assuming that at the time of Lee's trial the government possessed the fee application filed by Lee's lawyer in the Wavra case (and the government does not concede that it possessed the document), that publicly-available document was readily available to Lee and therefore not suppressed for purposes of *Brady*. Lee's lawyers were well aware that the government intended to introduce evidence about the Wavra murder at Lee's sentencing hearing and easily could have obtained a copy of the fee application. That document is listed on the public docket sheet from the Oklahoma case and contained within the publicly-available court file.[10] In fact, in a November 14, 2014, letter to the Attorney General seeking resolution of Lee's case "short of execution," Lee's lawyers acknowledged that this "information relating to the Wavra incident was available to, yet never pursued by, Mr. Lee's trial . . . counsel." Letter from Ruth E. Friedman to Attorney General Eric Holder (Nov. 4, 2014) (on file with government). The publicly-available fee

---

[10] The docket sheet is available at http://www.oscn.net/applications/ oscn/GetCaseInformation.asp?submitted=true&viewtype=caseGeneral&case masterID=16933&db=Oklahoma. The undersigned were able to obtain a certified copy of the file in the case and were able to verify that it contains the fee application that Lee now contends that government suppressed. Lee's current lawyers presumably obtained the document in the same manner.

application plainly does not qualify as suppressed *Brady* material. *See Shields*, 789 F.3d at 747 (concluding that publicly-available information about a lawsuit was not suppressed).

Lee also fails to establish a *Brady* violation because he was present at the preliminary hearing at which, according to Lee, a judge found that there was insufficient evidence to support a first-degree murder charge. The *Brady* rule is designed to ensure disclosure of "information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). *Brady* does not require the government to disclose information already known to the defense. *See United States v. Paulino*, 445 F.3d 211, 224-25, 227 (2d Cir. 2006) (finding no *Brady* violation where the government failed to disclose statements made in the midst of trial by counsel for another defendant because the statements contained only "information already known in substance to the defense"); *Allen v. Lee*, 366 F.3d 319, 325 (4th Cir. 2004) (en banc) (per curiam) (finding no *Brady* violation where the defendant had "personal knowledge" of the information contained in undisclosed jail records); *United States v. Wilson*, 787 F.2d 375, 389 (8th Cir. 1986) ("The government is under no obligation to disclose to the defendant that which he already knows."). Because Lee was present at the preliminary hearing, he knew what happened at that hearing, and therefore

67

the government was not constitutionally required to disclose that information to Lee.

### b.   Lee Fails to Establish that the Fee Application Is Favorable or Material

Evidence is "favorable" under *Brady* if it is exculpatory or impeaching. *See, e.g.*, *United States v. Baker*, 453 F.3d 419, 422 (7th Cir. 2006). Favorable evidence is material "if, had it been disclosed, there is a reasonable probability that the outcome of the [proceeding] would have been different." *United States v. Dimas*, 3 F.3d 1015, 1018 (7th Cir. 1993) (per curiam).

The fee application that Lee argues the government unlawfully failed to turn over is not favorable or material under *Brady* because Lee's theory about the favorable nature of the document is based largely on speculation. According to Lee, the "presiding judge was not impressed" at the preliminary hearing on the charge of first-degree murder against Lee in the Wavra case. Pet. 47. Lee claims that the judge found that the crime of first-degree murder was not established by the evidence "[a]fter taking into account all of the evidence" and "review[ing] . . . all the prosecution's evidence." Pet. 47. Lee further claims that the Oklahoma judge made a "judicial ruling that the prosecution could not even establish probable cause on a murder charge," Pet. 47, and "reject[ed] . . . any murder charge in the Wavra matter," Pet. 48. Lee grounds this detailed recitation of alleged events solely in the sparse

68

notations in his lawyer's fee application. But "more than mere speculation or unsupported assertions" is required to support a claimed *Brady* violation. *Shields*, 789 F.3d at 747.

To be clear, the fee application does not exclude the possibility that the hearing took place as Lee imagines. The government has attempted to ascertain what happened at the preliminary hearing but as of yet has been unable to find anything that sheds light on Lee's allegations. In order to establish a *Brady* violation, however, Lee has the burden of identifying favorable and material evidence that the government suppressed. Lee's speculation about what happened at the preliminary hearing is inadequate to satisfy that burden.

In fact, the record here tends to undermine Lee's speculation. Before Lee's sentencing hearing, the government informed the district court about the contents of the transcript of Lee's testimony at Patton's preliminary hearing. The government explained that, according to the transcript, at the end of that hearing, the Oklahoma judge called the attorneys to the bench and then after an off-the-record discussion ordered the sheriff to take Lee into custody "for the crime of murder in the first degree," "find[ing] from the evidence introduced during the hearing that there is probable cause to believe that [Lee] aided and abetted in the homicide and is under the law a principal to the crime." 5/10/1999 Vol. 43C Tr. 17-18. When the Arkansas

69

district court asked whether Lee's case went to trial in Oklahoma, the government explained: "No, sir. Later an agreement was reached where he was placed on five years of deferred sentence they called it up there. The essence of the agreement was that he would plead to the robbery of Mr. Wavra, that if he stayed out of trouble for five years, the matter would be dropped completely." *Id.* at 19. All of this indicates that there was a judicial finding of probable cause to charge Lee with first-degree murder and that Lee pleaded guilty to robbery pursuant to a favorable plea agreement and not merely because a court found there was an inadequate basis for a murder charge.

Even assuming the fee application establishes the facts as theorized by Lee, the fee application is not material under *Brady*. Although the district court in Arkansas recently concluded otherwise, on the assumption that "the lawyer's cursory statement in his fee application" was accurate and Lee could prove its accuracy, Dkt. 1313, at 14 & n.3, that conclusion was not necessary to the court's decision, and the government disagrees with the court's dicta.

No reasonable probability exists that the jury would have reached a different result if it had been presented with evidence—as posited by Lee— that he pleaded guilty to robbery because a judge made a finding of no probable cause to support a murder charge and not because prosecutors offered him a favorable plea deal. The facts the government presented to the

70

jury regarding Lee's involvement in the murder of Joey Wavra remain the same regardless of the disposition of the charges against Lee. Likewise, the government's argument that Lee had an opportunity to reform and avoid future trouble, but instead continued to act violently and commit additional crimes, also remains equally valid.

The evidence presented to the jury at Lee's sentencing hearing established that Lee's cousin (Patton) stabbed Joey Wavra and slashed his throat but Lee savagely beat Wavra, forced him down a manhole, and then retrieved rope and a knife specifically for Patton's use. That evidence amply supported the government's argument that Lee must have known that his cousin was going to murder Wavra with the knife, which would have made Lee liable, at a minimum, as an aider and abettor. In fact, the evidence the government presented at Lee's sentencing hearing—his testimony at the preliminary hearing in Patton's case—was the same evidence that caused the Oklahoma judge in that case to find that there was "probable cause to believe that [Lee] aided and abetted in the homicide and is under the law a principal to the crime." 5/10/1999 Vol. 43C Tr. 18. That judge therefore ordered that Lee be taken into custody on that charge. *Id.* The facts presented to the jury fully supported the government's argument that Lee was morally and legally responsible for the Wavra murder.

71

Lee suggests (Pet. 45-46) that his testimony at Patton's hearing did not reflect his true role in the Wavra murder, but he provides nothing to support that suggestion. In fact, when he attempted to make a similar argument in his first motion for relief under § 2255, the district court rejected it, concluding that "there is nothing before the Court to indicate that [Lee's] 'true role' in the murders was anything other than as portrayed during the sentencing trial." *Lee*, 2008 WL 4079315, at \*45 (denying § 2255 motion). The same still holds true.

The central thrust of the government's argument at Lee's sentencing remains the same regardless of whether a judge found the evidence insufficient to maintain a first-degree murder charge or whether prosecutors agreed not to pursue a first-degree murder charge as a part of a plea bargain. Either way, Lee avoided a lengthy term of imprisonment despite brutally beating Wavra and providing a knife to his cousin to kill Wavra. Based on these circumstances, the government reasonably argued that Lee had an opportunity to reform and avoid future trouble but instead continued to act violently and commit additional crimes, culminating in the murders of the Muellers. The importance of the evidence about Lee's involvement in Wavra's murder was to show that Lee had played a role in the murder of another person before he participated in the killing of the Mueller family—regardless of whether Lee was convicted of robbery or murder. The attorney's fees

72

application does not alter this argument, and no reasonable probability exists that a jury presented with the information in the document would have reached a different verdict at Lee's trial.

### 2. The *Napue* Claim Lacks Merit

Under *Napue*, the government violates a defendant's due-process rights if it knowingly uses false evidence to obtain a conviction. *See United States v. Hilliard*, 851 F.3d 768, 781-82 (7th Cir. 2017). To establish a *Napue* violation, a defendant must show that (1) the government presented false evidence; (2) the government knew or should have known the evidence was false; and (3) the false evidence likely affected the judgment of the jury. *See United States v. Cardena*, 842 F.3d 959, 976-77 (7th Cir. 2016). Lee fails to satisfy these requirements.

### a. Lee Fails to Demonstrate that the Government Knowingly Presented False Evidence at Trial

Lee fails to demonstrate that the government made a false statement in asserting that "Lee got this incredible, this incredible deal, this plea bargain in the end, pled guilty to robbery." Tr. 7963. The fee application is not inconsistent with and does not foreclose Lee's acceptance of a beneficial plea deal. That document states that the court in Oklahoma recommended the dismissal of the first-degree murder charge and also recommended the government file robbery charges. Even assuming the fee application

73

accurately reflects the details of what took place at the hearing, it is not clear whether the court made that recommendation at the request or with the acquiescence of the prosecutors as a part of a negotiated plea disposition. The sparse fee application does not provide a basis to conclude that the government presented false evidence, and that application is the only basis for Lee's *Napue* claim.[11]

In addition, even assuming the statement that Lee benefited from a plea deal was false, Lee fails to demonstrate that the government knew or should have known the statement was false. As the prosecutors at Lee's capital trial explained to the Arkansas district court, it was their understanding that "an agreement was reached where [Lee] was placed on five years of deferred sentence they call it up there. The essence of the agreement was that he would plead guilty to the robbery of Mr. Wavra, that if he stayed out of trouble for five years, the matter would be dropped completely." 5/10/1999 Vol. 43C Tr. 19. As far as the government is currently aware, there is no basis to dispute the veracity of those statements. At a minimum, however, the prosecutors at Lee's trial plainly believed that Lee pleaded guilty to robbery as a result of a beneficial plea agreement. Lee

---

[11] As noted, the government has attempted to ascertain additional information about the hearing but thus far has been unsuccessful.

provides no basis for the serious accusation that those prosecutors knowingly lied to the district judge.

Lee contends (Pet. 57-58) that the Oklahoma police officers who handled the Wavra matter must have known whether Lee benefited from a plea agreement and their knowledge is attributable to the federal prosecutors in the case against Lee for murdering the Muellers. Although, for purposes of *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), Lee provides no support for the assertion that every member of the prosecution team's factual knowledge is attributable to the government for purposes of determining whether the government violates *Napue* by knowingly presenting false evidence at trial. Moreover, Lee provides no basis to conclude that the Oklahoma City police officers that investigated the Wavra matter in Oklahoma in 1990 were part of the prosecution team in the federal case against Lee in Arkansas for murdering the Muellers in 1996. *See, e.g.*, *Chatman v. City of Chicago*, No. 14-CV-2945, 2016 WL 4734361, at *3 (N.D. Ill. Sept. 12, 2016) (in determining whether an individual is part of the prosecution team, a court considers "whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy") (internal quotation marks omitted). Any knowledge about the

75

disposition of the case against Lee by the Oklahoma police officers or prosecutors therefore was not attributable to the federal prosecutors in this case.

### b.    No Reasonable Likelihood Exists That the Alleged Falsity Affected the Jury's Verdict

For much the same reasons that the fee application is not material under *Brady*, no reasonable likelihood exists that the falsity alleged by Lee affected the jury's decision to impose the death penalty. The facts about Lee's involvement in the Wavra murder remain unchanged: Lee brutally assaulted Wavra and forced him down a manhole and provided his cousin with a rope and a knife to use to kill Wavra. At least one judge found that these facts established probable cause to charge Lee with first-degree murder. Moreover, regardless of the disposition of the case against Lee, whether through judicial evaluation of the evidence or a plea agreement, the fact remains that Lee had an opportunity to change his ways after this close brush with a first-degree murder charge. Instead, he maintained his violent criminal conduct, culminating in his murder of three individuals in Arkansas, including an eight-year-old-girl. The jury heard all of this evidence and rejected Lee's mitigation case. No reasonable likelihood exists that the jury would have reached a different verdict because of additional facts about the disposition of the charges against Lee in the Wavra case.

76

## CONCLUSION

For the foregoing reasons, this Court should deny Lee's petition for a

writ of habeas corpus.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>JOSH J. MINKLER<br>United States Attorney<br>Southern District of Indiana</td><td>BRIAN A. BENCZKOWSKI<br>Assistant Attorney General</td></tr>
<tr><td></td><td>MATTHEW S. MINER<br>Deputy Assistant Attorney General</td></tr>
<tr><td>MICHAEL GORDON<br>Assistant United States Attorney<br>Eastern District of Arkansas</td><td>/s/John M. Pellettieri<br>JOHN M. PELLETTIERI<br>Attorney, Appellate Section<br>Criminal Division<br>U.S. Department of Justice<br>950 Pennsylvania Ave., N.W., Rm. 1260<br>Washington, D.C. 20530<br>(202) 307-3766<br>john.pellettieri@usdoj.gov</td></tr>
</table>

October 25, 2019

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of

the Court for the United States District Court for the Southern District of

Indiana using the CM/ECF system on October 25, 2019. I certify that all

participants in the case are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766

78