IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA,

            Plaintiff,

  vs.                          No. LR-CR-97-243

(1) CHEVIE O'BRIEN KEHOE AND     Monday, May 10, 1999
(2) DANIEL LEWIS LEE,          Little Rock, Arkansas
                         10:45 a.m.
          Defendants      UNDER SEAL

VOLUME 43-C
TRANSCRIPT OF IN CAMERA HEARING
BEFORE THE HONORABLE G. THOMAS EISELE,
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
On Behalf of the Plaintiff:
    MS. PAULA CASEY, United States Attorney
    MR. DAN STRIPLING, Assistant U. S. Attorney
    MR. ROBERT DE LA CRUZ, Department of Justice
    MR. LANE LIROFF, Department of Justice
      United States Attorney's Office
      TCBY Building
      425 West Capitol Avenue, Suite 500
      Post Office Box 1229
      Little Rock, Arkansas  72203-1229

On Behalf of the Defendant Lee:
    MR. JACK T. LASSITER, Attorney at Law
      Hatfield & Lassiter
      401 West Capitol Avenue, Suite 502
      Little Rock, Arkansas  72201-3437
    MS. CATHLEEN V. COMPTON, Attorney at Law
      221 West Second
      Suite 701
      Little Rock, Arkansas  72201

    Proceedings reported by machine stenography.  Transcript prepared by computer-aided transcription.

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

2

# P R O C E E D I N G S

(Proceedings continuing in chambers.  Defendants not present.  Attorneys for Defendant Kehoe not present.)

THE COURT:  We are in chambers with the attorneys for the government and for Mr. Lee.  And the jury has just returned verdicts with respect to the three victims, Counts 3, 4 and 5, imposing life without the possibility of release on each of those counts.  So the government had indicated before the verdicts were received that they would be contacting the Justice Department to determine whether they should proceed in seeking the death penalty and, if not, what the consequences were legally in terms of the status of the case.  Has that been done yet, or is this something that we have to do?

MR. STRIPLING:  Your Honor, we have to contact DOJ and talk to the Death Penalty Committee up there.

THE COURT:  When do you think you could have some response, some information to the Court?  By noon?

MR. STRIPLING:  Your Honor, it's DOJ.  I can't guarantee that.  We can make every effort to do it as quickly as we can.

THE COURT:  What about some legal memorandum from the Justice Department and the defense counsel on where that puts the judge?  I know we've already had some comments suggesting that unless the Supreme Court changes something that the alternative that I would have, if the jury didn't make the

Elaine Hinson, RMR, CCR
United States Court Reporter

3

UNDER SEAL

verdict, would be life without parole.  But our own reading indicates that that's a little ambiguous.  It sounds like it's life or life without the possibility of release.  At least that's one of the arguments that you can make if you read the statute.  So I want to get, I want to get it clarified, what will be the consequence if the government says we no longer want to pursue the death penalty.  Should we go ahead and submit to the jury the issue as to whether or not they agree that life; in other words, tell them that the government has withdrawn its request for the death penalty, and so we are submitting to you for your decision whether you believe the sentence should be life without parole.  If they unanimously agree, that will be the sentence.  If they do not unanimously agree, it would be a hung jury.  Then the natural consequences of that would follow, and I would be back where we are now in terms of trying to figure out what the options are for the Court.

          MS. COMPTON:  You are talking about -- excuse me, Judge.  You are talking about doing it without testimony, just go into them at 9:00 o'clock tomorrow morning, say this is what we need you to decide, or would the government put on aggravators and we would put on mitigators and then they would come to that point?

          THE COURT:  It's the penalty phase.  I guess I would let you put on evidence.  I guess one of the things, the

Elaine Hinson, RMR, CCR
United States Court Reporter

4

UNDER SEAL

government would be saying, in effect, since you have decided that the person we believe to be the leader in this whole enterprise should not be put to death, we are not going to seek the death penalty. But we do believe that the sentence of life without parole is appropriate. I don't know.

MR. LIROFF: Your Honor, I work for a unit in the Justice Department called the Capital Case Unit. I will pose that question to the people up there while we are also presenting this to the Death Penalty Review Committee and try and get some answers back.

THE COURT: Good. What I need to do is meet with Mr. Lee's attorneys and y'all sometime here maybe this afternoon. If we are going to go forward, are there any problems? There were some problems that had not been fully resolved on the paper at least or on the record before, you know, going forward with the proof. So you need to decide what kind of proof you are going to want to put on, if any; that is, both the government and the defendants. And then let me know if there's any concern or problem about the admissibility of it or any arguments that it shouldn't be or whatnot.

MS. COMPTON: I think we have two issues on that, Judge. They are both related to the Joey Wavra murder. One is a photograph. I didn't bring my file with me. I wasn't quite prepared for this. But one is a photograph. I had filed a motion in limine to keep the Wavra photographs out of

Elaine Hinson, RMR, CCR
United States Court Reporter

5

UNDER SEAL

evidence.  The government had responded basically saying, okay.  I'm paraphrasing, because I don't have the response.

THE COURT:  They agree they should be kept out.

MS. COMPTON:  Yes, sir.  And, after that happened, then Mr. Liroff showed me one picture, which is not particularly gruesome to look at.  I mean, it doesn't show the slit throat.  It doesn't show the naked body.  It shows his feet sticking up in the drainage ditch where he was left after he was killed by John David Patton, and wanted to introduce that.  My objections over that are the same.  We can go into that in whatever detail the Court likes.

The other thing is -- frankly, Mr. Lassiter has been researching this.  He may want to talk about it.  I don't think we have any law either way.  But when John David Patton was arrested, there was a preliminary hearing.  Mr. Patton is Danny Lee's cousin who is now serving a life sentence in the Oklahoma state prison system.  There was a preliminary hearing in September.  The murder occurred in July of 1990.  There was a preliminary hearing in September.  Danny was called as a witness at the preliminary hearing and gave testimony which so incriminated him that in October, a few days later, he was charged with the Wavra murder as well.  He ultimately pled guilty to a reduced -- to a robbery, because he took the boy's bicycle after the fact.  He was not represented by counsel at that preliminary hearing.  He was 17 years old.  So we don't

Elaine Hinson, RMR, CCR
United States Court Reporter

6

**UNDER SEAL**

think that that ought to come in.

Now, backing up, in July, when he went to the detectives to talk, there's a video. And the detective on the record with his mother sitting there Mirandizes him, asked him if he understands all that, and he says he does. So he's been Mirandized in July to talk to the detective. But then when he goes to the preliminary hearing, he doesn't have a lawyer. He is 17 years old. And unless Mr. Lassiter knows something that I don't, I don't think there's any law out there that guides us very much. We would think there's a constitutional problem with the admissibility.

THE COURT: What's the attitude of the government in light of these developments? Are you going to press or just --

MR. STRIPLING: Your Honor, if we put the proof on, and obviously that's a big if at this point. But if we put the proof on, we would want to put on the testimony that he gave at the preliminary hearing. It's very succinct, to the point.

THE COURT: Do you have a copy of it?

MS. COMPTON: Yes, sir.

THE COURT: Can we just say we will meet at 2:30 or 3:00? Let's say 3:00 o'clock. By that time everything should be worked out. Then I will make these decisions, whatever is necessary in terms of the type of hearing that you contemplate having tomorrow. All right?

MS. COMPTON: May I ask one question of the

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

government just while we are in here and on the record?  Do y'all think -- and you may not know.  Lane may know better than anybody.  Do y'all think there's any possibility that the Death Penalty Committee is going to come back and say, no, you have to go forward with the death penalty; you have to do it?

MS. CASEY:  It's my understanding that in order to pursue the death penalty we have to have their permission.  I think that we have the option of dropping the death penalty without their permission.  But that's what we are checking on.

MS. COMPTON:  I know they can decertify.  But I didn't know if they could force you to pursue something you don't want to pursue.

MS. CASEY:  I think it works exactly the opposite way.

THE COURT:  I'll see y'all at 3:00 o'clock.

Instead of having 20 pages of instructions to the jury this time, we have a little synopsis.  Is that satisfactory?

MS. COMPTON:  Yes, sir.

(Recess from 10:45 a.m. until 3:00 p.m.  Proceedings in chambers.  Defendant Lee present.)

THE COURT:  The lawyers find a place.  All right.  We are in chambers.  I'm here because I don't know what the communication is going to be.  Otherwise I would be out there in open court.  So what is the situation?  Can you give us a report from the attorney general?

Elaine Hinson, RMR, CCR
United States Court Reporter

**8**

UNDER SEAL

MS. CASEY:  Yes, Your Honor.  I've not spoken with the attorney general, but with the deputy attorney general. The department is not decertifying the death request.

THE COURT:  Is not?

MS. CASEY:  Is not.

THE COURT:  We are going forward with the trial.

MS. CASEY:  Yes, Your Honor.

THE COURT:  So tomorrow morning we will see you all at, I guess, 9:00 o'clock.  Be here about a quarter till 9:00. I'm going to need the attorneys to go over any issues that remain now about this trial tomorrow.  So what are they?  What does the government plan to do?  Is it going to be somewhat like the last presentation?

MR. STRIPLING:  Your Honor, it will be more involved.  We will prove the Wavra murder.  I think the only issue outstanding on the Wavra murder is the presenting of the transcript to the jury, the transcript where Danny Lee testified at the preliminary hearing.

THE COURT:  Have you got a transcript of that?

MR. LASSITER:  Let me pick it up from there.  I will have one to you in an hour or so.  I have dictated a motion asking the Court to make a determination concerning voluntariness of that statement under 18 U.S.C. 3501, I believe, which sets forth certain factors for the Court to look at in determining whether or not a statement or confession was

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

voluntary. And the confession as defined in that section is broad enough to catch this preliminary hearing testimony. The factors of importance here to us are his age, 17 at the time. Nothing appears in the transcript at the hearing. No advice of rights, that he has a right to remain silent. He was subpoenaed to the hearing. He is interrogated by the prosecutor. The prosecutor doesn't warn him of his right to remain silent. Neither does the judge.

THE COURT: I understood from an earlier statement that he had been advised of his rights some couple of months before or something.

MR. LASSITER: That's correct, Your Honor. Within days of the Wavra homicide, he is interviewed by a detective in Oklahoma. We've watched the videotape of that. He was Mirandized prior to being interviewed.

THE COURT: So have y'all done any research on the law? Is there any -- have y'all got something to contribute to the resolution of that issue? You are talking about voluntariness -- is the only thing you are saying is -- what factually do we need to hear? You have his age. You are saying he wasn't Mirandized on that particular occasion.

MR. LASSITER: That's right, Your Honor. He has no attorney present with him.

THE COURT: No attorney. So that's the factual information.

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

MR. LASSITER:  Yes, Your Honor.

THE COURT:  So you will have it to me by within an hour?

MR. LASSITER:  Yes, sir, I think so.  I've dictated the first draft.  I will have the motion and the attached transcript.

THE COURT:  All right.  Then, as soon as the government gets it, I will have to get some quick response.  So let's move things up in the morning.  Let's have y'all here about 8:00, see if we can't resolve this.

MR. STRIPLING:  Your Honor, if we could get it resolved tonight, if I can't put the transcript on, I'm going to have to put some other witnesses on to cover the same points and make some decisions on that.  If we could get it resolved tonight, that would tell me what I'm going to have to do.

THE COURT:  I think we can.  In other words, we will just, as soon as I get it, we will get on it, see if we can't resolve it.  So y'all stand by.  We'll see if we can do that this evening.  But, in any event, I will move that down.  If we are going to do that tonight, I will say 8:30 in the morning for the lawyers.

MR. LASSITER:  I will get a copy of the transcript on over to you while I'm tidying up the motion.

THE COURT:  We can read that.  And then you can get the motion.  You can fax it if you want to, whatever.  Anything

11

UNDER SEAL

else now about tomorrow's hearing?

MS. COMPTON:  No, sir.

THE COURT:  Any problem for the government?

MS. COMPTON:  I guess there is still the issue about the photo of Joey Wavra's body in the tunnel.

MR. LIROFF:  If I may, there was a motion to exclude because it was thought photographs of the murder victim would be unduly prejudicial showing the harm that was inflicted upon him.  I was always bothered because this was a murder that happened in the storm drain.  And maybe it's not -- I'm not from the area.  I didn't realize what a storm drain would look like.  I found a photograph that shows the body in a pool, and basically you just see the feet.  It sees -- you get an idea of what the size of the storm drain, which is much larger than I was assuming.  So I thought that this was important because it would allow the jury to understand where the killing took place.  All you see is the feet.  You don't see any blood, and you don't see any wounds.

Now, it is true that when counsel originally brought the motion, the government conceded that they wouldn't show photographs of the body.  All I'm saying is that we are not talking about gruesome photographs.

THE COURT:  Bring the photo at 8:30.  I will pass on it.  All right.  Anything else?  All right.  Y'all clear out and get this work done fast so we can have a smooth hearing

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

tomorrow if possible.  Thank you.

(Recess from 3:20 p.m. until 5:40 p.m.  Telephone conference reported as follows.  Counsel for the government and counsel for Mr. Lee participating.)

THE COURT:  All right, folks.  Can you hear me?

MS. COMPTON:  Yes, sir.

MR. LASSITER:  Yes, sir.

THE COURT:  This is Judge Eisele.  I'm calling in connection with the United States of America versus Daniel Lewis Lee, LR-CR-97-243.  We have a sentencing hearing starting tomorrow at 9:00 a.m.  The government has indicated it's desire to put on a transcript from a preliminary hearing in the case of United States versus -- excuse me -- <u>State of Oklahoma versus John David Patton</u> on September 28, 1990, in which Mr. Lee appeared as a witness and testified.  And I have had a chance to read that partial transcript.  I have now received a motion to suppress Oklahoma preliminary hearing testimony with a memorandum attached.  So let me find out a few things.  At the time of that murder out there that Patton was convicted of, how old was Daniel Lee?

MS. COMPTON:  Seventeen.

MR. STRIPLING:  Seventeen, Your Honor.

THE COURT:  He was 17 then.  And he was also 17 when he testified.  Right?

MS. COMPTON:  Yes, sir.

13

UNDER SEAL

THE COURT:  Now, it appears that he was in custody at the time he was subpoenaed to come in to the court to testify. Is that correct?

MR. STRIPLING:  No, sir.  That is not correct.

THE COURT:  He says he was at some -- sounded like a juvenile home or something?

MS. COMPTON:  He was on a pass, Your Honor, from the Oklahoma Correctional -- COJAC is what the acronym is.  He was on a 30-day pass from COJAC, which is a juvenile facility in Oklahoma at the time.

THE COURT:  30-day pass?

MS. COMPTON:  Yes, sir.

MR. STRIPLING:  That's at the time of the murder, Your Honor, not at the time that he appeared in court.

MS. COMPTON:  That's right.

THE COURT:  I see.  So he was not in custody at the time he was subpoenaed.

MR. STRIPLING:  That's correct, Your Honor.

THE COURT:  But he was subpoenaed?

MR. STRIPLING:  Yes, sir.  He was subpoenaed.

THE COURT:  Let's go back a little bit.  Give me the date of the murder.

MR. STRIPLING:  Your Honor, the murder was on July the 23rd or -4th.  I don't have that.

MR. LASSITER:  I think it is the 24th.

Elaine Hinson, RMR, CCR
United States Court Reporter

14

UNDER SEAL

THE COURT:  '90.  And what was the date that he was interviewed by the detective?

MR. STRIPLING:  It was within a few days of that, Your Honor.

THE COURT:  Was it in August, first of August, or do you know?

MR. STRIPLING:  No, sir.  I can look at it.  I want to say it's still in July.  I have the interview in front of me.

MR. LASSITER:  It may have been the next day.

THE COURT:  That was in July then?

MS. COMPTON:  He talked to the detective two times.

MR. STRIPLING:  Yes, sir.

THE COURT:  The first time was right after the murder?

MS. COMPTON:  They both were.

MR. STRIPLING:  Both were, Your Honor.

THE COURT:  Both were.  On both occasions was he Mirandized?

MR. STRIPLING:  I don't know about the first occasion, Your Honor.  I assume he was.  I've not asked the detective that specifically.  The second interview was videotaped.  And the videotape shows that he was Mirandized.

THE COURT:  Do you know the date of the videotape?

MR. STRIPLING:  Yes, sir.  I have it in front of me

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

just now.  It was July the 26th of 1990.

THE COURT:  In other words, two days after the murder?

MR. STRIPLING:  Evidently I have a video, though I've not looked at it, of the first interview.  It's dated July -- I'm sorry.  That's a different interview.  July 26, 1990, the interview where he was Mirandized.

THE COURT:  Was he questioned?

MR. STRIPLING:  Yes, sir, extensively.

THE COURT:  Were his answers like they are in this transcript?

MR. STRIPLING:  Substantially.  He does -- the transcript is more succinct.  The detective who was questioning him went all over the place, because at that point the detective did not have all the facts.  The transcript from our perspective is better because it goes to the heart of the matter, while the statement given on the 26th to the detective is all over the place.  But where the questions are the same, the answers are substantially the same.

THE COURT:  And do those relevant questions and answers essentially cover the same territory that we find in the transcript?

MR. STRIPLING:  Yes, sir, essentially.  Again, by the time of the preliminary hearing, of course, they had more information, so they could ask some additional questions.  But

16

UNDER SEAL

the questions cover essentially the same area.

THE COURT: Now, in the video, when he's Mirandized, is he told he has a right to have an attorney?

MR. STRIPLING: Yes, sir. They show the detective pulling out his Miranda card and reading directly from the Miranda card. They show that Mr. Graham was the name that was used at this time.

THE COURT: Was he told that he was a suspect or charged, or how did they put it to him, or what they were going to ask him about?

MR. STRIPLING: His mother is present. My recollection is that she interrupts once or twice while this process is taking place. But essentially they just tell him that they have questions. They knew that he was there and knew that he had information and read him his rights and start asking questions. There are additional interruptions at that point from his mother on whether he should answer some questions because the information he was giving would be hearsay. The detective then changes the manner in which he asks questions in an effort to avoid asking questions that are clearly hearsay. That goes on for a while. After a while that issue seems to evaporate, and Mr. Graham begins answering all the questions, even information where it's clearly hearsay that he's providing.

MR. LASSITER: I do not recall him ever being told

UNDER SEAL

that he was a suspect or any words to that effect. I think Mr. Stripling's recollection, that the officer just said he had some questions for him or words to that effect is accurate.

THE COURT: All right. Now, let me ask you this. Following on, I understand that after this transcript, I now have a little addendum here suggesting that after it was over with -- do you have that? First of all, an additional page was added to the one that I had. Then finally we have a supplement.

MR. STRIPLING: Your Honor, we received faxed copies today because we knew the transcript ended abruptly. We thought we had the other pages, but we did not. We called the people that had them and asked them to fax them to us. The faxes weren't very good. That's the reason we retyped that last page. And we did just the information that we thought would go before the jury, so that's the reason we didn't cover everything. I have in front of me a portion that we did not retype because we didn't think this would be appropriate to go before the jury. I will be happy to read it to you so we will have the exact language.

THE COURT: You are talking about continuing on after this?

MR. STRIPLING: Your Honor, at the end of the hearing, Mr. Albert stated: "Judge, I have no further questions of the witness." Then the judge said: "Would

18

UNDER SEAL

counsel approach the bench."  There is an off-the-record discussion, but that was not recorded.  It's just a parentheses "off the record," close parentheses.

THE COURT:  I have that.  I'm down to there.  That's where I end.

MR. STRIPLING:  Yes, sir.  Then the next thing that happens is the Court:  "Sheriff, this Court finds from the evidence introduced during the hearing that there is probable cause to believe that Daniel Lewis Graham aided and abetted in the homicide and is under the law a principal to the crime. The sheriff is ordered to take Daniel Lewis Graham into custody for the crime of murder in the first degree.  Bond is denied. I'll issue a commitment."  Then the next statement is Mr. Graham saying:  "I love you."  Mr. Patton saying:  "Yeah."  And then the next statement is Mr. Albert, who was the prosecutor there, stating:  "Your Honor, his mother has requested that Danny Graham be kept separate from the defendant, Mr. Patton, and I'm sure the jail will do that."

THE COURT:  Is that the end of it?

MR. STRIPLING:  Your Honor, there is another statement at the very bottom of the page.  The Court:  "There's no question but what the jail" -- and that's the last page that we received.

THE COURT:  All right.

MR. STRIPLING:  I assume the jail will do that or

19

**UNDER SEAL**

something like that.  That's the very last of it.

THE COURT:  So he ended up being charged with first degree murder?

MR. STRIPLING:  Yes, sir.

THE COURT:  Now then, what happened to that?  Was there a trial?

MR. STRIPLING:  No, sir.  Later an agreement was reached where he was placed on five years of deferred sentence they call it up there.  The essence of the agreement was that he would plead to the robbery of Mr. Wavra, that if he stayed out of trouble for five years, the matter would be dropped completely.

THE COURT:  Was there at any point any effort to suppress this transcript in the murder proceeding against him?

MR. STRIPLING:  Your Honor, nothing I've read would indicate that there was ever any proceeding other than an agreement reached for the deferred sentence.

THE COURT:  Was the other man tried, or did he plead guilty or what, John David Patton?

MR. STRIPLING:  Pled guilty, Your Honor, received life without parole.

THE COURT:  How old was he?

MR. STRIPLING:  A little bit older, Your Honor.  I want to say 18 or 19 at the time, not much older.

THE COURT:  Now, the defendants have brought the

20

UNDER SEAL

Court's attention to Section 3501, wherever it is.  I don't believe the government has made any response.  Do you have any legal authority, Mr. Stripling?

MR. STRIPLING:  Mr. De La Cruz will address that, Your Honor.  He's been looking at the statute.

THE COURT:  Mr. De La Cruz.

MR. DE LA CRUZ:  Yes, Your Honor.  3501 governs that defendant's confession.  3501(d) specifically states that "Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention."  But what we have here, we submit, is that Mr. Lee is not governed under 3501 for the purposes of an admission in the Wavra case because one of these other persons, he was not in custody, not coerced into making this statement.  His statements were completely voluntary.

THE COURT:  He was being questioned.  Right?  Read that statement again that you just read to me as a suggestion that it excluded it.  Hold on.  I have to get it here.

MR. DE LA CRUZ:  Are you ready, Your Honor?

THE COURT:  Wait just a minute.  Now I have it.  "Nothing contained in this section shall bar the admission of evidence of any confession made or given voluntarily by any

Elaine Hinson, RMR, CCR
United States Court Reporter

**21**

person to any other person without interrogation by anyone." What do you think is going on in this preliminary hearing? Is this interrogation?

MR. DE LA CRUZ: This is certainly not custodial interrogation, Your Honor. This is a judicial proceeding clearly in regards to Mr. Patton, that defendant. And, yes, he is being questioned about the circumstances that lead to the murder, but questioning on the bench is substantially different than an interrogation by police officers.

THE COURT: Well, you know, I'm kind of aghast that the court didn't advise the man of his rights before permitting the questioning to go forward, but he didn't. I mean, you can argue that he had already been advised, I guess. There's that issue of continuing effectiveness of the prior advice. If you look under (b), it tells how the trial judge shall determine the issue of voluntariness.

MR. DE LA CRUZ: Yes, Your Honor. But that goes to the defendant in that proceeding, which was Patton. This was not --

THE COURT: I understand. It can be argued the whole thing applies to the defendant in the particular case. But the definition, if I can find that again, (e), "As used in this section, the term 'confession' means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing." I guess your idea is that only

UNDER SEAL

with respect to the defendant, you know, I think that can be made. But a quick look at these annotations don't give us any clear ruling on that.

Now it's going to be used to be used against him adversely because it's going to be used to show his future or possible future dangerousness. Let me hear from the defendant's attorney. You filed this little brief. The argument is that 3501(a) applies to defendants. If he were a defendant, you couldn't use it against him. And I guess by the same token, you could argue if they proceeded with the murder charge against him, they couldn't have used it. That's the reason I asked if there had been a motion to suppress it. But he had been advised of his rights, not too much -- well, July, August, September, what, two and a half, three months.

MR. STRIPLING: End of July and the end of September, Your Honor.

MR. LASSITER: Two months.

THE COURT: Go ahead, Mr. Lassiter and Ms. Compton. Let's hear anything else you would like to say about this.

MR. LASSITER: I don't have too much to add, Your Honor, other than to state that it appears to me that this preliminary hearing transcript and the contents thereof constitutes self-incriminating statements. It looks like an interrogation to us. He's interrogated by the prosecutor who gets incriminating statements out. He is charged at the end of

UNDER SEAL

the hearing.

THE COURT:  You can't tell that the prosecutor -- in fact, you kind of get the impression the prosecutor was a little bit surprised by his testimony.  All the first leading questions are, in effect, you are drunk.  You didn't know what was going on, all this sort of thing, until finally he digs himself in deeper and deeper.  He is the one that starts the fight.  He is the one that beats him up.  He is the one that is handing the knife and the rope and whatnot.

MR. LASSITER:  Yes, sir.  The direct examination by Barry Albert, and he is referenced on the cover as being assistant district attorney.

THE COURT:  There is a public defender.  But the public defender is, I gather, for the defendant.

MS. COMPTON:  That's right.

THE COURT:  Not for him.  He has no attorney of his own.

MS. COMPTON:  He gets the public defender after this, after this testimony, and the Court sent him to lockup.  Then the public defender is appointed for him.

THE COURT:  Yeah.  I'm not so sure why it makes all that much difference from what you are telling me, if the detective testifies.  By the way, would you use just the video if you went that route?  Would you just use the video?

MR. STRIPLING:  Yes, sir.  Your Honor, may I make one

UNDER SEAL

other point about 3501(d)?

THE COURT:  Yes.

MR. STRIPLING:  The very last phrase there, as I read it, requires that the statement or confession be given by someone not under arrest or other detention.  Clearly when Mr. Graham made this statement, he was not under arrest.  And I don't believe that being subpoenaed to court to testify is the equivalent of detention.  From reading that portion of the statute, it would seem that 3501 is clearly inapplicable.

THE COURT:  Usually we are talking about custodial interrogation.  But, you know, you can subpoena a person into court and put him under oath and require him to answer questions.  In fact, I don't think there's any question in my mind after reading this transcript that he thought he had the obligation to answer.  No one suggested that he didn't, unless he recalled his prior, the prior advice that had been given to him.

MS. COMPTON:  Your Honor, just almost parenthetically, so that you will know this, and I don't think -- I mean, the government may have an objection to me telling you.  But it's certainly in all the records if anybody has gotten this case.  By this time, by age 17, in Mr. Lee's life he has been in and out of juvenile institutions for years.  I just think that's sort of important for you to know. He may not have been in actual physical custody of a juvenile

UNDER SEAL

institution at this particular moment.  But, as often as not, he was.

THE COURT:  I suppose you can make the same argument, more than likely he was thoroughly familiar with his right to remain silent and have a lawyer by virtue of his prior criminal record.  And I get the impression that if we don't admit the transcript, that you are going to get the same information from the testimony of the detective; that is, out of the videotape that he is essentially acknowledging and admitting the same thing.  Right?

MR. STRIPLING:  Yes, sir.

THE COURT:  What do you miss if you go that route as opposed to just reading a transcript?  This is more focused, I gather.  You've made that point.

MR. STRIPLING:  The detective goes all over the place.

MR. DE LA CRUZ:  The videotape is almost unintelligible in picking up Defendant Lee's statements as well, Your Honor.

MR. LASSITER:  They are correct in the sense the quality of the tape isn't very good.

THE COURT:  Is the detective going to be here?

MR. STRIPLING:  Yes, sir.  He is here.

THE COURT:  Everyone knows Mr. Lee can testify at a suppression hearing like this without waiving his right not to

26

**UNDER SEAL**

testify otherwise.  So what we have here is a motion to suppress a statement.  Maybe I ought to hear from the detective in the morning to get a better feel for it and to see.  Do we have a signed waiver, acknowledgment of rights, or is it all just orally in the transcript?  Of course, you might have to ask the detective to find out for sure.

MR. STRIPLING:  Your Honor, I don't believe there's a written statement.  I've not seen it if there is.

THE COURT:  Or a written waiver of rights or acknowledgment of what his rights are and waiver of his rights?

MR. STRIPLING:  I did not specifically ask the detective that when I spoke to him earlier today.

THE COURT:  All right.  Let's do this.  Let's have y'all here at 8:30.  Bring the detective.  Advise Mr. Lee of his right to testify without prejudicing the rest of the matter.  And then I will hear whatever else is to hear.  We might do a little more looking at this.

MR. LASSITER:  I may possibly use his mother as a witness also.  She's down here.

THE COURT:  I don't guess she was present in the courtroom, or was she?

MS. COMPTON:  I believe she was.

THE COURT:  All right.  Well, we'll just have to push the thing forward as far as the jury is concerned.  Be here at

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

8:30.  We will conduct the balance of this suppression hearing, fill in the spaces.  All right.  Let me see.  I plan to use essentially the same verdict forms as modified and to use the same preliminary capital instructions.  Is that satisfactory?

MS. COMPTON:  It's fine the way they are done so far, Your Honor.  It may be as the testimony develops in the mitigation portion, it may be that I'm going to modify those mitigators that I've already submitted.  I did those quite a long time ago.

THE COURT:  I understand.

MS. COMPTON:  I may modify them some just to fit the actual testimony.  But they are pretty close.

THE COURT:  The final instructions are something else.  I'm talking about the preliminary ones.

MS. COMPTON:  Okay.  I'm with you.

THE COURT:  I think y'all agree.  So I don't think that will slow us down.  So let's go ahead and try to get this out of the way.  Are there any other issues now we need to resolve before the hearing begins?

MS. COMPTON:  The photograph.

THE COURT:  The photograph.  I haven't seen the photograph.  But I'm going to suppress the photograph.  I've read the transcript and what he says he did.  You know, someone came in afterwards, I guess, and found the body and took a picture of it in the manhole?  In the manhole?

Elaine Hinson, RMR, CCR
United States Court Reporter

UNDER SEAL

MR. STRIPLING:  Yes, sir.  I have the first detective on the scene.  He's a different detective than the one who took the statement we've been talking about.  I intend to introduce him and introduce some pictures just showing the manhole cover and that sort of thing through him and let him give the physical layout.

THE COURT:  I'm going to suppress the foot.  You can show the physical layout.  That will be all right.  All right.  We will see you in the morning at 8:30.  We will complete the hearing on this.  I will make the final decision.

MS. COMPTON:  Thank you.

(Proceedings adjourned at 6:05 p.m.)

### CERTIFICATE

I, Elaine Hinson, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of the proceedings in the above-entitled case.

*Elaine Hinson*
_____

Elaine Hinson, Official Court Reporter

Date:    May 10, 1999,

Elaine Hinson, RMR, CCR
United States Court Reporter