7339

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA,

             Plaintiff,

    vs.                                    No. LR-CR-97-243

                                           Tuesday, May 11, 1999
(2) DANIEL LEWIS LEE,                      Little Rock, Arkansas
                                           8:30 a.m.
                 Defendant


                        VOLUME 44
              TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE G. THOMAS EISELE,
          UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
On Behalf of the Plaintiff:
    MR. DAN STRIPLING, Assistant U. S. Attorney
    MR. ROBERT DE LA CRUZ, Department of Justice
    MR. LANE LIROFF, Department of Justice
       United States Attorney's Office
       TCBY Building
       425 West Capitol Avenue, Suite 500
       Post Office Box 1229
       Little Rock, Arkansas   72203-1229


On Behalf of the Defendant Lee:
    MR. JACK T. LASSITER, Attorney at Law
       Hatfield & Lassiter
       401 West Capitol Avenue, Suite 502
       Little Rock, Arkansas   72201-3437
    MS. CATHLEEN V. COMPTON, Attorney at Law
       221 West Second
       Suite 701
       Little Rock, Arkansas   72201



Defendant Lee Present


    Proceedings reported by machine stenography.  Transcript
prepared by computer-aided transcription.



                   Elaine Hinson, RMR, CCR
                 United States Court Reporter

INDEX    May 11, 1999    Volume 44

**MOTION TO SUPPRESS**    7341

| GOVERNMENT'S WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| RON MITCHELL | 7349 | 7351 | | |

| DEFENDANT'S WITNESSES: | | |
|---|---|---|
| DANIEL LEWIS LEE | 7353 | |
| DEBRA LEA GRAHAM | 7355 | 7361 |

| GOVERNMENT'S EXHIBITS: | Received |
|---|---|
| 1102 (For motion only) | 7364 |

**PRELIMINARY INSTRUCTIONS**    7367
**OPENING STATEMENT** - LIROFF    7378
            - COMPTON    7384
**STIPULATIONS**    7469

| GOVERNMENT'S WITNESSES: | | |
|---|---|---|
| RANDALL YARBROUGH | 7389 | |
| CHAI CHOI | 7398 | |
| BRIAN COMPTON | 7407 | 7415 |
| ROCHELLE EZZI | 7456 | 7458 |
| NANCY CUMMINGS | 7461 | 7467 |

| DEFENDANT'S WITNESSES: | | |
|---|---|---|
| EDMOND FRANK GUTIERREZ | 7473 | 7480 |
| DEBRA LEE GRAHAM | 7485 | 7540 |

| GOVERNMENT'S EXHIBITS: | Received |
|---|---|
| 1092 | 7393 |
| 1090, 1091 | 7397 |
| 1097, 1098, 1099, 1100, 1101 | 7401 |
| 1103 | 7419 |
| 1106, 1107, 1108, 1109 | 7470 |
| 1110 | 7549 |

| DEFENDANT'S EXHIBITS: | |
|---|---|
| DL-17 | 7483 |
| DL-18, DL-19 | 7494 |
| DL-20, DL-21, DL-22 | 7496 |
| DL-23 through DL-30 | 7509 |
| DL-31 through DL-36 | 7532 |
| DL-37 through DL-38 | 7535 |

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

P R O C E E D I N G S

(Jury not present.)

THE COURT:  Good morning.  We are here in connection with the motion to suppress Oklahoma preliminary hearing testimony of Mr. Lee, which was discussed with the attorneys yesterday evening and continued for this hearing this morning. Over the evening we found a couple of cases that I think fairly well clarify the situation.

One is a Ninth Circuit case, United States vs. Kilgroe, which essentially, it deals with, not with the statute, but with the constitutional requirements.  And let me just read the facts briefly.  It says, "Appellant Kilgroe was subpoenaed to testify for the defense in a criminal trial.  During the course of cross-examination, he made several self-incriminating statements that were later used by the government to convict Kilgroe of fraud.  The question presented is whether Kilgroe was entitled to have the court or the prosecutor read him Miranda warnings before he took the stand for the defense."

It says, the facts, "Kilgroe, in-house counsel for National Business Printers, was subpoenaed to testify for the defense in the criminal mail fraud prosecution of Albert Clark, another employee of National.  Kilgroe testified that in his capacity as National's counsel he had repeatedly advised defendant Clark that his telemarketing program was neither fraudulent nor illegal.  On cross-examination, the Assistant

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

United States Attorney sought to impeach Kilgroe by getting him to admit that he was a participant in the mail fraud scheme, not just a disinterested attorney giving legal advice to Clark. Sure enough, Kilgroe made several incriminating statements disclosing his in-depth involvement in the mail fraud scheme. Defendant Clark was convicted.

"Not long thereafter, events turned from bad to worse: Relying on Kilgroe's incriminating testimony in the Clark trial, the United States Attorney charged him with mail fraud. At trial, the district court admitted, over defense objection, a redacted version of Kilgroe's testimony in the Clark case. The jury convicted Kilgroe for mail fraud and he was sentenced to 30 months imprisonment.

"Kilgroe's only contention is that before he testified in the Clark trial, either the prosecutor or the court was required, in accordance with Miranda, to inform him of his right against compelled self-incrimination and warn him that anything he said could be used to convict him. He relies heavily on the fact that he was forced to testify under the weight of a subpoena and on his surmise that the prosecutor considered him a putative defendant at the time of the trial.

"Discussion. 'Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated,' quoting from Berkemer vs.

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

McCarty, 468 U.S. 420 at 437, a 1984 case.

Continuing, "Although 'those types of situations' may vary, they all share two essential elements: 'Custody and official interrogation,'" citing Illinois vs. Perkins. Then, going on, these other cases "established a number of prophylactic rights designed to counteract the, quote, inherently compelling pressures, unquote, of custodial interrogation. Thus, the scope of Miranda is not, and never has been, coextensive with the scope of the right against compelled self-incrimination. See Murphy, 465 U.S. at 429 through 434. Miranda only comes into play when the government-generated coercion risks, quote, undermining the individual's will to resist,' thereby leading him to disclose information he would otherwise not voluntarily reveal," citing Perkins.

Going on, "Although the courtroom is the paradigmatic setting for invoking the right against compelled self-incrimination, it is not the type of setting that would justify invoking Miranda's prophylactic rule. The Miranda court itself recognized that 'the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery,'" citing Miranda. "Nor does the, quote, obligation to appear and testify truthfully, unquote, created by a

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

subpoena 'constitute compulsion to give incriminating testimony' of the sort that implicates Miranda's policies," citing United States vs. Jenkins. "Unlike custodial interrogation, which usually takes place without warning and, therefore, without the chance for reflection or legal advice, the subpoena gives the witness the opportunity in advance to obtain whatever counsel he deems appropriate and carefully contemplate his testimony. He remains free, of course, to refuse to answer questions that would incriminate him.

"Kilgroe's claim that he required special protection because he was a putative defendant subjected to high pressure cross-examination is without merit. Cross-examination by a prosecutor, conducted in public and in the presence of both the judge and jury, is hardly tantamount to custodial questioning by the police. While it is no doubt a powerful tool, cross-examination lacks the elements of isolation and intimidation associated with custodial police interrogation. That Kilgroe may have been a putative defendant when he testified is beside the point. The internal knowledge of a government agent that a witness may have been involved in criminal activity generates no external coercion on the witness," citing another case, Anfield, 539 F.2d.

Going on, "It is easy to think of Miranda as an expansive shelter against a citizen's ignorance of his constitutional rights, especially because for the past 25 years the Miranda

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

warning, quote, has been ingrained in the American public," unquote, citing Ceol, 'Right to Remain Silent,' <u>Washington Times</u>, June 13, 1991, "and 'become part of our common awareness.' But the <u>Miranda</u> litany is a palliative only against the unique pressures inherent in custodial interrogation. It is not a judicially crafted civics lesson, to be recited whenever someone might find it useful to hear. Thus, except in the context of custodial interrogation, <u>Miranda</u> leaves the responsibility for keeping a citizen informed of his constitutional rights with the preeminent guardian of those rights: The citizen himself."

Now, as I said, that dealt with the constitutional issue limitations. We have found another case dealing with the section of the law which has been cited by the defendant, Section 3501. And the history of that legislation indicates it was passed by Congress in reaction to <u>Miranda</u> to really cut down upon rather than to enlarge the protections of the <u>Miranda</u> decision. That has to be kept in mind as we interpret it.

The case that we found is <u>United States vs. Valdez</u>, a 1994 Second Circuit case. I'm not going to go into much detail. I want to quote some portions from it. There the defendant testified for the defense at the codefendant's trial. And then they looked at the statute to see if his statements could be interpreted broadly as, quote, confession as defined in 3501. And they concluded, "This would seem to be satisfied by Mock's

Motion to Suppress

prior testimony, in which he made statements that at the very least tied him to the defendants in such a way as to implicate him in their conspiracy."

Now, continuing with the opinion, "Even if Mock's testimony could constitute a, quote, confession, unquote, for purposes of Section 3501(a) and (e), however, Subsection 3501(d) limits the applicability of the entire section, stating that, quote, nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention," citing 18 U.S.C. 3501(d).

Reading on, "Subsection (d) therefore places two limitations on the applicability of the entire section:  (1) if the confession was given without interrogation; and (2) if the confessor was not under arrest or detention at the time the statement was made," citing United States vs. Bernett, 495 F.2d 943 at 972, "Wilkey J., concurring, stating that Congress' intent in Section 3501(d) was to create 'a broad exception to the procedural requirements of Section 3501.'  See also United States vs. Bailey, a Seventh Circuit case, 728 F.2d, citing concurrence in Bernett, holding that Section 3501(d) creates an exception to the procedural requirements of the entire section."

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

Continuing, "Both of these limitations apply in this case.  Mock was subject to cross-examination during his testimony before Judge Lowe, but although an effective cross-examination can perhaps be as unpleasant as many interrogations, there is a tremendous legal distinction between the two.  Moreover, as the district court found, Mock was not under arrest or detention at the time of his testimony.  Mock came to court freely in order to testify on behalf of the defendants, and was unaware, as per Judge Lowe's instructions, of his imminent arrest.

"Application of Section 3501(d) indicates that Mock's testimony, even though possibly incriminating, is not a 'confession' subject to the restrictions of the rest of the section.  Therefore, the requirements of Section 3501(a), which mandates among other things the admission of the underlying circumstances to voluntary confessions, are not operative to compel the district court to admit the evidence concerning Mock's testimony," citing cases, "holding that requirements of Section 3501 do not apply, because statement was spontaneous and not the product of interrogation," citing another case, "holding that no voluntariness hearing required under 3501 where statement was volunteered and was not in response to interrogation," citing another case, "holding that a voluntariness hearing under 3501 not required where defendant spoke out on his own, not in response to interrogation.

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

"Mock cannot therefore rely on Section 3501 to require the admission of the circumstances of his testimony in the first trial. He can only argue that the district court abused its discretion as to the relevancy of those underlying circumstances. Because we find the district court did not abuse its discretion, we affirm the court's judgment on this issue."

Now, here we have a situation where the defendant was 17 years old at the time of the crime and at the time the statements were made. I believe that those decisions and the interpretation of 3501 and 3501(d) particularly favor the government's position in the case. However, I've been informed that some two or two and a half months before this statement was made that the defendant was Mirandized and interviewed and, in fact, gave much of the information in response to that interview that we find in this transcript. And really, as I understand it, the government's main reason for wanting to use the transcript rather than the video of the interview is that the transcript is much more legible and understandable. The video is hard to hear and understand. I have not heard it. That's the representation that's made. So there may also be the circumstance here that the transcript does not really disclose information prejudicial to the defendant that he had not already disclosed in the interview and that it's simply a matter of making it more understandable to the jury.

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

There's the other issue in the case.  And that is we are dealing here not with the trial of guilt or innocence.  We are dealing with an issue of punishment in which the technical Rules of Evidence do not usually apply and in which information, they use the word "information" as opposed to "evidence," may be brought before the jury if it bears upon any issue relevant to sentencing.  So with all those things in mind, the Court wishes to limit this hearing to receive information upon the prior warning so the record will be complete on that.  So at this point the government has the burden of moving forward, if you will call your first witness.

MR. DE LA CRUZ:  The government calls Detective Mitchell, Your Honor.

THE COURT:  Detective Mitchell?

MR. DE LA CRUZ:  Yes, Your Honor.

THE COURT:  Come forward, please.  Come to this lady.  Raise your right hand and be sworn.

**RON MITCHELL, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION

BY MR. DE LA CRUZ:

Q.    Sir, state your name for the record, and spell your first and last name, please.

A.    Yes, sir.  Ron Mitchell, R-o-n, M-i-t-c-h-e-l-l.

Q.    How are you employed, sir?

A.    I'm a police detective with the City of Oklahoma City,

Elaine Hinson, RMR, CCR
United States Court Reporter

7350

Motion to Suppress/Mitchell - Direct

assigned to the homicide unit.

Q.   On July 26th, 1990, did you have an opportunity to interview Mr. Daniel Graham, now known as Daniel Lewis Lee, in regards to an investigation into the murder of Joseph Wavra and the murder that had occurred on July 24th, 1990?

A.   Yes, I did.

Q.   Who else was present in the room at the time of that interview?

A.   His mother was present and then another detective, a Detective Willard Page.

Q.   At the beginning of the interview, did you advise Mr. Lee of his rights under Miranda?

A.   I read him his rights from a card that I carry with me.

Q.   Did you also read, did you also ask Mrs. Graham whether she understood those rights as well?

A.   Yes, I did.

THE COURT:  Do you happen to have that card that you use with you?

THE WITNESS:  I do, sir.

THE COURT:  Could you, if that is what you read, read to the Court what you read to him?

THE WITNESS:  Yes, sir.  "You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you are being questioned.

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress/Mitchell - Direct

If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one.  If you decide to make a statement, you may stop at any time."  Then I ask two waiver questions, the first being:  "Do you understand each of these rights I've explained to you?"  He responded that he did.  The second was:  "Having these rights in mind, do you wish to talk to us now?"  Again he responded that he did.

THE COURT:  This was videotaped.  Is that correct?

THE WITNESS:  Yes, sir.

THE COURT:  Including the warning?

THE WITNESS:  That's correct.

MR. DE LA CRUZ:  No further questions.

THE COURT:  You may cross-examine, Mr. Lassiter.

MR. LASSITER:  Your Honor, if I might, I just have one question.

CROSS-EXAMINATION

BY MR. LASSITER:

Q.    Was the tape ever reduced to a transcript?

A.    No, it was not.

MR. LASSITER:  That's all I have.

THE COURT:  Let me ask defense counsel, have you had a chance to look at the tape?

MR. LASSITER:  Yes, Your Honor.  We saw it last Friday afternoon.

THE COURT:  All right, sir.  You may stand down.  Let

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress/Mitchell - Cross

me see again.  The date that he talked with him was July 26?  I'm just asking counsel, was July 26, 1990?

MR. DE LA CRUZ:  Yes, Your Honor.

THE COURT:  And then this statement was made -- I have it here -- on September 28th, 1990, so July, August, September, looks like two days longer than two months after.  And I'm advised that the defendant's mother was present at the time of the first interrogation and waiver of rights.  And is it also true that she was present at the interrogation at the preliminary hearing or not, or do we know?

MS. COMPTON:  She was, Your Honor.

THE COURT:  She was present?  The defendant acknowledges that she was present then.  Does the defendant wish to offer anything in addition to what we have here on this issue?

MS. COMPTON:  Yes, sir.

MR. LASSITER:  Yes, Your Honor.  Mr. Lee.

THE COURT:  Mr. Lee, you may come forward.  Raise your right hand and be sworn.

(Defendant Lee sworn.)

THE COURT:  Mr. Lee, you have the right to testify at the suppression hearing without waiving your right to remain silent during the penalty phase.  But, if you happen to decide to testify at the penalty phase and you testify differently from what you say here, then this could be used to impeach

Motion to Suppress/Lee - Direct

you.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Mr. Lassiter.

**DANIEL LEWIS LEE, DEFENDANT'S WITNESS, SWORN**

DIRECT EXAMINATION

BY MR. LASSITER:

Q.    Mr. Lee, state your full name, please.

A.    Daniel Lewis Lee.

THE COURT:  Speak a little louder, Mr. Lee.

A.    Daniel Lewis Lee.

BY MR. LASSITER:

Q.    In 1990, you testified at a preliminary hearing in Oklahoma County, Oklahoma.  Is that correct?

A.    Yes.

Q.    And that was in a case involving a Mr. Patton.  Is that correct?

A.    Yes.

Q.    That's your cousin.  Is that right?

A.    Yeah.

Q.    How old were you at the time?

A.    Seventeen.

Q.    Now, prior to, were you subpoenaed to that hearing?

A.    I believe I was.

Q.    Prior to testifying at that hearing, did the prosecuting attorney indicate to you that you had a right to remain silent?

Motion to Suppress/Lee - Direct

A.    No, he didn't.

Q.    Did the judge or anyone advise you that you had a right to remain silent?

A.    No.

Q.    Did anybody advise you that you were the subject of a criminal investigation?

A.    No, they didn't.

Q.    Did anyone advise you that you had a right to an attorney?

A.    No.

Q.    Did anyone advise you that you were going to be arrested after that hearing?

A.    No.

Q.    Had you known that you were going to be arrested following that hearing and had you known that you had a right to remain silent, would you have testified at that hearing?

A.    No, I wouldn't.

Q.    I think you were interviewed late in July by law enforcement?

A.    Yes.

Q.    And at any time between that interview and when you testified at the preliminary hearing in September, did you have an attorney?

A.    No.

        MR. LASSITER:  That's all I have, Your Honor.

        THE COURT:  Any cross-examination?  Let me just ask

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress/Lee - Direct

you about, at the time you were 17 years old.  I think there's some indication that you had been in juvenile custody?

THE DEFENDANT:  Yes.

THE COURT:  Just tell me your prior experience with the law before this interview that you had in this event.

THE DEFENDANT:  The juvenile system was it.

THE COURT:  The juvenile system?

THE DEFENDANT:  Yes.

THE COURT:  I notice that in July you were advised of your rights.  Had you been arrested and advised of your rights on other occasions before this?

THE DEFENDANT:  Yes.

THE COURT:  Were they in connection with any felony charges?

THE DEFENDANT:  No.  They were all --

THE COURT:  Juvenile --

THE DEFENDANT:  Yeah.

THE COURT:  -- offenses.  Any other questions by anybody?  Mr. Lee, you may stand down.  Anything else by the defendant?

MS. COMPTON:  I would call Lea Graham.

THE COURT:  Just come forward, please, to the lady. Raise your right hand and be sworn.

**DEBRA LEA GRAHAM, DEFENDANT'S WITNESS, SWORN**

DIRECT EXAMINATION

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress/Graham - Direct

BY MS. COMPTON:

Q.    State your name for the record, please.

A.    Debra Lea Graham.

Q.    You are going to have to hold that mike a little bit. Your voice is very soft.  You've testified in this courtroom before during earlier proceedings.  Is that correct?

A.    Yes.

Q.    You are Danny Lee's mother?

A.    Yes.

Q.    Can you back up with us, Ms. Graham, to July of 1990 for just a few minutes?  Tell the Court who John David Patton is as relates to you and Danny.

A.    John David Patton is my nephew, my sister's son.

Q.    So he and Danny are maternal first cousins?

A.    Yes.

Q.    When did you first learn of John David's arrest in Oklahoma City?  Let me help you out.  On July 26, we know for sure that you were up at the police station with Detective Mitchell.

A.    I believe Joey died the 24th, approximately two days.

Q.    Did you take Danny to the -- I'm saying police station. That may not be --

A.    Yes, it was.

Q.    To the police station in Oklahoma City?

A.    Yes, I did.

Motion to Suppress/Graham - Direct

Q.   At whose request did you take him to the police station in July?

A.   I believe it was this gentleman.  I just heard his name. I can't remember, but his face is very familiar.

          THE COURT:  The detective who just testified?

          THE WITNESS:  Yes.

BY MS. COMPTON:

Q.   Did he call you at your home?

A.   Yes, he did.  He did.  He was polite.  He asked if I knew what had happened.  I said I was getting bits and pieces.  And he asked me to bring Danny in.  I had a scheduling problem with my daughter's school activities and so on.  He was getting a little concerned that I was trying to put him off, I think. But it was approximately two hours before I could actually get downtown to Oklahoma City.

Q.   At that time were you living where you live now at Yukon?

A.   Yes.

Q.   So it's a pretty good little trek?

A.   Yes, it is.

Q.   But the same day that he called you --

A.   That evening we went down.

Q.   And you were, in fact, sitting in the interview room --

A.   Yes, I was.

Q.   -- with your son, were you not?  And did you hear Detective Mitchell read Danny his rights from the <u>Miranda</u> card?

Elaine Hinson, RMR, CCR
United States Court Reporter

7358

Motion to Suppress/Graham - Direct

A.    Yes.   At the same time, he also told him he was just here to gather information about the crime.  He wasn't under suspicion.

Q.    Did you acquiesce in Danny giving the information after he was read his rights by Detective Mitchell?

A.    I didn't hear the first part.

Q.    Was it all right with you?  Did you tell Danny to go ahead and tell him the truth?

A.    Yes.  I encouraged him to tell the truth.

Q.    When was the next time, if that was July 26 of 1990, approximately how long was it before you heard anything else from anybody about Danny's involvement or potential involvement in John David's trial?

A.    When this happened, my family was completely split.  Only in the last year has my -- John David Patton's mother and I actually had free conversation.

Q.    Your sister?

A.    Yeah.

Q.    But if the interview was in July of 1990, we know that in September of 1990 Danny went to a preliminary hearing?

A.    Right.

Q.    Was he living with you at the time he went to the preliminary hearing?

A.    Yes.

Q.    Did you take him there?

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress/Graham - Direct

A.    Yes, I did.

Q.    How did you know to take him to court?  Was he subpoenaed?

A.    I believe he was, yes.

Q.    We know that in July Danny was on a pass from COJAC, which is a juvenile facility?

A.    Right, for treatment.

Q.    Treatment for what?

A.    For his hyperactiveness.  He had had some suicidal problems, symptoms.  I didn't send --

Q.    It's okay, Ms. Graham.  Just stick with me for a minute here.  If you move forward to the September date in 1990, all I'm trying to find out from you for sure is whether Danny at that time was living with you and Carrie in the house at Yukon or whether he was living --

A.    I believe he was.

Q.    You think he was living at home by that time?

A.    In July he went back to COJAC for treatment, but he came home.  And then we went to court.  His juvenile caseworker, which was required because I had no insurance to get him treatment, we had to go through the juvenile system to do it.  And she told me from the very beginning that Danny did not need an attorney.

Q.    Let's talk about that.  How long roughly, I'm talking about --

A.    Two months.

Motion to Suppress/Graham - Direct

Q.   Wait.   Listen to my question.   A year?   Two years?   Three years?   How long roughly had Danny been in any kind of juvenile treatment facility?   And how much contact had you had with his caseworker?

A.   Not very much.

Q.   So did you ask her point blank at the time Danny was subpoenaed whether --

A.   That he needs an attorney, yes.   She said, oh, no, he doesn't need that.   In the courtroom -- I'm sorry.   In the little room outside the courtroom, I spoke to the detectives.   I spoke with Barry Albert.   Is it Albert Barry?

Q.   The prosecutor?

A.   Yes.   And told him that Danny needed an attorney.   He says, "Oh, no, he doesn't.   He doesn't need an attorney."   I said, "Then I'm going to take him home.   He is not going to testify without an attorney."   He said, "You do, and I will arrest you."

Q.   Did you bring it to the attention of the judge that you thought Danny needed a lawyer?

A.   Yes, I did.

Q.   Where was that?

A.   That was through his secretary around the corner at the courthouse.

Q.   Did any of these people say, Okay, let's hold on, we'll go see about getting him a lawyer?

Motion to Suppress/Graham - Direct

A.    No, no.  They all said, Oh, he doesn't need an attorney.

Q.    Did any of them ask you whether Danny had been represented by counsel before?

A.    Not that I know of, no.  I don't think so.

Q.    Did his caseworker to your knowledge know of any lawyer who had represented him?

A.    She didn't even show up.  She wouldn't even take my calls.  Her name has been in the news numerous times -- I cannot give you her name.  I don't remember it -- for disasters on her cases.

Q.    Her name is irrelevant to me.  I'm just trying to find out from you for sure whether she made you believe that Danny did not need an attorney.

A.    She absolutely did.  She said he did not need an attorney.

Q.    Thank you.  That's all.

        THE COURT:  Mr. De La Cruz.

                CROSS-EXAMINATION

BY MR. DE LA CRUZ:

Q.    During the July 26th interview that you attended with Danny, do you recall that?

A.    Yes.

Q.    And Detective Mitchell began asking questions of Danny?

A.    Yes.

Q.    And you objected on hearsay grounds.  Is that correct?

A.    On hearsay?  I don't remember the entire video.

Motion to Suppress/Graham - Cross

Q.   Do you recall telling Danny not to answer anything, any of the questions that he didn't personally have knowledge of?

A.   Yes.  John David's stepfather had called and talked to Danny on the telephone.  I didn't trust Richard.

Q.   You did object during that hearing?

A.   That he not go by anything that Richard had said.

Q.   Detective Mitchell honored your objection, didn't he?

A.   I don't remember.

MR. DE LA CRUZ:  No further questions.

MS. COMPTON:  That's all I have, Your Honor.

THE COURT:  You may stand down.  Anything else for the defense?

MS. COMPTON:  No, sir.

THE COURT:  Anything else for the government?

MR. STRIPLING:  No, sir.

THE COURT:  I've already told you how I view the law, which in this case I think argues for the admissibility of this.  Of course, all the information concerning the circumstances can be put on by the defendant.  But also there's nothing in this proof to indicate that the statement was not voluntary.  It's true that there's information that a caseworker and the prosecutor, somebody advised the mother that an attorney would not be needed.  They've gone through the whole thing with the detective, and apparently the mother at that time had more or less represented her son and objected on

7363

Motion to Suppress

various grounds.  I think probably, for the record, I haven't looked at it.  But it might be a good idea to put the video in just to reflect the statements made to the Court by the government as to its contents.  It can just be made a part of the record.  So, Marge, if you will give it a number.

So I'm going to overrule the defendant's objection and permit it to be used.  Of course, the defendants can put in anything they care to about the context of what happened, just as the mother has testified, so that the jury can have the benefit of that.  Is there anything -- all right.

MR. LIROFF:  On this issue, Your Honor, we had provided a transcript to you.  And we had difficulty coming up with the last two pages of that transcript.  And last evening I received access to the last two pages.  What we had given you was an attempt to replicate it.  I now have those last two pages.

THE COURT:  You have the actual two pages?

MR. LIROFF:  Yes.  I've given a copy to Mr. Lassiter.  And I'm now giving your clerk those two pages.

THE COURT:  Let me see what they say.  I read the rest of it.  Let me look at this.

COURTROOM DEPUTY:  The tape is going to be Government's 1102.

THE COURT:  1102 is received for purposes of this preliminary hearing.

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

(Government's Exhibit 1102 received in evidence for the motion to suppress.)

THE COURT:  They have two pages, but actually only one that has testimony on it.  The questions on this page, page 44, are:

"Q.  Was there any reason why David was mad at Joey at the point that you went to the manhole?

A.  Well, besides stealing some stuff out of Larry's house and urinating all over the chair -- well, yeah -- yeah, I guess so.

Q.  So did he say anything to Joey about being mad at him or hit him or anything before he went down to the manhole?

A.  He just told him he was screwed up, you know, telling him it's not too cool to party in someone's house and steal their stuff and pee on the furniture.

Q.  He never threatened him or anything?

A.  No.

Q.  And then he just followed Joey down into the manhole after you took Joey down there yourself?

A.  Yes.  I didn't take him down there, just pushed him down.

MR. FAULK:  Pass the witness.

THE COURT:  Mr. Albert.

MR. ALBERT:  Judge, I have no further questions of the witness."

And the last page is just a certification by the court

Elaine Hinson, RMR, CCR
United States Court Reporter

Motion to Suppress

reporter.  So those pages will be added to the one that you introduced.  Is that all right, so it will be complete. Anything else before we start the penalty phase?

MS. COMPTON:  Your Honor, I believe Mr. Liroff and I had stipulated maybe last week -- I can't remember -- to the introduction of certified copies of both pleas; that is, that of John David Patton to the murder of Joey Wavra and that of Danny Lee, at that time known as Daniel Graham, to robbery.

THE COURT:  Is that agreed, that that can be introduced?

MR. LIROFF:  Yes.

THE COURT:  They can be received without any authentication, just as evidence in the case.  Anything else?

MR. LIROFF:  The record should reflect another stipulation that counsel and I have entered into, which is that the evidence that the government introduced in the penalty phase in the Kehoe case, the testimony of the witness regarding the vulnerability of the victim, the testimony regarding the mannequin will be deemed admissible, and the jury can rely upon it in this case.

THE COURT:  Without having it repeated?

MR. LIROFF:  Right.

THE COURT:  And you will so advise the jury?

MR. LIROFF:  Yes.

THE COURT:  Is that satisfactory?

Elaine Hinson, RMR, CCR
United States Court Reporter

MS. COMPTON:  That's correct, Your Honor.  I understand along with that stipulation is the agreement the dummy or mannequin won't be brought back into the courtroom during this phase of our trial.

THE COURT:  Will not?

MR. LIROFF:  That's correct.

THE COURT:  But it can be in the government's case.  Is that correct?

MS. COMPTON:  No.  We are going to deem that stuff as being admitted in this case without bringing the dummy in.

THE COURT:  I think I understand the stipulation.  Anything else?

MR. STRIPLING:  Your Honor, I've shown defense counsel photographs that I intend to use in the presentation this morning.  I believe counsel has an objection to one.  We probably need to get that resolved because I intend to introduce it through the first witness.

THE COURT:  What is it?

MR. STRIPLING:  Your Honor, it's a photograph in the storm sewer.  It's a photograph of the wall showing blood on the walls.

THE COURT:  Let me see it.

   What's the objection?

MS. COMPTON:  Your Honor, the objection really is twofold.  The first one is I keep thinking I'm through with

7367

these Wavra photographs, and then they keep coming back, which is probably not a valid objection. But I did file a motion a long time ago. There was a response made to it. I understood we weren't going to bring in those photographs.

THE COURT: As I understand it, everybody agrees, do they not, that Patton murdered this child?

MR. STRIPLING: It is agreed that he is the person that wielded the knife, Your Honor.

THE COURT: So if the man bled, it was because he wielded the knife.

MR. STRIPLING: He had the knife because Mr. Graham brought it to him.

THE COURT: Well, you are going to have proof of that, I gather.

MR. STRIPLING: Yes, sir.

THE COURT: I'm going to sustain the objection to 1093. Anything else?

MS. COMPTON: I don't believe so.

THE COURT: All right. What we will do, why don't we just plan to start at 9:30. Tell the jury that we will start at 9:30 instead of 9:00. We will have our recess until that time. Court will be in recess.

(Recess from 9:15 a.m. until 9:35 a.m. Jury present.)

THE COURT: Good morning, ladies and gentlemen. Now, ladies and gentlemen, once again it becomes my duty to give you

Elaine Hinson, RMR, CCR
United States Court Reporter

7368

Preliminary Jury Instructions

some preliminary instructions for your guidance as we enter the penalty phase of the trial.

In this penalty phase, you should keep in mind the preliminary instructions I gave you at the beginning of the guilt-innocence phase of the trial as well as the following instructions.

As you know, the penalty phase has been conducted separately for each defendant. This penalty phase deals only with the Defendant Daniel Lee.

Now, I know you took some notes when you were listening to the penalty phase of Mr. Kehoe. None of that is to be used unless the parties stipulate, as I understand they will, that some of it may. In other words, they may stipulate that some of the evidence that was received in the Kehoe trial is to be received here. If they do, then you may use your notes with respect to those particular stipulated matters.

You have unanimously found the Defendant Daniel Lewis Lee guilty of the offenses of murdering William Mueller, Nancy Mueller and Sarah Powell, each of which is a violent crime in aid of racketeering activity, as charged in Counts 3, 4 and 5 of the superseding indictment respectively. You must now consider whether imposition of a sentence of death is justified or whether the Defendant Daniel Lewis Lee should be sentenced to life imprisonment without the possibility of release.

The law leaves this decision exclusively with you, the

Elaine Hinson, RMR, CCR
United States Court Reporter

Preliminary Jury Instructions

jury.  If you determine that the defendant should be sentenced to death or to life imprisonment without the possibility of release, the Court is required to impose that sentence.

Before you may consider whether to impose a sentence of death for the murder of each victim, you must make each of the following three findings unanimously and beyond a reasonable doubt:

First, you must find unanimously and beyond a reasonable doubt that Daniel Lewis Lee was at least 18 years of age at the time he committed each capital offense;

Second, as to each capital offense, you must find unanimously and beyond a reasonable doubt one of the following three mental states to have existed:

(1) the Defendant Lee intentionally killed the victim; or

(2) the Defendant Lee intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(3) the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act;

Elaine Hinson, RMR, CCR
United States Court Reporter

7370

Preliminary Jury Instructions

Third, in the death penalty statute, a number of aggravating factors are listed.  These are called "statutory aggravating factors."  As to each capital offense, before you may consider imposition of the death penalty, you must find that the government proved at least one of these aggravating factors specifically listed in the death penalty statute, and your finding must be unanimous and beyond a reasonable doubt. The statutory aggravating factors alleged by the government in connection with the Defendant Lee's murders of William Mueller, Nancy Mueller and Sarah Powell are set forth below in the preliminary instructions.

If, after fair and impartial consideration of all the evidence in the case any one of you does not make all three of these findings beyond a reasonable doubt as to a particular victim, your deliberations will be over with respect to the count charging the defendant with the murder of that victim.

On the other hand, if you do unanimously make these findings beyond a reasonable doubt, you must then determine whether you unanimously find that the government has proved the existence of a nonstatutory aggravating factor beyond a reasonable doubt and whether any of you find that the defendant has proved any mitigating factors by a preponderance of the evidence.

A nonstatutory aggravating factor is one other than those specifically listed in the statute, the death penalty statute.

Elaine Hinson, RMR, CCR
United States Court Reporter

Preliminary Jury Instructions

The terms "aggravating factors" and "mitigating factors" have to do with the circumstances of the crime or the personal traits, character or background of the defendant.

The word "aggravate" means "to make worse or more offensive" or "to intensify." The word "mitigate" means "to make less severe" or "to moderate." An aggravating factor is a fact or circumstance which would tend to support the imposition of the death penalty. A mitigating factor is any aspect of a defendant's character or background, any circumstance of the offenses or any other relevant fact or circumstance which might indicate that the defendant should not be sentenced to death.

The government must prove the existence of at least one statutory aggravating factor and may prove at least one nonstatutory aggravating factor, but the burden of proof as to both is beyond a reasonable doubt. To find the existence of an aggravating factor, your decision must also be unanimous.

The defendant has the burden of proving any mitigating factors. However, there is a different standard of proof as to mitigating factors. You need not be convinced beyond a reasonable doubt about the existence of a mitigating factor. You need only be convinced that it is more likely so or likely true than not true in order to find that it exists. Also a unanimous finding is not required. Any one of you may find the existence of a mitigating factor.

If you unanimously find that at least one statutory

7372

Preliminary Jury Instructions

aggravating factor exists, you must then weigh the statutory and nonstatutory, if any, aggravating factors you have so found to exist against any mitigating factors any one or more of you have found by a preponderance of the evidence to exist when you determine the appropriate sentence.

If you unanimously find that the statutory aggravating factor or factors, and any nonstatutory aggravating factor which you all have found to exist, sufficiently outweigh any mitigating factor or factors which any one or more of you found to exist; or, if, in the absence of a mitigating factor or factors, you find that the aggravating factor or factors alone are sufficient to justify the imposition of death, the law provides the defendant shall be sentenced to death.

In making this determination, you must not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater.  Rather, you must consider the weight and value of each factor.

If, after weighing the aggravating and mitigating factors, any one of you finds that a sentence of death is not justified, then the sentence of death will not be imposed.  In that event, the jury must then determine whether the defendant shall be sentenced to life imprisonment without the possibility of parole, of release.

Again, whether or not the circumstances of this case justify a sentence of death is a decision that the law leaves

Elaine Hinson, RMR, CCR
United States Court Reporter

7373

Preliminary Jury Instructions

entirely to you, the members of the jury. You should not take anything I may say or do during this phase of the trial as indicating what I think of the evidence or what I think your verdict shall be.

Now, the government alleges the following statutory aggravating circumstances or factors:

1. That the Defendant Daniel Lewis Lee murdered each victim; that is, William Mueller, Nancy Mueller and Sarah Powell, in expectation of the receipt of anything of pecuniary value;

2. That the Defendant Daniel Lewis Lee murdered each victim; that is, William Mueller, Nancy Mueller and Sarah Powell, after substantial planning and premeditation;

3. Regarding Count 5 only; that is, that Sarah Powell was a victim who was particularly vulnerable due to her youth, that being eight years of age, when she was murdered by Daniel Lewis Lee; and

4. That the Defendant Daniel Lewis Lee intentionally killed or attempted to kill more than one person during a single criminal episode.

The government also alleges the nonstatutory aggravating factor of the defendant's future dangerousness; that is, that Daniel Lewis Lee, if not put to death, would be a danger in the future to the lives and safety of other persons.

Now, the Defendant Daniel Lewis Lee alleges the following

7374

Preliminary Jury Instructions

mitigating factors:

1.  Mr. Lee's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge.

2.  Mr. Lee was under duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

3.  Mr. Lee does not have a significant prior criminal record other than his juvenile record.

4.  Mr. Lee committed the killing or killings under mental or emotional disturbance.

5.  Another person equally culpable in the crimes will not be punished by death.

6.  Mr. Lee was subjected to emotional and physical abuse, abandonment and neglect as a child and was deprived of the parental guidance and protection which he needed.

7.  Mr. Lee suffered from neurological impairments that were identified and which could have been treated when he was a child and adolescent.

8.  Mr. Lee suffers from brain dysfunction, which has gravely impaired his ability to function in the absence of strong support and guidance.

9.  Mr. Lee was introduced to drugs and alcohol while still a child.

Elaine Hinson, RMR, CCR
United States Court Reporter

Preliminary Jury Instructions

10.  Mr. Lee needs a structured environment and would likely benefit from the structure of a prison.

11.  Mr. Lee was only 22 years old when the murders were committed.

12.  Mr. Lee is a follower and was under the influence of Chevie Kehoe and possibly others at the time of the offense.

13.  Other persons were involved in this racketeering enterprise and conspiracy who will under the law receive no sentence or substantially less punishment or were not prosecuted.

14.  Mr. Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers.

As I previously instructed you, the government must meet its burden of proof beyond a reasonable doubt.  A reasonable doubt is a doubt based upon reason and common sense.  It is not an imaginary doubt.  However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.  It is a doubt that arises from the jury's consideration of the evidence or the lack of evidence and is the doubt that would make a reasonable person hesitate to act.  Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to act and rely upon it in the most important of his or her own personal affairs.

A reasonable doubt exists whenever, after careful and

7376

Preliminary Jury Instructions

impartial consideration of all the evidence in the case, the jurors do not feel convinced to a moral certainty that a culpable mental state or an aggravating factor has been established.

The defendant does not have the burden of disproving anything that the law requires the government to prove beyond a reasonable doubt. The burden is wholly upon the government. The law does not require the defendant to produce any evidence at all.

If the defendant wishes to put before the jury any mitigating factor or factors for its consideration, then it is the defendant's burden to establish such factor or factors by a preponderance of the evidence. To prove something by a preponderance of the evidence means to prove that it is more likely true than not true. It is determined by considering all the evidence and deciding which of the evidence is more believable.

In making the determinations you are required to make in this penalty phase of the trial, you may consider any evidence that was presented during the guilt phase of the trial as well as any evidence that is presented at this sentencing phase of the trial.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says or only

Preliminary Jury Instructions

part of it or none of it.  In deciding what testimony of any witness to believe, consider the witness' intelligence, the opportunity the witness had to have seen or heard the things as to which he has testified, the witness' memory, any motives that the witness may have for testifying in a certain way, the manner and demeanor of the witness while testifying, whether the witness said something different at an earlier time, the general reasonableness or unreasonableness of the testimony and the extent to which the testimony is consistent with the other evidence that you believe.

Now, from time to time during the course of the penalty phase of the trial, there will be recesses.  You will be permitted to leave the jury box and go your separate ways.  I want to advise you now, in case I forget to on those many different occasions, that until this case is turned over to you for your deliberations, you are not to discuss it among yourselves or with anyone else or permit anyone to discuss it in your presence.  Under your oaths, you are obligated to keep an open mind on all the facts and issues until you've heard all of the evidence and have had the benefit of the arguments of the attorneys and have received the Court's final instructions as to the law.

Keep in mind, too, the requirement that you are not to read anything that might be reported about the case in the media or listen to or view any television, radio, computer or

7378

Preliminary Jury Instructions

Internet report about the case.  Your obligation is to base your decision solely upon the lawful evidence and information that has been brought and will be brought before you during the course of both phases of the trial and not upon anything that you might see or hear outside of this courtroom.

Now, once again, this process will now proceed.  And the attorneys are permitted to make what we call an opening statement to outline and summarize the proof and the evidence that the attorneys expect will come before you during the penalty phase.  The defendants are not required to make one at this time.  They may reserve it and make it at a later time.  What is the intention of the defendant?

MS. COMPTON:  Your Honor, I intend to make my brief opening after the government does theirs today.

THE COURT:  Immediately following the government's?

MS. COMPTON:  Yes, sir.

THE COURT:  All right.  The government may make an opening statement.  Mr. De La Cruz.  Excuse me.  Mr. Liroff.

MR. LIROFF:  May it please the Court, Mr. Lassiter, Ms. Compton.  Hello.  My name is Lane Liroff.  I'm a trial lawyer in the Department of Justice.  I haven't spent much time with you.  But I've had the opportunity to work on this case with Mr. Stripling and Mr. De La Cruz, directed towards this phase of this trial relating to Danny Lee.

You know, people are different.  And you, your life

Elaine Hinson, RMR, CCR
United States Court Reporter

Opening Statement - Liroff

experience or my life experience separates us.  And, as a result of that, the law, Judge Eisele in this case, early on chose that we would have two separate penalty phases.  And we do that because people are different.  They have different aspects to their lives that allow you or require -- I think you would agree it would be fair -- to study their individual case separately.

Now, Mr. Lee now stands before you.  And he's been convicted of murder in aid of racketeering of Bill Mueller, Nancy Mueller and little Sarah Powell.  He is by your verdict a killer.  But now in this trial you will learn aspects of Mr. Lee's life, of his personality, of things he has done, of his psychological profile that in the end will convince you that as he sits here today and will be in the future, Mr. Lee is a dangerous man.  That, ladies and gentlemen, is a lot of what this trial will be about.

What we will do here is place Mr. Lee, Danny Lee, in perspective, his life experiences, his good deeds and his crimes.  Every one has something good to say about them.  And this is our opportunity to hear those people.  And during this trial then we balance his life, those he has hurt or will hurt in the future.

The law, as you know, based upon the instructions just given to you by Judge Eisele, remains the same, as it was in Mr. Kehoe's case.  Three things that we are going to first be

Opening Statement - Liroff

talking about whether they've been proved:  Over the age of 18.  You are going to learn -- you've already learned, but you will learn that Mr. Lee was 22 days short of being 23 when this crime happened.  I think his birthdate is January 31st, 1973.  You will discuss -- we will argue about whether there was the culpable threshold mental states.  And, again, the evidence amply supports that the placing of a bag over a living human being, the elaborate taping of it shut, the taping of stones to the body and tossing it into a bayou is at a minimum conduct that shows reckless disregard for human life.

You will address generally the same four aggravating factors, statutory aggravating factors:  Pecuniary gain, substantial planning, multiple murders, vulnerable victim.  And there's something I want to say about vulnerable victim.  Clearly the taking of a life is always aggravating.  But in the instance where the victim is so young, the law permits an additional aggravator.  And I'm not telling you things you don't know.  What I wanted to point out is that the evidence presented in Mr. Kehoe's case by the government as to the vulnerability of Ms. Powell, her small size, her personality, the evidence, the presentation of the mannequin, that demonstration will be deemed admissible in this case.  And that's something that you will and can consider.  What that means is there's not going to be the repetition.  We are not going to wheel the mannequin back in.  We are not going to

redress him.  We are not going to bring that rock anymore because I don't think we need to do that.  I do believe that that presentation established the point that was made, trying to be made.

The last aggravating factor that you will consider is the factor, the nonstatutory factor, called future dangerousness. What this means is that the evidence presented to you in this case as to Mr. Lee means that even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards.  He continues to be dangerous.

Like I said in the beginning, people are different.  Mr. Lee is not Mr. Kehoe.  And in this area you are going to learn things, things about Mr. Lee that it was not pertinent for you to know before this trial, before the penalty trial.  The evidence that will be presented in this trial is going to help you understand that Mr. Lee, this man who sits right here in this courtroom, is a violent and dangerous man.  He thrives on this stuff.  That is part of his profile.  Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time.

In the end, what the evidence that will be presented will establish is that Mr. Lee is a psychopath.  I don't mean that in a common term.  I do mean that in the medical use.  What you will also learn is some five and a half years ago, before Mr. Lee helped kill the Mueller family, Mr. Lee helped kill another

Opening Statement - Liroff

person, Joseph John Wavra, in Oklahoma.  Mr. Lee was then just 17 years old.  He was at a party with other men.  He was drinking.  He was doing drugs.  And you are going to learn in this case that Mr. Lee has a problem with both of those things.  And that problem continues today.

Mr. Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person.  To avenge what he perceived as a wrong, he began a vicious assault against this victim, Mr. Wavra, with his fists, with his feet.  What had happened is, as I said, they were doing a lot of alcohol.  There were drugs.  The victim, Mr. Wavra, urinated on a chair.  That was his fault.  And that is why he died.

Joined by his cousin, a person by the name of John Patton, Mr. Lee beat Mr. Wavra, kicked at his body.  He was taken outside.  They removed some of his clothing, a shirt, his shoes.  Mr. Lee took off -- they call it fanny packs, fanny pouches, went through the victim's pouch, went through his wallet.  They forced him to enter down into a storm drain.  And when Mr. Patton asked Mr. Lee to get him a knife, Lee willingly went back to the house and gave him the knife so that he could kill Joseph Wavra.

I don't want to misdirect you.  The person who wielded that knife was Mr. Lee's cousin.  The person who got the knife and gave it to him, along with a rope, to help him was this Mr. Lee.

Elaine Hinson, RMR, CCR
United States Court Reporter

Opening Statement - Liroff

Now, few of us in life get an opportunity for a second chance. But Mr. Lee did. And he got a gift in that case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to get off with just a robbery. He got minimal jail time. And he was given that opportunity to walk out that door with a second chance. Unfortunately, that doorway led him eventually to Tilly, Arkansas.

You will learn that Lee has another conviction some years later in Florida for a concealed weapon. You will learn that he has during this period of time been in and out of trouble.

You will also learn that Mr. Lee has been a difficult prisoner while pending trial in this case. In fact, what you are going to learn, that within a couple, about a couple of months ago, Mr. Lee, demonstrating his character I've been talking to you about today, actually threatened to kill a Pulaski County Jail officer. Things weren't going well for him that day. He wasn't getting what he wanted. The officer wouldn't do for him what he wanted. He angrily started to yell at her. Then he started to yell, and he shouted obscenities at her. Then, he said, "You are going to die, just like the others did. You will have your head blown off."

We will prove in this case to you that Mr. Lee, because of his psychological profile, who he is and who he will be for years to come, is dangerous and will continue to be dangerous.

At the conclusion of this case, we will ask you to do that

7384

Opening Statement - Liroff

same thing, but this time on this scale for this person.  We are dealing with different weights, because the factors, the aggravating and mitigating factors, are different for this person.  And what we will ask you to do, based upon those weights and the way the scale is at that time, to return a verdict of death, because the evidence will show that that verdict is justified and fair and because it is the verdict that Mr. Lee has earned.  Thank you, ladies and gentlemen.  Thank you, Your Honor.

THE COURT:  Ms. Compton for the defendant.

MS. COMPTON:  May it please the Court, gentlemen.  Ladies and gentlemen of the jury, I've been sitting over here for 10, going on 11 weeks being real quiet, haven't had a whole lot to do.  You have all been here.  You remember how many days we would go sometimes without talking about Danny at all.  Chevie, Chevie, Chevie, Chevie, Danny.  Chevie, Chevie, Chevie, Chevie, Danny.  Chevie, Chevie, Chevie, Danny.  And it went like this for some good period of time.

Now, Mr. Liroff has stood before you and told you several truths.  But, like many, many of the witnesses that you've heard from in this case, he's also left out some really important facts.  I'm mindful of Jeff Brown, whose memory was hopelessly selective every time he talked to you.  I'm mindful of some of the other witnesses who came before you and remembered things that were important to them, but also omitted

Elaine Hinson, RMR, CCR
United States Court Reporter

7385

things that may have been very, very important to you.  And that's what Mr. Liroff has come down here from Washington to do for you is to tell you some very simple truths about Danny, but to omit some very, very important truths about Danny.

When I talked to all of y'all 10, 11 weeks ago -- I can't even remember.  We talked about mitigators, and we talked about excuses.  And each of you understood, and you've shown by your verdict on Chevie Kehoe, that you have a keen understanding of what a mitigator is and that it's not an excuse.  It's not something someone comes whining to you about, says, whaa, whaa, I had a terrible childhood.  Please forgive me for everything I've ever done wrong.  It is a fact or a circumstance of the person's life that has an impact on your decision.  And it helps guide you through your decision.

Now, Mr. Liroff told you several truths, including the fact that Danny has been involved in some bad things before he ever met Chevie Kehoe.  He made one error in that he said that was five and a half years ago that he and his cousin took a boy down to the drain.  Actually that was nine years ago coming up in July of this year.  It was 1990.  Danny was 17 at the time.

Let me tell you a little bit about the truth that Mr. Liroff omitted to tell you that's going to become, I think, keenly, keenly important for you as this trial goes on.  It is the truth about Danny Lee that as a very little boy, and I'm talking 18 months to two years old, he suffered from seizures.

Opening Statement - Compton

In fact, Danny wouldn't even have to get a fever up to 104 or 105, as most people who suffer seizures do, before he went into seizure.  It would happen as low as 99.9 or right at a hundred.

Seizure disorders affect the brain.  Seizure disorders affect the way a person's firing works.  It can be called a neurological problem.  It's a wiring problem.  We are all wired a certain way.  And we all have lots of things that come to us from our backgrounds, from our mothers, from our daddies, from the things around us.  But what we've all got individually that nobody has just like us is our wires.  And different things can happen to get those wires crossed and make them function improperly.

What Mr. Liroff didn't also tell you is that at age 15, Danny Lee had a brain wave test that showed abnormalities. What he didn't tell you is that his mother, Lea Graham, who sits here before you, took him to the doctor, would do what the doctor said for a while, and then would self-medicate.  For example, if the phenobarbital given for the seizures was making Danny too drugged, she would back away; or, when he was supposed to take Ritalin because some doctor said he was, she, like a lot of mother's do, and I'm not faulting her, would back away.  So you had the combination of an illness that's being treated, a mother who is doing her best, but is making some judgment calls that may not neurologically have worked right.

Elaine Hinson, RMR, CCR
United States Court Reporter

Case 2:19-cv-00468-JPH-DLP    Document 14-2    Filed 10/25/19    Page 49 of 212 PageID #: 396

7387

Opening Statement - Compton

What Mr. Liroff failed to tell you, which is also the undisputed truth, is that Danny Lee's biological daddy left him when he was a baby. And he never, ever saw him again, with the possible exception of one brief interlude. We were going to bring Danny Lee's daddy in here to talk to you about it, and he died. He had cancer. He died before the trial began. But there are other people who know about him.

And what Mr. Liroff didn't tell you is that after Mr. Lee and Ms. Graham separated and divorced, although arguably they didn't have to divorce, because Mr. Lee, Sr., had neglected to tell her that he had a wife in California. But, in any event, she remarried. She married a man named Dennis Graham.

And what Mr. Liroff also failed to tell you that will become very important to you is that Mr. Dennis Graham was horribly abusive to Danny.

What Mr. Liroff failed to tell you, which is the undisputed truth, is that Mr. Graham had a daughter who suffered from cerebral palsy, and Danny was so good to her that even Mr. Graham couldn't match him with his own daughter, who could not feed herself, could not wipe herself, could not get around alone without assistance.

What Mr. Liroff didn't tell you is that Carrie Graham, Danny's younger sister, will talk to you about how Danny led her to God. And what he did not talk to you about, besides the wiring problems, are the same thing Mr. Sullivan talked to you

Elaine Hinson, RMR, CCR
United States Court Reporter

about with Mr. Kehoe. And that is a spark of goodness that but for the wiring problems, but for the failure of treatment at an early age, but for a hundred if's and intervening factors, could have been all different. Danny Lee could have taken one medication that could have changed things. Danny Lee could have had one person when Mr. Graham was abusing him to step in and try to save him that could have altered things. Danny Lee could have had a lot of things happen, but they didn't. A lot of things did go wrong.

I know that y'all are worn out. I see it in your faces. I know you have to be. You've already made one of the most awful decisions any human being ought to ever have to make. And now you are being brought back in here and asked to do it again. And what I would have dearly liked to have done is stood up here and said, Your Honor, let the government put on whatever they want to. I'm not even going to talk, because this jury is tired, and this jury has already decided that Chevie Kehoe, who the government calls the leader, who the government says runs this show, they've already decided that Chevie should be allowed to live, so surely they are not going to do anything to kill Danny Lee, surely not. But I can't do that. And y'all know I can't. I can't let my client down. I can't let his mother down. And I can't take the risk, because the government is going to tell you some bad, bad stuff.

So, as sick and tired as I know y'all are, I'm going to be

7389

Opening Statement - Compton

bringing you witnesses.  Some of them are going to be long.  Most will be short.  But some of them are going to be long lengthy witnesses who are going to detail for you the background of Danny Lee, who are going to detail for you the humanity of Danny Lee, who are going to detail for you when the wiring got faulty, before birth, at birth or after birth and what that means to a human being.

And here's what I want to leave you with, ladies and gentlemen, is this.  Mr. De La Cruz has told you that Danny Lee was no more than a dog.  Danny Lee was Chevie's loyal dog.  And then they send Mr. Liroff down here, after you've spared the master, and ask you to kill his dog.  And I'm going to beg you not to do it.

THE COURT:  Is the government prepared to proceed?

MR. STRIPLING:  Yes, Your Honor.  Call Randy Yarbrough.

THE COURT:  All right, sir.  Come forward, please.

**RANDALL YARBROUGH, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION

BY MR. STRIPLING:

Q.   State your name, please, sir.

A.   Randall Yarbrough.

Q.   How are you employed, Mr. Yarbrough?

A.   I'm employed as a lieutenant for the police department for the City of Oklahoma City.

Elaine Hinson, RMR, CCR
United States Court Reporter

7390

Yarbrough - Direct

Q.    How long have you been with the police department?

A.    Nineteen years, sir.

Q.    What were your duties in July of 1990?

A.    I was a detective sergeant with the homicide division.

Q.    I want to take you back to July 24th of 1990.  Were you called to the scene of an apparent homicide?

A.    Yes, sir, I was.

Q.    When were you called to the scene of that apparent homicide?

A.    Received the call just shortly before noon and arrived at the location about 12:13.

Q.    Who did you meet when you arrived at the scene?

A.    I met at the scene with patrol officers, my supervisors, the fire department.

Q.    What information did you receive about the location of the body?

A.    I received information from Sgt. Maule, patrol officer on the scene, that there was a body in the sewer located underneath the hotel at that location.

Q.    Again, what was the location?

A.    It was in the 2200 block of Northwest 39th Street.

Q.    In Oklahoma City?

A.    In Oklahoma City.

Q.    You said sewer.  Is this a storm sewer?

A.    Yes, sir, it is.

Elaine Hinson, RMR, CCR
United States Court Reporter

7391

Yarbrough – Direct

Q.    After you received information about the body, what action did you take?

A.    I requested from the fire department if they could help me get a ladder down into a manhole that was located in the parking lot and assist me by giving me some boots that I could put on.  I was dressed in a suit that day and some loafers or shoes.  They assisted me with both objects.  I was able to get down into the sewer with the use of their boots and ladder to check it out.

Q.    What happened after you got down into the sewer?

A.    I proceeded in a northbound direction in the sewer for about 50 yards, to where I saw an overhead sunlight shining in.  It was a grate covering the sewer.  The water runs inside.  I proceeded on just a short way farther to where the tunnel turned at a 90 degrees, going back towards the east or at a northeasterly direction.  I took just a few steps inside the tunnel.  After my turn, shined my flashlight and discovered what appeared to me to be two feet.

Q.    Describe the sewer for us.  Tell us about the size and construction of it, please.

A.    The sewer was of all concrete.  It was 7 feet wide and 7 feet tall.  In the area that I was walking in, it was all level.  In the area where I had seen what appeared to me to be human feet, the sewer tunnel started to go downward.

Q.    Was there water where you were walking when you went to

Elaine Hinson, RMR, CCR
United States Court Reporter

Yarbrough - Direct

this location of the body?

A.    Very little.

Q.    Was there water at the location of the body?

A.    Where the sewer started in a downward angle, there was water up to the level where I had been walking.

Q.    After you saw the feet, what action did you take?

A.    I immediately backed out of the scene in an effort to get more lighting and be able to process the scene in the manner that it should be.

Q.    After you came back out of the storm sewer, what action did you take?

A.    I came out of the storm sewer.  I notified my supervisors that there was, in fact, what appeared to be a body to me in the sewer.  I explained all that I could see was from the bottoms of the feet and possibly a little bit of the legs.  But I was pretty sure it was a body, and it was very dark.  I would need some assistance, some artificial lighting and some different clothes than the way I was dressed in order to process the scene adequately.  I also requested the medical examiner and our technical investigators.

Q.    While those people were coming, did you go change clothes?

A.    Yes, sir.  I lived not too far from the location, so I went home and changed into some blue jeans and a shirt in an effort to be able to move more comfortably in the area.

Q.    So you go home and change clothes.  Other people arrive.

Yarbrough - Direct

Did you find another location in which to go down into the sewer, storm sewer system this time?

A.    Upon my arrival back at the location, the medical examiner had arrived and the technical investigator.  I explained to them where I thought the location of the body was in the drain, storm sewer, and explained to them that I thought it would be much easier for us to go through the area where the grate was and the sunlight was coming out.  And it also would be easier for removal of the body.

Q.    Mr. Yarbrough, I'm showing you what's been marked for identification as Government's Exhibit 1092.  Can you tell us what that is, please?

A.    Yes, sir.  That is the storm grate covering the sewer that we removed in order to get down in there.

MR. STRIPLING:  Your Honor, I offer Government's Exhibit 1092 into evidence.

THE COURT:  Received.

(Government's Exhibit 1092 received in evidence.)

BY MR. STRIPLING:

Q.    I put Exhibit 1092 under the camera.  There's a monitor in front of you.  Are you able to see that?

A.    Yes, sir, I am.

Q.    Tell us again what that depicts.

A.    That depicts the grate that was covering the sewer that I originally had passed under, saw the sunlight coming in.  This

Elaine Hinson, RMR, CCR
United States Court Reporter

Yarbrough - Direct

was firmly attached in the sidewalk.  It required the use of a wrecker that we requested to come to the scene and help us pull that grate up and move it over.  From that point, we were able to again use the fire department's ladder, place it down into the sewer in order for myself, the medical examiner and the technical investigator to go down into the sewer.

Q.    In fact, did a group of you go down into the storm sewer?

A.    Yes, sir, we did.

Q.    Tell us what occurred after you went down into the sewer.

A.    This time we were equipped with better lighting, so we approached very carefully one step at a time looking overhead, looking below our feet, looking to the left or right for any possible evidence that might be along the way as we approached the body.

Q.    And tell us what you found this time with the better lighting and all when you approached the body.

A.    As we made the 90-degree turn, approaching the body in the tunnel, on the wall we saw a blood splatter, approximately starting approximately 3 1/2 feet high, all the way down to the bottom of the tunnel.  We saw several other pools of blood in the tunnel up close to the walls.

Q.    Would you describe the body for us, what you saw when you first got to the body?

A.    When we first walked up to the body, as I stated before, the tunnel starts to slant down, so the portion of the body

7395

Yarbrough - Direct

from the knees up was under water laying kindly down.  The portion of the knees down was visible and on top of the tunnel area.  The first thing that was visible to us at the time was what appeared to be puncture wounds on the bottom of the feet.

Q.    Did you begin the process of removing the body from the storm sewer?

A.    Yes, sir.  First we did photographs of the area.  I collected samples from the area.  And then the body was removed.

Q.    And was the body removed through the grate that you showed us earlier?

A.    Yes, sir, it was, with the help of the wrecker.

Q.    And after the body was removed and you got out into natural light, were you better able to observe other wounds on the body?

A.    Yes, sir.  We positioned the technical investigator van in an effort to kindly secure the public away from the scene.  The body bag that the body was in was open.  The medical examiner on the scene, Mr. Nick Graham, did a closer examination of the body.

Q.    Just summarize for the jury the wounds that you saw, please.

A.    Once again, we examined the bottom of the feet.  If I recall correctly, there were 13 puncture wounds or stab wounds of some sort on the bottom of the feet.  From that point, they

Yarbrough - Direct

went up the legs, very few in the legs.  But there were some in the stomach cavity, some in the chest cavity.  And then at that point it was observed that the body had his throat slashed.  It was a big gap.  The medical examiner made mention to me at the time that it appeared that his jaw could possibly be broken and his nose could be broken, which indicated to the medical examiner that these injuries was prior to the stabbing or death.

Q.    Was the body taken for an autopsy?

A.    Yes, sir, it was.

Q.    Where was the body taken for the autopsy?

A.    It was taken to the medical examiner's office located in Oklahoma City.

Q.    While you are engaged in this activity, are other detectives working also?

A.    Yes, sir, they were.

Q.    Had a group of detectives gone to the house at 2316 Northwest 38th Street, the Dawson house?

A.    Yes, sir.  That was Detective Sgt. Mitchell.

Q.    Later did you go back to that house?

A.    Yes, sir.  Later myself and my partner went to the house.

Q.    I'm showing you what has been marked for identification as Government's Exhibit 1090 and 1091.  Can you tell us what those are, please.

A.    This appears to be pictures of the grate or, excuse me,

Yarbrough - Direct

the manhole located in the back of the address on Northwest 38th.  One shows the opening down in.  And the other one shows the manhole cover laying off to the side.

MR. STRIPLING:  Your Honor, I would offer Government's Exhibit 1090 and 1091 into evidence.

THE COURT:  Received.

(Government's Exhibits 1090 and 1091 received in evidence.)

BY MR. STRIPLING:

Q.    Detective Yarbrough, first I'm showing you Exhibit 1090 on the monitor.  If you would, please tell the jury what this depicts.

A.    It depicts a picture of the manhole in the back yard located on Northwest 38th with the manhole cover laying on its top, the bottom being facing towards the sun off to the side of the manhole cover, excuse me, the manhole.

Q.    I'm now showing you Government's Exhibit 1091.  Tell us what this depicts, please.

A.    It depicts a view of standing over the manhole in the back yard and photographing down in it.  You can see the brick steps that are placed inside the manhole.

Q.    Thank you, sir.

MR. STRIPLING:  You may ask.

MS. COMPTON:  I don't have any questions of this witness.

Elaine Hinson, RMR, CCR
United States Court Reporter

Yarbrough - Direct

THE COURT:  You may stand down, sir.  Call your next witness.

MR. STRIPLING:  Call Dr. Choi.

THE COURT:  Come forward, please, to the front of the courtroom.  Come to this lady and raise your right hand to be sworn.

**CHAI CHOI, GOVERNMENT'S WITNESS, SWORN**

DIRECT EXAMINATION

BY MR. STRIPLING:

Q.   Would you state your name for us, please, ma'am.

A.   Yes, sir.  My first name, C-h-a-i, Chai.  Middle initial, S.  Last name, C-h-o-i, Choi, sir.

Q.   I'm sorry.  I mispronounced your name.  I apologize.  How are you employed, ma'am?

A.   Currently I'm a forensic pathologist working with Office of Chief Medical Examiner for the State of Oklahoma.

Q.   How long have you been employed there?

A.   Since 1983, so a little over 16 years.

Q.   Tell us about your educational background, please.

A.   Yes, sir.  First of all, I graduated school of medicine in Seoul, Korea, and came to the United States and received a residency in anatomical pathology for four years and two-year residency in clinical pathology and two-year fellowship in forensic pathology at the Office of the Chief Medical Examiners in Salt Lake City.

Choi - Direct

Q.    I'm sorry.

A.    Salt Lake City, Utah state.  Then immediately, I received American board certification of both anatomical and clinical and forensic pathology.

Q.    How long have you been board certified?

A.    Since 1983, immediately joined the current Office of Chief Medical Examiner as a forensic pathologist.

Q.    How many autopsies have you performed through the years?

A.    Well, a little over 3,500 cases.

Q.    Have you testified through the years?

A.    In not this state, but, yes, Oklahoma state, yes.

        MR. STRIPLING:  Your Honor, I would submit that this witness is qualified as an expert in forensic pathology.

        THE COURT:  Any voir dire?

        MS. COMPTON:  No, sir.

        THE COURT:  She will be accepted as such and permitted to express opinions in the area of her expertise.

BY MR. STRIPLING:

Q.    Ma'am, did you perform the autopsy on Joseph John Wavra?

A.    Yes, sir.

Q.    When did you perform that autopsy?

A.    The date was July 25th, 1990, in the morning, around 8:10.

        THE COURT:  Is that July 25?

        THE WITNESS:  Yes, July 25

BY MR. STRIPLING:

Elaine Hinson, RMR, CCR
United States Court Reporter

Choi - Direct

Q.   Where did you perform the autopsy?

A.   At the morgue, 901 North Stonewall, Oklahoma City, Oklahoma state.

Q.   Now, we are going to go through some diagrams in just a moment.  I will have you point out some details.  But before we get into the details, would you just take a moment and summarize for the jury, please, what your findings were when you performed the autopsy?

A.   Yes.  First of all, the body was stated as a young man as 22, white man, was nude, showing multiple bruises, scratches and stab wounds and cuts in his body.

Q.   Ma'am, I am showing you five diagrams which are marked Government's Exhibits 1097 through 1101.  Can you tell us what those are, please?

A.   Yes.  This is the diagrams in which I made at the time I made the autopsy on him.  There was the copy --

COURT REPORTER:  I'm sorry.

THE COURT:  We can't hear you.

THE WITNESS:  Reasonably well depicted, well showing.

BY MR. STRIPLING:

Q.   These depict the stab wounds and other injuries that you were telling us about?

A.   Correct.

MR. STRIPLING:  Your Honor, I would offer

Elaine Hinson, RMR, CCR
United States Court Reporter

7401

Choi - Direct·

Government's Exhibits 1097, 1098, 1099, 1100 and 1101 in evidence.

THE COURT:  Received.

(Government's Exhibits 1097, 1098, 1099, 1100 and 1101 received in evidence.)

THE COURT:  Which one is this?

BY MR. STRIPLING:

Q.   Let's use the diagrams.  There's a monitor in front of you.  Are you able to see the diagram on the monitor?

A.   Reasonably well.  I am going to use my copy as well.

THE COURT:  Which one is this?

MR. STRIPLING:  Your Honor, this is Government's Exhibit 1097.

BY MR. STRIPLING:

Q.   Now, ma'am, using the diagram which is a diagram of the facial area, would you explain to the jury, please, what you found during the autopsy in the facial area of Mr. Wavra?

A.   Yes, sir.  First of all, I would like to describe from top and down and right to left.

Q.   Yes, ma'am.

A.   First of all, tangent to the forehead was near the midline several dots and circle that was described as red, which you call as red, which would indicate a fresh and petechial contusion, which meant pressure bruises -- right, your thumb, in the left midline and forehead, right.  Then red contusion of

7402

Choi - Direct

the left and two separate red bruise and also petechial contusion, which are pressure bruise. And there's four separate places marked on his forehead.

And then go to the right eye, show the red contusion, which is upper and lower eyelids. And just above the eyebrow, yes, that area shows the bruise, which is similar age of the forehead bruise.

And then go to the left eyebrow. There is, yes, a linear split of skin called a laceration. And then bridge of the nose that showed split of skin as well as broke nose, which is palpable.

Then left upper lip, there was also the abraded contusion, which is bruise and scratches. And left chin showed the same ages of other bruises and scratches. There's a scratch with a bruise.

And on the right back of the head, which is a little tear, about three-fifths of an inch, showing that picture. And behind the right ear lobe there was bruises also, right. There was no left side of the head shown injuries. Go to next.

Q.   I'm now showing you Government's Exhibit 1098. Tell us, please, what this exhibit depicts.

A.   That is showing the main exposing the front neck where the cuts, the throat, located, and also under the chin and lips. First, the upper lips, show bruises and tear inside of membrane. And the lower lip is a bruise. And under the chin

Elaine Hinson, RMR, CCR
United States Court Reporter

7403

Choi - Direct

there's several, two, three, bruises.  Then go to the neck, up front, across the Adam's apple, which is a prominent part of the neck, across the larynx or Adam's apple, from the right to the left, and showing the split, the cuts, and the pattern of the injury show that at least two times cut through same area, producing gaping cuts.

Over the cuts and depths showing the air pipe, what we call trachea, being mostly transected, which is split in almost two, as well as a right side wound that was deeper than left side.  There, major blood vessel, right, internal jugular vein, and common carotid artery, which is major largest vessels running on the right side of neck, which completely transected vein and artery, transected, split into two segments.  Around the cuts at the margins, a little bit of scratches, dots, lines there, that is bruises as well, right.  And underneath is a small cut.  Excuse me, small red scratch mark, right, sir.

Q.    Were you able to make a determination how many slices were made in order to cause this injury?

A.    As I said, two or three at least.

Q.    Ma'am, I'm showing you now what's been introduced into evidence as Government's Exhibit 1099.

A.    Yes.  This picture presented the multiple stab wounds exposing the chest and abdomen area, which numerate number from up and downward from right to left order.  It's not the order of infliction, right.

Elaine Hinson, RMR, CCR
United States Court Reporter

Choi - Direct

Q.   You started at this point and worked down?

A.   Right.

Q.   Then you go over here to the right side, left side, excuse me, and work down again?

A.   Right, down to the abdomen.

Q.   How many incisions did you locate in the chest and abdomen?

A.   There's several incision, which is cuts.  But stab wounds, I number in this picture, 15.

Q.   If you would, just take a moment and go through and describe those 15 stab wounds for us.

A.   Right.  The overall stab wounds went into the, first of all, right side of the chest, which No. 1 through 9, total number of stab wounds located to right chest.  And No. 3, near the nipple, that and No. 5 just around the nipple.  No. 7, which is a little lower, close to the midline.  There's three stab wounds went into the lung, of the right side of the lung, which punctured.  The rest of the numbers of the stab wounds were not inflicted to the lung or other major organs.  The left side, that's left side, No. 11 to No. 13, which are three stab wounds on the left side of chest.  And No. 13 actually punctured a left lung, which bled into the chest cavity about 300 CC, which is close to one pint.

Q.   I'm sorry, ma'am.

A.   300 milliliter, which about close to one pint of blood,

7405

Choi - Direct

remaining in the left chest cavity. But the right side chest cavity contains a little over 400 milliliter, which is one pint of blood still remaining in the right side of chest cavity, which is bleeding from the stab wounds.

Then abdomen is No. 10 through 14, 15, which are three stab wounds in the stomach area. One of the wounds went into the duodenum, which next to the stomach, big intestine, and showing blood smearing in the abdomen cavity. This is the stab wounds concerned. And then a small superficial cut is around the stab wounds, and then some bruises at the left of the chest and left lower abdomen.

Q.   Moving on to the other part of this diagram showing the back, can you just summarize for the jury, please, what injuries, what wounds, are depicted here?

A.   Right. Next is No. 16 and 17, which are right side of stab wound, No. 16, which it punctured a lung as well. And No. 17 didn't go into the major organ damage. That's two stab wounds, one on the right, the other one on the left. And one superficial cut was at the back of the right shoulder. The others, they are bruises on the back of the shoulders and back and buttocks.

Q.   I'm showing you Government's Exhibit 1100. Tell us, please, what this depicts.

A.   Yes. This is sole of both feet, which on the right, three; the left, about ten. And cuts and stab wounds were

Elaine Hinson, RMR, CCR
United States Court Reporter

7406

Choi - Direct

counted.

Q.    I'm showing you Government's Exhibit 1101.  We won't go into detail on this.  If you would, just summarize for the jury what this exhibit shows.

A.    This is overall body of the front and back of the person, which I did the autopsy, and just the head and neck which detailed, and chest, detailed the back.  But other area, which are arms and legs, shown in this particular picture.  And there's the arms showing several bruises, scratches and upper dorsum of both wrists and around the knees and feet too.

Q.    As a part of the autopsy, were blood alcohol tests run?

A.    Yes.

Q.    How many different fluids were used in order to run the tests?

A.    In this particular case, we used what available blood, which it came from this body was a heart, blood from heart, and under the collar bone, vein, which is subclavian blood, and the femoral blood, which is the groin area, which is very reliable, and the urine and vitreous humor, which is eye fluid, inside the eyeball.

Q.    What were the results of these various blood alcohol tests?

A.    The peripheral blood, which femoral blood is .17 percent weight by volume, and vitreous humor is .20 percent weight per volume.  And urine is not reliable much, is .24.

Choi - Direct

Q.   Does that indicate that Mr. Wavra was intoxicated?

A.   He indeed consumed alcoholic beverage before he died and over legal limits, .1, and plateau, just like a stage, stalled and decline stage.

Q.   Ma'am, do you have an opinion as to the cause of death of Mr. Wavra?

A.   Yes, sir.

Q.   What is that opinion?

A.   In my opinion he died of a combination of cuts of the throat and the multiple stab wounds.

Q.   Thank you, ma'am.

          MR. STRIPLING:  You may ask.

          THE COURT:  We will go ahead and have a break.  Then you can cross.  We will be in recess for 20 minutes.  Did you say no cross?

          MS. COMPTON:  I'm not going to have any questions of her.

          THE COURT:  You may stand down.  You are excused.  We will have our recess now.

     (Recess from 9:45 a.m. until 11:10 a.m.)

          THE COURT:  Your next witness.

          MR. STRIPLING:  Brian Compton.

          THE COURT:  Come forward, please.  Come around to this lady.  Raise your right hand to be sworn.

          BRIAN COMPTON, GOVERNMENT'S WITNESS, SWORN

7408

Choi - Direct

DIRECT EXAMINATION

BY MR. STRIPLING:

Q.   Would you state your name, please.

A.   Brian Compton.

Q.   Where do you live, Mr. Compton?

A.   Mustang, Oklahoma.

Q.   What do you do for a living?

A.   I'm a frame carpenter.

Q.   In July of 1990, where were you employed?

A.   Taco Bell.

Q.   Which Taco Bell?

A.   The Taco Bell in Mustang.

Q.   Did you meet a man named David Patton when you worked at Taco Bell?

A.   Yes, sir.

Q.   How did you meet Mr. Patton?

A.   He was the boyfriend of my shift leader at the time.

Q.   At the time, did you meet Danny Graham or Danny Lee?

A.   Yes, sir.

Q.   Do you recall when you met them?

A.   No, not exactly.  It was at Taco Bell.

Q.   During the summer of 1990?

A.   Yeah.

Q.   Do you recall going to a party on July the 23rd, 1990, in Mustang?

Elaine Hinson, RMR, CCR
United States Court Reporter

7409

Compton - Direct

A.    It wasn't really a party.  It was just a couple of guys getting together.

Q.    Tell us how that got started, please.

A.    Honestly, I really don't remember.  As far as we all got together somewhere in Mustang.  Either it was at Taco Bell or at somebody's house.

Q.    Who got together?

A.    It was me, Bobby, Danny and David.

Q.    Who is Bobby?

A.    Bobby Thomas.

Q.    Danny is whom?

A.    Danny Lee.

Q.    Who else was there?

A.    David, John David Patton.

Q.    Where did you go after you got together?

A.    We went into the north side of the city, Oklahoma City, to Larry somebody.  I can't remember the last name.

Q.    Larry Dawson?

A.    Yeah.

Q.    You went to his house?

A.    Yeah.

Q.    Do you recall where that house is?

A.    Somewhere on Northwest 38.

Q.    Tell us what occurred when you got to Larry Dawson's house.

7410

Compton - Direct

A.    Bobby Thomas and David had left to go get some drugs.

Q.    What drugs?

A.    Initially it was supposed to be marijuana.  When they came back, they had LSD.

Q.    Were you guys drinking?

A.    Yes, sir.

Q.    What were you drinking?

A.    Beer.

Q.    When the people left to go get drugs, who was with you at the Dawson house?

A.    Danny and a few other guys that I just didn't know.  I didn't know anybody there other than them other three guys, Bobby, David and Danny.

Q.    What happened after Larry and David and Bobby returned with the drugs?

A.    We all split it up evenly and just continued to party.

Q.    Again, what drug was this?

A.    LSD.

Q.    At some point that evening, did some people leave to go get more beer?

A.    Yes.

Q.    Who left to get beer?

A.    It was David and Larry.

Q.    At some time that evening did a person named Joey Wavra come into the house?

7411

Compton - Direct

A.   Yes.

Q.   Do you recall exactly when Wavra got there?

A.   No, I do not, not exactly.  It was late in the evening, about sundown, I guess.

Q.   What occurred when David and Larry came back on their trip to go get the beer?

A.   David had come in the back door and said that the police were driving around the neighborhood.  And Larry had walked -- apparently David took off running whenever he seen the cops, and Larry just continued to walk back to the house.

Q.   What happened with Larry after the police got there?

A.   He was arrested.

Q.   What was he charged with?

A.   Public intoxication.

Q.   After Larry is arrested for public intoxication, what did the other people that are at the party do?

A.   Everybody just kind of hung out waiting on the cops to leave.  David had tried to, he had made a few phone calls.  Yeah, he had made a few phone calls trying to round money up to get Larry out of jail.

Q.   Is everybody pretty much in the house at this point?

A.   Yeah.

Q.   And at some time at this point what occurs with Joey Wavra inside the house?

A.   Like you said, most of the people were in the house.  I

Elaine Hinson, RMR, CCR
United States Court Reporter

7412

Compton - Direct

was outside the house.  After the cops, after Larry was arrested, I had gone out in the back yard, and apparently Joey had urinated on the couch or chair inside the house.

Q.    During the time that Larry is in jail and David is trying to get money, what is everybody else doing?

A.    We are just hanging out, partying, nothing of significance, I mean.

Q.    Was it decided to wait until morning to do something?

A.    Yeah.  We had decided to wait until morning.  We were going to leave earlier.  Larry had been arrested, though, and Larry's car was parked behind ours.  We weren't able to leave until morning.

Q.    During the time that you folks are waiting to leave, do you see something going on between Danny and Joey?

A.    Yes.

Q.    What do you see going on between them?

A.    I seen Danny and Joey fighting.

Q.    Tell us what you saw occur.

A.    I was standing beside the garage, which is separate from the house.  I had seen Danny run across the yard and hit Joey and knock him down to the ground.

Q.    Was there any conversation about why Danny was hitting Joey?

A.    Not at that time.  I had walked over to Danny's cousin, David, and asked him, you know, what was this for and all

Elaine Hinson, RMR, CCR
United States Court Reporter

7413

Compton - Direct

this.  He just said that he had urinated on the couch and whatnot, and it was just a fruitless fight.

Q.    While this is going on, do they, does someone perform a search of Wavra, Joey Wavra?

A.    After Danny beat him up and beat him pretty good, he took the satchel off his waist and went through it and came out, came up with a bottle of cologne he said was stolen out of the house, out of Larry's house.

Q.    Now, during the time that Danny was beating on Joey, did he hit him with anything?

A.    Yeah.  There was a stick in the yard.  I don't know if it was a tree branch now or if it was a shovel handle or what.  But he picked up a stick of wood and hit him a couple of times.

Q.    After they find the cologne, what occurred involving -- is there a manhole in the back of that yard?

A.    Yes.

Q.    What occurred involving the manhole in the back of the yard?

A.    After Danny was, after Danny had beat him up, David told Joey to get down into the manhole, and Joey didn't want to go at first.  After he was pushed a few more times, he proceeded to crawl down into the manhole.

Q.    Who had opened up the manhole to put Joey in?

A.    David and Danny.

Q.    Was there some point at which Danny went down into the

Elaine Hinson, RMR, CCR
United States Court Reporter

7414

Compton - Direct

manhole?

A.   Yes.   But I do not recall at what point in time on that evening that he entered the manhole.

Q.   Was there ever a coin toss that evening or that morning, I guess it would be now?

A.   Yeah.   It was early in the morning.   There was some talk of a coin toss to see if he would live or die.   At that point I just -- it was -- I don't know -- seemed so odd to me that it would just -- it didn't click to me.   I had left the area in the back yard.

Q.   Do you know who tossed the coin?

A.   No, I do not.

Q.   Now, later, after Joey Wavra had been put down inside the storm sewer, was there any activity involving the knife and a rope and a bag?

A.   Yeah.   I had gone back to the front of the garage.   The manhole was in the back of the garage.   And I had seen Danny come out of the house with a black plastic bag.

Q.   What did you see occur?

A.   It was handed to David into the manhole.

Q.   Did you see a knife and a rope?

A.   No, I did not.

Q.   Later, what occurred with Joey and the manhole at this point?

A.   I honestly do not remember.   As far as what, I did not

7415

Compton - Direct

ever go into the manhole, so I do not, I do not know what happened inside the manhole with Joey.

Q.   Then later did everybody leave to go get Larry out of jail?

A.   Yes.

Q.   And at that point you don't know what is going on with Joey?

A.   At that point David had told us that he was just tied up down there and that we needed to go get Larry out of jail.  And since it was Larry's house, Larry's cologne, he would let Larry decide what he wanted to do with him.

Q.   Thank you.

          MR. STRIPLING:   You may ask.

                    CROSS-EXAMINATION

BY MS. COMPTON:

Q.   Mr. Compton, my name is also Compton.  I represent Mr. Lee.  Let me see if I can get a feel from you, if you can remember.  I know there's been a great passage of time here. But can you give the jury any indication of how much drugs y'all were taking and how much alcohol y'all were consuming?

A.   I myself had consumed quite a bit of alcohol.

Q.   Were you drinking beer?

A.   Yes.  I was drinking beer.  I had probably drank a good 12 pack by myself.

Q.   Over what period of time?

                    Elaine Hinson, RMR, CCR
                    United States Court Reporter

Compton - Cross

A.    Probably from about, well, we had started drinking back in Mustang, I had, so that was at 8:00 or 9:00 o'clock or even earlier than that.

Q.    In the nighttime on this night?

A.    Excuse me?

Q.    On this night, you are talking about 8:00 or 9:00 o'clock at night?

A.    Yeah.

Q.    When the party started?

A.    Yeah.

Q.    Go ahead.

A.    I probably drank until 1:00 or 2:00 o'clock in the morning.

Q.    When somebody -- you had mentioned earlier about marijuana.  Were you also smoking marijuana?

A.    No.  We did not have any.

Q.    Nobody had marijuana?

A.    No.

Q.    So somebody left.  Who was it who left?  Was it David and Larry who left to go get drugs?

A.    No.  It was Bobby and David.

Q.    Bobby Thomas and David Patton?

A.    Yeah.

Q.    Now, we've heard something about John David Patton.  Is that the same guy you are talking about, David Patton, Danny's

Compton - Cross

cousin?

A.    Yes, yes.

Q.    So those two guys left to go get drugs.  Did you know what kind of drugs they were going after?

A.    Yes.  They were supposed to be going after marijuana.  We didn't have any.  They were going after it.  When they came back, they had LSD.

Q.    Did they have marijuana as well?

A.    No, not that I can recall.

Q.    Do you happen to have any recollection of what John David was drinking that night?

A.    Yeah.  He was drinking a mixed drink of some sort that he had made because we ran out of beer.

Q.    Do you know what he made it from?

A.    No.  I sure don't.

Q.    And so then, if I'm understanding your direct testimony correctly, everybody at the party, all those that you had mentioned, took the LSD, split it up among yourselves?

A.    As far as me, Bobby, David and Danny, yes.  I don't know.  There was a lot more people there, and I don't know any of them.

Q.    And I guess was Larry arrested before or after?  Where was he arrested in this?  Would he have been also taking LSD?

A.    Yes.  He went to jail on LSD for public intoxication.

Q.    So give me a rough time frame, if you can, when the LSD

Compton - Cross

came to the party.

A.    Honestly, I don't know.

Q.    No clue?

A.    No.

Q.    The party started about what time?

A.    It was right before dark, right at sunset.

Q.    And ended, I guess, the next morning?

A.    Yeah, ended the next morning.  I don't even know what time of day.

Q.    If I'm getting the picture straight, everybody at this party, both before and after the LSD got there, is pretty well intoxicated and inebriated.  Is that right?

A.    Yeah.

Q.    And after the LSD got there, I guess things got even more drunk and disorderly?

A.    Correct.

Q.    Thanks.

        THE COURT:  Anything else?

        MR. STRIPLING:  No, Your Honor.

        THE COURT:  You may stand down.  Call your next witness.

        MR. STRIPLING:  Your Honor, we have a transcript of the statement made by the Defendant Daniel Graham on September 28, 1990, which I would introduce into evidence.  I would propose to publish it to the jury by having a person read the

Compton - Cross

part of Mr. Graham.  I will read the part of the people questioning him.

THE COURT:  That's fine.  It will be received over the objection of the defendant.  You may do so.  Are you going to mark it as an exhibit also or not?

MR. STRIPLING:  Your Honor, I will be happy to do it however the Court --

THE COURT:  What about that, Marge?  It would probably be better to do that.

COURTROOM DEPUTY:  1103.

THE COURT:  What is it, Marge?

COURTROOM DEPUTY:  1103.

THE COURT:  1103 has been received.  You may read it in the manner you suggested.  Let the person represent Mr. Lee.  Go ahead.

(Government's Exhibit 1103 received in evidence.)

(The following transcript was read into the record by Mr. Stripling and Michael Lowe.)

"Q.  State your name for the Court.

A.  Daniel S. Graham.

Q.  Spell your last name, please.

A.  G-r-a-h-a-m.

Q.  And what is your date of birth?

A.  January 31st, 1973.

Q.  How old are you today?

7420

A.    Seventeen.

Q.    What is your street address?  Where do you hang your hat?

A.    My mom's house.

Q.    And what is that address?

A.    I don't know.  I've only been there a few times.

Q.    You don't know your mother's address?

A.    No.

Q.    Okay.  Is it in Mustang, Oklahoma?

A.    Well, it's in between.  It's out in the country.

Q.    Okay.  Have you ever lived anywhere other than with your mother?

A.    No, not as part of my residence.

Q.    So you've lived there all your life.  Is that right?

A.    Well, yes.

Q.    You don't know how to tell this Court the address or the post office box?  Is that what you're telling us?

A.    Yeah.

Q.    Well, you gave the police an address, didn't you?

A.    Well, my mom was sitting there telling me what it was.

Q.    Well, that address that you gave the police doesn't exist.  So that's why I'm trying to find out what your address is at this time.

A.    Sir, I don't understand what you're talking about.

Q.    Pardon?

A.    Could you explain what you're talking about?

7421

Q.    Route 3, Box 78-A according to the investigators doesn't exist.  So I'm asking you if I want to mail a letter to you at your mother's house, what address do I use?

A.    I don't know.  Ask my mom.  She lives there.

Q.    You've never given that address to school authorities?

A.    I haven't had the opportunity.

Q.    Okay, Mr. Graham.  You're acquainted with a man by the name of John David Patton, are you not?

A.    Yes.

Q.    Are you related to him?

A.    Yes.

Q.    What is that relationship?

A.    He's my cousin.

Q.    Now, prior to July the 23rd or late evening hours or the early morning hours of July 24th of 1990, had you ever met a young man by the name of Larry Paul Dawson prior to that time?

A.    Yes.

Q.    Are you related to Larry Paul Dawson?

A.    No.

Q.    Had you ever had an occasion to meet at his home at 2316 Northwest 38th prior to those dates I just gave you?

A.    Yes.

Q.    How many times approximately?

A.    I'd say about five.  But they were like previous years, you know.  We'd gone over and visited him and something like

7422

that, you know.

Q.    Does he live with someone who is related to you?

A.    No.  My cousin Rodney used to live next door, you know.

Q.    Okay.  Now, you were at his home, Larry Dawson's home, during the evening hours of July the 23rd and the early morning hours of July the 24th of this year, were you not?

A.    Yes.

Q.    And you were there with the defendant, Mr. Patton.  Is that correct?

A.    Yes.

Q.    And two other young men, Bobby Thomas and Brian Compton.  Is that correct?

A.    Yes.

Q.    You all went there together in Bobby Thomas' car.  Is that right?

A.    Yes.

Q.    You went there for the purpose of having a party, drinking some beer and doing some other things.  Is that correct?

A.    Yes.

Q.    And after you arrived, you and the people that I have named, including Larry Dawson, drank some beer and took some dope and had a good time, didn't you?

A.    Yes.

Q.    Okay.  In order to expedite this, I want to take you to on or about 4:00 o'clock a.m. on July the 24th of 1990.  Were you

Elaine Hinson, RMR, CCR
United States Court Reporter

7423

aware that at some point during the early morning a young man by the name of Joey Wavra had come to Larry Dawson's home?

A.    Yeah.  He come like later on in the night, though.  It wasn't like 4:00 in the afternoon or nothing like that.

Q.    I said sometime prior to 4:00 a.m. in that early morning.

A.    Yes.

Q.    Do you know what time it was approximately when you first became aware that Joey Wavra was at this residence?

A.    No.  I just know it was sometime that day or that morning.

Q.    Where were you when you first realized that a person other than the five of you that were there drinking beer and hitting acid and having a good time was present on the premises -- where were you at?

A.    On the roof.

Q.    Did you see Joey Wavra come up on the roof?

A.    No.  I seen him ride his bicycle in the driveway.

Q.    So you were aware that he arrived on a bicycle?

A.    Yes.

Q.    Were you introduced to him?

A.    Yeah.

Q.    What did you say?

A.    Yes.

Q.    Okay.  Were you on the roof at that time?

A.    No.

Q.    So you have a distinct recollection of being introduced to

7424

him.  Is that correct?

A.    I remember him showing up.  And I remember Larry saying, yeah, this is Joey.

Q.    Okay.  And were you intoxicated, on drugs at that time and alcohol?

A.    Yes.

Q.    But you do remember seeing Joey Wavra.  Is that correct?

A.    Yes.

Q.    Now, were you aware that at some point during those early morning hours that Larry Dawson was arrested and taken to the police station?

A.    Would you repeat the question?

Q.    Were you aware that at some time during the early morning hours of July 24th, that Larry Dawson was arrested and taken to the police station?

A.    Yes.

Q.    Okay.  Do you know what time that was approximately?

A.    No.

Q.    Were you intoxicated at that time?

A.    Yes.

Q.    Did you see the police car at that residence?

A.    Yes.

Q.    Did you hear Larry Dawson tell everyone to go back in the house and stay in the house and not to leave?

A.    Yes.

7425

Q.    So you couldn't understand what he was saying.    Is that correct?

A.    Basically, yes.

Q.    And you did what he told you to do.    Right?

A.    I made an attempt.

Q.    Well, you went back in the house, didn't you?

A.    I tried to get everybody together and go back in, yeah.

Q.    Well, everybody went back in, didn't they?

A.    No.

Q.    The people that didn't go back in the house would have got arrested, wouldn't they?

A.    No.

Q.    Where did they go?

A.    Inside.    I went back out.

Q.    Everybody went inside, and you went back out?

A.    I went in.    And I think Bobby went in with me, Bobby Thomas.    He went in with me.    And then, you know, I started looking around.    And everybody else was on the front porch.

Q.    What did you do?

A.    I went back outside and got everybody to come back in.

Q.    Come in?

A.    Yeah.

Q.    Where was the defendant, Mr. Patton?

A.    Sitting on a chair in the living room.

Q.    Where was Joey Wavra?

Elaine Hinson, RMR, CCR
United States Court Reporter

Case 2:19-cv-00468-JPH-DLP    Document 14-2    Filed 10/25/19    Page 88 of 212 PageID #: 435

7426

A.    I don't remember.  I think he was sitting on the floor.

Q.    Inside the house?

A.    Yes.

Q.    Now, did you have any trouble with him up to that point?  Had you been in any kind of push and shove or verbal dispute with him up to that point?

A.    Well, not exactly.

Q.    So everybody was tripping out.  Is that right?

A.    Yes, sir.

Q.    Having a good time, laughing, feeling good?  Is that correct?

A.    Yes.

Q.    But you knew where you were and you knew who you was with, didn't you?

A.    Yes.

Q.    Now, after Larry Dawson was taken into custody to the jail, something violent happened in the back yard, didn't it?

A.    Yes.  I assaulted Joey.

Q.    What time do you think it was when you assaulted Joey Wavra in the back yard?

A.    I don't know.  The sun was coming up.  I know that.

Q.    Getting light?

A.    Yes.

Q.    What caused you to do that?

A.    Well, it first started out inside the house.

Elaine Hinson, RMR, CCR
United States Court Reporter

7427

Q.    Tell us about that.

A.    Well, after they arrested Larry, you know, we all come in.  And we all started counting money so we could bail Larry out of jail.  And, you know, David, he was making phone calls.

Q.    Did you hear him make those phone calls?

A.    No.  I just seen him on the phone.

Q.    You're talking about the defendant, Mr. Patton?

A.    Yes.

Q.    How many phones calls do you think he made?

A.    I only seen him on the phone once.

Q.    He was counting money seeing if he had enough money to make bond for Larry Dawson?

A.    Yes.

Q.    And who was counting the money?

A.    Me, David and Bobby.

Q.    The defendant, Mr. Patton, was involved in counting the money?

A.    Yes.

Q.    Now, he had just got paid that day, hadn't he?

A.    Yes.

Q.    And he was the one --

A.    I think.  I don't know.

Q.    Well, he's the one that had the most money, wasn't he?

A.    I think so.

Q.    What happened inside the house while Mr. Patton was on the

7428

phone and you people were counting money in anticipation of making Mr. Dawson's bond?

A.    Well, after David off the phone, he went across -- well, I think it's across the street -- went to a neighbor's house to do something.  I don't know, working on getting Larry out, you know.  You know, I was saying, you know, this really sucks that Larry is in jail, you know.  And Joey started laughing, saying, yeah, I'm glad it happened.  And I hit him in his eye.

Q.    Inside the house?

A.    Yes.

Q.    The laughing?

A.    Yes.

Q.    Was saying, I'm glad it happened?

A.    Yeah.

Q.    That made you mad?

A.    Yes.

Q.    And he didn't attack you, did he?

A.    No.

Q.    Joey Wavra did not attack you, did he?

A.    No.

Q.    He didn't have any knife or weapon in his possession, did he?

A.    No.

Q.    You just popped him in the face?

A.    Yes.

Elaine Hinson, RMR, CCR
United States Court Reporter

7429

Q.    Did you hit him more than once?

A.    Yes.

Q.    How many times did you hit him?

A.    I don't remember.

Q.    Many times?

A.    No.  I hit him -- inside the house, I hit him once and told him, you know, that's not cool, man.  You know, because he let us in his house and he let us party.

Q.    He lives in Larry Dawson's house --

A.    No.  Larry let us in his house to party.

Q.    I see.

A.    And then he goes to jail, and Joey starts laughing about it.

Q.    Well, he was intoxicated, wasn't he?

A.    Yes.

Q.    So would you say he was highly intoxicated when he laughed and made the statement?

A.    I'm not too sure.

Q.    He wasn't able hardly to get out of the chair, was he?

A.    I don't know.

Q.    Did something else happen in that house that you later told the defendant, Mr. Patton, about that offended you on some way?

A.    I told Dave that I hit him.

Q.    Did you tell Dave that he urinated in the chair?

7430

A.    Oh, yeah.

Q.    When did that happen?

A.    Right after Larry got took to jail.

Q.    Did you see Joey Wavra urinate in the chair?

A.    Yes.

Q.    Was his pants wet?

A.    Yes.

Q.    Did that make you mad?

A.    Yes.

Q.    How come you got mad about that?

A.    He peed on the couch or on the chair.

Q.    Well, you're the guy that wouldn't let him get up and go outside, aren't you?

A.    Yes.  I was telling him to use the bathroom.

Q.    Did you tell him that before he urinated on his pants?

A.    Yes, several times.

Q.    Then you struck him for that also.  Is that right?

A.    Yes.  I kept trying to tell him that, you know, if you go outside, you are going to be arrested, you know.  And he was trying to tell me, no, no, that won't happen, you know.

Q.    Why did you care if he was arrested?

A.    Because, man, he was just there to have a good time.

Q.    I mean, you're the guy that's punching on him.  Why do you if he gets arrested?

A.    Because I didn't think it was too cool to have someone

else to go to jail for just trying to use the bathroom. Larry was gone, man. They could have got all of us for breaking and entering if they wanted to.

Q. Oh, they could have?

A. I'm pretty sure they could have.

Q. Okay. Now, after you had this altercation with Joey inside the house, did you go outside in the back yard with him?

A. Yes.

Q. Was David Patton back when you went out in the back yard?

A. Yes.

Q. How did you get Joey out into the back yard?

A. He walked through the front door and around the side of the house through the fence.

Q. Did you tell him to go out in the back?

A. No. I imagine he went back there because his bicycle was back there.

Q. Was he going to leave on it?

A. Yes.

Q. Were you going to let him leave on it?

A. Yes. We told him to leave.

Q. So he goes outside to get his bicycle. What prevented him from taking it and leaving?

A. He said something, and I ran back in the yard and hit him again.

Q. What did he say?

A.    I don't remember.

Q.    So you ran into the back yard and struck him?

A.    Yes.

Q.    And knocked him down?

A.    Yes.

Q.    Did you break his nose?

A.    No.  I hit him in the eye.

Q.    And when -- did he fall to the ground?

A.    Yes.

Q.    Did you kick him?

A.    Yes.

Q.    Did you stomp on him?

A.    No.

Q.    Did you lean over and hit him some more while he was on the ground and disabled?

A.    Yes, once.

Q.    He wasn't even able to resist.  He couldn't fight back, could he?

A.    Yeah, he was.

Q.    He didn't try to hit you, did he?

A.    Yeah.

Q.    Then what happened after you made this assault on Joey Wavra in the back yard of Larry Dawson's house?

A.    Bob, Brian and David came in the back yard to see what was going on.

Q.   What happened then after David, the defendant, came into the back yard?

A.   He grabbed my shirt and said, come on, he'll leave.  Let's get out of here, you know, something like that.

Q.   Did you get up off of him then?

A.   Yes.

Q.   What did the defendant, Mr. Patton, do when you got up off of him?

A.   Finished eating his donut.

Q.   Did he strike Joey Wavra in the back yard?  Did you see him do it?

A.   Yes.  That was after he pulled me off.

Q.   And after he ate his donut, you saw the defendant, Mr. Patton, then strike and assault and kick Joey Wavra in the back yard.  Is that right?

A.   No.  That's not the way it happened.

Q.   Well, you tell me what you told the police then.

A.   You know, after David grabbed my shirt and pulled me off of him, said that's enough -- okay.  He pulled me off, you know, and he was eating his donut.  And I grabbed some water, and we were talking.  We were fixing to leave.  And he said something else, and I hit him in his nose.

Q.   Who said something else?

A.   Joey.

Q.   What did he say?

Elaine Hinson, RMR, CCR
United States Court Reporter

A.    I don't remember.

Q.    He said something you can't even remember and you hit him in the nose for it?

A.    Well, obviously it was something that made me mad or else I wouldn't have done it.

Q.    If anyone says something to you you don't like, you like to punch them in the nose.  Is that it?

A.    No, sir.

Q.    How many people have you done this to before?

A.    I don't remember.

Q.    All right.  What happened?  What did you see the defendant, Mr. Patton, do after you punched him in the nose again?

A.    He said, you know, I don't think it would be a very good idea if the neighbors -- you know, something like that, you know, to see this guy sitting out here.  And we started thinking, you know, we better not put him back in the house. Bob was indicating, you know, I'm not giving you any ride nowhere, you know, because he had -- he urinated all over himself.  He wasn't going to let him in the car.

Q.    Well, he had his bicycle there.  He could have taken it and walked away, couldn't he?

A.    Yes.

Q.    But you didn't let him do that, did you?

A.    I didn't tell him he couldn't.

Q.    Tell me what you told the police that you observed the defendant, John David Patton, do to this man after you struck him in the nose?

A.    Hit him in his nose, man.

Q.    You saw him then strike Joey Wavra, didn't you?

A.    Yes.

Q.    So both of you were beating up on him then, weren't you, yes or no?

A.    Yes.  Not at the same time.

Q.    What happened after you observed the defendant take his licks on this poor intoxicated young man that had already beaten to the ground by you?  What are you laughing about?  Do you think it's funny?

A.    No.  I think you're an idiot.

Q.    You think I'm an idiot, huh?

A.    Yeah.

Q.    What did you do then, you and Mr. Patton, the defendant, after you beat this boy up?

A.    We took him back in the back yard, me and Bobby, Brian and David were walking with us -- with me and --

Q.    Was the defendant present?

A.    Yes.  He was standing behind me.

Q.    You took who into the back yard?

A.    Joey.

Q.    What did you do with him when you got him back there?

A.    Well, see the back yard is separate.  And it's got like -- the back yard has got a fence going between it.  And I took him like behind the safety fence and --

Q.    Why did you do that?

A.    Put him back there behind the trees.

Q.    Why did you want to put him behind the trees?

A.    So the neighbors wouldn't see him and call the cops.

Q.    Who else went behind the fence with you and Joey Wavra?

A.    It was me, Bobby, Brian and David.

Q.    Everybody went behind the fence?

A.    Yes.

Q.    Okay.  At some point did you open the manhole?

A.    Yes.

Q.    Who opened the manhole?

A.    I did.

Q.    So you had been down the manhole before, hadn't you?

A.    I stuck my head down in there.

Q.    No --

A.    I crawled about halfway in.

Q.    Before this day, you had been in the manhole on other occasions, had you not?

A.    No.

Q.    Never before?

A.    Not that manhole.

Q.    So you didn't know that this manhole was back there, did

Elaine Hinson, RMR, CCR
United States Court Reporter

you?

A.    I knew it was back there.

Q.    How did you know it was back there?

A.    Larry was talking about it.

Q.    So --

A.    Some plumbers had been coming around checking stuff, asking where the manhole was at.  And he was telling us about it.

Q.    That night?

A.    Yes, before the party started.

Q.    Okay.  So you knew there was a manhole back there?

A.    Yes.

Q.    But you didn't know what kind of manhole it was, did you?

A.    How many different kind of manholes are there?

Q.    Well, there's some that are 7 foot by 7 foot.  And there's some that are little round manholes that you can't get into.  Now, did you know how big this manhole was?

A.    No.

Q.    Whose idea was it to take the cover off the manhole?

A.    Mine.

Q.    For what reason -- why would you want to take the cover off the manhole?

A.    To let Joey go down there so the neighbors wouldn't see him, and when he sobered up, he would come out.

Q.    Stick him into the manhole?

Elaine Hinson, RMR, CCR
United States Court Reporter

A.    Yes.

Q.    Was the defendant, Mr. Patton, present when you took the cover off?

A.    Yes.

Q.    If he told the police that he's the one that took the cover off, that would be a lie.  Is that right?

A.    I don't know, sir.  Using the drugs we were on, I mean, I don't know.

Q.    Now --

A.    You've got the suit.  You make the decision.

Q.    Who?

A.    You have a suit.  You make the decision.

Q.    I've got a suit.  I should make the decision?

A.    Yeah.

Q.    No.  We're going let a jury make the decision.  Now, when you took the manhole cover off, what happened next?

A.    I stood Joey up and walked him over there, and we put him in the manhole.

Q.    Who is we?

A.    Me and David.

Q.    Put him in the manhole?

A.    Yes.

Q.    Physically?

A.    Well, we held his hands.

Q.    Did you say something to him?

Elaine Hinson, RMR, CCR
United States Court Reporter

A.    I told him to go down there, man.

Q.    This was after you had already beaten him up.  Is that right?

A.    Yes.

Q.    And you had a hold of him when you got to the manhole.  Is that right?

A.    I was holding his arm, yes.

Q.    You told him to go on down there?

A.    Yes.

Q.    Did he go on down there?

A.    Yes.

Q.    Did he make any statement to you before he went on down there?

A.    Yeah.  He said, Don't make me go down there.

Q.    Don't make me go down there?

A.    Yeah.

Q.    What did you say to him?

A.    I said go down there.

Q.    So it was your idea to force him down into the manhole?

A.    Yes.

Q.    He was forced into the manhole, wasn't he?

A.    No.

Q.    Well, you told him twice to go down there, and he said, no, I don't want to?

A.    Yeah.  But he crawled in there by himself.

Elaine Hinson, RMR, CCR
United States Court Reporter

Q.   After you told him twice to go, after you beat him up.   Is that right?

A.   Yeah.

Q.   Now, did you see the defendant, Mr. Patton, go down into the manhole?

A.   Yes.

Q.   Did he go into the manhole after Joey was forced down into the manhole?

A.   Yes.

Q.   Did you go down into the manhole at that time also?

A.   I crawled about halfway in.

Q.   Did you take your head in first or your bottom part of your body?

A.   Well, I crawled down hanging on to the top and stuck my head down.

Q.   So you could see in there?

A.   Yes.

Q.   Could you see what kind of manhole it was?

A.   Yes.  It was seven foot by seven foot.

Q.   How did you know it was seven foot by seven foot?

A.   I just know it was big, and you only said there was two kinds, little bitty round ones and seven foot.

Q.   So you saw then Joey in the manhole with the defendant, Mr. Patton.  Is that correct?

A.   Yes.

7441

Q.    What did you see the defendant Mr. Patton, do to him once he got Joey into that manhole?  Did you see him hit him?

A.    No.

Q.    Did you hear any conversation between them?

A.    Yeah.

Q.    What did you hear them say?

A.    'Take off your socks.'  He made him take off his socks.

Q.    Where were his shoes?

A.    Huh?

Q.    Where were Joey's shoes?

A.    They came off in the back yard before we went down there.

Q.    So Joey had, what, his shirt and his pants on and his socks when he was forced down into the manhole?

A.    And his underwear.

Q.    Pardon?

A.    And his underwear.

Q.    Okay.

A.    Or I imagine.  I guess he was wearing them.

Q.    You heard Mr. Patton tell him to take his socks off.  Is that right?

A.    Yes.

Q.    What else did you hear Mr. Patton say to Joey Wavra while he was in the manhole with him?

A.    I don't know -- after that, you know, I said, hey, Dave, do you want me to go get a rope and take this dude down the

7442

tunnel.

Q.   So it was your idea to go get a rope?

A.   Yes, to tie -- you know, to tie on his hands and lead him down the tunnel and confuse him to get his directions mixed up.

Q.   Okay.

A.   So, when he did come out, he wouldn't know which way he went in.

Q.   So you were aiding and abetting Mr. Patton.  You were assisting him at that time, weren't you?

A.   No.

Q.   Well, it was your idea, 'Dave, do you want me to go get a rope?'

A.   I was asking him if he needed one.

Q.   What did he say -- what did Mr. Patton say to you?

A.   He said, 'I don't care.'

Q.   Did you go get a rope?

A.   Yes.

Q.   Did you give it to Mr. Patton?

A.   I threw it in the tunnel, and obviously he grabbed it.

Q.   Did he ask you to go get anything else other than a rope?

A.   A plastic bag.

Q.   What else?

A.   And a knife.

Q.   Now, did Mr. Patton ask you to go get those things?

Elaine Hinson, RMR, CCR
United States Court Reporter

7443

A.    He indicated he was going to cut his jeans off of him.

Q.    My question is, did he ask you to go get the knife and the plastic garbage bag?

A.    No.  He said, 'Do you have a knife?'

Q.    Was it your idea to get the knife and the plastic garbage bag?

A.    No.  He needed one.  I got one.

Q.    Did he ask you to do it, or did you do that on your own?

A.    I did it on my own.

Q.    So you went and got the knife and the plastic garbage bag and the rope under your own volition, your own action.  Is that right?

A.    No, dude.  Listen to what I'm saying, you know.  He indicated that he needed a knife.

Q.    Now, sit up.  Are you telling this Court that you went and got the knife and the garbage bag and the rope on your own and delivered it to this defendant, Mr. Patton, in that manhole where he had this beaten boy?

A.    No.

Q.    All right.  How did you come about to go get the knife and the rope and the garbage?

A.    He needed to cut his jeans off.

Q.    Well, I don't care if he needed to go to the hospital.  Did he ask you to go get it, or did you go get it on your own?

A.    I don't know.  I was tripping hard, Guy.

Elaine Hinson, RMR, CCR
United States Court Reporter

7444

Q.   Well, you did go get the knife, didn't you?

A.   Yes.

Q.   And you brought it back to the defendant, Mr. Patton, didn't you?

A.   Yes.

Q.   And you did go get the rope.  And then you go and get the garbage bag, didn't you?

A.   Yes.

Q.   Did you go down in the manhole then?

A.   No.  I stuck my head in.

Q.   Did you ever go down inside the manhole?

A.   Only when I crawled halfway in.

Q.   Did you ever tell the police you went down into the manhole?

A.   I may have.

Q.   Well, now, I'm asking you, did you go down into the manhole?

A.   No.  As far as I went in is halfway, dude.  Excuse me.

Q.   Okay.  So you delivered him the rope, the knife and the garbage bag.  What did the defendant, Mr. Patton, say to you after you gave him those items?

A.   Excuse me, sir.  I didn't give him the plastic bag.

Q.   Well, how did he get it?

A.   He didn't have a plastic bag.  I did.

Q.   Then are you the person that put Joey Wavra's clothing in

7445

the bag?

A.    Yes.

Q.    You did that there at the manhole right after you gave him the rope and the knife.  Is that right?

A.    Yes.

Q.    And then Mr. Patton passed the victim's clothing up to you.  Is that right?

A.    Well, he didn't pass them.  He threw them up there, and I picked them up.

Q.    And you put them in the garbage bag?

A.    Yes.

Q.    What did you intend to do with his clothing?

A.    Put them in the bag so I wouldn't get piss all over my hands.

Q.    You got piss all over your hands when you put them in the bag, didn't you?

A.    Yeah, but would you rather put something in a bag and carry it around in a bag than carrying it all of the time, you know.  I mean --

Q.    Did you ask Mr. Patton what he was going to do with this young boy?

A.    Yes.

Q.    What did he tell you?

A.    He said, 'I'm going to cut his jeans off and take him down the tunnel.'

Elaine Hinson, RMR, CCR
United States Court Reporter

7446

Q.   Now, after he threw the clothing of this young boy up out of the manhole to you and you put them in the garbage bag, what did you do next?

A.   Me, Bobby and Brian went inside.

Q.   Did you ever see Joey Wavra again alive that night or any other time?

A.   No.

Q.   How long was the defendant, Mr. Patton, gone before he came back to the house?

A.   I don't know, around 30 minutes.

Q.   What did he say to you and the other two young men with you when he came in the house about Joey Wavra?

A.   He said, 'It's cool.'

Q.   It's cool?

A.   Yeah.  Joey's okay.

Q.   Joey's okay.

A.   Yeah.  He told us that he took him down there in the tunnel and led him down the tunnel a ways and, you know, just confused his directions.

Q.   And did what with him?

A.   Left him.  He said, 'I untied his hands.'

Q.   Untied his hands?

A.   Yeah.  He showed me the rope.  The rope was in his pocket.

Q.   Well, we know now he untied his hands and left him dead, don't we?

7447

A.   I don't know if he was dead or not, dude.

Q.   Where did you go when Mr. Patton, the defendant, got back out of the storm sewer and came in the house?

A.   Well, we were sitting around.  And we started eating, you know.

Q.   Did David -- John David Patton, did he eat?

A.   I don't know.

Q.   After you ate, what did you do?

A.   We started to leave.

Q.   Where did you go?

A.   I don't remember.

Q.   Did you take the garbage bag with the victim's clothing in it with you?

A.   I stood in the back seat, yeah.

Q.   You was in the back seat with it, weren't you?

A.   Yes.

Q.   You were in the back seat riding with the defendant, Mr. Patton, weren't you?

A.   Yes.

Q.   He showed you the little kitchen knife while you was in the car, didn't he?

A.   Yes.

Q.   And he told you that all of the clothing was -- well, you knew the clothing was in the bag because you put them in there, didn't you?

Elaine Hinson, RMR, CCR
United States Court Reporter

7448

A.    Yes.

Q.    Did he tell that you that he had killed Joey then?

A.    No.

Q.    Never made any statement about it?

A.    No.  All he told me was it's cool, you know, Joey's all right.

Q.    Where did you go when you got in the car and left?

A.    He went to make arrangements to get Larry out of jail.

Q.    Did you get him out?

A.    Yes.

Q.    Did you go back to Larry's house after you got him out of jail?

A.    We drove by, stopped and let him out.

Q.    Well, when Larry got out, the defendant, Mr. Patton, got out with him, didn't he?

A.    Yes.

Q.    And the defendant, Mr. Patton, and Larry went around into the back yard, didn't they?

A.    Yes.

Q.    You weren't present?

A.    No.

Q.    And you didn't hear their conversation, did you?

A.    I was in the car.

Q.    Did you hear their conversation?

A.    No.

7449

Q.   Did you tell the police that the defendant, John David Patton, made the statement that Joey should be put in the sewer?  Did you tell the police that he made that statement?

A.   I don't remember.  I was still coming down from the drugs, and I was pretty nervous.

Q.   Well, you were interviewed by the police.  Your mother was present, wasn't she?

A.   Yes.

Q.   And a videotape was made, wasn't it?

A.   I'm not too sure.  I don't think so.

Q.   I'll tell you right now that a videotape was made.

A.   All right.

Q.   It's been recorded what you told the police.  So I'm going to ask you again if you have a recollection of telling the police that it was John David Patton who made the statement that Joey should be put in the sewer?

A.   He may have.  I don't remember.  No, no, he didn't say that.

Q.   Now, you talked to John David Patton on the telephone after he was arrested, didn't you?

A.   Yes.

Q.   He called you from the jail, didn't he?

A.   Yes.

Q.   And you told the police that he told you that he had got caught for murder.  Is that right?

Elaine Hinson, RMR, CCR
United States Court Reporter

7450

A.    Yes.   He said, 'Dan, they got me for murder.'

Q.    And you told the police that the defendant, John David Patton, told you that he had killed Joey?

A.    Yes, when he called me.

Q.    On the phone from the jail, he made the statement to you on the phone that he had, in fact, killed Joey Wavra?

A.    Yeah.   That was the first time I knew about it.   And at that time me and my mom got in the phone book.   And we found out where -- who we needed to talk to, phone numbers.   And I contacted Mitchell, Detective Mitchell, at that time.

Q.    And you were interviewed by him on one occasion when you withheld and lied to him about what happened out there, didn't you?

A.    Yes.

Q.    It wasn't until your second interview that was videotaped that you told about the violence and hat happened to Joey in the back yard of Larry Dawson's house, wasn't it?

A.    Yes.

Q.    Do you think that was funny?

A.    Excuse me?

Q.    Do you think it was funny that this defendant had killed Joey Wavra?

A.    No --

Q.    Do you think it's funny now?

A.    There's nothing funny about death.   Do you think it's

7451

funny?

Q.   Do you think it's funny that you aided and assisted him in getting the knife and the rope and the garbage bag for him?

A.   No.

Q.   I have no further questions of this witness."

        MR. STRIPLING:  Then we have the cross-examination.

"Q.   Mr. Graham, when David called you, do you actually recall exactly what he said?

A.   He said, 'Dan, they got me for murder 1.'  And I said -- I thought it was a joke at first, you know.  I thought he was at work, you know.

Q.   Did he say anything else besides that?

A.   Yes.

Q.   What else did he say to you?

A.   He said, 'I think you ought to go talk to the detectives, you know.'

Q.   Did he say anything else about the murder other than 'I've been charged with murder 1'?

A.   I said, 'Are you sure you're the one that did it?'  And he said, 'Yeah.'

Q.   Did he say anything else -- Mr. Albert just yelled at you and told you that he had said some other things.  I just killed -- I murdered him.  I actually killed him.  Did he actually say those words?

A.   No.  He sounded -- he sounded real -- I mean, he didn't

7452

sound like Dave.  He sounded -- I mean.

Q.    Well, the point is you asked him, did you do it, and he said, yeah.  And that was all that was said about --

A.    I don't know.  He just said yeah and hung up, you know.  I don't know if it was like a "yeah" as in "yes" or --

Q.    Okay.  That's fine.  Let's go on to something else.  How long have you known David?

A.    Since I was born.

Q.    Before you got to this point of going to the party, had David been acting strange any time before that, several days or weeks before?

A.    No, not that I noticed.

Q.    Was he using drugs on a regular basis that you know of?

A.    No -- well, I don't know, I mean.

Q.    How often did you hang out with him during the weeks and months before the party happened?

A.    As often as possible.

Q.    How often would that be?  A couple of times a week?

A.    You know, I seen him just about every day.  We would work on his car, you know.  He would come over and help me on my mom's house.

Q.    Okay.  Now, there was some acid that was passed around, and you saw that.  Right?

A.    Yes.

Q.    Do you remember how many David got?

Elaine Hinson, RMR, CCR
United States Court Reporter

7453

A.    I think he took about two hits.

Q.    Did you see him sharing the blotter that he had with anybody else?

A.    No.

Q.    Do you know how many hits were bought total?

A.    No.

Q.    And this was the first time you had taken acid yourself?

A.    No.

Q.    How did this acid affect you?  Was it really good or the quality of it?

A.    The quality was all right.  It had a lot of strychnine in it.

Q.    And that caused you to be real tense and irritable?

A.    Yes.

Q.    Had Joey done anything violent to anyone during this party?

A.    Not that I noticed.

Q.    And also when you were hitting Joey, you put a cigarette -- a lit cigarette into his arm, didn't you, at one point?

A.    Yes.  We were in the house.  And he was tripping kind of hard, laughing about Larry.  And I took my cigarette and touched it to his arm and said, 'Dude, you need to wake up.'

Q.    At this point you're obviously real mad and also the strychnine is affecting you?

A.    Yes.

Q.    What kind of alcohol did you have that night?

A.    Beer.

Q.    How much did you drink?

A.    I was really drunk, I guess.  I don't remember.

Q.    Was it over a six pack?

A.    Yes.

Q.    And when did you start drinking that night?

A.    I don't remember.  It was around 5:00, 4:00 or 5:00 in the afternoon.

Q.    Did you notice how much David Patton was drinking?

A.    No.

Q.    He was drinking beer with you.  Right?

A.    Well, he was drinking a mixture of two different liquors.

Q.    Schnapps and Everclear?

A.    Yes.

Q.    What size of bottle -- did you see the bottles?

A.    There was three pints and we mixed what we could fit into a fifth.

Q.    Do you know how much of these bottles that he actually drank -- was anybody else sharing?

A.    No.  I took like two or three drinks.

Q.    David was drinking most of what was in the bottle?

A.    Yes.

Q.    After the party was over, did you notice how much was out

7455

of the bottle?

A.    The bottle was empty.

Q.    Is it fair to say everyone at the party was extremely intoxicated?

A.    Yes.

Q.    Now, you said you had taken acid before.  When you take acid, does it sometimes give you what they call a rush where all of a sudden you get a rush of the drug into your system?

A.    Yes.

Q.    Would you agree that it makes you paranoid?

A.    Yes.

Q.    Did you -- would you say that you were out of touch with reality because of the acid?

A.    Yes.

Q.    And did David do anything unusual that caught your eye that night as far as how intoxicated he was?

A.    We were just all partying pretty hard.

Q.    Was he falling down, staggering, slurred speech?

A.    We were all stumbling around and falling down.

Q.    And you said David asked for the trash bag.  Did he ever ask for it, or did you just go get it?

A.    Well, I went and got it, and he indicated that, you know, put that in something.  So I went and got a trash bag.

Q.    All right.  When David joined you in going into the manhole, was there any reason why he was mad at Joey at the

point?

A.    Excuse me?

Q.    Was there any reason why David was mad at Joey at that point that you went to the manhole?

A.    Well, besides stealing some stuff out of Larry's house and urinating all over the chair -- well, yeah -- yeah, I guess so.

Q.    So did he say anything to Joey about being mad at him or hit him or anything before he went down to the manhole?

A.    He had just told him he was screwed up, you know, telling him it's not too cool to party in someone's house and steal their stuff and pee on the furniture.

Q.    Never threatened him or anything?

A.    No.

Q.    And then he just followed Joey down into the manhole after you took Joey down there yourself?

A.    Yes.  I didn't take him down there, just pushed him down."

        MR. STRIPLING:  Your Honor, that concludes the testimony.

        THE COURT:  All right.  You may stand down.  Call your next witness.

        MR. STRIPLING:  Rochelle Ezzi.

        ROCHELLE EZZI, GOVERNMENT'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. STRIPLING:

Q.    State your name, please, ma'am.

7457

Ezzi - Direct

A.    Rochelle Ezzi.

Q.    Where do you live?

A.    Ft. Pierce, Florida.

        THE COURT:  Spell your last name again for us.

        THE WITNESS:  E as in Edward, z-z-i.

BY MR. STRIPLING:

Q.    You testified earlier in this proceeding, did you not?

A.    Yes.

Q.    And in that testimony, you testified about meeting Danny Lee at a friend's birthday party in April of 1995?

A.    Yes.

Q.    I want to take you back to that party where you met Danny Lee and just ask some specific things.  At that party did you and he have a conversation about boot laces?

A.    Yes.

Q.    Tell us about that conversation, please.

A.    Well, we were all partying.  And they were the only skinheads at this party.  And I noticed that he had on red laces.  And I asked him what do the red laces mean.  He said -- I asked what the different color laces meant, and he said white kind of means, if you are going to go over to a friend's house and you are not going to have any, you know, uproars or fighting or anything like that, just basically a peaceful thing.  Black is we are not going to plan on starting anything, but if something does happen, we are ready to fight.  And red

Ezzi - Direct

meant that you murdered before and that's why you wear red.

Q.   Red meant what?

A.   That you murdered before.

Q.   He was wearing red laces?

A.   Yes.

Q.   Did you see him wear red laces on other occasions?

A.   Yes.  They were in his boots all the time.

Q.   A couple of weeks after this, did you have another conversation with him?

A.   Yeah, a few weeks later.

Q.   Tell us about that conversation.

A.   We were on the back porch at my friend's house.  I don't know how we got into the conversation.  He was talking about how him and his cousin years back had beat somebody up real bad and slit his throat, and they weren't sure if the guy died from beating him up or from slashing his throat.  And his cousin said, "I will take the blame.  I'm going to have to do life anyway, so I will take the blame for it."  Danny wasn't real sure, you know, who exactly did murder this person.

Q.   Thank you.

          MR. STRIPLING:  You may ask.

                    CROSS-EXAMINATION

BY MS. COMPTON:

Q.   From what you've just told the jury, Ms. Ezzi, I have to assume after Danny told you what red boot laces meant, you

Ezzi - Cross

still associated with him?

A.    Uh-huh, yes.

Q.    So two weeks later you and he are having a conversation in which he says he doesn't know who killed Joey Wavra?

A.    I didn't know the person's name.

Q.    Somebody that he and his cousin had been involved with years ago?

A.    Yes.

Q.    After that conversation, did you continue to associate with Danny Lee?

A.    Yes.

Q.    Let me ask you this.  Did you know him as Daniel Lee or Daniel Graham?

A.    I knew him as Danny Lee.  I knew him as Danny Lee Graham. I also knew him as Danny Graham.

Q.    So all of those work for you.  I just wanted to establish that because we are not real clear on our time frame when either name was used.  How did you say you met him in April of '95?

A.    Yes, April 22nd to be exact.

Q.    And so how long did your association with Mr. Lee last?

A.    Here I am today.  He called me May of probably '97 or '96, May '96.  Then I didn't hear from him anymore.

Q.    Let me ask a different question.  That wasn't too good. What I really wanted to know is how much time did you spend

Ezzi - Cross

with Danny during the -- after you met him in April of '95?

A.   I spent quite a bit of time with Danny.  Even when he went up to Orlando, him and John were like best friends, and I was very close with John.  When John went up to Orlando, I would continue to go up there.  I would see him and Danny.  Danny called me on the phone a couple of occasions.  We talked.

Q.   How would you -- we are back to the time frame of April, May, June and July of 1995.  During that time frame, how would you describe your relationship with Danny?

A.   Friends.  We are friends.

Q.   How would you describe your current relationship with Danny?

A.   Well, our current relationship, I'm very confused, because I never thought Danny to do something like this.  Personally, when he told me the story about up on the porch when he told me about the murder, I didn't know if he was like trying to impress me, thinking that was going to impress me that he was this skinhead or what.

Q.   I guess my question was poorly asked again.  Currently do you have any kind of feeling for Danny Lee?

A.   I have mixed emotions for Danny Lee.  I believe that he knew what Chevie Kehoe had in store, what he wanted to do.  And I think that Danny himself feared Chevie and kind of got caught up in it all because he didn't know how to get away from it himself.  That's just my own opinion.

7461

Ezzi - Cross

Q.    Sure.  Do you think that -- you understand, Ms. Ezzi, that all we are here about right now is for this jury to decide whether Danny lives or dies.  You understand that?

A.    Yes.

Q.    Do you think that there's any good in Danny Lee, any positive in him that could be a positive influence inside the system?

A.    I think if he becomes rehabilitated and accepts Jesus as his savior and realizes that white people are not the ultimate breed, as they put it, of race, I think once he accepts that, that it's a whole melting pot out there, I believe he can do a lot of good.

Q.    That's all I have.  Thank you.

        THE COURT:  Anything else?

        MR. STRIPLING:  No, Your Honor.

        THE COURT:  All right.  You may stand down.  Call your next witness.

        MR. LIROFF:  Nancy Cummings, Your Honor.

        THE COURT:  Come forward, please.  Just come to this lady and then raise your right hand and be sworn.

        **NANCY CUMMINGS, GOVERNMENT'S WITNESS, SWORN**

                DIRECT EXAMINATION

BY MR. LIROFF:

Q.    Good morning.

A.    Good morning.

Cummings - Direct

Q.    Would you move that microphone a little bit closer.  Could you tell us your name?

A.    Nancy Cummings.

Q.    Would you spell your last name?

A.    C-u-m-m-i-n-g-s.

Q.    I can't help but notice by your outfit.  You seem to have some connection with the Sheriff's Department?

A.    Yes, sir.  I'm a deputy at the Sheriff's Department.

        THE COURT:  Put the microphone a little bit up from you.  Speak into it a little bit so I can hear you.

BY MR. LIROFF:

Q.    You are a deputy?

A.    Yes, sir.

Q.    Is that which Sheriff's Department?

A.    Pulaski County.

Q.    How long have you been a deputy sheriff?  How long have you been a deputy sheriff?

A.    For approximately two and a half years.

Q.    As a part of your responsibilities, do you work in the Pulaski County Jail?

A.    Yes, sir.

Q.    What do you do in the Pulaski County Jail?

A.    I work in the units.  I worked over inmates.  I worked in the pods.

        THE COURT:  I'm sorry.  I can't hear you.  You are

going to have to speak up.

BY MR. LIROFF:

Q.    You are going to have to speak up, please.  You started telling us you worked with inmates.  You work within the pods?

A.    What it is, it's a unit where the inmates are detained.

Q.    Are people kept there who are awaiting trial?

A.    Yes, sir.

Q.    Was one of the people who was kept there during the time you worked Danny Lee?

A.    Yes, sir.

Q.    Do you see Mr. Lee in court today?

A.    Yes.

Q.    Would you tell us -- would counsel stipulate to the identification?

        MS. COMPTON:  Sure.

        MR. LIROFF:  Thank you, counsel.

BY MR. LIROFF:

Q.    Excuse me for asking.  Excuse my ignorance.  Does this mean that on occasion you guard male prisoners?

A.    Yes.

Q.    Did you on occasion guard Mr. Lee?

A.    Yes.  I worked in his unit for -- what we do is a 90-day rotation.  I guarded him for 90 days.

Q.    Did there come a time when something happened between you and Mr. Lee?

7464

Cummings - Direct

A.    Yes.   One day when he wanted out to use the phone.

Q.    Where was he when you say he wanted out?

A.    He was in his cell.

Q.    His cell?

A.    Yes.

Q.    Is he in a cell by himself?

A.    Yes.

Q.    Where were you when he was in a cell?

A.    I was standing in front of his door.

Q.    Could you describe what his door looks like?

A.    It's a steel door with a narrow window about this wide (indicating).   It also has a trap door which we open and place their food trays in, because in that type of unit they are not all allowed out at one time.   There can only be one on the floor at one time.

Q.    Why?

A.    It's for the majority, it's for like high escape or high risk inmates we put in there, or protective custody, we put them in that unit.

Q.    Did Mr. Lee call your attention in some way?

A.    Yes.   He was asking me if he could get out and use the phone.   I told him he couldn't at that moment because we just got Kehoe out on the floor to see his attorney.

Q.    Why couldn't he use the phone if Mr. Kehoe was seeing his lawyer?

Elaine Hinson, RMR, CCR
United States Court Reporter

A.    Well, his attorney was upstairs.  He was going to go see his attorney.  But we don't have any movement.  When you have one out on the floor, we can't bring another one out right then.  Plus I had an inmate with me right beside me.  I couldn't have brought him out that minute anyway until I got that inmate secured in his cell, and I told him that as long as I had Kehoe out on the floor, he couldn't come out.  And I always let him use the phone whenever he wanted.  At that moment I could not bring him out.  His attorney was already upstairs waiting to see him anyway.

Q.    I'm not sure if I clarified this.  What date was this?  You were starting to look at something.  Did you prepare a report relating to this incident?

A.    Yes.  It was February 23rd.

Q.    Thank you.  With reference to that report, looking at that report, does that help you recall what the date was?

A.    Yeah, because I didn't know exactly what day it was.

Q.    Did you look at the report and help recollect what the date was this happened?

A.    Yes, because this report was wrote the day this all happened.

Q.    What was the date?

A.    February the 23rd.

Q.    This year?

A.    Yes, 1999.

Cummings - Direct

Q.   You told Mr. Lee that you couldn't let him out.  Did you also explain to Mr. Lee why it was that you couldn't let him out?

A.   Yes.  I told him he couldn't come out right then because Kehoe was out.

Q.   Did Mr. Lee react?

A.   Yes.  He became real mad, and he started screaming, yelling, cussing.  I told him, "I don't know why you are acting like that.  I let you out any time you want."  He started making threats.  He said he was going to have my head blown off like he did the others, like "You fucking bitch, you are going to die like the others did."  He was just steadily screaming.  I finally turned and went back down the stairs to call my supervisor.

Q.   Was he just saying this, or was he saying it louder?

A.   He was screaming it.  It was to the point he was so loud he was up in the upper sub bay where his cell is.  I could hear him still screaming all the way down on the floor at the deputy station.

Q.   Was he just screaming, or was he doing anything else?

A.   He was hitting on the door.  I told him, "Lee, you cannot come out at the same time.  I have Kehoe out right now."  He was like, "He is my fucking codefendant.  I can come out right now.  It doesn't matter.  I need to call my attorney."  And he is like, "You fucking bitch.  You ain't no better than the

7467

Cummings - Direct

others." He was really irate. He was cussing. He was beating on his door saying, "I want out to call my attorney."

Q.    Was he in any way able to reach out from within his cell?

A.    Yes. The trap door was open, because what we were doing also was getting trays -- they are Styrofoam trays -- out of the trap. He had stuck his arm out saying, "I want to call my attorney. I want to call my attorney now. Let me out. You are no different from the others." He was just really irate.

Q.    Did he threaten you?

A.    Yes.

Q.    What did he say?

A.    He said, "You fucking bitch. You are going to die like the others. You are no better than the others are. You fucking cunt. You are going to have your head blown off like the others."

Q.    Thank you. Nothing further.

        THE COURT: Ms. Compton, if it is going to be a couple of minutes, fine.

        MS. COMPTON: I have one question.

        THE COURT: Go ahead. You may ask.

        MS. COMPTON: Your Honor, I have two questions.

        THE COURT: You may ask two questions.

                    CROSS-EXAMINATION

BY MS. COMPTON:

Q.    You had been dealing with Danny Lee for some period of

Elaine Hinson, RMR, CCR
United States Court Reporter

time, had you not?

A.   Yes.

Q.   And prior to this time, had there been any similar outbursts to what you've just described?

A.   No.   That's what really surprised me, his attitude that day.

Q.   Thank you, ma'am.   That's it.

THE COURT:   You may stand down.   We will now be in recess until 1:30.   Court will be in recess.

(Recess at 12:20 p.m.)

## CERTIFICATE

I, Elaine Hinson, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of the proceedings in the above-entitled case.

*Elaine Hinson*
_____

Elaine Hinson, Official Court Reporter

Date:   May 12, 1999

Elaine Hinson, RMR, CCR
United States Court Reporter

7469

Stipulation

(Continuing at 1:30 p.m., jury present.)

THE COURT:   Call your next witness.

MR. LIROFF:   Your Honor, we're going to enter into some stipulations at this point.

THE COURT:   Why don't you read them from the lectern, please.

MR. LIROFF:   Your Honor, we have several items of evidence that we have marked, and counsel will join me in stipulating to their admission into evidence.

The first item, Exhibit No. 1102, that's 1102, reflects a conviction in the State of Florida in 1995 for Danny Lee for the crime of carrying a concealed weapon.

Your Honor, I'm advised by Mr. De La Cruz that my first opportunity in this courtroom to mention an item of evidence, and I may have used the wrong number.

THE COURT:   Let's get the right number.

MR. LIROFF:   That's how these things go.   Sorry about that.   I think what we'll do is move everything up, Ms. Clerk?

THE COURT:   Is this stipulation about the conviction?   What number should it be?

(Off-the-record discussion between Mr. Liroff and courtroom deputy.)

MR. LIROFF:   Thank you very much.   Let me try again.

The conviction that I just described will be identified for the record as 1106.

7470

Stipulation

THE COURT:  All right.

MR. LIROFF:  The second matter, 1107, is a proof of birth in Santa Ana, California, for Daniel Lewis Lee, with a birthdate of January 31, 1973.

THE COURT:  Very well.

MR. LIROFF:  The next item, No. 1108, is a judgment and sentence in the District Court of Oklahoma County, the State of Oklahoma, for Daniel Lewis Lee, for the crime of robbery.

THE COURT:  All right the Exhibits 1106, -07, and -08 are received by agreement of the parties.

(Government Exhibits 1106, 1107, 1108 received in evidence.)

MR. LIROFF:  And the last exhibit, Your Honor, is 1109, which is a conviction for John Patton in the State of Oklahoma for the crime of first degree murder.

THE COURT:  Conviction of John Patton, all right.  It will be received also.

(Government Exhibit 1109 received in evidence.)

MR. LIROFF:  One last stipulation, Your Honor.  And the stipulation is that the -- I'll wait for Ms. Compton.

(Off-the-record discussion between Ms. Compton and Mr. Lassiter.)

MR. LIROFF:  Whenever you're ready.

MS. COMPTON:  I'm sorry?

7471

Stipulation

MR. LIROFF:  I thought you wanted to hear the stipulation, so I was going to wait.

MS. COMPTON:  Go ahead.

MR. LIROFF:  Well, thank you.

The stipulation is that the evidence that was presented in the Kehoe penalty phase by the government, specifically the victim vulnerability testimony and evidence, and the evidence relating to the crime scene photographs, the presentation of the mannequin, all that evidence is equally admissible as against Mr. Lee, and this jury can consider it as well in their decision as to Mr. Lee.

THE COURT:  Very well.  You will treat that evidence as having been introduced in this proceeding, just as it was in the Kehoe penalty phase.

MR. LIROFF:  Thank you, Your Honor.  At this time then the government does rest their case.

THE COURT:  The government rests.  All right.  Ms. Compton?

MS. COMPTON:  Your Honor, the first person we would call would be Detective Mitchell, who has been here earlier, for purposes of introducing the videotape of John David Patton.

THE COURT:  If the parties want to stipulate to its introduction, we can do that, if that's all you're going to use it for.

7472

Stipulation

MS. COMPTON:  Just play the video, and if they'll stipulate, we can play the video.

MR. LIROFF:  I'll stipulate.

THE COURT:  The video may be played by stipulation so you don't have to have him in to identify it.  I think we have already given it an exhibit number -- no, I think we have a new exhibit number.  What will that be, Marge?

MS. COMPTON:  16?

COURTROOM DEPUTY:  17.

MS. COMPTON:  17.

THE COURT:  Daniel Lee what?

COURTROOM DEPUTY:  17.

THE COURT:  No. 17.

MS. COMPTON:  Are you marking it?

COURTROOM DEPUTY:  Yes.

THE COURT:  Do you need some assistance doing this or are you all set to go?

MS. COMPTON:  I need assistance.

Your Honor, we thought that Detective Mitchell had this particular video with him.  He tells me that he does not.  The only other copy is at the government's office.  I apologize. We thought that Detective Mitchell had the original.

THE COURT:  The government's office here in Little Rock?

MS. COMPTON:  Yes, here.

7473

Gutierrez - Direct

THE COURT: Let's get it. Do you want to proceed with something else or do you want to wait for that?

MS. COMPTON: I think we better wait, Judge. I don't have any kind of short witness. Actually, if Mr. Gutierrez is there, we can do that while we wait. Frank Gutierrez.

THE COURT: All right, sir, come forward to the front of the courtroom, please. Come forward to this lady up here. No, up here. And when you get there, if you'll raise your right hand and be sworn.

FRANK GUTIERREZ, DEFENDANT'S WITNESS, DULY SWORN

THE COURT: Ms. Compton.

DIRECT EXAMINATION

BY MS. COMPTON:

Q.   Mr. Gutierrez, I'm over here. I'm going to ask you to speak into the microphone. Can you do that?

A.   Speak louder because I can't hear too good.

MS. COMPTON: Your Honor, may I approach maybe over there by the witness like we've done before?

THE COURT: Certainly.

THE WITNESS: 1, 2, 3, testing. How is that?

BY MS. COMPTON:

Q.   I'm going to stand right here and see if you can hear me all right. Can you hear me?

A.   Yeah. Excuse me. Yeah, I can hear you.

Q.   But you still need to speak into the microphone so the

7474

Gutierrez - Direct

ladies and gentlemen on the jury can hear you.  All right?

A.    Okay.

Q.    Would you state your name, and spell your last name for the court reporter?

A.    Edmond F. Gutierrez.  You want the spelling of my first name?

Q.    No, you can just spell the last name.

A.    G-u-t-i-e-r-r-e-z.

Q.    Where do you live?

A.    Oklahoma City.

Q.    How long, roughly, have you been a resident of Oklahoma City?

A.    Well, pretty hard for me to tell.  Around 30 years.  But in Tulsa, I started in 1931.

Q.    Came to Tulsa in 1931 and then moved to Oklahoma City 30 years ago?

A.    Yeah.

Q.    Where did you come from when you went to Tulsa?

A.    Texas.

Q.    All right.  Are you a native of Mexico?

A.    No.  I'm born in -- I don't know what happened to me.

Q.    Do you want a glass of water?

A.    Yeah.  I was born in Texas.

Q.    Okay.

A.    My folks, they Spanish, Mexican, I don't know.

7475

Gutierrez - Direct

Q.    The court reporter is not going to hear you unless you speak into this mike.

A.    Oh, boy.

Q.    What if I stand up here and you can look at me and talk into the mike?

A.    Okay.

Q.    Okay?

A.    I feel better now.

Q.    Okay.  Are you acquainted with Danny Lee, also known as Danny Graham?

A.    I knew him.

Q.    Okay.  How did you come to know Danny?

A.    His mother live in the old house I got at the farm.

Q.    Are you her landlord?

A.    Well, more or less.  You know, you want me to tell the story how it started?

Q.    I want you to tell me the story how you began renting your farmhouse to Ms. Graham.

A.    Okay.  She came and she wanted to rent the house, and I didn't want her to rent the house because wasn't -- was in pretty poor shape, you know.

Q.    How long ago are we talking about, roughly?

A.    She was here probably about -- let's see, around 20 years, I guess.

Q.    All right.  Where is the house that you're referring to?

7476

Gutierrez - Direct

A.    In Oklahoma City.

Q.    Is it outside?  Is it a rural area?

A.    Yeah, just a little ways out of town, uh-huh.

Q.    We've heard of a post office box or something in Yukon. Is it in Yukon?

A.    Between Yukon and Mustang.

Q.    Mustang, all right.  Now, can you describe the house for the ladies and gentlemen of the jury?  What kind of house is it?

A.    It's lumber, but pretty old.  I don't know how old. Pretty old.  And, you know, the house had termites and pretty old house.  I didn't want to rent it.  But Lea insisted that she wanted to rent the house, and then I got suspicious of what she wanted the old house for.  You know, a lot of times they want to raise marijuana, so I asked her, "What do you want the house for?", and she point at the little girl.

Q.    At Carrie, her daughter?

A.    At Carrie, her daughter.  Said, "I don't want to want to raise her in town among dope people, dopes and drunks," and then I changed my mind.

Q.    That changed your mind and you decided to rent her the house?

A.    I told her how much can she pay, because I knew she can't pay too much.

Q.    How did you know that?

7477

Gutierrez - Direct

A.    Know what?

Q.    That she couldn't pay much.

A.    I say, "You can't pay much," because you can see those people -- well, poor people don't have too much money.  So I says, "How much can you pay for it?"  And she says, "How about 250, because I don't have too much money."  I says, "Lady, I take 150, but you clean it."

Q.    Take care of it?

A.    Yeah.  She says, "Oh, thank you, thank you."  And that's the way I rented it, because when she says she didn't want to raise that kid -- and her kid just a beautiful kid then.

Q.    Carrie?

A.    Carrie.  And she sent her to school, she worked to send her to school.  I don't know how she managed, but she did.  What I was interested in is she made me feel sorry for the kid.

Q.    For Carrie?

A.    For Carrie.  Yeah, they raised sometimes with father and mother, sometimes with father.  Sometimes, you know, they just -- and those kids, they go through quite a bit, you know that.

Q.    They go through what?  What were you going to say?

A.    They go through, you know, troubles between, you know, their parents.

Q.    Splitting up?

A.    Splitting up and fighting and fussing and, oh, God, I don't know.  But, anyway, I felt sorry for the kid.  And she

7478

Gutierrez - Direct

was a beautiful kid, and very smart, but very shy.  At the beginning she was shy, because sometimes I come and she look pretty sad, you know.  Kind of like, you know, she didn't want to talk, she didn't want -- and one day I just, you know, the way I talk and my mind get things on it sometimes that I'm not supposed to, and I says, "Carrie, what would you rather be, rich, ugly girl or a beautiful, poor girl?", and she look at me, you know, she smile.  From then on I never got trouble with her.

Q.    That broke the ice?

A.    Broke the ice, I guess.  You see, I'm not -- I didn't go to school, but I can think pretty good, but I can't let the words come out of my mouth right.

Q.    Because you're thinking faster than you can talk?

A.    I have no education.

Q.    Because you're thinking faster than you can talk?

A.    Not only that.  A lot of times I can't understand a lot of words, and a lot of times it's hard for me to understand.

Q.    When did you first meet Danny, Carrie's brother?

A.    Oh, boy, another thing, my mind is kind of -- I can guess probably.  The first time probably was about three, four years after she move in.

Q.    After she started renting?

A.    Came in and went out.

Q.    Did you ever have occasion to work with Danny on any kind

7479

Gutierrez - Direct

of project?

A.    He always had a lot of respect for me and he wanted to work for me, but I didn't have no work, because I lease what I got.  And he always respect me, that's the main thing.  Because I don't care who he is, when they respect you, you got to respect them back.  If you don't respect them back, you know what's going to happen.  And then he, you know, you know, he lives, come back a year later, two, I don't know.  And then he asked me for a job all the time, but I didn't have no job.  But a lot of times I have list of things to do, you know.

One day I had a big tree in a creek, great big tree, and I got a chain saw, but I can't crank it because I got a bad arm.  He helped me around, so I asked him to help me, so he glad to help me.  I didn't know how he was going to do it, because those trees are pretty big.  You have to have knowledge about cutting trees with a 16-inch saw.  He got over there and he used -- he did it once, and you could see he was powerful.  He got the thing started, and he started on the top and then on the sides and then, you know, keep working, because he go about that much (indicating) and the tree was, you know, can't go through.

Q.    Right.

A.    But he knew how to do it.  You know, he got over there and then he get to the bottom, and then with the reverse saw, he just cut the bottom of it.  He go that much (indicating), and

7480

Gutierrez - Direct

all you have to do is push it.

Q.    Did he do other odd jobs for you from time to time?

A.    I can't remember.  But that was about the only thing, clean things, you know.

Q.    Clean things up for you?

A.    Sometimes.  Because, you know, he happened to be around and cut the yards.  And at that time, you know, I tried to pay him, and he said, "No, forget it.  It was nothing."  I said, "No, I want to pay you."  So he said, "Well, take it off on mama's rent."  That surprised me.

Q.    He wouldn't accept the cash, he said, "Take it off mama's rent"?

A.    Yeah.

Q.    Has he always been respectful to you?

A.    Very respectable, and I don't know why.  And I have to respect him the same way, because, you know, you can make enemies easy, but pretty hard to make friends.  And he wants to be a friend, I try to be a friend.

Q.    Thank you.  Somebody else might have a question for you. I'm through.  And when somebody else is through, you may go.

A.    Go on.

          MR. LIROFF:  A few questions.

          THE COURT:  All right.

                    CROSS-EXAMINATION

BY MR. LIROFF:

7481

Gutierrez - Cross

Q.    Mr. Gutierrez, my name is Lane Liroff.

A.    Glad to know you.

Q.    Glad to know you.  Can you hear me?

A.    Yeah.

Q.    Good.  I just have a couple of questions for you.  Is that all right?

A.    Good.  I got to catch a plane.

Q.    Good.  When you were talking about Mr. Lee cutting down that tree, I thought I heard you use the word "powerful."  Is that the word you used?

A.    He was very strong, yeah.  Because I saw him do it.  Takes a pretty strong man to do it.  But he works.  He was a good worker.  And then just like I said, he had sense to work.  You can hire anybody.  Like me, I can't do nothing because you got to, you know, have a little knowledge to do -- to do it right.  And he did.  And I noticed that.

Q.    Thank you.  The next thing I wanted to ask you about is that you mentioned that there were times that Mr. Lee left, came and left?

A.    Mr. Lee you said?

Q.    Danny Lee.

A.    Danny.

Q.    Danny?

A.    Danny.

Q.    Tell me about that.

7482

Gutierrez - Cross

A.    I don't know.  He go someplace else.  I don't know where he goes, because, you know, none of my business.  And he said, "I got to go," because I don't have a right to tell him don't go or go.  You know, he used to live out of town, probably.

Q.    How old was he?

A.    Well, one time he was under age.  So 17.

Q.    But you're saying there are times that he would just up and go?

A.    Well, yeah.  He'd go on probably to work someplace.  One time he was working in -- in Yukon, you know, for about three month, I guess, and they like him pretty good, and then he lost his job, I guess.

Q.    Were there times he left and you didn't know where he was?

A.    Well, I got other things to do and I don't live there.  I live a long ways from there.

Q.    Thank you, sir.

A.    Thank you.

Q.    Thank you very much.

        MR. LIROFF:  Thank you, Your Honor.

        THE COURT:  You may stand down and you may go to that airplane.

        THE WITNESS:  Thank you.

        THE COURT:  You're welcome.

    Call your next witness, please.

        THE WITNESS:  I like Arkansas.

7483

Gutierrez - Cross

THE COURT:  Good.

THE WITNESS:  I came 1931 and I bought apples for 10 cents a bushel at Gentry.

THE COURT:  We like Oklahoma, too.

THE WITNESS:  Thank you.

THE COURT:  Ready for the video?

MS. COMPTON:  Yes, sir.

Your Honor, at this time Ms. Newton is going to assist me.  Actually, she's not going to assist me, she's going to do it, and play DL-17, which is a videotape of John David Patton's statement to Detective Mitchell.

THE COURT:  It's received.  You may play it.

(Defendant Exhibit DL-17 received in evidence.)

(Defendant Exhibit DL-17, videotape, played to the jury.)

MS. COMPTON:  Your Honor, there's more on this tape, but it's almost completely inaudible and it doesn't get us anywhere, so we're willing to stop at this time.

THE COURT:  It's inaudible?  To make it clear, that was the interview with David Patton?

MS. COMPTON:  Yes, sir.

THE COURT:  Who was convicted and sentenced to life without parole?

MS. COMPTON:  Serving life without parole in the Oklahoma State Penitentiary system.

THE COURT:  Why don't we go ahead and recess.  We'll

7484

Gutierrez - Cross

be in recess at least until a quarter after.

Court will be in recess.

(Recess at 2:55 p.m.)

C E R T I F I C A T E

I, Eugenie M. Power, Official Court Reporter, do

hereby certify that the foregoing is a true and correct

transcript of proceedings in the above-entitled case.

Date:  May 11, 1999

Eugenie M. Power, RMR, CCR
United States Court Reporter

7485

Graham - Direct

THE COURT:  Ms. Compton, you may proceed.

MS. COMPTON:  Lea Graham.

THE COURT:  Ms. Graham, come forward, please.

Just come up here and raise your right hand.

(Witness sworn.)

THE COURT:  Please be seated.

DEBRA LEA GRAHAM, DEFENDANT LEE'S WITNESS, DULY SWORN

MS. COMPTON:

Q.    Would you state your name, please.

A.    Debra Lea Graham.

Q.    You have previously testified in this courtroom in this cause, have you not, Ms. Graham?

A.    Yes, I have.

Q.    And what is your relationship to the defendant, Daniel Lewis Lee?

A.    I'm his mother.

Q.    I believe that we talked about this at one time, but some weeks have passed since then.  There are records about your son that call him Daniel Lewis Lee and there are records that call him Daniel Lewis Graham.

A.    Yes.

Q.    Can you explain the difference why he has two different names?

A.    Danny was born Daniel Lewis Lee.  When I met and married Dennis Ray Graham, he wanted his name changed to Graham and he

Graham - Direct

planned to adopt him immediately.  He didn't do it.

Q.    He did not adopt him?

A.    No.

Q.    So --

A.    But Danny's school records from kindergarten through are

Daniel Lewis Lee Graham.

Q.    Okay.

A.    And when he needed his driver's license at 16 -- or

actually 17, he had to go back to the Lee.

Q.    That's fine, I just wanted to know.  Mr. Graham never

formally adopted Danny, but he has used that name for some

period of time.

      Let's back up a little farther now, Ms. Graham, and have

you tell us where and, if you don't mind, when you were born.

A.    When I was born? I was born in Patterson, New Jersey,

November 13, 1953.

Q.    And who were your parents?

A.    Audrey Arthena Strickland Chadwick, and my father was

James Howard Chadwick.

Q.    Were you born Debra Lea Chadwick?

A.    Yes, ma'am.

Q.    I'm going to skip around a little bit. Tell the jury --

there's been some confusion about your name as well.  Sometimes

you have been called Debra Graham, for example, I think on your

grand jury transcript, and sometimes Lea Graham.

Graham - Direct

A.    I grew up as Debbie.  When I met Dennis Graham I was Debbie to everyone who knew me.  However, his first wife's name was also Debbie, so I quickly switched over to Lea.

Q.    Just to avoid the confusion.

A.    Just to avoid the confusion.

Q.    And you have been going by Lea since that time?

A.    Since that time, yes.

Q.    How many brothers and sisters did you have?

A.    I have four sisters and one brother.  I have a son who's named after my brother, Daniel.

Q.    Did you all grow up in New Jersey?

A.    No.  Myself and my younger sister were born in New Jersey.  The others were born -- my older sisters were born in Tennessee, around Dresden and Martin, Tennessee.

Q.    About how old would you have been when ya'll went from New Jersey to Tennessee?

A.    Four and a half or five.

Q.    And then did you do the bulk of your growing up there in the state of Tennessee?

A.    No.  We were there for approximately three years, and then we moved to Carnegie, Oklahoma where my mother's parents are from.  And that's where I grew up.

Q.    Let's talk a little bit about -- you've talked about your siblings.  Let's talk about -- a little bit about your parents.  Was Mr. Chadwick -- was your dad around the whole time you were

Carolyn S. Fant
United States Court Reporter

7488

Graham - Direct

growing up?

A.    No, I didn't know Mr. -- Howard at all.

Q.    Mr. Howard?  Is that his first name?

A.    Well, it's James Howard is his name.  I have called him Howard all my life, mainly because his mother introduced me to him as Howard when I was about 7.  And said, "This is your father." I went to see him when I was 17.  I worked and had an airline ticket to New Jersey to see him.

Q.    We are talking about your biological dad?

A.    Yeah.  And then I saw him maybe twice again before I went back for his funeral to Tennessee.

Q.    Well, how is it that he was not a part of your life when you were growing up?  Did he and your mother divorce?

A.    They separated when we moved from New Jersey, and I don't think the actual divorce was final or taken care of until I was 11, 12.

Q.    But you had no real --

A.    Before she married dad, which is my stepdad, which is my daddy.

Q.    What's his name?

A.    Robert Tully.

Q.    And you consider Mr. Tully to be your daddy?

A.    Oh, yes, and grandpa.

Q.    Now, what do you know about Howard, about your biological dad?  Do you know anything about his background?

A.    He was an ironworker.  He built bridges in New York. Standard bridges that are up there.  He was an alcoholic.  I remember asking my mother about the him in early adolescence, and all she ever said to me was he was an alcoholic.  I didn't grow up around that. I had no idea.  The definition in the dictionary wasn't enough to explain to me what alcoholism is. I had never seen it.

Q.    And what about your mother? Did your mother have any kind of problems with alcohol or other substance abuse?

A.    Oh, no.  No.

Q.    Mr. Tully that you have referred to, did you just tell the jury that you thought of him as your daddy and your grandaddy?

A.    Oh, no, grandpa to all the grandchildren: Danny and Carrie.

Q.    Is Mr. Tully still living?

A.    Yes.

Q.    Is your mother still living?

A.    Barely.

Q.    Where are they?

A.    In Carnegie, Oklahoma.

Q.    Where is that in relation to Yukon, Mustang, where you live?

A.    It's about 90 miles southwest of where I live.  North of Lawton is the easiest -- about 30 miles north of Lawton.

Q.    When you say that your mother is barely alive, is she old

7490

Graham - Direct

and ill, or is it something particularly wrong?

A.    Before all of this started, my mother was vibrant, gorgeous, energetic.  She doesn't get out of bed some days.

Q.    You say "before all this started," you mean when Danny was arrested?

A.    Yes.  Yes.  I'm sorry.

Q.    We'll take all the time you need.

A.    She developed shingles in her eyes, and at one point she only had about five percent vision left.  She's been hospitalized.

Q.    Is one of your sisters there staying with her now?

A.    My youngest sister, Oweda, lives on the same acreage. They have built their home next to mom -- it's about a city block away; the same 80 acres -- and her children and her husband.

Q.    So somebody is there close by while you're down here?

A.    Yeah.

Q.    Tell us a little bit about where you went to school and how far you went to school?

A.    Well, I started school, kindergarten, in New Jersey.  I don't remember a lot about it except there was a little short, fat girl that ate paste all the time and it made me throw up a lot.  That is my first -- only memory of kindergarten.  When we went to Tennessee, I was second grade, two years of second grade, because I didn't learn to read like they thought I

7491

Graham - Direct

should.

Q.    Because you did not learn to read?

A.    Right, I didn't learn as quickly, so I went to Tennessee -- I mean, we moved from Tennessee to Oklahoma and I started in the third grade. And I was there until mother and dad married and we -- I was in town in Carnegie, in town school, and then sixth and seventh grade was at Aulden, which is now a ghost town. It's where mom and dad grew up and went to school. Fourth -- no, fifth, sixth and seventh grade were in one class -- classroom. And after seventh grade, I went back to Carnegie.

Q.    Oklahoma.

A.    Aulden. The same house we lived in, it's just -- one went west and one went north -- east, I mean, and north. And in the ninth -- no, tenth grade I moved to Lawton. Actually, it was after the ninth grade during the summer I went to Lawton to stay with my mother's sister and her husband and two children. And it was a summer job. I babysat and took care of the house a little bit. It was very nice, and they asked me to stay, and I did. And I went there in Lawton for a year. My tenth year.

Q.    In the tenth grade you were in Lawton, Oklahoma?

A.    Yes.

Q.    And then what happened?

A.    And then I went back to mom and dad's after the summer. I was there two summers and school year, and I moved to

7492

Graham - Direct

Tennessee.  I was very rebellious, and I still at that time had no use for a stepfather just yet.  You know, he had rules and regulations that didn't quite fit in.  So I went to Tennessee and stayed with my brother and his family.

Q.    Were you about 15 or 16 now?

A.    Sixteen or 17.

Q.    Did you finish school?

A.    No.  I was attending through any junior year, but far from passing.

Q.    But far from passing? I am not under any circumstances wanting to embarrass or be indelicate with you, Ms. Graham, but did you have any kind of problems in school -- problems learning?

A.    Dyslexia.

Q.    Okay.  Anything else?

A.    I didn't know I had that until I was an adult, you know.

Q.    You weren't diagnosed until you were much older?

A.    Yeah.

Q.    I take it then, as most dyslexics, you had a lot of trouble with reading, but didn't know why?

A.    Uh-huh.

Q.    Were there any other diagnoses in your childhood other than the standard -- I'm not talking about chicken pox and measles that everybody has, but anything else that affected you during your childhood or adolescence besides the dyslexia?

7493

Graham - Direct

A.    I don't think so.

Q.    Now, eventually you moved to Dallas, Texas; is that right?

A.    Yes.

Q.    What prompted the move to Dallas?

A.    I shared an apartment with my older sister, Anita, who was an airline stewardess at the time.  I worked -- in the afternoons I worked at Safeway, which is Homeland now.  I started checking groceries -- bagging groceries and then checking groceries.  And I also worked at a donut shop in the mornings, early hours, get to work at around 3:00 in the morning and working until 8:00, 8:30 shift was over, the rush hour, making and selling donuts.  And then rest a few hours and go to work at Safeway.

Q.    When you were living in Dallas with your sister, did you meet a man that you would ultimate marry?

A.    Yes.

Q.    Who was that?

A.    James Eugene Lee.

Q.    Roughly when was it that you and Mr. Lee would have married?

A.    March -- the first of March in '72.

        MS. COMPTON:  May I approach the witness, Your Honor?

        THE COURT:  Yes, you may.

BY MS. COMPTON:

Carolyn S. Fant
United States Court Reporter

Graham - Direct

Q.   I'm going to show you what has been marked for identification purposes as Defendant's Exhibit DL-18 and DL-19 and ask you whether you can identify these photographs.

A.   That's -- 18 is me, and I think in that dress I was sophomore or junior year.

Q.   Sixteen or 17?

THE COURT:  Speak a little louder.

THE WITNESS:  Seventeen.  And 19 is Jim and myself after Danny was born.

MS. COMPTON: Okay.  Your Honor, I move to introduce DL-18 and DL-19.

THE COURT:  Received.

(Defendant Lee's Exhibit Nos. DL-18 and DL-19 were received.)

THE COURT:  Is that 18?

MS. COMPTON:  This is 18.

BY MS. COMPTON:

Q.   Now, you think from your dress, Ms. Graham, that you were either a sophomore or junior in high school when this picture was taken?

A.   Yes.

Q.   So 16 or 17 years old.

A.   Yes.

Q.   Let me show you DL-19 and get you again to identify the people in that picture.

Carolyn S. Fant
United States Court Reporter

Graham - Direct

A.    That's James Eugene Lee and myself at a museum in California.

Q.    I can almost tell by the size of your bell bottoms what year that was, but do you know?

A.    '73.  Yeah.

Q.    Now, you said that was in California.  You met Mr. Lee in Dallas; isn't that right?

A.    Yes.

Q.    How did you end up in California?

A.    His work moved him to California, and I followed him or went with him.

        THE COURT:  Let me interrupt a moment.  My television is off.

        THE WITNESS:  This one is, too.

        THE COURT:  Can we check that out for a moment?

        All right, you may continue.

        JUROR: This one, ma'am.

        THE COURT:  All right.  Someone turned them off.  I don't know who went around pushing buttons.

BY MS. COMPTON:

Q.    All right, you were talking here about 19 and said that was a picture after Danny was born.  Let's move into that. When was Danny born to you and Mr. Lee?

A.    January 31st of '73.

Q.    Let me show you what has been marked for identification

Carolyn S. Fant
United States Court Reporter

7496

Graham - Direct

purposes as DL-20, 21 and 22.  Can you identify those?

A.    Yes.  Twenty --

THE COURT:  Speak up.

THE WITNESS:  -- is Danny with James Lee.  And 21 --

21 is taken in Carnegie at my grandparents' 75th wedding

anniversary.

BY MS. COMPTON:

Q.    And who is who in the picture?

A.    It's Jim and Danny.  And 22 is Danny when he finally got

brave with his first birthday cake.

MS. COMPTON:  Your Honor, at this time I would move

for introduction of DL-20, 21 and 22.

THE COURT:  Received.

(Defendant Lee's Exhibit Nos. DL-20, DL-21, and DL-22 were

received.)

BY MS. COMPTON:

Q.    Ms. Graham, do you know where this picture was taken and

approximately how old Danny would have been?

A.    That was taken in Arizona at a friend's.  I can't remember

right now the name of the town, but their street was called

End's Lane.

Q.    Okay, you were visiting there?

A.    Yes.

Q.    About how old is Danny in that photo?

A.    He's about 14 months, I believe.

Carolyn S. Fant
United States Court Reporter

7497

Graham - Direct

Q.    And is this picture -- this is the one that you were telling us was at your grandparents' 75th wedding anniversary; is that right?

A.    Yes.

Q.    How old would Danny have been?

A.    That was the Christmas before -- when he was 11 months old.

Q.    And then DL-22, I couldn't understand what you were saying about him getting brave enough.  What did he get brave enough for?

A.    It was a small birthday cake, and he didn't want to put his hands in it. He was taking one finger at a time to taste it.  And he just got carried away.

Q.    Finally dove in?

A.    Finally dove in.

Q.    Did you -- when you married Mr. Lee, did you know anything really about him?

A.    No.

Q.    How long was the courtship before you and he married?

A.    Nine months, 10 months.

Q.    How did you meet him?  Did I ask you that?  You met him in Dallas, but how?

A.    I met him dancing, at a dance club.

Q.    What things about him did you not know that you ultimately found out?

Carolyn S. Fant
United States Court Reporter

A.   Oh, goodness.   I didn't know he was 22 years older than me.

Q.   So you were 17 when you married him?

A.   I know -- before the time I left him, I knew of seven children before Danny.   I didn't know of any of those.   Shortly after we started our life together in California, I met Tracy Emma Lee, which is Danny's stepsister -- I'm sorry, half-sister -- that spent weekends with us.   With me.   And his -- Tracy's mother's name was Linda.   I met her several times.   She knew I was living with Jim.   She knew I had his ring on.   She never told me she was still married to him.

Q.   They had not ever gotten a divorce?

A.   No.   I didn't know that I wasn't legally married until I was back in Oklahoma and filing for a divorce.   And they said, "You don't need a divorce."

Q.   You said that Mr. Lee was 22 years older than you.   How old were you when you married him?

A.   Eighteen.

Q.   So he was 28, 38 -- he was 40 at the time, but you didn't have any idea?

A.   I thought he was more like 29 and 30.   I knew he was older than me; I just didn't expect that much.

Q.   Then what happened?   How long did you and Mr. Lee remain married and what happened to the marriage?

A.   We were together almost three years and --

Carolyn S. Fant
United States Court Reporter

Graham - Direct

Q.    What happened?

A.    He used a lot of drugs, he drank a lot.  Toward the end he just thought it was okay to bring other women home to the house that Danny and I were living in.

Q.    Whether you were there or not?

A.    Yeah.

Q.    Did Mr. Lee ever hurt you?

A.    When he drank and took drugs, yeah.

Q.    All right.  And, once again, you remember I have talked to you as much as I can about this.  I don't want to embarrass you in any way, but now is the time to talk about some of these things.  Did you use or abuse any substances during the time you were married to Mr. Lee or afterwards?

A.    I smoked marijuana with him, and this was before I was pregnant with Danny.  And I was around it, but I didn't smoke after that.  When Danny was first born, or, I guess, six, seven weeks later -- when he was seven weeks old, I hadn't lost the baby fat, and he suggested I take these little white pills, which I did.

Q.    Mr. Lee made that suggestion?

A.    Yeah, and I did take those for a short time.

Q.    And I guess it was amphetamines that you were taking.

After you separated from Mr. Lee -- and you said you were together about three years -- when would you have separated from him if you can put a year on it? If you can't, you can't.

Carolyn S. Fant
United States Court Reporter

A.    In the summer of '75.

Q.    Okay.

A.    I got an apartment in California away -- on my on with just Danny and I.  And then October of '75 I moved back to Oklahoma.

Q.    With Danny?

A.    With Danny finally.

Q.    I'm sorry?

A.    Finally.

Q.    What do you mean finally with him?

A.    When I left Jim and got my own apartment, I was working and had taken Danny to a babysitter, and Jim picked him up at the babysitter's house and kept him for two weeks and I didn't know where he was.  I couldn't get any help.  My mother flew out from Oklahoma out there to help me try to find Danny.

Q.    I guess you did find him.

A.    They finally -- Detective Fox, I believe was his name, finally brought Danny back to the police station where I was waiting, and we left from the police station to the airport to Oklahoma.

Q.    Straight to Oklahoma.  How old was Danny roughly about this time?

A.    Eighteen months.

Q.    I neglected to ask you something.  Back up with me.  We talked about childhood illnesses of yours, but I forgot to ask

7501

Graham - Direct

you about a time.  Was there a time when Danny was an infant, like under a year old -- six or eight months old -- when both you and he were hospitalized?

A.    Danny dehydrated.  We both had the flu and Danny dehydrated and was hospitalized.

Q.    This was while you were in California?

A.    Right.  This was in Garden Grove, California.  The small community hospital was diagonally across the street from the corner of the apartment where we lived in.

Q.    Were you and Danny both hospitalized?

A.    No, they sent me home.

Q.    And what about Danny?

A.    And kept Danny.  And I checked on him at least twice, three times a day.  And they told me it was upsetting him more than -- because he would see me and start crying.  He wasn't well enough to go home, and I wasn't well enough to take care of him.

Q.    How long did he stay in the hospital?

A.    He was in the hospital -- I think it was five days.

        THE COURT:  I can't hear you.

        THE WITNESS:  Five days.

BY MS. COMPTON:

Q.    Try to remember to speak up into the microphone, okay?

        Now, let's talk about Danny as a little bit older, as a toddler, Ms. Graham.  Did he ever have any problem with

Carolyn S. Fant
United States Court Reporter

7502

Graham - Direct

seizures?  Did he ever have a seizure?

A.   Yeah.  The first time he had one, I was getting ready to go out and he was fussing, and I picked him up and I said, "Danny, you're going to be okay, Aunt Marty is going to come over and babysit," because we were sharing a duplex with Marty at the time.

Q.   Who is Marty?

A.   My oldest sister.  And when I picked him up, he was so hot, and all of a sudden his body started shaking, his eyes rolled back and his body quit shaking, and all the time I was trying to get hold of the doctor.  I couldn't dial the number. I was shaking too badly. I called the operator and she said she couldn't connect me, and I said, "You'll have to because I can't dial the number." I kept -- anyway, when Danny went limp, I ran out the front door.

Q.   Where were you living?

A.   It was in Oklahoma City on 20 --

Q.   I don't need the street name, I was trying to find out which state you were in at this time.

A.   And it was snowing outside and really cold.  I ran out to a neighbor next door and she wasn't home.  I banged on her -- so I went around the house to the other neighbor trying to get some -- and I was taking this phone number with me trying to -- so someone could dial the number for me, and when I was doing that Danny started whimpering and crying.

Carolyn S. Fant
United States Court Reporter

7503

Graham - Direct

Q. How old was he?

A. He was 18 months. Just after I came back from California. And little did I know at the time, but because I had already stripped all of his clothes off him, thinking is he pinched or did something bite him? I didn't know what I was looking for, but I had stripped everything off him. And by running outside with it snowing and being so windy and cold, I lowered his temperature fast enough that he came out of the seizure that he had had.

Q. Was he then treated for this seizure --

A. Yes.

Q. -- or any kind of seizure disorder?

A. Yes. He was put on phenobarbital to control the seizures. At first he was put on it as a maintenance thing, and he was on that for a long time, and then I was to use it only when temperatures rose, which I did.

Q. Okay. What did his temperature have to get to before you were supposed to administer this?

A. Ninety-eight, 99. I could see it. His eyes would glaze, and the first thing I would do, because with Dr. Biehler's suggestion, our pediatrician, is that if I can cool him down with tepid water in the sink or bathtub, that's the thing to do first. And if it doesn't come down immediately, then to use the phenobarbital.

Q. How long, give or take a month or two, how long did this

7504

Graham - Direct

go on before he quit doing it or did he ever quit doing it?

A.    He quit doing it at four.

Q.    Four years of age?

A.    Four and a half he quit having seizures.  Temperature still affected him badly.

Q.    And you mentioned a Dr. Biehler.  Could you spell that?

A.    Larry B-I-E-H-L-E-R.

Q.    Is he in Yukon or Oklahoma City?

A.    In Oklahoma City on Comanche Avenue, but I'm sure he's retired now.

Q.    But he's the pediatrician who diagnosed the seizure problem and gave you the phenobarbital and told you what to do with it?

A.    Yes.

Q.    Did you ever deviate at all from what Dr. Biehler told you to do with the phenobarbital?

A.    The maintenance, I didn't deviate.  I disagreed with him and he didn't tell me I was doing the wrong thing, but I did tell him that I could tell that he was drugged.  I didn't like the look of his eyes when he was taking it. I couldn't see how this could possibly be good for him.  Dr. Biehler didn't say, "You have to leave him on there," but he wanted to make sure I would use it -- used it when the seizures were coming and the fever was going up.

Q.    But if I am understanding your testimony correctly, Ms.

Carolyn S. Fant
United States Court Reporter

7505

Graham - Direct

Graham, there would be times when you, as the child's mother, would kind of override what the doctor had told you to do and use your on judgment; is that correct?

A.    As far as the drugging him, yes.

Q.    With the phenobarbital.  After four years old, did you stop phenobarbital altogether?

A.    Yes, and that was at the doctor's recommendation.

Q.    When did you meet Dennis Graham?

A.    Late '75 or early '76.

Q.    How did you meet him?

A.    I met him through a friend.  Sam and I were really good friends and he said, "You ought to meet my roommate." He's apologized for that.

Q.    Did you and Mr. Graham date for awhile?

A.    Yes.

Q.    How long roughly was your all's courtship?

A.    Seven months.

Q.    And then you married him?

A.    Yeah.

Q.    When was your daughter with Mr. Graham born?

A.    November 7th of '78.

Q.    When you -- or right before you married Mr. Graham, did you get cold feet?

A.    Oh, I canceled everything.  I canceled the church, the flowers, the band.

7506

Graham - Direct

Q.    Why did you do it?

A.    Because I saw some signs in Dennis that scared me.

Q.    What did you know about him after seven months of courtship before you married him?

A.    Not enough.

Q.    What signs did you see right before the wedding that scared you into almost backing out?

A.    His greed.  He was -- money greed.  He wasn't fair in his dealings with his own family as far as money.  And he had been physically abusive.

Q.    To you?

A.    Yeah.  He had slapped me.

Q.    Before you married him?

A.    Yeah.

Q.    And you married him anyway? You need to answer verbally.

A.    Yes.  Yes.

Q.    So you canceled the wedding, but you reinstated the plans and you did get married, and Carrie was born.  Did Mr. Graham have other children?

A.    Yes, he has two other children.  Lynn is 30 now, Edwina Lynn Graham, and Dennis Ray Graham, Jr. is six -- no, three weeks, two weeks younger than Danny.

Q.    Did those two children live in the house with you and Mr. Graham?

A.    Eventually.

Carolyn S. Fant
United States Court Reporter

7507

Graham - Direct

Q.    What did he do for a living, Dennis Graham?

A.    Well, when I met him and married him, he was working for the post office.  He -- and then he didn't do anything.

Q.    Quit working?

A.    Yeah, hurt his back about three and a half years into the marriage and played golf after that.

Q.    Did you and he -- what kind of lifestyle did you have? Did he have some money?

A.    He had -- at the time I married him, he had the home that he lived in, which was a standard tract house: three bedrooms, a bath and three-quarters and two-car garage.  He also had another house that would have the same qualifications on a much smaller scale and much more worn condition.  That's all he had.

Q.    Okay. Where did you and he end up living?

A.    We ended up at Golden Oak, 8201 Golden Oak Road.

Q.    In?

A.    Oklahoma city.

Q.    What kind of neighborhood is that?

A.    Very up-scale.  We were the first and second generation to move into that neighborhood.  Most of the other parents were looking at college in the next year or two, and we were looking at grade school.

Q.    Let me show you another series of photographs that have been marked for identification purposes and see if I can get

7508

Graham - Direct

you to go ahead and identify these for me, Ms. Graham, at this time.

MS. COMPTON:  Your Honor, these are DL-23 through 30, and I'm going to ask her just to identify each of them.

THE WITNESS:  Twenty-three is Danny.  Oh, how old are you here? Less than three.  Less than three.  If you notice, he has his cowlick.  And he was always cutting his bangs.

MS. COMPTON:  We'll talk about him some more.

THE COURT:  Speak up a little, please.

THE WITNESS:  Twenty-four is a picture of my four children: Danny, Carrie, Denny and Lynn.

BY MS. COMPTON:

Q.    You're saying your four children; your two children and Mr. Graham's children?

A.    Yes.

Number 25 is a picture of Dennis Graham, myself, Danny and Carrie.  Number 26 is a picture of Danny, five or six years old.  I'm not sure that's right.

Twenty-seven is a picture of Danny.  I believe he was 11 or 12.

Twenty-eight is a picture of Dennis Graham, myself, Danny and Carrie.

Twenty-nine is a picture of Danny standing in front of our house.  This was would have been 11 years old.

Number 30 a picture of myself, Danny, and Carrie after the

Carolyn S. Fant
United States Court Reporter

Graham - Direct

divorce.

MS. COMPTON:  Your Honor, I move for introduction of DL-23 through 30.

THE COURT:  Received.

(Defendant Lee's Exhibit Nos. DL-23 through DL-30 were received.)

THE WITNESS:  See his eyes there?  He was on phenobarbital at the time.

BY MS. COMPTON:

Q.    How old do you think he is in this picture?

A.    Three.

Q.    Let's look at No. 7.

THE COURT:  Number what?

MS. COMPTON:  I'm sorry, this is DL-24.

THE WITNESS: Danny is in the center in the back.  And then clockwise that's Denny, Jr. And the bottom is Carrie and Lynn.

BY MS. COMPTON:

Q.    All right.  Let me ask you something about Lynn, Ms. Graham.  Did she come to live with you all eventually?

A.    Yes, she did.  I think just after this picture was taken. Or just before, I mean.

Q.    She appears in the picture to have some form of disability.  Is she disabled?

A.    She has severe cerebral palsy.

Carolyn S. Fant
United States Court Reporter

7510

Graham - Direct

Q.   Does it have any effects on her mental capacity, or is it just physical?

A.   Oh, no.  No. Lynn is just brilliant.  You know, I put her in school.  She had been in an institution until she came to live with us.  I put her in school for hopefully mainstreaming eventually, and I kept telling them, "There's a brain in this child that's working. She's alert and she's attentive." And they would say, "Oh, yeah, sure, Ms. Graham, right." Finally, I said, "I want a workbook for her." And I took the workbook apart staple by staple, enlarged it on legal size paper or copied it onto legal size paper, and I made her a multiple choice answer group on each page and gave her a yellow magic marker because at the time yellow was all we had available.  And all she had to do was get in the general area, and do you know within six months she was doing long multiplication and division in her head and getting it right?  But because she couldn't speak plainly and because she didn't have hands to hold a pencil properly, they assumed she was ignorant and retarded.  Lynn is living on her own now, paying her own bills.  Very happy young lady.

Q.   You said she's 30.  We know that Danny is 26, so it looks like in that picture Danny is five or six and she's going to be maybe nine or 10?

A.   Yeah.

Q.   What happened?  You and Mr. Graham married and did not

Carolyn S. Fant
United States Court Reporter

Graham - Direct

have his children living you, and then they both came or did just Lynn come?

A.   At first it was just Lynn.   And they were always over on weekends and a big part of our lives.

Q.   When Lynn came to live with you all, did it cause any disruption in the marriage or home life?

A.   Oh, yeah.   For one thing, it wasn't planned.   Lynn came for her what looked like a usual weekend visit, and Lynn liked to pack everything she had in this really big suitcase. She couldn't carry it anyway, so she didn't care how heavy it was. But she had everything she owned in that suitcase, and her mother was nowhere to be found.   And that's how she ended up staying with us.

Q.   What's her mother's name?

A.   Deborah Sue.

Q.   She is the one that had been called Deborah so you decide you would be Lea?

A.   Right.

Q.   Mr. Graham didn't have any other wives, did he?

A.   No, not at the time.

Q.   So then Lynn comes to live with you and causes this disruption. Was she any kind of behavior problem?

A.   Yeah. Lynn had never lived at home.

Q.   She had been institutionalized?

A.   Since she was four, and the reason she stayed at home

Carolyn S. Fant
United States Court Reporter

Graham - Direct

until she was four was because she was pretty much as an infant when until she was four. When she came to live with us, she was still in diapers. She had never had a bath with a fluffy washcloth and soap and bubbles. She had always been hosed down in the institution. So there was a lot of -- she needed a lot of tender loving care. She was frightened of a bath.

If she didn't get her own way, if I didn't have -- immediately sit down and try to read her lips and understand her conversation, she threw temper tantrums. She was always, always wiping feces on the walls. Fortunately, she kept most of it in the bathroom, which was easy enough to scrub down. Depressing.

Q. Along this same time frame that Lynn comes to live with you, what's going on in Danny's life? How is he doing in preschool and school?

A. He's not doing well at all.

Q. What's happening?

A. He's losing -- he has lack of concentration. He gets lost in the shuffle. I have an infant.

Q. Carrie?

A. Carrie. And Lynn is a ten-year-old infant.

Q. And Danny got lost in the shuffle. What specific problems was he having in school? Was he in school -- he started school by this time?

A. Yeah. Yeah. Behavioral problems as far as the

Graham - Direct

hyperactivity.  Not sitting in his seat as quick as he should, not staying in his seat as long as he should.  Speaking out of turn.  That's pretty much it.

Q.   Was he given any more medication?  I know we have left the phenobarbital.  Was he prescribed something else?

A.   Yes, I agreed to put him on Ritalin, and it was -- the school was not going to let him be in regular classrooms if he wasn't on Ritalin, so I agreed to do that.

Q.   Did you once again let the mom override the doctor or the school?

A.   During the summer, because I had learned a lot about nutrition with Danny -- for these children.  And during the summer -- it wasn't the first few summers -- I weaned him off with Dr. Biehler's knowledge that this was my plan to do, and I weaned him off because Ritalin you can't just stop it all at once.  You have to break it in half and downsize it and change the dosage.  But I could control Danny's -- that's not fair to say.  I could get the same effect as with Ritalin by controlling Danny's diet.  Keeping out all white starches, no sugars, no processed food.  Everything had to be made from scratch, but I could do it.  And Danny didn't have to be drugged.

Q.   Did you have the same opposition to Ritalin that you had had to the phenobarbital?

A.   It was obvious to see he was drugged.

7514

Graham - Direct

Q.    And you didn't like that?

A.    No, you don't drug your child if there is a way around it. We tried to go back to the school with the diet, but Lake Park Elementary wouldn't abide by not letting Danny have the snacks except the ones that I sent for him. They wouldn't let him take his own lunch. That was disruptive. It was the chemicals in the food, because I did add in the starches and other things and the sugars. A small amount of sugar he could handle, but the chemicals in all the food, it just drove Danny up a wall where had no focus. It's not his fault that he couldn't tolerate the chemicals of this world.

Q.    Did Dr. Biehler or some other doctor diagnosis Danny along this time with a attention deficit disorder?

A.    Yes.

Q.    And that's why they wanted him on the Ritalin?

A.    Yes.

Q.    Can you tell the jury how long he was regularly taking the Ritalin before you moved him to the chemical free diet?

A.    Nine months to a year.

Q.    That he took it regularly?

A.    Yes, and then even after I tried the summer and had gotten back into school he took it regularly again for another two years.

Q.    And did it do any good as far as his behavior problems in the school?

Carolyn S. Fant
United States Court Reporter

Graham - Direct

A.    It sat him down and he was able to be still.

Q.    Did Danny have any resistance to being in any kind of special classes for children with attention deficit disorder?

A.    Not until they Dennis started calling him stupid and retarded.

Q.    Dennis did what?

A.    Telling Danny that he was stupid and retarded because he needed these additional classes.

Q.    Let's take a look at DL-25.  Now, is that Mr. Graham in the picture with you all?

A.    Yes.

Q.    And Danny and Carrie are the children?

A.    Yes.

Q.    It looks for all the world, Ms. Graham, like the perfect happy family.  Were you all a perfect happy family of four?

A.    We tried -- I tried to make the appearance of it.

Q.    Was there ever a time when you were doing a family photo when Mr. Graham said something peculiarly ugly to Danny?

A.    Always.

Q.    Did he invite him to step out of the picture one time?

A.    Yes.

Q.    Now, along about the time that this photograph is taken, is this before -- it looks like from the last one this would be before Lynn came to your house; is that right?

A.    No, I think this was one when -- this is -- I think this

7516

Graham - Direct

was the portrait studio that the appointment was made and Lynn and Denny were at their mother's house, and we went without them. Olan Mills.

Q. You said that you tried to make it be a happy normal family. What happened? We already know that Lynn had her problems and we know what kind of problems Danny was having. Were you and Mr. Graham exhibiting problems by this time?

A. Oh, yes.

Q. What kind of problems?

A. Dennis was drinking on a regular basis. Dennis is a very violent man.

Q. Was he abusing you regularly by this time?

A. Oh, yes.

Q. And what kind of abuse was Mr. Graham visiting on you?

A. Physical abuse, beatings. We had stone floors in the entryway. And I honestly thought I would be bald headed because he loved to -- he would get hold of my hair and slam my head into the stone floor.

Q. Did Danny and Carrie ever witness any of this abuse?

A. All of the children did.

Q. All of the children did regularly?

A. Yeah. Danny and Lynn didn't see it as much.

Q. I'm coming into another hard area, Ms. Graham. Was there sexual abuse in this marriage?

A. Yes.

Carolyn S. Fant
United States Court Reporter

7517

Graham - Direct

Q.   And did your children ever witness any of the sexual abuse?

A.   I'm sure they did.

Q.   Did you later learn that Mr. Graham had sexually abused Danny?

A.   Yes.

Q.   Did you ever know that that was going on at the time?

A.   No.

Q.   I'm talking strictly about sexual abuse now.

A.   No.

Q.   Let's talk then for just a moment about Danny and Dennis. You said something earlier about when Dennis began telling him he was stupid.  Did Dennis discipline Danny differently from the other children?

A.   Yes.

Q.   How so?

A.   He whipped Danny.

Q.   Everybody gets whippings as a kid.

A.   No, no, it wasn't just a whipping.  They were beatings.

Q.   And what would Danny do to merit a beating from Dennis Graham?

A.   Nothing.  Nothing.  They wouldn't deserve a beating.  A note coming home from school saying he didn't finish his work, or saying that Danny was -- spoke out of turn in class and he will miss tomorrow's recess, putting the bicycle pump back up

7518

Graham - Direct

crooked in the garage, which is a pit-- junk pit anyway.  Danny always took the blame for Lynn.  It started with Lynn, I think, was when he started taking the blame so Lynn wouldn't get in trouble.

Q.    When Lynn came to live with you all?

A.    He would take the blame for Lynn for things that Lynn had done.  And it just kept on going.  He was taking the blame for Denny and taking the blame for Carrie.

Q.    Was there an occasion when you knew that Danny was taking the blame for Carrie, and Carrie was letting him do it?

A.    The first time I absolutely knew that Danny could not possibly have had anything to do with this and Carrie was the only one in the general area of whatever the problem was.

Q.    Do you remember what the problem was?

A.    No, I don't.  They are never important.  Never.  It was just life.  You know.  So he left his shoes on the stairway instead of carrying them up.  You don't beat a child for that.

Q.    What happened this particular time that you knew Carrie was the culprit?

A.    Danny was getting his beating downstairs, and I went upstairs to Carrie and I said, "Look at this.  I know that you did this, Carrie, and it's shameful." And I told her she couldn't let her brother take responsibility, take a spanking -- I called them at the time -- for something she had done; that this is unfair and she should tell her daddy.

7519

Graham - Direct

And she went over to the balcony, and she hollered, "Daddy, I did it. Don't spank Danny." And Dennis wouldn't listen to her, and I spanked Carrie.  And when Dennis was through beating Danny, he threw him down and came upstairs and beat the shit out of me because I had spanked Carrie. That was a nightmare that would not end.

Q.    Did Dennis ever discipline Carrie?

A.    Never.

Q.    Ever whip her at all?

A.    Never.

Q.    All this was reserved for Danny?

A.    Yeah.

Q.    Okay.  Take a breath.

A.    I didn't know how to get out.  I didn't know how to get out.

Q.    Let's look at DL-26 and 27 and just get you to tell the jury while they are looking at them who's in these pictures and approximately when it would have been.

A.    That's Danny, and I think he was five or six.

Q.    Now, while ago you were looking at a picture and you said you could tell by Danny's eyes that he was drugged.  Can you tell anything in this picture?

A.    No, his eyes are sparkling in this picture.

Q.    Now, what about DL-27?  About how old is Danny in that picture?

Carolyn S. Fant
United States Court Reporter

7520

Graham - Direct

A.    I think he's 11 or 12.

Q.    So you would have been back in Oklahoma at that time?

A.    Still in Golden Oak.

Q.    You're talking about a particular address?

A.    Before I left.

Q.    Tell the jury what is depicted -- well, first is that Danny?

A.    Yes.

Q.    In DL-30?

A.    Yes.

Q.    What house is that that he's standing in front of?

A.    That's the house that my children started growing up in. 8201 Golden Oak Road.  You can see just over Danny's head there were two matching wings on each end of the entryway.  Where the arched windows are is a curved entryway.  It's a 24 foot ceiling.  The house had 10 foot ceilings.  It had the archways into the entryway.  The front door was an arched door.

Q.    I want to come back to this after while, Ms. Graham, but right now what I want to know about this house that you and Mr. Graham lived in and Danny lived in, is this the time type of place you lived in after you divorced Mr. Graham and moved?

A.    Oh, no.  No.

Q.    What did you live in after you left this house?

A.    The barn I'm living in now.  And it's not fair.  Dennis didn't put one dime into that house.  I sold real estate.  I

7521

Graham - Direct

bought that house.  The rental property that I had bought before I bought that house made the payment on that house.

Q.    Now, Mr. Graham is not in this picture?

THE COURT:  What number is it?

MS. COMPTON:  I'm sorry.  Thirty.

THE COURT:  I thought you said DL-30 was the last one.

MS. COMPTON:  It was 29.

THE COURT:  Thank you.

BY MS. COMPTON:

Q.    Where is Mr. Graham in this picture?

A.    I had divorced him by the time this was taken.

Q.    About when did that happen?

A.    That I divorced Mr. Graham?

Q.    Yes.

A.    I left him in '74.

Q.    We just talked about the house that ya'll lived in and the house that you and your children moved in.  But you didn't move directly to the barn you're living in now, did you?

A.    No, it wasn't a barn.  It was little bitty, about 800 square feet in Tennessee.  A couple of miles from my brother and his wife.

Q.    So when you left Mr. Graham, you went to Tennessee?

A.    Yeah.  Yes.

Q.    Did you sneak off from Mr. Graham?

Carolyn S. Fant
United States Court Reporter

7522

Graham - Direct

A.   The children and I, Danny and Carrie and myself, had gone to my brother's house in Tennessee for a week to ten-day visit.  We stayed three weeks, and I couldn't go back.  And when I finally came back to Oklahoma, I just drove -- stopped on the exits and drove on down to my parents' house, and at that time Dennis had closed the bank accounts, and he closed even my personal bank account.  How did he do that? He put property in his family's names, so I ended up borrowing money from my dad, and we -- I got a court order to keep him away from the house.  And my brother-in-law and sister went to the house with the U-Haul trailer, and what I took in that trailer is all I have now, you know.

Q.   So you left that marriage basically penniless; is that right?

A.   Penniless.

Q.   And moved to Tennessee, and from Tennessee back to Oklahoma?

A.   To Mountain View, Oklahoma, because in Tennessee -- to live in Tennessee and get a divorce in Oklahoma, I needed two attorneys, and I couldn't do that.  We moved to Mountain View, Tennessee (sic.) because it was far enough away from Dennis, I thought.  Close enough to my parents.  And my little sister and her husband had lived in that house when they were first married and it was available to me.

Q.   I'm going to back up with you just a second, Ms. Graham.

Carolyn S. Fant
United States Court Reporter

7523

Graham - Direct

I missed something in my notes.  When, after Carrie was born -- you talked earlier about after Danny was born you took some amphetamines to try to help you get the weight off.  After Carrie was born, did you become involved in any substance abuse, alcohol, drugs or otherwise?

A.    No.

Q.    Did you drink alcohol after Carrie was born?

A.    Yes, when I was married to Dennis, I did.

Q.    Did you begin drinking heavily at some point during the worst years with Dennis?

A.    Yes, I did.

Q.    What do you mean when you say "drinking heavily"?

A.    Dennis usually got home around 4:00 to 4:30.  Never later than 4:30, and I made a point to be drunk before he got home. Slaps didn't hurt as bad.

Q.    So, on a regular basis you were being drunk every afternoon when he came in.  How long did that go on?

A.    About a year.  I don't know.  It's just --

Q.    After you left Mr. Graham -- what was going on with Danny when you left Oklahoma and went to Tennessee?

A.    Tennessee? Dennis came to Tennessee immediately.  My brother was there, so Dennis didn't get as physical with the rest of us as he wanted to, with me and Danny.  He was telling Danny that this was all his fault.

Q.    That what was all his fault?

Carolyn S. Fant
United States Court Reporter

7524

Graham - Direct

A.    The divorce, the separation, the state of poverty that we were learning to live in. It was literally culture shock.  We went from country club to wishing we could qualify for food stamps.  And telling Danny that it was all his fault.  If Danny would just go away, then Carrie and I would be happy with Dennis again.  Just telling Danny he's the man of the house now.  He's got to take care of everything now because he screwed it up for me and Carrie.

Q.    How long did that visit last?

A.    He hung around for about three days.

Q.    Did Danny receive any "spankings" during that time?

A.    No, my brother stood guard and also a friend that I had known from high school.

Q.    Where was it -- which state was it that Danny entered some kind of a home bound program for schooling?

A.    That was in Oklahoma before we -- before I left Dennis.

Q.    Well, I'm confused on my dates.  While you're still married to Dennis Graham and still living in the Oklahoma City area, Danny was put into something called a home bound program?

A.    Yep.

Q.    What was that?

A.    Basically home schooling through the school itself.  The curriculum for the school.

Q.    Would you be the home-school teacher?

A.    Yes, and there would be a teacher come in once a week at

7525

Graham - Direct

designated hours to do the testing and, you know.

Q.   During the time that he was in the home school, give me an age frame.  Ten?

A.   No.  Twelve.  Twelve, I think.

Q.   Okay.  During that time was there ever an occasion when you taped Danny into his chair or roped him into his chair?

A.   I used a large belt and buckled it behind the chair.  This was suggested to me to keep him -- it was not to tie him to that chair.  It was not -- that was my initial thought when I heard this, "I'm not trying my kid up."  But they explained to me this was to help with his impulse reactions.  That if he started to get up and he felt he was still in the chair, that it would make him think, "Yeah, I need to stay in this chair and finish my work." That was the purpose of it.

     And the same thing with the tape; to put a piece of tape across his mouth.  If he opened his mouth to talk, "Oh, yeah, I'm supposed to be quite." It didn't make a lot of sense, and it didn't work.

Q.   But you did it?

A.   It's a lot of psychiatrists that think they have a lot of answers, and they are pretty bizarre.

Q.   But in spite of your thoughts that they were bizarre, did you do it, Ms. Graham?

A.   I tried it.

Q.   Did you strap him to the chair and tape his mouth?

7526

Graham - Direct

A.    Yeah.

Q.    I guess when you all went to Tennessee, that would have been the end of your time and Danny's time with Lynn and with Denny; is that right?

A.    Yes.

Q.    I think I neglected to ask you this. How was Danny with Lynn?

A.    Oh, he was so good with her.  He was -- to put Lynn's big metal braces on her legs took a lot of massaging just to loosen up her leg muscles enough to get them straight enough to put them on, and Danny helped with that. Warmth was important for her muscles to relax enough, and Danny helped with the rapid rubbing of her muscles.  He always helped her with stairs.  He held ice cream cones for her because she couldn't hold her own.  And he helped her with her buttons.  He combed her hair for her.

Q.    Did he ever complain to you?

A.    No.

Q.    About, "Mom, this is some kind of disabled person and I don't want to do this."

A.    No. No.

Q.    How about Danny's relationship with Carrie?

A.    No.  Never.

Q.    Has Danny ever to your knowledge ever mistreated his little sister?

Carolyn S. Fant
United States Court Reporter

7527

Graham - Direct

A.    No, never.  I had a difficult pregnancy with Carrie, and when Carrie was born, Danny's eyes were shining.  He was so proud.  And when Carrie was born with the two holes in her heart, and we were looking at open heart surgery to put the patches -- the mesh in, hopefully to close the holes, Danny couldn't have any friends in the house because of Carrie's reduced immune system.  Danny never complained.  Never.  He would stand at the front door -- at that time we were living on Mansfield, which was in Dell City, catty-cornered across from Cheek Place, the house we lived in when I first married Dennis.  And he would stand out there on the front porch and play with his little friends and tell them, "No, you can't come in." But then he would come in and say, "Mama, can I take some cookies outside?" And he would.

Q.    In spite of his attention deficit disorder and hyperactivity and all the things you described, was Danny good?  Was he kind?

A.    He was good.  He was kind.  He's gentle.

Q.    Did he ever end up in some kind of a body cast or brace?

A.    Yeah.  We were in Mountain View at the time.  Sixteen, 17.  At 16 he tried out for the Mountain View football team, and in the physical, the coach -- no, in the medical physical that they had to have for the coach, they noticed a deformity in his back.  And so I took him to a specialist in Lawton, Dr. Jack.  And Danny -- at his shoulder blades three, and it could

Carolyn S. Fant
United States Court Reporter

7528

Graham - Direct

be six by now but at the time it was three, vertebrae had fussed forward, and I kept saying to him, "Danny, stand up straight." "Danny, don't slouch your shoulders." He can't sit up straight.  His back is fused forward, and these vertebrae -- and I understand this will greatly increase because of the lack of movement of them.  And his bottom -- at his waistline is really curved in for compensating by trying to stand up straight with his bent back.  And doctors have told me that this is from lifting weights at too young of an age, too heavy weights, and too many repetitions.

Q.   Who was encouraging the weight lifting?

A.   Dennis.

Q.   Did Danny try to get along with Dennis?

A.   Oh, yeah.  Yeah.  And Danny cried many times, "Why can't he just love me?" And that's all he wanted.

Q.   Did he ever want to find his daddy?  Did he look for Mr. Lee?

A.   Yeah, he did. And, you know, Danny was at the wedding when I married Dennis.  He's in the wedding pictures.  But he had forgotten that Dennis was his stepfather, and when Danny was -- just before -- just a day or two before we went to Tennessee Dennis was screaming and ranting and raving and swinging at Danny and me, and we were both ducking him and he ended up falling down into the living room steps, sitting himself in the recliner and swung at Danny and said, "You've never been

Carolyn S. Fant
United States Court Reporter

Graham - Direct

nothing but a stepson." I didn't stay but two more days after that. I guess only because I didn't know where to go.

Q. Who is Bobby Norton?

A. Bobby Norton, I have never met him personally. I have spoke with him on the phone. He's a friend of Danny's that Danny met, I believe, in Tennessee, Murfreesboro. He's an older man. He has, I think, children Danny's age probably. And he took Danny under his wing; didn't abuse him, didn't call him stupid.

Q. Do you know about how old Danny was when he went to live with Bobby Norton?

A. I think he was 17, 18.

Q. Had you and he had a problem that made him want to live outside the home? What happened?

A. Danny and I can irritate each other. I don't think we had a problem. No, he wanted to go back to Tennessee where he had met some friends when we lived there. There were a lot of factory jobs there. He just wanted to go out on his own.

Q. Did you know what Mr. Norton does for a living -- Bobby Norton?

A. No. I know he had horses and he had some land, and Danny was enjoying the horses. He was helping him clear the land.

Q. Do you know what Mr. Norton's racial beliefs are?

A. No.

Q. So you and Mr. Norton never really had anything other than

7530

Graham - Direct

a telephone conversation or two?

A.    To see how Danny is doing.

Q.    Do you know how long Danny lived with Bobby Norton give or take?

A.    Four, five, six months.  I really don't know.

Q.    By this time you were back in Oklahoma?

A.    Yes, I was living in my barn.

Q.    Now, then, you were here when Mr. Gutierrez testified, were you not?

A.    Yes, he's such a dear.

Q.    He's a nice man.  And he testified that you came to him and asked about renting the place and offered $250.00 a month and he took a hundred fifty a month for you to also keep the place up.  Is that how you remember it?

A.    Yes.

Q.    Do you work outside the home?

A.    I did at the time.  I worked for a company called Climate Master.  They made industrial size heat pumps.  And I worked in the cost accounting department.  I started out in accounts payable department, which is pretty brain dead work.  But cost accounting was pretty fun.  It was interesting.  It was constant thinking.

Q.    Are you currently employed outside the home?

A.    No.

Q.    Why not?

Carolyn S. Fant
United States Court Reporter

7531

Graham - Direct

A.    I first went to work for the Census, and I'm in between jobs.  I have tested and taken the test and waiting, hoping to be hired back.

Q.    What do you live on?

A.    What do I live on?  Nothing.  When I went to work for the Census, I was on SSI.  Well, '92 -- I worked all the way through until July of '92 when I hurt my back, and I went through the workers' comp. court, and that was just an existence.  And then I went to work for the Census, and because I reported my income, you know, even though it was a temporary job, my SSI -- I think it was $42.50 this month because of my previous earnings.

Q.    Forty-two dollars and fifty cents?

A.    Yeah.  So I'm looking for a job.  And I will find one.

Q.    Who is Jennifer Givens?

A.    Jennifer Givens is the love of my son's life and the mother of my granddaughter.

Q.    What's your granddaughter's name?

A.    Audrey McCall Graham Givens.

Q.    When was Audrey born?

A.    July 11th, '95.  She's named after my mother, Audrey.  And her maternal grandmother's maiden name was McCall.

Q.    Let me show you what I will mark as DL-31, DL-32, DL-33, DL-34, DL-35, and DL-36.

      I'm going to ask you if you can identify that series of

Carolyn S. Fant
United States Court Reporter

7532

Graham - Direct

photographs.

A.    Number 31 is Danny and Jennifer and a little bit of Carrie.

Thirty-two is Danny, Jennifer and Carrie.

Q.    Do you know where that was?

A.    Yes, this is a pond or lake by our house in the country. Oh, wait.  Maybe it's not.  I'm not sure now.  I originally was looking at that. I don't know.

Number 33 is Danny holding Audrey the first few days she's home from the hospital.

Number 34, Danny is holding Audrey in the hospital after her birth.

Thirty-five is Danny, Jennifer and Audrey at the park -- the duck park actually.

Thirty-six is Jennifer holding Audrey.

MS. COMPTON:  Your Honor, I move for introduction of DL-31 through 36.

THE COURT:  Received.

(Defendant Lee's Exhibit Nos. DL-31 through DL-36 was received.)

BY MS. COMPTON:

Q.    There is a tiny bit of somebody at the top of that picture.  Can you actually tell --

A.    That's Carrie.

Q.    Do you know where this was taken?

Carolyn S. Fant
United States Court Reporter

Graham - Direct

A.   In Yukon at the Braum's kids' ball thing.  I don't know what you call them.

Q.   I forgot to ask you.  You said Jennifer Givens was the love of Danny's life.  When did they get together?

A.   He met her when he was in the Murfreesboro area in that time frame.

Q.   While he was in Tennessee with Bobby Norton?

A.   In that time frame, yes.

Q.   And I think you have said you had a hard time identifying the background in DL-32.

A.   It's in Oklahoma.  This is before -- this is when they first started dating or living together, I should say.

Q.   Who's in that picture with Danny?

A.   On the left is Carrie, and Danny is in the center, and Jennifer is on the right.

That's Danny after being up all night waiting for his daughter to be born.

Q.   Where was Audrey born?

A.   Bowling Green, Kentucky.

MS. COMPTON:  I'm sorry Judge, that was DL-33.

THE COURT:  All right.

BY MS. COMPTON:

Q.   And DL-34, is that along about the same time?

A.   That's in the hospital room, just the next day.

Q.   What about DL-35?  Can you tell from looking where this

Carolyn S. Fant
United States Court Reporter

7534

Graham - Direct

picture is taken?

A.    That was at the duck pond in Bowling Green, Kentucky.

Q.    Where Audrey was born?

A.    Yes.

Q.    Is this shortly after her birth?

A.    Yes, just a couple of weeks.

Q.    And tell the jury who is depicted in DL-36.

A.    That is Jennifer holding Audrey McCall.

Q.    And that's Jennifer Givens, the love of Danny's life?

A.    Yes.  And they are in their duplex in Bowling Green.  I wish you had gotten that video of Audrey's birth and them showing me the house that they lived in.

Q.    Did Danny and Jennifer ever marry?

A.    No, she didn't want to marry.

Q.    Do you know where she is now?

A.    Yes, she is still in Bowling Green -- actually, there's a little town within the town of Bowling Green.  It's the same zip code.

Q.    But she is there with Audrey.  Have you had any contact with Audrey, your granddaughter, since this time?

A.    The last pictures I have of Audrey, Audrey was two.  She's almost five.

Q.    She is almost five now.  What happened?  How is it that you no longer have any contact with her?

A.    I didn't -- when the investigation started my house was

7535

Graham - Direct

being surveilled daily.  I told Jennifer that at all cost to keep Audrey away from all of this, to keep her away from the media, to not have the news on, to not discuss this when Audrey is in the same house.  I didn't know she would stop sending me pictures of her.

Q.    Let me show you DL-37 -- I'm sorry, and 38.  I had mismarked them.

A.    These are photocopies.  Number 37 is a photocopy of notes and letters that Jennifer used to send to us.

Q.    What is 38?

A.    Thirty-eight is the same.

MS. COMPTON:  Your Honor, I move for introduction of DL-37 and 38.

THE COURT:  Received.

(Defendant Lee's Exhibit Nos. DL-37 and DL-38) were received.)

BY MS. COMPTON:

Q.    All right, Ms. Graham.  I don't know if we are going to be able do this on here or not.

THE COURT:  That's 37?

MS. COMPTON:  Yes, sir.

BY MS. COMPTON:

Q.    Can you read that?

A.    It's blurred right now.  You had it right.  It says: "Dear" -- there you go.  Whoops.

Carolyn S. Fant
United States Court Reporter

7536

Graham - Direct

"Dear Grandma Lea and Aunt Carrie.  Thank you so much" --

THE COURT:  Speak into the microphone.

THE WITNESS:  -- "for my activity turtle.  I don't want to play -- want to play with it" --  I can't read it.

BY MS. COMPTON:

Q.    I'm going to bring it to you.

A.    Okay.

MS. COMPTON:  Your Honor, it might be easier if I bring her both exhibits.

THE COURT:  Or if you wish to read it, you may.  They are in evidence.

BY MS. COMPTON:

Q.    I don't know if I can read it.  "Thank so much" -- "Dear Grandma Lea and Aunt Carrie." Who that referring to?

A.    Myself and my daughter.

Q.    "Thank you so much for my activity table.  I can't wait to play with it when I get in my new house. I had a great two year birthday party.  Wish you could have been here.  Take care of yourself.  I love you." And there's some kind of Hallmark looking thing.  "Love, Audrey."  Does this have a date on it anywhere?

A.    Seven of '96.

Q.    So, as recently as July of 1996 you were receiving stuff from Jennifer and, of course, Audrey didn't really write that. I guess she would have been too little.

Carolyn S. Fant
United States Court Reporter

Graham - Direct

And then in DL-38 I show the date being January of '97, which means I did this backwards. No, it doesn't. '96. Is this another one --

A.   Yes.

Q.   -- that was sent to from you Jennifer Givens?

A.   Right. She made these cards on her little computer at the office.

Q.   And, again, this is addressed to you and your daughter, Carrie; is that right?

A.   Yes.

Q.   "Granny had my pictures made before Christmas, and my mommy didn't know it was a surprise. Mom says I look older in these pictures but I'm not even three yet. I held my little Cabbage Patch doll that you gave me for Christmas in my pictures. Mom sure wondered how I snuck it from the house to do that, but I'm sneaky. Shh. Don't tell her. She might catch on. Bet you're wondering how I can type on the computer so accurately. Help from mom, of course, but I am learning. I have a Winnie-the-Pooh story and game that plays on the computer that Santa brought.

"Take care and tell everyone I said hello, and we are thinking of you. Bye for now. Love Audrey." This is again obviously signed by her mother.

"P. S. I didn't get to tell you thank you for my Bible book personally, so I want to thank you now. Mom says I will

7538

Graham - Direct

really enjoy reading it when I get older.  I look at the pictures now." And then it's got our sign on it.

Q.   Did you have occasion to send gifts to Audrey?

A.   I did.

Q.   Are you doing that anymore?

A.   No.

Q.   Has Jennifer made it abundantly clear to you she no longer wants to have anything to do with you?

A.   Pretty much.

Q.   When Jennifer and Danny split up, were you around?  I don't mean obviously in the room at the time, but in Danny's life at the time?

A.   By phone.  By phone.

Q.   And what type reaction did he have to this breakup?

A.   Oh, it broke his heart.  It broke his heart.

Q.   Well, Danny had dated other girls, hadn't he?

A.   Oh, yes.

Q.   He dated Gina Young?

A.   Yeah.

Q.   And others.

A.   But -- actually, I guess you did date Gina before you met -- okay.

THE COURT:  I can't hear you.

MS. COMPTON:  She said he did date Gina before.

BY MS. COMPTON:

Carolyn S. Fant
United States Court Reporter

7539

Graham - Direct

Q.    So what was different about Jennifer?

A.    He fell head over heels for this girl.  She had come to my parents, Danny's grandparents, for -- I believe it was Christmas.  The house was full.  And they we had -- the girls -- we mothers -- the kids were outside playing and we had gone back to mom's bedroom to look at some things, and when I came out Danny was on his hands and knees proposing to Jennifer.  And I caught my breath, and I just kind of stepped back behind waiting to see, and the girl was laughing at him.  It wasn't an, "Oh, my, I'm embarrassed kind of laugh." This was a hysterical, "You crazy fool."

Q.    Switch gears with you one more time.  I'm about to quit.

You know what this jury, the same jury you're looking at right now, has convicted your son of; is that right?

A.    Yeah.

Q.    And do you understand what we are here for now?

A.    Of course.  Yes.

Q.    You understand that the only choices that this jury has is either to spare Danny or to kill him?

A.    Yes.  Yes.

Q.    You have known him all his life, Ms. Graham.  If he's left alive, even inside prison walls, do you think he can do any good for anybody?

A.    Oh, I know he will.  I know it.

MS. COMPTON:  Pass the witness.

Carolyn S. Fant
United States Court Reporter

7540

Graham - Cross

THE COURT:  Any questions?

MR. LIROFF:  Yes, Your Honor.  May I inquire of the Court.  I don't know how late you go.

THE COURT:  We are going to go to 5:00.

MR. LIROFF:  Okay.

CROSS EXAMINATION

BY MR. LIROFF:

Q.   Good afternoon, Ms. Graham.

A.   Good afternoon.

Q.   I'm sorry, but I'm going to have to ask you some questions.

A.   Certainly.

Q.   I'm sorry also for the pain that your family has suffered for the last several years.

A.   Thank you.

Q.   Ms. Graham --

MR. LIROFF:  Counsel, where are the photographs you just identified?

MS. COMPTON:  Do you want all of them?

MR. LIROFF:  Yes.

THE COURT:  The number, please?

MR. LIROFF:  DL-36.

BY MR. LIROFF:

Q.   This is a photograph of your grandchild?

A.   Yes.

Carolyn S. Fant
United States Court Reporter

7541

Graham - Cross

Q.    And it's a photograph of Jennifer Givens, is it?

A.    Yes.

Q.    And this is the woman that you described as the love of your son's life?

A.    Yes.

Q.    To make the point -- that suggests to make the point that this is a person that he loved, cherished?

A.    Yes.

Q.    And wanted to hold dear?

A.    I'm sorry.  I couldn't hear you.

Q.    And wanted to hold dear?

A.    Yes.

Q.    And this is the person that you said that your son proposed to?

A.    Yes.

Q.    And you told us about Jennifer's response?

A.    Yes.

Q.    Did you know that there were substantial incidents of domestic violence in their relationship?

A.    Jennifer told me that there was some from her part to Danny.  She threw knives at him.

Q.    I'm sorry?

A.    She threw knives at him.

Q.    Did you know during their relationship that he substantially abused alcohol?

Carolyn S. Fant
United States Court Reporter

7542

Graham - Cross

A.    No.   They both drank at appropriate times.   Not to say alcohol is ever appropriate, but at parties with a group of friend gatherings.

Q.    Did you know that he substantially abused her physically?

A.    I will never believe that. She's told me differently.

Q.    Did you know that before the grand jury that heard this case she said that there was a time -- no, that there were times that -- when she was pregnant with your grandchild that your son, Danny Lee, abused her.   Did you know that?

        MS. COMPTON:   Your Honor, at this point I'm going to object to anything that Ms. Givens testified somewhere else. If Ms. Givens is going to come, the government could have called her.

        THE COURT:   Excuse me, say it again.

        MS. COMPTON:   I don't want the government to tell this witness what somebody else said.   They could have brought Ms. Givens if they chose to, and they did not.

        MR. LIROFF:   This is a character witness.   I'm asking the witness if she knew.

        THE COURT:   Let me have counsel up at side bar, please.

        (Bench conference between the Court and counsel, as follows:)

        MR. LASSITER:   Your Honor, may I respond to the last comment?

Carolyn S. Fant
United States Court Reporter

7543

Graham - Cross

THE COURT:  Certainly.

MR. LASSITER: As I understand the law in the Eighth Circuit, if he's basing their own questions on a character witness, he has to pose a question that is likely within the realm of knowledge -- possible realm of knowledge of this witness.  Clearly this person's grand jury testimony would not be.

THE COURT:  I think that's right.  Furthermore, I'm gathering that you don't intend to make independent proof of this.  You're going to ask her if she knew what this lady said.

MR. LIROFF:  Whether we'll call this witness is something we are yet undecided on.  I'm sorry, Your Honor. Whether we are call her is undecided.  I intend to change the form of the question and ask whether she was aware personally of this.  And in the format requested by Mr. Lassiter.  I can change the format.  I don't object to the objection as to form, but that only seems to go as to form.

THE COURT:  I'm having trouble seeing what the government is planning to do. Are you going to bring Jennifer on to testify that she was abused?

MR. LIROFF:  Your Honor, I don't know, but I know they are going to call a psychologist who's going to talk a lot about things that he does know a lot about; things that are hearsay based, and I intend to question him also about that.

MS. COMPTON:  That's fine.  He's an expert.

Carolyn S. Fant
United States Court Reporter

7544

Graham - Cross

THE COURT:  The expert can rely upon the hearsay statements, but this is a more direct problem.  In other words, I think I have -- do you know whether you're intending to call her and that you expect her to testify that she was abused?  Now, you say you have a reason to ask because you have grand jury testimony.

MR. LIROFF:  I have a good faith basis.  I have an affidavit that I read from her and also when she testified before the grand jury she adopted that affidavit and swore that that's true.  So I have a good faith belief for that.

THE COURT:  I'm not challenging the good faith of asking the question. The question is: Are you going to independently prove it to this jury?

MR. LIROFF:  Your Honor, I was notified that they intended to call Jennifer Givens.  They told me they were going to call her.  They notified me two days ago.

MS. COMPTON:  She is on the witness list as a potential witness.  She is on the list as a potential witness who may not be called.

Judge, my main problem so the record will be clear here is if Ms. Graham doesn't know, she doesn't know.  That's fine.  But my main problem is counsel telling her what somebody else said to the grand jury and then to examine her knowledge with that is inappropriate.

MR. LIROFF:  Your Honor, I'm listening to counsel's

Carolyn S. Fant
United States Court Reporter

7545

Graham - Cross

objection. I will withdraw the question and change the form in which I ask the question.  And I will ask it traditionally as Mr. Lassiter suggested.  I will ask it in the traditional do you know format, which I think I'm permitted to do as to a character witness.  But, again, as to this witness, I was notified two days ago by defense counsel they considered calling her. And I haven't been notified that they are not going to call her.

THE COURT:  Well, they are not committed.  I guess they can not call a witness they put on the list.  That gives you the option of calling her, I suppose.

MR. LIROFF:  Yes, that does.

THE COURT:  So I think if you change the format with the representations made, that will be satisfactory.  That will be adequate.

(End of bench conference.)

MR. LIROFF:  Your Honor, I'm withdrawing the question and will rephrase.

BY MR. LIROFF:

Q.    Ms. Graham, did you know that when Ms. Givens was pregnant with your grandchild that your son abused her physically?

A.    No, and I don't believe that.

Q.    Ms. Graham, do you know the circumstances under which your son and Ms. Givens broke up?

A.    It had a lot to do with money.  Danny wasn't earning

Carolyn S. Fant
United States Court Reporter

7546

Graham - Cross

enough money and, honestly, Danny couldn't take any more of her.

Q.    Did you know that they broke up over an argument?

A.    Most breakups are over an argument.

Q.    Fair enough.

Let me ask you if you know about the argument.  Did you know that Ms. Givens tore up your son's photograph of Adolph Hitler, which enraged him, and he attacked her and the police were called?

A.    That is ridiculous.  I do know of other arguments. Would you like to hear about those?

When Danny called me long distance saying, "Mom, what do I do?  She's going crazy." And you could hear her in the background screaming and hollering and throwing things, and Danny saying, "Damn! Quit hitting me on the head.  Mom, what do I do?" My only suggestion to him was, "Danny, get your coat and go for a walk.  Let her calm down."

Q.    I am showing you what's been marked as DL-30.  That's your son?

A.    Yes.

Q.    And that's your daughter?

A.    Yes.

Q.    How old is your son in this picture?

A.    Nineteen.  Jennifer was with us at the time we had those pictures made in Oklahoma.  She just wasn't in the photo.

Carolyn S. Fant
United States Court Reporter

7547

Graham - Cross

Q.    Was there a time when your son had behavior problems?

A.    In grade school with the Ritalin is why.

Q.    You told us -- I'm looking at my notes and I see that at one time you said that he wasn't sitting in his seat as soon as he should, he wasn't sitting in his seat as long as he should, or he was speaking out of turn.  But I'm asking you: Did your son have behavior problems?

A.    As I just described, as you just read.  Those are the behavior problem that he was experiencing in school.

Q.    I am not focusing just on these issues, and this happened at a younger age.  I'm asking if your son, maybe when he was 13, maybe when he was 15, was displaying behavioral problems?

A.    No.  He was behind in his studies -- in his grades.  He had frustration with that, but it wasn't behavioral problems.  It was learning disabilities.

Q.    I'm sorry, Ms. Graham.  I just don't know how to go about this but do it directly.  Didn't your son have behavioral problems to the extent that you had to petition the juvenile court not once, more than one time, relating to his behavioral problems?

A.    I don't know where you're coming -- maybe I'm supposed to know what you're saying, but I don't.  Yes, I asked for treatment for Danny because of his suicidal tendencies.  Those problems were at home.

        MR. LIROFF:  Your Honor, I'm unfamiliar with the

Carolyn S. Fant
United States Court Reporter

7548

Graham - Cross

process that you have in this court.  This is an exhibit that I did not know that I would utilize.  I think we would be up to either 1008 to 1010, but I have a document I wish to show this witness.

THE COURT:  I gather it's a court or public record?

MR. LIROFF:  Yes.

COURTROOM DEPUTY:  1110.

THE COURT:  You asked her if she petitioned.  I don't know if she signed it or not, but anyway you can show it to her and ask if she recognizes it.

Is it marked?

COURTROOM DEPUTY:  1110.

THE WITNESS:  There is no mark on this.

THE COURT:  We'll call it 1110, Ms. Graham, and we'll take it from there.

BY MR. LIROFF:

Q.  Have you looked at that exhibit?

A.  I am right now.  This is immediately after I left Dennis.

Q.  Let me ask you a question.  Do you recognize your signature on that document?

A.  Yes, I do.

Q.  Have you read the document?

A.  Yes.  I'm reading it.

Yep.  This is to say that he's having trouble at home, isn't it?

Carolyn S. Fant
United States Court Reporter

7549

Graham - Cross

Q.    This is a document that you petitioned the court relating to your son?

A.    How can that be in Martin, Tennessee because I was in Mountain View when I petitioned the court. I had insurance when I lived in Martin, Tennessee.

Q.    I'm showing you again --

A.    Weakley County, Tennessee.

Yes, "son is having trouble adjusting at home."

Q.    May I see that?

MR. LIROFF:  Your Honor, I want to ask one more question, and then it might be a good time for the recess.

BY MR. LIROFF:

Q.    This document that you signed, does it state in the handwritten part in the center: "Said child is unruly and beyond parental control.  He continually slips off from the house in the middle of the night and will not follow rules.  He also uses vulgarity towards his family." Is that what it says?

A.    Yes.

THE COURT:  All right, are you offering the exhibit?

MR. LIROFF:  Yes, I am.

THE COURT:  It's received, and we will break now for the evening.

(Government's Exhibit No. 1110 was received.)

THE COURT:  Please be back in the morning ready to go to work at 9:30.  The jury may leave.  Everyone else remain

Carolyn S. Fant
United States Court Reporter

7550

Graham - Cross

seated.

(Jury leaves courtroom.)

THE COURT:  Court will be in recess.

(At 5:05 p.m., the above-entitled proceedings were adjourned.)

- - -

<u>C E R T I F I C A T E</u>

I, Carolyn S. Fant, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of proceedings in the above-entitled case.

_____
Carolyn S. Fant

Date: 5/12/99

Carolyn S. Fant
United States Court Reporter