7551

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

 vs.            No. LR-CR-97-243

              Wednesday, May 12, 1999
(2) DANIEL LEWIS LEE,     Little Rock, Arkansas
             9:30 a.m.
     Defendant

VOLUME 45
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE G. THOMAS EISELE,
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
On Behalf of the Plaintiff:
 MR. DAN STRIPLING, Assistant U. S. Attorney
 MR. ROBERT DE LA CRUZ, Department of Justice
 MR. LANE LIROFF, Department of Justice
  United States Attorney's Office
  TCBY Building
  425 West Capitol Avenue, Suite 500
  Post Office Box 1229
  Little Rock, Arkansas   72203-1229

On Behalf of the Defendant Lee:
 MR. JACK T. LASSITER, Attorney at Law
  Hatfield & Lassiter
  401 West Capitol Avenue, Suite 502
  Little Rock, Arkansas   72201-3437
 MS. CATHLEEN V. COMPTON, Attorney at Law
  221 West Second
  Suite 701
  Little Rock, Arkansas   72201

Defendant Lee Present

 Proceedings reported by machine stenography.  Transcript
prepared by computer-aided transcription.

Elaine Hinson, RMR, CCR
United States Court Reporter

7552

INDEX        May 12, 1999   Volume 45

| DEFENDANT'S WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DEBRA LEA GRAHAM CONT. | | 7553 | 7600 | 7604 |
| CARRIE DENISE EDWARDS | 7606 | 7621 | | |
| JOY CAMPBELL | 7625 | | | |
| DANNY BISHOP | 7643 | 7647 | | |
| MARK DOUGLAS CUNNINGHAM | 7651 | 7743 | | |

| GOVERNMENT'S EXHIBITS: | Received |
|---|---|
| 1111, 1113, 1114 | 7554 |
| 1096, 1075, 1076 | 7587 |

| DEFENDANT'S EXHIBITS: | |
|---|---|
| DL-39 | 7603 |
| DL-40 | 7603 |
| DL-41, DL-42, | |
| DL-43, DL-44 | 7617 |
| DL-45 | 7647 |

Elaine Hinson, RMR, CCR
United States Court Reporter

7553

P R O C E E D I N G S

(Jury present.)

THE COURT:  Good morning, ladies and gentlemen.  We are ready to proceed.  I think the witness is on the stand.  If you will just take the stand again for further cross-examination.  Mr. Liroff.

MR. LIROFF:  Thank you.

**DEBRA LEA GRAHAM, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

**CROSS-EXAMINATION CONTINUING**

BY MR. LIROFF:

Q.   Ms. Graham, I do know this is difficult for you.  I understand that.  But I would ask you, if you can, to make your answers as accurate and complete as possible.

A.   Yes, sir.

Q.   Thank you.

MR. LIROFF:  Your Honor, I have three photographs.  And we've numbered them 1111, 1113 and 1114.  And I would ask to approach the witness.

THE COURT:  You may.

BY MR. LIROFF:

Q.   Could you look at 1111 and tell me if you recognize what is shown in this photograph?

A.   That is my mailbox.

THE COURT:  Excuse me.

THE WITNESS:  I'm sorry.  The number?

Graham - Cross

THE COURT:  What did you say it was?

THE WITNESS:  It's my mailbox at my home.

BY MR. LIROFF:

Q.    1113, do you recognize what is shown in this photograph?

A.    Yes.  That's my home, myself and officers.  One of them I recognize, but I don't have a name for him, at the time they arrested Danny and searched my house.  That is my home.

Q.    Excuse me.  1114, that is your home?

A.    Yes, yes.

Q.    Is this the home?

A.    That I live in now and have going on 11 years now.

Q.    Is this the home owned by Mr. Gutierrez?

A.    Yes, it is.

MR. LIROFF:  Your Honor, I would offer these three photographs:  1111, 1113 and 1114, into evidence.

THE COURT:  Received.

(Government's Exhibits 1111, 1113 and 1114 received in evidence.)

MR. LIROFF:  Thank you.

BY MR. LIROFF:

Q.    Showing you now on the screen what has been marked as 1111, could you tell us what is shown in this photograph?

A.    That is a mailbox with Graham, 15200.  If the post office recognized a 15200 Southwest 59th Street address, that's what it would be.  That is a number assigned to me through the 911

Elaine Hinson, RMR, CCR
United States Court Reporter

service in Oklahoma.  My mail comes to Rural Route 3.  If you will see on the front of the box, it has 78-A.  Where it lifts down is 78-A.  And that's how my mail is delivered, Yukon, Oklahoma, 73099.

That is me being --

THE COURT:  Excuse me.  Is that 1113?

THE WITNESS:  I'm sorry.

MR. LIROFF:  I want to ask a question.

BY MR. LIROFF:

Q.   Showing you now 1113, do you recognize what is shown in this photograph?

A.   My home at the time that Danny was arrested.  I'm sorry.  This was about four and a half hours after Danny was arrested.

Q.   This person right now I'm pointing at, who is that?

A.   That's me trying to walk as straight as I could.

Q.   This person --

A.   An officer.  I don't know his name.  But he is sitting back here in the courtroom.

Q.   Please let me conclude my questioning.

A.   I'm sorry.

Q.   Now showing you 1114, what is shown in this photograph?

A.   That is the east view of my house from the street.

Q.   This is the home --

A.   The window of the center of the house is Carrie's old room, now the baby's old room.  And the little front room

Elaine Hinson, RMR, CCR
United States Court Reporter

Graham - Cross

that's -- this house had two front doors when I moved into it. And that would be just one bedroom, so I turned what used to be the -- I don't know what it was. The house was built in 1982. I'm sorry. 1882. But that's a closed-in porch that's used for storage.

Q. This is the home owned by Mr. Gutierrez?

A. Yes, it is.

Q. This is the home that you described as the barn?

A. Oh, yes, yes.

Q. When we left off yesterday, I was asking you questions about your son's -- particularly about whether he had behavioral problems or not. And at first we had discussed, you told us that he had fidgeting problems in class.

A. In grade school, yes, he did.

Q. Let me finish my question. And I asked you further whether there were any other behavioral problems. And I believe my recollection is you did not provide any other examples of behavioral problems. And what I would like to do right now is to see if we can fill out this picture to see whether there are or are not other behavioral problems that were not mentioned yesterday.

Now, to begin with, I'm looking at a document that we identified yesterday as Government Exhibit 1110. And we established yesterday that it bears your signature and that it was a petition to a court in Tennessee regarding Daniel Lewis

7557

Graham - Cross

Graham. And written in it, the document that you signed, written upon it, it says, "Said child is unruly and beyond parental control. He continually slips out from the house in the middle of the night and will not follow rules. He also uses vulgarity towards his family." And this appears to be dated December 6, 1987. What I would like to do is ask you what this document represents. What was going on with Mr. Lee in terms of his behavior at this time?

A.    Danny was really suffering from the separation. He had been repeatedly told that his mother and little sister and himself, of course, would live in poverty the rest of our lives, that Dennis would see to it if I didn't come back. Danny begged me to go back to Dennis. At one point, I said, "Danny, don't you remember the beatings?" I wasn't nearly as calm. He said, "Mom, I can take it. I can take it so you and Carrie won't do without." I told him, "I won't let you take it. And I can't take any more myself." The night that I left, the morning, the night before I left, I honestly thought Dennis was going to kill me.

Q.    Ma'am, I don't mean to interrupt. But that's not what I asked you.

A.    Yes, it is.

Q.    Please listen to my question again, if you will. What I want to know is what was your son's behavior that caused you to file a petition with the court that said that he was unruly,

Elaine Hinson, RMR, CCR
United States Court Reporter

Graham - Cross

that your son was beyond parental control?  What was his behavior?

A.    His behavior, self-destruction, begging to go back to Oklahoma, where his friends were, even if we didn't go back to Dennis, to go back to Oklahoma, where his family and friends were at.  Dennis had told him, "If you misbehave enough, she will have to come back."  And I honestly believe that's what Danny was trying to do.

Q.    What was his behavior that you described as self-destruction?

A.    I think I just described it.

Q.    Do you mean to tell this jury that you petitioned the court telling the court that your son was unruly because he wanted to go back to Oklahoma?

A.    Yes.

Q.    And that's the sole reason?

A.    Being told he was responsible for the poverty that we were in, that he had the power to fix everything if he would just get me to go back to Dennis.  In Tennessee, to have a child under the age of 21 admitted for any emotional problems, any treatment whatsoever, you must go through the courts.  You must petition the court.  I honestly thought I was providing a situation, a treatment center where Danny would learn that he has value, that he would be able to recover and that Dennis would not be able to get to him by phone, by letter, by showing

Graham - Cross

up at my door at all hours of day and nights.  That was why I petitioned the court was to help Danny to recover from the years of abuse.

Q.   It says in this document that he continually slips off in the middle of the night and will not follow rules.  What does that refer to?

A.   Danny went out at night, often just to the porch, just to sit.  Danny has always had a sleeping disorder, since he was four months old.  He didn't sleep like a newborn sleeps.  He catnapped five and ten minute naps.

Q.   It also says that he uses vulgarity towards his family. What does that refer to?

A.   He cursed.

Q.   Were there other issues in terms of Danny, for example, were there issues relating to violence?

A.   No.

Q.   Were there issues relating to -- let me withdraw that. Have you heard the expression "conduct disorder"?

A.   At some point.  But I'm not placing it to a specific incident.

Q.   But you heard that term "conduct disorder" in terms of your son, Mr. Lee?

A.   Yes.

Q.   Did there come a point around this time that Mr. Lee began to commit law violations?

Graham - Cross

A.    Yes.

Q.    Did Mr. Lee start to commit crimes, such as burglary?

A.    Not at that time, I don't believe.

Q.    Arson?

A.    No.

Q.    Witness threatening?

A.    Never that I am aware of ever.

Q.    Violence?

A.    Yes, to property, not to people.

Q.    I'm going to use an expression.  It's probably the wrong word.  Intrafamilial violence.  Do you know what I mean by that?

A.    No, I do not.

Q.    Did Mr. Lee harm his family?

A.    No.

Q.    You told us about the relationship between Mr. Lee and his younger sister.  I guess that would be Carrie?

A.    Carrie, yes.

Q.    In May of 1988, is it not true that you filed a petition just like we referred to 1110, because your son assaulted your daughter?

        THE COURT:  Let me -- I think you said May of '98.

        MR. LIROFF:  If I did, I apologize.  And I will rephrase the question.

BY MR. LIROFF:

Elaine Hinson, RMR, CCR
United States Court Reporter

Graham - Cross

Q.   Did you not file such a petition in May of 1988 because your son assaulted your daughter?

A.   Yes, I did.   That consisted of Danny pushing Carrie to get past her in the hallway.   This was very unlike Danny.   The counselors I had talked to, I mentioned this to them.   And they used that in those terms in order to request treatment for the emotional damage done to my son.   Those were requirements by the State of Tennessee to initiate in-house treatment.

Q.   Is it not true that beginning in 1988 your son had a series of stays at residential psychiatric facilities?

A.   Yes.

Q.   Is it also not true that your son had stays at juvenile residential care programs?

A.   Yes.

Q.   Is it also not true that your son could barely stay in any facility for any length of time because he kept hurting people?

A.   No.

Q.   Is it not true that your son assaulted employees, staff, at these residential care facilities?

A.   I do remember an incident when Danny pushed back.   When a person in charge of him pushed him, Danny did push back.

Q.   Is it not true that your son also began to harm fellow patients?

A.   No.

Q.   Is it not true that he was found by the staff to be

Graham - Cross

overtly aggressive in a number of occasions?

A.    I don't remember that term at all.

Q.    Is it not true that beginning at that point your son began a life of continual violence to others?

A.    No.

Q.    Excuse me.  Have you seen a report prepared by a neuropsychologist prepared at the request of your son's lawyers named Dr. Bianchini.  I will provide the spelling later.  Have you seen that report?

A.    No, I haven't.

Q.    Is it true that your son has in his life had over 100 separate instances where he was hit in the head?

A.    I have no idea.

Q.    Your son, since he left you in 1988, thrives on violence, does he not?

A.    I don't believe so.

Q.    Your son lives a life-style that involves him in fights with many, many people?

A.    I'm not aware of any of that.

Q.    Does your son partake in fights where he or others are armed with baseball bats?

A.    No.

Q.    Are you aware whether or not your son took a fork and stabbed another person in the neck?

A.    No, I'm not.

Q.    Yesterday you described your son as being good, as being kind, as being gentle?

A.    It's true.

Q.    Is it fair to say that you do not know your son very well?

A.    I know my son.  I know his soul as well as I know my own.  Danny is kind.  He does have -- has had suicidal treatments.  And that's one of the reasons he was in the treatment centers -- I'm sorry -- suicidal tendencies.  He has been self-destructive.

Q.    You told us yesterday about instances when your son was either taking the medication Phenobarbital or Ritalin and you were, as the attentive mother, sensitive enough to be able to see the effect of those drugs upon him.  True?

A.    Yes, I saw it.

Q.    And would that suggest that you were sensitive enough to notice what about your son?  What is it that you saw that allowed you to know that he was being affected by these drugs?

A.    His activity level on Phenobarbital was sluggish.  A toddler and four year-old should be bouncing, full of energy.  Danny didn't have that.  His eyes were glazed.

Q.    You also told us that because of this and your concern about this that you went to his physician and talked about changing his treatment program.  Correct?

A.    I asked him if there was another medication that would control the seizures for Danny.  And he felt like Phenobarbital

Graham - Cross

was the best, and I continued on.  At another regular pediatrician appointment, I asked him if we could maybe reduce the dosage, and he agreed to that.  Another time, later on at routine visits, I asked him, is it really necessary to keep him on this Phenobarbital all the time.  A high school friend of mine has white lines, rings, around her teeth.  And she had told me that these were from Phenobarbital treatments when she was a child.  And I was concerned about that for Danny.  He doesn't have that problem.  He has weak teeth, really weak teeth.  But he doesn't have the rings around him caused by Phenobarbital.  And then is when Dr. Biehler said to use it at times that I see seizures coming on or that, when he gets a cold, be sure and give it to him then because if his temperature goes up, he will have another seizure.

Q.   So you did not cease the use of the Phenobarbital on a whim without the doctor's consent?

A.   Never on a whim.

Q.   And not without the doctor's consent?

A.   Yes, I did.  At the time that I was doing it, using it just when he had a temperature or had a cold, I decreased it then, yes.

Q.   Why?

A.   Why?  Because when a child doesn't take Phenobarbital continually and then takes it, the drug effect is so obvious, so obvious.

Elaine Hinson, RMR, CCR
United States Court Reporter

7565

Graham - Cross

Q.   And you are sensitive to these things?

A.   Yes.

Q.   The Ritalin, were you sensitive to the effect of the Ritalin?

A.   Oh, I always hated Ritalin.  Do you know in just the year Danny was home before he was arrested, I had a piece of paper from a pediatrician in Texas that gave adult children's -- I'm sorry -- a children's definition and description of how it felt to be on Ritalin.  And one of them was to have constant worms crawling under your skin.  When Danny stood beside me at the kitchen table and read that, he weeped.  He cried.  And, he said, "Mama, it was just like that."  So when -- I know I did the right thing.  I could not continue.  Danny took his Ritalin.  But he begged me not to have to take it.  He said, "Mama, it doesn't make me feel good."

Q.   Do you know what huffing is?

A.   Yes, I've heard that.

     MR. LIROFF:  For the reporter, h-u-f-f-i-n-g.

BY MR. LIROFF:

Q.   What is huffing?

A.   Or called sniffing.  It seems to be really popular these days with the young people, mostly household products.  Danny did try that at one time.

Q.   Tell us about that.

A.   I don't know what it was.  But I know Danny was point

Elaine Hinson, RMR, CCR
United States Court Reporter

Graham - Cross

blank, "Yeah, I wanted to try it. I heard it talked about. I wanted to try it," and he did. He didn't care for it, and he quit.

Q. How do you know he did?

A. Danny told me he did.

Q. But couldn't you see the effect?

A. He wasn't at home at the time.

Q. Excuse me, ma'am. Would you allow me to finish my question? Fair enough?

A. Fair enough.

Q. Isn't it true that at a young age your son began to huff, to sniff household products for the purposes of obtaining a high?

A. I believe that was at 15.

Q. If it was at a younger age, because of your sensitive awareness to the effect of drugs upon him, you would have been aware of this?

A. Oh, definitely.

Q. I'm going to read to you a portion of a report. I'm going to ask you if it's correct or not. "When he," referring to your son "was 10 or 11 years old, he started huffing a few times a week. He huffed gas, Scotchguard and spray paint. He would spray the substance into a sock or a rag to inhale it. He had gotten around other kids who were doing it. And ultimately after between two and three years of doing this, he

7567

Graham - Cross

decided that he did not like the other kids who were doing this, so he stopped.  He was in the seventh grade when he stopped huffing.  He reports that he passed out more than 100 times while huffing."  You would have noticed that?

A.    Where did that report come from?

Q.    Did you notice that?

A.    No.  And I don't believe -- I don't know that to be true. Where did that report come from?

Q.    Is it correct to say -- excuse me for asking this question.  I apologize.  I don't mean to be rude.  Are you a good housekeeper?

A.    I used to be before I hurt my back.

Q.    Were you in 19 -- between the years 1983 and 1986 a good housekeeper?

A.    I didn't do it myself.  I had a housekeeper during those years.

Q.    Were you aware in your house that there was found on a regular basis socks or rags that continually had the odor of household products penetrating from them?

A.    That is ridiculous.  That is absolutely ridiculous.

Q.    The suggestion that your son was doing this that often over that many years is just wrong?

A.    That's right.

Q.    And the suggestion that your son did this so many times that over 100 times he was unconscious?

Elaine Hinson, RMR, CCR
United States Court Reporter

7568

Graham - Cross

A.    There's that hundred figure again.

Q.    Excuse me.  I'm not done with my question.  I've given you a lot of leeway to answer, so please give me the opportunity to ask the question.  The suggestion that your son was between the -- excuse me -- between the ages of 10 and 11 had passed out more than 100 times as the result of intentionally sniffing this stuff -- excuse me --

A.    I'm not aware of any of this.  I don't know where you are getting these ideas.

Q.    Please let me finish my question.  Given your sensitive nature that you were aware, so aware of the effect of the Ritalin and the other drug upon him, you would have known these things, wouldn't you?

A.    Yes, I would have.

Q.    So this suggestion is wrong?

A.    Yes, it is.

Q.    How about your son's alcohol problem?

A.    I don't know what age Danny started drinking.  I do know that the first time I saw him drunk was in Tennessee.  He literally was green.  I called my brother because I didn't have a doctor in Tennessee yet.  I called my brother over.  My brother looked at him.  He said, "Oh, my gosh, he is drunk."  I later found out that he was -- he had been at -- there's a country and western singer from Tennessee that at the time was not popular.  He is now.  He lived around the corner on K

Elaine Hinson, RMR, CCR
United States Court Reporter

7569

Graham - Cross

Street.  He had a blue colonial house with many barns.  Randy Travis is where he was drinking.

Q.    What did you do about his alcohol abuse?

A.    That led me to the treatment centers, petitioning the court for treatment.

Q.    I want to ask you about your son's history, just a small period of time, when he was about 15 until he was about 17.  Somewhere in about September '98, wasn't he picked up in Oklahoma for -- maybe not Oklahoma, Oklahoma or Tennessee, for burglary?

THE COURT:  Once again, you said '98.  Is that what you meant?

MR. LIROFF:  I'm sorry, Your Honor.  I appreciate you caught me on that.

BY MR. LIROFF:

Q.    1988.  September 19 -- September 18th, 1988.  Is it true that your son was picked up for a burglary offense?

A.    I'm not sure of the dates, but yes.

Q.    Is it true that 11 days later he was picked up for an arson offense?

A.    The arson charge that is on Danny's juvenile record, may I explain this to you?

Q.    Please.

A.    Okay.  In Mountain View, Oklahoma, Danny's grades were so low, on homecoming night, the big football game, he had gone to

Graham - Cross

the football stadium to go to the game.  And they were told he was ineligible and could not attend.  So on his way back down Main Street, which we lived on Main Street, a block past the business section, on the highway going out of town, the fire department door was open, a garage door that rolls up.  Inside were the elder men of the town that always played cards there, drank their beer and smoked their cigars.  And Danny stopped to talk with them.  He was striking matches and putting them out in the ashtray.  As he walked out to the street where the trash barrel was standing, he continued to strike matches and put it out and throw them in the thing, in the can.  And, when it caught on fire, the fire department was right there with the fire extinguisher to put it out.  About a week later, they decided, Oh, we could charge him with this for arson, and they did.

Q.    And about a month after that he was placed in a juvenile facility called Star One?

A.    Right, for suicidal tendencies.

Q.    Actually that comes up later.

A.    No.  That was happening then.

Q.    Does this happen more than once?

A.    In Tennessee, he was having those problems.

Q.    About six weeks later, he moved from Star to another facility called Arcadia.  Fair enough?

A.    I think that was it, yes.

Elaine Hinson, RMR, CCR
United States Court Reporter

Graham - Cross

Q.    About ten days later he left Arcadia without your permission and without the permission of the facility?

A.    That's true.

Q.    And about --

A.    He went over a five-foot fence.

Q.    I'm sorry?

A.    He went over a five-foot fence.

Q.    About 20 days later, he was picked up for three burglaries?

A.    I don't think so.

Q.    And about nine days later, he was found to have threatened a witness in a case against him?

A.    I don't know where you are getting that.  I'm not aware of any of that.

Q.    Three weeks later, all the charges that I just mentioned were found true, and he was admitted as a juvenile delinquent. True?

A.    I think that's when he went to COJTC.

Q.    About two weeks later he went to a facility called Wesleyan Group House.  That's W-e-s-l-e-y-a-n, Wesleyan Group house?

A.    I don't know where that is.

Q.    He lasted a little over two weeks at Wesleyan.  But he was kicked out for violence.  True?

A.    I don't know.  I don't know where that is.  I'm not -- I

7572

Graham - Cross

don't remember it.  I don't believe it happened that way.

Q.   I'm just trying to find out either how well you remember or how well you know your son.  After arriving and being kicked out of Wesleyan, he was sent to a place called Hillcrest Alpha House, H-i-l-l-c-r-e-s-t, Hillcrest Alpha.  Fair enough?

A.   Yes.

Q.   And while at Hillcrest Alpha, again signs of violence?

A.   Danny couldn't successfully kill himself while he was in treatment centers.  I know he did purposely try to get himself thrown out so that he would have access to suicide repeatedly.

Q.   And on or about --

A.   That was his sole purpose at that time.

Q.   On or about June 6, 1989, he was admitted to St. Anthony's for a suicide attempt and for violence?

A.   The St. Anthony's was they had given him a drug of some shot of some sort at Hillcrest that Danny had an adverse reaction to, his breathing and his heart rate.  And they took him to St. Anthony's for medical treatment.

Q.   Are you aware that at St. Anthony's, when he arrived, he was so out of control that a number of staff members were involved in trying to hold him down?

A.   Yes.  I remember that from the medication they had given him at Hillcrest.

Q.   Do you know that his stay at St. Anthony's only lasted a short time because they couldn't handle him?

Elaine Hinson, RMR, CCR
United States Court Reporter

Graham - Cross

A.    No.    They kept him on Thorazine.    And I went to the courts of Oklahoma to have him removed from that facility because of Thorazine.

Q.    From St. Anthony's, he went to a place called the Willow Crest, in August of 1989?

A.    Didn't you say Willow Crest earlier also?

Q.    You know, I misspoke.    Let me rephrase that question. Incidentally, I didn't say Willow Crest.    I said Wesleyan.    But in June, June 28th, 1989, he was placed at Willow Crest. Correct?

A.    I don't know where Willow Crest is.

Q.    But his stay at Willow Crest didn't make two months because he was kicked out for violence?

A.    I don't know about that.

Q.    And he lasted at Willow Crest for six days?

MS. COMPTON:    Your Honor, let me just make a quick objection.    If she says she doesn't know about a place, then obviously she doesn't know what happened there.    I don't understand the point of asking the witness a question, and she doesn't know the answer, and then he asks her the next question.    And I object to it.

THE COURT:    Well, I gather he is looking at her parental attention to her son's situation and her knowledge of what is going on, so I'm going to overrule the objection.    You may continue.

Elaine Hinson, RMR, CCR
United States Court Reporter

Graham - Cross

MR. LIROFF:  Thank you.  I am near the end of this.

BY MR. LIROFF:

Q.    Six days and went AWOL.  Did you know that?

A.    No.  Once he was in DHS -- I'm sorry -- juvenile custody, unless letters came back to me that I had addressed to Danny, sometimes I often did not know where they had moved Danny.

Q.    Did there come a time he went to someplace -- and I'm not sure if I'm pronouncing this correctly -- COJTC?

A.    COJTC.

Q.    Is COJTC an acronym, COJTC?

A.    Yes.

Q.    But they call it COJTC?

A.    I can't tell you what each initial stands for.  But it is a treatment center in Oklahoma.  We finally were making a lot of progress at that with family counseling.  It was about 75 miles from my home.  Carrie and I drove down once, if not twice a week, for family counseling.  The counselor that we were assigned to was Jim Lamb.  We were making -- Danny was making so much progress understanding that it wasn't his fault that things had happened to him in his childhood, that it was my fault for not protecting him, finally understanding that he did not have to go through life paying for my mistakes.  Then Jim Lamb decides that we will do a little shock treatment on Danny.  And he shows him an inch thick file of front and back type of every counseling service we had had with myself, Danny

Elaine Hinson, RMR, CCR
United States Court Reporter

7575

Graham - Cross

and Carrie.  And he has Danny read this entire file.

The betrayal that Danny felt had to be more overwhelming. I knew as an adult being at a state treatment center that all of our counseling would become of record.  I never dreamed that this trusted counselor would actually show Danny the entire file of every negative, painful, in writing of our family counseling.  Danny came home just shortly after that because he had no trust for anyone.  I had no way of telling him, Danny, we are going to have to trust these people, because the betrayal I felt, as much as it was, it wasn't even a portion of what Danny was feeling.

Q.   Is COJTC, he wasn't put in COJTC by you.  In fact, he was ordered placed there by a court in Oklahoma.  Isn't that true?

A.   I had, slamming my fist on the desk tables, insisted that it was a treatment center that would not drug Danny, that had no authority to give him any medication of any kind, because the drugs that they were giving him either gave him an adverse reaction or it was Thorazine, and there was no benefit in that.  There was no purpose to it other than to sedate a child and put them in a corner.  There was no growth in that.  There was no healing in that for Danny.  And COJTC was the best living arrangement Oklahoma had to offer that fit Danny's needs for growth and maturity.

They were individual houses, little -- it reminded me a lot of the grounds a lot of my church camp.  They were little

7576

Graham - Cross

cottages.  There were four patients living in each cottage with one adult supervisor that also lived there.  It was 24-hour care.  I think there were two that alternated through the week.  They had regular responsibilities as far as taking care of the grounds, which Danny loved the flowering, the raking and the trimming trees and so on, of washing dishes, of helping to prepare meals.  This was a point of growth for Danny, of learning to fit back into a family unit.

Q.    I understand.  Now, my question was, in fact, Danny was ordered to be, to stay in COJTC by the court in Oklahoma.  Isn't that correct?

A.    Yes.

Q.    In fact, COJTC was a juvenile jail that he was supposed to stay at, wasn't it?

A.    No.

Q.    And, in fact, while -- he stayed at COJTC for a while, for a number of months.  Is that correct?

A.    Yes, he did.

Q.    And periodically he would get a pass to go out?

A.    Yes.

Q.    And, in fact, he got a pass in July 1990, didn't he?

A.    Yes, he did.

Q.    And on that pass Danny met up with Joey Wavra, didn't he?

A.    With David, yes.

Q.    Now, you learned a couple of days after Joey was killed

7577

Graham - Cross

that Danny was somehow some way implicated in this, didn't you?

A.    I knew from the very next morning.  I knew that night.  I looked for Danny.  I called my sister looking for Danny and David.  Richard, David's stepfather, said, "Well, you must know where they are."  I couldn't think.  In Oklahoma City, where would they be?  Any apartment, any house.  I was up all night.  If I had known that Richard's mother had been out of state taking care of her brother, who was ill, I would have thought of her house.  But I didn't know that she was gone.

Q.    And eventually you went with Danny to be interviewed by a detective?

A.    Yes, I did.  I told Danny he had to tell the truth, the absolute truth.

Q.    This was the same detective that was here yesterday?

A.    Yes, it is.

Q.    You know that the interview with Danny was tape recorded?

A.    Yes.  I found out.  I assumed.  I didn't know.  It was videotaped actually.

Q.    Correct.

A.    It was showed at David's preliminary hearing -- I'm sorry -- Danny's preliminary hearing, when they chose not to press charges against Danny.  Danny was told all the way through he did not need an attorney.  When he went to David's preliminary for this testimony you heard read yesterday, two weeks before this started, I was continuing asking for an

Elaine Hinson, RMR, CCR
United States Court Reporter

7578

Graham - Cross

attorney.  "No, you don't need one."  The same day I spoke with Robert Macy, the district attorney of Oklahoma County.  He told me, "Attorney or not, your son is going to testify.  Yeah, he probably should have one, but he is not going to get one."

You've also failed to mention that the district attorney that prosecuted on Danny with this left the prosecution office immediately.  Danny's was the very last case.  His name is Barry Albert or Albert Barry -- I don't know which -- at the time.  He went into private practice in defense.

Q.    Could I ask a question?  I think we are getting a little far afield.  May I?  In the interview that Danny had with the police officer, isn't it true that while he's trying to ask your son questions, you are turning to the officer, and you are telling him, "What do you want to ask that for?  That's hearsay."  You are getting in the way of the officer asking questions of your son.

A.    Danny had spoke with Richard before we went in.  Richard made it a point to call Danny repeatedly.  And I wouldn't let him -- I don't trust Richard.  I don't like him.  It was his son, Larry, that went out and found the drugs.

Q.    All I'm asking you is this.  Isn't it true --

A.    I didn't know what Richard had said to Danny.  And I did not trust one thing.  And Danny is so vulnerable for taking the blame for other people.  And that's exactly what he was trying to do when he was on the stand in David's preliminary was

Elaine Hinson, RMR, CCR
United States Court Reporter

7579

Graham - Cross

trying to help take some of the blame off of David.  When all of the other witnesses there at that party told the same exact story that Danny told, that Danny did not, did not kill Joey. Danny, in that interview, I'm sure you have that videotape of that interview when I took him in originally for questioning. Danny told how he had beaten Joey.  And poor Joey was truly beaten.

Q.    By your son?

A.    No.  Danny, in that interview, I looked down and picked up Danny's hands and said, "Danny, but, Honey, your hands aren't swollen.  They are not bruised."  They were not scuffed.  His hands were baby soft.

Q.    Isn't it true that in that interview Danny told the officer that while Joey was down he went up to and with his foot kicked him in his face?

A.    I don't remember that.

Q.    Isn't it true that the last time your son got involved in a murder you were there at the interview trying to prevent the officers from properly interviewing Danny?

A.    No.

Q.    And the next time that your son is involved in a murder or murders you are doing the same thing?

A.    No.  If I thought for a moment that Danny was guilty of killing this family, I would tell him he has to take responsibility.  I truly, I understand that you found him

7580

Graham - Cross

guilty.  In my heart and soul, my son did not do this.

Q.   In that interview that you just described, isn't it true that Danny told the officer that he punched Joey in the eye?

A.   Yes, he did.

Q.   Isn't it true that in that interview Danny told the officer that he took a lit cigarette and plunged it in the arm of Joey?

A.   Yes, he did.

Q.   Isn't it true --

A.   He said he touched it to him.

Q.   Why are you minimizing these things?

A.   I'm not.  I'm trying to correct you.  If you don't want to show the video, then at least get it right.

Q.   Isn't it true that Danny said he wanted to whip Joey's ass?  Excuse me.

A.   Are you through with the question?  It's hard to understand when you are through with a question.

Q.   I'm sorry.  I apologize for that.

A.   I'm sure he did say something to that effect.

Q.   Isn't it true that Danny said, quote, I wanted to take his face away from him, close quote?

A.   I don't remember that statement at all.

Q.   Isn't it true that Danny said that when he kicked Joey he bruised his foot?

A.   The problem is --

Elaine Hinson, RMR, CCR
United States Court Reporter

7581

Graham - Cross

Q.    Excuse me.  I'm still asking the question.  And, in fact, looked down in the video, excuse me, looked down and looked at his foot and showed the officer where the bruise was?

A.    Are you through now?

Q.    Yes.

A.    Okay.  Danny did that.  However, the other members at the party and Danny's own testimony, that when Joey rode up, they jumped off of the detached garage, the roof, and that is when Danny fell and twisted his ankle.  So Danny couldn't have been kicking Joey too much.

Q.    In that interview --

A.    That is also on the other -- I wasn't finished.  That also was one of the other people at the party said that Danny hurt his foot badly when he jumped off of the roof.

Q.    And in that interview your son indicated that he took Joey's wallet from him and went through it?

A.    Yes, he did.

Q.    And in that interview your son indicated that it was he who opened the manhole and made Joey crawl in?

A.    He was doing a lot of that trying to take the blame off of David.  That isn't what the other people at the party said.  Their interviews all lined up with the truth, that it was David.

Q.    Are you minimizing?

A.    No, I am not.  Danny should never have been there.  He

7582

Graham - Cross

never should have been out that late.  He never should have been at that party.  He certainly shouldn't have been taking drugs.  He didn't need to be drinking.

Q.    I agree.  He shouldn't have.  And he shouldn't have taken the keys to Joey's bicycle lock so he could pawn the bike.  But that's what he told the officer that he did.  Isn't that true?

A.    That's what they had planned to do and didn't.

Q.    Isn't it true he also told the officer that he got a bag from the garage to put Joey's things in?

A.    I don't remember where he got the bag.  I know David told him to put that in something.

Q.    Isn't it true that he also told the officer he got a rope to give to David?

A.    I think he handed it to David or handed it down to David. I don't know where Danny -- I don't think Danny was the one that actually went and got the rope.

Q.    He also told the officer that he got a knife and took it to David?

A.    Yes.

        MR. LIROFF:  Excuse me a moment.

BY MR. LIROFF:

Q.    Sometime did your son become what people may call a skinhead?

A.    Yes.

Q.    When was that?

Elaine Hinson, RMR, CCR
United States Court Reporter

7583

Graham - Cross

A.   After he left Kentucky, after Jennifer and he broke up is when that started.

Q.   After he broke up with Jennifer?

A.   Yes.

MR. LIROFF:  Your Honor, I'm holding a photograph that's been marked as 1096.  And I wish to approach the witness.  I'm going to show it to counsel right now.

THE COURT:  Very well.  Is that an exhibit that's already received?

MR. LIROFF:  I believe not.

BY MR. LIROFF:

Q.   Do you see that photograph?

A.   Yes, I do.  1096.

Q.   Do you recognize anyone in that photograph?

A.   This one man right here could be Danny, but I'm not sure that it is.  I don't know what kind of -- I don't know what this is.  I can't tell where it's from.

MR. LIROFF:  May I approach the witness with two more photographs?

THE COURT:  You may.

BY MR. LIROFF:

Q.   They are 1075 and 1076.  First I would like to show you 1075.  Do you see in 1075 the person that you thought could be your son?

A.   Yes, I see Danny.

7584

Graham - Cross

Q.    Now that you see that, do you realize that the person that you believe is your son is your son?

A.    Yes.

Q.    And showing you 1076, do you see that same person?

A.    Yes.

Q.    Is that your son?

A.    Yes.

Q.    Have you ever seen those photographs before?

A.    No.

Q.    Does your son appear to be a kind, loving, caring person in those photographs?

A.    Well, in 1076 it's showing his back.  In 1075 it's showing him looking at another person, looking very pleasant.  I don't know what these photos are or where they are from.  And 1096, it looks like he's waving to someone.

Q.    In -- well --

A.    If that is Danny.  It looks like him.

Q.    Would you describe for me the way it looks like Danny is waving at somebody?

A.    (Indicating.)

Q.    Please.

A.    I did.

Q.    I'm sorry.  Could you do that?

        THE COURT:  Are you going to introduce these?

        MR. LIROFF:  Yes.

Elaine Hinson, RMR, CCR
United States Court Reporter

7585

Graham - Cross

THE COURT: Well, they will speak for themselves.

MR. LIROFF: Thank you.

THE COURT: Any objection?

MS. COMPTON: Your Honor, I do have an objection. I would like to approach.

(Bench conference reported as follows:)

THE COURT: Here we are again. All right. What is your objection?

MS. COMPTON: Well, you've seen these pictures before, Your Honor. I knew they would come back. Frankly, I will have a witness. They will probably come in with one of my other witnesses. I think what Mr. Liroff is trying to do here is to impeach this witness about the time frame Danny became involved. She doesn't know. I mean, she didn't take these pictures. She wasn't there. She doesn't know about the time frame. She wasn't even, I don't think she's been made aware yet of when they were taken. So if it's being used for purposes of impeaching her, it's improper as far as getting the time frame right. As I said, I know we are going to see these pictures again. I know they will probably be admitted through one of my witnesses on cross-examination. They are coming in. But as far as using them for purposes of impeaching this witness about her time frame, I think it's improper.

THE COURT: I don't know that he's done that. She can look at it, make some estimate of his age at the time. She

Elaine Hinson, RMR, CCR
United States Court Reporter

7586

Graham - Cross

has said that he became involved after he left Kentucky, after he broke up with Jennifer.  Now, you know, I don't know what she can do by looking at this to decide when this was.  Apparently she's identifying them.  I'm going to let them in.  They are going to come in anyway?

MS. COMPTON:  They are.

THE COURT:  He can inquire about her knowledge of the timing.  And, you know, it may not be that he can impeach her with that, but we will just wait and see.

MR. LIROFF:  Thank you.

MS. COMPTON:  There's some writing on the back of those photos.

MR. LIROFF:  I think counsel is correct.  I'm not offering the writing.  I think it is hearsay.  I do believe counsel is also correct that I will be able to authenticate those pictures through a witness that she's bringing in.  And that writing we will try and obliterate some way.

THE COURT:  Let me ask you.  It gives a date of photo as 1-11-92.  If that is the date of the photo, I guess you can ask her what was the date he broke up with her.

MR. LIROFF:  Okay.

THE COURT:  Was it before or after this date.  I don't gather anyone is objecting to this being the actual date these photos were taken.

MS. COMPTON:  I don't.  The witness is wrong about

Elaine Hinson, RMR, CCR
United States Court Reporter

7587

Graham - Cross

the time of involvement.  She's clearly wrong.

THE COURT:  I think she's probably wrong from other pictures I've seen in evidence, assuming the hair cut has anything to do with the status.

MR. LIROFF:  Thank you.  I appreciate that tip.

THE COURT:  I'm going to overrule the objection.

(Continuing in open court).

MR. LIROFF:  Your Honor, I wish to withdraw the question I was about to ask.  There's something I want to clarify.

THE COURT:  Very well.

BY MR. LIROFF:

Q.    When did your son and Jennifer break up?

A.    '96.  But I don't know the date.

Q.    You just testified that Danny became a skinhead after their breakup?

A.    It's my understanding.

Q.    I would like to show you 1096 now.

THE COURT:  I'm receiving the three photographs, 1096, 1075 and 1076.  And this was  96.  All right.  Go ahead.

(Government's Exhibits 1096, 1075 and 1076 received in evidence.)

BY MR. LIROFF:

Q.    First I've panned back so we can see this.  In this photograph, you see people standing.  You see to the left

7588

Graham - Cross

somebody wearing a white robe outfit.  You see some people holding a flag, and to the right -- a flag in the center of the picture, and to the right there's a person who is sort of cockeyed who maybe is waving at the camera.  Do you see that?

A.    Yes.

Q.    Now what I would like to do is I would like to focus in on that person who you said is waving at the camera.

A.    I think that's probably Danny.

Q.    The way that you described, the person has their hand --

THE COURT:  Now, the picture speaks for itself.

MR. LIROFF:  Okay.  Thank you.

BY MR. LIROFF:

Q.    That's your son?

A.    I think it probably is.

Q.    That picture was taken before '96, wasn't it?

A.    I have no idea.

Q.    Well, did something happen to your son in 1995 that would mark him so that you could say that this picture was taken before or after 1995?

A.    No.

Q.    Did your son lose an eye?

A.    In '96 -- September of '95.

Q.    He appears to have both eyes?

A.    Yes.

Q.    So this would appear at least to be before your son lost

Elaine Hinson, RMR, CCR
United States Court Reporter

7589

Graham - Cross

his eye?

A.    Yes.

Q.    Doesn't your son, this picture appear to have been taken in 1992?

A.    I wouldn't have any way of knowing that.

Q.    If your son was appearing at a rally like this in 1992, that would suggest that you didn't or you were wrong about when he became a skinhead?

A.    I see that he is with other skinheads at that group right there, what appear to be other skinheads.  I don't know if Danny was a member of them.  I don't know.  I didn't know anything of that.

Q.    I'm showing you another photograph -- excuse me.  I'm also offering 1075.

        THE COURT:  They've all been received.

        MR. LIROFF:  Thank you.

        THE COURT:  This is 1075?

        MR. LIROFF:  Yes.

BY MR. LIROFF:

Q.    And that appears to be a photograph taken at the same time.  Is that correct?

A.    Yeah, I would say so.  That's Danny.

Q.    I'm sorry for going into his rear.  I don't mean to be indelicate.  But he seems to have some type of suspenders that are hanging down, doesn't he?

Elaine Hinson, RMR, CCR
United States Court Reporter

7590

Graham - Cross

A.    Looks like it.

Q.    And that's him?

A.    Yes.

Q.    And now I'm showing you 1076.

A.    Yes.

Q.    Same person?

A.    Yes.

Q.    You see the swastikas in the back of the jacket?

A.    Yes, I do.

Q.    What does it say on the back of your son's jacket?

A.    You will have to focus it better.  I can't see it.

Q.    Can you read that that says Phineas Priest?

A.    It's not focused on this TV that I'm looking at.  Maybe I can look up here.  I can tell that the last word is Priest. But it is still not focused enough to see the first word.

            MR. LIROFF:  I would like to see some of the photographs that this witness identified yesterday.  Counsel, do you have them?

            MS. COMPTON:  I do.

            THE COURT:  Mr. Liroff, we are going to go ahead and take our morning break.  We will be in recess for about 20 minutes.  Court is in recess.

       (Recess at 10:45 a.m.)

7591

Graham - Cross

## CERTIFICATE

I, Elaine Hinson, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of the proceedings in the above-entitled case.

*Elaine Hinson*
_____

Elaine Hinson, Official Court Reporter

Date:    May 12, 1999

Elaine Hinson, RMR, CCR
United States Court Reporter

7592

Graham - Cross

THE COURT:  Mr. Liroff?

MR. LIROFF:  Thank, Your Honor

CROSS EXAMINATION-Resumed

BY MR. LIROFF:

Q.    Ms. Graham, I want to show you a photograph that's marked as DL-34.  And in that photograph that appears to be your son?

A.    Yes, that's definitely my son.

Q.    And your son is holding your granddaughter?

A.    Audrey McCall.

Q.    And you see the haircut that he has at that time?

A.    Yes.

Q.    Real short?

A.    He always had short hair.

Q.    Well, I'm not going to spend the time, but you have shown us photographs where he doesn't have short hair.

A.    Right. In the summers he always preferred it really short.  He preferred flat tops.

Q.    Are you saying at the time that he was with Jennifer in late '95 '96 that he was not a skinhead?

A.    I wasn't aware of it.

Q.    Are you willing to admit that he had adopted a skinhead lifestyle?

A.    I wasn't aware of it.

MS. COMPTON:  Your Honor, maybe I can short-circuit this. I will be happy to stipulate that Mr. Lee began his

Carolyn S. Fant
United States Court Reporter

7593

Graham - Cross

activity in the skinhead movement around 1991 if that will help.

THE COURT:  That will be accepted and it will save a lot of additional time and proof, I think.

What time in '91?

MR. LIROFF:  Excuse me, Your Honor. I appreciate the offer of counsel, but I believe that it may have been earlier.

THE COURT:  Earlier than '91?

MR. LIROFF:  Yes.

THE COURT:  How old he would have been in '91?

MS. COMPTON:  He was born January 31st of '73.

THE COURT:  So in '91 what would he be?  Eighteen?

MS. COMPTON:  Part of it.

THE COURT:  Eighteen.

So you have evidence before that.  Well, concentrate on that then.  We've got you down to '91, and if you can go earlier than that, put on the proof.

BY MR. LIROFF:

Q.   Well, let me ask you this.  Skinhead aside, do you recall a time while you were living with your son that he expressed hateful ideas?

A.   I heard his views -- no, I heard skinhead views in '96.  I wasn't any too nice with Danny when I heard about them.  I refused to let him mention anything like this when Carrie was around, which he didn't anyways.  He was very protective of

Carolyn S. Fant
United States Court Reporter

7594

Graham - Cross

Carrie. I asked him why he was associating with these people, because obviously he didn't believe some of the things that he had told me about them. The racism. Frank is obviously Mexican. Carrie's great, great grandmother is Pincey Tine -- Tincy Pine, I'm sorry. And she was born on the Trail of Tears. Cherokee, full blood. Tincy's husband, J. G. Graham, Sr., was full blood Cherokee. Danny's friends were not all white; the majority, because we lived in a white community with very few racial mixes.

Q. Let me ask you this: Do you agree that your son expresses hateful thoughts, hateful to Africa-Americans, hateful to Jews, hateful to many, many people?

A. I have heard him -- yes, I have heard him quote the opinions of skinheads. I have heard Danny say them as if he believed them, and each time I told him, "I don't believe that Danny. I know better."

Q. And in that photograph we showed you --

A. He's with a group of other people who obviously are very racist.

Q. In the jacket he's wearing, he has swastikas?

A. I have never seen that jacket. Never.

Q. Isn't it true when he was arrested in that house in his room the police found numbers of articles that had hateful attributes to them, such as swastikas, such as demeaning pictures?

Carolyn S. Fant
United States Court Reporter

7595

Graham - Cross

A.   I don't know.  I didn't see them in my house, and they didn't show me what they took from my house.

Q.   Are you minimizing here to benefit your son?

A.   I'm telling you I don't know about all of this.  I can't tell you what I don't know.

MR. LIROFF:  Excuse me just a moment, Your Honor.

Your Honor, I have a Xerox copy of a five-page letter.  It's been marked 1115.  I would want to show it to counsel, and I would also ask permission to approach the witness to show her this letter.

THE COURT:  You may.

MS. COMPTON:  Your Honor, I guess we ought to approach before I sit here and read this whole thing, which is going to take some time.

THE COURT:  Very well.

(Bench conference between the Court and counsel, as follows:)

MS. COMPTON:  Your Honor, I have just been handed for the first time a copy of an envelope that shows Danny -- his return address is Pulaski County Jail.  He's written to his father after we found out where his father was.  I haven't seen this letter.  Two pages long.  And then attached to it is a detention facility classification board meeting.  Before I go sit down and read the letter to see what it says, I would object to it coming in through this witness.  She doesn't

Carolyn S. Fant
United States Court Reporter

7596

Graham - Cross

know.  She's been divorced from Mr. Lee for years.  Didn't even know where he lived.  I don't see how it can come in through her.  If it's going to come in, I'm going to have to read it.

MR. LIROFF:  It's a letter from Defendant Lee.  I believe his mother can authenticate that this is a letter from him, so for that reason --

THE COURT:  You mean by just the handwriting?

MR. LIROFF:  Oh, yes.

THE COURT:  And if she says yes, then what?  What's her use for this?

MR. LIROFF:  What's the relevance?

THE COURT:  We'll, I haven't read the letter.

MR. LIROFF:  I will tell you.

THE COURT:  Then you're going to ask her something about what's in the letter?

MR. LIROFF:  Yes.

THE COURT:  I will give you full opportunity to read it so take your time.

MR. LASSITER:  How did the government obtain the letter?

THE COURT:  Ask Mr. Stripling.

MR. STRIPLING:  They routinely review mail being sent by prisoners out there.  They have security concerns, and especially watched Mr. Lee's mailings.

THE COURT:  You don't have an extra copy of that, do

Carolyn S. Fant
United States Court Reporter

7597

Graham - Cross

you?

MR. LIROFF:  I can give you this copy, Your Honor.

THE COURT:  I can be looking at it at the same time.

MS. COMPTON:  For one thing, Lane, the copy I've got I can't read it.  It's cut off.

THE COURT:  This one is, too.

MR. STRIPLING:  Your Honor, those copies were made routinely out there as mail was being sent and the copies -- the letter was mailed, so all we have are the copies that were made, and this is the condition they were in when we got them.

MS. COMPTON:  Well, we can't read it.

THE COURT:  Let me see.

Have you read it?

MS. COMPTON:  I'm finished.

THE COURT:  What's the note on the card here?

MR. LIROFF:  I believe that's Mr. Lee's writing.  He is in the habit of sending out things like this and annotating them.  Making comical references.

THE COURT:  Was this with it?

MR. LIROFF:  Yes.  He's in a habit of sending photographs that he may have access to to people.

THE COURT:  Well, you have read it. Frankly, I haven't -- I have tried to, but I'm having a little problem understanding it. Any further objections?

MR. LASSITER:  Your Honor, just a general objection

Carolyn S. Fant
United States Court Reporter

7598

Graham - Cross

as to relevancy. And I'm not sure what he's going to inquire about. If you can tell us --

MR. LIROFF: There is one passage that I believe I saw the Court read several times, and in that passage Mr. Lee indicates to his biological father that his mother's former man in her life would beat him but not that often. "That mom always exaggerated the beatings and what beatings he had he deserved because he was acting out, and that goes directly to the core of what this witness has said, and that's the only passage I'm going to rely upon.

THE COURT: That's the only part you're going to ask her about? First of all, if she doesn't identify it, you're going to have to do something else about it. If she does, you can draw her attention to the particular thing, but I think the gratuitous -- all the vulgarity, you're not going to get into all that.

MR. LIROFF: No.

THE COURT: All right, I'm going to permit it.

(End of bench conference.)

MR. LIROFF: If I may approach.

THE COURT: You may.

BY MR. LIROFF:

Q. Ma'am, showing you what has been identified as 1115, it's a number of pages, and I would ask you to look at this to see if you recognize the handwriting.

Carolyn S. Fant
United States Court Reporter

7599

Graham - Cross

A.    The printing is Danny's.  It looks --

Q.    Is that a letter written by your son?

A.    It appears to be, yes.

Q.    That letter appears to be addressed to Jim Lee?

A.    Yes.

Q.    Who is Jim Lee?

A.    Danny's father.

MR. LIROFF:  Your Honor, I would like to read the passage that I mentioned at bench conference.

THE COURT:  You may do so.

BY MR. LIROFF:

Q.    For your reference, for the jury's reference, for the reporter's reference, a portion of the margins are dropped so when I hit a point where there's a word, I'm going to describe the word if part of it is lopped off, but I want to read a passage here and then ask you a question.

"Haven't been able to get hold of mom yet, but I'm sure it will be neat.  Ha.  I real, R-E-A-L-L, think it will be good for her.  It may piss her off enough to make her start living gain." G-A-I-N, question mark.

"So she told you it's been months since she's dated? It's been years." The word -- the letters are H-E -- "hates men.  Her last one wasn't much to speak about.  Y-A-H.  He would beat" -- the word is O-T-H.  "He would beat oth of us sometimes.  It wasn't as bad as she makes out.  Not that I

Carolyn S. Fant
United States Court Reporter

7600

Graham - Cross

remember anyway.  Had most of it coming anyway.  Ha.  Ha.  I pulled a lot of shit on that bastard." And then the word is O-M-S "been getting into this Jesus shit pretty heavy lately."

Did you hear what I read?

A.    Yes, I did.

Q.    It appears that your son is writing a letter to his biological father and he's referring to Mr. Graham, doesn't he?

A.    Yes, apparently.

Q.    And it appears that in that letter he's saying that you make more of the alleged abuse that Mr. Graham inflicted than he recalls.

A.    Yes, he's said that a lot.

Q.    And he says that he pulled a lot of stuff -- I paraphrased that -- and that he had it coming?

A.    I don't know what he's referring to.

MR. LIROFF:  Your Honor, thank you very much.

THE COURT:  Ms. Compton.

REDIRECT EXAMINATION

BY MS. COMPTON:

Q.    Ms. Graham, we talked a little bit earlier about John David Patton, your maternal nephew?

A.    Yes.

Q.    Did John David have any history of mental illness?

A.    Yes.  He, at least two years before, had been diagnosed paranoid schizophrenic.

Carolyn S. Fant
United States Court Reporter

7601

Graham - Redirect

Q.    Are you talking before the Wavra murder?

A.    Before he killed Joey, not to minimize it.  Yeah.

Q.    Was there anybody else?  Which sister's son is he?

A.    He's Darlene's.  Darlene is the sister just older than me, four years older, and he's a twin.  He has a twin named James Daniel Patton, John David Patton.

Q.    Does James Daniel Patton have any mental illness that you know of?

A.    I don't know if there are any medical reports on it.  In my opinion --

Q.    Don't give us your opinion.  I wondered if he's been diagnosed like his brother has?

A.    I don't know.

Q.    Is there anybody else in your family on either side that you know of who has been so diagnosed, paranoid schizophrenic or any other mental illness that you're personally aware of?  If you don't know --

A.    No.  Now, my mother's uncle, Stephen, did commit suicide.  His wife's name was Lilly.  His daughter's name was -- is Jo Ann.  She is my mother's cousin.  She grew up with my mother's family a lot of her young life.  I don't know -- the family doesn't know for sure if it was mental illness.  In World War I he had a plate put in his head.

Q.    Who did now?

A.    Stephen.  Great uncle.  We don't know.

Carolyn S. Fant
United States Court Reporter

Graham - Redirect

Q.    Okay.  Anybody else that you know of?

A.    Darlene is on -- David's mother --

Q.    Yes.

A.    Is on antidepressants.  I don't know that for a fact right now, but she has been.

Q.    Anybody else?

A.    No.

Q.    Have you been treated with any kind of drug therapy at all?

A.    Oh, yes.

Q.    And I'm not talking about drugs for back pain or anything.  I'm talking about antidepressants?

A.    No, no, not antidepressants.

Q.    Let me show you what will be marked as DL-40.

        COURTROOM DEPUTY:  Thirty-nine.

        MS. COMPTON:  Thirty-nine.

BY MS. COMPTON:

Q.    Did I show you this?

A.    Yes.

Q.    All right.  Can you identify what's in DL-39?

A.    They were pictures of Jim, Danny's biological father.

        MS. COMPTON:  Your Honor, I would offer this.  It's kind of a photo collage. They are three pictures, but they are glued onto a card together.

        THE COURT:  Received.

Carolyn S. Fant
United States Court Reporter

7603

Graham - Redirect

(Defendant Lee's Exhibit No. DL-39 was received.)

BY MS. COMPTON:

Q.   I'm not sure you can see those very well.  Do all three of the pictures glued together on the collage depict Mr. Lee?

A.   Yes.

Q.   Now, you did not know him during this time frame, did you?

A.   No.

Q.   Did you even know where he was or --

A.   No.

Q.   -- what he was about until the investigation began?

A.   Right.

Q.   Now, then, you were talking yesterday a little bit about Danny and the love of his life, Jennifer Givens, and we have seen pictures of her and the granddaughter, Audrey.  Did Danny make a videotape for you when Audrey was born?

A.   Yes, he did.

Q.   Just so the jury won't be in shock.  There is nothing distasteful about it, is there?

A.   The actual delivery is not there.  The preparation.

        MS. COMPTON:  Your Honor, we are going to show about four and a half minutes of the tape.

        THE COURT:  Has it been given an exhibit number?

        MS. COMPTON:  It will be DL-40.

        THE COURT:  It's received, and you may play it.

    (Defendant Lee's Exhibit No. 40 was received.)

Carolyn S. Fant
United States Court Reporter

7604

Graham - Redirect

(Video playing.)

BY MS. COMPTON:

Q.    Who is depicted in the videotape?

A.    Danny and Jennifer and Audrey McCall.

Q.    And obviously this is at the birth when Audrey was born. Was she born in Bowling Green?

A.    Yes.

Q.    Now, Ms. Graham, you have been on the stand for some period of time and you have been involved in this investigation for a couple of years.  You have heard a lot and you have seen a lot.  As you sit here right now, do you think that this jury, if they spare your son's life, can he do anything?  Can he be of any good to anybody inside the prison?

A.    Yes.  Yes.  Yes.

Q.    That's all I have.

                    RECROSS EXAMINATION

        MR. LIROFF:  Your Honor, I have a couple of questions, just a couple, that relate to a report that I was given today and didn't have time to look at it until redirect examination, so to that extent this is beyond the scope of redirect and I ask permission to reopen my cross for these couple of questions.

        THE COURT:  You may.  Go ahead.

BY MR. LIROFF:

Q.    Ma'am, I just was given a report relating to your son

7605

Graham - Recross

dated February 19, 1988 by a Dr. Long, a neuropsychologist in Memphis, Tennessee. Now, this is during that year that we have spent a lot of time dwelling on. Danny was 15 years old. Do you recall what precipitated -- what caused Danny to be taken to this doctor for evaluation?

A.    That is the first document that you showed me that was highlighted.

Q.    Never showed it to you before. Never looked at it.

A.    No, I'm telling you this connects to that document you first showed me where I asked for treatment. However, I never met this doctor. I only spoke with nurses that relayed what the doctor said.

Q.    Well, let me ask you this. I'm looking at the second page, and I want to ask you a question based upon something that's written. It reads --

A.    I'm sorry.

Q.    Are you okay? Do you want a moment?

A.    I'm fine.

Q.    It reads: "Danny has an extensive history of behavioral and emotional problems. He has been suspended from various schools for behavioral problems and for defiance of authority figures. He also has a history of verbally and physically abusing his mother."

A.    I don't know where that came from. I have never heard that before, and I am not minimizing!

Carolyn S. Fant
United States Court Reporter

7606

Edwards - Direct

MR. LIROFF:  Thank you, Your Honor.

THE COURT:  All right, Ms. Graham, you may stand down.

Call your next witness.

MS. COMPTON:  Call Carrie Graham.

THE COURT:  Come forward, please.  Come to this lady. Raise your right hand and be sworn.

CARRIE DENISE EDWARDS, DEFENDANT LEE'S WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MS. COMPTON:

Q.    Would you state your name, please?

A.    Carrie Denise Edwards.

Q.    I have called you Carrie Graham every time.  I apologize.

A.    That's fine.

Q.    Where do you live, Ms. Edwards?

A.    El Reno.

Q.    How far is that from where your mother lives and where you grew up in Yukon, Oklahoma?

A.    About 17 miles.

Q.    And you have a little boy; is that right?

A.    Yes, Noah.

Q.    How old is Noah?

A.    About 14 months.

Q.    Let me ask you something.  You have testified here before, but you have not been in the courtroom the whole time, and

Carolyn S. Fant
United States Court Reporter

7607

Edwards - Direct

obviously the rule prohibited that some of the time.  Can you be here? Are you at a point where you can stay in court?

A.    No, ma'am, I'm not.  I was in school and college and admitted in a nursing program that takes a year to get into, and a family to tend to also.

Q.    All right.

A.    If I could have been, I would have definitely.

Q.    Did you finish the nursing program?

A.    No.

Q.    Are you not going to school right now, though?

A.    No, it's summertime now.

Q.    Who has your little boy right now?

A.    My Aunt Anita.

Q.    Is he here in Little Rock with you?

A.    Yes.

Q.    We have been here a long time, and I was going to take you through a lot of the family history that I'm not going to do now.  But I do want to get into certain points with you, Ms. Edwards, about your growing up both in Oklahoma and Tennessee, when you came back to Oklahoma, and I want you to try to remember how old are you at certain times.

How old are you right now?

A.    Twenty.

Q.    When you first -- let me see.  When you got to Tennessee after your mother and Mr. Graham divorced, do you remember

Carolyn S. Fant
United States Court Reporter

7608

Edwards - Direct

about what time frame that was?

A.    I was about eight years old.

Q.    So up until you were eight years old, where did you go to school?

A.    Lake Park Elementary, I believe.  It was in Bethany, Oklahoma.

Q.    Is that also near Yukon, Mustang, Oklahoma City?

A.    Oh, yeah.  Yeah.

Q.    Who is your biological father?

A.    Dennis Graham.

Q.    And did you grow up in the house with both Dennis Graham and your mother?

A.    Yes.

Q.    Lea?

A.    Yes, until they separated and divorced.

Q.    And that was what age for you?

A.    Around seven or eight.  I think eight.

Q.    Now, obviously Danny was in the home for all of that time.  Who else was in the home, if anybody?

A.    Dennis' first wife's children: Denny and Lynn, and Lynn had cerebral palsy.

Q.    When did Denny and Lynn come to live with ya'll, if you can put it in the perspective of how old you were?

A.    I'm not really sure.  I think I was around five maybe. I'm not positive, though.

Carolyn S. Fant
United States Court Reporter

7609

Edwards - Direct

Q.   Then at some point before your mother and your daddy separated, did Denny and Lynn go back to live with their mother or go somewhere else or stay with you all the time?

A.   They went back to their mother.  I'm not sure when.

Q.   Can you give us a time frame at all?  Do you think they were with you for a year, two years?  Do you know?

A.   Around that. It was more than a few months, and it was less than my whole lifetime.

Q.   That's all right.  It's hard to remember.

     Carrie, I want to talk to you now about your daddy.  What is your current relationship with Dennis Graham?  Do you have ongoing contact with him now?

A.   We speak on the phone maybe once a month and see each other every maybe two months maybe.

Q.   When you see each other and talk, is it friendly, hostile?

A.   It's friendly.  It's different.  I mean, he's not like my father.  Like going to see an uncle or something, really.

Q.   During the time that all of you were living together -- we've seen a picture of a big castle-looking house.  Is that the house that you grew up in for the most part?

A.   Yes.  Yes.

Q.   During the time that you lived with your mother and Danny and your dad and your dad's other children in that house, did your father ever use any form of discipline on you?

A.   On me, nothing more than a few spankings, but he hardly

7610

Edwards - Direct

ever did that either.  Just told me not to do it again.

Q.    And during that time frame did your father use any form of discipline or your brother Danny?

A.    Severe beatings.  He beat Danny.

Q.    How frequently, if you can remember, would you observe Danny taking a beating from your daddy?

A.    Often.  I don't know a time frame, but anything could set him off.

Q.    That was my next question.  What would prompt the beatings?  We just had a letter introduced that Danny wrote to his biological dad saying that he usually deserved it. What did Danny do to deserve the beatings?

A.    Nothing I know of.  He could spill a glass of milk, drop a plate, or spill meat or milk or anything.  It didn't take anything.  Breathe wrong.  My daddy never showed Danny the love he deserved.

Q.    Did you ever allow Danny -- and there may have been more times, but I'm thinking of a specific occasion -- did you allow Danny ever to take the wrap for something that you had done?

A.    I don't know what it was I had done, but, yes.  Danny -- I blamed something I had done on Danny, and my mom saw me do it. And Danny ended up getting beaten for it by my dad, and my mom took me to my room and gave me a spanking also, but Danny just took the blame for me.

Q.    I guess I will have to ask you this.  What did your dad

Carolyn S. Fant
United States Court Reporter

7611

Edwards - Direct

use to whip Danny with?

A.    A belt.  And it wasn't just the leather part.  It was the metal part also.

Q.    What would Danny do?  Most people cry when they are whipped or they run to their rooms or go away. What would Danny do as a reaction when Dennis whipped him?

A.    Be quite.  Quiver -- his chin would quiver.  He would scream after it was over.

Q.    Let's talk a little bit less about your dad and a little bit more about the other people in the household.  How old was Denny as compared to Danny.  You don't have to tell me exact ages, but roughly.

A.    I think Denny is a month older.

Q.    Roughly the same age?

A.    Yeah.

Q.    What about Lynn?

A.    She's a few years older than both of them.

Q.    Were you always the baby in this family?

A.    Yes.

Q.    Was there a time before Lynn came that she lived in some kind of institution?

A.    I believe so.  I'm not really for certain.  I know she did, but I don't know if it was before or after.

Q.    Do you have any independent memory of what it was like when Lynn first came to live with ya'll?

Carolyn S. Fant
United States Court Reporter

7612

Edwards - Direct

A.    Chaotic.    I remember mom was stressed more and dad was harder on Danny.

Q.    Was Lynn -- I know that Lynn has cerebral palsy, but did she have any particular problems or outbursts that had to be dealt with by the family?

A.    Not to my independent knowledge, but mom has said things like she would put feces on the wall or spill food or throw food against the wall.    She would have seizures sometimes.    It was just a difficult life.    She wore braces and needed a lot of attention.

Q.    How did Danny respond to Lynn?

A.    He was always wonderful to her.    Nice, and helped her do anything.    Up and down the stairs.    We had a two-story house and Lynn couldn't make it up by herself, and Danny was always nice to anybody who needed help, Lynn included.

Q.    Let's see.    Move with me to when the separation occurred between your mom and dad.    Have you said that you were about eight; is that right?

A.    Uh-huh.

Q.    And so what did you all first do?    Did you leave Oklahoma right then? Did you stay in Oklahoma for a little while?

A.    You know, when we left, we left in the middle of the night.    Stayed at our grandmother's house.    And we moved to Tennessee with our dogs and everything.    I didn't know we were moving at the time.    I thought we were on vacation for two

Carolyn S. Fant
United States Court Reporter

Edwards - Direct

weeks.  Mom was upset about something, and after we were already in Tennessee, I realized that I'm not going to live with my daddy anymore.

Q.    So you didn't know about it until you had actually stolen off in the night and gone to the relatives in Tennessee?

A.    Yes.

Q.    Was there any contrast between the home you had lived in in the Oklahoma City area where you went in Tennessee?

A.    Definitely.  In Oklahoma City, rich kids, you know, in that area.  Lots of money.  And we moved to Tennessee and had absolutely nothing.  A very small house.

Q.    Did you go from -- I know you lived in the country, but you go from Oklahoma City to a rural area of Tennessee?

A.    Oh, yeah.  Yes.

Q.    Did you or Danny have any kind of adjustment problems with that change?

A.    I did definitely, and I believe Danny did also.  It was very different, the whole lifestyle, and then we didn't have our dad.

Q.    Now, eventually, during the time that you were in Tennessee, did you know that your brother became involved in what's known as the skinhead movement?

A.    At the time I didn't know.

Q.    When did you first learn about it?

A.    I'm not really sure.  I mean, I was older.  We had lived

7614

Edwards - Direct

in Union City by now, and that's when he talked about it.  But at the time, I didn't know.

Q.    You didn't know when he first began; you just know that eventually he got there?

A.    Yeah.

Q.    Now, were you around in 1990 -- let's see.  Help me out. How old would you have been in '90?

A.    Twelve.

Q.    So were you aware of the incident when Joey Wavra was killed and your cousin went to the penitentiary for it?

A.    Yes.

Q.    After that time, or along about during that time, was Danny in or out of a juvenile or psychiatric facility?

A.    In and out and then into jail for that.

Q.    After he came home from jail -- did he come home to live with you and your mother?

A.    I think so. I'm not for sure.

Q.    Danny was in and out of the house a lot, wasn't he?

A.    Yes.

Q.    But eventually, after the incident where John David went to the pen, did Danny come back home and live with you and your mother?

A.    Yes, and while he was there, there was a man named Brother Weeby.

Q.    While he was there?

Carolyn S. Fant
United States Court Reporter

7615

Edwards - Direct

A.    When Danny was in jail.  I'm sorry.  There is a man Brother Weeby, and he got Danny to read the Bible and saved him, and when Danny got home he decided to take us and my mom to that church where Brother Weeby attended.

Q.    What kind of church was it?

A.    A Southern Baptist.

Q.    Was there any kind of Aryan Nation connection?

A.    Not at all.  They were -- black people attended also.  It wasn't nothing like that.

Q.    Where was the church?

A.    In Oklahoma City.

Q.    Then you say Danny came back and he started taking you and your mother.  Was church something that you did routinely?

A.    Not as a child, no.  My dad didn't like it very much.

Q.    So was it basically the first time you had begun going on any kind of regular basis?

A.    Yes.

Q.    Did you and Danny have any conversations about going to church?

A.    All the time. If I would read the Bible and didn't understand anything, Danny was there to point out this is what this means and that's that, you know.  He's the one who led me to Christ.

Q.    And you know now that some of his beliefs are pretty far flung from the King James version, don't you?

Carolyn S. Fant
United States Court Reporter

7616

Edwards - Direct

A.    Yeah.  Anything to belong, I think.

Q.    All right.  Then talk to us a little bit about Jennifer Givens.  Did you know Jennifer personally?

A.    Yes.

Q.    When was it roughly that Danny and Jennifer hooked up?

A.    I think I was about 14.

Q.    There was in the video that we played earlier -- a video Danny had made when Audrey was born -- there is mention of Carrie.  You're not in the room when this --

A.    Her younger sister's name is Carrie also.

          MS. COMPTON:  Your Honor, may I approach Ms. Edwards?

          THE COURT:  Yes.

          MS. COMPTON:  Forty-one, Marge?

          COURTROOM DEPUTY:  Forty-one.

BY MS. COMPTON:

Q.    I'm going to show you some pictures that I have marked for identification purposes as DL-41, 42, 43 and 44.

          THE COURT:  Excuse me, 21, 22?

          MS. COMPTON:  Forty-one.

          THE COURT:  To 44.

BY MS. COMPTON:

Q.    I need to just go through them and see if you can identify them.

A.    That's Audrey.  She is so gorgeous.  She looks just like Danny.

Carolyn S. Fant
United States Court Reporter

Edwards - Direct

And this one where she's blowing out the candles in her cake.

Q.   That's 42.  And what is 43?

A.   Audrey.  She is so gorgeous.

Q.   And 44?

A.   Audrey.

Q.   Let me have them back.

THE COURT:  Are you offering them?

MS. COMPTON:  Yes, I am.  In fact, I'm offering 41, 42, 43 and 44.

THE COURT:  All four are received.

(Defendant Lee's Exhibit Nos. DL-41, DL-42, DL-43, and DL-44 were received.)

BY MS. COMPTON:

Q.   All right, Ms. Edwards, was there a time when you and your mother maintained a relationship with Jennifer Givens and Audrey?

A.   Yes, we used to write letters and send pictures and her little drawings to us until this trial started and she cut that off.

Q.   Until the trial began?

A.   Yeah.

Q.   And 41 is obviously a very early age picture of Audrey. Do you know how old roughly she is in that picture?

A.   Anywhere between one and two I think.  Maybe 18 months.

Carolyn S. Fant
United States Court Reporter

7618

Edwards - Direct

Q.    And 42, do you remember when you all received 42?  Was that sent to you by Jennifer Givens?

A.    Yes, it was.  I don't remember when, but --

Q.    Must have been right after her birthday?

A.    Yeah, I'm guessing.

Q.    And, again, I'm just trying to get a time frame if you can remember, if you're able to tell us.  You can tell a little bit by the size of Audrey.  Do you know how old she is in this photograph?

A.    Maybe three or two. Two or three.  I think that one came with her second birthday, so I guess she's two.  Preschool age.

Q.    Is that also Audrey?

A.    Yes.

Q.    Is this another one of the pictures that Ms. Givens sent to you?

A.    Yes.

Q.    Now, I'm going to show you a couple of photographs that were previously introduced and see whether you can identify the people in here.  They have been previously identified, but just tell us -- look at the top of the picture, too?

          THE COURT:  Exhibit number, please.

          MS. COMPTON:  I'm sorry, DL-31.

          THE WITNESS:  I remember that day.  That's Danny and Jennifer and half of my head.

Carolyn S. Fant
United States Court Reporter

7619

Edwards - Direct

BY MS. COMPTON:

Q.    What were ya'll doing that day?

A.    Playing in the balls at the Braum's Restaurant.

Q.    Playing in the balls at what?

A.    Braum's.  It's an Oklahoma restaurant.  The little play area outside made for kids.

Q.    How old would you have been in this photograph roughly?

A.    Fourteen or fifteen.  That was the first time I had met Jennifer.

Q.    So this is before Audrey is born?

A.    Yes.

Q.    Was this in Oklahoma?

A.    Yes, in Yukon actually.

Q.    So they had come to visit you and your mother?

A.    Yes.

Q.    Let me show you what's been previously introduced as DL-32 and ask whether you can identify the people in that and where it was made.

A.    Jennifer, Danny and I.  And that was at Overhoser Lake near the house we grew up in.

Q.    In Oklahoma?

A.    Yes.  It was just down the street from the big castle house.

Q.    Was this the same visit at the pictures with the balls or balloons?

7620

Edwards - Direct

A.    Yes.

Q.    Did Danny ever ask Jennifer Givens to marry him?

A.    Yes.

Q.    Were you there?

A.    Yes.  We had a big Christmas dinner at my grandmother's house, and the whole family was there.  It was a big thing, and Danny got down on one knee and asked Jennifer to marry him, and in front of our entire family she said, "Danny, we have already talked about this, and it's not going to happen." And he asked her again.  And she wouldn't do it.  And Danny bit his tongue and swallowed his pride and went outside and cried for awhile, and Jennifer somehow lasted the rest of the day in front of the whole family.

Q.    And then left?

A.    Yes.

Q.    Did you say it was a family reunion?

A.    No, it was Christmas dinner.

Q.    Roughly how many family members witnessed this?

A.    My grandmother and grandpa, and our family, and my mother's sister, Oweda, and her husband and her two children, and a few other aunts, uncles and cousins.

Q.    You haven't been in the courtroom the whole time, Ms. Edwards, but you are now aware, are you not, of what we are doing here and what our sole purpose is here now?

A.    Yes.

7621

Edwards - Cross

Q.    You know this jury has found Danny guilty of really horrible crimes.  You understand that?

A.    Yes, ma'am.

Q.    And do you understand that the only thing they can now do is either allow him to live out his life in prison or to be killed.  Do you understand that?

A.    Yes.

Q.    Ms. Edwards, has your brother got any good in him?

A.    My brother is the most awesome brother I could ever have in this whole world.  I love Danny.

Q.    Can he do any good for anybody?

A.    Yes, he's always done good for us.  Always.  He can do it. I know.

Q.    Thank you.  I'll tender the witness.

            THE COURT:  Any questions?

            MR. LIROFF:  Yes, please.

                    CROSS EXAMINATION

BY MR. LIROFF:

Q.    Would you like some water?

A.    No, thank you.

Q.    Can I ask you a few questions?

A.    Uh-huh.

Q.    You were seven or eight years old when your parents separated?

A.    Yes.

Carolyn S. Fant
United States Court Reporter

7622

Edwards - Cross

Q.    I'll give it a try.

Before your parents separated, were you aware whether or not your brother used drugs of any kind?

A.    I wasn't aware at the time.  I don't think he did even before.

Q.    Do you know what huffing is?

A.    Huffing paint maybe, I guess.  Is that what you're --

Q.    What is huffing paint to you?  What does that mean to you?

A.    Smelling the fumes, I guess.  I don't know.  I don't do drugs.  I have no idea what it means.

Q.    Did Danny do things like that?

A.    Not that I'm aware of.

Q.    You would be around the house when he was here.  If he was doing it, you would have seen it.

A.    Yes.

Q.    Do you remember your brother getting into a lot of fights?

A.    When? Like -- I don't know what you're asking me.  What time frame?

Q.    At any time.

A.    With neighborhood children or anything? No.  No.

Q.    When he was a little boy, do you remember him getting into fights?

A.    No more than a little boy would.  I mean --

Q.    How about the time he was a teenager, when he was 15?  Did he get into fights?

Carolyn S. Fant
United States Court Reporter

7623

Edwards - Cross

A.    No more than a teenager would and have a squabble with your best friend.

Q.    How about when he was older?  Were you aware that he was getting into a lot, a lot of fights?

A.    Not until he was in the skinheads did he start fighting.

Q.    When was that?

A.    I don't know when it was actually.

Q.    How do you know he got into a lot of fights when he was in the skinheads?

A.    He would tell me about them, I guess.

Q.    What would he tell you?

A.    I don't know; just that he got into a fight.  "This guy punched me here and I punched him there."

Q.    Did you ask him why he was getting into fights?

A.    No, I didn't.

Q.    Did you ask him why he wouldn't stop getting into these fights?

A.    I'm sorry?

Q.    It was more than one fight.  He told you that?

A.    I'm sure it was.

Q.    It was many, many fights.

A.    I'm not sure.

Q.    He liked these fights, didn't he?

A.    I can't tell if he liked them or not.

Q.    Would you talk to him about it?

Carolyn S. Fant
United States Court Reporter

7624

Edwards - Cross

A.    Not a whole lot, sir.

Q.    Did you try to get him to stop?

A.    No.

Q.    When was it that he was telling you about getting into these fights?

A.    I guess I was at least 14 or older.

Q.    What year is that?

A.    I don't know.  I was born in '78.  I don't know the math.

Q.    Might that be '92?

A.    I guess.  Yes.

Q.    At that time did he talk to you about opinions he had about race, anti-Semitism.  Did he talk about that?

A.    Yeah, he did.  It was what skinheads wanted him to believe, and I think he would do anything to belong.  And his thoughts were that which the skinheads wanted him to think.

Q.    Let's go before that.  Sometime before that.  Let's go to May of 1988.  Did he assault you?

A.    In May of 1988? I don't have a clue.  Danny never hit me more than a big brother would push a sister around.

Q.    Do you know whether or not in 1988 in May Danny was removed from your house because he had assaulted you?

A.    I don't know.  I can't remember.

Q.    You can't remember? No?

A.    No.

Q.    Did you ever talk to Jennifer after Danny proposed to her?

Carolyn S. Fant
United States Court Reporter

7625

Campbell - Direct

A.    I asked her why she wouldn't marry him, and she never gave me an answer.

MR. LIROFF:  Thank you.

THE COURT:  Anything else?

MS. COMPTON:  I have nothing further.

THE COURT:  You may stand down, and you are excused.

Call your next witness.

MS. COMPTON:  May Ms. Edwards remain in the courtroom?

MR. LIROFF:  I have no objection.

THE COURT:  Yes, she may.

MS. COMPTON:  Danny Bishop.

Call Joy Campbell.

THE COURT:  Come forward, please.  Come to this lady here.  Raise your right hand and be sworn.

JOY CAMPBELL, DEFENDANT LEE'S WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MS. COMPTON:

Q.    Speak into the microphone, please, and tell the Court your name.

A.    Joy Campbell.

Q.    Where do you live, Ms. Campbell?

A.    Spokane, Washington.

Q.    Have you testified in this cause earlier?

A.    Yes.

7626

Campbell - Direct

Q.   Now, then, when did you first come to know Danny Lee?

A.   The spring of '95.

Q.   How did you come to know Danny?

A.   At a youth congress.

Q.   At a what?

A.   At a youth congress.

Q.   What kind of youth congress was it?

A.   For Aryan Nations.

Q.   Was that in Hayden Lake, Idaho?

A.   Yes.

Q.   How did you come to be at a Hayden Lake youth congress?

A.   I drove up there with some friends.

Q.   Well, what made you want to go there?

A.   I was a skinhead.

Q.   You were a skinhead?

A.   Yes.

Q.   If we looked at pictures of you from some time ago, would you have like the shaved head?

A.   Yes.

Q.   Who got you involved in the skinhead movement?

A.   Mostly, I would say on my own free will or Sean Haines.

Q.   We know who Sean Haines is, but remind the ladies and gentlemen of the jury who he is to you.  I'm sorry.

A.   He was also the father of my child.  You saw his birth certificate, and so forth, last time.

Carolyn S. Fant
United States Court Reporter

Campbell - Direct

Q.   Well, and we saw his birth certificate in connection with when Aldrik, your son, was born because we knew Danny was there or shortly after that?

A.   Yes.

Q.   Sean Haines and Danny were friends.  Is that also correct?

A.   Yes.

Q.   Were they roommates at some period of time?

A.   Yeah.  When Danny moved up there, he stayed with Sean.

Q.   Now, you say that you were a skinhead.  How old are you?

A.   Twenty.

Q.   And when did you become a member of the skinhead movement?

A.   Fifteen.

Q.   You were 15 years old.  How did your mother, Vada Campbell, react to you being in that movement?

A.   She hated it.

Q.   You're 20 now.  Are you completely finished with the skinhead movement?

A.   Yes.  I'm no longer a skinhead.

Q.   How does a person go about sort of unbecoming a skinhead after having been one?

A.   I just go to school.  I just don't hang out no more.

Q.   You just don't what?

A.   I don't hang out anymore.  I go to school, and I work, and I'm a mom.

Q.   So, I mean, is it fair to say that you grew out of it or

7628

Campbell - Direct

circumstances caused you to get out of it?

A.    Yes, you can say that.

Q.    Let me talk to you about Danny.  I guess when you first met him he was already a skinhead.  Did you say that?

A.    Yeah.

Q.    Now, how often-- you met him in the spring of '95.  How often would you see Danny Lee?  What was your type of friendship or contact with him?

A.    Probably see him every other day if not more.

Q.    I'm going to keep reminding you. It's really hard to hear you.

A.    I'm losing my voice.

Q.    So for a period of what?  A month, a year?  How long would you go about seeing Danny on such a regular basis?

A.    For over a year.

Q.    During this time did you form a relationship with him that you could call loving or caring?

A.    Yes, I did care for him, yes.

Q.    I don't want to embarrass you, but were you and Danny lovers?

A.    No.

Q.    Well, there had somebody talk early, early in the trial that maybe you had been.

      So you're friends, you have a caring relationship, and --
did you bring some notes with you?

Carolyn S. Fant
United States Court Reporter

7629

Campbell - Direct

A.    Yes.

Q.    What did you do -- what kind of notes did you make?

A.    Well, I'm sick right now.  I think I have strep throat, so I made some notes -- with a fever as well -- so I don't forget anything.

      It's just notes about how Danny drove Jen up here when they came up in '95.

Q.    It's notes to prompt your memory about things about Danny?

A.    Yes.

Q.    And you knew I was going to be asking you whether there was any goodness in Danny Lee, did you not?  Do your notes help you think about good things that Danny Lee has done for people?

A.    Oh, I don't need the notes.

Q.    Well, tell the jury a little bit about what good things Danny has done.

A.    When I first met him in '95 with Jen and Christy Duke up at the church on Sunday.  I went because it was free and I didn't have no money.  But Jen didn't want to stay up there anymore.

Q.    You're talking about Jennifer Thomas?

A.    Yes.  She didn't want to stay up there anymore; she wanted to go home.  And so Danny decided he would drive her home.  She said she couldn't do it by herself.  He drove from home from Washington to Florida.  Most skins -- anybody I know, skinhead or not-- would have been like, "Hop on a bus. Figure it out.

Carolyn S. Fant
United States Court Reporter

7630

Campbell - Direct

I'm not going that far." But he drove her all the way home. That says a lot if you ask me.

Also, I was -- when I was pregnant, Sean Haines -- as I said before, the father of my child -- used to yell at me, push me, whatnot, and Danny was always there for me. "It will get better. You deserve better." You know, whatnot. He was always there. Hugs or anything. We were never lovers, but it was friendship. Never asked me to date him, never did anything, but it was -- he was always there for me emotionally.

Q. What about financially? Was Danny ever able to help you out when Sean didn't or couldn't?

A. Actually Sean told Danny -- I didn't find this out until later in the spring of '96, but Danny gave Sean a couple of different times $20.00. And he would give him this money and telling Danny that he was buying Aldrik shoes or diapers or clothes. Me and Aldrik never saw any of the money. He bought beer or something for his girlfriends.

Q. By the way, you and Sean Haines are completely separate and apart right now, aren't you?

A. Yes.

Q. How long have you been away from him?

A. I haven't seen him for over a year.

Q. What other acts of kindness can you recall Danny committing in your presence?

A. When I was pregnant, and I used to walk everywhere.

Carolyn S. Fant
United States Court Reporter

7631

Campbell - Direct

Everywhere.  And I would try getting Sean to walk with me to the store one time, and Sean wouldn't do it.  Like, "No, it's cold, you're crazy.  I don't think so." Danny and Chevie Kehoe decided they would walk me to the store, and bought me a Yahoo.  Asked me if I wanted anything else.  You know, the only two people that would walk with me.

Q.   Let me ask you something that doesn't have anything to do with these little acts that you're talking about, Ms. Campbell.  Do you know -- as a former skinhead do red boot laces red shoelaces mean anything?

A.    National Socialist.

Q.    What is that?

A.    Just general belief of the skinhead.

Q.    Do the red shoelaces indicate that somebody has been murdered?

A.    No.

Q.    What is the significance of red shoelaces?

A.    Is basically you stand up for your race or you getting in a fight or whatnot, standing up for what you believe in.  It has nothing to do with murder.

Q.    That would allow to you lace your boots up in red --

A.    Yes.

Q.    -- for skinhead purposes.

You've told the jury that you had these skinhead beliefs.  You've quit them, you're moving on.  Did you have any trouble

7632

Campbell - Direct

doing that?  Giving it up?

A.    Besides Sean Haines saying he was going to bust down my door and beat up my dad, no.

Q.    Sean has given you a lot of trouble?

A.    Yeah.

Q.    Do you think from your relationship with Danny Lee -- by the way, do you know what he's been convicted of?

A.    Yes.

Q.    And do you think from your relationship with Danny that in spite of skinhead beliefs, in spite of being in this organization, in spite of these convictions of truly horrible crimes, there is any spark of goodness in him?  Anything he can do to help somebody within the prison?

A.    Definitely.  He's always been the first one to say, "If you need it, I'll help you." If Danny owns one shirt and one pair of pants, if someone needs it, he'll give them his without any doubt.  He'll give the last anything for someone who needs it.

Q.    Did you ever know of an occasion when Danny took the wrap, so to speak, for an incident that was not his fault?

A.    Yeah.

Q.    Tell us about it.

A.    Winter of '96 they were driving -- him and Sean Haines were in Sean Haines' vehicle, the Suburban, and Sean rear-ended a '95 Mercedes Benz.  Called me up, "Oh, my god, can you dad

Carolyn S. Fant
United States Court Reporter

7633

Campbell - Direct

come fix it?" And, of course, my dad didn't want any part of it, but he convinced Danny to hop over in the driver's passenger to take the blame for it because Danny had a driver's license.

Q.    And Sean didn't?

A.    Nope.  And Danny took the blame for that.

THE COURT:  Any questions?

MR. LIROFF:  Yes, Your Honor.

THE COURT:  It's 12:15, so we'll recess for lunch.

Ladies and gentlemen, we'll now recess for lunch.  Be back at 1:30, everyone else let the jury go.

(Jury leaves courtroom.)

THE COURT:  Ms. Compton, how are we doing? Give me some idea of how we were going.

MS. COMPTON:  After Ms. Campbell, I don't know where Danny Bishop was.  He's a very brief witness also, and there is a Sharron Denny that will take a little bit longer.  Probably only 20 minutes on direct.

After that, I have Dr. Cunningham would will take, I would say, a minimum of two hours on direct examination.  And then I have Dr. Bianchini here and a short filler witness if I need them, but I sort of anticipate that Dr. Cunningham will take up the most of the afternoon.

THE COURT:  The other doctor?

MS. COMPTON:  Dr. Bianchini.

Carolyn S. Fant
United States Court Reporter

7634

Campbell - Cross

THE COURT: Will that be of similar length?

MS. COMPTON: No, he will not. He'll be a much shorter witness.

THE COURT: Court will be in recess.

(Recess 12:15 to 1:30 p.m.)

AFTERNOON SESSION

THE COURT: Mr. De La Cruz, you may cross.

MR. DE LA CRUZ: Thank you, Your Honor.

BY MR. DE LA CRUZ:

Q.   Ms. Campbell, on direct you indicated that you were a member of the Aryan Nations and a former skinhead; is that true?

A.   A member of Aryan Nations for only a year, but yes.

Q.   When you testified previously in the trial, you didn't volunteer that, did you?

A.   Didn't volunteer what?

Q.   That you were a former skinhead and former member of Aryan Nations?

A.   No.

Q.   When you attended this youth congress that you described up at Aryan Nations compound, do you recall when that was?

A.   Do I recall when it was?

Q.   Do you recall?

A.   Yes.

Q.   When was it?

Carolyn S. Fant
United States Court Reporter

7635

Campbell - Cross

A.    April of '95.

Q.    April what? What date?

A.    I believe it was the 21st.  Excuse me, I'm sick and I can barely hear you.

Q.    Was it the 20th of April?

A.    I believe so, or the 21st. It was on a Sunday.

Q.    What's the significance of the 20th of April?

A.    Hitler's birthday.

Q.    Adolph Hitler?

A.    Yes.

Q.    Now, you mentioned Nationalist Socialist.  What's the common term for that -- for those two words?

A.    National Socialist would be as far as commonwealth, so forth.  I think there is a misunderstanding between the National Socialist and the Revolutionary Socialist, but basically just commonwealth and sharing and stuff.

Q.    Isn't it true that the Nationalist Socialist were also called the Nazis?

A.    Yes.

Q.    When you talked about the red boot laces, skinheads wear three different types of boot laces, don't they? Red, white and black?

A.    Yes.

Q.    And is it just a coincidence that red, white and black is also the colors of the Nazi flag during World War II?

Carolyn S. Fant
United States Court Reporter

Campbell - Cross

A.    Probably, yes.

Q.    It's just a coincidence?

A.    I believe everybody probably wears black laces with their boots, so I don't believe a person I saw walking down the street to the courthouse is a Nazi either.  Generally people wear black.

Q.    But people walking down to the courthouse aren't wearing Dr. Marten's, are they?

A.    Generally, it's actually pretty popular in the youth scene.

Q.    So a skinhead it means nothing that they are wearing red, white or black boot laces for a skin head?

A.    Red and white would be for more a skinhead.  Not black.

Q.    And if Danny said that red meant a specific color to him --

        THE COURT:  Say that again.

BY MR. DE LA CRUZ:

Q.    If Danny Lee said that red boot laces for him meant something particular, would that make a difference?

A.    If he believed it to mean something?

Q.    Yes.

A.    To make a difference to me?

Q.    As opposed to a generalized statement of knowledge among skinheads of what the colors meant?

A.    Probably not.

Carolyn S. Fant
United States Court Reporter

7637

Campbell - Cross

Q.    What's the role of women in the Aryan Nations?

A.    Role? To be women.

Q.    And to do what?

A.    To be women; to be yourself.

Q.    That's the role?

A.    No particular role.  It's not like we are designated to go cook dinner or anything.  There is no designated role.

Q.    You went to church at Aryan Nations; isn't that right?

A.    A few times, yes.

Q.    Did you hear Pastor Richard Butler speak?

A.    Yes.  Yes.

Q.    And he never talked about the role of women in the Aaron Nations?

A.    Not too much, no.

Q.    Not about raising white children to create --

A.    Yeah.

Q.    -- a breed for the future?

A.    Yeah, I've heard that.

Q.    Let me direct your attention on the television monitor to Government's Exhibit 1096.  What's this symbol?

A.    Excuse me?

Q.    What is that symbol?

A.    Aryan Nations flag.

Q.    That's the Aryan Nations flag; is that correct?

A.    Yeah.

Carolyn S. Fant
United States Court Reporter

7638

Campbell - Cross

Q.    Let me direct your attention to Government's Exhibit 1076.  On the bottom of Danny Lee's jacket, what is this symbol?

A.    Excuse me.  Can I ask what the relevance of this is?

Q.    Yes.  What is the symbol?

A.    I don't know.

Q.    You don't know?

A.    No.

Q.    You have never seen that before?

A.    Of course, I have.

Q.    You have.  And where have you seen it before?

A.    Around.

Q.    Associated with who?

A.    Skinheads.

Q.    And klansmen?

A.    Sure.

Q.    Can you read what's printed here?

A.    No.  Something priest.

Q.    If it said Phineas Priest, would that mean anything to you?

A.    No.

Q.    Not at all?

A.    No.

Q.    You have never heard that term?

A.    I'm sure I've heard it.

Carolyn S. Fant
United States Court Reporter

Campbell - Cross

Q.    Where?

A.    Probably over at a friend's house or something.

Q.    The last time you were here I asked you if you had received letters from Danny Lee.  Do you recall that?

A.    Yeah.

Q.    And you did receive some letters, didn't you?

A.    I received two.

          MR. DE LA CRUZ:  May I have this marked as an exhibit and a staple or something or a clip?

          May I approach the witness, Your Honor.

          THE COURT:  Yes.

BY MR. DE LA CRUZ:

Q.    Let me show you what's been marked as Government's Exhibit No. 1117.  Do you recognize this?

A.    No.

Q.    You never received this letter?

A.    No.  Some of my mail is picked up by another gentleman who I was sharing a P. O. box with.  He told me about a letter that Danny had sent, but I never received it.

Q.    You never received a letter that told you to deny everything if you received this letter?

A.    No.

Q.    What was your address in Spokane?

A.    2607 Rich.

Q.    Is that your current address?

Carolyn S. Fant
United States Court Reporter

7640

Campbell - Cross

A.    Yes.

Q.    When did you live or when was your mailing address P. O. Box 7433?

A.    I believe it still is.  I have a P. O. box as well.

Q.    So you do receive mail at P. O. Box 7433, Spokane, Washington 99201?

A.    Actually, I think -- I forget what it is.  I can't remember what it is now.  It's 99207.

Q.    You never received a packet from Danny Lee with grand jury statements and other --

A.    No.

Q.    -- things?

A.    No.

Q.    You're aware that Danny Lee lost his eye in October of '95; is that correct?

A.    Yes.

Q.    How did he lose his eye?

A.    In a bar fight.

Q.    Was Danny involved in many fights?

A.    No.

Q.    Not that many fights?

A.    No, not that I saw.

Q.    What did Danny tell you about his fights before October when he lost his eye?

A.    About the fight when he lost his eye?

Carolyn S. Fant
United States Court Reporter

7641

Campbell - Cross

Q.   No.

A.   Or just before.

Q.   Did he tell you that he was involved in fights?

A.   No.

Q.   Is it common for skinhead members to be involved in fights?

A.   Anybody who wants in a fight, they'll fight.  I wouldn't say it's common for any particular person.

Q.   Is it common for skinheads to go out and find racial targets or people that they don't like, gays, blacks?

A.   No, I wouldn't say they go out and find it.

Q.   They don't? That's your testimony?

A.   That would be my testimony for the Spokane skinheads, yes.

Q.   Have you ever heard of the "pub" scouts?

A.   Yes.

        THE COURT:   Of what?

        MR. DE LA CRUZ:   Pub scouts.

BY MR. DE LA CRUZ:

Q.   Are you aware they considered changing their name at one point?

A.   No.  I don't think I knew any of them.  I knew of them. They are just little kids that think they're cool.  This is all they are.

Q.   You and Danny have a common friend named Johnny or John. Who is that?

Carolyn S. Fant
United States Court Reporter

7642

Campbell - Cross

A.   Last name, please?  There's a couple of Johns.

Q.   Well, I'm asking you.  What is John's last name?

A.   I don't know.  What John do you want to know about?

Q.   Tell us both.

A.   I would rather not.  Which John are you talking about?

Q.   I would like the answer.  The last name for both Johns.

A.   I know John Christiansen.  What John are you in reference to?

Q.   The John who was in jail.

A.   John Perry?

Q.   Is that John Perry, Jr.?

A.   Yes.

Q.   And you never received a letter from Danny and instructions to give to John Perry, Jr.?

A.   No.  I just told you that.

        MR. DE LA CRUZ:  No further questions, Your Honor.

        THE WITNESS:  Thank you.

        THE COURT:  Anything else?

        MS. COMPTON:  No, sir.

        THE COURT:  You may stand down.

        Call your next witness.

        MS. COMPTON:  Danny Bishop.

        THE COURT:  Just come forward to the front of the courtroom, please.  Come to this lady here.  Come to this lady.  Raise your right hand and be sworn.

Carolyn S. Fant
United States Court Reporter

7643

Bishop - Direct

DANNY BISHOP, DEFENDANT LEE'S WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MS. COMPTON:

Q.    Would you state your name, please?

A.    Danny Allen Bishop.

Q.    You're going to have to slow down and speak right into the microphone.

A.    Danny Allen Bishop.

Q.    Where do you live, Mr. Bishop?

A.    I live in Purcell, Oklahoma.

Q.    Where is Purcell in relation to Oklahoma City, Yukon or Mustang?

A.    It's about 34 miles to Oklahoma City, about 40 miles to Yukon.

Q.    Okay.  Are you acquainted with Danny Lee?

A.    Yes, ma'am.

Q.    Do you know him as Danny Lee or Danny Graham? Or both?

A.    Both.

Q.    How did you come to meet Danny Lee?

A.    Through another friend.

Q.    Who's that friend?

A.    Tommy -- I can't remember his last name.

Q.    When did you first become acquainted with Danny?

A.    About five, six months before he was arrested.

Q.    So if he was arrested in September of '97, it would have

Carolyn S. Fant
United States Court Reporter

7644

Bishop - Direct

been five or six months before that time?

A.    Yes, ma'am.

Q.    Where did you meet him?

A.    At my house.

Q.    How much contact over that five or six month period did you have with Danny?

A.    He stayed at my house quite often.  I would say two months out of the six months we was around each other.

Q.    Were you married at the time?

A.    Yes, ma'am.

Q.    And what was your wife's name?

A.    Michelle.

Q.    Did Michelle have any children?

A.    Yeah, she had two children.

Q.    What were their names?

A.    Mercedes and Rochelle.

        MS. COMPTON:  Your Honor, may I approach the witness?

        THE COURT:  Yes.

BY MS. COMPTON:

Q.    Let me show you what's been marked as DL-45 and ask if you you can flip it over and see if you can identify it.

A.    That's Mercedes.

Q.    Is this how Mercedes looked at the time that Danny knew her?

A.    Yes, ma'am, it is.

Carolyn S. Fant
United States Court Reporter

7645

Bishop - Direct

Q.    Let me ask you this?  You and Michelle are no longer married, are you?

A.    Correct.

Q.    Do you and she still communicate?

A.    At least twice a week.

Q.    Is there some reason why she can't be here today?

A.    Michelle?

Q.    Yes.

A.    She just gave birth to twins, a boy and girl.

Q.    Now, this little girl Mercedes appears to be part black and part white or part Hispanic and part white. Is that true?

A.    That is correct.  Her father was black.

Q.    Did Danny ever meet her father?

A.    He may have.

Q.    Did you ever see Danny interact with Mercedes or your other stepdaughter?

A.    Yes, ma'am.  He spent quite a bit of time with them being around my house.  They had a good relationship.

Q.    I was just going to ask you how Danny was around Mercedes?

A.    He earned his relationship with her.

Q.    He earned it?

A.    Yes.

Q.    How do you mean?

A.    He loved her, and she loved him.  They played.  He treated her like I would.

Carolyn S. Fant
United States Court Reporter

7646

Bishop - Direct

Q.   Now, I forgot to ask you something that you may need to talk about. Do you have a drug problem and a drug conviction?

A.   I don't have a drug problem now.  I did, yes.  I have a pending drug conviction.

Q.   Are you in a court-ordered recovery program?

A.   Yes, ma'am, I am, in Purcell, Oklahoma.  It's called drug court.

Q.   How long have you been drug free on this particular occasion?

A.   Seven and a half months.

Q.   Now, when you and Danny were hanging around together during this time before his arrest in September of '97, did he ever have any conversation with you about his tattoos, any of them?

A.   He didn't care too much for them.

Q.   He didn't care for them?

A.   No.

Q.   How did you know that?

A.   Well, a hundred ten degrees outside he would wear long sleeves, long pants.  Sweat to death. He wasn't proud of his tattoos, no, ma'am.

Q.   Did he ever ask to you do anything about taking him somewhere?

A.   He wanted to get other tattoos on the tattoos that he had on his neck.

Carolyn S. Fant
United States Court Reporter

7647

Bishop - Cross

Q.    To cover them?

A.    Yes, ma'am.

        MS. COMPTON:  Thank you.  That's all I have.

                    CROSS EXAMINATION

BY MR. STRIPLING:

Q.    My name is Dan Stripling?

        THE COURT:  Just a moment, please.  The picture --
did you offer it?

        MS. COMPTON:  No, but I would offer DL-45 at this
time.

        THE COURT:  All right, it's received.

    (Defendant Lee's Exhibit No. DL-45 was received.)

        THE COURT:  All right, Mr. Stripling.

BY MR. STRIPLING:

Q.    Mr. Bishop, I have just a few questions.  I believe you
met Mr. Lee at a party at your house, did you not?

A.    That's probably correct.

Q.    You were partying a lot and so was he in the summer of
'97?

A.    Yes, sir.

Q.    And you told us that he stayed at your residence on
several occasions.  Was the last occasion just right before his
arrest?

A.    About an hour before his arrest, that's correct.

Q.    And, in fact, when he stayed at your house -- he'd stayed

                    Carolyn S. Fant
                United States Court Reporter

7648

Bishop - Cross

there for several days, hadn't he, before his arrest?

A.    Yes, sir.

Q.    And, in fact, when he came to stay at your house, at that time he didn't have any belongings and you had to give him a pair of jeans and a shirt to wear, did you not?

A.    He had clothes at his mom's house, but he enjoyed being around me.  I enjoyed being around him.  We had a lot in common.

Q.    He stated to you that he did not like having the tattoos that he had?

A.    Yes, sir.

Q.    Are you aware that after his arrest while he was incarcerated he had more tattoos added to his body?

A.    No, I'm not.

Q.    You went to visit his house once, didn't you?

A.    Yes, sir.

Q.    And when you were at his house you noticed that he had a bullet proof vest there, did you not?

A.    That's correct.

Q.    And I believe that during this time period Mr. Lee was driving a motorcycle?

A.    That's correct.

Q.    And on October the 1st, 1997 some ATF agents came to your house and interviewed you, did they not?

A.    That's correct.

Carolyn S. Fant
United States Court Reporter

Bishop - Cross

Q.    You showed them the motorcycle, did you not?

A.    That's correct.

Q.    The motorcycle had been damaged when it was left at your house, had it not?

A.    That's correct.

Q.    It had been damaged because Mr. Lee had stomped it and kicked it, had he not?

A.    The bike was left on the side of a road which had been damaged before we returned to the motorcycle, and, yes, we loaded it up and brought it to our house.

Q.    But it had been damaged by Mr. Lee who had stomped it and kicked it because it ran out of gas?

A.    That I can't say.

Q.    You said that to the agents when they came and interviewed you, didn't you?

A.    That's possible.

Q.    Well, let's get this straight.  You recall them interviewing you?

A.    Yes, sir.

Q.    You recall that they asked you about the bicycle -- the motorcycle?

A.    Yes, sir.

Q.    You recall that you took them outside and showed them the motorcycle?

A.    That's correct.

Carolyn S. Fant
United States Court Reporter

7650

Bishop - Cross

Q.   The motorcycle had obvious damage to it, did it not?

A.   It did.

Q.   They asked you if you knew how the damage came to be on the motorcycle, did they not?

A.   They did.

Q.   And you told them that the damage was there because Danny Lee had stomped it and kicked it because it ran out of gas.

A.   I can't prove that, but I may have said that.

Q.   That's what you told the agents, isn't it?

A.   Yes, sir.

        MR. STRIPLING:  Thank you.  That's all I have, Your Honor.

        MS. COMPTON:  I have nothing further of this witness.

        THE COURT:  All right.  You may stand down and you are excused.

        THE WITNESS:  Thank you.

        THE COURT:  Call your next witness.

        MS. COMPTON:  Call Dr. Mark Cunningham.

        MS. COMPTON:  Your Honor, we need -- we didn't get it set up during the break.  It may take us just a second to get it straight here.

        THE COURT:  Very well.  Doctor, come forward and put your books where you want them at the witness stand and then -- or wherever you want them.  Raise your right hand and be sworn.

MARK D. CUNNINGHAM, DEFENDANT LEE'S WITNESS, DULY SWORN

Carolyn S. Fant
United States Court Reporter

7651

Cunningham - Direct

DIRECT EXAMINATION

BY MS. COMPTON:

Q.    State your name, please.

A.    Mark Douglas Cunningham.

Q.    Where do you live, Dr. Cunningham?

A.    In Abilene, Texas.

Q.    What do you do for a living?

A.    I'm a clinical and forensic psychologist in private practice.

Q.    In private practice there in Abilene?

A.    That's correct.

Q.    How long have you been a psychologist?

A.    I finished my Ph.D. and internship in 1978.  I was initially a psychologist with the Navy.  I believe that I was first licensed in Connecticut in about 1980.  And then have been in practice in Texas since 1981.

Q.    What is -- you said that you are a forensic psychologist. What is a forensic psychologist as opposed to just a regular psychologist or some other kind?

A.    Forensic psychology is the application of psychological research and techniques to legal issues.  Things like child custody evaluations, or psychological injury in civil action, or in criminal cases things like competency to stand trial, or mental state at time of offense, or sentencing determination issues such as are being considered today.

Carolyn S. Fant
United States Court Reporter

Cunningham - Direct

Q.    Where did you obtain your undergraduate degree and what field was it in?

A.    I received my bachelor's degree from Abilene Christian College in Abilene, Texas.  I had a double major in mass communications and psychology and a minor in Bible.

Q.    A minor in what?

A.    In Bible.

Q.    And then after that did you go on to pursue a higher level of education?

A.    Yes, I did.

Q.    Where did you go to do that?

A.    Oklahoma State University.

Q.    What type degree did you get at Oklahoma State?

A.    I received both a master's and a doctorate degree at Oklahoma State in clinical psychology. And that doctoral training is accredited by the American Psychological Association as a clinical psychology training site.

Q.    What does that mean it's accredited by the psychological association?

A.    That means that the American Psychological Association has critically reviewed the curriculum, the faculty, the library holdings, the courses that are taught.  It's a relatively arduous thing for a university to have a program credentialed by the American Psychological Association.  So there are a limited number of those, and the competition for admission into

Carolyn S. Fant
United States Court Reporter

Cunningham - Direct

those programs is very intense.

Q.    You mentioned a few moments ago that you had something to do with the Navy.  What did you do in the Navy and where?

A.    I did my clinical psychology internship with the Navy at the National Naval Medical Center in Bethesda, Maryland, a suburb of Washington D.C. It's a primary naval hospital.  I was an active duty naval officer at the time I was on internship, and after that I became a staff clinical psychologist at the Naval Submarine Medical Center in Groton, Connecticut, where I served for three and a half years.

Q.    Did you receive any awards or declarations at that time?

A.    Yes, I did.

Q.    What was that?

A.    I received a Navy Commendation Medal for my professional contributions in the Navy, across that period of time that I was at the sub base medical center.  A relatively unusual decoration for a junior officer in his first assignment.

       While there, I also did two years of part-time post-doctoral study at Yale University.  In that program I was given the award as the outstanding trainee.

Q.    Are you board certified in any field of psychology?

A.    Yes, I am.

Q.    What field is that?

A.    Forensic psychology.

Q.    What does board certification mean?  What does it entail?

7654

Cunningham - Direct

A.   Board certification in psychology is not as routine as it is to medicine.  It's intended to signify practicing at the highest levels within that discipline.  And in psychology you can be board certified in clinical psychology, forensic, neuro psych, family psychology, industrial psychology.  There are a number of different specialty areas that you can be board certified in. In each of those cases, it's a relatively arduous procedure of demonstrating that you have sufficient training and continuing education in that area; that you have practiced it for a number of years.

In the forensic psychology boards, you submit examples of your work, which typically are expanded and extensive reports of a case that you have been involved in that's accompanied by scientific research and case law and that sort of thing that demonstrates your knowledge and proficiency in the field.  And that's then critically reviewed by some board certified forensic psychologists who decide whether or not that demonstrates sufficient knowledge to allow to you sit for an oral exam, and that oral exam is administered by three board certified forensic psychologists.  Takes about three hours, and the failure rate of that oral exam is 40 percent.  And so it's a steep hill.

Q.   Have you likewise done any teaching yourself in the field of psychology?

A.   Yes, I have.

Carolyn S. Fant
United States Court Reporter

7655

Cunningham - Direct

Q.    Where have you done that?

A.    As a graduate student I was a teaching assistant.  I taught sections in introductory psychology there at Oklahoma State University and was also a lab assistant and an individual intelligence testing class.  Then when I was in the Navy, I taught part time through the community college system as well as an extension program for various university-offered course work on the naval base or in a submarine tender that was anchored there.

Then when I left the Navy in 1981, for two years I was a full-time assistant professor of psychology at Hardin-Simmons University, which is a small private college in Abilene.

Q.    Have you published professional works in the field of forensic psychology?

A.    Yes, I have.

Q.    What is peer review, by the way?

A.    Peer review -- you're referring to peer review journals, I assume.  Peer review journals are how scientists communicate information with each other. A piece of research or a summary of research is written up into a paper and it's submitted to a journal, and the journal editor then sends that out to reviewers, people who have substantial expertise or national reputation in that area, and they review the paper to identify whether it adequately accounts for the research in the field, whether the research design is scholarly and appropriate and

Carolyn S. Fant
United States Court Reporter

7656

Cunningham - Direct

sound, and if so, they may then agree to publish that paper in their peer review journal. Typically the rejection rate at a peer review journal is 80 or 90 percent. They are rejecting nine out of ten papers they get.

Q. Have you had papers published in a peer review type journal?

A. Yes, I ever. I have had three papers published in peer review journals across the last year or so. My doctoral dissertation was also published in a peer review journal. That's back in 1981.

Q. I want to ask you about a particular publication of yours that's called -- I think the entire title is "Without Appointed Counsel in Capital Post-conviction Proceedings. A study of the self-representation competency of Mississippi Death Row inmates."

A. Yes, that paper is in press. That's a fourth one. That one has been accepted. It's gone through peer review and is now awaiting publication. That will actually come out in August or September in "Criminal Justice and Behavior," which is a major forensic psychology journal.

Q. With regard to that one particular journal entry or item that you have written, Dr. Cunningham, do you have a specific point of pride about that particular document?

A. Yes, I do.

Q. And what is that?

7657

Cunningham - Direct

A.    Let me add that I'm the co-author of it.   I'm the first author.   I wrote that with a colleague of mine, Dr. Mark Vigen.   And Dr. Vigen and I went in and we evaluated 44 of 52 men who at that time were on the Mississippi death row.   We evaluated everybody who would agree to it.   In Mississippi at that time -- we went into there about a year and a half ago, as I recall.   In Mississippi at that time the state did not provide for the appointment of an attorney at the post-conviction phase, at a certain phase of the death penalty appeal process, and so these men were faced with either getting volunteer attorneys to represent them or trying to represent themselves. And so Dr. Vigen and I went in to evaluate these men to determine their capacity to serve as their own attorneys in doing their appeals, so we gave them -- we interviewed each one about an hour.   Did a clinical interview.   Gave them an intelligence test of their verbal abilities, a reading comprehension test.   We took the information that they were -- they would have to read to represent themselves and did a readability analysis of it to see what reading difficulty that was at.   We gave them personality testing.   We gave them some measures of malingering.   We gave them the law school aptitude test, the LSAT, to see their legal aptitude.   We gave them a test knowledge specific to Mississippi law about post-conviction.

        And those -- our findings from that research I wrote up

7658

Cunningham - Direct

into an affidavit that was then filed in a suit in Mississippi, and was filed with the Mississippi Supreme Court. The Mississippi Supreme Court had, on a number of occasions, ruled that there was not a right to a state-funded, state-paid-for attorney at this level of the appeal process.

About a month or two, as I recall, after the report and the suit was filed with the Supreme Court, they reversed their long-standing position and said that these men were not competent to represent themselves and indicated that they were instructing the legislature to draft legislation to provide some mechanism to provide them with attorneys. And so that's -- that participation in that project is quite rewarding, both from the opportunity to interview that number of individuals on death row as well as having participated in something that had an impact in helping provide a representation of these individuals.

Q.    Do you happen to have a psychology license in the State of Arkansas?

A.    Yes, I do. I'm licensed as a psychologist here in Arkansas, Texas, Oklahoma, Tennessee, Indiana, Colorado and Oregon. I took a test here and had an oral exam I went through here in Arkansas to be licensed.

        MS. COMPTON:  Your Honor, at this time I would tender Dr. Cunningham as an expert witness in the field of forensic psychology.

Carolyn S. Fant
United States Court Reporter

Cunningham - Direct

THE COURT:  Any voir dire?

MR. LIROFF:  May it please the Court.

THE COURT:  Yes, you may inquire.

VOIR DIRE EXAMINATION

BY MR. LIROFF:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    Now, is it my understanding that recently, in the last few years, four or five years, you have recently focused your professional attention on a particular field called violence risk assessment in capital cases?

A.    It's been a portion of my professional interest, that's correct.

Q.    And in fact, some of the articles that you referred to in Ms. Compton's introductory questioning related to particular scientific techniques that you believe are more appropriate to employ in the area of violence risk assessment in capital cases.

A.    That's correct.

MS. COMPTON:  Your Honor, I don't want -- I'm not trying to interrupt, but I will tell the Court that Dr. Cunningham is not going to talk about a violence risk assessment in this case.

MR. LIROFF:  Your Honor, I believe this is part of his qualifications, and I also believe that it will be relevant

7660

Cunningham - Voir Dire

to his testimony eventually in this case.

THE COURT:  Go ahead.  Let's see where it goes.

BY MR. LIROFF:

Q.    Just so we are clear, this particular field, violence risk assessment, studies the likelihood or the probability that someone who is a convicted capital offender -- the likelihood of their being dangerous in the future?

A.    That's correct.  Within that area of risk assessment of capital offenders, the issue of violence risk assessment is a much broader area.  One specific application of it is to capital offenders.

Q.    And you notice I always said "capital cases"?

A.    In that question I'm not sure that you did.  That's why I was clarifying it.

Q.    If I don't, forgive me, but I mean it.

A.    Certainly.

Q.    Just one or two questions here and we are going to move on, but is it true that it is your opinion that the most correct or the most scientific approach to ever present to a jury is to use this actuarial approach to violent risk assessment in capital cases?

A.    In most instances.  The exception of that would be if there is an inmate who has a well-established pattern of behavior, particularly a well-established pattern of violent behavior in prison, his own personal history of violent

7661

Cunningham - Voir Dire

behavior in prison may are more predictive than the group rate. But in the absence of that sort of pattern displayed in that same context to prison, most often the actuarial approach is going to be the most accurate.

Q. And is -- it's easy to get lost in these things, and I don't want to do that, but is it correct to say very simply this approach that you described as the most scientific is not the approach we are going to use here today?

A. I don't anticipate that I'm going to testify about risk assessment today. And so I'm not going to be using any approach regarding risk assessment. My understanding is that I'm going to be testifying about adverse developmental life experiences that Mr. Lee has had.

Q. Okay.

Now, you have been a psychologist for 20 years?

A. That's correct.

Q. But until 1995 you had never testified in a capital murder case?

A. I believe that's correct.

Q. And it was only in 1995 that you obtained this board certification that you have told us about?

A. That's correct. I was board certified in late January or early February 1995.

Q. And before 1995, your practice was primarily as a clinician, that you saw patients in your office.

7662

Cunningham - Voir Dire

A.   Across the eighties and early nineties my practice was primarily clinical with a small amount of forensic work.  That was a growing portion of my practice even across the early nineties.  My involvement in capital cases began in 1995.

Q.   And now you almost never see patients.

A.   I see very few patients.  I see patients typically on a weekly basis, but not very many anymore.

Q.   In fact, over 90 percent of your practice is doing just this: testifying in capital murder cases on behalf of defendants who are facing the death penalty?

A.   No, sir, I don't think that's correct.  My practice at this point is about at least 90 percent forensic in nature. But I continue to have a general forensic practice.  I do child custody evaluations and work on other criminal issues and occasionally do personal injury cases as well, so it is a general practice in forensic psychology.

Q.   Now in terms of your research that you've published, you have told us about a number of articles.  Is it fair to say that only three of those articles pertain to original research performed by you?

A.   The doctoral dissertation was original research.  The Mississippi study is original research.  There was a paper that I did in the Navy on a bed wetting clinic that we had on nocturnal uresis treatment program.  That was not a peer review journal.  That was original research.  Those three represent

original research.  The others represent summaries of research that I have analyzed.

Q.    Was -- and you may not being fair.  Maybe there's a fourth one, an article you published in 1981 relating to biofeedback?

A.    That was my dissertation that I completed in 1977.  But the publication pipeline for that was pretty lengthy.  It didn't actually come out until 1981.

Q.    And that was an article that really doesn't relate to the type stuff we're talking about here today -- directly relate.

A.    In fact, in a number of cases it does have some direct relationship.  A number of the capital offenders I have evaluated did have learning disabilities, and that paper was specific to that area, so that paper has some relevance although that research is getting dated now.

Q.    It relates to the use of something called biofeedback on particular male adolescents, does it not?

A.    That's correct.  It was a study in evaluating whether or not EEG biofeedback -- in other words, giving the person information about their brain waves -- whether it would allow them to control their brain waves to some degree to improve their abilities in visual, spacial or creative or verbal tasks which was problematic for these adolescent males.

Q.    When you left the Navy back in 1981, you went into private practice and eventually -- is it in Abilene, Texas?

A.    I returned to Abilene and took a full-time academic

Carolyn S. Fant
United States Court Reporter

7664

Cunningham - Voir Dire

position at Hardin-Simmons University in the psychology department and started a part-time practice at the same time. And then in 1983 I resigned the academic position and have been exclusively in practice since that time.

Q.    And from about 1983 or beginning in 1983, you developed another specialty that you haven't shared with this jury.  What was that?

A.    I'm not sure what you're describing.

Q.    Did you develop another specialty in your private practice in Abilene, Texas that you have not yet told this jury about?

A.    I have described my work as a clinical psychologist. Perhaps I haven't.  Beginning in 1981, when I returned to Abilene and started a private practice, I began to see private patients.  By the time I resigned that position, I was probably seeing 30 or 40 hours a week of private patients and continued to see -- to maintain a heavy clinical load across the eighties and early 1990's.

Q.    But didn't you have a particular specialty that you developed through your experience at Columbia?

A.    No, sir, I was never at Columbia.  There was a two-year, part-time, post-doctoral program at Yale University in sex therapy.  And I was also certified as a sex therapist through the America Association of Sex Educators, Counselors and Therapists.  That was always a very minor part of my private practice in Abilene.  I did some of that and maintained that

Carolyn S. Fant
United States Court Reporter

7665

Cunningham - Direct

certification, I think, through the mid-to-late 1980's. It was a small part of my practice, and my interests were going in other directions, so I didn't continue to maintain the continuing education in that area.

MR. LIROFF: Thank you, sir. I submit, Your Honor.

THE COURT: Ms. Compton.

So he will be accepted as an expert in the field of clinical and forensic psychology and permitted to express opinions in the area of his expertise.

MS. COMPTON: Thank you.

DIRECT EXAMINATION-Resumed

BY MS. COMPTON:

Q. Dr. Cunningham, let's talk about this case. First, let me ask you this: Have you in fact testified in other federal courts across the country?

A. Yes, ma'am.

Q. And have you also testified in state courts around the country?

A. Yes, I have.

Q. In this particular case, what fee are you charging the government for your testimony and time?

A. The fee for my time is $180.00 dollars per hour.

Q. It doesn't make any difference whether you're in court or out of court?

A. Yes, ma'am, that's correct.

Carolyn S. Fant
United States Court Reporter

7666

Cunningham - Direct

Q.    And this fee that you charge, who pays you?  Who appoints you?  How do you get involved in the case?

A.    Well, my fee is paid by the federal courts.  The magistrate or the judge reviews the billings that I send in and is the one who authorizes payment of that.  In terms of how I initially get involved, in this case I was initially contacted by you and you asked me about my willingness to participate in the case and in terms of performing an evaluation.  I then provided an affidavit that described my own -- and a vita, kind of a resume, that described my own background in this area as well as what functions I anticipated that I might provide.  And that was then submitted to the court who reviewed that and made a determination about whether in fact to appoint me in the case.

Q.    And you were ultimately appointed.  Did you have to come back and re-evaluate the amount of time and thus the amount of money that you would need?

A.    Yes, ma'am, I did.  There was an initial estimate that I had, and then I had to come back and say I have expended much more time than I anticipated and there are still these things that remain to be done, so I then submitted another affidavit describing that -- describing how, why it is that I misguessed, why I was short in the beginning, and what still needed to be done.

Q.    Was that second one approved by the court?

Carolyn S. Fant
United States Court Reporter

7667

Cunningham - Direct

A.    Yes, it was.

Q.    Now, you have been working for some period of time with regard to the Daniel Lewis Lee or Daniel Lewis Graham case; is that correct?

A.    That's correct.

Q.    What all did you look at in order to evaluate Mr. Lee and to make the report that you made?

A.    I spent a considerable amount of time directly interviewing and evaluating him.  I talked to family members and a number of what are called third parties, other sources of information about him and his family life.

I reviewed extensive records.  I reviewed summaries of his psychiatric treatment, I reviewed medical records, I reviewed -- I reviewed information about the tragic death of Joey Wavra.  I reviewed criminal records associated with Mr. Lee.  I reviewed the indictments associated with this case.  I reviewed the photographs that were associated with this case in terms of the scene of the recovery of the victims in the case and the crime scene.  Reviewed autopsy photographs as well.

The documents that I reviewed go on single spaced for about four or five pages, and so I reviewed quite a few records in the case.

Q.    Let me focus on a couple of those to be more specific because it's way too lengthy to go into everything that you went through.  But did you have an occasion to review records

Carolyn S. Fant
United States Court Reporter

7668

Cunningham - Direct

from the Baptist Medical Center of Oklahoma regarding Danny Lee

with a pediatrician by the name Dr. Larry Biehler?

A.    Yes, I did.

Q.    Did you have an opportunity to review the University

Behavioral Health Center records from Midsouth Hospital Child

and Adolescent Psychiatry again?

A.    Yes, I did.

Q.    Did you look at a report of a psychometric consultation

dated February 16th of 1988 and signed by Emil Carp?

A.    Yes, I did.

Q.    Did you look at a neuropsycho diagnostic evaluation report

dated February 1988 signed by Charles L. Long, Ph.D.?

A.    Yes, I did.

Q.    Did you look at a confidential psychological report dated

October of 1987?

A.    Yes, I did.

Q.    Did you look at something from the Western Mental Health

Institute, Timber Springs Adolescent Center?

A.    Yes, I did.

Q.    Did you look at Central Oklahoma Juvenile Treatment Center

residential discharge summary and other records from that

place?

A.    Yes, I did.

Q.    What is the common name for Central Oklahoma Juvenile

Treatment Center?  Is that's what's commonly called COJTC?

Carolyn S. Fant
United States Court Reporter

7669

Cunningham - Direct

A.    I was unfamiliar with that, but that's what I observed in the testimony this morning.

Q.    Did you look at -- you mentioned criminal records.  Did you look specifically at a state of Florida criminal record that has something to do with Danny Lee carrying a concealed weapon?

A.    Yes, I did.

Q.    What weapon was that, by the way?

A.    That was a piece of wood.  A short piece of wood like -- looked like a hoe handle or something that had some silver tape wrapped on it. It was a small club.

Q.    Did you look at the Sacred Heart Medical Center records on medication administration record for Danny Lee?

A.    Yes, I did.

Q.    Did you look at any records with regard to the psychological evaluation of John David Patton?

A.    Yes, I did.

Q.    What is the significance of John David Patton's psychological history to you as a forensic psychologist?

A.    In this case, part of the significance that I found -- that was important is, number one, this represents a relative of Mr. Lee who has a significant major mental illness with a diagnosis of paranoid schizophrenia as well as other diagnosis of borderline personality disorder.  Because mental illness and schizophrenia has a genetic component to it, it's important to

Carolyn S. Fant
United States Court Reporter

7670

Cunningham - Direct

be aware of close relatives who have suffered from this kind of condition.  Particularly because you can have a phenomena described as partial genetic penetration.  In other words, that a relative may not have the full syndrome.  They may not be fully schizophrenic but may have difficulties that are on some spectrum or continuum of disorder that is less intense or less severe than that.

I was also struck that John David, as he was evaluated, displayed a significant amount of paranoid thinking.  And in psychological testing that Dr. Ryan performed that I reviewed, Danny also had showed an elevation reflective of paranoid thought processes.  So there seemed to be some similarities in some of the emotional makeup.  Both of them had substance disorder problems.  Both had been diagnosed at times with borderline personality features, so there was some correspondence there that I found utterable.

Q.    Did you ultimately recommend -- I guess ultimately is the wrong word.  Early in your evaluation did you recommend a neuropsychological evaluation of Mr. Lee?

A.    Yes, I did.

Q.    What prompted you to recommend -- well, what does neuropsychological mean?

A.    A neuropsychological assessment involves an evaluation of how well someone's brain works.  It's different from what -- a clinical psychologist may evaluate the person's personality

7671

Cunningham - Direct

function and I may do some general intellectual assessment and may evaluate how effectively the person's brain works to a small degree, but that exists as a separate specialty.  There are psychologists that by training and practice focus exclusively on studying the relationship between the apparatus and what you're able to do with it, with what kind of behavior thought processes are generated.

Q.   Are you trained to do that?  Can you do a neuropsychological examination?

A.   No, ma'am.  I have some familiarity with the testing, but I'm a general clinical psychologist.  I'm not a neuropsychologist by specialization.

          MS. COMPTON:  Your Honor, at this time Dr. Cunningham will need to step down and raise the screen on the projector.

          THE COURT:  Very well.  You may do that.

          MR. LIROFF:  Your Honor, can we approach for a moment?

          THE COURT:  Yes.

     (Bench conference between the Court and counsel, as follows:)

          MR. LIROFF:  Your Honor, at one point earlier there had been an exchange of letters between Ms. Compton and myself directed to you relating to this presentation and the fact that -- who will control the overhead projector and how the use of these displays can be confusing for the record because the

Carolyn S. Fant
United States Court Reporter

7672

Cunningham - Direct

witness rarely identifies what is being shown to the jury, and I think for the record to be complete there has to be some fashion in identifying that the jury is being shown a particular exhibit.  And if these diagrams are not numbered in any way, then we can't do that.  So I would ask that we ensure that if a diagram is displayed that it be identified and we affix a number to them so that we can clearly know what we are talking about.

MS. COMPTON:  I can number them as we go.

THE COURT:  Very good.

MR. LIROFF:  Thank you.

(End of bench conference.)

BY MS. COMPTON:

Q.    Dr. Cunninghan, I'm going to tell you what we have had to tell a lot of witness who have stepped down is you've got to be where the jury can hear you and the court reporter, so if you need a microphone for that, we can get you one.

A.    Yes, ma'am.

Q.    I'm going to go ahead and start numbering the slides and ask you if you can do the same thing as we go so there is no confusion of what you're talking about. This will be No. 1.  It starts out: "What Accounts for the Differences in Outcome?" I want to ask you: Have you been in the courtroom during the testimony in the sentencing phase of Mr. Lee's trial?

A.    Yes, I have.

7673

Cunningham - Direct

Q.    And did you hear the testimony of Lea Graham and Carrie Graham?

A.    Yes, I did.

Q.    Have you also talked with Lea Graham and Carrie Graham?

A.    Yes, I have.

Q.    Now, how is it that Carrie Graham could have turned out a young mother and nursing student and with apparently no significant problems in her background and Danny could have so many and they came from the same place?

A.    That's a fundamental question in forensic psychology to try to identify why it is that some people have bad things happen to them and have a very negative outcome and other people don't. And as we try to account for that, we look at several different factors that seem to give us a way of understanding why people are affected differently, and I will try to relate these to compare Danny with Carrie as we go through these.

First, there may be differences in the trauma that someone experiences.  There may be -- whether it's sexual abuse, how frequently and how extensive; physical abuse; psychological abuse; and childhood neglect.

In the case of Danny and Carrie, there are indications that Danny was sexually abused and had extensive perverse sexual exposure and was treated very differently by his stepfather, Dennis, as compared to Carrie.  That he was

Carolyn S. Fant
United States Court Reporter

7674

Cunningham - Direct

routinely severely physically abused where Carrie was not.

Similarly, he repeatedly experienced instances of being rejected by Dennis. And the communication was that he was unimportant, he was in the way, that he was responsible for things that were going wrong in the family. And that was not Carrie's role. Quite importantly, Carrie is there with her biological father, and Danny has already been abandoned by one father that he fantasizes about across his childhood about where is his father and what he's like and tries to emulate him. Carrie has her biological father there.

Then we have childhood neglect may also play a role in this. These children were raised in different areas within the family system as well.

Then you have predisposing and contextual factors. There may be genetic factors.

Q. Let interrupt you right there. Does that have to do with what you were just telling about from the stand with John David and why his psychological history was important to you?

A. That's correct. That's one example of a genetic factor. Although Carrie would share that genetic heritage because that's through the mama and they have the same mother, but Carrie and Danny have different fathers, so there is a fundamental difference in the genetic heritage that they have.

Quite obviously Danny is a male and Carrie is a female, and when we look at any social types of outcome and criminal

Carolyn S. Fant
United States Court Reporter

7675

Cunningham - Direct

outcomes, males are substantially more as risk for those kinds of outcomes in the face of adverse family situation than females.   Females are more likely to have this expressed by early pregnancy, early marriage, participation in abusive relationships themselves.   It's not that they come through unscathed; it's just their outcomes don't tend to be as criminal or as violent in nature.

Then there are neurological and physical vulnerabilities that may be different.   In Danny's case, the reason that I recommended that neuropsychological evaluation be performed is that he had a number of what I would consider to be risk factors for having something wrong with the wiring, something wrong with the apparatus, and those include being diagnosed with a seizure disorder in early childhood, the attention deficit disorder, the learning disabilities, a number of neuropsychological insults that occurred in terms of head injuries.   The huffing.   A number of things that represented neuropsychological risk factors for him that are not evident in the same way for Carrie.

Q.   Let's move down to the bottom of this slide and you have the word "choices" written at the bottom.   What are you talking about choices?

A.   Well, certainly a major factor that accounts for differences in outcomes is what choices someone makes. The choice is always there.   It's important to note that the choice

Carolyn S. Fant
United States Court Reporter

7676

Cunningham - Direct

you get is the choice at the end of this pipeline. It's not like all of us have exactly the same choice or come to a certain point in our lives with the same equipment and looking at the world in the same way. Yeah, there is always a choice, but it's a choice that's shaped by these things that happen along this line, as well as, you know, accidents in the environment. The girl that you propose to, does she take your proposal you marry you and settle down and you begin a more conventional life structure, or do you not? Who is it that you're thrown into relationships with? What exposures do you have at what critical ages? All of those things end up affecting what choices you ultimately have.

Q.    Move with me, please, Dr. Cunningham, to what will be No. 2, and Ms. Higginbotham approached me and said we are going to call all of these DL-46-1, 2, 3, etc. What we are going to next will be DL-46-2.

A.    Should I mark the whole thing?

Q.    Please.

A.    DL-2.

Q.    46-2. I skipped one.

DL-46-2 is entitled: "Why Talk About Family History?" I think you just did that, but if you will, highlight the important aspects of DL-46-2.

A.    Certainly. There are a number of family behavior patterns in effect that are multi-generational that you see going from

7677

Cunningham - Direct

one generation to another. In my clinical practice I have had, for example, a 16 year old girl in my office who's pregnant, whose mama got pregnant at 16, whose grandma got pregnant at 16. So there is some multi-generational scripts that seem to be occurring.

The child is predisposed through heredity. And the family itself and the growing up in that family shape the child much like if we think about a piece of clay that's being molded. And as well as childhood itself is formative. There is a saying that the child is the father of the man.

Q.    Which means what?

A.    That means that the person that we see out here in adulthood is given birth to by this child. The child is fundamental. That's where the shape of the person is made, and in adulthood that's like set in concrete. When bad things that happen to you as a child, it dents the clay. It fundamentally changes the shape of things. When bad things happen as an adult, you knock a chink out of the concrete, but the general shape is the still same. That's why we are so concerned about protecting our kids from having traumatic things happen to them and trying to ensure every opportunity and are more concerned about them being traumatized in some way than they are about ourselves or other adults because we recognize this.

Q.    Move with me now to a slide entitled: "Core Principle," which will be DL-46-3. "Healthy Development Depends on Family

7678

Cunningham - Direct

Relationships." I think we all know from experience, Dr. Cunningham, but tell us what you mean from a psychological perspective.

A.    This is a fundamental tenant in psychology that the various schools of psychology don't argue about.  The quality of attachments to parents and other members of the family during childhood is central to how the child ends up relating to and valuing other members of society as an adult.  That's a core principle in psychology and it's core to what I'm going to be talking about today.

Q.    All right.  Move, please, to what we'll call DL-46-4, which has a little diagram at the bottom that I want to talk to you about when you put it on the screen.  This is entitled -- 46-4 is entitled: "Healthy Development: Early childhood." I guess you have drawn --

A.    Yes, ma'am.

Q.    -- look likes a box.  What does the box symbolize?

A.    That's like the foundation of a house.  When I think about how healthy development works, I often think about it as a house under construction.  I think it's a take-off on one of Jesus' parables about building your house on the rock or on the sand, and so this isn't an original concept with me that someone being constructed is like building a house, but I find it to be a useful way to think about here's how you build a healthy house and contrasting that this is how a house ends up

Carolyn S. Fant
United States Court Reporter

7679

Cunningham - Direct

being constructed poorly.

Q.    Let's go on to --

A.    This is what early childhood fundamentally requires is secure, stable relationships with parents.

Q.    46-5.  Now, again, the house is here and we are talking about healthy development in middle childhood.  And please tell us what you mean.  You've got some more of the house built on what had just been a foundation here?

A.    Across middle childhood we can think about the framework of the house coming up and that fundamentally requires continued security and stability across childhood; that the child's world stays pretty predictable and safe and consistent.  What's described in kind of fancy terms as "supportive parental involvement in expanding competencies." What that means is I'm down there helping them get signed up for soccer and I'm standing on the sideline and clapping for them.  I get them in music lessons and I sit and listen while they practice.  I'm encouraging their capabilities in this larger world outside the family, and I'm there helping that happen and helping them be successful out there in that arena.

Q.    Okay.  We'll go into adolescence, which you should mark 46-6.  It looks like you put the roof on the house.

A.    Yes, ma'am.  Adolescence, a couple of very important aspects of that is, first, that there is a positive same sex role model.  That if you're a boy, you've got a man there that

Carolyn S. Fant
United States Court Reporter

7680

Cunningham - Direct

you can model yourself after that's constructively positive. And if you're a girl, you've got a woman who's there you can emulate and identify with and try to be like.

Again, a fancy way of describing the "gradual reduction in structure tied to responsible independence." That means that I'm gradually turning loose and giving them a little bit more freedom, and then they screw up and I clamp down and have some boundaries there, and then I start turning loose a little bit again. So it's this very gradual letting them move into independent adulthood while I'm requiring them to be responsible while they go about it. I'm close at hand.

Q. Let me ask you something particular to the Graham family right here, Dr. Cunningham. Is this going to be important in showing why Carrie turned out without any significant problems and why Danny turned out with significant problems? Is that important right here?

A. Some of it certainly. Lea with coping problems and other difficulties that she has had was a better model than Dennis was or by the father who was absent for Danny, or by the racist and white supremacist and other individuals who assumed a mentoring role in Danny's life. And, also, Lea simply wasn't strong enough to structure Danny as well as the problems he had himself, but she really couldn't enforce the boundaries and the limits, which is a challenge for single mom's with adolescent sons anyway, and Lea particularly had difficulty with that.

Carolyn S. Fant
United States Court Reporter

7681

Cunningham - Direct

She simply was pretty overwhelmed, and I think doesn't have a lot of capacity herself to manage this demand.

Q.    Let me just ask you something because this term is bandied about a lot in common talk.  What exactly from the psychological perspective is adolescence?  Does that cover a set period of years?

A.    It's a zone that extends between childhood and adulthood. In western culture it really tracks out pretty far, especially when we consider what are the tasks of early adulthood: establishing financial independence, achieving some career direction or being self-supporting and working in a functional, contributing-to-society sort of way.  In many instances, forming a solid social network perhaps of family as well.  And so in that sense, for example, when we look at Danny, Danny's life, despite being 26 years old, is still substantially adolescent, at least to the time of his arrest, was still substantially adolescence.  He had not made substantial educational achievement.  Had really not gotten involved in an ongoing career, had not been able to establish a permanent romantic relationship, although he sought to do this.  Had really not constructed a positive or constructive or stable even residence much less a community presence.  So in many ways Danny continued to exhibit kind of an adolescent status despite his age, which was in adulthood.

Q.    All right, let's look at 46-7.  Looks like you've got the

7682

Cunningham - Direct

roof on the house again and maybe even lights are coming on.

A.    Then in late adolescence and early adulthood the finishing of the house involves having intact capabilities.  That means that you have educational capabilities and that your mind works well and that there are opportunities.  There are jobs available for you to get.  And then that there are adults that are on hand to continue to mentor and assist and guide you.

My oldest son is 22 and is making substantial movement in this way, and yet he still needs a good deal of mentoring and assistance and guidance.

MR. LIROFF:  Excuse me, Counsel.  Excuse me.

THE COURT:  On your feet, please.

MR. LIROFF:  I would like to interpose an objection.  There is a narrative and not responsive to the question just posed.

THE COURT:  Objection overruled.

MR. LIROFF:  Thank you.

BY MS. COMPTON:

Q.    So we have late adolescence to early adulthood.  You were just talking about Danny at the time of his arrest in 1997 would still have been in the adolescence phase. Why does this slide apply to Danny Lee?

A.    Danny did not have intact capabilities as we'll see, and because of his limited capabilities intellectually and psychologically and to some extent wiring-wise, the

Carolyn S. Fant
United States Court Reporter

7683

Cunningham - Direct

opportunities that he had available to him were similarly constricted.

And then the adult mentors that he had were quite corruptive in nature. Bobby Norton, who he took on as kind of a surrogate father --

Q.   Let me interrupt you right there. I think you better tell the jury who Bobby Norton is and whether you talked to him.

A.   He's someone I interviewed by telephone. Danny first met him in about 1989 or '90, I think when he was AWOL from one of his residential treatment settings. Bobby Norton was a significant figure in the Ku Klux Klan in Tennessee, and I think from the late seventies to early eighties subsequently became kind of a southern director for Aryan Nations. He had a compound there in Tennessee where he held meetings and where he took young men and tried to teach them about this racist, separatist Aryan Nations sort of thing, and formed a very close relationship with Danny Lee.

Q.   How hold was Danny?

A.   Danny would have been in 1979 or '80 in the 16, 17 year old range when they first met, and Danny ended up living there for a period of time. It was kind of uncertain, but a number of months that he actually lived there and worked on Bobby Norton's place across the early 1990's.

Q.   All right. Let's move to 46-8. This is a long slide, and I don't want to go through each and every item on here, but I

Carolyn S. Fant
United States Court Reporter

7684

Cunningham - Direct

do want you to touch upon the emotionally damaging factors that you found in Danny Lee's background to be important to your report in this case.

A.    Certainly.

There is multi-generational family distress.  This is a family system that has been disturbed across generations besides just Danny.

There is alcoholism and substance abuse in the family.

He's abandoned by his father and stepfather.

He has a number of things happen that fundamentally disrupt his development across his childhood.

The family resources are overwhelmed.

He's emotionally abused by his stepfather.

He observes domestic violence in the home.

There is a perverse sexual atmosphere in the home.  Likely observes the sexual assault of his mother by the stepfather.

Q.    Let me stop you right there, Dr. Cunningham.  Ms. Graham that she was sexually abused, and she did not go into it. After talking with her did you delve a little bit more into this aspect?

A.    Yes, ma'am, I did, and I will be talking about that in some details as we go.

Q.    I'm sorry.  Go ahead.

A.    Both with her -- I spoke to her at length about it. Also I interviewed Dennis Graham's ex-wife and also an ex-girlfriend

7685

Cunningham - Direct

to get additional information and try to verify the nature of his sexual practice problems.

Q.    All right.

The next one is neglect and undermined remediation by the mother. And what I'm primarily interested in having you talk to the jury about here is what Lea Graham talked about with medications and Danny, and how that could be a problem here.

A.    Yes, ma'am.  Part of what we'll look at there is that the doctors would give -- would write orders about how the medication is supposed to be administered, and she would arbitrarily act to change that on her own either to seek a change in it from the doctor or simply to modify it herself. And as a result, Danny was undertreated.  He was not appropriately treated. I think her intentions were good, she was well-intentioned, but she made some very serious errors in the way she handled his medical and psychological problems.

Q.    All right.  We have already talked about the post-divorce loss of structure and repeated disability.  What about Danny's alcohol dependence and drug abuse?  Are you talking about Danny or somebody in the family history?

A.    I'm talking about Danny and his early abuse of drugs. Huffing of gasoline and Scotchguard and spray paint, smoking marijuana, drinking alcohol, methamphetamines, LSD.  Heavy drug abuse that began -- certainly was present in mid-adolescence and huffing at age 10 or 11 that that began, which is not

Carolyn S. Fant
United States Court Reporter

7686

Cunningham - Direct

terribly surprising, given the genetic predisposition that he has to alcohol and drug use and the modeling that happened in front of him and the developmental trauma that he went through that he is self-medicating with these drugs.  And so it's not particularly surprising that he would begin to abuse alcohol and drugs in early adolescence.

Q.    Ms. Graham was asked during her cross-examination why she would tend to minimize his huffing or other problems that Danny had.  Can you address that?

A.    Certainly.

In the most general sense, all of us as health care providers are advised not to treat our own families because there is a tendency to not accurately perceive what is going on with your own family.  It skews your judgment.  Lea has been in at least two abusive marital relationships, and in many ways she reacts and sounds like someone who has been in abusive relationships and her coping mechanism is to pretend that it's not happening and to avoid, and she just doesn't encounter and deal with reality the way that it is very well, and I think that hampered her response to those abusive relationships and also interfered with her effectively intervening in Danny's life because, first, you've got to see the problem realistically and you have to be prepared to directly and tangibly intervene as opposed to pretend it's not there. Her tendency is she only tells you a little bit of what's there.

7687

Cunningham - Direct

The problem as much worse than what she acknowledges.

Q.    As an example, she talked about drinking in the afternoon before Dennis would come home.

A.    Yes, ma'am.

Q.    What did you find out about her drinking habits in the afternoons before Dennis would come home?

A.    She would make sure she was drunk by the time that he came in the door so that whatever physical or sexual abuse that was inflicted on her she simply didn't have to deal with.  She described that she did that for at least the last year that she was here in the house with some indication that perhaps it began earlier than that.

Q.    Okay, I think that we can right now easily skip corruptive racist influences and come back to that because we have been over it. You just talked about the idealization of Bobby Norton --

A.    Idealized him, yeah.

Q.    -- and you say Danny idealized Chevie Kehoe?

A.    That's correct.

Q.    I want to talk to you about that and what it is you learned about his relationship with Chevie Kehoe and why this could be important to you?

A.    Danny perceived that Chevie kind of represented everything that he did not have.  And I've got an overhead that talks about that in detail.  Principally what Chevie provided him was

7688

Cunningham - Direct

a brother, was family, and so Bobby Norton was his father and Chevie Kehoe was his brother. And that seems to have been the root of the influence that Chevie had on Danny is that Danny felt like that he had a family. And that that family was Chevie and Chevie's family, and that Chevie was his brother. And he spoke of him in that way and continued to have significant loyalty and attachment to him as a brother.

Q. Now, let's move to 46-9.

This is another long slide, and I don't want you to go into detail on each and every one of these, but I do want you to briefly tell the jury how Danny's daddy and how his stepdaddy impacted him in a way that becomes important in your report.

A. Danny's biological father is a guy whose life was pretty chaotic and who had lots of problems himself, and this is Danny's genetic heritage, also the guy that was drugging and physically abusing Lea in front of Danny. This is also the guy that took Danny away for a couple of weeks when he was a little bitty kid, with Danny having a lot of separation anxiety after he had been jerked away from his mama.

Q. Wait a minute. We know that Danny's daddy left when he was 18 months old. How could he have seen any kind of abuse and remembered it?

A. Well, obviously he can't remember it. That's what's called childhood onset amnesia. That means that people

7689

Cunningham - Direct

typically have no memories of their life before the age of four or five, but that doesn't mean that the things that happened to you across those years don't matter or didn't fundamentally affect you. An 18 month old is incredibly aware of what's happening emotionally around him, and you see that with little kids when somebody, say a nine or ten year old, wants to hold a little baby and the baby cries and squeals because they sense that this person is unsure about what they are doing as compared to a grandma who picks them up and the kid feels safe. Children of 12 and 18 and 24 months are very aware of the emotional climate around them and are fundamentally influenced by that and effected by it, even though they can't remember it as adults.

Q. Now, then, I'm sorry. Had you finished with Mr. Lee because I interrupted you there.

A. There are a couple of other things we might point out. One, that he was substance abusing himself, which is part of the genetic risk factor that Danny has for alcohol and substance abuse. He has an extensive criminal record right up to just before his death where he was released from federal custody on charges that were pending because he was dying of lung cancer.

Q. Did you meet him before he died?

A. Yes, I did. I made a trip up to the Spokane, Washington area and met with him and talked to him. The history that he

7690

Cunningham - Direct

gave was also substantially minimized as I got other records about him and found out other information about him.  He also tended to minimize the extent of his criminal history and the chaotic nature of his life.

Part of the influence that his father had as well is that as Danny was growing up, he had this fantasy of this dad.  His dad was going to show up some day and he really clung to stories about his dad.  He was a rebel, his dad had tattoos, his dad was a two-fisted John Wayne kind of guy that didn't take anything off somebody and, you know, was in fist fights and things and that was a part of the model that was in the back of his mind, as well as being incredibly hungry and searching across his adolescence for his heritage and who he was and who his father was and who his people were.  And the absence of James from his life, of his father from his life, seems to be a part of creating that vacuum.

Q.    Let's talk briefly about Mr. Graham.  We have touched on some of this, and we know from Ms. Graham that he routinely abused alcohol, and we know from her and Carrie about the abuse of Danny, but I would like for you to talk more about the emotionally abusive aspect of Mr. Graham to Danny and the sexual malfunction.

A.    Certainly.

Dennis did things like Danny would be -- they were about to take a family picture, extended family picture, and Danny is

7691

Cunningham - Direct

in the picture, and Dennis tells him to step out of the picture because after all it's not his biological family.  And Danny's response after that is to cry to his sister and say, "Why can't he just love me?" Or as Lea talked about that Dennis blamed Danny for the divorce and said it was his fault.  Or almost anything that happened in the family, Dennis would accuse Danny of it being his fault.

And so Danny was quite hungry for some male approval and affirmation and thought of Dennis as his father. He was only two and a half years old when Dennis came into his life.  And so that repeated emotional rejection was really destructive to him.

Q.    Now, Ms. Graham talked about sexual abuse, and she kind of left it dangling there.  What did you find out about Mr. Dennis Graham and his sexual taste and the type of abuse he inflicted on her and other women?

A.    First, Dennis seemed to have no boundaries around his sexuality.  In other words, he didn't care where the kids were when he decided he wanted to have sex with Lea.  He wanted the kids to say in their rooms so he could walk around the house naked and wanted to do that in his prior relationship, his prior marriage to Deborah Sue.

And in both the relationship with Deborah Sue and with Lea and with a subsequent girlfriend, long-term girlfriend named Gail, he introduced a dildo about the diameter of a baseball

Carolyn S. Fant
United States Court Reporter

7692

Cunningham - Direct

that he wanted to use on them and also wanted them to use on him. And, in fact, they caught him or would walk in on him stimulating himself with this device and a baseball bat and some other objects. He had wanted one of them to purchase a strap-on penis so that they could have sex with him as the recipient of that. He had an extensive collection of heterosexual and homosexual pornography that was there in the house with Lea and that Danny was exposed to. On one occasion Lea walked in and Dennis was scolding Danny -- he had gotten in trouble -- and said, "If you do that again, I'm not going to let you have access to this material anymore."

When Danny is in residential treatment he alludes to Dennis sexually abusing him, and so this is -- in terms of the assaults, Lea described that she would try to be compliant and maybe have sex with him as much as we wanted, and at one period of time she had intercourse with him four or five times a day for a couple of months to see if she couldn't satisfy him, but there was no satisfying. And even when she was being compliant he might slap her, get her to crying, kind of a rape fantasy, as if it was more arousing to him for this to be forced.

Q.    Let me interrupt you there because it's time for a break.

THE COURT:  Yes. Court will be in recess.

(Recess 3:00 to 3:20 p.m.)

- - -

C E R T I F I C A T E

Carolyn S. Fant
United States Court Reporter

7693

I, Carolyn S. Fant, Official Court Reporter,
do hereby certify that the foregoing is a true and correct
transcript of proceedings in the above-entitled case.

_____
Carolyn S. Fant

Date: 5/13/99

Carolyn S. Fant
United States Court Reporter

7694

(Continuing at 3:20 p.m.   Jury present.)

DIRECT EXAMINATION OF MARK DOUGLAS CUNNINGHAM CONTINUING

BY MS. COMPTON:

Q.    Dr. Cunningham, let's try to wrap it up on the sexual history of Dennis Graham.   How did you get this kind of information other than from Lea and Danny's records where he talked about sexual abuse at a treatment center?

A.    I also spoke to Dennis Graham's ex-wife.   And then I spoke to a girlfriend, Gail, who he had after the divorce with Lea. Then there is reference in his treatment records at one point where he says that makes -- it indicates he was sexually abused.   There's a reference, as I recall, to his stepfather.

Now, it's important to understand here that a couple of things, the homosexual pornography, Lea described there was heterosexual and homosexual pornography.   The other two women described only heterosexual pornography in their homes.   Danny denies that he was sexually abused, which is not very surprising to me.   Everything about him is trying to argue against him being small, inadequate, helpless, victimized.   And it's as if his whole late adolescent adulthood is a caricature in the other direction.   But he does deny it.   These other folks describe the sort of atmosphere that is happening in the home, the reports that he made as a juvenile.   Lea describes a fifth grade teacher who asked her if Danny was being sexually abused.   And she did her minimizing thing then too and said,

7695

Cunningham - Direct

no, I'm sure he is not, and didn't even ask the teacher what the teacher was seeing that made her have those concerns.

So this information comes from a variety of sources that are generally consistent, although there are some elements of it that are -- that everybody doesn't report.

Q.   Curiously enough, the next thing that you have on this part of your chart is that Dennis Graham spoke against the government and talked of how to get over on them.

A.   That's correct.  Lea described that, that he would often talk in a negative way about the government and how you could avoid paying taxes or fulfilling obligations as a citizen, that sort of thing.

Q.   And finally you note that he stalked and followed Lea and the children when they tried to leave.  Are you talking about when she tried to leave in Oklahoma and ended up going in the middle of the night?

A.   That's correct.

Q.   Were there any other instances of him stalking her and the children?

A.   I'm trying to think how much I recall that I asked her about that.  She did talk about him coming out to Tennessee at some time later, that he was trying to create such economic hardship that they would be forced to come back.  I don't recall whether I inquired about other ways that he might have stalked them.

7696

Cunningham - Direct

Q.    All right.  Let's look at 46-10.  In 46-10 you outline some of the factors on Lea that you've already talked about and that she's already talked about.  But what I'm primarily interested in here, Dr. Cunningham, is Ms. Graham's, what has been described as minimizing things and her inability to cope with certain things going on around her, and ask you if you could just sort of fill in the blanks on this slide with that information.

A.    Lea was overwhelmed.  She was overwhelmed.  Carrie was two years old.  Lynn comes to live there, who is not toilet trained and throws tantrums and throws her food and smears her feces and requires all kinds of assistance, including trying to get some reasonable curriculum for her in school.  Dennis is drunk every night.  He is physically and sexually abusive.  He is physically abusive of Danny.  Danny is having behavioral problems in school.  Lea has more than almost anybody could cope with.  Yet what she brings to bear from her own family history is problematic.  She was abandoned by her own biological father.  She also had learning disabilities, dropped out of school, was virtually illiterate at the time she left school and, as Danny has, learned to read significantly as an adult.

Q.    Why would Ms. Graham do what Mr. Liroff described as minimizing on the witness stand, minimizing her problems, minimizing Danny's problems?

Elaine Hinson, RMR, CCR
United States Court Reporter

7697

Cunningham - Direct

A.    That's a real primitive way of not making your problem so big, is you just pretend like they are not there.  It also relieves you of the responsibility of having to stand up and intervene, protect yourself, protect somebody else.  So I think that's a long-term historic style for her.  In this instance I imagine there is also some element of perceiving that anything negative that she might say about how Danny ever behaved as a kid or adolescent was somehow going to increase the likelihood that he would be put to death.  And so I think as a mama there was probably some minimization that was operated that way as well, along with a historic coping style.

Q.    Let's look at 46-11.  We've already talked about everything in this slide, Dr. Cunningham, and don't really have to go through it again, except that I just want you to explain to the jury right now very briefly -- we may come back to it -- why the alcoholism and drug abuse by Lea, by Dennis and by Jim Lee would have any effect whatsoever on Danny.

A.    There are a couple of effects that we can look at.  One of them is genetic, from his father and mother.  We will speak about that in more detail, but that alcohol and drug abuse is significantly biologically driven and is a genetic susceptibility, that this is important for.  Second, there is modeling of substance abuse and how you cope with life, so we have modeling.  Then people that are substance abusing tend not to do a very good job as parents and overreact, both with

7698

Cunningham - Direct

neglect and overreact and emotionally or physically abuse kids with a greater degree of incidence. You have much greater likelihood of traumatic experience as a childhood that the kid has to deal with. So for all of those reasons, substance abuse in parents ends up being a damaging event in the lives of children.

Q.    Carrie talked about Dennis' whippings of Danny. And I asked, her, you know, what would prompt it. And she said basically anything, nothing, spilling a glass of milk, breaking a plate, anything. Is that an example of this emotional overreacting you are talking about?

A.    Yes, it is.

Q.    Let's look at 46-12. This goes on, talks some more about the effects of alcoholism and drug abuse by parents. And mostly what I want to talk about here are the second two items on the list. That would be modeled substance abuse and then psychological injury with its component parts. You mentioned modeled abuse just a minute ago. But you didn't tell the jury what you mean by modeled abuse.

A.    A lot of how children learn to behave is by watching how the people around them behave. They model on that. They imitate that. That's what they learn about how you are supposed to act.

That's why most of us, I think, surprise ourselves that we do or say something and it suddenly occurs to us that that is

7699

Cunningham - Direct

exactly the way that our mama or our daddy did something.  And that likely has a lot to do with there was a good deal of modeling that was happening there that we weren't aware of. That's one of the primary elements, primary risk factor, for drug and alcohol abuse.  Is there genetic susceptibility?  Was there modeling of this in the child's life?  Is there trauma the kid is trying to medicate or the adult is trying to medicate?  So those are three of the risk factors for drug and alcohol abuse.

That becomes very relevant, because if a kid begins to abuse drugs and alcohol in early adolescence while things are still under construction, that is a further destructive effect on his life trajectory, because meanwhile he is not growing in terms of his coping capability because he is anesthetizing it. He is medicating himself all the time, and it leads him into interactions with peers who are also having problems.  And it interferes with participating in useful, healthy kinds of activities.  So it becomes then its own risk factor that's knocking things off the track.

Q.   Let's skip down now to -- there's a little diamond down here, broad social and psychological risk factor.  I think relationship problems pretty much explains itself.  But let's look down at the bottom three:  Feelings of defectiveness, psychological disorders, and criminal behavior, and have you tell us how the alcoholism and drug abuse that's been modeled

7700

Cunningham - Direct

and patterned can lead to these type risk factors.

A.    Certainly.    In terms of feelings of defectiveness, kids are what psychologists call very egocentric.    That means they interpret the world around them in terms of themselves.    So if my world is out of control, as a household tends to be when there's alcoholism, then the kid feels incompetent.    And if daddy doesn't love me very well, and I'm a kid, I don't think there's something wrong with dad.    I think I'm defective and unlovable.    So you have some fundamental impact on self-appraisal and what -- how you perceive yourself and what you think you're worth, what you anticipate other people are going to care about you.

Q.    Are you talking about self-esteem?

A.    That's a part of it.    Part of it is self-esteem.    Part of it is who I fundamentally perceive myself to be.    It's not am I feeling pretty good about myself today.    It's much more basic than that.    Again, when we have someone like Danny, who was posturing so much how big he is and how bad he is, in terms of the way he's decorated himself, that's a testament to how small and frightened you must feel inside to have to puff that much on the outside.

Q.    What are you talking about when you say decorated himself?    Are you talking about the tattoos?

A.    That's correct.

Q.    What significance are the tattoos to you?

Cunningham - Direct

A.    Well, the tattoos are, they are socially provocative. They get people's attention. Folks orient to those. They react to them. Now, they may react negatively. But when they react negatively, at least that's a sign that I have impact. I matter. I can affect other people around me. It's a way of kind of signaling. As most of us would look at those, there's a sense of malevolence. It's like this must be somebody who is very bad. So that's a social communication that's occurring. For what reason? Why would you need to communicate that, unless inside you are feeling pretty small and inadequate and victimized and overwhelmed.

Q.    All right. Let's talk about, second to the bottom, psychological disorders. You've touched on those with Danny. But I want you to touch on those under this category, broad social and psychological risk factor with alcoholism and drug abuse.

A.    The genetic susceptibility to alcoholism, there is also some increased susceptibility to other psychological disorders as well as simply alcohol or substance abuse that can be part of this genetic package.

Clearly when the family that you grew up in is disorganized and chaotic or abusive, that increases the likelihood of all kinds of different psychological disorders as an adult. It goes back to our house under construction sort of thing. So both from genetic susceptibility as well as to

Elaine Hinson, RMR, CCR
United States Court Reporter

Cunningham - Direct

feelings about yourself as well as damage that's done to the structure of the house, having alcoholism and drug abuse in your parents is a broad risk factor.

Q.   What does alcoholism and drug abuse by your parents have to do with your criminal behavior?

A.   To the extent that the child is drinking and drugging himself, his likelihood of becoming involved in violent or criminal behavior is markedly increased, as well as growing up in a situation of family disorganization and abuse and neglect.  Those are also risk factors for criminality and for violence in adulthood.

Q.   I want to talk to you just a little bit, Dr. Cunningham, about we had talked in relationship to Lea about Danny's fighting or committing violent acts or being put into the residential care facility.  What about Danny?  Does Danny also minimize what goes on at this time?

A.   Danny describes going off to treatment centers.  And he describes acting out in an aggressive sort of way.  He seems okay with that.  He doesn't -- he doesn't talk about things in the records like how depressed he was or about his crying or about being abused.  Those feelings he doesn't talk about very much, so he minimizes that part of it.

Q.   Does he ever acknowledge a suicide attempt?

A.   Not that I recall.  So he talks about and is willing to acknowledge the behaviors that are more acting out and

Cunningham - Direct

antisocial, the ones his mama didn't want to talk to.  We've kind of reversed it in that way.  She wants to talk about the pain that he was feeling emotionally but doesn't want to talk about the conduct disorder, what psychologists call acting out sorts of things.  Danny is willing to talk about acting out because that doesn't sound like a victim.  He doesn't want to talk about the things that acknowledge how small and frightened he feels on the inside.

Q.   Let's look at 46-13.  The only thing that I want to talk about on physical and emotional abuse by a stepfather, since we've been over that already, is down toward the bottom, it's the second from the bottom, about forcing Danny to lift weights in an attempt to exhaust his energy.  Tell the jury about that because I don't think it's come out.

A.   Lea described that Dennis got Danny on this weight lifting routine in late childhood, early adolescence, just before the separation for a period of time, and was under the idea that if he could exhaust his energies, that would treat the hyperactivity, that then he wouldn't bounce off the walls so much.  So he pushed him and stayed on him pretty hard about lifting and lifting more weight and doing more repetitions and that sort of thing.  Danny, both being eager to please Dennis, and also the sort of intimidation and pressure that Dennis brought to bear would comply with this, Danny is then diagnosed with a deformation in his spine.  Lea's report is that the

Cunningham - Direct

physicians attributed that to the weight lifting that occurred.

Q.   Let's look at 46-14.   This is called, "Impact of Emotional Abuse."   Again, I don't want to go through every single thing in the slide.   But I want to talk about damaged attachment. And then skip down to powerlessness and have you tell the jury what you are talking about here.

A.   By emotional abuse, we are talking about the things that scar your heart and not your body.   The bottom line is is that the scars that are on your heart are slower to heal than the scars on your flesh.   Damaged attachment has to do with your attempt to connect and to form a basic relationship with the other people in your family, with the folks that you love and who love you.   Those attachments in a family, those primary relationships in a family, are part of how the child is developing his own personality, as well as learning about how to relate to other people.

     And across Danny's -- across Danny's childhood, his mom is preoccupied with the disturbed relationships that she's in herself to a significant degree, and the father figure is either abandoning or abusive and rejecting.   So we certainly have fundamentally disrupt attachment to male figures.   Mama is kind of a plus minus.   She's being his room mother, participating in school, being a dorm mother.   I think -- the room mother.   She's trying to do the best she can.

Q.   But she gets drunk every afternoon for a year.

Cunningham - Direct

A.    Yeah.  But then she gets drunk.  And she's involved with these relationships with men, or she's preoccupied, and so she is kind of an uneven presence in his life.

Q.    46-15 is the effects of abuse and neglect on children. This appears to sort of highlight the contents of a study by the American Psychological Association.  If you will, just briefly describe for the jury the effects of this kind of abuse and neglect on children in general.

A.    Certainly.  These are the findings of the American Psychological Association Presidential Task Force on Violence and the Family, where we had a blue ribbon panel of experts who reviewed the literature, reviewed the research in this area, and then identified what some of the primary effects are of violence within the family, neglect and maltreatment of children.  So one of the first points is that abused and neglected children may show a variety of initial effects, things that are observable right then, as well as long-term effects in all areas of functioning:  Psychologically, emotionally, physically and cognitively, thought process wise.

Q.    On the list that you have of the psychological, emotional, physical and cognitive effects, would you just let us know?  I will call them out, and let us know whether Danny Lee exhibits any of these.  Low self-esteem?

A.    Yes.

Q.    Depression?

Cunningham - Direct

A.    Yes.

Q.    Anger?

A.    Yes.

Q.    Exaggerated fears?

A.    Not that he directly reported.

Q.    Suicidal feelings?

A.    Yes, by the records.

Q.    I'm sorry?

A.    By the records, yes.

Q.    Poor concentration?

A.    Difficult to separate from the attention deficit disorder, but that's there.

Q.    Eating disorders?

A.    Not that was reported.

Q.    Overly compliant?

A.    No.

Q.    Regressive behavior?

A.    No.  The bed wetting that he displayed up until he was about 15 I think likely has more neurological significance, although that may be a piece of regressive behavior.  That may be some evidence of emotional turmoil.

Q.    You think it's more of what you call a wiring problem?

A.    I think that's more of a wiring problem.

Q.    Health problems?

A.    Not that are -- I mean, he has the spinal issue and some

7707

Cunningham - Direct

other things, but no psychosomatic things, not like stomachaches, headaches, that sort of thing.

Q.    Withdrawal?

A.    I don't think there is much description of the withdrawal, no.

Q.    Poor peer relations?

A.    His choice in peer relations is poor.  But he does interact with his peers.  He affiliates with negative and antisocial peers.

Q.    Acting out?

A.    Yes.

Q.    Anxiety disorders?

A.    Not that's directly exhibited.

Q.    Sleep disturbance?

A.    Not that was reported.

Q.    Lack of trust?

A.    Yes.

Q.    Secretive behavior?

A.    To some degree.  In part, kind of his acting out, he is doing things he's trying to cover up.  And clearly he is very closed about his own history.

Q.    Overly rebellious?

A.    Yes.

Q.    Drug or alcohol problems?

A.    Yes.

7708

Cunningham - Direct

Q.    Let's look at 46-16.  I'm mostly interested as to the effects of abuse and neglect on children, page 2, at the middle paragraph, abused and maltreated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior, and ask you to comment on that.

A.    That's correct.  These are, again, part of the findings of this Presidential Task Force out of the APA on Violence and the Family.

Q.    Dr. Cunningham, is this, the 2 up at the top of this one means that it's Page 2 or the second page?

A.    Yes, ma'am.  It's just a continuation of this here.  This was the first point, the first conclusion that's made in this report.  And these are continuing, kind of summaries of the effects of abuse and neglect on children.

Q.    Thank you.  Go ahead.

A.    They are at risk.  Now, this doesn't mean that every child who is abused and neglected ends up behaving in a delinquent or criminal fashion or violent fashion as an adult.  Instead, the analogy is closer to it's like children growing up on top of a toxic waste dump.  All the children don't get cancer.  But you have a significantly increased incidence of cancer in the children who grow up on top of that toxic environment.  Okay.  That's what violence in the family is like.  It's not that it produces it in all cases or even the majority of cases.  But

Elaine Hinson, RMR, CCR
United States Court Reporter

7710

Cunningham - Direct

A.   The result is that children that are exposed to family violence, observing the violence, observing your mother being beaten up, observing your siblings being physically abused, is as destructive psychologically as being actually hit yourself. Again, it's the notion of the scars on your heart kind of idea.  So observed family violence in the children that are exposed to that have reactions and symptoms that are very similar to kids who are directly mistreated.

Q.   46-19, I think we've talked about.  I want you just to put it up there and see if there's anything that Lea has not testified to that you can help us out with, although I believe it's all in.  This is entitled, "Neglect and Undermined Remedial Interventions."

A.   The only thing perhaps is, that hasn't been already testified to, is that she resisted his participation in special education and encouraged and moved toward pulling him out of that, resource placement, which he very much needed.

Q.   From which records did you learn that?

A.   As she talked to me.  She talked to me about not wanting him in special ed, about his complaining about not being retarded and not wanting to go.  She kind of joined him with that, and again doesn't perceive him as I think having -- she doesn't perceive him as having fundamental problems with his wiring.  It's his diet.  It's the chemicals he's exposed to. It's some external thing, so that makes it difficult for her to

7711

Cunningham - Direct

sustain either the medication support or the school intervention that he requires.

Q.    Now let's look at 46-20, which is styled, "Impact of Child Neglect."  And the thing that I'm primarily interested in in slide 46-20 is the caption with the diamond by it, more psychologically damaging than physical abuse.  And I would like you to talk briefly about that.

A.    The research that looks at the effects of child neglect has found that it seems to be more destructive to the child to be neglected than it is to be physically abused, because in physical abuse, at least somebody is attending to you.  They are reacting to you.  It isn't like just leaving you to your own resources.  Now, let me qualify that Danny was not neglected in the way that many children are neglected, where he's simply not picked up as an infant or his diaper isn't changed or he isn't fed routinely.  So there isn't that gravity of neglect.  The neglect is more neglect of protection, of not sustaining medical interventions and school interventions and getting drunk herself.  It's neglect that's a little bit later in the sequence, not so much across infancy, but later on.

Q.    Okay.  Let's look at 46-21, which is titled, "Overwhelmed Family Resources."  Again, there are only a couple of points that I want you to highlight on this slide.  I would like for you to go to the bottom two parts of this slide, Dr. Cunningham.  What are you talking about when you say Dennis

7712

Cunningham - Direct

Graham coped poorly with household chaos, and the marital relationship deteriorated?

A.    The onset of Dennis' drinking to excess, getting drunk on a daily basis, and also being routinely physically violent, happens after these other stresses build up in the family, after Carrie is born and Danny is having trouble in school and Lynn comes there to reside.  And as the stresses -- and he's injured himself.  As the stresses build up in the family, Dennis' coping capacity ends up being overwhelmed.  So that's the drinking and the physical abuse and the perverse sexual demands.  And all of that increases as this family burden builds.

Q.    The bottom one on 46-21 says, "Danny was lost in the shuffle."  Is that your terminology or somebody else's?

A.    I believe that that was Carrie's terminology, as his sister talked about what happened in the family.  At that time she talked about Danny being lost in the shuffle.  Lea may have mentioned that.  But it was either Carrie or Lea.  The idea was that everybody, there was so much going on that there simply wasn't a lot of energy that could be directed toward Danny.

Q.    46-22, you can put up there.  But I believe that it has been completely covered.  This is types of sexually traumatic experience or abuse.  And you are talking primarily here about what you've already mentioned with regard to Dennis Graham.  Is that correct?

7713

Cunningham - Direct

A.    Right.    It's important to recognize that when you talk about sexual experiences that can be traumatic, that isn't just direct physical sexual abuse, that observing sexual abuse or assault or having a perverse family atmosphere or exposure to graphic sexual behavior or premature sexualization, that those are all ways of being traumatized sexually, besides being fondled or directly abused.

Q.    I want to ask you to skip 46-23 and move directly into 46-24, the traumagenic dynamics of sexual abuse.  And the first thing I want to know is what does "traumagenic" mean?

A.    Traumagenic is that which causes trauma.  The idea is what is it about sexual abuse that makes it traumatic?  How does that work?  How is it that that injures the child?  This is another paper that comes from the American Psychological Association that filed a friend of the court brief in a case before the Supreme Court that is based on some research that was done by Finkelhor and Brown, that there are four primary ways that sexual abuse or sexual trauma is damaging to a child.  Those include traumatic sexualization, which means that this child's sexuality is misshapen.  It's like, again, the clay that's being formed.  Betrayal, that someone on whom the child is vitally dependent has caused them harm. Powerlessness, that the child's will is overwhelmed, and they experience themselves as being victimized and incompetent and inadequate.  And, stigmatization, that means that the badness

Elaine Hinson, RMR, CCR
United States Court Reporter

7715

Cunningham - Direct

because his house isn't constructed that way.  We kind of expect that, as much as he would try, he would end up, would have relationship problems.

Q.    Look at 46-25.  There's only one area of this study that I want to go over with you.  46-25 is entitled "Sexual Abuse Males/Females."  And it appears to come from a study in the American Journal of Orthopsychiatry.  Is that correct?

A.    That's correct.

Q.    The thing that I'm most interested in is the middle one, "Males were as disturbed as females though reporting less extensive and less extended abuse."  I would like for you to comment on that study.

A.    There's kind of a social tendency to think that only women are injured by sexual abuse, only females are, and that men are not hurt by sexual abuse.  And the research points that that's simply not being the case, that men are at least as vulnerable to the effects of sexual abuse, if not more so, than females.  The males are, in part, because males in our society have a hard time with victimization, with being powerless, with issues of masculinity, harder for males to acknowledge health or to describe when something has happened to them.  So for many reasons, there are vulnerabilities about a male that result in sexual abuse having a significant impact, at least as much impact as it has on females.

Q.    Now, this study is talking obviously about males in

7716

Cunningham - Direct

general.  But have you found this to be true as to Danny Lee in particular?

A.    He has had so many adverse things happen to him that it's hard to separate which adverse event accounts for which piece of negative outcome.  But I think there is clear evidence in his life of these different kinds of traumas that have occurred.  His adulthood has been, if you call it that, has been very marginal in his adjustment.

Q.    Let's look at 46-26, which is another study.  The title of the slide is, "Impact of Sexual Abuse on Males."  Again, Dr. Cunningham, we don't need to go through each and every thing that's in this.  I want you to tell the jury about the study.  And then I want to move directly into alcohol and substance abuse, violent criminal acts and sexual offending.

A.    I'm sorry.  Where do you want me to start?

Q.    With the study.  Who did the study?

A.    There's a study that -- there are two studies that relate to this.  One of them is Urquiza and Capra, 1990.  This is in an edited book.  The second is another study by Gilgun that is also part of the same edited book.  They are looking at long-term effects of sexual abuse on males.

Q.    Basically I wanted to focus on the bottom two of your slide, alcohol and substance abuse and violent criminal acts and sexual offending.

A.    Again, risk factors, not that this makes the person go

7717

Cunningham - Direct

forward or that most males that are sexually abused don't end up being alcohol and drug dependent and don't end up in sexual offending or violent criminal acts. It's a risk factor. It increases the likelihood. It's our toxic waste dump analogy again.

Q. Move to 46-27, which is titled, "Disruptive Development: Childhood Seizure Disorder."

A. Lea describes Danny as having an initial seizure with fever at age 18 months. That's what's subsequently described in treatment records, residential treatment records, psychiatric consults, that same history of 18 months is described. The first place I see a reference to it in Dr. Biehler's records is at about age two and a half, as I recall, in 1975, in July of '75. So he would be about two and a half years old at that time. Phenobarbital, which is an anticonvulsant, was prescribed. His seizure frequency subsequently decreased. But Lea discontinued the maintenance medication. That means giving it to him every day, and instead began to give it to him on an as-needed basis. When he started to have a seizure, then she would put some of it in the corner of his mouth and treat those as they occurred. So then the seizure frequency increased with even mild fever. She would also put him in a cold bath to try to bring the fever down.

Q. You found in the records of Danny Lee that there was an abnormal EEG when he was about 15 years old. That's February

7718

Cunningham - Direct

of 1988?

A.    That's correct.  They did a brain wave.  They looked at his EEG.  The report that's there in the records is that this EEG was abnormal and suggested a generalized seizure disorder.

MR. LIROFF:  Excuse me.  Your Honor, I want to make an objection to this witness' interpretation as to what the abnormal EEG means, because I don't believe he's been qualified in this area.

THE COURT:  I think he is reporting what a record indicated, what a medical record indicated.  Tell us what the source of that information is.

THE WITNESS:  That's from the Mid-South Hospital discharge summary.  I am quoting.  They describe abnormal EEG suggesting generalized seizure disorder.

MR. LIROFF:  Thank you.  I will withdraw the objection.

BY MS. COMPTON:

Q.    Was that one of the things, Dr. Cunningham, that made you suggest to the Court that a neuropsychological evaluation ought to be performed on Danny?

A.    That's correct.  Not only a neuropsychological evaluation.  I also recommended that EEG testing be done currently, as well as a neurological evaluation, as well as PET scans and spec scans that look at the metabolic activity of the brain, given the risk factors.  And then particularly early

Elaine Hinson, RMR, CCR
United States Court Reporter

7719

Cunningham - Direct

seizure disorder and an abnormal EEG in mid-adolescence, I thought that it was important that he be worked up very completely from a neurological and neuropsychological standpoint.

Q.   Let's look at 46-28, "Neurologic and Psychological Abnormalities in Murder Defendants."  This again appears to be the result of some study?

A.   That's right.  This is a 1995 study by Blake that appeared in the Journal of Neurology.  The medical records of 31 individuals awaiting trial or sentencing for murder were reviewed, and abnormal EEGs were present in 8 of 20.  Not everybody got an EEG.  So the 20 that did, 8 were abnormal. Abnormal MRIs, 9 of 19.  Interesting particularly in terms of this case, paranoid ideas, a hundred percent of them.  History of physical abuse, 83 percent.  History of sexual abuse, 33 percent.  So some of the elements that are present in this case are represented, are high frequency among these individuals that were awaiting trial.

Q.   This almost sounds, Dr. Cunningham, like there was no way in the world, given everything we now know about Danny Lee, that he wouldn't go out and commit a murder.  Is that what you are saying?  Is that what this study says?

A.   No, ma'am.  No, ma'am.  This is looking at individuals that committed a murder, and then you are identifying what risk factors do they have.  Obviously the overwhelming majority of

7720

Cunningham - Direct

people with abnormal EEGs don't commit criminal acts.  Among the folks that do commit violent criminal acts, particularly murders we are saying in this case, and there are other studies that point toward an association or an over representation of neurological and neuropsychological problems in violent offenders, that the wiring seems to have something to do along with other factors, with the vulnerability that they have to violent offenses.

Q.    Let's look at 46-29, which is styled, "Learning Disability and School Failure."  Again, we've talked about nearly everything in here.  And all I want you to focus on is the bottom diamond.  Where did you get this quote, "I'm not retarded, and I'm not going back to the retarded class"?

A.    That was from an evaluation that was done on him.  I can find it.  But I don't know that I can quote it for you immediately.  It was an evaluation that was done, as he was protesting why he was being evaluated, why intellectually and academically.  That was his protest.  "I'm not retarded, and I'm not going back to the retarded class," which is how he seemed to equate special education and resource, that that was evidence of a further self-esteem blow.

Q.    Let's look at 46-30, the "Impact of Learning Disability and School Failure."  I really have only one area that I want you to cover out of the many that are represented by this slide.  And that would be the bottom one.  What is the impact

7721

Cunningham - Direct

of learning disability and school failure on social risk vulnerability, and what does that mean in terms of Danny?

A.    Broad social risk vulnerability means that the person is at greater risk for employment problems, relationship problems, psychological problems, criminal problems, that it is a broad risk factor for many different bad outcomes.

Q.    46-31 addresses "Attention Deficit Hyperactivity Disorder."  We need to talk about that.  When did Danny first exhibit signs of ADD or hyperactivity?

A.    As a preschooler, and perhaps even earlier, as Lea is talking about him having significant sleep problems as an infant and a toddler.  That's often one of the early signs of hyperactivity is sleep problems.  But, as a preschooler, he is removed from three different nursery schools because he is so hyperactive the teachers couldn't control him.  Finally, it's diagnosed in kindergarten, first grade.  And the records vary depending on whether they describe him taking Ritalin from kindergarten or describe him from first grade.  Lea talks about him taking this medication from first grade through fourth, discontinuing it without the doctor's approval.  Then his behavior problems became more serious, and kind of on and off again across his adolescence.

Q.    When did the Ritalin resume?  Are you talking about Ritalin resuming in adolescence?

A.    There are some -- for example, I think at age 14, Dr.

7722

Cunningham - Direct

Biehler has a note about him being hyperactive and talking to Lea about starting the Ritalin again.  Some of the other health records also mentioned stimulant medication being utilized, which seems to have been sporadic in nature.  This refers, there's kind of a triad of symptoms, three symptoms that are fundamental to attention deficit hyperactivity disorder.  One is inattention.  The child is easily distracted.  Another, impulsivity.  That means acting without thinking, without adequate judgment.  And excessive motor activity, little engine just going all the time, so they are bouncing off the walls.

Q.    Let me ask you one more question about this.  Does this have anything to do whatsoever with Dennis Graham or Jim Lee or any of the people in Danny's background?

A.    Not in terms of kind of emotional influences.  Attention deficit disorder is again a wiring, fundamentally a wiring problem, that has some inheritability to it.  So in that sense it's aggravated by the emotional situation you are in, but it's really more of a physical neurological kind of problem.  It's a wiring problem.

Q.    Let's look at 46-32, which is styled, "Disruptive Development:  Implications of ADHD," which is attention deficit disorder, "in Adolescence."  I am going to skip the first one and ask you to talk about hyperactive children often having a coexisting behavior disorder, oppositional defiant disorder and conduct disorder.  First I will get you to define those two

Elaine Hinson, RMR, CCR
United States Court Reporter

7723

Cunningham - Direct

disorders.

A.    Certainly, if I could jump forward to DL-46-33.

Q.    All right.

A.    Here we have the diagnosis, like, for example, attention deficit disorder.  And here are typical kinds of symptoms that are a part of attention deficit hyperactivity disorder.  These are the sorts of symptoms that you have with an oppositional defiant disorder.  And these are the kind of symptoms you would have with a conduct disorder, which, as you can see, have a more, much more antisocial kind of quality to them.  Then in the column over here, this is the percentage of children who are hyperactive who had those symptoms.  And this is the percentage of normal children or non-hyperactive children who had these symptoms.

Q.    Dr. Cunningham, excuse me.  Just for the record, see if you can define those, instead of saying "this column," you are talking about the column on the left and the column on the right, so that it will be in the record what you are referring to.

A.    That's correct.  On the far right of the transparency, there is a column that is titled "Normals."  It has a percentage under it.  Then right next to that, toward the inside of the page, is a column called "Hyperactives," with a percentage under it.  Then the numbers correspond to those.  So, for example, 73 percent of the hyperactive kids fidget.

Elaine Hinson, RMR, CCR
United States Court Reporter

7724

Cunningham - Direct

But only 10 percent of the normal kids fidget.  Under conduct disorder, 46 percent -- 49 percent have stolen without confrontation who are hyperactive, as compared to only 7 percent of normal kids.  So there is association between these so that if you are hyperactive, you are much, much more at risk for a conduct disorder or an oppositional defiant disorder.

Now, that may well suggest that there are wiring issues that are associated with these as well, as well as the fact that someone who is hyperactive is collecting negative input about themselves.  And that may well add to it.

Q.    Let's look down there -- we're on 46-33 still -- at conduct disorder.  And you just said something about a wiring problem, and I missed that.  What did you say?

A.    Well, to the extent that conduct disorder is so often seen among kids who are hyperactive; in other words, when we look at -- let me go back to 46-32, that 59 percent of the hyperactive kids had a diagnosis of oppositional defiant disorder along with that.  And 43 percent had a diagnosis of conduct disorder.  That's far, far more than the general population.  So we have an association that kids that are hyperactive seem to be much, much more at risk for oppositional defiant behaviors and also a conduct disorder.  To the extent that hyperactivity is a wiring problem, then there is some implication of conduct disorder and oppositional defiant disorder, at least for these kids as having some wiring

Elaine Hinson, RMR, CCR
United States Court Reporter

Cunningham - Direct

component as well, although, again, the incidence, the genetic part of this hyperactivity may mean that their parents don't function quite as well.  The kid who is hyperactive is getting lots of negative social messages and a good deal of failure experiences.  And that may be part of what is contributing to the conduct disorder as well.  But it is a very strong association.

Q.   And the items found in 46-32 and 46-33 are each taken from studies on the hyperactivity.  Is that correct?

A.   That's correct.  DL-46-32 is from a very well respected text regarding attention deficit hyperactivity disorder by Barkley, who is talking about the research in this area.  Then the table is an adolescent outcome.  I believe this is in Barkley's text, where they are looking at an eight-year follow-up study that was in the Journal of the Academy of Child and Adolescent Psychiatry in 1990.

Q.   Now let's look at 46-34 and talk about the implications of this attention deficit disorder and childhood behavior disorder into adulthood.  And, again, we are going to skip over quite a bit of 46-34.  And let me bring you down kind of to the middle toward the bottom.  One, two, three, four, five, six, starting with No. 6 on your diamonds, "A childhood history of ADHD and/or conduct disorder is commonly observed among male prison inmates."  What are those statistics?

A.   That is that among a group of male prison inmates, 63

Cunningham - Direct

percent of them have a history of conduct disorder.  Other studies, the range may be as high as 75 percent, depending on the prison population.  But in this study it was 63 percent. That's compared to 6 to 16 percent of the males in the community have a history of conduct disorder.  But 63 percent of those in prison have a history of conduct disorder.  And 41 percent of those in prison have a history of attention deficit hyperactivity disorder as compared to 3 to 5 percent of the general population.

Q.   And the bottom, the bottom diamond there, says that only 11 percent of ADHD children as adults are free of any psychiatric diagnosis.  I'm particularly curious about that.

A.   That's correct.  This is, as I recall, from Barkley as he looks at the outcome of kids who have attention deficit disorder with hyperactivity, that close to 90 percent of them as adults either have a psychiatric diagnosis or are not functioning very well or continue to have significant symptoms of this attention deficit hyperactivity disorder.  And it persists into adulthood in one way or another for the majority of individuals that they looked at.  It's not over at childhood.

Q.   46-35 continues on with disrupted development.  It's titled, "Emotionally Disturbed."  On this particular, 46-35 and 46-36, I do want you to go through all the items on here as quickly as you can do that and still tell the jury what's

7727

Cunningham - Direct

important here.

A.    Danny is identified both in elementary school and in adolescence as being emotionally disturbed.  The attention deficit hyperactivity disorder seems to be a part of that.  He is in a classroom for emotionally disturbed children in first through third grades.  He is getting resource support in fifth grade.  They seem to be trying to address not only the learning disability, but also his emotional disturbance.

In adolescence, the behaviors are substantially worse. They are more pronounced and are creating greater problems. This is from a report that was done, a school psychologist evaluation in October of 1987.  As they are talking about what's happening to him emotionally, there's a description that his actions may stem from feelings of inadequacy and insecurity, which is a thing that I've talked about.  Acting out may be a way of covering up or compensating for his perceived shortcomings, that due to his anger and aggression and lack of control, more deep seated problems may be present. The dichotomy of a nice kid, that Danny can be very engaging and likeable and can be a nice kid.  But then at the same time, there are uncontrollable behavior problems, and the abruptness of the change, how quickly he can shift, similar to the deputy who testified about not having any problems with him and how quickly he shifted to being verbally abusive and threatening toward her.

Elaine Hinson, RMR, CCR
United States Court Reporter

7728

Cunningham - Direct

Q.    Are you telling us he's been exhibiting that kind of sign since childhood?

A.    That's correct.  Since age 14, and with indications back in elementary school of descriptions that his behavior, also having lots of problems as well.  The records have extensive descriptions of his problems all the way through school.

Q.    You got that from reports within his school records?

A.    That's right.  These are within the records.  The summaries of the earlier records that are part of these psychiatric records is most of where this comes from.

Q.    What happens at age 15?

A.    He attends the Oneida Baptist Institute.  He is expelled. He is still wetting the bed three or four times a month.  He's admitted to Mid-South, where they treat him with Cylert, which is a stimulant medication used to treat attention deficit disorder, and also Pamelor, which is an antidepressant medication.  He is diagnosed there as having an attention deficit hyperactivity disorder, a dysthymic disorder.  That's a long-standing low grade depression, not bad enough to be called a major depression, not an acute onset that then goes away, more of a static ongoing depression.

They have a rule out of borderline personality disorder, which is a personality disorder that's characterized by much instability of identity and emotion and social attachments in relationships.  This is the same diagnosis that John David, his

7729

Cunningham - Direct

first cousin, has also received, along with the schizophrenia diagnosis.

The person who has a borderline personality disorder, it's not that they don't attach. But, instead, the attachments that they make are unstable. They over attach and idealize. Then things fall apart completely on them.

For example, if somebody is a psychopath, that's down at one end of the continuum. At the other end of the continuum is a borderline personality disorder. Both of them have attachment problems. This guy doesn't attach at all. This one attaches, but in an unstable and tense way. So they are both attachment disorders, different ends of the continuum.

Q.    What does R slash O mean?

A.    That means rule out.

Q.    They are trying to rule that out?

A.    See, he is only 15 years old. You typically don't want to make a personality disorder diagnosis until somebody is at least 18, if not on into adulthood, because the idea is this is a long-standing deeply ingrained pattern of behavior. At 15, you really haven't had enough behavior to exhibit a long-standing deeply ingrained pattern. So they are concerned about it. So it's a rule out, something to kind of keep in mind out here.

Q.    And then go on. Skip over now to 46-36, which really is just a continuation of 46-35. We have it separately marked.

Elaine Hinson, RMR, CCR
United States Court Reporter

7730

Cunningham - Direct

A.   By the way, these are by no means exhaustive of all the different treatment centers that he was sent to.  There was a chronology of that that was gone through in Lea's cross-examination of all the different placements that he had. We are only hitting some of those.  Again, we are talking about emotionally, Dr. Charles Long talks about his low frustration tolerance and low self-esteem, that he seems anxious and unsure of his own abilities.  Then at Timber Springs, he takes Cylert, which is the stimulant medication, Tofranil, which is an antidepressant.  He appears depressed and often cries.

Here they are diagnosing him with an intermittent explosive disorder.  That means that the person goes along and then has an outburst of anger and rage that's much out of proportion to the stimulus, to the situation that should be causing, then often afterwards feels kind of embarrassed or ashamed or regretful about what happened there.  An adjustment disorder with depressed mood, again picking up that depressive component, abuse of marijuana, abuse of alcohol and abuse of inhalants.

Q.   Let me stop you right there right quick, Dr. Cunningham. The records suggest a dramatically different substance abuse in the huffing or inhaling household products than what Ms. Graham's recollection is.  Can you just touch on that?

A.   Certainly.  Ms. Graham reports that Danny may have experimented with the huffing, and then that was all, that she

7731

Cunningham - Direct

would certainly be aware of it. Typically, as children are abusing aerosols and gasoline and that sort of thing, their parents are not aware of it. It may persist extensively for a long time without the parent or sibling being aware that it's happening.

Q. She said that she was acutely aware of his problems when he took the Ritalin and the phenobarb as a baby.

A. I think that Lea believes that she has been quite attuned to Danny and what's going on and what he feels. I don't have confidence in her observations or her degree of awareness about what's happening to him emotionally in that way. I think her own need to see it in a certain way interferes with that. This is also -- Danny talks about abusing inhalants around the age of 10 or 11. But here he's at 15, and they are talking about inhalant abuse as being an active diagnosis.

Now, again, the record, it's difficult. It's here in the record. Danny says that he would claim to have more substance abuse problems than he did because the substance abuse program was better than the behavior control program, so again his assertion is I really didn't have a significant problem. I was just working things. There's other evidence, though, that, in fact, there does seem to be a problem. So it's my own perception is that given his risk factors, there has been an ongoing drug and alcohol problem that he attempts to minimize and deny. Again, he says this happened early and was not

7732

Cunningham - Direct

happening after age 12 or so.

Q.    Then he's admitted to the Mid-South Hospital.  Do you remember where that is?  It doesn't matter.  I was just wondering if you would remembered where.

A.    Yeah.  I would have to look at the record.

Q.    And the diagnosis there?

A.    Again, dysthymia, the low grade depression and attention deficit disorder with hyperactivity.  Then he is tested by Dr. Karp, who identifies the ADHD, the dysthymic disorder, the borderline personality disorder and a specific developmental disorder.  That's the learning disability.  Then later on, when he was at COJTC, they identify a conduct disorder, solitary aggressive type, and as I recall, pick up some of these same things as well, along with the conduct disorder.

Q.    And at age 16 he goes to yet another place, St. Anthony's.  Is this a hospital as well?

A.    Yes, it is.

Q.    What happened?

A.    He's admitted there for a suicide attempt and violence against others.  It is described in the record.  Then, as I described, it was gone through on Lea's cross.  There are many additional close frequency, close in time, different places that he's referred to across these years of 16, 17 years old.

Q.    I would like to skip 46-37, which is, "Post-divorce Loss of Structure," because we've already talked about it.

7733

Cunningham - Direct

I would like to skip "Repeated Disability," which is 46-38, because we've already talked about it, with the exception of the loss of his eye. That's what we talked about. I would like to skip 46-39, because we have talked -- no. I'm sorry. There is one thing in 46-39 we need to talk about. I apologize. This is styled, "Alcohol Dependence and Drug Abuse." We have talked about that. Look about six or seven diamonds down. And we talk about in alcohol related fights: Lost teeth, caps knocked off teeth, and lost eye. Let me ask you why you included that in 46-39.

A.    One of the indications that alcohol is a problem for somebody is that it causes problems in their life, that they are being arrested for it, that they are involved in fights, and particularly fights that result in physical injury to them. Danny is involved in a number of alcohol related fights. As I recall, he has lost three teeth, described the caps being knocked off of his teeth many times. Also he lost an eye in a barroom fight. Then he describes other injuries that he sustained across late adolescence, early adulthood, similar situations and fights.

Q.    I want to skip 46-40, as we've already talked about it, or the items in it. I would like to skip 46-41, the "Genetics of Alcoholism," because I think we've talked about that. I want to look at 46-42, "Mixed Alcoholism and Drug Dependence Predisposition," only for one thing. And that's down at the

Elaine Hinson, RMR, CCR
United States Court Reporter

7734

Cunningham - Direct

bottom.  You cite a study by Miller and Gold.  I would like you to tell the jury what Miller and Gold found in mixed alcoholism and drug dependence predisposition as to clinical findings.

A.    Their summary of the research is that there is a common biological vulnerability to alcohol and drug abuse.  In other words, if you have a parent who is an alcoholic, you are not only at greater risk to abuse alcohol, you are at greater risk to abuse substances as well.  The vulnerability that's there biologically and chemically is present for both alcohol and other drugs.  And it supports the idea that a significant risk factor in alcohol and drug addiction is neurochemical.  In other words, that some people have -- their bodies react different to alcoholic substances, and that individuals who don't have problems with alcohol and substances, it may not be a question that they have better willpower.  It just doesn't cause them to be intoxicated, the same way somebody whose biological system reacts to alcohol and substances in a fundamentally different way.

Q.    Now let's look at 46-43.  And we are going to kind of switch gears with 46-43 and talk about Danny's racism and the influences that may have brought him there.  You have at the top of this "Danny's Vulnerabilities."  I think we've talked about most of these.  But let's kind of zip through them and let you touch upon the important aspects of his vulnerabilities to a racist influence.

7735

Cunningham - Direct

A.     As I try to trace the origins of why it is that Danny got involved in this kind of racist movement with the skinheads and Aryan Nation and the rest of it, it begins with his vulnerabilities of his desire for a father and family and his need for structure, that there were no good values that were there to fill in the gap for him, so he was ripe for somebody telling him how things were and what to believe in.  He had -- he was illiterate in many ways, uneducated, immature.  His self-esteem is not good.  Like all of us, he wants to be special and doesn't have too many ways to get there that he perceives.  He has limited ability, and he is starved to belong to somebody somewhere.

Now, those vulnerabilities are cycled through community prejudice that he was exposed to, and then two different lines of influence.  One is a racist family that he essentially fell into, that Bobby Norton became his father, and Chevie Kehoe became his brother.

The research that looks at how people become extremists identifies that there is often a personal relationship that's kind of a conduit, that you have vulnerabilities, and then there is someone with a personal relationship, a friend, a family member, a spouse, who infects you essentially.  Then you begin to withdraw from more normal conventional mainstream relationships.

So what we have then is this family that was created with

Elaine Hinson, RMR, CCR
United States Court Reporter

7736

Cunningham - Direct

Bobby Norton and Chevie Kehoe and then the racist organizations that were available to meet these needs. Of course, these two end up kind of cross-fertilizing each other.

Q. Let's look at 46-44, the psychological dynamics. Really right here, Dr. Cunningham, this is not the result of any psychological study or paper, is it? This is just something that you've put together with regard to Danny Lee. Is that right?

A. Well, it's a combination. There is a researcher in this area named -- a sociologist named Raphael Ezekiel that talks about -- I think his book is entitled The Racist Mind, where he talks about some of the dynamics, some of the motivations that cause people to move in this direction. Some of this is also based on my evaluation of Danny and trying to understand what his particular vulnerabilities are that were then met through this identification, what I'm calling a solution. Here is his experience. Here's how he is feeling. And then here's how this racist identification ends up meeting these needs.

Q. Let's move to 46-45, which does appear to be the results of Mr. Ezekiel's study, The Racist Mind: Portraits of Neo-Nazis and klansmen. I guess that's a book rather than a study. And I just want to talk to you about a few of the items from the Ezekiel book. What was the median age of -- by the way, he is not looking at Spokane or Sacramento skinheads, is he? Who is he looking at?

Elaine Hinson, RMR, CCR
United States Court Reporter

7737

Cunningham - Direct

A.    He is looking at skinheads in Detroit.  And he ended up spending an extensive amount of time with these guys, enough to gain their trust and to spend hours talking to them where they ended up revealing to him their family histories and background and vulnerabilities.  What was so striking, as I read this was, the factors that he identified in his Detroit skinheads that sounded a whole lot like Danny Lee's background, speak to the same kind of vulnerabilities.

Almost all of them had lost a parent in childhood, usually the father.  There was a lot of ambivalence, a lot of mixed feelings about this missing parent, who like James, probably had no contact after the exit.  James did come back a number of months later and saw Danny once and then disappeared from his life, the stepfather being cold, rough, abusive, similar to what was described with Dennis.  Extreme economic vulnerability, a single parent family, which was the situation after the divorce.  Family alcoholism, family violence, family separation.  As the child goes to detention centers or foster care, damaged sense of belonging somewhere.  The kids didn't feel like they belonged anywhere.  They had no continuing source of care across a critical early adolescent period of time.  A number had suffered significant childhood disease or deficiency.  Of course, here we have Danny with ADD, a seizure disorder, learning disabilities, and the spinal problem until adolescence.  Their school experience was unpleasant.  They

7738

Cunningham - Direct

usually dropped out early. Most lived a pretty desperate teenage life. They are kind of living hand to mouth, with no work and no prospects for work.

Q.   Let me interrupt you right there and ask about that one. Under that, Ezekiel says, "undisciplined, inexperienced, uneducated, unskilled and unfit." Are these words that you likewise would have used to describe Danny?

A.   Yes, they are. As these young men or late adolescents look forward into their adulthood, they have so little that they are carrying with them that it's going to let them move forward in a functional way, and that underneath it all that they are profoundly isolated and frightened, that fear was the biggest emotional component that he saw in their lives.

Q.   They are going around with these tattoos on and doing the acts and barroom brawls?

A.   That's correct. Ezekiel talks about that this is a way of getting significance, that when you fight, you get this kind of John Wayne macho I must be a man because I'm willing to stand up and duke it out with somebody. There is, as they would demonstrate or wear tattoos or Nazi paraphernalia, that they then get reactions from the rest of the public. As those people react and even with hostility, that's evidence that I'm significant. I'm important.

     It kind of goes along with a saying about children, that for children, it's better to be wanted by the police than no

7739

Cunningham - Direct

one at all.  But they will take negative attention instead of no attention.  So hostility and conflict at least says, I'm important.  I can impact on you.

Q.    Let's move to 46-46.  This talks about Bobby Norton became Danny's dad.  You've already testified to most of what's on here.  So I want you to drop third from the bottom.  Where did you learn that Danny asked Bobby Norton if he could call him "Dad"?

A.    Bobby Norton told me that.  Bobby Norton also described that Danny tried to be an obedient son to him and talked about in that relationship with him being honest and loyal and honorable and receptive, trying to learn the stuff that Bobby Norton was teaching, and working hard and being eager to get out and do hard manual labor.  Danny also talked about a very strong attachment that he had to Bobby Norton.  And Bobby Norton told me they loved each other, that there was a very significant bond between them.

Q.    Let's look at 46-47, which leaves Bobby Norton and has to do with Chevie Kehoe.  What I would like you to do with 46-47, Dr. Cunningham, is just to try to summarize Danny's experience and his perception of Chevie without going through each and every item on this list.

A.    Danny contrasted the way that he grew up with what he saw about Chevie Kehoe's family, not the Kirby and Gloria part of it, what Chevie had created with Karena and her kids, and

7740

Cunningham - Direct

idealized that, saw that as being healthy in every way that his family system was unhealthy. And then, as I described, that here Danny feels an absence of family. And Chevie makes him his brother. That seems to be the essential glue that held them together, as well as his idealizing Chevie and contrasting that with his own life experience.

Q. Would you move to 46-48. Again, I'm going to shift gears with you and go back to your diagram of the foundation of the house and ask you to describe what you are talking about here.

A. In Danny's early childhood, across the first couple of years of his life, there's alcohol and drug abuse of his parents, marital conflict of his parents. He is abandoned by his father. He has a seizure disorder. And he is suffering from attention deficit hyperactivity disorder. So the basic foundation that is being formed in his life has got some cracks in it.

Q. Now let's look at 46-49. This is the house of Danny Lee's in middle childhood. What's going on?

A. There's learning disability and school failure. Dennis is an alcoholic. There are overwhelmed family resources. He is being physically and emotionally abused by Dennis. So the structure, as it's being created here, the framework of the house is having a hard time going up and is also kind of askew.

Q. 46-50 is the same thing, I guess. This is Danny's house, so to speak, his emotional house in middle childhood?

Elaine Hinson, RMR, CCR
United States Court Reporter

Cunningham - Direct

A.    He is emotionally disturbed.  He's observing domestic violence.  There's perverse sexual exposure and sexual abuse.  There's alcohol related neglect from his mom.

Q.    Then 46-51.  We look at Danny's house in adolescence.

A.    There is a loss of structure after the divorce.  Danny doesn't end up adapting very well at all to Tennessee or to the loss of his stepfather, abusive as he was.  Again, his personal resources to cope and to adapt are not very good.  He doesn't.  He's abandoned by his stepfather.  He becomes alcohol dependent and drug abusive.  He is institutionalized.  And he is exposed to corruptive racist influences in the community.

Q.    And 46-52.  I hear a sigh of relief from the jury.  What is depicted in 46-52, which is the last of your slides?

A.    In late adolescence, he suffers from multiple disabilities, learning disabilities, attention deficit disorder, loss of his eye, orthopedic problems.  He's under corruptive racist influences.  He's idealizing Bobby Norton.  There's a failed attempt at an adult life structure.  He sets up house with Jennifer Givens.  That doesn't work.  He is disabled again with the loss of his eye, and the idealization of Chevie Kehoe.

        MS. COMPTON:  Your Honor, that concludes the slides that Dr. Cunningham needs to talk about.  I have two final questions.  I don't know whether you want us to move the projector and let him sit down, or I can ask him right here.  I

Cunningham - Direct

can do it whichever way the Court please.

THE COURT:  You can ask them right there.  Let me first, for the record there, this Exhibit 46-1 through 52, they are really demonstrative exhibits.  They will be received.  23, 37, 38, 40 and 41 were not shown.  So the others as reflected in the record are received for the purposes of illustrating his testimony.  You may ask questions while he stands there.

BY MS. COMPTON:

Q.   Dr. Cunningham, do you have an opinion as to the forensic psychological factors that have affected Danny Lee in his life and have affected his outcome?

A.   Yes, I do.

Q.   Would you tell the jury what that opinion is?

A.   My opinion is that Danny Lee experienced many traumatic and adverse life experiences that fundamentally shaped him.  It shaped him neurologically, psychologically, socially, emotionally and ethically, and that I think contributed to his involvement in this offense.

MS. COMPTON:  Your Honor, at this time I have no further questions.  I would offer Dr. Cunningham's report as Defendant's Exhibit 47.

THE COURT:  No.  It can be -- the government can use it.  But unless you want to bring the jury's attention to certain portions of it, I don't want to just hand them an exhibit and then say read it and see.  I assume that he has

Elaine Hinson, RMR, CCR
United States Court Reporter

7743

Cunningham - Direct

summarized it, what you think is important.  If there's anything else in the exhibit that you want to introduce, you can do so.  The government can use it for cross-examination to the extent they wish.  But I don't want to just hand an undifferentiated or unidentified stack of papers to the jury.

MS. COMPTON:  All right.  That's all I have.

THE COURT:  Now, I guess we will want to remove this, or do you want -- I'll ask Mr. Liroff.  Do you want the projector there for your cross-examination?

MR. LIROFF:  No.  Thank you.

THE COURT:  Is it no?

MR. LIROFF:  No.  Thank you.

THE COURT:  We will remove that then.  Mr. Liroff, you may cross.

CROSS-EXAMINATION

BY MR. LIROFF:

Q.   Thank you.  Good afternoon, Doctor.

A.   Good afternoon.

Q.   It's been the end of a long day.

A.   Yes, sir.

Q.   We've talked about a lot of things.

A.   Yes, sir.

Q.   A lot of what we talked about seemed to end for Mr. Lee largely at age 17, 19, seemed to me.

A.   The psychiatric history that I described ended at that

Elaine Hinson, RMR, CCR
United States Court Reporter

Cunningham - Cross

point.  The involvement of Bobby Norton in his life continued on into the -- I think it crossed the early nineties.  I think Bobby Norton told me that he had last seen --

Q.    I'm sorry, Doctor.  I just asked a simple straightforward question.

A.    Excuse me.

Q.    If that's okay.

THE COURT:  Wait a minute.  When you just make a comment and make it sound like a question, you know, you are going to get an answer if you stop.  So make your questions more specific, and I think the answers will be more specific.

MR. LIROFF:  I will endeavor, Your Honor.

BY MR. LIROFF:

Q.    Now, among the things I'm interested in is Danny Lee, Mr. Lee today.  And you are a psychologist.  And among the things I'm going to focus on are psychological factors.  Excuse me.  Psychological opinions and diagnosis about Mr. Lee today.  Fair enough?

A.    I may have some difficulty with that, because the focus of my evaluation of him was on formative factors that brought him to this place and was not specifically oriented toward what is his diagnosis at this time.

Q.    Are you a psychologist?

A.    Yes, I am.

Q.    Just so we are clear, because I don't want a

7745

Cunningham - Cross

misapprehension, you are not a medical doctor?

A.    No, sir.  I have a medical degree, not an M.D.  I have a Ph.D.  I'm a clinical and forensic psychologist.

Q.    I didn't mean to suggest that you had misrepresented.  But I wanted to clarify that.

A.    Certainly.

Q.    You have talked about psychological diagnosis.

A.    Yes, I have.  I have reported what's in the record about him, particularly across those formative years.

Q.    Do you have an opinion whether or not Mr. Lee is a dangerous person, a violent person, as he sits here today?

A.    In the community, I think that Mr. Lee does present a significant risk, as has been demonstrated by his conviction in this case.  So, in that sense, in the community I believe that he is a serious risk.

Q.    Were you present at my opening statement yesterday?  You lose track.  Were you present yesterday during my opening statement?

A.    Yes, I was.

Q.    During the opening statement I said to the jury that Mr. Lee is a violent man.  Is that true?

A.    In some contexts he has been violent.  He has been violent in terms of barroom fights, was certainly violent in this offense.  Violence and risk of violence is context dependent, so it's not scientific to talk about somebody being violent as

7746

Cunningham - Cross

if that's a pervasive way entered in a relationship at all times.

Q. I also told the jury that he thrives on this stuff, referring to violence. You heard me say that.

MS. COMPTON: Your Honor, I would like to approach.

(Bench conference reported as follows:)

MS. COMPTON: Actually I meant to make a motion in limine at the end of my direct examination of Dr. Cunningham. This becomes very important. Dr. Cunningham did not perform a risk assessment on Danny Lee. He did not come here and testify as to his future dangerousness or lack thereof. Now, admittedly, in the affidavit that he gave to the Court, he said that he might go there. However, we did not do that. And I don't think that Dr. Cunningham is going to be prepared to talk about risk assessment and future dangerousness given the fact that he and I decided not to go into that after Judge Forster overruled us on some of the issues that we had asked about and additional tours of the Bureau of Prisons, additional information that Dr. Cunningham was going to need if we were going to do risk assessment and future dangerousness. We are not.

Dr. Cunningham is doing strictly mitigation. I would move in limine to keep the government from going into an area which has not been brought out in direct and which isn't going to be. His assessment is strictly as to mitigation and not as to

Elaine Hinson, RMR, CCR
United States Court Reporter

7747

Cunningham - Cross

risk assessment of future dangerousness. We are not prepared to go there.

THE COURT: I gather the report, which I have not seen, does go beyond what you used on direct?

MS. COMPTON: No, sir.

THE COURT: It does not?

MS. COMPTON: We don't do any risk assessment or future dangerousness. It is strictly within mitigation and psychological factors as has been testified to on direct.

THE COURT: Well, he has identified himself as a clinical and forensic psychologist with a Ph.D. degree. He has had an intimate investigation of the defendant, so I think Mr. Liroff should be able to ask him in his opinion if he is dangerous. Now, he can handle himself. If it's in the area of his expertise and considering what has been revealed about his intimate knowledge of the man, he can inquire. I think the expert is fully capable of explaining why he can't answer certain of these questions.

MS. COMPTON: All right.

THE COURT: He is in effect making his own witness, is he not, when he goes out of the realm of what you've questioned him about. He runs somewhat of a risk. But as far as just saying, no, you can't do that, I don't think I'm in a position to do that. It's up to the witness to say I'm not prepared to handle that, or I don't have enough information to

Elaine Hinson, RMR, CCR
United States Court Reporter

7748

Cunningham - Cross

do it, or I need more studies or whatever.  So I'm going to let him inquire.  The witness -- at some point I may feel that it's diminishing returns here.

Also, the method of questioning, you have these preambles to the question.  It would be helpful, it seems to me, if you just ask him the question.  You heard me say in my opening statement this.  Is that true?  You know, it's all right.  I would like to get the questions and the answers before the jury.

MR. LIROFF:  Thank you.

(Continuing in open court.)

MR. LIROFF:  The objection is overruled?

THE COURT:  You may proceed.

BY MR. LIROFF:

Q.    You can answer the question.

A.    Could you repeat it, please?

Q.    Is this man, your client, Mr. Lee, is he a dangerous man?

A.    First, Mr. Lee is a man that I have evaluated.  I would not characterize him as my client.  I can give you estimates, my best estimates of his risk.  But to do that we are going to have to identify what level of violence are we talking about and in what -- in what context of confinement, confinement being where he is going to be for the rest of his life.  So dangerousness, as is described in the literature, no one can be described as dangerous in toto in every situation in all

7749

Cunningham - Cross

respects.  So, instead, what's more scientific is to talk about what's the probability, what's the level of risk, in what context of confinement, at what time period in his life, and in what violence are we talking about?  Are we talking about a fist fight, or are we talking about killing a correctional officer, because the likelihood of those things varies profoundly.  So I can address this.  But I would have to break it down into these component parts.

Q.   Is there a feature of his personality that he is a person who likes violence?

A.   Again, not in all respects at all times.  Across this recent time period in his life, across his late adolescent and young adulthood, he has repeatedly gotten into fist fights and barroom brawl sorts of situations, which seem to be a way of perceiving himself as a more adequate masculine guy who belongs to the skinheads.  And the skinhead culture has a good deal of that kind of rough and ready fist fighting kind of violence attached to it.  So certainly in that context he has been violent and has repeatedly pursued that level of violence. This offense is pretty isolated in its level of violence that he's displayed.

Q.   This is, this offense is isolated in terms of the violence that was displayed?  Is that your answer?

A.   In terms of the murder of three people, yes, it is.  I'm not aware of any other murders that he has committed or been

Elaine Hinson, RMR, CCR
United States Court Reporter

7750

Cunningham - Cross

convicted of.  There are other episodes of violence that is above a fist fight.  There's a report of -- a self-report that's described, not to me, one of the other witnesses, of him stabbing somebody in the neck with a fork.  There was also his collateral participation, whatever degree that was, in the murder of Joey Wavra.  Those are the other two most significant episodes of violence that -- instances of violence that are part of this record.

Q.    His record is replete with evidence of violence.

A.    Fist fighting level of violence, disorderly conduct, assaultive behavior.

Q.    In terms of the contextual situation, it is across the board.  He has committed violence in institutions?

A.    That's correct.

Q.    He has committed violence in institutions against peers?

A.    That's correct.

Q.    I should say that in a more straightforward language. While incarcerated, while in custody, he has assaulted other patients or inmates?

A.    It's been described in regard to patients.  I don't think that I'm aware of a description of the assault of another inmate.  But other patients, there are instances where he's been violent with them or behaved in an intimidating, bullying fashion at least.

Q.    Are you aware that while incarcerated in this case pending

Elaine Hinson, RMR, CCR
United States Court Reporter

7751
Cunningham - Cross

trial he assaulted other inmates?

THE DEFENDANT:  Bullshit.

A.    Let me review my records.  That doesn't immediately come to mind.

BY MR. LIROFF:

Q.    Doctor, I will get back to that.  You answered that you don't recall.  He has no understanding or appreciation of the enormity of this situation, does he?

A.    To the extent that somebody who is immature, as he is, I think he appreciates the enormity of it through the eyes of somebody who is a late adolescent and is immature, has a lot of psychological baggage that he is carrying.

Q.    Did you just hear the comment he made a moment ago?

A.    Yes, I did.

Q.    Do you know that's not the first time?

A.    I would not be surprised if he didn't display very good judgment and was kind of impulsive about what he blurted out.

Q.    Do you know that he regularly states pejorative obscene insults to the lawyers in this case?

A.    I wasn't aware of that.  It's not terribly surprising to me.  I was not directly aware of it.

Q.    Is that a sign of his paranoia?

A.    I think that he, I think that he does easily identify himself as being persecuted in some way.  I think it is a sign of his impulsiveness.  It's a sign of his immaturity.  It's a

Elaine Hinson, RMR, CCR
United States Court Reporter

7752

Cunningham - Cross

sign of poor judgment and impulsivity.  It's a sign of the negative experiences that he's had with authority across his life.  I think he pretty easily erupts into some resentment.

Q.    Let's talk about his violence.  He has been violent in institutions against staff?

A.    There are reports of that.  That's correct.

Q.    And recently there was an attempt or at least an expression of threat of violence against staff?

A.    There was a threat.  He was described as beating on the doors of his cell.  It was not an attempt that I'm aware of to engage in an assault.  There was a very ugly threat that was made.

Q.    This is the type of thing, one aspect, that suggests if incarcerated he will continue to be a threat, present a threat of violence?  Yes?

A.    Violence of a fist fight nature and violence -- I think there's a reasonable likelihood that you will continue to get threats from him and that there can be fist fights and belligerence and that sort of thing.  I think there is a good likelihood of that.  Violence of a greater gravity than that, we would have to begin to look at actuarial numbers because he doesn't have -- he doesn't have a track record in prison that we can study to identify indications of serious violence, major assaults causing substantial injury, that sort of thing, particularly as an adult.

7753

Cunningham - Cross

Q.    So what you are saying is we have to see if he actually hurts somebody first to see if he will hurt somebody?

A.    No.   In the absence of a personal pattern that he might, that he has not yet exhibited as an adult.   We have a pattern of his responding to institutional confinement with a lack of cooperation and belligerence, kind of eruptively some part of the time.   We don't have a record of him seriously injuring others while institutionalized, and we don't have a track record of him in a prison setting as an adult.   Additionally, we don't have the benefit of a full neurological workup.   We don't have the benefit of whether anticonvulsant or other psychoactive medications would reduce his aggressive threshold.   And that's another part of this risk equation.

Q.    You've testified, I believe today, that he has impulsive features?

A.    Yes, he does.

Q.    You've testified, I believe today, that he exercises poor judgment?

A.    Yes, he does.

Q.    Do you know of a study, scientific study, that says those features go away when you enter a prison?

A.    No.   I wouldn't expect that they would go away, although the structure of prison substantially contains those as compared to the free community.   I'm also aware of studies, such as I presented in this case, that impulsiveness and poor

7754

Cunningham - Cross

judgment are very common among prison inmates. And that alone

doesn't differentiate him, so those are risk factors in the

community. But when we look at individuals who are in prison,

the overwhelming majority of those individuals are impulsive

and have bad judgment, and so those alone don't cause Danny Lee

to become more of a danger.

Q.    Yesterday I used a term "psychopath." The question is, is

that a psychological term?

A.    Yes, it is. It's not a diagnosis within DSM-IV. But it's

recognized within forensic psychology.

Q.    Do you recognize it?

A.    Yes, I do.

Q.    And does it come from a test, a psychological instrument

prepared by a Dr. Hare?

A.    It doesn't come from that. It's measured by a structured

interview called the psychopathy checklist revised that is

developed by Dr. Hare and has been increasingly widely

researched within the field of forensic psychology. In fact,

one of my peer review publications addresses that concept.

        THE COURT: All right, Doctor. We are going to break

for the evening. It is 5:00. We will be in recess until

9:30. Ladies and gentlemen, keep in mind the prior admonitions

of the Court. You may now leave. Everyone else remain seated

until the jury is out of the room.

        (Jury excused.)

Elaine Hinson, RMR, CCR
United States Court Reporter

7755

THE COURT:  Doctor, you may stand down.  The defendant has given the Court some estimate of the time for the balance of the defendant's case.  Does the government have any estimate of the rebuttal time?

MR. LIROFF:  At this point I believe we will present one witness.  That's Professor Ryan.  I believe that his direct could take about as long as Dr. Cunningham.  And his cross, I will leave that to counsel.

MS. COMPTON:  I would like to address something about Dr. Ryan's testimony.

THE COURT:  Go to the lectern.

MS. COMPTON:  I have a copy of Dr. Ryan's report.  And it's my understand from reading that report and from a lot of other stuff in this case that went on earlier in motions and whatnot, that Dr. Ryan is going to do some sort of or has in his report done some sort of risk assessment.  Dr. Ryan is also being used only, as the Court was advised early in this case, only for rebuttal.  Now, again we visit this issue.  Dr. Cunningham has not raised that aspect of the statute, the risk assessment aspect of the statute.  So I would like to move now to limit Dr. Ryan's testimony to pure rebuttal, which would be rebuttal of mitigation factors only, and not have him go into risk assessment, because it will be rebuttal of nothing that has been brought in this case.

THE COURT:  Mr. Liroff, why is that not accurate, or

7756

do you intend to use him for risk assessment analysis?

MR. LIROFF:  Your Honor, I intend to use him for the purpose of expressing psychological and neuropsychological opinions about this defendant.  There has been testimony by a psychologist who has elaborately explained to this jury who this defendant is.  What he hasn't done is provided the additional information in terms of his psychological profile.  You can't show one picture, one side of this person's psychological profile without allowing the jury to understand the psychological profile that he continues to carry today.

THE COURT:  The objection is that you should have brought that on in your case, if that's part of your direct case.  And if it's not to be rebuttal, then it shouldn't come on as rebuttal.  Now, anything that this doctor has testified to and your doctor will contradict, take exception to, you are certainly permitted to put him on.  But to take him into an area that has not been developed is essentially to come on at the rebuttal stage rather than at your own case in attempt to introduce things that are not truly rebuttal.  I just don't know until I hear it.  I gather you are going to confine it to a rebuttal of the testimony that was given by the defendant's doctor.

MR. LIROFF:  That's my intention.  What I do intend to do is to have this witness, aside from the neuropsychological attributes that will be testified to, he

7757

will also testify to a psychological test that we were just getting into called the Hare psychopathy that results in a diagnosis, a psychological diagnosis. This diagnosis rebuts the testimony of Dr. Cunningham.

THE COURT: Well, you will have to show me how it does. Until you have him on the stand, he hasn't expressed any views essentially. I just don't know what you are going to be contradicting. I can see -- let's put it this way. We will leave it to the defendant to object as to his testimony when it gets to the point you say, stop, it's not rebuttal. And I'll have to make a judgment as to whether it is or not. I'm not going to let the government put on its case on rebuttal that it should have put on in direct. If it's strictly rebuttal, there will be no problem.

MR. LIROFF: Could I indicate that the order that permitted Dr. Ryan to testify I believe put me in a position of only responding to the defendant's presentation of a psychologist. I could not put a psychologist on in my case in chief until they officially called the psychologist. I believe that's my understanding of the law. I believe once they called the psychologist, that opened the door to the presentation of a competing opinion about the psychological profile, both as an adolescent and as to Mr. Lee today.

THE COURT: I'm going to go out here and review the order you are talking about, see if I can understand the

7758

nuances of it all.

MS. COMPTON:  Your Honor, I don't have any problem with that.  That's true, that only after we bring on a psychologist can they bring on a psychologist.  And it is for rebuttal.  This is a statutory thing.  I think what I will do is go to my office and file a written motion in limine and include this doctor's report so that the Court will be aware of exactly where I'm talking about not wanting to go, which is risk assessment.

THE COURT:  That would be a good idea.  Court will be in recess.

THE DEFENDANT:  Your Honor, can I say something?

THE COURT:  All right.  The defendant wants to say something.

THE DEFENDANT:  Mr. Liroff made reference to violent behavior while incarcerated.  I just would like you to know in the 19 1/2 months I have been incarcerated on these charges, there's been not one single aggressive altercation while I've been in the facility.

THE COURT:  I think your attorney should be aware of that and can bring it out.  He was using -- I couldn't tell from the questions whether he was talking about when you were in juvenile detention or in adult detention, so that will probably be clarified in the course of the examination of the witnesses.

Elaine Hinson, RMR, CCR
United States Court Reporter

7759

THE DEFENDANT:  Thank you, sir.

THE COURT:  Court is in recess.

(Recess at 5:05 p.m.)

### CERTIFICATE

I, Elaine Hinson, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of the proceedings in the above-entitled case.

*Elaine Hinson*

Elaine Hinson, Official Court Reporter

Date:    May 13, 1999

Elaine Hinson, RMR, CCR
United States Court Reporter