7760

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


United States of America,          Docket No. LR-CR-97-243

                        Plaintiff,  Thursday, May 13, 1999
                                    Little Rock, Arkansas
vs.                                 9:15 a.m.

(2) Daniel Lewis Lee,

                        Defendant

                    VOLUME 46
            TRANSCRIPT OF JURY TRIAL
        BEFORE THE HON. G. THOMAS EISELE,
        UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
On behalf of the Plaintiff:
    MR. DAN STRIPLING, Assistant U. S. Attorney
    MR. ROBERT DE LA CRUZ, Department of Justice
    MR. LANE LIROFF, Department of Justice
        United States Attorney's Office
        TCBY Building
        425 West Capitol Avenue, Suite 500
        Post Office Box 1229
        Little Rock, Arkansas 72203-1229

On behalf of the Defendant Lee:
    MR. JACK T. LASSITER, Attorney at Law
        Hatfield & Lassiter
        401 West Capitol Avenue, Suite 502
        Little Rock, Arkansas  72201-3437
    MS. CATHLEEN V. COMPTON, Attorney at Law
        221 West Second, Suite 701
        Little Rock, Arkansas  72201


Defendant Lee present


Proceedings reported by machine stenography; transcript produced by computer.

                Pegge J. Merkel, RMR
            United States Court Reporter

7761

INDEX

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mark Douglas Cunningham | | 7761 | | |
| Kevin Bianchini | 7837 | 7871 | 7894 | |
| REBUTTAL WITNESSES | | | | |
| Thomas Ryan | 7901 | 7932 | 7947 | 7950 |

Pegge J. Merkel, RMR
United States Court Reporter

(Prior proceedings under seal)

THE COURT: All right, ladies and gentlemen. Good morning. Sorry we were late getting started. We were dealing with issues that the lawyers and the Court had to dispose of first. Dr. Cunningham is on the stand and is being cross examined. You may proceed, Mr. Liroff.

MR. LIROFF: Thank you, Your Honor. I'm sorry for doing this right now, Your Honor.

CROSS EXAMINATION

BY MR. LIROFF:

Q. Dr. Cunningham, you told us that you had spent -- I believe you didn't tell us how much time you spent, but I think I added it up at one point and I thought it was ten hours interviewing Mr. Lee?

A. That's approximately correct.

Q. And did you talk to Mr. Lee about his history?

A. Yes, I did.

Q. Did you explore issues relating to a word you used yesterday that I may have used previously, minimalization?

A. I didn't explore directly minimalization with him. I was attending to that across the period of time that I interviewed him. I was paying attention to how he described his history and what he spontaneously added and whether he seemed to be embellishing that.

Q. Was that important to you?

A.    It certainly was.

Q.    Did you ask him on occasion how he felt about things in his life?

A.    Yes, I did.

Q.    For example, you told us about an incident relating to a photograph where he was asked to leave the family photograph.  did you ask him how that made him feel?

A.    I think I got that information from his sister Carrie, perhaps his mother who described that.  He had not reported -- I would need to look at my notes.  I don't specifically recall him describing that incident.

Q.    That's fine.  Did you ask about other situations, such as, let's say the Joey Wavra situation.  Did you ask him how he felt about that?

A.    I don't recall specifically asking him how he felt about that.

Q.    Did you discuss it with him?

A.    I believe so.  Again, I would need to look at my notes to verify that.

Q.    Would it be fair to say that as a psychologist, when you are talking to a client or a subject, that when a person is talking to you about something, you are observing how they are talking about it.

A.    That's correct.

Q.    And that's important to you.

A.    Yes, it is.

Q.    And you use that in evaluating many things about his make-up.

A.    That's a piece of the data along with many other things.

Q.    And that allows you to understand who he is.

A.    In part, that's correct.

Q.    Is it fair to say that as a forensic psychologist what you do is you sort of act as a detective.

A.    In part, in terms of looking at much more data than a clinical psychologist usually does, that I, for example, interview a number of third parties which is not typically part of clinical practice, and I review extensive records. So I'm less reliant simply on what he describes to me and instead try to have a broader data base.

Q.    Okay.    And if you find something in a record, depending upon what it is, you can consider it important and apply it?

A.    That's correct.

Q.    And if you are not given a record, then the quality of your opinion can be affected?

A.    That's correct.    Sometimes the same information is in other records, but clearly if there's something that's important in a record that I don't have, then that may create some lapse or gap in my opinion.

Q.    Okay.   Now, Mr. Lee, is he stupid?   And I'm sorry for using that term, and it's probably not a psychological term but it's a common term.   Is Mr. Lee stupid?

A.    That's not a term that I use.   I'm not trying to dodge.   I can tell you that his, I think the best estimate of his IQ score was in the verbal IQ in the low average range, in performance IQ in the average range.   That was the earlier administration before some other tests were given that might have some practice effects on them.   So that would be my best estimate.

Q.    Is it possible you made a mistake there?

A.    No.   As I recall in October 1987 his verbal IQ score was 88, his performance IQ score was 102, his full scale IQ score was 94, but let me look at that record specifically and I can tell you.   Yes, sir, this is testing that was done on October 13, 1987.   His verbal IQ score, as I said, was 88; his performance IQ score was 102, and his full scale IQ score was 94 plus or minus five, because there is some standard of error measure in this that --

Q.    But the score of 94 is not the lower range; the score of 94 is average, is that correct?

A.    Full scale IQ score is the average range; the verbal IQ Score is on the low average side; performance IQ score is also average.

Q.    But there is other evidence in the record, because you have to consider all parts of it, that suggest that Mr. Lee is more intelligent than that, isn't there?

A.    No, that's really not the case.  Unfortunately, the same IQ test was administered to him three or four months later in October of, I guess 1970 -- I'm sorry, February of 1988.  Well, a test like this is highly influenced by whether you have seen it before, whether you have had practice with the same items.

And so what happens is because he's already practiced with these blocks and these puzzles and these pictures where you are supposed to find things missing and things, his performance IQ score jumps from 102, which is in the average range, to 128 which is in the superior range.  Well, that sort of jump is clearly attributable to practice effects from simply having the test three months before.  So the examiner in that case I think erred pretty significantly in repeating the same test within three months.

His verbal IQ score goes from 88 to 102.  Now, it's not that he has become 10 to 20 percent smarter in the three months' interval.  He's had practice with the test.  So that's what careful attention to the records does is that rather than simply taking the test in isolation, that you look at them, look at the timeframe,

Cunningham - cross

7767

whether it was administered before to try to make some understanding of it.

Q.   The report that you just referred to describes Mr. Lee as a bright boy, shows significantly better performance in intelligence, performance IQ 128 in the superior range.

A.   That's the second report where they failed to apparently identify Gee, we just gave you this test three months before.  You went from one institution to another. They didn't adequately identify what he has been already given.  They give him a test without identifying that they just gave it.  You've got massive practice effects.  They have a misinterpretation of their data.

Q.   So tell me this.  We're talking about a person who you have identified as having a learning disability?

A.   That's correct.

Q.   We're talking about a person who has what's diagnosed as an attention deficit disorder?

A.   That's correct.

Q.   And the learning that you just talked about is an example of a person who can learn, isn't it?

A.   No, sir.  A learning disability doesn't mean that you are like a chicken and every morning when you wake up it's a brand new world.  It's not that you can't learn anything.  It's that your learning capacity is deficient

Pegge J. Merkel, RMR
United States Court Reporter

in specific areas.  For example, you may be able to learn a lot of things that have to do with mechanical capability or manipulation of objects.  You simply can't learn to read, or you can't learn to spell or you can't do mathematical problems; but that doesn't mean that you can't remember who you were introduced to yesterday.  So what you are describing doesn't at all refute the notion of a learning disability.  It's simply clearly evidence of practice effects.

Q.   Doctor, a jump of 20 points is not clinically explainable by the explanation that a person with a learning disability took the test three months before, isn't that correct?

A.   No, sir.  You are very profoundly mistaken about that observation.  Let me tell you about what happens in performance tests.   You put together, for example, object assembly consists of putting together pieces that make a puzzle and it's timed.  You have a certain period of time to do that.  When you have seen those objects before, when you have never gotten that puzzle together before, or maybe you have assembled it before, three months later when you see that puzzle, you put that thing together in a hurry.  You get bonus points because you did it so fast. That's an example.

The same thing happens as you are manipulating

the blocks, as you are identifying what essential piece is missing from a picture. You are going to remember that several months later and you are going to see substantial increases.

Even some of the verbal tests. If you are given a vocabulary test and there are vocabulary words you don't know, it wouldn't be surprising if you went back and asked a staff member or other people, what does this word mean. What's that mean, that you might gather some additional data like that. And so these tests are significantly affected by having had them recently administered to you, and not to attend the practice effects is a very serious error in clinical interpretation.

Q. And a person who would have a 20 percent, excuse me, 20 point jump is also inconsistent with a claim of neurological deficit?

A. No, sir, it's not. It's not that when there is a neurological deficit that you just all over can't function. That's not how that works, at least in many cases. It's not like you can't find your way to the bathroom.

Instead there are specific sorts of abilities that may be affected in many instances, or it may be that it's not cognitive ability so much as it is your ability to control emotional reactions that you have. So there

are many different forms that neuropsychological or neurological damage may take that still would let you have a very significant practice effect on a test like this.

Q.    Dr. Cunningham, in your presentation to this jury yesterday with these diagrams, were you selective in the material that you presented?

A.    Well, I interviewed him for ten hours, and I talked to a large number of other people, and very clearly in that material I didn't describe everything that happened to him.  Additionally what I was principally focused on were formative factors, particularly adverse formative factors, things that influenced his development to go awry, to take a negative turn.  So there were many, many things that were part of his record that were not specific to those formative factors that I was describing.

Q.    Were you selective to the extent of shaping the result?  In other words, did you select features that were supportive of a position and ignore features that discounted a position?

A.    No, sir, I don't believe I did.

Q.    Did you do things, make these charts in such a way that it would create to this jury a false impression?

A.    No, sir.

Q.    Well, I'm looking at DL-46-27.  It's a chart entitled "Childhood Seizure Disorder."

A.    Could that be made availale to me so I could look at it as well.

THE COURT:  Why don't you put it on the screen?

MR. LIROFF:  I've drawn on my copy.

BY MR. LIROFF:

Q.    I'm focusing on the bottom part.

A.    Yes, sir.

Q.    And I'm focusing on the part that relates to that EEG.

A.    Yes, sir.

Q.    EEG is a test that measures electrical activity near the surface, the top part of the brain.  I'm describing this poorly, but is it fair to say that this is a very crude diagnostic tool?

A.    The test is used routinely and perhaps is almost the only way to diagnose a seizure disorder is to do an EEG, and for that purpose, the purpose of measuring seizure activity, it's the best test available.  Now, there are many other things that it can't do, but for that purpose it's the best available.  So I'm not sure about your characterization of it as crude because that's the only way to measure that.

Q.    Fair enough.  But we're not using it here to prove that he had a seizure disorder.  What I'm asking you is, is it crude in terms of establishing whether there is a

brain disorder?

A.    It establishes only a single brain disorder that's available.  It goes toward establishing or suggesting the presence of abnormal electrical activity in the brain or a seizure disorder, and that would need to be confirmed, I would expect, with clinical findings of seizure activity.

Q.    Right.  It merely would perhaps suggest to a treating physician that I should refer this person out to actually determine if there's brain difficulty or not.

A.    Yeah.  I would think that it might lead to, as happened in this case, to a referral for additional neurodiagnostic evaluation.  But that doesn't necessarily mean that additional evaluation -- for example, a neuropsychological evaluation may not clarify for you whether there is a seizure disorder present except by how thorough the history is.

        Now, if you have a generalized seizure disorder EEG at age 15 and you take a clinical history and find out that this child had in fact had clincal evidence of seizures across infancy and early childhood, then your degree of certainty about there being something abnormal about this person's wiring is substantially increased.

Q.    Now, is it also true that this type of result that could occur in this case could occur simply by somebody during the test moving their head?

A.    That I'm not familiar with and that isn't the interpretation that's offered from this measure.

Q.    And the person that was being studied at this time was a person who was known and described as fidgeting, correct?

A.    That's correct.

Q.    And a person who --

A.    Not fidgeting during this exam.  He's not described in that way.  There's no indication here that these results are thought to be invalid because of movement artifact.  But are you saying in general does he fidget, is he hyperactive?  He certainly is.  But a hyperactive child can in fact sit still for an EEG.

Q.    In fact, the person is also described as a drug consumer, substance abuser at this time as well.

A.    That's correct.

Q.    Which could affect their ability to follow the instructions while the test is being conducted.

A.    Well, there's no indication that he was actively abusing substances in close proximity to this evaluation. He was admitted on December 8th and the test is on February 15th.  So we're about two months out, in confinement, and I don't recall there being an indication of perceiving him abusing substances while he was an in-patient.

Q.    And standard of care with a suggestion of an abnormal EEG would say that this person should be referred out to a neuropsyche for evaluation?

A.    That would be an additional piece of data to get would be the neuropsyche evaluation, although, again, the neuropsychological evaluation may not speak specifically to whether there's a seizure disorder occurring or not.

Q.    And that was done in this case?

A.    Yes, he was referred out for a neuropsychological evaluation, that's correct.

Q.    And the neuropsyche evaluation was done four days later?

A.    That's correct, on February 19, 1988.

Q.    And you don't mention this in this diagram, do you?

A.    I was talking about the presence of a childhood seizure disorder.  The neuropsychological evaluation does not assess whether or not there's a seizure disorder.  In other words, you can have a seizure disorder and still do fine on these cognitive tests that are part of a neuropsychological evaluation.

Q.    But the issue here is not whether there was a seizure disorder as a young child.  The issue is whether that is evidence of brain damage or brain disfunction, and as to that, the test was conducted four days later and that test was negative, isn't that correct?

Cunningham - cross

7775

A.     No, sir.   You have mischaracterized in your question.   The presence of an abnormal EEG, particularly with a clinical history of seizure disorder, is evidence of brain disfunction.   It's evidence of electrical wiring problems.   Now, they refer him out to see whether or not this is associated with additional deficiencies in his cognitive capabilities, and as they measure that, they identify that it's not, although this neuropsychologist was sloppy enough that he didn't identify that this test, a part of his exam had been given three months before, and so he describes him in his own findings as having superior performance, as I recall, in these non-verbal tests, which is simply an error.   So I'm concerned about the quality of the clinical history that was part of this neurodiagnostic eval. as well.

Q.     The neuropsyche evaluation was by Charles Long of Memphis, Tennessee?

A.     That's correct.

Q.     Are you aware that he has a national reputation as a neuropsychologist?

A.     That may be the case but he missed the practice effect in this one.

Q.     And are you saying that this neuropsyche -- you are criticizing this neuropsyche evaluation by this doctor?

A.     In that particular aspect, that's correct.

Q.    And this neuropsyche evaluation that you are criticizing states, does it not, that Mr. Lee is currently functioning within the normal range of higher cortical functioning, is that correct?

A.    He describes that in one place and then in another place he identifies there being some minor problems with higher cortical functioning.  But in a general statement he says that he's in the normal range of cognitive capability.

Q.    And this is not mentioned in any of your diagrams?

A.    This diagram addresses the seizure disorder and is accurate to that extent.

Q.    That's not the question I asked you.  Is this mentioned, the fact that there was a finding by a neuropsychologist, that there was normal brain functioning, is it mentioned in any of your diagrams?

A.    He doesn't say there is normal brain functioning.  He describes that his higher cortical processes appear to be functioning in the average range.  I don't recall that Long addresses at all the question of whether or not Danny Lee had a seizure disorder.

Q.    And this report is not supportive of an argument that Mr. Lee has brain damage, is it?

A.    Yes and no.  In his report Long talks about Danny Lee having a learning disability, as I recall, which is a

Cunningham - cross

7777

brain disfunction if you will.  He also describes him, as I recall, as having attention deficit disorder with hyperactivity.  That also is a brain disfunction of sorts.  He doesn't address the issue of the -- doesn't give him a seizure disorder diagnosis as I recall.

There is evidence both of early childhood seizures and an abnormal EEG.  Those also point toward there being some wiring problems in the electric circuit.

What he identifies is, in terms of his global kind of intellectual ability and higher capability, those seem to be functioning in an average range.

Q.    Let me ask you about another diagram, number 47. It's entitled, "Corruptive Influence Idealization of Chevy."  Do you have that in front of you?

A.    Yes, sir, I do

Q.    I'm focus on one aspect of that.  "Jennifer had his child but refused to marry him.  Separated from daughter."

A.    That's correct.

Q.    That doesn't fully describe the extent of the relationship that you learned based upon your investigation in this case, does it?

A.    By no means.  This is simply two very brief phrases.

Q.    In the investigation in this case did you learn that during the course of that relationship that Mr. Lee partook of domestic violence as against Jennifer?

Pegge J. Merkel, RMR
United States Court Reporter

A.    Yes, I did.

Q.    And you learned that Mr. Lee in fact abused her physically when she was pregnant with his child?

A.    I heard testimony to that effect, that's correct.

Q.    And in fact that there was a point when -- have you seen a police report relating to an incident of domestic violence between Jennifer and Mr. Lee?

A.    I don't think that I saw the police report.  I heard that described.

Q.    You didn't mention that in your presentation yesterday, your knowledge about the domestic violence characteristics of that relationship, did you?

A.    I don't recall whether I described that or not. Given the family system that he grew up in, it would not be surprising if his own attempts to have an intimate relationship were uneven.  Seems like I did say something about his relationships would be uneven.  I don't remember whether I specifically noted that there had been violence.

When you asked me about a violent person I may in fact have referenced that there was some domestic violence that was reported, but I'm not recalling specifically.  The relationship with Jennifer seems to have had, I think I may have said this yesterday, both positive and pretty disfunctional aspects to it.  What I learned is that there was some degree of mutual physical

Cunningham - cross

7779

abuse, that she was described as throwing things at him and pushing him.

As I recall, reading either her affidavit or testimony before the grand jury, she talked about them pushing and shoving each other, and so this was a relationship that in some ways they were very close and in others, the way in which they dealt with each other or fought was inappropriate and, again, I'm not asserting that he wasn't more aggressive than she was at times, that there wasn't some spousal abuse that was beyond her pushing. Given his history, that could have certainly been the case.

Q.   Were you aware of an incident where she tore up his photograph of Adolph Hitler and he attacked her and the police had to be called?

Q.   I heard that described. Yes, I did.

Q.   In your review of the records there is other instances of violence, behavior, violent behavior by Mr. Lee?

A.   Yes, there is.

Q.   Was there substantial discussion, excuse me, discussion of the fact that Mr. Lee assaulted his sister, his younger sister Carrie?

A.   There was a reference to that as well, on a single occasion as I recall.

Cunningham - cross

7780

Q.    Was there, and I'm not sure how accurate it is, I don't know if you were able to ascertain anything about it, but there was also a reference of Mr. Lee assaulting his mother?

A.    There was, as I recall, there was a reference that he would throw a shoe at her in the car as they were driving down the road, and I think there were also some general descriptions of there being some physical aggression directed toward her.

As I talked to Carrie and Leah neither of them described that as being a part of the routine relationship with him or in fact indicated, as Carrie described, she could not recall an instance of him being physically aggressive with her beyond the kind of brotherly sort of things that happen.

Q.    And there was also discussion in the record relating to burglary offenses?

A.    That's correct.

Q.    That Mr. Lee broke into homes and took things?

A.    There was a burglary II charge as I recall.

Q.    Several?

A.    There's at least a single one and I think there's more than one.  I can look at my --

Q.    That's fine.  Will you agree there's more than one?

A.    I believe that's the case.

Cunningham - cross

7781

Q.    An arson offense?

A.    That's correct.

Q.    Threatening a state witness?

A.    That's correct.

Q.    And I'm not going to go through the chronological breakdown that we did before, but is it fair to say that in 1988 into 1990 Mr. Lee was frequently in and out of psychiatric facilities, residential care facilities, juvenile facilities?

A.    That's correct.    The adverse factors that I detailed yesterday had certainly come to fruition by that time and he was displaying lots of problems, not just behavior but emotions as well.    He was diagnosed with a low level long term depression that was repeatedly observed, personality instability.    There is a lot of emotional issues that they are identifying beyond just simply acting badly.

Q.    And while Mr. Lee is at these facilities he's assaulting other patients or inmates?

A.    I don't know if the word assault is usually the case.    They talk about discharging him because of violence, they talk about him being aggressive with staff and other patients and making threats or being intimidating.    There is not -- I'm hesitant to -- "assault" has a connotation of a more serious kind of attack or injury.    I don't recall a description from the

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7782

records of an attack that was noted in the detail where they said he did this, he really hurt somebody.

Q.   Is it true that in the records they refer to a facility known as D. H. S. and indicate that no, excuse me, that he was placed at Wesleyan, W-E-S-L-E-Y-A-N and while there he instigated an assault involving a staff member?

A.   It does indicate that he was -- that's correct he was admitted there on February 22, 1989, dismissed on March 10th as being unacceptable to their program because of aggressiveness.

Q.   And for example, while he was at St. Anthony's Hospital he couldn't be kept there because they didn't feel that they could treat him because of his aggressive history?

A.   That's correct.

Q.   He's described otherwise as intimidating and harassing other patients?

A.   That's correct.

Q.   Physically abusive to patients?

A.   Again, that's my general recollection.   I don't have that particular part of the chart in front of me.

Q.   There's a reference that he was picked up on a string of armed robberies?

A.   That I would need to -- you might direct me to a

Pegge J. Merkel, RMR
United States Court Reporter

record regarding that.

Q.    You were familiar -- you are familiar with the writings of Dr. Hare, is that not correct?

A.    Yes, I am, Bob Hare.

Q.    And you are familiar with his book, "Without Conscience, the Disturbing World of Psychopaths amongst us"?

A.    Yes, I am.  It was published in 1993 as I recall. It's a book that's intended more for popular consumption as opposed to being a scholar reference.

Q.    Can I read you a passage and ask you if you agree with that passage or not.

MS. COMPTON:  Your Honor, I'm going to object.

THE COURT:  He hasn't acknowledged it as a scientific treatise.

MR. LIROFF:  Can I withdraw the question.

THE COURT:  Yes, you may withdraw the question.

BY MR. LIROFF:

Q.    Is Dr. Hare recognized -- he's a Canadian psychologist, correct?

A.    That's correct.

Q.    He is recognized worldwide as being an authoritative psychologist in the field of psychopathy?

A.    He's recognized worldwide regarding his expertise and development of this concept of psychopathy that was

originally advanced by a guy named Cleckey in the 1940s. That doesn't mean that everything he does is authoritative. In fact, in my own peer review research, literature review regarding the concept of psychopathy and the PCL-R identify some significant problems with a piece of research that he did with McPherson in 1984 that really had some pretty serious methodological flaws in it as a piece of research. So I'm familiar with his work, I have great respect for him, and he's made significant contributions but he's not authoritative in every instance in all of his research.

Q.    In terms of his book "Without a Conscience" is there a particular area that you think he is not authoritative in?

A.    That book is not a -- it's not a scientific publication. It is written more for a popular audience and uses terminology and words in more popular sort of ways and is not referenced to the extent or in the detail that you see with something that is a scientific publication. So it's more of a dumbing down, if you will, to a more popular reader and when you do that, you will lose some degree of scientific exactitude. So I would not use that book as a source of scientific authority. So for that reason I don't think that I cited it at all in my own literature review about the concept of psychology and how

Cunningham - cross

7785

it applies to sentencing.

Q.    But if it presents an opinion that you would agree with, you would let us know that?

A.    Yeah, that's correct.

Q.    And if it presents an opinion that you disagree with, you could explain to us why and how you disagree?

A.    That's correct.

MR. KIROFF:    Your Honor, I'd like to read the passage to ask him if he agrees or disagrees.

THE COURT:    That's not my understanding of how you use a learned treatise, and to bring it in and, of course, you are going to have the person who wrote the book here, as I understand, and you can raise it with him. But he has not validated this as a scientific treatise upon which he relies and, therefore, you can ask him his opinion.    So I'm going to sustain the objection on the basis that it is not a scientific treatise.

BY MR. LIROFF:

Q.    Let me ask you this then, Doctor.    Is it not true that people who are subject to the type of influences that you talked to this jury about yesterday, that all those people -- boy, that's a bad question; I'm going to have to rephrase that.

Isn't it a fair statement that people that are subject to the influences described yesterday, all those

people do not become murderers?

A.    Certainly that's correct.  I used the toxic waste dump example as you recall.  I talked about increased risk, increased incidence, but by no means do all those people, or even most of those, go on to kill someone.

Q.    That's something I wanted to ask you about.  You just said most of them do not become murderers?

A.    That's correct.

Q.    And is it not also true that some people who are involved in nurturing, supportive environments do become murderers?

A.    That happens.  It's much less frequent than when the risk factors are present.

Q.    And Mr. Lee bears characteristics of people who develop disorders regardless of their home environment?

A.    I'm not sure that I fully understand the question in terms of characteristics.  I'm not sure what characteristics that you are referring to that people develop regardless of their home environment.

Q.    You referred to a diagram number 32, that's DL-46-32 and that talks about something we've talked about attention deficit disorder, fair enough?

A.    That's correct.

Q.    Attention deficit disorder, children who have that, are at greater risk for developing a conduct disorder?

Cunningham - cross

7787

A.    That's correct.

Q.    Conduct disorder, is it fair to describe, and I'll ask you, is a form of juvenile delinquency?

A.    That's correct.  A conduct disorder is a psychological term; juvenile delinquency is a legal term, but, yeah, kids that have conduct disorders, particularly if they are hyperactive as well, are much more likely to end up in criminal difficulty as adolescence.

Q.    In other words then -- well, let me ask you.  Someone who has a diagnosis or someone who is ADD, attention deficit disorder, is at risk to develop conduct disorder regardless of their home environment.  They are at greater risk?

A.    They are at greater risk.  The home environment is likely also to be significant.  There's a contribution, or at least as we understand it, there are likely two influences that occur.  Some of it may be constitutional, may be kind of part of the predisposition of this child from early on, and some of it has to do with being damaged by the nature of relationships that are present, kind of community that the child is in.

Q.    I just asked you a simple question, I hope I can clarify that.  Is it not true that someone with an attention deficit disorder is at greater risk to develop a conduct disorder, regardless of home environment?

A.    I think that's the case.

THE COURT:  Let me advise the parties.  Our recess this morning will be at 11:00 rather than a quarter till.

BY MR. LIROFF:

Q.    When we talk about conduct disorder, you put up a diagram yesterday, DL-46-33?

A.    That's correct.

Q.    And it had a bunch of features in that, did it not?

A.    Yes, it did.

Q.    And Mr. Lee had almost every feature, did he not?

A.    The features that you described here, as they are talked about in this setting, are intended to act as -- they occur repetitively and pervasively.  So we've got some things like burglary and fire setting, by my recollection we have the arson charge that apparently involved the trash can.  I think there's another instance that may have occurred in residential treatment.

Q.    Another instance of arson?

A.    Of fire.

Q.    Can we go through them?

A.    If you like.

Q.    Stolen without confrontation?

A.    The conduct disorder symptoms are before the age of 14 as I recall, and I don't recall there being

discussions, I'm not sure if there are discussions of theft in his record before the age of 14.  There were after that.

Q.    Run away from home overnight, at least twice?

A.    Again, the onset of those is -- my understanding of the records is uncertain.  Certainly that's occurring by the time he gets into the treatment centers, by 1987, '88, but, again, by then he's 14 years old.

Q.    Lies?

A.    I didn't see reports of him lying that I recall from early childhood.

Q.    Engaged in fire setting?

A.    Again, those may also have occurred after age 14.

Q.    Truancy?

A.    By the time he's in kind of eighth grade we're having that described.  I don't recall the reports of truancy across elementary school.  Again, we've got a little bit of an age issue there of when is the onset of that.

A.    Broken into homes, building or car?

A.    My recollection is that that also is after age 14.

Q.    Used a weapon in a fight?

A.    We skipped some; you are going to jump down?

Q.    I'm going to ones that do apply.

A.    I'm sorry.

Q.    Is there any evidence that he was cruel to animals?

A.    Not that I recall before the age of 14.    I don't recall a report of being cruel to animals.

Q.    Any evidence that he raped somebody?

A.    No.

Q.    I'm going to the ones that I thought apply.

A.    There are about eight others that apparently don't also apply.

Q.    Used a weapon in a fight?

A.    Not before age 14.

Q.    But he did.

A.    We're talking about conduct disorder.    They don't apply within the age range.

Q.    Also physical fights?

A.    There's some discussion of fighting in elementary school.    That becomes more problematic in late adolescence.

Q.    Now, is someone who has -- and he was diagnosed as having a conduct disorder, is that correct?

A.    That's described in his -- ultimately when he's at COJTC, I think they moved to diagnose him as conduct disorder.    Earlier the other treatment centers are not focusing on conduct disorders as I recall.

Q.    And is it fair to say that someone with attention deficit disorder who has a diagnosis of conduct disorder is at risk, at heightened risk, to, as an adult, be

Cunningham - cross

7791

diagnosed as antisocial personality disorder?

A.    I guess that is certainly correct.  I believe I indicated that in one of the overheads.

Q.    DL-46-34?

A.    That's correct.

Q.    Adults with a history of ADHD -- ADD and ADHT, are those two different things?

A.    Sometimes they are used interchangeably and I might have even done that on a couple of the overheads in this presentation.  The attention deficit disorder can be with or without hyperactivity.  So in some children it may be you have some of the inattention and the impulsivity but not the over motor activity, or you some have kind of an alternative form of it where the child is, their attention is inwardly focused.  They may daydream a lot, be described as lethargic and slowed down and read and that kind of thing.  That's a very different presentation and has a different course to it than the hyperactivity type does.

Q.    And -- okay.  Children with either of these, regardless of their environment, are at greater risk to develop antisocial personality as adults.

A.    That's correct.  I mean, obviously it's not something they sign up for, it's not something they choose.  Nobody wakes up when they are 18 years old and says I think I'll

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7792

be an antisocial personality disorder.  That comes out of some risk factors like ADD and early conduct disorder and also comes out of adverse community settings and comes out of damaged families that end up damaging this individual, and so 75 percent of the people in prison are identified as being antisocial personality disorders.  It's a pretty common presentation in that setting.

Q.    We can't say all criminals are antisocial personality.

A.    The ones that are in prison we can state that about 75 percent of them are.

Q.    Can we say it's likely that someone who is antisocial is criminal in some respect?

A.    No.  fifty-three percent of individuals in the community who can be diagnosed with antisocial personality disorder have no significant arrest record, based on the community studies.

Q.    Dumb it down for me.  Define antisocial disorder.

A.    You want the DSM IV criteria, or you want me to describe it?

Q.    I asked you to put it in lay person terms.

A.    Antisocial personality disorder is characterized by, again, some difficulties in attachment so that the person may behave in a more self-serving way, doesn't form relationships to others in a stable fashion.  So you see

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7793

behaviors like repeatedly doing things that would cause you to get arrested, not having remorse for your activity, not being able to empathize very well with other people, being irresponsible and impulsive, and there is a whole kind of complex of things that go along with behaving in a socially inappropriate manner, particularly as it tends to be kind of self-centered and exploitive of others.

It may not be occasioned by being arrested at all. It may be the person is dishonest in their business dealings or they may occupy some political position and simply not be very trustworthy in the way they go about them.

Q.   Adults with a history of ADD or ADHD are at risk to develop sociopathy?

A.   There's a slight increase of risk simply from the ADD. It's the combination of ADD and conduct disorder that seems to create this risk for antisocial personality disorder. Sociopathy is kind of the more antiquated term. That's what antisocial personality disorder was called in kind of an earlier diagnostic system.

Q.   And is it also not true that you have expressed opinions and criticized the term antisocial personality disorder?

A.   That's correct. Again, the peer review article that I have talks about a number of problems with this as a

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7794

diagnosis, that as a profession we keep changing our mind about exactly which diagnostic features make up an antisocial personality disorder.

The number of symptoms that can cause an antisocial personality that can result in a diagnosis are extraordinarily large, like 400,000 different symptom combinations that can result in you having this diagnosis. Now, clearly anything that you can get to 400,000 different ways is a very broad net, and perhaps too broad to be very useful.

The disorder stated as a diagnosis is not very stable so that when you have somebody come in to today, another group of examiners come in six months from now, they only agree with each other that a person is antisocial about half the time, and as you look at aging, you see a much lower incidence of this after age 30, and particularly after age 40 than you do in the 20s. So there's an aging out, some burnout that occurs over time. So there are a lot of problems with this as a diagnosis that suggests that a forensic psychologist, for example, that comes into a setting like this and testifies really needs to tell the Court about the problems with the diagnosis and not just bandy it about, because the jury may think that somebody is particularly malignant and it's never going to go away and that sort of thing, and that's

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7795

really not reliable.

Q.    But there's another term more currently used, is there not, in this area?

A.    Yes, there is.

Q.    What is that term?

A.    That term is psychopathy.  About 75 percent of the people in prison that can be diagnosed as an antisocial personality disorder, about 25 percent of the people in prison in a high security setting, can be diagnosed as meeting criteria for psychopathy or being psychopaths as measured by this Hare psychopathy check list revised. Again, a psychopath doesn't mean the thing that people probably think it does like serial sex killer stuff. That's not what it's talking about.

Q.    You are jumping ahead of my next question.

A.    Excuse me.

Q.    That's okay, since you led me there.  So it doesn't mean this wild eyed crazy person that you might commonly consider.  A psychopath, to a psychologist, means what?

A.    Well, it's measured by an instrument called the psychopathy check list revised, which is developed by Robert Hare and it comes out of conceptualizations by a guy named Cleckey, as I described earlier, who wrote a book called "Mass Insanity" in the 1940s.

Q.    I hate to interrupt, I'll let you finish your answer.

Could you for the reporter spell that person's name?

A.    C. L. E. C. K. E. Y.

Q.    I may be wrong but isn't it spelled with a K?

A.    No, C.

Q.    Go ahead.  I didn't mean to interrupt.

A.    The test measures 20 different domains, and essentially what happens is that you take a very thorough history and you research records and maybe talk to some third parties as well and then you score the person zero, one or two on these 20 different descriptive domains.

As you do that, you have the manual open in front of you so that as you are rating this person, zero being this really is descriptive, one it is kind of descriptive of this person, two is this really doesn't meet the criteria, and we've got about two paragraphs this long that describe this characteristic like being glib and superficial.  It isn't what I think glib and superficial means, it's a very specific description of the sort of presentation the person will have.  And so you score this person across these 20 different items.  So you have a score range from zero to 40.

To call someone a psychopath kind of depends on the setting that you are in.  On the most simple level you might say if the person scores over 30 then they would meet criteria to be called a psychopath.  Now the test has

Cunningham - cross

7797

a certain degree of error associated with it.  It's like a bathroom scale that you get on and it says your weight is 100 pounds and you get off of it and get right back on it again and it says your weight is 95 and you get off of it and get right back on again and it says your  weight is 105.  So there's a certain amount of error that's associated with the scale and there are errors associated with psychological tests as well.  Now, we call the degree of error a standard error of measurement.

Now, if I want to be 95 percent sure --

Q.    I'm sorry, Doctor, I think the question is define psychopath.  I don't think the question was talking about standard error.

A.    In order to define somebody as a psychopath in a setting where it really matters, like a capital sentencing proceeding, because this is such a loaded explosive term --

MR. LIROFF:  Your Honor, I'm sorry --

THE COURT:  No, you asked the question and he may respond, and then we're going to have a break.  Go ahead.

THE WITNESS:  If you want to be 95 percent sure, then you have to go two standard errors of measurement which means the person would have to score over 36 and a half.  You need to get a score of 37, to be two standard

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7798

errors of measurement above 30, so that we're 95 percent sure that when we call him a psychopath he really is.

Now, that is also based on the test was accurately scored. There's a potential for a certain amount of subjectivity as I am deciding does this person meet these criteria or not, and if I'm not careful about that, if I'm not appropriately conservative about the way I score it, then I may end up with a score that in fact is too high or I guess if I wasn't assigning enough too low, not because of the standard error measurement but because of inappropriate scoring and bias that's occurred or inadequate history taking that's occurred as part of that scoring.

So to call somebody a psychopath in a setting of great weight where you want to be 95 percent accurate, you would go to a score of 37.

If we're in a research setting where I'm trying to compare this and gather research, I might use a score of 27 or a score of 30. I might break people up into low, medium and higher scores because I'm trying to collect research, I'm not deciding whether somebody lives or dies based on that weight.

THE COURT: All right, Doctor, we'll stop for a moment and we'll have a morning recess. Ladies and gentlemen, you may leave. I'm going to stay here in the

Pegge J. Merkel, RMR
United States Court Reporter

courtroom for a few minutes.

(Jury exits).

THE COURT:  All right, the jury is out and there were two items in Ms. Compton's motion in limine filed last night or early this morning that we did not deal with before commencing the proceedings this morning.  Doctor, you may stand down.

THE WITNESS:  Thank you, sir.

THE COURT:  And that has to do -- let me turn to the last page of the motion.  It says, "Counsel for defendant requested of the sheriff's of Pope County and Pulaski County copies of any written memorandum concerning Danny Lee's stay at his facility.  Copies of those letters are attached.  The sheriffs responded each with a packet of materials.  There is no written documentation of any assaults on inmates from either of those facilities yet the government intends to put on proof of such assaults.

"The government did not put the defendant on notice of such an aggravator and the sheriffs did not provide such documentation, so it comes as a complete surprise to counsel for defendant and should be suppressed for lack of notice."  So let me find out, does the government intend to put on evidence of any violent acts on the part of the defendant Lee while he was in custody in Pope County or Pulaski County?

Pegge J. Merkel, RMR
United States Court Reporter

MR. LIROFF:   In a sense yes, Your Honor.

THE COURT:   Beyond the lady that already testified about his cursing her.

MR. LIROFF:   If I may, could I explain?

THE COURT:   You may.

MR. LIROFF:   The defendant wrote a letter November 1, 1998.   In that letter the defendant said while incarcerated in the Russellville jail pending charges on this case that he bashed a few baby rapers.

THE COURT:   Bashed a few what?

MR. LIROFF:   Bashed a few baby rapers.

THE COURT:   Baby rapers, okay.

MR. LIROFF:   And that was only in terms of a question that Dr. Cunningham -- an answer Dr. Cunningham raised.   I believe it was not -- he raised the issue, when I was asking him about violence, he said it's contextually and that is when it came up and that's when I asked him if he was aware that there was a statement to that, and that's the only reference.   It comes from the defendant.

'There's two ways to interpret it, either it occurred or the defendant is bragging, but I think that goes to the weight and not the admissibility.

THE COURT:   Is there anything else?

MR. LIROFF:   No.

THE COURT:   That is the only thing you intend to

Cunningham - cross

7801

put on?

MR. LIROFF:  Yes.

THE COURT:  Well, if it comes out in the context of the doctor's testimony, I suppose we'll have surrebuttal from the officers up there to say it did not happen, in other words, that he was just bragging or making noise.

MR. LIROFF:  Yes, sir.

THE COURT:  So I guess that's the way we'll handle that.  That's his own statement.  I think that's the way I'll handle it, but I'll give you permission to, either by stipulation or otherwise, get a statement from them that there was no evidence of any violence while he was there or attack upon anybody and you can put that in evidence if the government in fact brings forward that statement as a part of the doctor's testimony.

MR. LIROFF:  And Your Honor, just so that -- there is a lot of stuff in this letter that we may not want to go into, so I'm not going to mark it and introduce it for the jury's reference.

THE COURT:  The defendants have seen the letter?

MR. LIROFF:  Yes.

THE COURT:  Now there's the other aspect of this, I don't know whether this appropriately -- they also raised the issue of notice, that you did not alert them

Pegge J. Merkel, RMR
United States Court Reporter

that you were going to bring on evidence of his violence in these situations.  So you did not, that's obvious.

MR. LIROFF:  No, that's not true.  I'm not offering it as future dangerousness and I'm not going to argue future dangerousness and in fact, if given the opportunity, I'll tell the jury that they cannot consider it for future dangerousness, all they can consider it for is in terms of the quality of the opinion rendered by Dr. Cunningham.  I agree it is not relevant to future dangerousness because it wasn't alleged, but I think that's the law.

MS. COMPTON:  Well, I certainly have an objection to Mr. Liroff instructing the jury, Your Honor, as to what is future dangerousness or what is not.  Now, if he wants to use this -- there's a highlighted -- it's a long letter and there's a highlighted spot on page 1 that says, "I bashed a few baby rapers but the cops didn't care."  If he wants to use that to somehow impeach Dr. Cunningham, I don't think I really have any major objection to that.  I certainly object to the whole letter coming in.

THE COURT:  He's not going to put the letter in.

MR. LIROFF:  I'm informing the Court I don't want to do that but I think there's a lot of stuff there that counsel could correctly argue shouldn't come in.

Cunningham - cross

7803

THE COURT:  With that discussion we'll let it go forward.

MS. COMPTON:  And I also want to make clear that Dr. Cunningham has seen jail records and has never seen this.  This was not included in the packet of stuff that I got that was sent to him.  So he's never seen or heard this.

THE COURT:  So even if Mr. Liroff doesn't ask him about that statement upon redirect, you can ask him if he ever heard anything about it and you can use, like I say, if you wish to, you may get an affidavit or maybe a stipulation after talking to the people who run those institutions, that is, the sheriffs of Pope County and Pulaski County, that there was no such evidence of any physical violence on the part of the defendant Lee while incarcerated in those institutions.  We'll be in recess.

(Recess).

THE COURT:  Mr. Liroff, you may continue.

BY MR. LIROFF:

Q.    Doctor, in October 1990 a Dr. Sullivan, a medical doctor, wrote a prognosis for Mr. Lee.  Do you agree with that evaluation?

A.    Will you tell me which treatment center that was associated with?

Q.    It is characterized as a residential discharge

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7804

summary from Central Oklahoma Juvenile Treatment Center.

A.    Yes, I do.

Q.    This was written when Mr. Lee was 17.

A.    That's correct.

Q.    The prognosis reads, quote, "Daniel meets the criteria, other than age, for antisocial personality disorder.  He is at high risk to continue involvement with the legal authorities and there is considerable likelihood of aggressive behavior towards others in an attempt to coerce actions favorable to his needs.  Risk remains very high for the use of intoxicating substances of various kinds, mainly in the context of pleasure seeking activities."  Is that correct?

A.    That's correct.  And it goes on from there talking about involvement in vocational training and that sort of thing.

Q.    Doctor, when we left off I had asked you to define psychopathy.

A.    That's correct.

Q.    And I'm sorry, but it didn't stick.  Is it fair to say that psychopathy could include two features.  Antisocial misconduct is one feature; would you agree with that?

A.    There are two factors associated with it.  One is called, we refer to as aggressive narcissism which is more

of a personality style or personality feature and another one is called deviant lifestyles. There is factor one and factor two. There are some items that are not associated with either factor but most of them break out into one factor or the other.

Q. Is there also a characteristic about psychopaths that they can do things to other people, harm other people, and they don't feel any responsibility or remorse for what they do?

A. That's one of the items, one of the domains that you are scoring is lack of remorse. Again, that has a very extensive and elaborate description discussion about it. So it's not simply a matter of saying the name lack of remorse and thinking he does or he doesn't.

Q. And a psychopath is going to be more impulsive?

A. That's another one of the items.

Q. And a psychopath is going to display, I'm not sure if you gave me the answer. You would expect a psychopath to display a lack of remorse?

A. That's one of the 20 items that's scored. So maybe someone could obtain a pretty significantly high score and not have scored on that. So you've got 20 different areas that you are looking at, and that's one of the 20.

Q. And you would expect a psychopath to have poor behavioral control?

Cunningham - cross

7806

A.    Well, again, when you say "expect a psychopath" poor behavioral control is, again, one of the 20 items. Someone could meet criteria for psycopathy and not have evidence of poor behavioral controls, but that is one of the domains that we're scoring, and I suppose any of these 20 are at greater -- if you end up scoring a 37, pretty clearly out of 40 you have scored 2 on almost all the items and one on a couple of others and even certainly three-fourths of them you are scoring on.  So I'm not trying to quibble, but I'm trying to answer accurately and, again, there are 20 items and you are naming different ones of those 20 items.

Q.    And you would expect a psychopath to be more prone to violence?

A.    It depends on the context.  With increasingly high scores on this instrument that's been associated with a greater likelihood of criminal activity and violent criminal activity in the community among white males through midlife with a merging but kind of an adequate research about whether it means that by minority groups or adolescents or females, there has simply not been much research about psychopathy, what it means about somebody's behavior in an institutional setting, and the research that has been done has been substantially flawed with methodological problems, and then you have some other

studies that show there's no association of psychopathy scores with institutional violence.

Q.    I'm not asking you about institutional violence.

A.    You asked me about is it associated with violence, and the answer to that is it depends on what setting you are talking about.  There's a greater risk of violence in the community with high score.  It has not been clearly demonstrated that there is evidence that a high score is associated with violence in an institution and in fact there are some studies that don't find any association between the two.

Q.    Doctor, can you agree with the statement that psychopaths have an increased incidence of predatory violence?

A.    In the community among white males through midlife.

Q.    Who wrote that, what I just said?  Who wrote that?

A.    I don't know that I can give you an author for it.

Q.    Didn't I quote an article that you wrote?

A.    Well, you have to direct me to exactly that particular phrase.

Q.    Did you write an article published in a magazine entitled "Prosecutor's Brief"?

A.    Yes, I did.  I co-authored that with Dr. Tom Reidy and that's a publication for the California District Attorneys Association.

Q.    And I want to read to you a quote, "Psychopaths have an increased incidence of predatory (emotionalist) violence."

A.    You want to look at the rest of what's described about in what setting that occurs.  There is a whole article that's around that.

Q.    Did you write that?

A.    Yes, I did.

Q.    In that article did you also say, "Psychopathy involves both maladaptive personality features and socially deviant behaviors of interest to the Court with T. symptoms of impulsivity, lack of remorse, callousness and poor behavioral control."

A.    That's correct.  This article that you are describing is again kind of a dumbing down of the research and concepts, because it's intended for a non-psychologist, non-forensic psychologist audience.  So, yeah, I'm kind of generalizing and lumping some things together.  If you want a more definitive treatment of this, then go to the peer review article that I also co-authored in this area.

Q.    Excuse me, but if you are dumbing it down, who wrote it?

A.    Dr. Reidy and I wrote it.  We're dumbing it down for attorneys who are not experts in this area the way Dr. Reidy and I as forensic psychologists are.  That's who

we're dumbing it down for.  I'm not saying the authors were dumb.  Maybe we were.

Q.    Well, was there an article written by Serin and Amos that's cited in your article?

A.    I don't recall -- I'm familiar with Serin and Amos. I don't recall which article that was.  I know that was cited in a paper about integrated base rates.

Q.    Are you aware of an article by them entitled "The Role of Psychopathy in the Assessment of Dangerousness," spring '95 International Journal Law and Psychiatry?

A.    That sounds familiar.  I have read innumerable articles and treatises in that area, so I can't recall off the top of my head, but Serin and Amos I'm familiar with. The title I'm not familiar with.

Q.    This is the dumbed down article, is it?

A.    Which journal are you looking at?

Q.    International Journal of Law and Psychiatry.

A.    No, that one is likely not dumbed down.

Q.    And this study found that psychopaths were five times more likely to engage in violent recidivism in the community.

A.    In the community, that's exactly what I was saying. Among white males through midlife psychopathy is a substantial risk assessment factor.

Q.    Psychology to a great degree is a study of

statistics?

A.    When it's done most scientifically.

Q.    And this particular test has been accurately or it has been more accurately applied to white males, fair enough

A.    In the community through midlife.

Q.    Okay.  And Mr. Lee is a white male?

A.    But not in the community.

Q.    The *Meuller murders, did they occur in the community?

A.    Certainly they did.

Q.    The activity that we described of Mr. Lee, all the activity that I've talked about with you in the last two days was activity in the community?

A.    That's correct.

Q.    And some of the activity was in institutions?

A.    That's correct.  Not in a correctional institution setting from the testimony that there's been a verbal outburst at the corrections officer.

Q.    In fact, this article by Serin and Amos that talks about the fact that a psychopath is five times more likely to be violently dangerous is an article that you cite in your dumbed down article as being authoritative, correct?

A.    Authoritative in terms of that aspect, that there is much increased risk of violent recidivism in the

Cunningham - cross

7811

Q.   In fact, do you agree with the statement made in that article?

A.   I don't know that I would agree with all of the statement there.  I found that increased risk to be reliable, particularly as it's been combined with other studies that show the same thing, but I anticipate there may be other conclusions or opinions those authors may express in the article that I would not agree with.

Q.   Let me ask you this, because I can't know if you agree or not without asking you.  Do you agree with their statement that the psychopathy check list has emerged to be the standard for the assessment of criminal psychopathy in north America?

A.   I would agree with that.

Q.   You are familiar with the book, "Psychological Evaluations to the Court, and Handbook for Mental Health Professionals and Lawyers."  Are you familiar with this book?

A.   Yes, I am.

Q.   And I'm sorry, I think for the record I should cite the authors.  The first one is Melton, M. E. L. T. O. N.  Second one is Petrila, P. E. T. R. I. L. A., third one is Poythress, P. O. Y. T. H. R. E. S. S.  Fourth one is Slobogin. S. L. O. B. O. G. I. N.   Is this an authoritative work in the field of forensic psychology?

Pegge J. Merkel, RMR
United States Court Reporter

A.    It's a well respected forensic text.  Likely that as well might have some specific issues that I might take exception to or know of research that disagrees with, but in general, that's a well respected text.

Q.    And do you agree with their statement that the Hare psychopathy check list is the single most promising recent development in risk assessment of correctional and forensic populations, has been the psychopathy check list revised.  Do you agree with that?

A.    In terms of criminal activity and violence in the community, I would agree with that.  The instrument has not yet been shown to be predictive of correctional institutional violence.

Q.    I'm not asking you about correctional --

THE COURT:  No, it's mentioned in the quote.

BY MR. LIROFF:

Q.    Okay.  But in terms of my questions, I'm not asking you about institutional violence.

A.    Please understand that violence risk is always context specific, and so if you ask a general question about violence risk, I'm going to have to differentiate between what context we're talking about.

Q.    Is it fair to say that the psychopathy check list serves a purpose other than violence assessment, violence risk assessment?

A.    It also serves a purpose for identifying a likelihood of non-violent criminal recidivism but the principal purpose of this instrument is to identify individuals who are at greater risk of criminal activity or violence and that is increasingly demonstrated in the community.  There is no articular benefit in just attaching a label to someone unless it has some predictive significance to it.

Q.    Yesterday in your presentation the first exhibit you used is entitled, "What accounts for the differences and outcome."

A.    That's correct.

Q.    You looked at trauma, you looked a predisposing contextual factors, you looked at protective factors. Fair enough?

A.    That's correct.  And choices.

Q.    Because you agree that a person who suffers from attention deficit disorder and has greater risk of developing a conduct disorder, regardless of environment, and then has a greater risk of developing an antisocial personality disorder, regardless of environment, is also at greater risk of developing psychopathy regardless of environment?

A.    No, sir, I would not agree with that without adding in some clarifications.  When you have, for example, a high incidence of conduct disorder along with

hyperactivity, that points to something going on besides the child's environment, if there is some sort of wiring predisposition that's there. I'm not familiar with research, though, that controls for the environment of the child, that controls for the family being intact or there not being exposure to violence or other adverse factors such as are present in this case and then looks at what kind of outcome you get at the end. So, in other words, the research is correlational.

We have this, we have a good amount -- when this is present there seems to be a good amount of this. It's really more than perhaps should be there from environment and that makes us look toward there being wiring factors that are involved. But the research has not yet been done that definitively excludes environment as having anything to do with it.

Q. Is it not true that the opinion you just rendered is not mainstream psychological opinion?

A. No, sir. I think that what I've described is mainstream psychological opinion.

MR. LIROFF: I'm sorry, excuse me, just a moment, Your Honor, I'm looking for a source.

BY MR. LIROFF:

Q. Did you not appear at a conference, a seminar in Texas, a couple of months ago that you spoke at?

A.    Yes, I did.  This is a day long work shop that was under the auspices of the American Academy of Forensic Psychologists, the association of board certified psychologists.  I'm on the teaching faculty of that organization and I presented a work shop on capital sentencing evaluations and capital sentencing issues as the association has recognized my expertise in that area.

Q.    Did not every speaker at that presentation, aside from you, suggest that the psychopathy check list test is the state-of-the-art test to be used in criminal cases today?

A.    You know, there were a number of different work shops that were going on during that conference, and I'm not sure that all of them would have dealt with the concept of psychopathy.  The psychopathy check list is state-of-the-art if you are looking at likelihood of criminal activity and violent recidivism in the community among white males through midlife.  It is our present instrument at present for evaluating that.  There are some others that are under development.  So I would expect that other folks talking about this would, if they are looking at incidence of violence in the community, would encourage the use of PCL-R.

Q.    Is it also not true that your refusal to link conduct disorder, ADD or ADHD, to the development of psychopathy

Cunningham - cross

7816

is not mainstream psychological opinion?

A.    I'm not refusing to link it.  You had talked about, when you asked me that question earlier, completely excluding any family factors whatsoever, and that's what I was trying to clarify.  There is certainly some association of attention deficit disorder with conduct disorder, and of the combination of those two, with an inadvised likelihood of juvenile problems and diagnosis of antisocial personality disorder and among some a risk factor put into development of psychopathy.

          Now the issue there is can you entirely separate out the family factors as having anything to do with that, and that was the nature of your question.  That's why I was clarifying that.

Q.    Psychopaths who are at greater risk for violence --

A.    In the community.

Q.    -- present and utilize choice and free will?

A.    Well, the nature of the experiences that they have and the nature of their nervous system is such that they don't come to those choices in the same way that everybody else does.  If you have been -- if you have gone through the adverse factors, if you have a profoundly disfunctional family and if there are ADD issues and cognitive disorder issues that were present early on in childhood, as you come to the position as an adult and

making a choice or exercising free will, everybody doesn't get there in the same way, and we don't all have the same basis that we're making those decisions about.

And that's a concern to some of the folks that are doing research in this arena that regard psychopathy as a brain disorder that the person couldn't help and that really makes this person more suitable for quarantine, kind of like treating a medical problem as opposed to punitive. You have to incarerate them, but with some recognition that this is more of a medical issue than it is an immoral failure.

Q. Isn't it true that the opinion you just expressed is absolutely minority psychological opinion?

A. No, I don't think it is at all. There is a significant body of research that is looking at the way in which people who score high on the psychopathy check list have had different kind of nervous system functioning and react to stimuli differently and the nature of their brain processing is different and that this is not something that, again, it's not that somebody gets to be 22, 25 years old and says yeah, I think I'll be a psychopath. The combination of things that are formative and the nervous system of this individual is not typical and there is active investigation going on in those areas of looking at that medical neurological substrate.

Cunningham - cross

7818

Q.    Is it also true that psychopaths are not amenable to treatment?

A.    That depends on the elevation of the score.  There are indications that folks that are, and there's a very limited amount of research in this area, but there are indications that individuals who are on the lower to moderate end of the scores, perhaps in the 20s, that those individuals may benefit from treatment.

As individuals are extremely high scoring, then they seem not to benefit so much from treatment.  Now, that doesn't mean that they may not benefit a great deal from structure.  So, for example --

MR. LIROFF:  Excuse me a moment.  It's not responsive but if it is going to the area of structure I will question on it.  I didn't ask for it, but if he's going into the area of structure I will question on it.

THE COURT:  He can answer it and where you go depends on what the court rules.  So go ahead and finish your answer.

THE WITNESS:  If by treatment we mean psychotherapy or some sort of structured milleu, then that seems to be helpful to folks that are scoring in the moderate range across the 20s.  As you move up across 30, those individuals seem not to profit from that kind of treatment effort and in fact may simply learn to be

Pegge J. Merkel, RMR
United States Court Reporter

Cunningham - cross

7819

smarter about how they exploit other people.

If you are talking about by treatment placing them in a highly structured setting, then that may substantially inhibit any of the aggressive displays that they have. So, for example, even though 25 percent of the guys in higher security prisons can be diagnosed as psychopaths, the base rate, the rate of serious violence that occurs in those facilities is very low and is much lower than what would be occurring, profoundly lower, than what would be occurring in this population in the community. So that application of structure in fact does treat the outcome.

It doesn't change the underlying personality that they may have but it does inhibit and contain the worst expression of that. So in that sense, that kind of social quarantine, high structure setting is a treatment of sorts, at least in terms of reducing the negative outcomes.

Q. The quote "Psychopaths do not appear amenable to treatment" is a quote from your article?

A. Treatment, again, in terms of your standard mental health sort of things with individuals that are scoring at the high end above the 30s.

Q. Prior to 1995 you had never testified in a death penalty case?

A.    That's correct.

Q.    You are now essentially in the business of helping defendants who face the death penalty win their cases.

A.    No, sir.  I'm in the practice of clinical and forensic psychology.  A portion of that work involves capital cases.  Certainly I'm available to consult with the government as well as the defense and would cite similar kind of research and talk about things in very similar ways if I were called by them.

Q.    This is the twelfth federal death penalty case you have testified in?

A.    That's correct.

Q.    How many times have you testified on behalf of the government in those twelve cases?

A.    In all of those cases I testified on behalf of the court.  I was called by the defense.  I was as responsive as possible to questions the government had, as I have been with you today, and would have accepted an offer from the government had they contacted me to consult with them on the case from the outset if they desired that.

Q.    And you are paid handsomely for your work.

A.    I'm paid well, yes, I am.

Q.    And you have in fact billed for over 200 hours in this case.

A.    I have not yet billed all of that, but, yes, my work

Cunningham - cross

7821

in this case went in excess of 200 hours.

Q.   That's almost $40,000 in this one case?

A.   That's correct.  I've invested a great deal of time in this case.

Q.   And you testified in People versus Hardy?

A.   That's correct.

Q.   And you were paid $34,000 for that case?

A.   That's approximately the case, that's right.

Q.   You testified in Engle?

A.   That's correct.

Q.   You were paid almost $22,000 in that case?

A.   That's correct.

Q.   You testified in Beckford in Virginia?

A.   That's correct.

Q.   You were paid almost $34,000?

A.   That's correct.

Q.   You testified in Johnson in Illinois?

A.   That's correct.

Q.   You were paid almost $24,000?

A.   That's correct.

Q.   You testified in a habeas corpus case in Colorado called Rodriguez?

A.   That's correct.

Q.   You were paid $26,000?

A.   That's correct.  That also was authorized by the

Pegge J. Merkel, RMR
United States Court Reporter

court.

Q.   You testified in Alabama last year in a case called Holly?

A.   That's correct.

Q.   You were paid over $31,000?

A.   That's correct.

Q.   You were going to testify in court in Ashland, North Carolina just rerently?

A.   That's correct.

Q.   You were paid about $15,000?

A.   No, I don't think that's correct.  That was an initial estimate that I provided to the court that anticipated a very significant amount of involvement in that case.  I estimated that.  I think my actual -- the actual billing in that case, and I don't have a real specific recollection of it, but it was perhaps about a third of that.  I think it was in the $5,000 area but, again, I don't have those billing records and that's a general recollection.

Q.   You also chriscross across the country testifying in state court cases, is that not correct?

A.   That's correct.  I have been retained in various states around the country and that's part of my licensure in various states.

Q.   You testified just within the last couple months

Cunningham - cross

7823

twice in the State of Oregon?

A.    That's correct.

Q.    Testified in the State of Texas a number of times just this year?

A.    This year I recall -- what immediately comes to mind is a single time testifying in Texas in a capital case this year.  You would have to refresh my recollection.  I don't recall a second Texas capital case this year.

Q.    You tell me.  You testified in a Potter County case?

A.    That's correct.

Q.    Is Amarillo in Potter County?

A.    That's correct.

Q.    You testified in Illinois just recently?

A.    That's correct.  I think it's been six weeks ago.

Q.    Okay.  Have you ever testified, in any of these death penalty cases, have you ever testified, been called by the government?

A.    No.  The government has not retained me, although, again, if you guys would like to give me a call I'd be glad to consult with you.  I can understand why you don't.  A lot of this research evidence is not helpful to your position, so it is not surprising to me that you don't call me, but I'd be glad for you to and I'll come back and talk about this on your behalf.

Q.    I appreciate that.  You testified March, excuse me,

Cunningham - cross

7824

did you speak March 24th last year at a conference at Nashville, Tennessee?

A.    The date I don't recall.  I did speak at a conference in Nashville last year.

Q.    The title of that conference was, "The Fight for Life, Mitigation that Wins."

A.    That was the title of the conference that folks who developed it, the attorneys, applied to it.

Q.    You have a choice whether to speak at it or not and you chose to speak at it?

A.    Yes, sir, I'll speak to professional organizations of any sort.  I do that without charge.  That's a way of giving something back and trying to, again, increase the standard of practice of forensic psychology so both defense and the state know more about what's available. That's why I wrote this article for the "Prosecutor Briefs" in California to try to educate attorneys about forensic psychology and specifically forensic psychology in a capital arena.

Q.    It's also for business development, isn't it?

A.    It has that aspect too, that's correct.

Q.    Thank you.  And you also are listed in the American Board of Forensic Psychology as a mitigation, death penalty mitigation specialist?

A.    I don't know whether it's identified as a mitigation

specialist.  Under the areas of practice that I have commonly been called on, that I have experience and expertise in, I've been to capital cases and been involved frequently in issues of mitigation and so, yeah, that's an area of substantial experience that I have.

Q.   Yesterday you made reference to a finding by a Dr. Ryan; do you recall that?

A.   The M. M. P. I.

Q.   You know Prof. Ryan?

A.   I know Dr. Ryan, that's correct.

Q.   You know him to be a professor at the University of Virginia?

A.   I don't know if it's full time or an adjunct professor, in other words, whether he is teaching courses on a weekly basis.  You know, when I was full time I was teaching like 15 hours a week of course work.  There are adjunct faculty folks that are teaching several times a year or semester, and I don't know whether he's full time or adjunct.

Q.   You know Dr. Ryan is a neuropsychologist?

A.   That's correct.

Q.   You know Dr. Ryan is sitting in this courtroom?

A.   Yes, I do.

Q.   In preparation for this case, you had an opportunity to see a report prepared by him?

A.    Yes, I did.

Q.    And in fact, when you testified yesterday, you made reference to that report?

A.    Yes, I did.

Q.    And you referred to a finding that you said he made relating to Mr. Lee's existence of paranoia?

A.    I described an elevation, as I recall, on the M. M. P. I. scale six that is associated with a sensitivity and paranoid thought and identified -- those same characteristics had been identified in John David Patton, his first cousin.

Q.    But to suggest that his report suggests that he made a finding that Mr. Lee was paranoid is wrong, is it not?

A.    I did not make a finding that he was paranoid.  He identified that he has some paranoid features and characteristics and then made a differential or discussion about to what extent that was based on the setting he's in, facing a capital trial, as opposed to an ongoing personality sensitivity.

Q.    But what you didn't do is you didn't tell this jury that he made a diagnosis that Mr. Lee was a psychopath, did you?

A.    I don't recall that there was that report doesn't sayd diagnosis colon, but he does identify Mr. Lee as scoring in that range on the psychopathy check list and I

think does make a reference to him -- I can get it specifically.  Again, the only discrepancy is whether he said he had a diagnosis of.  He clearly identified him by his scoring of the PCL-R as falling into the psychopathy range based on a single standard error of measurement.

Q.    So Mr. Lee then, identified as a psychopath, would be impulsive?

A.    I don't understand the question.

Q.    Would you expect Mr. Lee to be, as a psychopath, impulsive?

A.    I would expect some impulsivity from Mr. Lee based on the attention deficit disorder diagnosis and conduct disorder issues that he had earlier.  I did not attempt to score him in terms of PCL-R criteria.  So, again, you simply can't say is he impulsive and then say yes or no.  Instead what we have to do is get out the manual, look at exactly what is described under impusivity and identify which of those characteristics he has or does not have and then identify whether he is not like that at all or a one or two.

Now because I didn't score him on that, I can't tell you exactly where he falls in terms of PCL-R criteria for that item.

Q.    Let me just ask you this and I'll sit down.  You did not use -- a couple of questions.  You did not use the

Cunningham - cross

7828

Hare psychopathy check list on Mr. Lee?

A.    That's correct.

Q.    You did not use the Hare psychopathy check list on any of the people that you examined or work up -- strike that.  In any of the federal death penalty cases that you have testified in, you have not used the Hare psychopathy check list?

A.    No, sir, that's incorrect.

Q.    Which one did you?

A.    I utilized this test in U. S. v. Paul Hardy in New Orleans in, I think that was 1996, February range of 1996 as I recall.  At that time I was not adequately familiar with how little research there was associated with the PCL-R with institutional conduct.  And so I gave the instrument in that case, because it is widely recognized, and I was thinking at that time that this had predictive significance for institutional behavior.

I subsequently became aware of, studied it more thoroughly and became aware of substantial weaknesses in that part of the research, and as a result I quit using the instrument in capital cases because it does not speak to the issues of formative factors, and I did not find it to be adequately research supported to tell me the next question, which is how is this person going to act in prison, or how is he going to behave on old age parole,

Pegge J. Merkel, RMR
United States Court Reporter

because there's insufficient research with that group as well, and some indication of aging out in old age.

So for those reasons I discontinued using it. I used it in Paul Hardy. I in fact testified about it.

Q. Let me ask you this. Isn't it true that in this case, as to Mr. Lee, not concerning risk assessment when incarcerated, but as to explaining whether or not the influences that you have described yesterday and today, how they impacted upon Mr. Lee, that the Hare psychopathy check list and the diagnosis whether or not he is a psychopath does have importance in this case for this jury?

A. No, sir, I don't think it did. What I was trying to measure is what formative factors shaped him. I wasn't attempting to label just exactly what are we going to call him at this point, a dysthymic disorder, explosive disorder, antisocial personality disorder, is he borderline? I wasn't trying to label him with the conclusion. I was attempting to evaluate what factors were formative in nature, and so I structured my evaluation accordingly. I didn't do a lot of things that I would have done if I was trying to label him out here. I was attempting to look at how do we get here, what happened that brought us to this point.

Q. Thank you, sir.

Pegge J. Merkel, RMR
United States Court Reporter

MR. LIROFF:  Thank you, Your Honor.

THE COURT:  Ms. Compton?

MS. COMPTON:  Your Honor, I need a little guidance from the Court before I begin my redirect.  In fact, with proper guidance from the Court I may not have a redirect.

THE COURT:  A conference?

(The following proceedings at the bench)

MS. COMPTON:  Your Honor, what I really need is a ruling on my motion at this point, if the court can give it, because if Dr. Ryan is not going to be able to testify regarding risk assessment or psychopathy, in all likelihood, I'm through except maybe a couple of questions.  If Dr. Ryan is going to be allowed to give his risk assessment diagnosis I have a lot of work to do.

MR. LIROFF:  If I may, Your Honor, I'm not offering, as I've said, Dr. Ryan's risk assessment but I will be offering opinions on a number of significant points that Dr. Cunningham expressed minority or actually wrong psychological opinions, and Dr. Ryan will explain why the psychopathy check list has application here and why it is distinguishable from the features that Dr. Cunningham relied upon, and most specifically Dr. Ryan will address a major misstatement we claim was made by Dr. Cunningham that psychopaths do have free will and are

Cunningham - cross

7831

responsible for their conduct.

THE COURT: I'm not so sure he said it in that environment. He talked about free will starts with everybody, depending on where they are in the mass of their background and how that free will expresses itself but in any event, what we have here is you have taken him into that area, defendant did not take him and essentially you have set him up for stating his views on this psychopath information and now you want to put on a witness to say he's wrong. And essentially you made him your own witness for the purpose of developing these issues and now you want to put on somebody to say he's wrong.

The only thing -- there was a great many things that you asked him but you asked about what he said to explain it, what he said on direct to explain. That was all right but you have gone beyond that and from your point of view, I mean, there's a lot that he can testify to, that is, Dr. Ryan. I'm talking now to defense counsel. The only area that I think that you are maybe excluded, that is, the government, should be excluded and you may not want to go into is the psychopath scale and the test and the effects of it, because the defendant did not go into it at all.

MR. LIROFF: What I want to show is that Dr.

Cunningham is wrong and should have gone into it and that he's making a wrong opinion, and when an expert makes a wrong opinion and he says he didn't go into it for the wrong reason, I think I have a right to demonstrate that he is wrong.

THE COURT: But you have just no -- you are the one that has developed his views on these issues. They weren't put forth by the defendant.

MS. COMPTON: By the way, I was assuming that I had an ongoing objection because of my motion so I didn't stand up and object every time.

THE COURT: That's true, I understood that. In fact, we talked about that before the evening recess.

MR. LIROFF: It's like this, Your Honor, and I'm sorry for presenting it this way. If a witness testified the world is flat, I'm trying to bring on a counterveiling to show that the world is round. Dr. Cunningham has testified here that the world is flat. He's given one side of this picture. It's not a one sided issue, because he is wrong in what he has said. He did not consider competing issues and I needed to expose that his opinion presented to the jury on direct is flat and that there are competing issues and in fact mainstream psychology disputes what he is saying.

THE COURT: I guess the real question in terms

of that, he did not testify that the world was flat until you got him on the stand.

MR. LIROFF:  And I believe he did and the point that I stressed three times in Ms. Compton's brief that I highlighted, and the first exhibit that he presented to this jury that said that it's this that caused -- that's allowed this behavior to exist and it failed to recognize that psychopathy and other issues, I'm sorry, but, yes, they did and I thought I demonstrated in my cross, and I took a lot more time than I would have because I was -- I knew I was trying to point out to you, and I think may have lost a lot of the jurors but what I was trying to demonstrate is that when he stated -- he has the right to that opinion, but the opinions he stated about the influences of the life experiences on Daniel Lee and cognitive functioning and all that stuff is one aspect of this, and that he is not taking into account other aspects of things that are on the record, and that's all in terms of that cross examination earlier this morning when we talked about that, that interview, about his ten hour interview with the defendant and things, he was asking -- that is the same type of discussion that Dr. Ryan had with the defendant as part of the Hare psychopathy.  That's what you do.  You ask the defendant about things and you look at them as a psychologist to find out how he explains

Pegge J. Merkel, RMR
United States Court Reporter

things, and that's all we're talking about.

MS. COMPTON:  No, Your Honor, it's not.  That's not all we're talking about.  We're talking about saying that they want to put a witness on only for rebuttal of something that our witness says and our witness doesn't say it and he can't rebut it.  All this is is this is a bunch of technical interruption to get around the fact that this is not rebuttal.  They don't want to use Dr. Ryan to rebut what Dr. Cunningham said in his direct examination.  They want to build it.  He did a nice job of building over my objection with the motion in limine so that he could come in the back door and call something rebuttal.

THE COURT:  Here's what we'll do.  It's 12:00, so we're going to recess and we'll come back and we'll have a little conference out of the presence of the jury, and I'll resolve this issue in terms of the cross examination.

Let me put it this way.  Well, let's leave it that way.

(End of bench conference).

THE COURT:  Ladies and gentlemen of the jury, it's almost our regular time for recess for lunch so we're going to actually break a few minutes early and ask you to be back at the regular time, at 1:30, to resume the

Cunningham - cross

7835

trial.  You may now leave.  Everyone else remain seated.

(Jury exits)

THE COURT:  Court will be in recess.

(Recess).

REPORTER'S CERTIFICATE

I,  Pegge  J.  Merkel,  a  certified  and  registered professional  reporter,  do  hereby  certify  that  the foregoing  is  a  true  and  correct  transcript  of  the proceedings in the above-entitled matter.

*Pegge J. Merkel*

Pegge J. Merkel, RMR

Pegge J. Merkel, RMR
United States Court Reporter

(Continuing at 1:25 p.m.  Jury not present.)

THE COURT:  I've had the opportunity to think about this issue over the lunch hour.  First, I am convinced that I probably permitted the government to go much farther on cross-examination than is proper.  At this point I have to deal with the remainder of the defendant's motion in limine.  I'm going to grant the Defendant Lee's motion in limine with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote, on the basis that such would not be proper rebuttal. I will deal with the other issues with respect to whether future testimony is appropriately considered to be rebuttal on a question and answer basis if objections are raised.

Also, I again want to state for the record that Ms. Compton's motion is moot with respect to risk assessment analysis performed by Dr. Ryan because the government has indicated that it will not offer such testimony.  Those are my rulings.  And I will ask the attorneys to conform thereto.  And we are ready to proceed as soon as we get the jury in.  I'm going to step out.  We'll just bring the jury in and start. Court is in recess.

(Recess from 1:28 p.m. until 1:30 p.m.  Jury present.)

THE COURT:  You may redirect, Ms. Compton.

MS. COMPTON:  Your Honor, I don't have any redirect of Dr. Cunningham.

Elaine Hinson, RMR, CCR
United States Court Reporter

THE COURT: Dr. Cunningham, you may stand down. Call your next witness.

MS. COMPTON: Kevin Bianchini.

**KEVIN JOSEPH BIANCHINI, DEFENDANT'S WITNESS, SWORN**

DIRECT EXAMINATION

BY MS. COMPTON:

Q. Would you state your name, please. And spell your last name.

A. Kevin Joseph Bianchini, B-i-a-n-c-h-i-n-i.

Q. Where do you live, Dr. Bianchini?

A. I live in New Orleans, Louisiana.

THE COURT: You are going to have to speak a little louder and into the microphone.

A. New Orleans, Louisiana.

BY MS. COMPTON:

Q. How long have you been a resident of the New Orleans area?

A. About 11 years.

Q. What do you do for a living?

A. I'm a clinical psychologist and a clinical neuropsychologist.

Q. Tell the ladies and gentlemen of the jury what each of those things mean, clinical psychologist and clinical neuropsychologist.

A. Well, a clinical psychologist is the general specialty that deals with psychological problems, psychiatric issues,

7838

Bianchini - Direct

deals with the assessment of these problems, trying to diagnose different psychological or psychiatric problems, and also formulates treatment for psychological or psychiatric problems. Neuropsychological or a neuropsychologist is someone who has a subspecialty within the realm of clinical psychology in dealing with brain damage, so we look at the functional, behavioral, mental changes that go along with different forms of brain damage: Brain damage produced by trauma, brain damage produced by cancer, for example, brain damage produced by dementia, brain damage produced by poisoning to the brain. All these different causes of brain damage cause changes in the way that the brain works. And that's what neuropsychology deals with.

Q. Tell us a little bit about your educational background. And I'm not all that interested in where you went to high school or anything, but your professional education.

A. I have a master's degree in psychology from the University of Tennessee. The specialty there was in something called behavioral medicine. I also studied certain neurological aspects of behavioral medicine and behavior there. I have a Ph.D. in clinical psychology from the University of Miami with a specialty in health issues, such as neurological problems. And I had a post-doctoral internship -- I mean pre-doctoral internship at the New Orleans V.A. Medical Center and also partly at Louisiana State University Medical School, where I

Bianchini - Direct

worked with a number of different neuropsychologists there and took a specialty in neuropsychology as recommended by the national societies, which is where you do half of your internship in neuropsychology.

Q.    You said that you practice in New Orleans right now.  What is the nature of your current practice, and how long have you been doing that?

A.    I've been in practice for about 11 years, the first four years of that or so, probably a little more than that, were as a resident.  I was completing my dissertation.  But I was licensed in '93.  So since then I've been working doing neuropsychological evaluations, evaluating folks with a variety of different brain problems, dementia.  All the things that I mentioned before are the things that I look at.

I also work a lot in neurological rehabilitation, where when folks have brain injuries and they need treatment to try to help themselves to get back to living independently or try to help themselves get back to working or whatever recovery is possible for them, I help.  I consult with a variety of neurological rehabilitation facilities in working with these patients.  So I do a lot of direct work with neurological patients.

I also have a practice in forensic neuropsychology and forensic psychology where I see patients referred to evaluate some of these issues in a forensic context.  For example, I do

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Direct

a fair amount of civil litigation when issues of brain damage are involved, like if a person is injured at work and they've sustained a brain injury and then they have some legal action against their employer, against a third party, I get involved in helping to determine what changes are taking place and, you know, what course of treatment to recommend and things like that.

Q.   Are you published in any journals having to do with neuropsychology?

A.   Yes.   I have some publications.   They are listed in my resume.

Q.   Talk to me just a little bit about -- there's one Bianchini, K. J.   Is that you?

A.   That's me.

Q.   The "Neuropsychological Evaluation and its Function in Rehabilitation," where was that published?

A.   That's actually not in the peer review journal.   That was kind of an informational publication.   It was in a local rehabilitation journal that's designed to just be informational for rehabilitation professionals like case managers and other folks involved in trying to understand rehabilitation issues.

Q.   You show another publication -- and I'm looking at your CV -- that says Lubar, it looks like, and Bianchini.   Again, is that you and somebody else?

A.   Yes.

Bianchini - Direct

Q.    And that's called "Spectral Analysis of EEG Differences Between Children With and Without Learning Disabilities."

A.    Right.

Q.    And that's published in the Journal of Learning Disabilities.  Tell the jury a little bit about that particular article.

A.    We looked at the prevalence of different types of EEG abnormalities in children diagnosed with learning disabilities and found some subtle EEG changes and published that paper.

Q.    There's something in your CV, Doctor, about a Title IVC -- I don't know -- a research project that you did back in '81 and '83?

A.    Right.

Q.    What was that?

A.    That was actually I was directing the research in the grant that led to that paper that we just discussed.  And that was the grant that funded that research.  I ran the laboratory, the EEG aspect and so on.

Q.    Do you likewise teach on the faculty of any university?

A.    Well, I'm an adjunct faculty member in the Department of Psychiatry and Neurology at Tulane University.  I'm adjunct clinical faculty also at the Department of Psychology in the University of New Orleans.  I don't actually teach classes.  I have supervised some students in some reading courses.  I help students with their dissertations and so on.  I sit on some

Bianchini - Direct

dissertation committees.  And I have also helped provide data from my practice for some students doing research.

Q.    Are you licensed in any state besides Louisiana in neuropsychology?

A.    No.

MS. COMPTON:  Your Honor, at this time I would tender Dr. Bianchini as an expert in the field of neuropsychology.

THE COURT:  You may voir dire.

MR. LIROFF:  If it please the Court.

VOIR DIRE EXAMINATION

BY MR. LIROFF:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    You are licensed as a psychologist?

A.    In Louisiana there's a specialty designation in neuropsychology, so I have -- my license is actually in clinical psychology and neuropsychology.

Q.    Did you perform a post-doctoral fellowship?

A.    I have post-doctoral experience, supervised experience in neuropsychology.

Q.    Did you perform a post-doctorate fellowship?

A.    A formal fellowship, no.

Q.    Are you board certified?

A.    I don't have the board certification in neuropsyche.

Q.    Have you attempted to obtain the board certification?

7843

Bianchini - Voir Dire

A.    I've gotten the materials.  I'm working on the
application.

Q.    Is it true that you would not qualify for board
certification?

A.    No, that's not true.

Q.    Are you a member of the American Psychological
Association?

A.    Yes.

Q.    Do you know what the requirements are under the American
Psychological Association to refer to yourself as a
neuropsychologist?

A.    Yes.

Q.    Do you know that you do not meet those requirements?

A.    That's not the case.

Q.    Isn't it true that the requirements under Division 40,
neuropsychology, under the American Psychological Association,
requires one year of supervised post-doctoral fellowship in
neuropsychology or board certification?

A.    It's my understanding that it's post-doctoral experience
in neuropsychology, which I have.

Q.    Could your understanding be mistaken?

A.    I don't think so.

MR. LIROFF:  I would submit the qualifications, Your
Honor.

THE COURT:  Well, I guess we could argue about it.

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Voir Dire

I'm going to accept him as a professional in the area.  He can express opinions in the area of his expertise.  You may continue.

DIRECT EXAMINATION CONTINUED

BY MS. COMPTON:

Q.   Dr. Bianchini, I want to talk to you a little bit about your involvement in this case and ask you whether you can independently recollect.  You don't have to look at your notes, whether you can independently recollect when you were first contacted about working in the case of Danny Lee.

A.   When I was first contacted, it was a good number of months ago, probably at least six months ago.

Q.   Who asked you whether or not you could help in the Danny Lee case or whether you could look at it to see if you could help?

A.   I believe it was first Dr. Cunningham.

Q.   Dr. Mark Cunningham, who has testified here earlier?

A.   Yes.

Q.   And have you in the past testified in any federal capital cases, federal death penalty cases?

A.   Yes.

Q.   Have there been federal capital cases in which you have been asked to look to see whether somebody suffered from brain damage and you have not found it?

A.   I believe so.

7845

Bianchini - Direct

Q.   For example, in the Trinity Ingle case, did you do a neuropsychological evaluation on Mr. Ingle?

A.   Yes.

Q.   Did you testify to his brain damage?

A.   I did not.

Q.   Have there been any other cases, either state or federal or civil, that could be civil cases as well, that you testified in, in which you have performed certain tests, looked for brain damage in a person because there were signs of it and not found it?

A.   Yes, there have been.

Q.   Now, I want to talk to you a little bit with regard to when you first saw Danny Lee and what you did when you first met him.

A.   Okay.  I first saw Danny in April.  I'm not sure of the exact date of my interview.  The testing was April.  It was April 17th.  So it was right around that time, April 16th, somewhere in there.

Q.   Let me ask you this.  You just mentioned something about testing.  Do you as a neuropsychologist actually do the hands-on testing yourself, or do you have a person who helps you administer certain tests?

A.   I have a technician who administers the tests.  I don't generally administer the tests myself.

Q.   So when you were looking at the date for the actual

Bianchini - Direct

testing, someone who works for you would have actually done that?

A.    Yes.

Q.    And then what's the next step in that process?  Do you actually interview a person who you are evaluating?

A.    The first step is I meet with the person, interview them, take a history.

Q.    Then what happens?

A.    Then the technicians give the test.  In this case it was one technician.

Q.    Then, after that, is there any reason for you to do follow-up interviews, or do you just review the tests and come up with your results?

A.    Review the tests and the person's history, which are very important, looking at records and other available materials on the person's history, because the history is very important for providing a context for interpreting the tests.

Q.    I was about to ask you about that.  You mentioned that history is very important.  What exactly does a neuropsychologist mean when he says a patient's history?  What are you referring to?

A.    History of different events in their life that could have led to or could be associated with some damage to the brain.  That's one important aspect of the history.  There are other things as well.

Bianchini - Direct

Q.    How do you obtain a history from a particular patient?

A.    Ask them questions about different events in their life.

Q.    Do you likewise review records?

A.    And review records as well.

Q.    Did you do that in this case?

A.    Yes, I did.

Q.    Let me ask you this, Dr. Bianchini.  When you said Dr. Cunningham had made the referral to you, did you rely in any way on records that Dr. Cunningham obtained?

A.    Yes, I did.

Q.    And did you use anybody else's test data or raw data, as it is called, in your field?

A.    I didn't use anyone else's test data in writing my report.

Q.    Did you send any raw data or test data that you had used to anybody else in this case?

A.    Yes.  I sent it to Dr. Ryan, who is seated in the courtroom.  He also sent his raw data to me.

Q.    So y'all swapped information?

A.    Correct.

Q.    Let me ask you now, Dr. Bianchini, if you can tell the jury some of the more commonly known risk factors which would predispose a person to a worse outcome of a neurological problem.

A.    There's a lot of different things that can make someone weakened for any subsequent neurological insult:  History of

7848

Bianchini - Direct

learning disability, history of seizure disorder, attention deficit disorder, prior history of head injury.  Those are all things that can make someone more prone to having permanent residual problems from any subsequent injury.

Q.    Let's kind of back up and do it step by step.  Why would a history of a childhood seizure disorder catch the attention of a neuropsychologist?  How is that important to you?

A.    Well, it indicates a preexisting neurological weakness.  And those kind of weakness are known to be associated with a worse outcome.

Q.    And what about a childhood learning disability?  Why would that catch the attention of a neuropsychologist?

A.    Same thing.  It suggests a preexisting weakness which would make someone more prone to, you know, having significant changes as a result of the given neurological insult.

Q.    Did you mention attention deficit disorder?

A.    Yes.

Q.    Why would that catch the attention of a neuropsychologist?

A.    Same thing.

Q.    How does the profession of neuropsychology define a mild brain injury in terms of loss of consciousness?

A.    Zero to 30 minutes loss of consciousness, so from no loss of consciousness to 30 minutes loss of consciousness.

Q.    In your interviews or your history taking with Danny Lee, did you determine that he had suffered any of that type mild

Bianchini - Direct

brain injury with loss of consciousness?

A.    Yes.    He described one brain injury where he did have some loss of consciousness during a football game when he was a child.    And then he had numerous, as many as a hundred, separate incidents involving significant blows to the head that didn't involve loss of consciousness.    But in many of those events he described, you know, he was dazed or showed other signs that there was some neurological trauma.

Q.    Can a person have a trauma that does not result in loss of consciousness and still have any mild brain injury, or do you have to have loss of consciousness for there to be injury?

A.    Well, a mild brain injury, as I said before, is defined as from 0 minutes to 30 minutes loss of consciousness.    That's how a mild brain injury is defined.    Typically a single mild brain injury is self-limiting.    You don't get much in the way of permanent problems from a single mild brain injury.    But a mild brain injury can involve no loss of consciousness.

Q.    I wanted to ask you a little bit.    And I forgot the fighter's name.    But he would fly like a butterfly and sting like a bee?

A.    Muhammad Ali?

Q.    That's the one.    What kind of problem did he have?    Did he have a brain problem?

A.    My understanding --

Q.    I know he wasn't your patient.

Bianchini - Direct

A.    Without reviewing the record, right, that he had traumatically induced Parkinson's disease.  I guess that's a good example of the effect -- the potential effect of multiple mild brain injuries.  Another example, you will hear about this with quarterbacks who have received concussions where they get dazed and they have to leave the game.  And then you hear about quarterbacks who consider retiring from football because they don't want to sustain permanent damage if they have more of these concussions or mild brain injuries, because it's known that if you have many of them, it can lead to permanent changes.

Q.    Let me ask you about -- I think it's commonly called a CAT scan or a CT scan.  Is there any neuropsychological reason to perform a CAT scan on a person who has been injured or had an injury to the head?

A.    Well, we don't routinely order a CAT scan, a neuropsychologist.  CAT scans are often used when people have head injuries and they come into the hospital to detect the presence of blood in their brain.  That's the most common use of a CAT scan.  And that's because when people have head injuries, sometimes they have a need for a -- they have a need for neurosurgical intervention immediately, like if you sustain a brain injury and you have bleeding inside your head, the neurosurgeons can get involved and treat that by performing surgery and save a person's life.  But you need to know if

Case 2:19-cv-00468-JPH-DLP    Document 14-4    Filed 10/25/19    Page 92 of 194 PageID #: 858

7851

Bianchini - Direct

that's happening. And that's the main reason why people do CAT scans when people first come into the hospital with a history of trauma to the head.

Q. Let me ask you this. And I'm bouncing around a little bit, Dr. Bianchini. You talked about this person who worked for you that came and did certain tests. The list is rather lengthy of the tests that were administered. Can you just highlight for the jury maybe not the name of the test, but more kind of what it does, what you are looking for in these tests that are administered to a person when you are looking to see whether there's brain damage?

A. Okay. Yeah. We look at a variety of different what you could call mental faculties. That's because when there's damage to the brain you produce changes in these mental faculties, things like your ability to pay attention, focus, your memory, your language, your thinking. All these are areas that to some extent can be measured discretely. And these things change when there's brain damage. So changes in those mental faculties can be an indication that there has been some brain damage.

Q. Now let's talk more specifically about what you've already touched upon -- do you need some water?

A. I would like some, yeah.

Q. -- about Danny Lee's history. We'll talk about Danny in particular and not a test. With regard to fighting, did you

United States Court Reporter

Bianchini - Direct

get a history from Mr. Lee that he was a fighter or a boxer or had been in street fights?

A.    Yes, I did.  I think you are asking about history of mild brain, of multiple injuries to the head.  He did mention that. He said that he had probably taken blows to the head on nearly a hundred different occasions.

Q.    Is this important to you as a neuropsychologist?

A.    I think it's consistent with what I was talking about earlier, which is a history of repeated mild brain injuries.

Q.    What about when you have something in your report called neurotoxicity?  What is neurotoxicity?

A.    Well, neurotoxicity, I guess probably a simpler way to say that would be poison, poison to the brain.  And certain chemicals when ingested or when inhaled will cause changes in the brain.  Sometimes those changes are temporary.  But kind of like the issue with the mild brain injury, if it's done enough or if the effect is severe enough, then you can get, you know, you are more likely to have some permanent changes.  Danny gave -- and I guess I should point out that when Danny was relaying these things, he didn't volunteer a lot of different symptoms.  He didn't seem to -- he wasn't volunteering a lot of information to indicate that he had brain damage.  Some of this was coming from me asking him questions about these things.  So he mentioned that he had been involved in inhalant abuse when he was around the ages of 10, 11, 12.

Bianchini - Direct

Q.    This is inhaling like household products or paint or something?

A.    The three that he mentioned to me were paint, Scotchguard and gasoline.  And all three of those things involve a variety of different neurotoxic substances.  The solvents that the paints and the Scotchguard are dissolved in are known to be neurotoxic.  Also gasoline has some additives that themselves are neurotoxic and have been found to produce neurotoxicity and neurobehavioral changes.  So Danny was involved in this on a number of occasions and also reports that he lost consciousness a number of times.

Q.    After huffing?

A.    Immediately after huffing.  And a loss of consciousness following the ingestion or inhalation of some neurotoxic substances is one indicator of acute neurotoxicity.  It's an indicator that the substance has caused enough damage, well, has affected the person in a way to cause damage.  So that history of loss of consciousness following this huffing is important, and particularly that it occurred a number of times.

Q.    Did Danny report to you that he had been a drinker early in his youth?

A.    Yes.

Q.    How much drinking did he do?

A.    He told me that he started when he was around 15 years old, although -- and he talked intermittently about drinking a

Bianchini - Direct

great deal, like intermittently.  I didn't get a clear sense of what the frequency was at that point.  Then from 1991 to '96 he told me that he was drinking every day, was going to parties three or four times per week and would become intoxicated at those parties.

Q.    Is that important to you historically when you are looking at neuropsychological problems?

A.    It can be.  Generally with alcohol use, you need a longer period of time of using the alcohol to have by itself, you know, a permanent neurological effect.  In other words, it's the people who drink alcohol for 20 years or so with no other risk factors, you know, that sustain alcohol related damage.  But it's kind of another, you know, when you have the mild head injuries and you have the neurotoxicity, the potential neurotoxicity, and then you add the alcohol, it's another aggravating factor.

Q.    Now, I'm looking at -- I guess it's page 3.  That's the page number at the bottom, page 3 of your report.  I found a couple of typos.  I just want you and I to get those straight before we go on.  The third paragraph down, "As a child, he has been told that he had seizure for 18."  What is that supposed to be?

A.    Since the age of 18 months.

Q.    Since the age of 18 months, he had a history of seizures?

A.    Right.  That was taken from the history that Danny gave.

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Direct

I looked at medical records on that.  It looks like right around that time, maybe a little later, when he was about two years old or so he started having reports in the medical records.  Dr. Biehler I think was the name, the pediatrician who documented seizures and recommended treatment with anticonvulsant medication, which anticonvulsant medication, of course, is seizure medicine.

Q.    And I have all the records tabbed right here if you need to look at any of the records.  There's that one typo.  I want to back up to that in just a minute.  While we are talking about typographical errors, in the middle of page 3, there's a paragraph that says "he reports," referring to Danny.  Right?

A.    Right.

Q.    "He reports the following symptoms of neurocognitive problems."  And No. 1 has quotation marks around it.  No. 1 says, "'intelligence comes and goes.'"  We will come back to that.  But No. 2 has quotation marks around "slow processing speed."

A.    That's incorrect.  That's actually my term.  Those weren't his words.

Q.    So Danny Lee didn't say that, and there shouldn't be quotations around it?

A.    Right.  That's correct.

Q.    Do you know of any other errors that are made inside the report that we have found going over it?

7856

Bianchini - Direct

A.    I don't know of any.  I'm sure there probably are some.

Q.    Now, so back up with me now to where you were talking about the seizures.  And tell the jury what significance that childhood seizure disorder had to you as a neuropsychologist.

A.    Well, again, it's an indication that he was having neurological problems at that point in his life.  And it's my understanding that the treatment for those problems was not followed through appropriately, probably, therefore worsening the prognosis.  But it's an indication that there was already some problems specifically with his brain at that point in time.

Q.    I hate to ask this question in his presence.  And I'm certainly not trying to be an embarrassment to Danny.  But you make a point of talking about bed wetting that goes on to a certain level of even age 15.  I just wonder why that's important to you as a neuropsychologist.

A.    Well, I mean that's something that is typically, you know, mastered much earlier than that, needless to say.  That can be another indication.  It could be an indication of a lot of things, psychological and neurological, of course.  But it can be an indication of neurological problems.

Q.    Then you point out that Danny was diagnosed as a child with learning disabilities and ADD.  And I think we've already talked about that.  Did you find in the records at least one abnormal EEG?

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Direct

A.    Yes, I did.

Q.    What is an EEG?  What does that stand for?

A.    It stands for electroencephalogram.  That is a very long-standing traditional test used by neurologists to examine the electrical properties of the brain.  They place electrodes on the skull.  And then they look at the brain waves.  And he had a significant abnormal EEG that was reported in the discharge summary from one of his psychiatric admissions when he was around 15.

Q.    I'm coming back now to where it's called "he reports the following symptoms of neurocognitive problems."  This is where you put quotation marks around something that you shouldn't have.  But what symptoms of neurocognitive problems did Mr. Lee actually report to you?

A.    Well, what I like to do is so that people can tell the way that information was gathered for when, for example, when a jury is trying to make their own determination about the reliability of the information, I like to sort of separate what the person says spontaneously and then what they get from me asking questions.  So when I asked him about cognitive problems, the only things he reported was this thing, "intelligence comes and goes," and he feels like "I can't think for several days at a time."  And that's, you know, that was the first thing he reported.  And then the next thing he said was that sometimes he feels real slow, like that his

7858

Bianchini - Direct

thinking or his attention or his mental abilities feel slow to him.  That's what I described as slow processing speed.

Q.   So when you put slow processing speed, that's your way of describing what he said to you about feeling slow?

A.   Correct.  That phrase is mine.

Q.   Now, let me ask you a little bit about IQ tests, I guess is the lay person or if we dumb down, like Dr. Cunningham did for the lawyers in the case.

A.   There's a little more on symptoms I should probably --

Q.   I'm sorry.

A.   That's okay.  There's some other things that -- next I asked him direct questions.  And the importance of me making that separation in a case like this is because, you know, it's important to understand that when I evaluate someone in this context they are understanding that this evaluation is being conducted as part of determining whether or not they will be executed.  So the motivation of the person, you know, there's certainly reason to be concerned the person would be motivated to show problems to save their life.  So that's why I try to kind of keep these things, you know, kind of clear as far as where they come from.  You know, so I then, I asked him to sort of spontaneously give me his report.  Then I asked some questions, you know, that are typical, you know, typical symptoms.  Sometimes when you do that, you can be suggesting problems to people, you know, if you ask like "Do you have

Elaine Hinson, RMR, CCR
United States Court Reporter

7859

Bianchini - Direct

problems with attention, concentration?"  They say, yes, yes, yes, of course.  You know, that could be a way of them trying to say that they have everything wrong with them in a way to make the evaluation more favorable for them.  So what's why I kind of try to discriminate.

But then I asked him some questions about some typical symptoms.  I think that's important to do, because just letting the person spontaneously report does not -- sometimes, first of all, people can't describe the problems that are happening to themselves.  And also patients with neurological problems sometimes lose their capacity or have a diminished capacity to be aware of their own abilities.  In other words, they have diminished awareness of themselves.  So it's a very common thing for people with certain kind of neurological damage to have lots of problems and not know it.  So I think it's not fair to then not ask direct, you know, follow-up questions about, you know, about some typical symptoms.

So I asked him some stuff about attention, concentration, memory and reasoning abilities.  These are some of the common areas where people do have damage.  He reported that he has some fluctuating problems with these things, with his capacity to pay attention or his capacity to remember.  He also reported another interesting symptom that I asked him about directly again, a symptom called -- it's kind of a funny name.  It's called anosmia.  That means the inability to smell.  Anosmia is

7860

Bianchini - Direct

important because it's related to a certain kind of brain damage that can be associated with difficulties, interpersonal difficulties.

Strangely enough, the inability to smell in the brain injury patients is highly correlated with the inability to return to work, because of these interpersonal problems that result as a result of this damage to this part of the brain, part of the frontal lobe. It's up in the front part of the brain.

Q. Wait a minute. I don't think I'm tracking.

A. Okay. I have gotten a little bit complicated.

Q. A damaged sense of smell can keep you from being able to go to work?

A. Yeah. I guess only if you are a fragrance man. No. Because of the structure of the frontal lobes and the structure of the sensory system, the part of the sensory system that controls your ability to smell runs right underneath your frontal lobes, the part of the brain that controls a lot of very important things, like your ability to regulate the way you behave when you are dealing with people.

So when you have damage to that part of the brain, those two, since they are so close in proximity, they tend to go together, that interpersonal problem and that difficulty with the ability to smell. So that can be important sometimes. Now, Danny has also had damage to his nose, which could also

7861

Bianchini - Direct

affect his ability to smell as well.

Q.    Was there anything -- I actually was going to come back to that.  I'm sorry.  Was there anything else that he told you that he related to you in this interview?  By the way, how much time did you spend with Danny?

A.    I spent about an hour with him interviewing him.

Q.    Anything else that he told you that became important to you as far as a neuropsychological evaluation?

A.    He denied having crying spells.  But he did mention difficulty controlling his anger.  At that time he said he was controlling it better now.  At the time he denied being depressed and told me that his appetite was normal.  He denied having hallucinations.  But he did report that he sleeps a great deal.  That was pretty much it as far as symptoms that he reported.

Q.    About sleeping a great deal or anything else you just reported, does that have any significance for you as a neuropsychologist?

A.    It can.  I mean, you know, again, it's something that it's not definitively neurological.  But it can have some significance because changes in your capacity to regulate your sleep-wake cycles can be associated with brain damage.  That's probably -- you know, that's generally with more severe forms of brain damage.  But, you know, with enough disruption of a brain functioning, you could get some changes in that stuff.

7862

Bianchini - Direct

But it can also be associated, you know, with different kind of psychological problems as well. So it's not definitively neurological, I would say.

Q. I'm getting the feeling from you that what you are talking about here is it's kind of a cumulative effect. You see several things that catch your attention as a neuropsychologist, and here are several things from Danny that taken as a totality mean something to you?

A. Yes.

Q. Now, did you in his records -- again, I have them here if you need to refer to them. Did you see where Danny had been administered any form of what we call IQ tests in his history?

A. Yes, on a couple of occasions.

Q. What is the term "practice effect," Dr. Bianchini? What does that mean?

A. That means that when you -- the way the tests are designed, they are normed on people taking them for the first time. So the way the tests are scored, they are scored based on the understanding that the test is new to the person. That's an important part of the way that the tests are designed. So when you have prior experience with a test, particularly with some of the motor things, some of the putting puzzles together and so on that Dr. Cunningham mentioned in his testimony, if you have experience with those things, it can significantly enhance your performance.

7863

Bianchini - Direct

Q.   Is there a norm that neuropsychologists have developed that people use to say this is how long you should go between this test before you give it again?

A.   I don't think there's -- I haven't seen anything published specifically on that.  I'm sure there probably is stuff published on it.  I think generally the rule of thumb is six months to a year.

Q.   So if Danny were given a specific IQ test in October of 1987 and then that same test was repeated in January of 1988, could you see any practice effect problems with that?

A.   I think there certainly would be potential for practice effect problems.  I'm familiar with the scores you are talking about.  And there was a gigantic -- I mean -- I'm sorry -- a very large jump.  It was 26 points on the performance IQ.  I think a good bit of that could be attributed to a practice effect.

Q.   When you interviewed Mr. Lee, I guess you obviously did that at the jail.  Is that right?

A.   Yes.

Q.   And was there anything about your visit with him in which he acted inappropriately toward you or anybody when you were there?

A.   He didn't act inappropriate toward me.  It was a little difficult getting him out of the cell initially.  I think he was in a little bit of a fuss with the guard about that.  When

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Direct

he came in the room, he apologized to me for the delay and said that they weren't letting him, you know, he was combing his hair or something, and they were giving him a hard time about that.  That's why he was giving them a hard time back.  But the first thing he said to me when he walked in the room was he was sorry about the delay.

Q.   Then for the rest of the interview with you, were there any inappropriate outbursts, any inappropriate behavior at all?

A.   No.

Q.   Talk to the jury a little bit, if you will, Dr. Bianchini, about some of the results of the tests that you gave, and I guess probably will want to talk about the Wechsler IQ test primarily.  And tell us how Mr. Lee scored.

A.   Well, I gave a pretty long list of tests.  A lot of the scores were within normal limits.  You know, he scored in the normal range on a lot of things.  But that's -- with the kind of damage that we are talking about, you wouldn't expect, you know, global impairments.  So you wouldn't expect impairments on a whole variety of different things.  You would expect them in certain areas.  So, you know, his performance, I mean, first of all, it was clear that he was trying his best, that he was working hard and that he wasn't trying to scam the test or trying to show brain damage falsely.

I should say that we also give -- it's standard now because so many people in these situations, where a person has

7865

Bianchini - Direct

some motivation to look worse, because of the outcome of the evaluation, when they are invested in looking worse than they really are, we have ways of checking that. We have special tests that we give people to check to see if they are faking. Some of those tests actually work quite well. I've used them and caught people faking a number of times. I gave two of those tests. Dr. Ryan, I believe, gave three more for cognitive abilities, and I think two for emotional issues. And there was no indication that he was trying to do worse than he was really capable of doing, like that he wasn't trying to put on neuropsychological damage.

Q.    Let me interrupt you there for just a second. On this what's commonly referred to as an IQ test, it seems that y'all break it down into three areas: Verbal, performance and full scale.

A.    Right.

Q.    And before you talk about scores, tell us why you do that. Why is an IQ test broken down into three different sections?

A.    Well, I mean, it's really two, the verbal and performance. The full scale is just the mathematical combination of the two. And the neuropsychologist might minimize the importance, are more focused on the importance of the verbal and the performance as two somewhat discrete areas. That is a long-standing tradition, going way back, intelligence

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Direct

testing assessing these different types of faculties.  And also there's some belief that verbal abilities, like your capacity to answer verbal questions or your capacity to reason verbally, is different than your capacity to put puzzles together or to put a story together by looking at different parts of a cartoon, assembling the panels in order, so on.  So they are thought to reflect different parts of the brain.  And there's some truth to that, although it's probably -- it's to some extent an oversimplification.  I know I kind of made that -- I don't think I made a simple explanation out of that.

Q.  Maybe I can help you out.  Let's talk specifically about Danny's verbal IQ score, what it was and what that means to you from a neuropsychological perspective.

A.  His IQ, his verbal IQ was 90.  His performance IQ was 99. Both of those are within the average range.

Q.  Then on his full scale IQ, what did he score?

A.  94.

Q.  What does that mean to you?

A.  Well, there's nothing especially exciting about any of that from a neuropsychological standpoint.  It's about what you would expect.

Q.  Is that about what you would expect with his history that you've described to us of the developmental learning disability and ADD and those things?

A.  Yeah, I mean, yes, you can have those things and have this

level of intellectual performance and intellectual -- different forms of brain damage often don't affect intellectual abilities.

Q.   Now let's talk about some of the other tests that you performed.  What I'm going to ask you to do here, Dr. Bianchini, is just to highlight for the jury, and obviously all the tests you performed are important or you wouldn't have performed them.  But highlight for the jury what findings came from any of these tests that you deemed important from a neuropsychological perspective.

A.   Okay.  So you want me just to talk about the significant tests.

Q.   Yes, sir.

A.   Okay.  Danny had two main areas of problem that I saw.  He had difficulty on several of the attention concentration tests, the capacity to focus.  One was a test called Trails B, which is particularly important for discriminating different kind of generic brain damage.  He was unable to do some serial reversal tasks, where you ask to recite the months of the year in a backward order.  That's thought to be a reflection of your capacity to maintain mental flexibility, hold something in your mind, then perform simple mental operations on it.

In another section of the test, the language section, there's another test called the FAS test, which measures language abilities, but also is sensitive to impairments in

Bianchini - Direct

attention and concentration.  He was also in the impaired range on that test.  My comment at the end of that section was that I didn't think that he had a language problem, but that I thought that he had impairments in attention/concentration.

Then the next thing that I saw of some significance was he had some impairments to the tests of short-term memory.  Short-term memory is an area that is also affected by some of the things that I was mentioning earlier:  The neurotoxicity and the multiple mild brain injuries.  He had on one of the tests, the Wechsler Memory Scale III, his scores were -- many of them were within the average range.  One was slightly lower than you would expect.  Let me just check that.

Q.    When you say that, I don't want to break your line of thought.  But when you say slightly lower than you would expect, are you talking about that you would expect for a normal person or for a person with Danny's history?

A.    No.  I'm saying slightly lower than you would expect for a normal person.

Q.    What were you looking at next?

A.    Then on the next test that I gave, a test called the California Verbal Learning Test, he had a number of scores on that test that suggested impairments in short-term memory.  And those were I thought also indications of short-term memory problems.  And those are really the only two areas, you know, where he showed much in the way of problem.

7869

Bianchini - Direct

But, you know, there are areas that I think do indicate the presence of some of these neurocognitive impairments, which interpreted in the context of all these things that he's had in his history, all these potential sources for brain damage, I think are an indication that he has experienced some permanent brain damage as a result of all these things that he has experienced that I mentioned earlier. And that was part of the reason. It was really the main reason why I concluded that he did have some brain damage, and that's why that diagnosis.

Q. I was about to ask you about that, whether you do have an opinion as to a diagnosis of Danny Lee from a neuropsychological perspective and what that opinion is if you do.

A. The diagnosis code that I use is something called nonpsychotic mental disorder following organic brain damage.

THE COURT: Would you repeat that?

A. I'm sorry. Nonpsychotic mental disorder following organic brain damage. And it's just a very generic general term to describe brain damage.

BY MS. COMPTON:

Q. What does the "organic" mean?

A. Well, organic is an old term that kind of has hung around. Organic refers to brain damage, just another way of saying brain damage.

Q. Did you give Mr. Lee in all these tests that you or your

Bianchini - Direct

Q.   assistant performed, did you give him something called a Hare test?

A.   No.

Q.   Is there some reason why you wouldn't have performed that test?

A.   I was asked to address specifically the neuropsychological issues and the issue of brain damage.  I was working with Dr. Cunningham as a clinical psychologist.  And I was asked specifically to address these neuropsychological neurological issues.

Q.   What is Tegretol, if I'm pronouncing it correctly?

A.   Tegretol is a medication that's used that has a history of use of treating seizures.  In recent years, as people have begun to understand better how to treat behavioral and mental changes that come from brain damage, Tegretol is a medicine that people have started to use to treat some behavioral problems that come with brain damage.

Q.   When you say have started to use, how recently has it been a drug on the market for use with brain damaged patients?

A.   Well, I mean, your question for use with brain damaged patients would include seizure patients.  I assume you mean brain damaged patients just with a behavior problem, probably in the last ten years or so, maybe a little more recently than that.

Q.   Most of the records that you have probably don't include

7871

Bianchini - Direct

much within the past ten years.  But did you find anything in Danny's medical records to suggest that Tegretol had been used for him at any time?

A.    I didn't see anything to suggest that.  Of course, it doesn't mean it clearly didn't happen.  But I have no records to reflect that.

MS. COMPTON:  I pass the witness.

THE COURT:  You may cross.

MR. LIROFF:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LIROFF:

Q.    Good afternoon, Doctor.

A.    Good afternoon.

Q.    So, if I understand this correctly, you had an opportunity in April of this year to interview Mr. Lee?

A.    Correct.

Q.    And that opportunity was one hour?

A.    Correct.

Q.    Then you left Mr. Lee and left your examiner to spend time with Mr. Lee?

A.    Technician.

Q.    Technician.  So you didn't do the testing?

A.    No.

Q.    And you weren't there to see how Mr. Lee responded to the testing visually?

Elaine Hinson, RMR, CCR
United States Court Reporter

7872

Bianchini - Cross

A.    That's correct.  That's a common practice in neuropsychology.

Q.    So you have to rely upon your examiner to ascertain if the examiner properly administered the test?

A.    Well, this technician has been working with me for six years.  I trained her myself.  I know her well.  But, yes, I did rely on her capacity to administer the test properly.

Q.    Is she a licensed neuropsychologist?

A.    No.

Q.    You've listed on the front page of your report a number of tests.  Do you know the order in which the tests were administered?

A.    No, I don't.

Q.    Isn't that important?

A.    No, not especially.

Q.    Is it taxing to take these tests?

A.    It can be.

Q.    If a test has a negative result, wouldn't you want to know if that result, if that test was given in the beginning, when the person was fresh, or given in the end, when the person was not fresh?

A.    My technicians are trained to determine if someone is fatigued and, therefore, not giving their best effort.  There's nothing to indicate that Mr. Lee wasn't performing up to his best abilities throughout the testing time.

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Cross

Q.    One of the tests that you found significant was called the California Verbal Learning Test?

A.    Correct.

Q.    When was that given?

A.    As I said, I'm not absolutely sure.

Q.    Is it fair to say that you are not only not absolutely sure, you don't know?

A.    Well, there's a typical order.  I'm trying to answer your questions completely.  There's a typical order that the folks use.  But, you know, they sometimes deviate from it.  So I don't know the exact order.  And the California Verbal Learning Test is usually given sometime kind of in the middle of the battery.  But I don't know that with absolute certainty.

Q.    In terms of your interview with Mr. Lee, Mr. Lee described a substantial history of violence.  Is that correct?

A.    He described a history of being in a lot of fights, and he said most of which he lost.

Q.    Have you ever interviewed anyone who acknowledged a history of violence or fights as extensive as Mr. Lee?

A.    I think some of the other folks that I've evaluated in this context have been close.  I'm not sure.  He certainly would be high up on the list.

Q.    In fact, Mr. Lee also describes other experiences in fights, such as being stabbed?

A.    Correct.

Bianchini - Cross

Q.    Being hit by weapons?

A.    Yes.

Q.    Did you ask him if he was using weapons, or is that not something you were interested in?

A.    I didn't ask him that.

Q.    Fending off more than one attacker?

A.    He did mention something about that.

Q.    Also Mr. Lee talks to you about a substantial history of drug use?

A.    Yes.

Q.    And, in fact, he describes an experience with inhalants called huffing that began when he was 10 or 11 years old?

A.    Correct.

Q.    Could you estimate how many times at that young age he personally chose to consume substances like this?

A.    He reported to me that he passed out more than a hundred times while huffing.

Q.    But that doesn't mean a hundred puffs or episodes. That means that among the many, many episodes that he utilized this stuff, there were a hundred times that he passed out?

A.    He may have used it more than a hundred times, which I believe answers your question.

Q.    Did Mr. Lee describe to you a time that when he was age 13 that he was incarcerated or placed in an institution where he could not have access to alcohol?

7875

Bianchini - Cross

A.    Did he discuss that with me?

Q.    Yes.

A.    Yes.

Q.    And because he was at the age of 13, at that young age, he was placed in some type of institution, couldn't have access to alcohol, he chose to use something else?

A.    He told me that he used LSD more than 30 times.

Q.    Now, in the next sentence, it says that he started drinking when he was around 15 years old.

A.    Yes.

Q.    Those two sentences are inconsistent with each other, are they not?

A.    Yes, they are.

Q.    Could you explain to me why he is telling you that he couldn't get alcohol when he was age 13, so he resorted to LSD, and in the next sentence you say that he started drinking when he was 15?  Is that logical?

A.    He was not a very well organized historian.  He gave -- there was a lot of overlaps in the different forms, in the different forms of abuse patterns.  So from this it sounds like he probably started drinking earlier than age 15.

Q.    In fairness to Mr. Lee, it sounds like you made a mistake.

A.    Is that a question?

Q.    Yeah.  In fairness to Mr. Lee, it sounds like you've made

Bianchini - Cross

a mistake, in that with that inconsistency, it would seem that you would say, Hey, Danny, you've told me this. You've told me this. Reconcile this for me. You didn't do that.

A.   I didn't reconcile. He told me two different things at two different times.

Q.   Is it fair to say until I just brought this to your attention, you didn't realize the inconsistency?

A.   Yes. However, the significance of a couple of years, you remember my prior testimony about the fact that the alcohol history, that much use of alcohol history probably in itself would not contribute to neurological damage in itself.

Q.   No. In fact, in terms of consumption of drugs, there really are only, what, you tell me, one drug that actually or one type of activity that potentially can involve resulting brain damage, and that's the huffing. Is that correct?

A.   Your question is -- I just want to be clear. Of all the different substances that he used, the one, the only one with a clear research supported result of brain damage would be the huffing? Is that what you are saying?

Q.   Yes.

A.   Well, you know, the alcohol, alcohol in itself can, like I said before, result in brain damage with a lengthy history.

Q.   How lengthy?

A.   Probably 20 years.

Q.   So we can exclude -- reasonably based upon the literature

7877

Bianchini - Cross

you know, we can exclude alcohol as a source?

A.    As an independent source.  That doesn't mean when in a weakened person it couldn't contribute.

Q.    And not in a 13 year-old, 15 year-old child?

A.    I'm sorry.  What's the question?

Q.    I will withdraw the question.  He also -- you also were aware of an EEG that was performed.  Is that correct?

A.    Correct.

Q.    In terms of not ascertaining the presence or absence of a convulsant condition, but in terms of a neuropsychological test, an EEG is a crude test, is it not?

A.    An EEG is not a neuropsychological test.

Q.    And there are a variety of things that can result in an -- that can cause an abnormal result in an EEG.  Is that true?

A.    There are a variety of things that can cause an abnormal EEG.

Q.    When there is an abnormal EEG, what that says to people like you, medical doctors, is that we should look more closely to determine if there is actual brain damage.  Is that correct?

A.    No.  I wouldn't say that.

Q.    And isn't it also true that after this test there was a referral to a Dr. Long?

A.    Yes.  That is correct.

Q.    And Dr. Long, other than finding the presence of the learning disability or this attention deficit situation, did

7878

Bianchini - Cross

not find the existence of other real issues in terms of neuropsychology.

A.    He found, like you said, the learning disability.  He said that because of his performance on the integrated tasks that he did not find evidence of higher cortical problems.  However, there was the problem pointed out earlier by Dr. Cunningham about his reliance on the IQ test that was most likely tainted by the practice effect.  There's no mention in Dr. Long's report of the history of a seizure disorder or of the abnormal EEG.  There's no mention of that.  And he doesn't report scores, so it's hard to tell the ways that he reached that conclusion.

Q.    I don't know.  Isn't it fair to say that this man, Mr. Lee, has been looked at a number of times by professionals over a 15-year period of time.  He's been given psychological tests.  Fair enough?

A.    Yes.

Q.    He's been given neuropsychological tests?

A.    Yes.

Q.    He's submitted to an EEG?

A.    (Witness nods.)

Q.    Yes?

A.    Yes.

Q.    He's also partaken of a CAT scan only a few months before the murder in this case took place?

7879

Bianchini - Cross

A.    Yes.

Q.    He's had recently two neuropsychologists examine him.

A.    Correct.

Q.    And, other than the common finding of a learning disability and an attention deficit disorder, isn't it fair to say that you are the only doctor who suggests that there is any other issue of brain damage?

A.    No.  That's not correct.

Q.    Who is the other doctor?

A.    Well, the pediatrician -- Biehler, I think is the name -- you know, diagnosed him as having seizure disorder.  That's neurological damage.

Q.    Are you saying to us that a childhood condition of fevers and the convulsants that occurred to that is in and of itself brain damage?

A.    That can be reflective of brain damage.

Q.    Well, it can be.  But is it brain damage?

A.    I don't understand the question.

Q.    Is my terminology wrong?

A.    I'm not sure.

Q.    Let me ask you this.  Is a pediatrician qualified to do a neuropsychological evaluation?

A.    No.  But a neuropsychological evaluation is not the only means for diagnosing brain damage.

Q.    And he has been looked at by now four neuropsychologists?

Elaine Hinson, RMR, CCR
United States Court Reporter

7880

Bianchini - Cross

A.    Three, I think.

Q.    And you are the only one who finds any suggestion of brain damage, other than the learning disability and the attention deficit situation?

A.    Of the three neuropsychologists -- this is a different question than your earlier question about indications of damage.  As I already testified, there are other indications of damage aside from my neuropsychological exam:  The history of -- all the history that I mentioned earlier.  But of the three neuropsychologists, I'm the only one that says of those three that says he had.  But, you know, I also included Dr. Long in his report.  I don't know that he didn't know about it.  But he makes no mention of the history of seizures in his report.  That may be important.  In addition, I mean, you know, a finding of a neuropsyche does not completely eliminate the possibility of brain damage.

Q.    If I get hit on the head and I get hit enough times and I sit here in this courtroom and keep hitting myself in the head, are you going to say because of that you can say I have brain damage?

A.    You mean if you hit yourself on the head?

Q.    Yeah.

A.    No.

Q.    Or if Mr. Stripling comes next to me and starts hitting me on the head, does that mean you could say because he hit Liroff

7881

Bianchini - Cross

on the head, Liroff has brain damage, just because of the proof

of the risk factor?

A.    Are you suggesting an analogy between that and what

happened to Mr. Lee?

Q.    Well, I'm asking you this.  That's your answer.  The

issues that you talked about as risk factors suggest to you

that you should look to see if there's brain damage, but the

risk factors do not prove that there is brain damage.  Is that

a fair statement?

A.    The risk factors do not prove the presence of brain

damage.  But they argue strongly for the likely presence of

brain damage.  Risk factors themselves can argue strongly for

the presence of brain damage.

Q.    This man has been given some of the most sensitive

neuropsychological instruments in the last month.  Is that

correct?

A.    He's been given some neuropsychological tests, correct.

Q.    Are there more sensitive ones other than the ones that

were given to him?

A.    Not neuropsychological tests, no.

Q.    Thank you.  I want to change gears and talk about

something.  There has been discussion in this courtroom about

wiring.  And sometimes people say that it dumbs down, and

someone suggested today, when you dumb things down, it's

getting into a dangerous area.  But you have a quote from Mr.

7882
Bianchini - Cross

Lee, "intelligence comes and goes." And it sounds like the wires are loose there, that sometimes the wires are connected, and sometimes they are not, and that's "intelligence comes and goes." First off, that's a quote that you relied upon and thought significant enough to include in your report?

A.   Well, I think it's important. I always include what people say. And I indicate it as being what they said, which I think gives it the proper context or importance.

Q.   Well, you said more than that. You report that expressions like that, he's reporting a history consistent with brain damage.

A.   That's true.

Q.   I know the analogy, I know we've dumbed down, and we keep talking about wiring. But is this like loose wiring?

A.   When people have damage, they perform less consistently.

Q.   Isn't it true that if you've got brain damage, you've got brain damage, and it doesn't come and go?

A.   The brain damage itself doesn't come and go. But your functioning can fluctuate more widely as a result of having impairments.

Q.   It's true that brain damage is either there or it's not?

A.   Sure. Brain damage is there or not. But, again, the question is -- your question is about the comment "intelligence comes and goes," which indicates some fluctuation in his capacity to think or focus or whatever. And that kind of

7883

Bianchini - Cross

fluctuation is consistent with damage.

Q.    That's your opinion?

A.    Yes.

Q.    And that's common accepted clinical opinion to neuropsychologists across the country?

A.    That fluctuation in mental status accompanies damage, yes.

Q.    Okay.  Now, you gave him a bunch of tests.  And you grouped them into certain categories.  Fair enough?

A.    Yes.

Q.    And in the first category I'm looking at, page 5, general intellectual ability.  And it's fair to say in terms of his IQ test here that this is average?

A.    That's correct.

Q.    Just so we are clear, and I don't need the numbers, but I need the range, the words that go with the range.  You have somewhere above average?    Is that true?

A.    I'm sorry.  What's the question?

Q.    What's above average?  What's above average, not the numbers.  What's the word that's above average?

A.    There's high average.

Q.    Is there something above high average?

A.    They've recently changed the terminology.  I think it's very high average.

Q.    I'm not --

A.    Unfortunately I don't get that many people in that.  I

Elaine Hinson, RMR, CCR
United States Court Reporter

7884

Bianchini - Cross

think it's very high.

Q.    I'm not trying to catch you.  Below average is what?

A.    You mean low average you are talking about?

Q.    Right.  So this is what I'm trying to get at.  We have high average.  We have average.  We have low average.

A.    Right.

Q.    What's below low average?

A.    I think the new term is very low.  It used to be borderline is what it used to be called.

Q.    So he is average?

A.    He is average in the intellectual abilities.

Q.    That's what IQ tests, intellectual abilities or ability to learn?

A.    Intellectual abilities.

Q.    So in terms of Mr. Lee's intellectual abilities, he's not stupid.  He's average.

A.    He's average.

Q.    I'm sorry.  I asked that question before, and I got into trouble.  Let's move to the next test.  And the next group of tests is clustered under the subject of attention and concentration.

A.    Uh-huh.

Q.    And there you said that these tests disclosed perhaps some impairment?

A.    Yes.

Bianchini - Cross

Q.    Brain impairment?

A.    I said tests of attention and concentration suggest impairments.

Q.    Isn't that entirely consistent with somebody who has a history of a learning disability and attention deficit disorder?

A.    Attention impairments can result from attention deficit disorder.  That's correct.

Q.    So this area here is consistent with something that we've known about with him and that wouldn't be the result of necessarily blows to the head or huffing or things like that?

A.    No.  I think with the history, when you have that history of attention deficit disorder in the past, certainly folks can have impairments in attention.  But when you have a history of all these other neurological insults, you have a history of the neurotoxicity and history of the multiple head injuries, I think both of those things can be responsible for these attention/concentration impairments.

Q.    Listen.  I'm just going to give you an opportunity.  Are you sure you want to go there with that opinion?  Is that what you're saying to this jury?

A.    Yes.

Q.    Thank you.  Let's move on to the next one.  Sensory perceptual functions.  First of all, what does that mean?

A.    Basic capacity to receive sensory information through the

7886

Bianchini - Cross

basic sensory apparatus and the neurosensory apparatus, so your capacity to feel properly with your fingers and hands, visual sensation, I mean visual processing, things like that. Even though Danny has obvious problems with his eyes, he did fairly well on that, obvious problem not having one eye, still did pretty well.

Q.   Is it not true that when you have a person with brain damage, you have a reasonable expectation to expect deficits in this area, sensory perception?

A.   Not necessarily. There are plenty of folks that can have brain damage that don't necessarily have sensory perceptual impairments.

Q.   That's your opinion?

A.   Yes.

Q.   Isn't it true that that is not a mainstream opinion?

A.   That's certainly not a mainstream -- that is certainly not true, that that is not a mainstream opinion.

Q.   Next area was motor functions. And we are talking about dexterity and things like that?

A.   Upper extremity motor speed, how quickly you move and how well coordinated you are.

Q.   When you saw Mr. Lee, was he shackled?

A.   When I saw him he was. But they removed -- I believe they removed his hand shackles when he was doing the test.

Q.   Are you sure?

7887

Bianchini - Cross

A.    I'm not a hundred percent sure.  I'm pretty sure I remember my tester telling me that.

Q.    Is it possible that this was performed while he was still wearing shackles?

A.    I don't think so.  I guess that's possible.  But the result was normal, so I didn't --

Q.    Do you know the jail reports that he did it when he was shackled?

A.    Then he was shackled.  But you should notice that I didn't interpret it.  There was no interpretation of damage, so it wasn't of great importance for me making my determination.

Q.    Okay.  So you've only identified two tests, two areas.  And this wasn't one of them?

A.    Correct.  I didn't identify this as an area of problem, correct.

Q.    Let's do it another way.  In terms of the some 28 tests that were given, Mr. Lee showed no brain damage as to 95 percent of those tests.  The numbers may be a little bit off.

A.    He showed impairments on about -- let's see -- five tests.

Q.    Now let's talk about one of them, because the next area is language functioning.  And in this area, you noticed perhaps some impairment.  Fair enough?

A.    No.  In the area of language, I noticed perhaps some impairments?

Q.    Yes.

7888

Bianchini - Cross

A.   No.  I have a statement to the contrary there.

Q.   Oh.  So I don't even have to worry about it.  You are saying it's not a problem.

A.   I said he didn't have language impairments.  He scored in the impaired range, as I testified earlier.  He scored in the impaired range on one of the tests.  But, like a lot of neuropsychological tests measure a number of different things.  That test, something called the FAS test, it's a test of verbal fluency, also measures attention/concentration and other things.  Therefore, I thought that his impairment in the score, his impaired score on that FAS test was more reflective of impairments in attention and concentration than specifically a language problem.  So I said he didn't have a language problem.

Q.   Thank you.  You took care of my cross in that area.  Now let's talk about memory and learning.  How many tests did you give him in the area of memory and learning?

A.   Two.

Q.   I may be wrong.  But didn't you give him a third called the Rey-Osterreith?  And I'm going to spell that.  R-e-y-O-s-t-e-r-r-e-i-t-h.  Isn't that a test in that area as well?

A.   I use that test more for constructual abilities.  But it does have a memory aspect of it, yeah.

Q.   How did he do on the Rey-Osterreith?

A.   Let me turn to that part.  I should point out at this

Elaine Hinson, RMR, CCR
United States Court Reporter

7889

Bianchini - Cross

point, that Rey-Osterreith -- neuropsychological tests have different levels of statistical or psychometric rigorousness. In other words, some of the tests are done up very well statistically and are normed. And those are the tests that are sometimes more rigorous as far as the statistics goes. However, there are other tests that are less rigorous but are still clinically useful. And we don't have as good of statistics on those. But they are good for looking at and forming judgments.

But it's important to inform people, you know, where your information is coming from. So I don't include that Rey-Osterreith because we basically just -- I just look at it and look to see how he did in the memory section. I don't score it as far as the memory. There's not a normed scoring -- I don't use a normed scoring for the Rey-Osterreith as a memory test. I use it more as a clinical test of constructual abilities.

Q.   Did he do well or not?

A.   He had some trouble.

Q.   Let's go to -- is the next test the WMS III?

A.   Yes.

Q.   What's the name for W?

A.   Wechsler Memory Scale III.

Q.   Isn't it fair to say that this is the most extensive test you have available in terms of testing memory?

Elaine Hinson, RMR, CCR
United States Court Reporter

7890

Bianchini - Cross

A.    I wouldn't -- well, it's the most diverse.  I don't know about the most extensive.  You know, different tests measure different things.

Q.    Well, it's the most diverse in the sense that you gave this man.  True?

A.    It's the most -- it has the widest range of tasks of the two tests that I gave him.  But the other one, the other test, the California Verbal Learning Test, sometimes is more difficult, and therefore sometimes more sensitive.

Q.    Insofar as his results on the Wechsler -- incidentally, in terms of memory, is it fair to say that if someone has brain damage, this is a very key area, because you look to see if memory is affected if there's brain damage.  Fair enough?

A.    Memory is important.

Q.    Yes.  Memory is important in ascertaining whether there's brain damage or not.

A.    Yes.

Q.    Now, in terms of this test, it's broken down into, what, six or seven categories, so the first one I can look at is working memory.  Was his score average?  I'm on page 11.

A.    That's the last one.

Q.    I know.

A.    You said the first one.

Q.    The first one I'm going to.

A.    Okay.  Yeah, that's an average score.

7891

Bianchini - Cross

Q.    What's the range of numbers of average in this area?

A.    90 to 110.

Q.    And he had a score of 102?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    General memory, average?

A.    Yes.

Q.    Auditory recognition, average?

A.    Yes.

Q.    Visual delay, average?

A.    Yes.

Q.    Auditory delay, average?

A.    Yes.

Q.    Immediate memory, average?

A.    Yes.

Q.    Visual immediate, average?

A.    Yes.

Q.    Auditory immediate?

A.    Slightly below average.

Q.    And that's it.  Not impaired, but slightly below.  How slightly?

A.    It is one point below the average.

Q.    What's the number?

A.    89.  But I should point out that there is some

7892
Bianchini - Cross

relationship between the person's intelligence and how well they should do. In other words, average is not -- average memory scores are not what you would expect for all people. Generally you expect that these memory scores to be slightly higher than their tested -- than their tested IQ scores. So that 89 is somewhat below his tested IQ scores. That's why I was a little bit excited about that one.

Q. In terms of his verbal IQ, is it one point below?

A. One point below, right.

Q. One point is somewhat below?

A. Right. But I said before, you would expect it to be above, not at the same level.

Q. Was this test given at the beginning or the end?

A. The Wechsler Memory Scale is typically given early on in our battery, so certainly given within the first three hours or so.

Q. How many hours was he given these tests?

A. Eight.

Q. Eight?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Is it fair to say -- you can just tell me if you agree or disagree with this statement. Having given the Wechsler, giving the California Verbal Test, which is the test you

7893

Bianchini - Cross

expressed concerns about was unnecessary?

A.    Given the California test --

Q.    Giving the Wechsler, it was unnecessary to give the California Learning Verbal?

A.    No.  I don't think that's fair to say.

Q.    And is it true that the results in the Wechsler are inconsistent with the results in the California Learning Verbal?

A.    I wouldn't say that.  They are different.

Q.    There's just one more area that I want to talk to you about.  There is an area that you talk about, and that is called higher cognitive functions.  Now, is it fair to say that a lot of the tests we've talked about really don't directly relate to reason?

A.    Many of the tests, you know, some of them relate to reasoning, like some aspects of the intellectual testing do.  But a lot of the tests we talked about don't relate to reasoning.  That's correct.

Q.    And this area is the area that tests how well a person, his ability to reason.  Fair enough?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    And this area of tests relate to complicated aspects of what we call human judgment?

Elaine Hinson, RMR, CCR
United States Court Reporter

Bianchini - Cross

A.    It relates to problem solving, abstract reasoning, things like that.

Q.    And these tests show his ability to know the difference between right and wrong?

A.    No.  I don't think they measure his ability to know the difference between right and wrong.

Q.    You don't know or what?

A.    I didn't say I don't know.

Q.    What are you saying?

A.    I said, no, these tests don't measure his ability to determine right from wrong.

Q.    These tests evaluate his ability, let's say, to change a course of action?

A.    There are elements that assess his ability to change strategies in solving a problem.

Q.    These tests evaluate his judgment?

A.    His judgment in solving tasks, problem solving tasks.

Q.    These tests for Mr. Lee showed no impairment?

A.    They showed no impairment.

Q.    Within normal limits?

A.    Correct.

Q.    Thank you.

        THE COURT:  Ms. Compton.

                REDIRECT EXAMINATION

BY MS. COMPTON:

7895

Bianchini - Redirect

Q. Dr. Bianchini, when you were talking about the new term about a little bit higher than average and you weren't clear about that, you said something I wanted to ask you about, and that was "Unfortunately I don't get to see many people who have that." What were you talking about? Why is that, that you don't see many people with high or above average?

A. Well, because most of the people I deal with that are coming to me for problems with brain impairments score lower than that.

Q. Most of your patients have brain impairments?

A. Yes.

Q. That's all I have.

THE COURT: All right, sir. You may stand down. Call your next witness. Well, who do you have left?

MS. COMPTON: Well, I've got to talk to you about that.

THE COURT: All right. Let's let the jury go. Then you can talk to us about it. We will have our afternoon recess.

(Jury excused.)

THE COURT: The jury is out.

MS. COMPTON: Judge, you may remember -- I probably ought to talk to Mr. Lassiter. I see him back here. I wrote the Court sometime back and said could we do this Tuesday through Friday as opposed to Monday through Thursday because I

Elaine Hinson, RMR, CCR
United States Court Reporter

7896

had a witness who couldn't come until Friday.  You said yes.
We started it that way.  Then that witness was supposed to have
gotten here so he could testify today.  But I think that he
didn't.  And what I need to find out from Mr. Lassiter, whether
he will even be here tomorrow.  If he is coming, then I think,
you know, we may want to do rebuttal out of turn, like we did
in the other case.  If he is not coming, then I'm through
anyhow.

THE COURT:  Mr. Lassiter?

MR. LASSITER:  Your Honor, the witness is Mr. Floyd
Cochran.  We learned over the noon break that he has a problem
with airplanes.  He related to me when I talked to him, right
at the end of our noon break, that he was in an airplane
accident in 1995.  Nobody was hurt.  He said the plane had to
land in a field with the landing gear up.  And last night was
the first time he had tried to get on an airplane since that
accident.  He related to me that he got on the plane, broke out
in a sweat and had to run off the plane and became ill.  His
luggage came on down here.  He stayed behind.  When I talked to
him, he told me he just didn't think he could fly.  He also
related to me that he lives near Penn State and that he has
testified before by video hookup there and that he knows
somebody in one of the departments over there he thought he
could arrange that with.  So that's kind of where we are with
Mr. Cochran.  I don't know if we have time to do that or the

7897

Court would allow that.

THE COURT:  What does he have to offer?  What's he all about, Mr. Cochran?

MS. COMPTON:  Your Honor, Mr. Cochran, I don't know if the Court can recollect all the testimony of Sean Haines. Sean Haines came early, early in the guilt-innocence phase of this trial and talked about being the youth recruiter at Aryan Nations.  Floyd Cochran used to be the youth recruiter at Aryan Nations.  And he was heavily involved in the movement, the skinhead movement.  He knew Mr. Lee personally.  He knew of Mr. Lee's involvement with Bobby Norton, which has just come out in Dr. Cunningham's testimony.

And Mr. Cochran basically has entirely given up the skinhead or Aryan Nation ways due to something that occurred to him at Aryan Nations.  He now goes around the country to various places, colleges, high schools, the Pennsylvania House of Representatives.  He's been different places all over the country, in which he talks about the movement and what the movement can do to people.  And he talks about it in relation to Mr. Lee and how if he got out, so can anybody else.  It's basically a question of a person who has been heavily involved in this movement being redeemed at a later date.  And Mr. Cochran was certainly every bit as involved as anybody else we've heard from.  The government has been aware all along. Since I put up a witness list, they have known that he was a

7898

witness.

THE COURT:  Which one of these mitigating factors is he speaking to, do you know, that you listed?  By the way, I need to know which ones you are eliminating when you essentially decide to rest your presentation.

MS. COMPTON:  I need to look at my list.

THE COURT:  We'll give you a chance to do that.  Can you speak to which ones he is testifying to?

MS. COMPTON:  Not without looking at my list, because I can't really remember what's on there right now.

THE COURT:  Well, your second one, let's see.  Mr. Lee was under duress regardless of whether the duress was of such a degree as to constitute a defense to the charge.  Does he have anything to say to that?

MS. COMPTON:  Oh, I don't think that Mr. Cochran is going to be qualified to talk about what kind of duress Mr. Lee was or was not under at a particular time.  He is going to be talking more in generalities as to the movement.  He is really going to be testifying a whole lot as Sean Haines testified for the government, except that he is going to be talking about how he knows Danny, has known him.  I guess, more particularly, his will have to do with the influence Bobby Norton had over Danny and why Danny may have been susceptible, from a lay person's perspective, why Danny may have been susceptible to this type of influence, because he knows because he knows Danny, and he

7899

knows because he was likewise susceptible.  In fact, their backgrounds are remarkably similar.  I had no idea Mr. Cochran had an airplane anxiety problem until now.

THE COURT:  He's in Pennsylvania now?

MS. COMPTON:  Yes, sir.

THE COURT:  I'm going to have a little short break here.  I will come back, give you a chance to tell me why it's that important.  We are not retrying the guilt-innocence phase.  So unless this contributes something to the penalty phase in light of the issues raised by the government or by you, I'm going to be a little skeptical, particularly considering the imposition upon the jury and the difficulty in getting the proof.  I gather our options are to do it by some videotape arrangements or something or, what, have him drive all night?

MS. COMPTON:  I don't think we would make him do that.  You know what happened, and the reason I told you that we would have to wait until Friday, is he was supposed to have been in British Columbia.  He was speaking to a group up there.  I don't know who it was.

THE COURT:  How did he get out there?

MS. COMPTON:  Sir?

THE COURT:  How was he going to get out there?

MS. COMPTON:  On the train.  So he was going to come from there here on the plane.  Then something happened about

7900

that.  He just said never mind.  I won't do the British Columbia thing.  I will just come from Pennsylvania direct, because it was getting real complicated.  But he didn't tell me that he couldn't, didn't know about flying.

THE COURT:  What remains of your case right now?  Is that it?

MS. COMPTON:  I'm finished, other than for Mr. Cochran.

THE COURT:  I'm going to let you go through the mitigating factors that you've identified originally and that you've indicated you might want to withdraw some of those.  If you do, I want to hear what they are when we resume, which will be before the jury comes back.  I want you and Mr. Lassiter to discuss again, and maybe with the government, what he might do in connection with this gentleman and really how necessary he might be to the presentation of your client's case.  So we will be in recess about 10 minutes, and I will be looking to talk to the lawyers again.  Court is in recess.

(Recess at 3:05 p.m.)

**CERTIFICATE**
I, Elaine Hinson, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of the proceedings in the above-entitled case.

_Elaine Hinson_
Elaine Hinson, Official Court Reporter
Date:   May 14, 1999

Elaine Hinson, RMR, CCR
United States Court Reporter

Ryan - Direct

(Continuing at 3:38 p.m., jury present.)

THE COURT:  Ms. Compton?

MS. COMPTON:  Your Honor, I have no further witnesses.  Defendant rests.

THE COURT:  And how about rebuttal?  Are you ready to proceed?

MR. LIROFF:  Yes, we are, your Honor.  We would call at this time, if it please the Court, Professor Ryan.

THE COURT:  Professor Thomas Ryan, come forward, please.  Come to this lady, raise your right hand and be sworn.

**THOMAS RYAN, Ph.D., GOVERNMENT'S WITNESS, DULY SWORN**

THE COURT:  All right, Mr. Liroff, you may proceed.

MR. LIROFF:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. LIROFF:

Q.    Professor, tell us your name.

A.    Thomas V. Ryan.

Q.    And what do you do for a living?

A.    I'm a clinical neuropsychologist.

Q.    Is that akin to Dr. Bianchini, the same type of thing, a neuropsychologist?

A.    Yes.  My training is as a clinical psychologist, and then I went on and received additional training to be a specialist in neuropsychology.

Q.    You're a professor?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7902

Ryan - Direct

A.    Yes, I am.

Q.    Tell me about that.

A.    I'm an assistant professor of psychiatric medicine at the University of Virginia Health Sciences Center, and there I teach seminars, I conduct research, I supervise interns on clinical cases.  I also supervise graduate students in terms of dissertations.

Q.    Do you work with people who have issues relating to brain damage?

A.    Every day.

Q.    In what circumstances?

A.    I'm director of neuropsychology at the Woodrow Wilson Rehabilitation Center, which is the State of Virginia's main rehabilitation facility, and I'm in charge of evaluating folks coming in to see if they have potential for rehabilitation. And so on a daily basis in my clinical practice, I evaluate and treat brain-damaged individuals as well as talk with their families about the effect of brain damage and what kind of prognosis they may have.

Q.    Have you had experience dealing with people who have seizure disorders?

A.    Yes.  I worked for four years on a comprehensive epilepsy unit at the University of Virginia Health Sciences Center.

Q.    You have experience then in evaluating people for the determination of whether or not they have brain damage?

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

A.    Absolutely.

Q.    On a daily basis?

A.    Yes.

Q.    Now, are you also board certified?

A.    Yes, I am.

Q.    Tell me about that.

A.    Board certified by the American Board of Professional Psychology in clinical neuropsychology.

Q.    And I take it you have an educational background in support for the work that you do?

A.    Yes.  You have to in order to meet the credential of review by the American Board of Professional Psychology.

Q.    Do you have a bachelor's?

A.    Bachelor's degree in psychology from Northeastern University.  I have a master's degree in clinical psychology from Fairleigh Dickinson University in New Jersey.  I have a Ph.D. from the California School of Professional Psychology in San Diego.

After I completed my Ph.D., I then completed a one-year clinical internship at the University of California in San Diego.  And then following that, I completed a one-year postdoctoral fellowship at the University of Virginia, and they retained me on as faculty.

Q.    I asked Dr. Bianchini about that, that postdoctoral fellowship.  Could you tell us just a little more what that is?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7904

Ryan - Direct

A.   Yes.  After receiving your Ph.D., in all states, an individual needs to have some supervised experience before they can then sit for licensure.  That can be obtained in a number of different ways.  You can get the training while you're working as a psychologist by someone who is licensed on site, or you can do a structured, formal program of training where you're supervised by one or more individuals, and my fellowship was in the area of neuropsychology.

Q.   Have you published articles in the area of neuropsychology?

A.   Yes, about 15.

Q.   Are we talking directly articles on the issue relating to the evidence or existence of brain damage in people who may have suffered injury or other predicaments?

A.   Seizure disorders, as well as brain damage and brain damage rehabilitation, as well as forensic neuropsychology or the application of neuropsychology to issues such as this.

Q.   I asked you about your board certification.  You said you had that in neuropsychology.  How many neuropsychologists are there in this country who are board certified?

A.   The last count, there was about 350.

Q.   And do you on occasion do forensic work, come to court and work on cases?

A.   Yes.  Part of my duties at the University of Virginia are that I'm on faculty at the Institute of Law, Psychiatry, and

Christa R. Newburg, RMR, CCR
United States Court Reporter

7905

Ryan - Direct

Public Policy, and that's a big fancy name for a liaison between the Department of Psychiatry and the School of Law. And we have a forensic training program where we teach other professionals how to do competency assessments, risk assessments, mental status at the time of the offense evaluations. We also have an evaluation clinic where we evaluate criminal defendants, and we also conduct research there, and I've been involved with the institute for about ten years.

Q.    Have you worked on criminal cases?

A.    On criminal cases?

Q.    Yes.

A.    Yes.

Q.    Have you worked on death penalty cases?

A.    Yes.

Q.    Have you worked on death penalty cases on behalf of defendants?

A.    Yes.  In fact, almost all my experience has been working on behalf of the defense.

Q.    And in terms of a percentage of your practice that relates to forensic, another witness said that they were 90 percent, what percentage is your practice relating to forensic work?

A.    I'd say 10 to 20 percent, and 80 percent is strictly clinical.

Q.    Does that mean 80 percent of the time you're working with

Ryan - Direct

people to evaluate whether or not they have brain damage?

A.    Yes, that's correct.

MR. LIROFF:  I'd offer the witness as an expert, your Honor.

THE COURT:  Any voir dire?

MS. COMPTON:  No, sir.

THE COURT:  He'll be accepted as an expert in the area of his expertise and may express opinions in that area.

You may proceed.

MR. LIROFF:  Thank you.

BY MR. LIROFF:

Q.    Did you become involved in this case?

A.    Yes.

Q.    Did you have an opportunity to interview and speak with and test Mr. Lee?

A.    I spent a lot of time with Mr. Lee.  I spent over 20 hours on three separate occasions.

Q.    Did you have an examiner do your testing for you?

A.    No.  I did the examination myself.

Q.    Do you have an opinion upon the effect of having an examiner do testing in a forensic situation?

A.    Well, I also use a technician, but in this case, I wanted to do the evaluation myself because I wanted to gauge the defendant's responses to some of the questions that I posed to him.  And it is, as Dr. Bianchini said, standard practice to

Christa R. Newburg, RMR, CCR
United States Court Reporter

7907

Ryan - Direct

use technicians, but I think all neuropsychologists agree that you lose something in that process, and that is that you're not right there and you're not thinking about brain-related difficulties the patient might have.  So I think almost everyone in the field would agree that it's fine to use a technician, but a superior approach is actually to do the testing yourself.

Q.    Does he have brain damage?

A.    Absolutely not.

Q.    Are his wires loose?

A.    No.

Q.    Tell us what you mean by that.

A.    Well, I looked at two out of the three, including my own neuropsychological assessments.  Two, one by Dr. Long, who has a national reputation, I know Dr. Long, showed no evidence of what they call higher cortical impairment.  The cortex is the mantle or the outside part of the brain, and that's the part of the brain that really processes information, and it's the most important part of the brain in terms of what we look at neuropsychologically.  There was no indications that there was this higher cortical dysfunction.

My testing was completely normal.  Every single test given to him was normal.  He was low average on two particular tests that had to do with attention and concentration, which fits with his attention deficit disorder.  It also fits with the

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

fact that he's being evaluated in a jail, which sometimes there's noises and things going on, trays for lunch coming in and out. That can adversely affect his ability to really maintain his concentration.

But I also looked at, for example, a CAT scan that was done in 1995. I believe it was October 2 of 1995. And that CAT scan was completely unremarkable. It was normal.

Neuropsychological tests were developed before we had CAT scans, and the reason they were developed is to answer one specific question, and that is, does a person have brain damage? There was a neurosurgeon out in Chicago working with this other psychologist, Ralph Reitan, and the neurosurgeon got tired of doing exploratory brain surgery to find out whether people had brain damage and wanted to develop some tests that would determine whether they did or did not, in fact, have it. And so there's a large body of empirical evidence and data showing that the battery that I use, the Halstead-Reitan battery, is valid and reliable in detecting brain damage. And, in fact, some of the studies that have been done where they compare, for example, other neurodiagnostic procedures, such as an EEG or an MRI or CAT scans with neuropsychological testing, neuropsychological testing is equally efficient in detecting brain damage as an MRI and a CT scan, and it's actually superior to an EEG. So they're very sensitive tests, and none of my tests came up impaired at all.

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

Q.    This guy has a history of a claim of repeated blows to the head.

A.    Correct.

Q.    I asked Dr. Bianchini whether the risk, the evidence of the risk proves the fact of brain damage.  Do you have an opinion about that?

A.    Yes.  Just because you receive a blow to the head does not mean that you have underlying brain damage.  I've got kids and I see my kids bump their heads all the time and think, don't do that.  That doesn't necessarily mean that there's brain damage.  He's right.  When people have repeated concussions, that has a cumulative effect, as evidenced in Muhammad Ali's case; however, the information that we're getting and that I got from Mr. Lee was self report, so really I didn't have any medical records that indicated that he was hospitalized for brain injuries.  And that's very different, because someone can say, "Yes, I was in a lot of fights, I lost consciousness," but you don't know whether that's exaggeration, whether that's an actual fact or not.

As a neuropsychologist, of course it's important for us to look at records, and the records that we look for are, for example, hospitalizations.  Did someone go to the emergency room and were they evaluated because of head trauma?  Oftentimes, if it's mild, they are released with precautions.  If not, they're kept overnight and they're given more sensitive

Ryan - Direct

tests such as an MRI or CT scan to see whether or not there's underlying damage, bleeding, and I found no indications in Mr. Lee's record that he was ever hospitalized or taken to the emergency department for these repeated blows to the head.

Q.    Did you perform certain tests that would have reflected whether there was injury as a result of blows to the head?

A.    Well, one thing you have to understand about brain injury from head trauma is that -- and that's what I did my dissertation on.  Brain injuries from head trauma and memory impairment go almost hand in hand.  In fact, of the thousands of people I've seen with brain damage from head injuries, I can't remember one case where they didn't have memory impairment, and that has to do with where the temporal lobes or the part of the brain that deals with memory sits.  It sits on these bony processes here on the side of your face, and when the head is moving and then stopped very rapidly, like in a car accident, that tissue, the temporal lobe tissue is often stretched and cut from those bones, and so memory impairment and brain injuries from head trauma go hand in hand.  In fact, we did a study where we polled family members and patients and asked them, "What is the number one symptom you have from your brain injury?"  And consistently it was memory impairment.

Q.    Was there proof of memory impairment in this case?

A.    Absolutely not.  I gave him a very comprehensive measure of memory function and compared his scores to other folks with

Ryan - Direct

the same kind of educational background and the same age, because those two things can affect someone's ability to perform on memory testing, and his memory testing was not just average, but well above average in certain areas.  For example, his overall memory, his global memory, he was at the 81st percentile, meaning he did better than 81 percent of the people whom this test was normed on.

His attention and concentration was at the 66th percentile, which is average.  His verbal short-term memory or his ability to remember things that he hears was at the 97th percentile, which is superior.  And his visual short-term memory was at the 45th percentile, which was average.  So there are no indications whatsoever of any memory impairment.

And I also looked at Dr. Bianchini's Wechsler Memory Scale III, which, as he mentioned, is a very comprehensive test to look at memory, and he was within normal limits except he was slightly below average on a measure of attention and concentration.  Again, somebody with a history of attention deficit disorder is going to have a little trouble with attention and concentration tasks.

With regard to the California Verbal Learning Test that he gave, that is a more difficult test, but I don't know whether that was given toward the end of the day when a person might have been kind of fatigued and tired, because it's a lot of tests.  Remember, Dr. Bianchini gave 28 tests in one day.

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

That's a lot of tests.  And even a normal control person, somebody who doesn't have brain damage, is going to have a hard time toward the end of the day.  You just get kind of tired of listening to this stuff and doing these tasks.  So it's hard to tell why he was impaired on that one particular measurement.

Q.   Would the result in the California Learning Verbal or Verbal Learning Test --

A.   Verbal Learning Test.

Q.   Is that inconsistent with his results in the Wechsler?

A.   Yes, it is.

Q.   I'll stop for a moment and ask you to spell some things because I know that somebody wanted me to make sure.

MR. LIROFF:  I'm asking the reporter. Halstead-Reitan.  Is that a word you have to have spelled?

THE COURT REPORTER:  No.

MR. LIROFF:  Wechsler?

THE COURT REPORTER:  No.

MR. LIROFF:  All right.

BY MR. LIROFF:

Q.   There was another area that I asked Dr. Bianchini about, and that was the area of sensory perceptual deficits where everyone agrees there is no issue for Mr. Lee.

A.   Yes.

Q.   And I asked him the question, when you have damage to the brain, would you expect impairment in this area of sensory

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

perceptual functioning?

A.    Often, but it depends upon what is causing the brain damage.  For example, with stroke patients, you almost always have sensory perceptual impairment.  With serious brain injuries, that is often the case that they have trouble in some sensory modality, but it is not always the case.

Q.    Have you reviewed the data, the underlying score and data used -- utilized by Dr. Bianchini?

A.    Yes, I have.

Q.    And in your opinion, does that support any opinion suggesting that there is brain damage to Mr. Lee?

A.    None at all.  I think what it suggests is that he performed somewhat poorly on a couple measures of attention and concentration.  The acid test, so to speak, is these tasks that look at higher level cognitive abilities, and these have been shown to be the most sensitive indicators of brain damage, like the category test, some of the other tests that I gave that are really measures not of one particular region of the brain, but the brain as a whole.  So, for example, somebody can have, you know, a tumor in some area and they're still going to be impaired on this test.  They can have a stroke in another area and still be impaired, so it doesn't really matter what the cause of the brain damage is.  If there is brain damage, they're going to do poorly on these tests.

        Consistently on measures of higher cortical functions or

Ryan - Direct

higher brain functions, he performed either average or well above average, which definitely contraindicates brain damage.

Q. Higher cortical is an area of the brain?

A. Again, the cortex is the mantle, lining. If it was an orange, it would be the peel, and then there is what we call the gray matter, and that is where all the real important stuff happens. That's your ability to figure things out, understand your world, formulate a course of action, regulate your behavior, whether you're impulsive, whether you have judgment problems, that kind of thing. All the most complicated aspects of what we do as human beings.

Q. Now, there has been a suggestion that there was a test given to Mr. Lee in 19 either '85 or '88, somewhere in there, an abnormal EEG?

A. Yes.

Q. Did you consider that test in evaluating Mr. Lee?

A. Absolutely. I put that in my report as well.

Q. Is there any significance to that result?

A. Well, what I learned in working with people with seizures over the four-year period of time when I was at the University of Virginia's epilepsy unit is that, for example, people can have serious brain damage where their CAT scan and MRIs were abnormal, had a big bleed like a stroke or had serious head trauma, and their EEGs can be normal.

The flip side of that is that you can have people with

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

normal functions who are just off the street, no neurological problems, who exhibit some abnormal findings on EEG. And, by the way, interpreting EEGs is kind of a funky endeavor, and that is, you can show one neurologist an EEG and that neurologist will say, "That's abnormal"; the other neurologist will say, "No, that's within normal limits."

Other things that made me skeptical about that one EEG was that Mr. Lee had been abusing substances. That can affect one's outcome on an EEG. And I don't know, there was no mention of artifact, which is this artificial movement. If somebody is moving around a lot, it's going to make the EEG look weird, but with his history of ADD, I wondered whether or not that could have done it as well. And people who are on medicines like Pamelor, which he was on, I don't know if he was on at the time Ritalin or Cylert, can result in some abnormal-looking EEGs.

And one more issue on the EEG is, the report said that it showed generalized problems. Nothing in anybody's neuropsychological testing showed that he had generalized problems, which means that he did poorly across almost all the tests, so I considered that, but I didn't think it was significant.

And I also wondered why they didn't follow up with -- what they typically do is then bring the person in for more extensive EEG monitoring. They'll leave the EEG device on for

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

24 hours and try to capture as many seizures as they can. There was no mention of a follow-up, and in the medical record I reviewed, there was also no mention of placing him on anticonvulsants at that time.

Q.   Does that suggest something to you then, these facts, the absence of these things?

A.   Yes.

Q.   What does it suggest?

A.   It suggests that it could have been a fluke.  I know that he did have a seizure disorder earlier on, and those were what we call febrile or fever-induced seizures, which are fairly common within children, and tend to actually go away by themselves.

Now, some people with febrile seizures during childhood do then go on to develop more serious seizure disorders, but that just didn't seem to be the case for Mr. Lee.

Q.   If Mr. Lee had developed more serious seizure disorder and that had impacted or affected his brain, would your testing have resulted and showed that?

A.   If he had repeated seizures, what it tends to do is kind of burn out the brain.  If you're having seizure after seizure after seizure, you start burning out those neurons, and, yes, indeed, you can show neuropsychological impairment.  There isn't any one particular profile of an epileptic, but in the hundreds of epilepsy cases I've seen, these people don't

7917

Ryan - Direct

perform well on neuropsychological tests.

Q.    You also conducted a lengthy interview with Mr. Lee?

A.    Yes, I did.

Q.    You talked to him about his life?

A.    Yes.

Q.    You talked to him about things that we've talked here, here today and yesterday with Dr. Cunningham.  Is that fair?

A.    Yes.

Q.    In terms of your examination, is it -- excuse me a moment.

      Did your examination suggest that Mr. Lee was a person who was suspicious?

A.    Yes.

Q.    Distrustful?

A.    Yes.

Q.    Angry?

A.    Yes.

Q.    There was a suggestion by Dr. Cunningham of a particular test you performed called an MMPI and that he talked about an elevated something, and he used the word "paranoia."

A.    Yes.

Q.    Could you explain what your tests showed in that area?

A.    That test is a personality test.  In fact, it's the most widely used personality test in the world, and it looks at a variety of personality features.  It looks at anxiety, depression, psychopathic deviancy.  It looks at heightened

7918

Ryan - Direct

levels of energy, what we call mania.  It also looks at someone's love of suspiciousness, and that is called paranoia scale.  And he was slightly elevated on the paranoia scale; however, I think it's really important to know that this evaluation was done in the context of a capital murder situation, so it's not unusual for people to be suspicious and distrustful, especially when the government's expert is coming in to evaluate him.  And it didn't reach a point where I would consider him to have a paranoid personality disorder or a psychotic paranoid disorder.  He had no indications of hallucinations or delusions which would suggest a more serious psychological disorder.

Q.    Dr. Cunningham talked about a cousin of Mr. Lee having a diagnosis of paranoid schizophrenic and said that was significant because there is a suggestion that that disease, that serious disease, has a genetic characteristic to it and that would suggest that Mr. Lee was at risk for that as well.

A.    And he is correct about that.

Q.    Okay.  But in terms of the application to this case, is he correct at this point for a 26-year-old male in considering it?

A.    His schizophrenia score on the MMPI was well within normal limits.

Q.    Did you see any indication that he suffered from a mental illness characterized as paranoid schizophrenia?

A.    None whatsoever.

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

Q.    Is that a preposterous suggestion to even suggest it?

A.    That he has a psychotic disorder like paranoid psychotic disorder or paranoid schizophrenia?

Q.    Yes.

A.    Absolutely.  There's no indication either on testing or on my clinical interview and interactions with him that he has any of those conditions.

Q.    Is there any suggestion that this man sitting right here suffers from any level of serious mental illness?

A.    No.

Q.    You told us you talked to Mr. Lee about his life.  For example, did you ask him how he became involved in the skinhead movement?

A.    Yes, I did.

Q.    What did he say?

A.    He told me that he got involved because he could have sex with a lot of women, drink a lot of beer, and get in a lot of fights.

Q.    Did you talk to Mr. Lee about fights?

A.    Yes.

Q.    It's not so much how much, but did he talk to you about why he fought?

A.    Well, he told me that he drank a lot and would get himself in trouble, but that he enjoyed the fighting.

Q.    He enjoyed it?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7920

Ryan - Direct

A.   Yes.   He liked the stimulation.

Q.   Did he seem impulsive to you?   Mr. Lee.

A.   Yes, he did.

Q.   Tell me what your thoughts were on that.

A.   All right.   There was an incident when some lunch trays were coming through, and the guard wouldn't let him have the lunch right away, and he immediately just jumped out of his chair and became extremely angry at the guard, arguing and using profanity as to why he couldn't get his lunch right then and there, and I thought that was a great example of impulsivity.

Q.   Did you observe features of manipulation in Mr. Lee?

A.   Of manipulation?

Q.   Yes.

A.   I asked him about many different incidences in his life, and I asked him, for example, you know, "Are you the kind of person that you think you can easily con people?"

    And his response to that was, "You know, it depends who it is."

Q.   Well, I'm going to ask you about a couple of particular points.   Was there evidence of manipulation relating to lunch trays or lunches?

A.   Relating to what?

Q.   Lunches.

A.   To what?   Lunches?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7921

Ryan - Direct

Q.   Yes.   Food.

A.   Food?   Okay.

Q.   Tell us about that.

A.   The guard came in, we were about to break for lunch, and they brought in a tray and said to me, "Would you like a tray as well?"

And I said, "No, I think I'll go out and get something to eat," for obvious reasons.

And Mr. Lee said, "No, no, no.  You want a tray.  You want a tray.  It's really, really good."

I said, "I really think I want to go out, stretch my legs, and get something to eat."

He said, "No, get another tray.  I want to eat it.  I want two trays."

So I got him another tray.

Q.   First of all, you have, in the testing that you utilized, there is testing -- there are means to detect whether he's faking?

A.   Yes.

Q.   You guys call that malingering?

A.   Yes.

Q.   And there was no evidence of malingering as to Mr. Lee?

A.   On one of the tests, the validity indicator profile, one of them came up invalid, but the vast majority of other measures of malingering suggested that, no, he was answering

7922

Ryan - Direct

questions and participating in the neuropsychological testing in a valid, straightforward fashion, no indications of deceptiveness.

Q.    But did Mr. Lee confide to you that as a child, he used to exaggerate his learning disabilities?

A.    Exaggerate them?

Q.    Yes.

A.    Yes.

Q.    Tell me about that.

A.    To try to kind of get out of class and to not do as much work as maybe he needed to be doing.  He really didn't like school.

Q.    You were in court when I asked, was questioning Dr. Cunningham this morning; correct?

A.    Yes.

Q.    I asked Dr. Cunningham if he was -- if Mr. Lee was stupid.

A.    Yes.

Q.    Did you hear Dr. Cunningham's reply?

A.    I heard it, but I don't know if I can tell you exactly what he said.

Q.    Well, let me ask you.  Is Mr. Lee stupid?

A.    Again, that's a layman's term.

Q.    Yeah.

A.    But based on IQ testing I did and Dr. Bianchini's, absolutely not.  He's got average intelligence.

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

Q.   Are there some features for a person who has learning disabilities that are surprising that you learned when you tested him?

A.   Yes.

Q.   Such as?

A.   His reading comprehension was excellent.  He was reading on community college level.  His learning disabilities really focused in the areas of spelling and mathematics.

Q.   That's it?

A.   Yes.

Q.   People with that type of impairment can study, can become lawyers?

A.   Most times, yes.  In fact, what happens a lot of times, except if it's a verbal learning disability, then you'd be hard-pressed to be an attorney, but a lot of times what happens to these folks are that they avoid jobs that have to do with reading or spelling or math, so they end up going into construction or pouring concrete or being an auto mechanic.  So what they do, they just circumvent the learning disability.  Learning disability doesn't go away; they just are aware of it and go into jobs that don't really tap into their disability.

Q.   Did you notice anything about glibness insofar as Mr. Lee?

A.   Yes.  It was striking that given the circumstances, he was happy and cheery and smiling, and his affect, the way he presented, didn't seem to match the gravity of the

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

circumstances.

Q.    Can you draw an inference from that?

A.    In terms of what?

Q.    His personality.

A.    I'm not sure about that question.

Q.    Okay.  Tell me about the -- tell me about the -- was there a particular thing that you noted during your interview when you first started to interview him in terms of how he acted in that room that you were interviewing him in the jail and perhaps as guards would walk by?

A.    Something in particular that happened?

Q.    Yes.

A.    Well, of course, I asked them to take the handcuffs off, and I wanted to make him as comfortable as possible, plus I had to give him some tests where he had to use his hands.  And he was very friendly with me, and I explained why I was there, what I was going to do, and that there wouldn't be any confidentiality like there usually is with a typical doctor/patient relationship, and that my report would be filed with the courts and that both attorneys, attorney for the government and his defense attorney, would get a copy.

Q.    Was there a -- were you in a room that had a window?

A.    Yes.

Q.    Could he see people that were on the outside?

A.    Yes.

Ryan - Direct

Q.   Did he react to various people that would walk by?

A.   Yes.  It was striking the way that he reacted differently. For example, I noticed that when black guards and black inmates went by, he had a lot of negative things to say and used a lot of profanity, talking about things that they were doing in jail and that sort of thing that offended him.

On the other hand, when white guards were there, he was friendly as could be.  He was waving, smiling.  Same thing with other inmates when they were walking by.  I thought that was rather striking.  It was such a dichotomy.

Q.   Did you talk to Mr. Lee about abuse, physical abuse that he may have suffered?

A.   Yes.

Q.   What did he tell you?

A.   I asked him whether he was ever abused physically, sexually, or emotionally, and what he told me was that two psychiatrists at one of the institutions that he was in didn't really like him and medicated him with Thorazine, kind of knocks you out, and that they then proceeded to have anal intercourse with him.

Q.   Two psychiatrists?

A.   Two psychiatrists, correct.  And then with regard to physical abuse, he said that in these institutions, people would frequently knock you around all the time.  That was his words.

Christa R. Newburg, RMR, CCR
United States Court Reporter

7926

Ryan - Direct

Q.    Did you ascertain anything in the record that would substantiate this claim of a rape by a psychiatrist?

A.    No, I saw nothing there.

Q.    Did you substantiate any claim that he was ever -- that Thorazine was ever used against him, on him?

A.    No, I did not see anything.

Q.    Did he tell you anything about a -- about any suggestion of molestation by a stepfather?

A.    No, he did not.

Q.    Insofar as physical abuse, and I'm not sure if I heard you, did he characterize the extent of that abuse?

A.    No.

Q.    Did he indicate that it happened when he broke the rules and gave you examples of when the discipline occurred?

A.    No, he did not.

Q.    Did he tell you something about taking a car a few times without a driver's license?

A.    Yes.

Q.    That's what I'm referring to.  Could you tell me about that?

A.    No, I didn't.

Q.    Could you share that with us?

A.    Yes.

Q.    Page 5.

A.    I was asking about his home life.  He indicated -- he said

Christa R. Newburg, RMR, CCR
United States Court Reporter

7927

Ryan - Direct

that his family life was -- they were strict with him at home, and he said, quote, I broke the rules, end quote, and that he said that he took the car a few times without asking and this is when he did not have a license.

Q.    Okay.  Did he talk to you about his drug and alcohol use?

A.    Yes, he did.

Q.    Generally, what did he tell you?

A.    That will take some time.  It was rather extensive.

He told me that with regard to alcohol, that he began drinking in fifth or sixth grade, and I asked him was there a period of time when he drank heavily, and he said that, yeah, starting around age 12 or 13, he sometimes drank daily, and that continued on until he was 17 or 18.

And then I asked him, "When was the last time that you had a drink?"  And the reason I asked that is because as a neuropsychologist, I want to know how long someone's been abstinent because, of course, alcohol can affect how someone performs on a neuropsychological test.  If they had a drink the day before they came in to see me, that can affect their performance.  Also, I want to know how extensive it was, and there have been many studies that have shown that the longer an alcoholic is abstinent, the less likely there will be permanent deficits regarding their brain functions.  So I asked him when was the last time he had a drink, and he said 15 months ago while he was in the Pope County Jail.

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Direct

And then I asked him about drugs, and he said that he started using LSD about age 13 or 14. That was the first time that he tripped. And I asked him to estimate about how many times he had taken LSD, and he said over a hundred times, easy. I then asked him when was the last time that he took LSD, and he said when he was first arrested in Oklahoma in September of 1997, he tripped while he was in jail or took LSD while he was in jail.

Q.   So -- I'm sorry. Continue.

A.   He then indicated to me that throughout his adolescence, he experimented with methamphetamine or speed, cocaine, and marijuana, and he said lots of pot, and that he smoked marijuana from the age of 13 up until about 1991. And I said, "Why in 1991 did you discontinue?"

And he said, "Well, I tried to quit doing drugs altogether."

And I said, "Why?"

He said, "That's because the skinheads frown upon that kind of thing." But then he said that he still continued to use drugs and alcohol, although not on a regular basis.

He then indicated that, of course, he huffed gasoline and Scotchguard. And I asked him how long this went on, and he said a year or two. And I asked him how old he was when he started, and he said he was about seven or eight years old.

Q.   Do I understand correctly that he indicated to you that

7929

Ryan - Direct

while he was incarcerated in the Pope County Jail on this case, he had consumed alcohol and LSD?

A.   Yes.

Q.   Did he tell you that he became intoxicated?

A.   Excuse me?

Q.   He became intoxicated at those times?

A.   Yes.

Q.   Did you observe, discuss, or try and ascertain Mr. Lee's level of -- general level of remorse related to the things he's done in his life?

A.   Yes.

         MS. COMPTON:   Your Honor, may we approach?

         THE COURT:   Yes.

     [Bench conference reported as follows:]

         MS. COMPTON:   This is going into what we talked about and I believe that you've ruled on in the motion in limine. The lack of remorse is a part of the nonstatutory aggravating factor of future dangerousness.   This is a part of his risk assessment and exactly part of what I had requested be kept out, and I thought you had so ruled.

         THE COURT:   What is the purpose of future dangerousness?

         MR. LIROFF:   I'm not doing it in terms of future dangerousness and I'm not asking for remorse as to this crime, and I will clarify that so there is no misunderstanding because

                     Christa R. Newburg, RMR, CCR
                     United States Court Reporter

7930

Ryan - Direct

the discussion wasn't relating to remorse as to this crime, but rather I was just addressing his level of violence, and they had a discussion about how he felt about having fights with people, and I'll ask the doctor to address it that way. But I'm not trying to do what you just -- what you thought I was, and I'll clarify it and make sure that it doesn't have that misconception. And I don't know if that clarifies it, but that's what I'm doing.

THE COURT: But you're talking about levels of remorse for what?

MR. LIROFF: In terms of the life he led, in terms of the fights that he's had, in terms of things that he's done as a skinhead, those type of things.

THE COURT: It's borderline, but I'm going to let you go that far.

MR. LIROFF: Okay.

[Continuing in open court:]

MR. LIROFF: If I may, I'd like to withdraw the question and rephrase it.

BY MR. LIROFF:

Q. Was it important in terms of evaluations that you were doing to evaluate whether he has a conscience? Is that --

A. Yes.

Q. Okay. And did you talk to him about things he has done as a skinhead that he would admit to, fights, people he's harmed,

Christa R. Newburg, RMR, CCR
United States Court Reporter

7931

Ryan - Direct

Q.    for the purpose of evaluating his level of remorse for those things?

A.    Yes.

Q.    And was that important diagnostically for you?

A.    Yes, it was.

Q.    What was the discussion about those issues?

A.    Well, I asked him, of course, about the crime that he was alleged to have committed.

Q.    I know, but I'm asking you -- we went towards the fights and stuff.

A.    Okay.  He got in a lot of fights from drinking, and, you know, I asked him if he ever regretted having committed any offenses, including fights, and he said no.  Then I asked him, you know, what effect had these crimes had on the victims, including the fighting.

And he said, "Well, you know the fights, just kids duking it out."

So to me, it just didn't seem like there was a lot of guilty feelings or remorseful feelings about those kind of things.

Q.    Mr. Lee know the difference between right and wrong?

A.    Absolutely.

Q.    Mr. Lee know the nature and quality of the acts that he did in 1996?

A.    Yes.

Christa R. Newburg, RMR, CCR
United States Court Reporter

7932

Ryan - Direct

Q.   Mr. Lee have any evidence of psychosis?

A.   No.

Q.   Mr. Lee have any evidence of delusions?

A.   No.

Q.   Mr. Lee have any active evidence of paranoia?

A.   No.

Q.   Mr. Lee have any evidence of brain damage that you could see?

A.   None whatsoever.

Q.   Any injury of mental illness?

A.   No.

        MR. LIROFF:  Thank you.  Thank you, your Honor.

        THE COURT:  Ms. Compton, you may cross.

        MS. COMPTON:  Thank you.

                    CROSS-EXAMINATION

BY MS. COMPTON:

Q.   Dr. Ryan, I'm a lawyer, so you're going to have to dumb it down for me real good.  Okay?

A.   I'm sorry.  Say it again.

Q.   I said I'm a lawyer, so I want you to dumb it down for me real good.

A.   Okay.

Q.   I'm also a very tired lawyer, so I want you to be patient while you're dumbing it down.  All right?

A.   I think dumbing down is the wrong word to use.

                Christa R. Newburg, RMR, CCR
                United States Court Reporter

7933

Ryan - Cross

Q.    Okay.   The first thing I'm curious about is whether before this case, did you know Dr. Cunningham at all?

A.    Yes.

Q.    How did you know Dr. Cunningham?

A.    I've worked on a number of cases where I've been retained by the government and he has been retained by the defense, and so one of the first cases or two, I introduced myself and we talked.   And I attended one of his workshops in February down in Texas.

Q.    One of the workshops where he was the presenter or the instructor and you were the student?

A.    Correct.

Q.    Okay.   Do you have regard for Dr. Cunningham and his work?

A.    I sure do.

Q.    Now, let me ask you another thing before I get into the nitty-gritty of your report, Dr. Ryan, and that is whether your report includes for the first -- I think it's four pages, although something happened on my fax machine.   For the first one, two, three, four, four full pages of your report, do you restate the entire indictment in this case?

A.    That seemed to me to be easier than putting it in my own words, just so that I stated the referral question and what my purpose was, and I wanted to just list the alleged crimes.

Q.    Why did you want to set out four pages of what the indictment alleged?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7934

Ryan - Cross

A.    I don't know if I wanted to.   It just happened that way.

Q.    You just did it?

A.    Well, yeah.   It was a lengthy indictment, and I hadn't planned on doing it that way, but it seemed easier.   I was under significant time constraints to get my report completed within just a few days.

Q.    Were you aware, for example, when you restated the indictment count by count in your report that Count 6 and Count 7 had been dismissed by the government?

A.    I wasn't aware of that.

Q.    You were not aware of that?

A.    No.

Q.    Does it have any importance to you?

A.    No.

Q.    It does not?

A.    I don't think it does, no.

Q.    Well, then why would you put the --

A.    Which count?   Count 4, did you say?

Q.    Six and seven.

A.    Six and seven.

Q.    And here's all I want to know, Doctor:   I guess I'm just trying to find out why you would restate the indictment including two counts that had been dismissed.   What purpose did that serve for you?

A.    I didn't know they'd been dismissed, but I included all

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Cross

the counts.

Q.    What purpose did it serve you?  That's what I want to know.

A.    To lay out what Mr. Lee was charged with.

Q.    Okay.  Would you agree with me that neuropsychological test results should be interpreted in the context of a patient's history?

A.    Yes.

Q.    Would you agree with me that a patient's history is very important to the test results?

A.    It's important in terms of how I interpret my test results.

Q.    Would you list for me the commonly known risk factors that might predispose a person to a worse outcome in a given neurological disorder?

A.    Head injuries, substance abuse, seizure disorders.  Those are the main ones.

Q.    All right.  Would attention --

A.    Attention deficit disorder, hyperactivity, learning disabilities, those sorts of things.

Q.    And does your review of Mr. Lee's records indicate that he had at some point in his formative years some of each of that?

A.    Some what?

Q.    Some of each of those factors that you just listed?

A.    Yeah, and I listed those in my report.

Christa R. Newburg, RMR, CCR
United States Court Reporter

7936

Ryan - Cross

Q.    That's right.  Now, how does your profession define a mild brain injury in terms of loss of consciousness?

A.    Well, there's some controversy about that, but --

Q.    How do you do it?

A.    We did a large study at the University of Virginia on individuals with mild brain injuries.  We looked at football players.  And the standard these days is anywhere from no loss of consciousness to 20 minutes of loss of consciousness, and no hospitalization.  That's generally the definition that is used.

Q.    So you can have no loss of consciousness and still suffer a mild brain injury?

A.    A concussion, yes.

Q.    Did you ask Danny specifically about injuries with loss of consciousness?

A.    Yes.

Q.    And where did you ask him that?

A.    Where did I ask him that?

Q.    I'm sorry.  Where in your report is that?

A.    It's on page 9, second paragraph.

Q.    Okay.  "When questioned regarding possible incidents of head trauma"?

A.    Yes.

Q.    What did Mr. Lee tell you about losing consciousness as a result of an injury or hit to the head?

A.    Consistent with what the other expert said.  He reported

Ryan - Cross

that while playing football in the third or fourth grade, he lost consciousness for a couple of minutes, and then he said maybe less than ten minutes.  He indicated that he was not hospitalized and, in fact, kept playing football.  Interestingly, he then denied having seizures or other neurological difficulties, which I thought was interesting.

Q.   But it's also interesting, is it not, Dr. Ryan, that the fact that he kept playing football or didn't need to be hospitalized is really irrelevant to you?  I mean, you've just told us that you don't have to go to the hospital and you can still have a brain injury?  Not necessarily that it happened in this particular instance, but it's possible, isn't it?

A.   I guess what it tells me is the level of seriousness of the brain injury.

Q.   Okay.

A.   Because if it was more serious, they would have taken him to the hospital.

Q.   While we're on that paragraph, the one that you just started with, "When questioned regarding," would you read for the jury the last sentence in that paragraph?  It starts with the word "additionally."

A.   "Additionally, Mr. Lee indicated that he," quote, "'never could pay attention, even before doing drugs.'"

Q.   End quote?

A.   End quote.

Christa R. Newburg, RMR, CCR
United States Court Reporter

7938

Ryan - Cross

Q.    So Mr. Lee told you during this history that he gave you, his personal history, that he never was able to pay attention?

A.    That's correct.

Q.    And did you not perform tests that would check to see whether he was malingering or faking?

A.    Yes.

Q.    And what were the results of those tests?

A.    As I said before, there were no indications that he was malingering.

Q.    And no indications that he was faking?

A.    Correct.

Q.    So when he told you that he never could pay attention before doing drugs, you have no reason to disbelieve that, do you?

A.    No.

Q.    Okay.  What is dementia pugilistica?  And I may not be saying it right.

A.    Dementia means a decline in functioning, brain functions. Pugilistica is fighting.  Dementia pugilistica is brain damage from -- that's what boxers get from repeated blows to the head.

Q.    All right.  And Mr. Lee reported to you a history of multiple fights, did he not?

A.    Yes, he did.

Q.    Did he report to you a history of multiple blows to the head during those fights?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7939

Ryan - Cross

A.    Yes.

Q.    In your report, I don't have the page marked, I'm sorry, but somewhere in here you talk about cognitive symptoms which are indications of brain damage?

A.    You'd have to refer me to the page.

Q.    Okay.  I'm going to find it.  I think it's on page 11.

A.    The first paragraph, under "Cognitive Abilities"?

Q.    Yes, sir.

A.    Okay.

Q.    What I want to know is whether it's the case that some neurologically impaired patients lack insight about the nature of their cognitive impairments?

A.    Correct.

Q.    Are some of your patients with brain damage, or, in fact, most of them are unable to fully be aware sometimes of just how damaged they are, aren't they?

A.    Not all of them.  A small portion of them.

Q.    A small portion of them.  Okay.  Did you ask Danny any of this, any direct questions about memory loss, incidents of memory loss that he had?

A.    Yes, I did.

Q.    In your report, Dr. Ryan, you wrote that there is no history of seizure or other neurological difficulties, and yet you had the records, the rather extensive background records on Mr. Lee, did you not?

7940

Ryan - Cross

A.    Where is that in my report?

Q.    I'm sorry?

A.    Where is that in my report?

Q.    I've got too many sticky notes.  I'll have to try to find it.  Let's do it the right way.  I'm tired and you've got to dumb it down for me.  Did you write that there's no history of seizures?

A.    No.  I indicated that he had an abnormal EEG.

Q.    What about a seizure disorder as a child?

A.    No, I did not put that in there.

Q.    Now, why not?

A.    That's because I wasn't aware of that until later.

Q.    You weren't aware that he had a seizure disorder as a child?

A.    I wasn't aware that he had febrile seizures as a child.

Q.    And when did you find that out?

A.    After my report was completed.

Q.    Okay.  Well, now that you know that he had this seizure disorder as a child, does that make any difference to you?

A.    Well, it doesn't change my opinion about the fact that he does not exhibit cognitive or neuropsychological impairment.

Q.    Okay.  But is it important to you with this or any other patient to know if he had this disorder as a child from 18 months to the age of four?  Is that important to you?

A.    It is important to me.

Christa R. Newburg, RMR, CCR
United States Court Reporter

7941

Ryan - Cross

Q.    Is it important to you that a doctor prescribed a certain dosage of phenobarbital and that the patient's mother altered the dosage?

A.    Yes.

Q.    Why is that important to you?

A.    Because the person can then continue to have seizures.

Q.    Let's talk a little bit about the -- I believe it's Dr. Long who does neuropsychological evaluation and says that Danny's got some kind of -- a portion of his IQ at 128.  Are you familiar with what I'm talking about?

A.    I'm sorry?  I didn't hear the question.  Do I have that in front of me?

Q.    No, are you familiar with it?

A.    Yes, I am.

Q.    What was the importance of this high-performance intellectual ability in Dr. Long's neuropsychological evaluation?

A.    Well, I agree there was a practice effect, I believe, that occurred; however, with brain-damaged individuals, that practice effect either is nonexistent or is very minimal.  So, for example, when I evaluate individuals, I frequently do a follow-up assessment within three months.  So I don't wait six months like other clinicians have discussed in terms of when you should repeat a psychological test, like an IQ test, and that is because with brain injuries, people get better.  And

Christa R. Newburg, RMR, CCR
United States Court Reporter

7942

Ryan - Cross

what I do is baseline evaluation to find out what their deficits are initially, and then I'll track them through rehabilitation. So three months later I'll readminister the same battery of tests. And people with significant brain damage, although there is some improvement, you don't see 20-, 30-point jumps, and that is because, as I mentioned before, new learning and memory impairment go hand in hand with brain damage. So even though they've been exposed to these materials, they don't seem to learn very well, and that's because of memory impairment.

Q.    But you --

A.    Now, with a normal person, you would expect to see that, that practice effect much more pronounced.

Q.    You do know what practice effect is?

A.    Yes.

Q.    You know what we're talking about. And it is common, is it not, Doctor, that you don't want to repeat the same test too closely to one that's already been performed, is it not?

A.    That really depends. For example, if I'm doing a dementia evaluation where I suspect Alzheimer's disease, I may repeat the same test in a three-month period or a six-month period. If it's a brain injury and I'm tracking them through rehabilitation, oftentimes it's three-month, six-month and 12-month neuropsychological examination.

Q.    Okay. When you looked at this report from Dr. Long with

7943

Ryan - Cross

the sort of increased level of functioning, you were also

aware, were you not, of the prior testing in October of '97 --

I mean '87 by Dr. Emil Karp, were you not?

A.    Yes.

Q.    And do you recollect what the scores on Dr. Karp's tests

just three months earlier were?

A.    I don't recollect.  I believe the performance IQ was 88

and I think his verbal IQ was within the average range, and

full scale IQ was also average.

Q.    94?

A.    Yes.

Q.    And what's the indication of the 88 on the verbal?

A.    88 is low average.

Q.    Okay.  I'm looking now at page 12 of your report,

Dr. Ryan, under the caption called, "Memory and Learning."

Similarly to Dr. Bianchini's findings, you did find one memory

score that was very low, did you not?

A.    Yes, I did.

Q.    And if you will, it's right in the middle of that -- well,

actually, it's more toward the bottom of the paragraph after

you do the percentiles?

A.    Yes.

Q.    Starts with, "He did experience."  Would you just read

that statement to the jury?  "He did experience some" --

A.    "He did experience some difficulties with regard to

7944

Ryan - Cross

immediate visual recognition memory (1st percentile)."

Q.    What does first percentile mean?

A.    That's probably the lowest score you can get.  It is the lowest score you can get.

Q.    That's as low as it goes?

A.    No, you can be below the first percentile, but that's pretty much the bottom of the barrel, although there were some extraneous distractors outside the examining room during this particular portion of the assessment.

Q.    And you've told us about that, and it's distracting at the jail.

By the way, you said that Danny wanted you to stay and eat with him, and you said, no, you figured you'd go out, for obvious reasons.  What -- I didn't get the obvious reasons.

A.    I wanted to get some fresh air and step out for a little bit, stretch my legs.

Q.    Did you want to eat at a restaurant instead of the jail?

A.    Did he eat at a restaurant?

Q.    Did you want to eat at the restaurant instead of the jail?

A.    No, I didn't want to eat at all.  I'm on a funny diet.

Q.    All right.  Let me talk to you now just to wrap up.  I think that I've covered everything in your report that I want to talk about.  I said I think.

No, I'm sorry.  I missed one thing, Dr. Ryan.  Let's look at page 6 again.  This is the results of the sleep-deprived EEG

Christa R. Newburg, RMR, CCR
United States Court Reporter

7945

Ryan - Cross

on February 15 of 1988.

A.    Yes.

Q.    Is this what I'm about to read to you your interpretation, or is this somebody else's:  "Impression was of an abnormal EEG.  This sleep-deprived EEG 'showed partly spiking wave bursts happening during awakening, hyperventilation, post-hyperventilation and drowsiness, suggesting a generalized seizure disorder, possibly arising from midline structures.'"

      Is that your quotation or somebody else's?

A.    That is the quotation from the actual reading of the EEG.

Q.    So would that have come simultaneously with when the EEG was performed on February 15 of 1988?

A.    Whoever read the EEG wrote that.

Q.    Okay.  With a history, Dr. Ryan, of multiple mild brain injuries, which you've acknowledged -- is that right?

A.    Well, no, I wouldn't say that.

Q.    You don't say that?

A.    I say that he's had multiple blows to the head, but to actually classify it as a brain injury is a totally different thing.

Q.    Okay.  Let's stay then with a history, which you acknowledge, of multiple blows to the head.

A.    Yes.

Q.    And you acknowledge repeat neurotoxic exposures, the huffing?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7946

Ryan - Cross

A.    Substance abuses, yes.

Q.    You acknowledge a prior history of seizure disorder?  You do now that you know about it.

A.    Yes.

Q.    You acknowledge this abnormal EEG.

A.    Yes.

Q.    And you acknowledge that Danny had attention deficit disorder?

A.    Yes.

Q.    You acknowledge that he had a learning disability?

A.    Yes.

Q.    Absent anything else and just those, just those things, with your training and your experience, you wouldn't be surprised, would you, if someone with that history had some brain damage, however mild, would you?

A.    Frankly, ma'am, I was shocked that the testing came out as normal as it did.  I fully expected to find brain damage here.  Now, I go into a case as unbiased as I possibly can.  Okay?  And given what I knew about his history, I didn't know about the febrile seizures, but I did know about the abnormal EEG, I knew about the polysubstance abuse, and I knew about the fighting.  I fully expected to find somebody who had significant brain damage, and I did not.

Q.    And it wouldn't have surprised you whatsoever if you did?

A.    That the neuropsychological testing would be abnormal?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7947

Ryan - Cross

Q.    Yes.

A.    No, that wouldn't have surprised me at all.  What really surprised me was that it was completely normal.

Q.    I understand that, but what I'm trying to get from you is, you would not have been remotely surprised, given this history which is proven up in the records, to find some brain damage, however mild, would you?

A.    No.

MS. COMPTON:  Okay.  Thank you.

THE COURT:  Anything else?

MR. LIROFF:  A couple questions, your Honor.

REDIRECT EXAMINATION

BY MR. LIROFF:

Q.    You told us that you became aware of the febrile seizures, seizures as a child during fever, you became aware of those more recently?

A.    Yes.

Q.    If those seizures had caused brain damage, would your testing disclose that damage?

A.    Yes.

Q.    You told us what the suggestion was from the EEG report suggesting a possibility of results based upon seizures.  If that EEG report accurately reported brain damage, would your testing have validated that?

A.    Absolutely, especially the fact that what the EEG showed

Christa R. Newburg, RMR, CCR
United States Court Reporter

7948

Ryan - Redirect

was generalized disruption of brain functions, not something lateralized, not something on the right side of the brain or the left or the front or the back, but generalized impairment. And there were no indications, of the three neuropsychological assessments performed, one by myself, one by Dr. Long, one by Dr. Bianchini, that there was any kind of generalized cognitive impairment, none whatsoever.

Q.    So with your experience as a psychoneurologist, there is no evidence of brain damage in this case?

A.    None.

Q.    You were asked a question about your regard for Dr. Cunningham.  And I understand professional courtesies, but I guess I'm curious to ask what that means, that you hold him in some regard.

A.    I respect him and I respect his work.  I don't agree with everything that he does or his views, but I respect his scientific approach and his honesty, and that's what I meant when I -- I respect him as a colleague.

Q.    Has he expressed today that you saw opinions that you thought were wrong?

A.    That I wouldn't agree with.

Q.    Did he express opinions that you believe to be substantially minority opinions?

A.    Yes, particularly the fact that inferences about the wiring and brain tissues.  I think that should be reserved for

Christa R. Newburg, RMR, CCR
United States Court Reporter

Ryan - Redirect

a neuropsychologist.

Q.    Did he express opinions that you believe were unscientific?

A.    Were unscientific?

Q.    Yes.

A.    Can you be more specific about what those --

Q.    He talked at one time about scoring a particular test, and without going into that --

A.    Yes.

Q.    -- did you consider that to be a wholly unscientific answer?

A.    I don't know if I'd use the word "unscientific."  I think I would disagree on the grounds that this one particular test, the author indicates a cutoff score and does not discuss the standard error of measurement and what it should be.  For example, in my clinical practice, I don't use two standard deviations to make diagnoses on neurological conditions.  It doesn't have to be two standard deviations in order for me to say there's something clinically wrong with the patient.

So it seemed to me to be a very stringent approach, and I understand the gravity of the situation considering it's a capital case, but I have not seen that figure of 37 on that one test anywhere else.

Q.    And again we're being very oblique, but I appreciate that.  There is no literature that supports that opinion?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7950

Ryan - Redirect

A.    I have not seen it.

MR. LIROFF:  Thank you.

MS. COMPTON:  Your Honor, I forgot one thing. It's --

THE COURT:  Go ahead.

RECROSS-EXAMINATION

BY MS. COMPTON:

Q.    I'm sorry, Dr. Ryan.  I started out tired and I'm real tired.

A.    Sure.

Q.    You are being paid by the government for coming here, are you not?

A.    Of course I am.

Q.    And what is your rate for performing these tests and doing these interviews?

A.    $225 per hour.

Q.    And what is your rate for testifying live in the courtroom like you're doing right now?

A.    $2,000 a day.

Q.    I'm sorry?

A.    $2,000 a day.

Q.    $2,000 a day?

A.    Right.

Q.    And then you charged the $210 an hour or the 2,000 a day for sitting over here in the back of the courtroom?

Christa R. Newburg, RMR, CCR
United States Court Reporter

7951

Ryan - Recross

A.   No, for everything I do, except for being in the courtroom and testifying, my fee is 225 per hour.  For being in the courtroom, consulting with the attorneys before court and after court, which ends up most times being 10 or 12 hours in a day --

Q.   Right.

A.   -- my fee is $2,000.

Q.   Okay.  So you've been here most of this week sitting in the courtroom, have you not?

A.   This is the second day I've been here.

Q.   Oh, just the second day?

A.   Yes.

Q.   You got $2,000 yesterday and 2,000 today?

A.   Yes.

Q.   In addition to the 210 an hour that you were getting --

A.   $225 an hour.

Q.   $225.  Okay.

        MS. COMPTON:  That's all.  Thanks.

        THE COURT:  All right.  Doctor, you may stand down.  Anything else?

        MR. LIROFF:  No, your Honor.

        THE COURT:  The government rests?  Anything more from the defendant?

        MS. COMPTON:  No, your Honor.

        THE COURT:  Both parties have rested.

                    Christa R. Newburg, RMR, CCR
                    United States Court Reporter

7952

All right.  Ladies and gentlemen, all of the evidence and the information permitted in a case of this type is before you.  It's a quarter 'til five, so what I'm going to do is let you go for the evening.  When we come back in the morning, we'll be in a position to have the attorneys argue the case to you, and you'll get the case shortly thereafter.  We're preparing the instructions.  I'm not going to read you the entire 29 pages.  Almost exactly what you've seen before.  But they will go with you to the jury room.  I will have a short, abbreviated, maybe a couple of page summary to give you before you retire to consider the issues.

All right.  You may now leave, ladies and gentlemen.  Be back in the morning at 9:30.  No, be back in the morning at 9, please, nine o'clock.  Everyone understand that.

(Jury exited the courtroom.)

THE COURT:  All right.  The jurors are out.

We will now hand you a set of the capital final instructions which have been altered to reflect that this is the penalty phase for Mr. Lee, and they have been altered also to show the mitigating factors which the defendant has -- is now asserting, and those have been corrected after conference with defendant's attorney.  I think they're almost identical to what we started out with at the beginning of this hearing.  So you can look at them.  If you find anything wrong, you should tell me.

Christa R. Newburg, RMR, CCR
United States Court Reporter

7953

We have also handed to you Special Verdict Forms No. 1 for William Mueller, No. 2 for Nancy Mueller murder, and No. 3 for the Sarah Powell murder, and they essentially are the same as with Mr. Kehoe, except, once again, the mitigating factors have been changed to reflect those being urged by the Defendant Lee. Look them over. I'm going to assume that they're satisfactory unless you tell me to the contrary in the morning.

Court will be in recess.

(Overnight recess at 4:47 p.m.)

_____

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Christa R. Newburg_

Christa R. Newburg, RMR, CCR
United States Court Reporter

Date:  May 14, 1999

Christa R. Newburg, RMR, CCR
United States Court Reporter