7760

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

United States of America,          Docket No. LR-CR-97-243

                  Plaintiff,    Thursday, May 13, 1999
                                Little Rock, Arkansas
vs.                             9:15 a.m.

(2) Daniel Lewis Lee,

                  Defendant

VOLUME 46
TRANSCRIPT OF JURY TRIAL
BEFORE THE HON. G. THOMAS EISELE,
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
On behalf of the Plaintiff:
    MR. DAN STRIPLING, Assistant U. S. Attorney
    MR. ROBERT DE LA CRUZ, Department of Justice
    MR. LANE LIROFF, Department of Justice
       United States Attorney's Office
       TCBY Building
       425 West Capitol Avenue, Suite 500
       Post Office Box 1229
       Little Rock, Arkansas 72203-1229

On behalf of the Defendant Lee:
    MR. JACK T. LASSITER, Attorney at Law
       Hatfield & Lassiter
       401 West Capitol Avenue, Suite 502
       Little Rock, Arkansas  72201-3437
    MS. CATHLEEN V. COMPTON, Attorney at Law
       221 West Second, Suite 701
       Little Rock, Arkansas  72201

Defendant Lee present

Proceedings reported by machine stenography; transcript produced by computer.

Pegge J. Merkel, RMR
United States Court Reporter

1

THE COURT:  Good morning.  All right, we're in the courtroom and the jury is supposed to be back at 9:30, and we're in the middle of the cross examination of Dr. Cunningham involved, I guess started cross examination of Dr. Cunningham, and this morning I found the defendant Lee's motion in limine that was referred to by Ms. Compton yesterday.

I should point out that it mentions that it is attaching a copy of Dr. Bianchini report, but I don't think that was attached.  I think the original that we got had two copies of Dr. Ryan's, report but in any event that's not that important.

Now, has the government a formal response to make to this?

MR. LIROFF:  Yes, Your Honor.

THE COURT:  You can make it orally?  All right.

MR. LIROFF:  Your Honor, I received this probably as you did, at about 8:20, 8:30 and had an opportunity to collect my thoughts but not put them on paper and I apologize.

THE COURT:  Just state them for the record.

MR. LIROFF:  Thank you.  Your honor, I spent a lot of time last night and this morning thinking about this question, and I'm prepared to tell you that the government is not going to present evidence in this case

2

of Dr. Ryan's risk assessment evaluation of defendant Lee.  That said, however, I want to point out some things that I believe doors that were opened by the presentation by the defense through Dr. Cunningham.

Looking at DL-46-1 entitled, "What accounts for the differences in outcome," Dr. Cunningham testified to factors which he contributed to Lee's behavior, in other words, how he became the person who he is.  He talked about trauma.  He talked about predisposing contextual factors.  He talked about protective factors and he did this all in a psychological framework freely rendering psychological opinions and buttressing it with support from authorities.

We submit that Dr. Cunningham is wrong.  We contest some of the facts and, more importantly, we contest the importance of those facts that Dr. Cunningham has presented.

Relying upon the same facts which were utilized by Dr. Cunningham, Dr. Ryan concludes that Mr. Lee is a psychopath.  The term psychopath is a psychological term. It is not the term, a generic term that you may see in your dictionary.  The finding that Lee is a psychopath arises from the same conduct detailed by Dr. Ryan and influences, excuse me, detailed by Dr. Cunningham.

Now, studies show, as Dr. Cunningham testified

Pegge J. Merkel, RMR
United States Court Reporter

3

to yesterday, that a diagnosis of attention deficit disorder puts a person at substantial risk for having a conduct disorder, and that I would refer to the Court and counsel to DL-46-32.

I want to talk to Dr. Cunningham about what a conduct disorder is. He made reference to that in DL-46-33. The important thing, Your Honor, is this, that a person who has attention deficit disorder is at this risk from becoming and developing a conduct disorder regardless whether he is in a disfunctional household or a nurturing, caring environment and that -- and I will stress this again and that fact contradicts the entire thrust of the Cunningham presentation, and that issue I believe I have the right in cross examination, but depending upon the answer in rebuttal, to dispute the opinions given by Dr. Cunningham.

If a person develops a diagnosis of a conduct disorder, as was identified by Dr. Cunningham from Mr. Lee, that person then is at substantial risk and, Your Honor, as opposed to the risks that were identified by Dr. Cunningham, we are talking about substantial risk of developing a diagnosis of antisocial personality disorder, or in the alternative, they are very similar, psychopathy or psychopath. Dr. Cunningham identified that substantial risk in his presentation DL-46-34.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

4

I want to talk to Dr. Cunningham about the risk that a person will develop an antisocial personality disorder or psychopathy. Now, Dr. Cunningham has authored an article himself in which he expresses the opinion that the term antisocial personality disorder is limiting and perhaps not the best term to use, and I think I'm not adequately describing it. He's very critical of the term antisocial personality disorder. But Dr. Cunningham, in his own article, has stated that the term psychopathy is a superior, superior diagnostic term.

So Dr. Cunningham's opinions, when you delve into either his prior testimony, prior presentation, but in particular one specific article that he as authored, he's the person who says antisocial is the wrong term and psychopathy perhaps is a better term. So I think because of his prior expressed opinions, I have the right also to evaluate that.

Now, and I don't know if I stated this, a person can become a psychopath regardless of whether he is in a nurturing environment or not. In fact, if I may, I want to read one portion of a passage of a book that was written by Dr. Hare, H. A. R. E. You are going to hear some, I imagine, in this case about Dr. Hare. He is a Canadian psychologist who is a leading authority in this area, and in fact developed the Hare psychopathy check

5

list revised which Dr. Cunningham has, in his own writings, described as an exciting new technique, and I can tell you my understanding of mainstream psychology is in the last 20 years the Hare psychopathy check list is the most exciting technique in the area of forensic criminal psychology.  But the Hare psychopathy test is not like the typical test that you may understand or expect. In fact, it's a test that looks at the same data that Dr. Cunningham spent two hours on direct examination detailing.  This is the part I want to read from Dr. Hare's book entitled, "Without a Conscience."

"It is true that the childhoods of some psychopaths were characterized by material and emotional deprivation and physical abuse.  There is, excuse me, "But for every adult psychopath from a troubled background, there is another whose family apparently was warm and nurturing and whose siblings are normal, conscientious people with the ability to care deeply for others. Furthermore, most people who have horrible childhoods do not become psychopaths or callous killers.  Illuminating as they may be in other areas of development, the argument that children subjected to abuse and violence become abusive and violent adults are of limited value.  There are deeper more illusive explanations why and how psychopathy emerges."

Pegge J. Merkel, RMR
United States Court Reporter

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

6

If Dr. Cunningham has expressed opinions that are in the mainstream psychology, I think in cross examination, and I think in rebuttal, I have the opportunity to expose this.  This was the absolute core of his presentation, and my answer to that is he has been selectively wrong, and I think I have a right to show that.

I also want to point out that Dr. Cunningham has received Dr. Ryan's's report, and in Dr. Cunningham's report he details the fact that he has seen Dr. Ryan's report, and yesterday on direct examination, yesterday on direct examination, not cross, Dr. Cunningham himself acknowledged that he had received the report and in fact made reference to a psychological diagnosis alluded to by Dr. Ryan and misrepresented that diagnosis.  In fact, Dr. Cunningham suggested that Dr. Ryan had made a finding of paranoia.  That characterization is wrong and the fact that he has misrepresented Dr. Ryan's finding is another grounds that should allow me to introduce through Dr. Cunningham, and potentially through Dr. Ryan, the fact that he has made that misrepresentation.

But the fact is this, Your Honor.  We are not bringing in something different.  In fact, we have two psychologists who are looking at the same field, and they are reaching different opinions and different conclusions

7

based upon their observations.

If the defense has presented particular opinions, we have the right to dispute that opinion and in fact to rebut it. And, Your Honor, that's my presentation.

THE COURT: Well, you know, the technical issue that we're dealing with here is not whether you have the right to show these tendencies that he's a psychopath, that he has these risk assessments which suggests that he's going to be dangerous in the future but that you had the burden of proving that beyond a reasonable doubt in your case in chief. You chose not to put that on. And so now, maybe you anticipated Dr. Cunningham was going to deal with those issues, and that you would then use him in true rebuttal. But since the defendant did not choose to do that, and as I understand it, Dr. Cunningham did not actually examine him for risk factors or conduct this type of, like the Hare psychopathic check list test and made no statements, as I understand it or recall, that he was or was not a psychopath.

So I guess the question is -- now, I think you are right. If he mentions Hare's report and mischaracterized it, clearly you are going to have a chance to cross examine him about it. Whatever he testified to, you know, you can cross examine him about,

but you can't, you know, you have already jumped on the question of future dangerousness. They did not choose to deal with that. They picked up on his early youth. Basically that was the first point you made on cross examination, you have dealt with him as a person 17 years of age and younger, what about him now, and that's exactly what apparently they decided not to do is to talk about him now, and there is an indication in the motion that Dr. Cunningham made no investigation or test to conduct, to determine his present condition and to answer these various questions about future dangerousness.

Let me hear from Ms. Compton in response. I think certain things he said are absolutely right. He mentioned that Dr. Cunningham talked about conduct disorder and, you know, that people are at a risk of conduct disorder under certain circumstances. Go ahead and respond. You can take the lectern.

MS. COMPTON: Your Honor, as I tried to say last night, and I was very tired and not a whole lot better this morning, but I tried to make it abundantly clear that if the government wants to cross examine Dr. Cunningham on something that he said, I don't have any way to object to that and I do not.

If the government wants to put on Dr. Ryan in pure and true rebuttal, I don't have any way to stop that

9

and don't want to try.

What worries me from a reading of Dr. Ryan's report is this.  It appears to me that Dr. Ryan, who came into this case very, very late, Dr. Ryan spent the first four pages of his report detailing the indictment.

THE COURT:  I know.

MS. COMPTON:  And then sort of skips over some very important things such as seizure disorder and abnormall EEG and goes straight into risk assessment and he almost immediately gets into psychopathy.

THE COURT:  Counsel has already acknowledged that it would be improper to go into risk assessment and doesn't intend to do so.  So focus a little more narrowly on the other potential issues.

MS. COMPTON:  Here is the problem though.  I can assure the Court that where Dr. Ryan wants to go is the psychopathy.  They want to be able to call Danny a psychopath; that is the purpose of all of this.  The way they get there is through risk assessment, not through early childhood development, not through those things Dr. Cunningham has detailed in his direct examination.

The way that Dr. Ryan gets to the word psychopath, which is what Mr. Liroff wants to say to this jury over and over again in his closing argument, because it's a very pejorative term, is through risk assessment.

That's what Dr. Ryan did.

THE COURT:  Let me ask you a little more pointedly.  I'm going to read from this paragraph.  "Mr. Lee was administered the Hare psychopathic check list revised PCL-R 4-24-99."  Hare is the name of the doctor, so apparently he devised the test.

MS. COMPTON:  That's right.

THE COURT:  Check list rather.  Does the check list, in other words, to add up these points, is he using the results of his risk assessment?  Have you seen the more particular report, the Hare psychopathy check list?  Have you seen that?

MS. COMPTON:  Yes, sir.  I have Dr. Ryan's Hare PCL-R which is the check list and it's got -- the left-hand side says possible ratings, right-hand side says rating item.  And he goes through several pages of this to get to the score that he uses to make this determination that Danny is a psychopath and, obviously, I'll go into it or won't, there are several problems with the subjectivity of the scoring and who the scorer is.  So we can go into that if you want me to but yes, I have his raw test results.

THE COURT:  And do those items involve the work that he did on the risk assessment in terms of future dangerousness to add up, to come up to with these points,

11

34 points to score him as a quote "psychopath"?

MS. COMPTON:  He does use the risk assessment analysis to get to where he goes.

THE COURT:  Show me that a little bit.

MS. COMPTON:  This is the only copy I have.

THE COURT:  Just read the portions.

MS. COMPTON:  I'll give you an example, and I may be doing this backwards.  He gives -- he can score zero -- zero is no, one is maybe, two is yes and X. is omit.  On grandiose sense of self-worth Dr. Ryan reports a 2.

Now, there's not any way in the world Dr. Ryan comes up with a grandiose sense of self-worth on Danny Lee from his background or childhood.  We all know that.  So he has to have come up with grandiose sense of self-worth and scored it the highest possible score simply from his interview with Danny when he does his risk assessment.

I think, again, lack of remorse or guilt, which is directly tied to an aggravated factor which has been raised by the government which the Court will instruct on. Lack of remorse or guilt again is only tied to his risk assessment as a future danger.  The non-statutory aggravated future dangerousness addresses lack of remorse or guilt.  So that strictly has to do with future dangerousness and the risk assessment for that future

Pegge J. Merkel, RMR
United States Court Reporter

12

dangerousness.

Dr. Ryan gives a score of 2 on the rating item called callous and lack empathy.

THE COURT: What was the first word?

MS. COMPTON: Lack of empathy.

THE COURT: No, something and lack of empathy.

MS. COMPTON: Callous.

THE COURT: Callous? Go ahead.

MS. COMPTON: Which again can only come from his visits with him in the jail and some testing he did at the jail for risk assessment and obviously doesn't come from Danny's background, because we now know that Danny was kind to his stepsister who had cerebral palsy and did several things that are absolutely unrelated to psychopathy.

We've got -- he scored a 2 on poor behavioral controls and that's easy. I mean, we all know, anybody that's been in the courtroom, that Danny has had behavior control problems; so he could have pulled that back from his background but I think he also used it for risk assessment.

Promiscuous sexual behavior using -- I guess that's because he had sex with women he wasn't married to or something. I don't even know about that. Again, I don't think it comes from anything in his childhood or

Pegge J. Merkel, RMR
United States Court Reporter

13

adolescence that Dr. Cunningham touched upon. We know that he had relationships with two women.

Early behavior problems, he scores a 2. That's a no brainer. We all know that from the earlier testimony, and I don't know if I'm answering the Court's question properly or not. Here is one, there's a high score, number 2, on juvenile delinquency and that's obvious and does come from his background and not risk assessment. There's one called criminal versatility and I don't know what that means, so I can't really address it.

And another thing, Your Honor, Dr. Ryan knows how many points it takes to get to psychopathy when he is scoring this, and if the Court, you've got his report, I guess you've got it twice since I gave you two of those and none of Dr. Bianchini's, but beginning at page 15 of Dr. Ryan's report --

THE COURT: That's the risk assessment page there.

MS. COMPTON: That's risk assessment. The first full paragraph, I mean, I'm sorry the second full paragraph that begins with, "Dispositional factors within Mr. Lee's background regarding violent recidivism," talks about that. He talks about relative youth.

"An additional dispositional factor" on fifth line "factor is that Mr. Lee scored high on the PCL-R and

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

14

is classified as a psychopath." This is a part of his risk assessment.

THE COURT: Well, regardless of whether that is tied together or not, this psychopath thing is evidence that was not brought on by the government in its direct case and was not alluded to by Dr. Cunningham in his examination. Am I correct in that? Was there any allusion to his being or not being a psychopath? I think he'sactually been cross examined in which he in effect said he made no such test.

MS. COMPTON: That's right.

THE COURT: So it was an issue that was raised in opening statement as to what the government was going to do and it all bears on one issue, future dangerousness. That's the issue that all of this is relevant to or which the government is attempting to bring it in for. So is it proper cross examination, first, and beyond that would the testimony be appropriate rebuttal? Is Dr. Cunningham handy?

MS. COMPTON: He is.

THE COURT: I want to ask him a few questions before we get back before the jury about -- let me make this point before he comes in. Just a moment please. I have an attitude about experts. Let's say defendants hire an expert, or the government hires an expert, and says

conduct these broad number of tests and give me answers to all these questions. His report comes back to defense attorney. Part of it is wonderfully favorable, the other part is charitably harmful. So I want to put him on and I want to limit it to what is favorable. And so I've always had the attitude that when that man makes these tests and does this investigation, it cannot be said that it did not influence his other findings. In other words, if this is a total picture, then the cross examiner should be able to pick up on what he actually did and cross examine him about it.

Now that does go beyond the scope of direct examination but it is, because it's one investigation of a particular person, and it's not fair to the jury to let some of it in and not let the other in, at least to show how it might impact upon the positive part that the attorney wanted to put before the jury.

So what I want to ask Dr. Cunningham, first of all, I want to question him about what tests he did and what evlauation he's made as by way of background, because my first problem is the question of cross examination and whether it should be limited. I'm inclined to think it should be.

MR. LIROFF: I'm sorry, I didn't hear what the Court just said.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

THE COURT: I said I'm inclined to think there should be some limits on cross examination, depending probably on what Dr. Cunningham says about what he did in the way of evaluation and testing.

So, let me put Dr. Cunningham on for a minute. I'm going to ask him a few questions, because I'm going to use them as a predicate for some of my decision making on the appropriate scope of cross examination. Bring him in please.

(Witness enters courtroom).

THE COURT: Dr. Cunningham, if you will just take the stand. The Court wants to ask you a few questions which has some purpose on the issue of cross examination and other issues presented to the Court for resolution.

THE WITNESS: Yes, sir.

THE COURT: I'm looking at Dr. Hare's report and in it he identifies quite a few tests that he, excuse me, Dr. Ryan. Dr. Ryan made quite a few tests made upon the defendant Lee.

THE WITNESS: Yes, sir.

THE COURT: Let me ask you if you made any of these tests. Here we have the first section I'm looking at is the neuropsychological measures, and he uses, the first one mentioned, is a Benton Visual Form

17

Discrimination test.

THE WITNESS:  No, sir.

THE COURT:  The second one mentioned is the Halstead-Reitan Neuropsychological Test Battery.

THE WITNESS:  No, sir.

MR. LIROFF:  Your Honor, I really hate to interrupt.  There are two things here.  I haven't had an opportunity to address the second part.  Dr. Ryan is a neuropsychologist.  All these tests you related to, this witness is not qualified to test --

THE COURT:  Whether he's qualified for not, I want to find out whether he did them, and you can certainly make a response after I go through this and tell me why it's important or not important in terms of cross examination.  But you are acknowledging he didn't do these tests and in fact you are further acknowleding he's not qualified to do these tests, but I want to be sure for the record, though.  The Kaufman Brief Intelligence Test.

THE WITNESS:  No, sir.

THE COURT:  The Peabody Individual Achievement Test-Revised.  That's reading comprehension.

THE WITNESS:  No, sir.

THE COURT:  The Lafayette Grooved Pegboard Test.

THE WITNESS:  No, sir.

THE COURT:  The Memory Assessment Scales.

18

THE WITNESS:  No, sir.

THE COURT:  The Wisconsin Card Sorting Test.

THE WITNESS:  No, sir.

THE COURT:  Under Motivational measures, the Rey 15 Item Memory Test.

THE WITNESS:  No, sir.

THE COURT:  And the Rey Dot Counting Procedure.

THE WITNESS:  No, sir.

THE COURT:  And the Test of Memory Malingering.

THE WITNESS:  No, sir.

THE COURT:  Now, under the psychological evaluation he identifies, beside the clinical interview, certain tests, and I don't know if it's a test or not but it has a formal name, Structured Interview of Reported Symptoms.

THE WITNESS:  No, sir.

THE COURT:  Do you recognize that as a formal --

THE WITNESS:  Yes, sir, it's the SIRS.

THE COURT:  S.I.R.S?

THE WITNESS:  Yes, sir.

THE COURT:  The next one is the Validity Indicator Profile.

THE WITNESS:  No, sir.

THE COURT:  Then the Minnesota Multiphasic Personality Inventory.

Pegge J. Merkel, RMR
United States Court Reporter

19

THE WITNESS:  No, sir.

THE COURT:  And the Hare Psychopathy or psychopathy check list revised PCL-R.

THE WITNESS:  No, sir.

THE COURT:  Now, did you make any other -- did you do any further analysis in terms of your investigation of the defendant Lee to make a determination as to whether he would be a quote "psychopath" unquote?

THE WITNESS:  No, sir.

THE COURT:  And did you -- listening to you it sounded like most of what you were testifying to had to do with his from birth to age about 17.  I don't know, there may have been beyond that, but most of it apparently that you dealt with were information that related to that age period, is that correct?

THE WITNESS:  That's correct, sir, formative factors.

THE COURT:  The formative factors.

THE WITNESS:  Yes, sir.

THE COURT:  Now he's 26 years old now.

THE WITNESS:  Yes, sir.

THE COURT:  I suppose you did interview him.

THE WITNESS:  Yes, sir, I did.

THE COURT:  Were you able or did you make any effort to evaluate his current condition with respect to

20

his future dangerousness after he's incarcerated?

THE WITNESS:  Yes, sir, I did interview him regarding the issues that would be relevant to that topic.

THE COURT:  What were some of the things that you dealt with?  Has that come out in your testimony?

THE WITNESS:  No, that was not my testimony but that much was part of my evaluation.

THE COURT:  And did you do any testing for that purpose or did you just -- was that -- what did you do for the purpose of -- I gather you made some kind of assessment of future dangerousness.

THE WITNESS:  Yes, sir, I did.

THE COURT:  What did you do for that?

THE WITNESS:  I reviewed his records of incarceration, both the current record of incarceration as well as prior jail incarcerations, and also his record while he was in various juvenile facilities to try to get some understanding of the way in which he responded to a structured setting because there was increasing degrees of structures as we move into a jail setting.

I interviewed him regarding his total life history for the purposes of trying to identify, not only the mitigating factors that I spoke to, but also the role that aggression played in his life in other kinds of -- in what context and under what stimulus or under what

Pegge J. Merkel, RMR
United States Court Reporter

21

provocation.

I reviewed materials, statistical material, regarding research studies that had been done looking at the follow-up of capital offenders and other prisoners in custody. I reviewed statistics from the Bureau of Prisons and sought many more statistics that were not made available to me that were also going to be relevant to that violence risk assessment.

I think those are the primary components, the research, the interview, and the records review.

THE COURT: Now, if you had known that you were going to be asked to testify as to risk assessment and future dangerousness as such if he's committed for life without parole --

THE WITNESS: Yes, sir.

THE COURT: -- would that form an adequate basis for your opinions?

THE WITNESS: It would form an adequate basis for me to testify about risk assessment in a broad sort of way. There was some very specific statistical information that I sought in terms of individualizing that risk assessment to him that had to do with the frequency of serious violence exhibited by white supremacy groups. The statistical information that I was provided dealt with a much broader range of disruptive and management behavior

22

problems out of that white supremacy group and didn't give me the specific information that I desired as I tried to compare him to a white supremacist and what risk of serious violence they represented in federal custody.

And so I'm able to individualize it to him to some degree but I'm quite concerned about the absence of that data from that comparison group. I can compare him to capital offenders. I can compare him to general Bureau of Prisons inmates and inmates in maximum security or high security in the Bureau of Prisons. I had desired to have specific base rate information about white supremacists as a group, not just disruptive behavior but seriously violent behavior, and that information was not made available to me.

THE COURT: That was sought, is that correct, Ms. Compton?

MS. COMPTON: Yes, sir.

THE COURT: Doctor, I'm going to let you step outside for a few minutes and we'll be proceeding shortly.

THE WITNESS: Yes, sir.

(Witness exits courtroom).

THE COURT: You wish to make a further response?

MR. LIROFF: May I, Your Honor?

THE COURT: You may.

MR. LIROFF: Because Ms. Compton advised the

Pegge J. Merkel, RMR
United States Court Reporter

23

government that she was using Dr. Cunningham for the purpose of evaluating and doing a risk assessment as to this defendant, Dr. Ryan was instructed to do a risk assessment. He was also instructed to do a neuropsychological evaluation, and we haven't even addressed that here today, but clearly the defense has opened the door to whether or not there are neuropsychological deficits with Mr. Lee, and Dr. Ryan has opinions about that, and the first tests that you talked about were all related to that and either similar or comparable tests were done by Dr. Bianchini.

THE DEFENDANT: I can't focus on those issues. I haven't seen Dr. Bianchini's report yet.

MR. LIROFF: That's fine. But counsel's presentation to the Court put the cart before the horse. She suggests that the risk assessment provides the foundation for evaluation in the diagnosis of psychopathy and that's wrong, and they are entirely severable.

THE COURT: Assume they are severable. The question still is, is it rebuttal.

MR. LIROFF: I can tell you why it's rebuttal. The rebuttal is this, because the presentation by the defense is that, it says it right in their opening brief at the bottom of page 1, "His expert opinion was that there were a number of factors of Danny Lee's life that

24

broadly and negatively impacted on Danny's neurological, social, psychological and ethical development" and the point is that those same factors show that there is another explanation what's going on with Danny Lee, and they are trying to say he was battered, that caused his behavior.

And what I'm trying to say and establish, and will through cross examination, at this point through cross examination, is that there is another bona fide psychological explanation as to what's going on.

They've opened that door. They've put that in issue. They are the one who talked to ADD. They are the ones who have said that ADD presents a risk of conduct disorder. They are the ones who said that conduct disorder presents the risk of antisocial personality disorders. They are the ones who said that that is there. They've established that with other factors.

What they tried to do is say but we think the situation in the home, we think the predispotion towards alcohol, we think that's more important in this case.

If that's what they've said, I want to, in cross examination of this doctor, suggest that there may be a different interpretation, and that's what I'm going. I'm not doing the risk assessment. That's there in the report because that was the information that was provided. But

Pegge J. Merkel, RMR
United States Court Reporter

25

the report is now moot because counsel has changed the direction. I'm not relying upon the report. But what I am going to do is, through cross examination of this witness, look at the material that he has looked at, that he has looked at, and suggest that there is another bona fide psychological or medical explanation that affects this behavior, and that is why I'm saying that I believe this is rebuttal and that I have the right to address this.

One more thing. In terms of the psychopathy, I'll tell you, the defendant to Dr. Ryan, denied involvement in this case. The issues that were discussed that allowed the scoring on the PCL-R is what it's called, are based upon the behavior that's talked about, and the PCL-R looks at juvenile delinquency, looks at short term marital relations, looks at failure to accept responsibility for own actions.

Dr. Ryan talked to Mr. Lee about fights he was in, how did you feel about fights that you were in, and that was partly because he wasn't acknowledging responsibility for the crime, but the things they were talking about are the life issues that Dr. Cunningham has talked about, impulsivity, earlier behavioral problems, pathological liar, which was a result that the defendant scored negatively on, that he was not a pathological

26

liar.

Conning and manipulation, the type of stuff which is within the parameters of what was presented in the direct examination. So all I'm saying is that if a witness -- if a medical witness says that I'm looking at this and I think this is cancer, I think if there is a bona fide expert on the side who says it's not cancer, it's some other disease --

THE COURT: If they are both looking at the same thing and come up with a different diagnosis, I think you are right, but if one of them is looking at one thing and one of them is looking at something else and says these factors indicate cancer and the other one says these factors indicate pneumonia then the trains miss.

MR. LIROFF: Let me do this. First give me the opportunity, with that understanding, to cross examine Dr. Cunningham.

THE COURT: That's what I'm going to do. Let me interrupt. I'm going to let you start cross examination. I'll let counsel object and we'll carry through and I can make a much better judgment at the conclusion of the cross examination of Dr. Cunningham about the scope of Dr. Ryan's quote "rebuttal" testimony. So that will be the best time to make that. Also, of course, it will have to come after Dr. Bianchini's testimony because he will

Pegge J. Merkel, RMR
United States Court Reporter

27

obviously be talking about some of the that too.  So let's take it one step at a time.

The question now is cross examination.  I've already indicated some things about the limits.  But whatever he said, you can cross examine him about, and you can ask him is it reasonable to draw other conclusions from that than the ones you drew.  But for taking him into areas that he didn't do and didn't investigate, then that's -- I'm going to cut off some of that because once he indicated he didn't do these tests, didn't make any effort to study something, then it seems to me the thing for to you do is try to convince the Court that Dr. Ryan can come in and talk about those things and it would be proper rebuttal.

MR. LIROFF:  If I can say one thing, and when I make these representations, I do this as an officer of the court, but I do it after having consulted and spent time with Dr. Ryan.  So I want you to understand I'm not pulling it out of the air.  So what I'm saying is this.  Dr. Cunningham bills himself as a defense mitigation expert and does not use the Hare psychopathy because he doesn't want the result, and it is standard of care in this area to do the Hare and --

THE COURT:  Let's face up.  The defendant identifies certain mitigating factors and has the burden

28

of proving them by a preponderance of the evidence.  So if they use a witness to establish those things and don't deal with what you are interested in, which is future dangerousness, then it's not necessarily that they are hiding something if they only deal with certain positive things that they have to prove.

MR. LIROFF:  But I'm not dealing with future dangerousness.  What I am dealing with is precisely this, precisely this.  When they say that there are factors that broadly and negatively impacted on Danny's neurological, social, psychological, ethical development, that there are other issues that need to be looked at also, and I'm disputing that, because I'm limited on rebuttal and cross examination of that, but that's where I'm at, and standard of care for psychologists in this area would have been to rule out whether or not there was psychopathy.

THE COURT:  All right.  You can inquire about that and we'll see where it goes.  Let me make this notation.  The way this thing developed was that back in March the government I think filed a motion and said quote, "The United States will not introduce mental health evidence during its case in chief of the penalty phase. Instead United States would only use this evidence to rebut any mental health evidence introduced by the defendant in his case in chief.

Pegge J. Merkel, RMR
United States Court Reporter

29

"If the defendant does not introduce the evidence, the United States will not introduce mental health evidence.  United States merely seeks discovery of the defendant's mental health evidence in order to rebut this anticipated evidence."  Unquote.  Following some hearings and finally the parties got together and made an agreement as to how they would proceed, and that was approved by I think a consent order.  And that's what we've been doing.  So now the question will come after this testimony and before the decision on the scope of Dr. Ryan's testimony as to what is and what is not appropriately rebuttal.  We'll be five minutes in recess and we'll bring the jury in and continue the trial.

(Recess).

Pegge J. Merkel, RMR
United States Court Reporter