7954

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

  vs.                                No. LR-CR-97-243

                                 Friday, May 14, 1999
(2) DANIEL LEWIS LEE,           Little Rock, Arkansas
                                 8:45 a.m.
           Defendant

VOLUME 47
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE G. THOMAS EISELE,
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
On Behalf of the Plaintiff:
    MR. DAN STRIPLING, Assistant U. S. Attorney
    MR. ROBERT DE LA CRUZ, Department of Justice
    MR. LANE LIROFF, Department of Justice
        United States Attorney's Office
        TCBY Building
        425 West Capitol Avenue, Suite 500
        Post Office Box 1229
        Little Rock, Arkansas   72203-1229


On Behalf of the Defendant Lee:
    MR. JACK T. LASSITER, Attorney at Law
        Hatfield & Lassiter
        401 West Capitol Avenue, Suite 502
        Little Rock, Arkansas   72201-3437
    MS. CATHLEEN V. COMPTON, Attorney at Law
        221 West Second
        Suite 701
        Little Rock, Arkansas   72201


Defendant Lee Present

    Proceedings reported by machine stenography.   Transcript
prepared by computer-aided transcription.


Elaine Hinson, RMR, CCR
United States Court Reporter

P R O C E E D I N G S

(Jury not present.)

THE COURT:  Good morning.  I have asked my law clerk and Marge to hand to you a couple of copies of the capital final instructions and also of special verdict forms 1, 2 and 3.  And I understand she has done so.  Are there any objections or exceptions to the proposed instructions or verdict forms as presented to you?  For the government?

MR. LIROFF:  No, Your Honor.

THE COURT:  Thank you, Mr. Liroff.

MS. COMPTON:  No, sir.

THE COURT:  Very well.  I have also advised counsel that it is my intention after the arguments of counsel to use this three-page summary of the instructions rather than read the entire 30 pages, as we have already done in the Kehoe case, because I think it's unnecessary, and also because the actual instructions will be given to the jurors.  In fact, there will be a separate copy for each juror.  And they will be reminded to follow those instructions carefully.  Is that satisfactory with the government?

MR. LIROFF:  Yes, Your Honor.

THE COURT:  And the defendant?

MS. COMPTON:  Yes, sir.

THE COURT:  Bring in the jury.

(Jury present.)

Elaine Hinson, RMR, CCR
United States Court Reporter

THE COURT:  Good morning, ladies and gentlemen.  You will soon be called upon to resolve the penalty phase issues with respect to the Defendant Daniel Lewis Lee.  As you are aware, this is an extremely serious stage of the case.  The parties have presented the evidence and information that they think are pertinent to the resolution of those issues.  The government has the burden, and therefore the government's counsel will now open the closing argument.  The defense attorney will argue in between, as you are familiar with this practice.  Then the government's attorney will be given the right to close.  Mr. Liroff, are you prepared to make your opening argument?

MR. LIROFF:  Yes, Your Honor, if it pleases the Court.

THE COURT:  You may proceed.

MR. LIROFF:  Ms. Compton, Mr. Lassiter, ladies and gentlemen of the jury.  Danny Lee is a dangerous man.  You've been on this case for a long time, and you've seen the evidence that was presented in its totality.  And you've learned that Danny is a man who fights with weapons, with his fists, with his feet, and eventually with plastic bags.

In the last couple of days, we had an opportunity not to talk about the facts of what he had done, because we know what he had done, and that's been established.  But what we wanted to talk about was qualities about Mr. Lee that allows you to

Closing Argument - Liroff

appreciate and understand the nature of that violence.

The first thing that I think is striking in a person, this person that you are about to judge, is that he clearly has what you could characterize as a love of violence. This is not something that I pulled out of the air last night in front of my laptop trying to think about things. It's something that seems to be demonstrated by the facts in this case.

First of all, there are the absolute sheer number of times that he's engaged in this behavior. We are not talking about children who are having playground scuffles. We are talking about an adult who has so many fights that he can't remember all of them. It's staggering.

He joined the skinheads. Why? There's a suggestion about how he was a lost teenager looking for some role identity. And I think there's some validity to some degree. But you can't discount what he said to Professor Ryan. Why did he join the skinheads? Lots of women, lots of beer and the fights. Somebody with that level of interest in fighting, it says something about them.

And another troubling factor is his level or his sense of remorse that was addressed yesterday. There is in you and in me, in all of us, a critical connection which controls your behavior. And I think we call it a conscience. We live good lives because we have a conscience, because we care that what we do can affect others. It's a sense of remorse if you caused

7958

Closing Argument - Liroff

harm.  It's so simple.  You get in the elevator.  You accidentally bump into somebody, and your first response is, oh, I'm sorry.  If his wires are mixed up, as has been suggested to you, then this is where his wires are mixed, because he's a man without a conscience.  If you think about this for this moment, I think you will realize that a man without a conscience is a dangerous man, because a man without a conscience does not care who he harms.

And another troubling aspect is this man has a hair trigger.  People around him describe him as volatile, unpredictable.

Do you remember the testimony of Nancy Cummings, a sheriff's deputy at your local Pulaski County Jail?  It started right in the beginning when I was questioning her.  But she had been guarding -- no, it wasn't me.  It was something Ms. Compton brought out.  She had been guarding him for a couple of months.  He was fine.  They were getting along.  And then what happened?  There was that moment when he wanted something, and she stood in the way.  Her request was reasonable.  There are security issues.  How did he react to that?  There was that hot lightning flash that exposes the real Danny Lee.  And you could see him, as Ms. Cummings was testifying, at that door banging and kicking at it, yelling obscenities and saying to her, "I'm going to kill you, like I did the others."

Do you want to send Mr. Lee to prison for the rest of his

7959

Closing Argument - Liroff

life, as will shortly be requested, with his history of assaulting staff, with a history of assaulting fellow patients or inmates?  We do have a responsibility at this juncture to ask ourselves this question.  Who is going to be the next Nancy Cummings?  And will he or she be so lucky?  And you have the right to be concerned, very concerned.

Now, I'm talking legally about the concept of future dangerousness.  And that was an issue in Mr. Kehoe's trial. Mr. Lee is not Mr. Kehoe.  Mr. Lee is different.  And you are charged with the responsibility of judging them separately.  If you believe he is a dangerous and violent man, then I suggest you have a responsibility to consider this in determining his penalty.  I would suggest that you have a responsibility to ask yourself the question is he dangerous, is he violent, will he be violent in the future?

Do you remember Wednesday afternoon, I had my first opportunity to question Dr. Cunningham.  It was about 4:45 to 5:00 o'clock, only 15 minutes.  And I asked Dr. Cunningham, "Is he violent?  Will he be dangerous in the future?"  I've been trying cases a long time.  I've seen experts testify.  I've seen experts testify more times that I can remember.  I can tell you one thing.  Experts come in all sizes and shapes, like people.  But I can tell you one thing.  When you ask an expert a simple directed question, is he violent, is he stupid, and it takes them five minutes to come up with an answer, and when you

Closing Argument - Liroff

step back and you say, what the heck did he just say, then you know you've got a problem. What did Cunningham say in response to that question, a question that you have the right to be concerned about? What did he say? He backed out. He avoided the question because he didn't want you to know the answer. Don't we know the answer? Don't we know based upon everything we've seen about this man for the last 10, for the last 12 years?

Danny Lee, this man who stands before you, is a violent and dangerous man. And you've learned this through his assaults against his family. They wouldn't acknowledge it. But through the testimony of Dr. Cunningham and others you realized that the records were replete with reference to this, assaults against Jennifer, assaults against fellow prisoners or inmates or patients, assaults against staffs at facilities, innumerable fights, and against the Muellers and against Joey Wavra.

There comes a point when you see behavior repeated not once, not twice, but endlessly, repeatedly, that you can step back, and you can say with complete satisfaction this, this is a man who is dedicated to violence.

When you go back to this jury room, as you will very, very shortly, I want you to put in your mind the mental image of a scale, because we are going to talk about that today. And I think Ms. Compton is going to do the same thing, because I'm

Closing Argument - Liroff

not going to do a lot of law here, because I don't think that's necessary because of your recent experience. You've gone through these instructions, and we can talk on a common level about what the law is. But you do know that it requires factors that the law calls aggravating and factors that the law calls mitigating. What you do is not count the number of factors. It's not a 5 to 3. It's not a baseball game. What you do is evaluate whether these factors exist. And, if you find them to exist, then you look in your heart, in your mind, in your soul, and you evaluate how they matter to you. If you find then in weighing those factors that it says you are satisfied that those aggravating factors sufficiently outweigh mitigating factors, that it supports this verdict, then you know what the verdict should be.

There was a reference in Mr. De La Cruz' argument that I saw a couple of weeks ago to the faithful dog. And it's a characterization that an incredibly able and very skillful lawyer, Ms. Compton, seized upon. But I want you, because I was thinking about that last night. In looking through this characterization, these qualities that I noticed with Mr. Lee, trying to prepare myself to communicate to you the love of violence, the absolutely no sense of conscience, the volatility, the hair trigger, and that's when I realized the characterization respectfully by Mr. De La Cruz doesn't fit. I've known dogs all my life, and this doesn't describe the

Closing Argument - Liroff

dog.

An example of that is that behavior that happened during the Joey Wavra murder.  You should be very troubled by that.  And that alone illustrates this drastic distinction on several levels between Danny Lee and Chevie Kehoe.  They were a bunch of -- at that point I can say kids, because that's what they were, 17 years old, kicking back, doing drugs, shouldn't have been doing it, really abusing alcohol, shouldn't have been doing it.  Joey urinated on a chair, and you saw it there.  And you saw Danny Lee, the man he was back then.  And he's the same man that sits over there.  He is the same man who during this trial has that hair trigger volatility that will make him say or do something at that instant, regardless of any consequences because it's damn the consequences.

And, unfortunately, Joey Wavra was in his way that night because he was the one.  He was the one who began it.  He was the one who beat him.  He was the one who hit him.  He was the one who kicked him.  He was the one who opened the manhole.  He was the one who forced him to go down.  He was the one who brought the rope.  He was the one who took the knife and gave it to his cousin to do the beating.

You heard that tape of the interview of John David Patton.  And you saw Patton covering up at every opportunity to protect Lee.  And you heard later on from that witness it was agreed Patton was going to take the fall for Lee.  Lee didn't

7963

Closing Argument - Liroff

wield that knife.  I'm not suggesting to you that he did.  But does any of us not know that by taking the knife and giving it to him what he was doing?  I would suggest to you both legally and morally the blood of Joey Wavra's hands is on Danny Lee.

One important aspect of this is this.  When this happened, Lee got this incredible, this incredible deal, this plea bargain in the end, pled guilty to a robbery.  How many of you, how many of you in your life have thought back.  Some of you are younger.  Some of us are older.  And sometimes in the middle of the night you sit back and you think about things that you've done, places you've been, self-confession time.

Sometimes I think about a junior high school dance that I was too afraid to walk across the dance floor and ask a particular girl to dance.  I think about that, and that's silly.  But that's, that's a small thing to illustrate the point I'm trying to make.  What I'm trying to talk about is sometimes we think about forks in the road where we've been.  We've gone right.  We didn't go left.  Then you think back, and you think, my God, should I have gone left?  When we were kids we used to call it a do over.  This is the one aspect of the Joey Wavra murder that I want to talk to you about.  Usually you commit a murder, and you get sent away for a very long time.  And you don't get an opportunity for a do over.  It's done.  You made a horrible mistake, and you can't do anything about it.  And you can't say, Gee, I wish I hadn't done that so

7964

Closing Argument - Liroff

I could get back on my life and have an opportunity to make amends. Danny Lee got a do over. He got the opportunity to say, my God, what have I done? Look where all this led me. He had the opportunity to say, I made a mistake, but I got an opportunity to turn myself around. And that's incredibly monumental.

It is rare for a murderer like Danny Lee to stand before a jury who is about to determine his death penalty, who has an earlier murder under his belt, who has a prior victim's blood on his hands. You know the expression. Fool me once, shame on you. Fool me twice, shame on me. And that's the first aspect of this Wavra murder that I think is terribly important and I think you should consider in distinguishing Lee from Kehoe because Lee has been here before. Lee has stood in the court of justice. Lee has had the opportunity to regret, and Lee has had that opportunity to change his ways.

The other aspect of the Wavra murder that's of absolute importance is because it communicates to you, and it says to you something about that aggravating factor of future dangerousness. I'm plugging that back into the law, so when you are back at that scale, that's one of the places you put it.

Now, let me shift gears for just a moment. I want to talk about some of these mitigating factors. The mitigating factors are things that the defense thinks they've proven. Your job is

Elaine Hinson, RMR, CCR
United States Court Reporter

Closing Argument - Liroff

twofold in regards to that.  Have they proven it?  And, even if it's proven, how important is it?  It's a long list.  It numbers 14.  But you can categorize or break these factors down that they've articulated and presented to you in certain categories.  And the first -- we could take care of five right off.  Ms. Compton in a really good argument, opening statement to you, said -- suggested that I am not telling you certain things, that I didn't tell you the truth or the big picture.  She said one of the things was Danny Lee is not wired right.  This is the wired-right argument.  And there are five mitigating factors that relate to this.  They based this argument on really three things and just three:  One, he has a history that would suggest, suggest, that he is at risk for some type of brain damage, convulsions, fights, drug abuses.

But I think if you carefully listened to the testimony yesterday, you realized that the history only says that a person is at risk, and history doesn't prove that they are affected.  I think one of the last questions of Dr. Ryan was the most telling in this area.  Anyone who looked at this case would say he must have a hard head, because there's the expectation that he would have some type of issues.  But the truth is that when you look carefully with very sensitive scientific instruments, you can't buttress it and prove it.  And that's the second point.  They rely upon, and Ms. Compton referred to it in her opening statement, this EEG test.  But

the evidence also shows that that test alone doesn't prove it. It only says that you should look further.

There is, in the end, only one thing that supports this proof. And that's Dr. Bianchini. And I'm going to submit it to you. I will tell you that the suggestion was is that Bianchini found very, at best, very minor, very specialized issues. And those issues, Dr. Bianchini, Dr. Ryan, when we talked about what they referred to as higher cortical function, the frontal lobe, I don't want to -- I shouldn't go there because I barely understand that stuff, so what I wanted to do is find out is that important. And that's the area that they said, told you affects reason, affects judgment. And that's really what we are talking about here, because if the wiring is wrong, you want to know is their judgment screwed up. And both of them said no. You don't -- people with learning disabilities are not killers. And there is this blanket broad sweeping of suggestion that he's got attention deficit disorder. He has a learning disability. That does not explain this behavior. Because he can't spell, because he has learning disability in regards to math does not alleviate his responsibility in this case.

The five factors, I want to go through them. I want to read them to you so you can see, because remember as to these factors, to rely upon them and use them, you have to say it's proven. "Mr. Lee's capacity to appreciate the wrongfulness of

Closing Argument - Liroff

his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge." Appreciate wrongfulness. There is no testimony that his ability to appreciate wrongfulness is in any way impaired. In fact, the testimony of both Dr. Ryan, Dr. Bianchini, in this area is consistent, not impaired.

"Mr. Lee was under duress, regardless of whether the duress was of such a degree as to constitute a defense to this charge." There is no evidence to suggest that Chevie Kehoe held a gun on Danny Lee from Spokane all the way to Tilly, Arkansas. He wasn't under duress. He was there because he wanted to be.

"Mr. Lee committed the killing or killings under mental or emotional disturbance." It's the same thing. They are trying to rely on smoke and mirrors. It's easy to come up with a suggestion of brain damage, and it's a frightening thing. But people who have brain damage can be examined, and it can be ascertained and proven. That's not what's happened here.

"Mr. Lee suffers from neurological impairments which were identified and which could have been treated when he was a child and adolescent." He suffers from a learning disability. Working with a learning disability would not have made him less a killer.

"Lee suffers from a brain dysfunction which has impaired

Elaine Hinson, RMR, CCR
United States Court Reporter

Closing Argument - Liroff

his ability to function in the absence of strong support and guidance." That evidence is not established either.

This is a man with a significant record. And yet it is suggested to you in mitigating factor No. 3 that you should find this to be a mitigation. I will read it to you. "Mr. Lee does not have a significant prior criminal record, other than his juvenile record." That's like the kid who killed his parents who walked into court, said, "Take mercy on me. I'm an orphan." This is a man with a track record of harm against others documented for the last 10 years. And they are saying his criminal record is insignificant? His arsons, his burglaries, the robbery of Joey Wavra, the concealed weapon, this is insignificant?

Can't we all now, with the benefit of hindsight, look at this and see, my God, look at what the diagnosis was. This was one of the last questions I asked Dr. Cunningham. In October 1990, October, November 1990, a staff psychologist from that Oklahoma juvenile facility -- I can't even remember what the acronym stood for -- said his prognosis is poor. This man is at risk to re-offend violently. They knew it. If they had laws, the best thing that could have happened would be to just keep him there, lock him there, throw away the key. You wouldn't be here. I wouldn't be here. And I know a family in Tilly, Arkansas, that would be -- that would be here. It was written on the wall. This is not an insignificant record.

Elaine Hinson, RMR, CCR
United States Court Reporter

Closing Argument - Liroff

There is a mitigating factor that was substantial.

No. 5. We are going to do the scale. I'm about to put this on the scale. And this is a mitigating factor, that "another person equally culpable will not be punished by death." If you look at it, it doesn't say who that is. But there's no question what we are talking about here. We are talking about Chevie Kehoe. And I think we have to take this head on right now. And I'm going to tell you this. Maybe as a government lawyer, I shouldn't be. But I'm going to tell you this because I think it's the only honest thing to say. If you find all things are equal, if you find these two men are the same men, then I'm telling you, you should have a very short verdict, and we could be back by lunchtime. And you should give a life term without possibility for release to Mr. Lee. That's what I'm saying, and I will admit it, and I'm telling you that. Things are not equal. Things are not the same. People are different. Chevie is not Danny.

The most obvious, and the most glaring difference is this. It all comes under the heading of "future dangerousness." To begin with, there was no evidence that Chevie ever had the opportunity to go repeatedly through the system to get out of the house. Remember, every time he went into the system, he was taken out of the house and given an opportunity to meet with something positive and constructive. Chevie didn't have that. There's no evidence of the prior

Closing Argument - Liroff

dangerousness.  There's no prior Joey Wavra as to Chevie.  There is as to Mr. Lee.

And there is secondly that most disturbing issue about this free-flowing hostility and volatility.  I think Ms. Compton could correctly tell you that if it wasn't for Chevie Kehoe, Danny Lee would not have killed the Mueller family.  I think we can all agree.  The problem is this, though.  Danny Lee, you know those awful guns that you saw, really ugly guns that you saw?  Danny Lee is like one of those guns, those deadly lethal weapons, loaded, cocked.  The only thing Chevie did was point that lethal weapon.  Doesn't there come a time -- there's a lot of excuse here.  Doesn't there come a time ever that we get to talk about responsibility?

Now, I know we are talking about a man who is going away for the rest of his life at a minimum.  But don't we at this point still get to talk about responsibility, or was his responsibility so eloquently expressed when he told Nancy Cummings, "I'm going to kill you like the others."  And maybe that's, maybe that's his epitaph.  And maybe that, in terms of this trial, is what the memory that we should keep in mind when we are evaluating Mr. Danny Lee.  The two men as to this crime may be equally culpable.  But they are not the same men.

Another mitigating factor is No. 9.  "Mr. Lee was introduced to drugs and alcohol while still a child."  Was he high on drugs while he was bagging the Muellers?  Did he do

Closing Argument - Liroff

this crime for money to buy drugs?  Did the drugs make him dangerous and crazy?  Do you know?  In order to be satisfied with that mitigating factor, they have to prove something that makes it make sense.  But, as bad as drugs are, drugs don't make you do the crimes that this man has done.

Mitigating factor No. 10:  "Mr. Lee needs a structured environment and would likely benefit from the structure of prison."  Sullen, angry, volatile, remorseless, dangerous, and not even a prediction from his psychologist, Dr. Cunningham, of any likelihood that things are going to change.  So, when you evaluate this mitigator, remember the question I asked Dr. Cunningham.  Is he violent?  Will he be violent in the future?

Mitigating factor No. 11:  "Mr. Lee was only 22 years old when this murder was committed."  Actually he was a couple of weeks short of 23.  Age can be a mitigating factor, not this age.  There's a big difference between an 18 year-old, a kid in a legally adult body, and a 23 year-old man.

There's one, just one mitigating factor left of substance to talk about.  And that has been presented and relates to Mr. Lee's childhood.  And it appears Lee was subjected -- there's no question he was subjected to emotional and physical abuse.  But I want to point out a couple of things.  First, what was the extent of it?  The seriousness, the gravity, was presented through Dr. Cunningham.  That's a hearsay type witness.  That's not proving directly to you that it really existed, that really

7972

Closing Argument - Liroff

happened.  Rather, he's repeating what people told him.  And I'm sorry.  But I'm going to submit to you that Dr. Cunningham expressed a level of bias.  You could see that.  A witness who won't answer questions is a witness who has an interest and a witness who has a bias.

There was the testimony of Ms. Graham, which established, there's no question that it established some issues.  Sometimes it was clear more by the cross-examination than by the direct examination.  But it was also clear that she was an unreliable witness.  But she is his mother.  And she would do what she could in any way for him.  But how reliable was the data that she provided?

Is Danny's stepfather responsible for these crimes?  Did he place these bags over the Muellers' heads?  They are going to argue figuratively he did.  Did Lea Graham help tape the rock to Sarah Mueller's abdomen?  They are arguing Lea Graham figuratively did.  Was Danny's pediatrician to blame for not insisting that Lea Graham follow a stricter regimen regarding his medication?  Were the facilities, the court facilities in Tennessee, are they to blame?  What about all those facilities he was in in Oklahoma?  Are they to blame?  How about that DA in Oklahoma who let him get off with a robbery?  Maybe he's to blame.  Is society to blame?  You?  Me?  How many murders does he get away with?  How many times do we point the fingers every which way?  At some point we get to look around the room, and

Closing Argument - Liroff

we stop looking away from Mr. Lee.  And we finally should settle our gaze at Mr. Lee.  He is the person who has committed this crime.  He is the person who is responsible.  They've tried to present this person.  They've dumbed it down.  I will never hear that expression again without thinking about my experience in Little Rock.  They dumbed it down when they talked about this loose wiring.  He has a learning disability.  Please, please, put this into perspective.  I'm tempted to say that dog won't hunt, because somebody dared me to say that.  But I expect that Washington lawyers should not tread there and use expressions like that, so I won't say that.

But what I will say is something is going on here.  And shortly I'm going to sit down.  I'm going to, when I do that, I can tell you that Ms. Compton is going to go over to that machine over there and take that photograph off, and she's going to put a photograph of young Danny or Danny with hair or Danny with a child.  And even the terminology, when I talk to you, he is a 26 year-old man.  I refer to him as Mr. Lee or Danny Lee.  But she will call him, as did Dr. Cunningham, as Danny.  And she will put pictures up for the purpose to focus you on the child, using the name Danny just first person, to try and humanize him.  It's subtle, and it's effective manipulation.

What I ask you to do is to, in following instructions of the Court, do this.  Just go back to that scale.  You start

Elaine Hinson, RMR, CCR
United States Court Reporter

with equally culpable defendants. That's something you have to take into account. And you start with the fact that he had a childhood that regardless of the extent to what it was, it was not what it should have been.

But this morning when I came in and I sat down in this chair, and I did what I do to psyche myself up to do this, I looked over at that table. It's been there all week. And I hadn't even seen it, this little T-shirt. That's when it hit me. You can't necessarily just evaluate this case without truly, truly appreciating the fundamental impact of the import of this crime, to go into a family's house, their home -- our homes are our sanctuary. When we go out into the world, we know we are at risk. When we step into our car or on an airplane, we know that. But when we come home, we have the right, don't we, to think that we would be safe and secure? And doesn't an eight year-old girl, damn it, have that right? So it sits there, this very subtle grim reminder of the horror wrought by Danny Lee.

And you realize the scale is starting to tip. And then when you start to add the things that truly separate him from Chevie Kehoe and you realize people are different, and if you walk out of this courtroom, you can say there was a difference. I know that we are the product of our childhood experience. And I'm not saying to you in any way that he had a great childhood. He didn't. He had a horrible childhood. But

Closing Argument - Liroff

there is also a point that you look at not only that, but you look at his crimes, and you also ask yourself the same, the same question we asked Dr. Cunningham that he wouldn't answer, the future dangerousness, the prior crime against Joey Wavra. Then it begins to happen. It slowly happens the way those scales tip. That's when those arms move and you realize.

In this case you can say because of his conduct, not his ideas, there's no angry crowd standing near a tree demanding street justice here. There has been every attempt to give this man fair and impartial justice. But in the end, in the end, looking at the law, not his hatred, looking at the law, you realize that there is only one compelling verdict that can be given in this case, based upon what he has done, what he has earned. Thank you.

THE COURT: Ms. Compton for the defendant.

MS. COMPTON: If it please the Court, gentlemen, the government, ladies and gentlemen of the jury. The first thing that I want to tell you, and I think we talked about this 11 weeks ago roughly, or Judge Eisele instructed you about it, and it's very important to me, is I don't want you to have perceived any rudeness on the behalf of Mr. Lassiter or me. He's a big boy, so I'm not going to speak for him. But I've got to tell you, it's one of the hardest things for me in a jury trial is to see people day in and day out and not nod and not speak and not say hello. And I made my mother a promise a

long time ago that if I was rude or if I cussed, I would be sure that anybody understood that it was not her fault, because she's a good and gracious woman and taught me better. But it's very difficult for me to see people on and on and on and never respond. So I apologize for having to follow what is a good rule.

The other thing that I want to tell you that always disturbs me greatly when I'm in this position, which is a closing argument in any case, is that because of its burden of proof, the government gets the last word. It's very frustrating to me to sit down and know that one of these gentlemen, probably Mr. Stripling, is going to get to come back to you when I'm done and tell you all the things I said that were wrong or that were bad or that were in error, because I won't get another opportunity to stand up here and talk to you again.

I am horribly, horribly nervous and upset at the gravity of what we are doing here, and I know you are. You've been back there, and you've done it on Chevie. Now you are having to go through it again for Danny. And I'm sure that you all question whether you will ever serve on a jury again or whether you will be looking for a way to get off after this experience, because I know it has been brutal on you, and it has been brutal on all of us.

I want to talk a little bit about Danny. And I hate to do

Closing Argument - Compton

it in his presence.  It seems wrong to me to talk about a person the way I'm going to talk about Danny in his presence.  And, yes, as Mr. Liroff told you, I'm going to call him by his first name.  I don't refer to him as "Mr. Lee."  I've been knowing him now for about a year and a half and spent a great deal of time with him.  I've been knowing his mother and his little sister and her little boy.  I've been in his home.  So to me he's not Mr. Lee or that man.  He is Danny.  And it would be silly of me to call him something else.

        And I'm going to tell you something else Mr. Liroff told you that I was going to do, and I'm not going to do it.  I'm not going to take down that picture, and I'm not going to show you a bunch of pictures of Danny as a baby, because you know without any expert witness, you know without anybody coming and talking to you who has a bunch of degrees and a bunch of numbers and things with his name, Dr. Cunningham, Dr. Ryan, Dr. Bianchini, you know what kind of childhood Danny had.  You know that Lea did what she could do, but that the house was horribly broken.  You know all of that.  And you don't need pictures of a cute little boy put up there to show you any differently.

        There's something else that's important in this picture that I want to talk to you about, and that is there's a man in that picture besides Danny Lee.  And that's Bobby Norton.  And you know that Bobby Norton headed up a horribly racist group.  You know that Danny got into that group when he was a boy.  And

Closing Argument - Compton

you know that he loved Bobby Norton, considered him a father figure and a mentor. Bobby Norton is right there with him in that picture.

You know already, no matter what Dr. Ryan came in here and told you, you know that Danny Lee's wires got crossed up. I'm going to tell you something else. So does Dr. Ryan. You know, he said something at the end of his testimony, the government's witness, Dr. Ryan, that I thought was very interesting, because I asked him. He sees brain damaged patients just like Dr. Bianchini does. I said, Dr. Ryan, you look at this history. You look at the seizure disorder. You look at the Phenobarbital being taken away too quickly and at the wrong times. You look at hyperactivity as a child and attention deficit disorder as a child, all of these before any blows to the head for fighting, all of this before any huffing or any alcohol. You look at all of this before that. And then add in those factors. You look at that, Dr. Ryan, and would you be surprised to find brain damage? And what did he tell you? I was shocked. I was shocked when I didn't. And I expect he was too. I expect he was very shocked at that.

You are not going to have to worry about Danny being back at a Klan rally. You are not going to have to worry about Danny being out in a society that he grew up in. You are not going to have to worry about Danny getting lost in the shuffle that was the chaos of his home anymore or lost in the shuffle

Closing Argument - Compton

that you know he got lost in, which was those juvenile or those juvenile facilities in Tennessee and in Oklahoma. And you know what happened to him there.

Dr. Ryan and maybe even Dr. Bianchini talked about that abnormal EEG in 1988. They were concerned that there wasn't any follow-up. Dr. Cunningham was concerned that there wasn't any follow-up to that abnormal EEG. But y'all know what happened. And it's not the fault of anybody. The system does its best. Danny Lee got in that juvenile system, got lost in the shuffle. Probably there was nobody to pay for it, and there wasn't any follow-up. You know that.

But you don't have to worry yourselves with Danny being out somewhere, because if you don't vote to put him to death, if you don't vote to execute him, he is going to go somewhere that's highly structured and highly secure.

Now, Mr. Liroff wants to talk to you about him assaulting other people, and he can do it inside the prison. But remember this. In all these juvenile facilities and all these psychiatric residential care facilities, nobody ever gave Danny any Tegretol. Dr. Bianchini tells you that Tegretol is not really a new drug anymore, but in the past ten years. Danny can be put on medication. You don't have to worry about the prison system can do medication. You know that because Mr. Stripling made a very big point each time Mr. Hampton put on one of the Ohio prison witnesses, he made it a point to

say, "Well, you are on psychiatric medications, aren't you?" And they all were. So you know that inside the system you can become medicated if medicine will help you.

You also know that you have the incredible authority and the incredible power to put Danny down like a dog. I am so offended. I am so offended by the notion of this man as a dog that I don't blame Mr. Liroff from backing away from it. I don't blame Mr. Liroff for coming in here and going, "Well, my colleague at the table called him a dog, but he was wrong." I don't blame him for backing away from it because that's so horribly offensive. You know what else? You know Danny is not a dog. Take a look at him. Take a look at Danny, because like Chevie's absence sits before you now, so will Danny's. You will never see from him again. He is gone. You will never see Danny again. Nobody will see Danny unless they are on a very strict visitor's list ever again: His mother, his sister.

And I want to talk about them a little bit. I want to talk about people in Danny's life who have known parts of him that I've come to know and who know parts of him that Mr. Liroff, Mr. De La Cruz, don't even want to know and don't want you to know. Ask yourselves when you go back there and the government is asking you to kill this man like a dog, ask yourselves this. Does someone who is so horribly violent and awful and evil, as the government would have you believe Danny is, does that person take care of a stepsister who has cerebral

7981

Closing Argument - Compton

palsy?  Does he show that kind of tenderness and gentleness? Ask yourselves whether he would bring Jennifer Thomas from Florida to Spokane, and after she gets there and is unhappy, just loads her up and takes her back.  Remember what Joy Campbell said?  "I don't know of any skinheads who would do that.  In fact, I don't know anybody who would do that."

Do you remember Jennifer Thomas?  Jennifer Thomas, who said that Danny was gentle and good to her, she didn't share his beliefs, but he was always kind to her.  Ask yourselves if Danny Lee was a good and compassionate brother, not only to Lynn, his stepsister, who had difficulties, but to Carrie, who didn't, taking the blame for everything, leading her to God. Ask yourselves if the man you saw in that video, so very proud of the birth of his daughter, is someone who is devoid of any conscience, inhumanity.  Ask yourselves if that's a dog that you should put down.  You know that it's not.

I want to talk very briefly about something that you are going to hear about again, and that is the horror of these murders.  And I don't want any of you to think that I for one single second don't think that those Mueller murders were the most horrible things in the world.  I don't want any of you to think for one second that when I was enjoying Mother's Day with my mother and my daughters that I didn't cry for Ms. Branch because of what she's lost.  Don't think for one minute that I haven't had the Branch family in my prayers since the day I got

Elaine Hinson, RMR, CCR
United States Court Reporter

7982

Closing Argument - Compton

on this case, because I have, and I will.  And I am so sorry they've had to sit in this courtroom and see some of what they've had to see.  Don't think that anything I'm saying to you is trying to minimize the horror of those crimes and the pain that Ms. Branch and Ms. Gurel have been through, because I'm not.

But let me tell you something about it, ladies and gentlemen.  Killing Danny Lee is not going to alter their pain.  Killing Danny Lee is not going to make it any easier for them to get up every morning and put their right foot in front of their left and get through the day.  Time will help a little bit.  The only time it's going to be completely okay is when they are rejoined with Nancy and Sarah.  That's the only time their pain is going to go completely away.  And there's nothing in killing Danny that will stop their pain.

Remember Gloria Kehoe, and she talked about the time that her nightmare began?  Lea Graham's nightmare began about the same time.  You know, if you vote to execute Danny, you end up creating another mother and another sister and more pain.  And you can do that.  They have pain enough.  They will never have the pain that Ms. Branch has.  But all you would be doing and all the government is having you do is create more pain.  And you don't have to do that.

I also have something I want to say to you about where Danny will be.  This is the federal system.  You know you are

Elaine Hinson, RMR, CCR
United States Court Reporter

7983

Closing Argument - Compton

in federal court.  He will more likely than not be put in a very high security prison.  And I feel compelled to talk a little bit about something I hear on the streets a lot.  I hear this from people a lot.  I hear it from politicians a lot, which is, you know, maybe that's a nice place to be.  It's like a country club.  It's not.  You know that Dr. Ryan doesn't even want to eat one meal in the jail because it's so nasty.  But, you know, inside that federal prison, no more girls, no more women, no more beer, no more sunrises, no more sunsets.

You know what?  Suppose it was a country club.  Suppose Danny was going to go to the finest country club.  Nobody wants to be locked up.  It's not the place that makes the prison. It's the bars and the guards and the lack of freedom.  It's having somebody tell you when to get up, when to go to bed, when to eat, what to eat, how to eat it.  It's having somebody read your letters, incoming and outgoing.  You know that. Jennifer Thomas wrote Danny a letter.  Mr. Stripling read from it because there is no right of privacy.  And I bet you that any one of us, any one of us would rather be free in an humble environment than locked up in the swankest country club.

But you don't have to worry about that because I'm telling you that's not what it is.  I'm telling you that it's a place with bars and with barbed wire and with armed guards and with extreme structure, with somebody telling you what to do and when to do it.

Elaine Hinson, RMR, CCR
United States Court Reporter

7984

Closing Argument - Compton

I know that it's been hard to listen to so much evil, evil stuff. And Danny does have bad things in his background. I want to talk to you a little bit about the mitigator that Mr. Liroff pointed you out to, which is that he doesn't have a significant criminal history other than his juvenile record. And I'm not trying to trick you about Danny's history. It's all over the records. In fact, we brought it to you. But it is primarily as a juvenile. And you know that he didn't kill Joey Wavra. His cousin did that. His cousin told you. You watched the video. I know there are evil things in Danny's background. I understand that. But you have to also understand what Dr. Cunningham was telling you about the shaping. And I can tell you too that Danny has so wanted to be a part of somebody that he would let Bobby Norton put his arm around him, take him in, train him and have him call him "Dad."

Mr. Liroff talked to you a lot about this is not Mr. Kehoe. These are not the same men. And you know that's right too. There's one flaw in what he's arguing to you, kind of like him backing away from calling Danny a dog. And I will tell you what it is. The government's theory in this case from the very beginning, from the very first time they filed an indictment, from everything that Mr. De La Cruz has told you throughout this trial and from what you evidently believed as seen by your verdicts in the Chevie Kehoe case, is that Chevie Kehoe was the leader, that Kirby Kehoe planned the 1996 Mueller

Closing Argument - Compton

robbery and that Danny Lee was a foot soldier or a follower or the loyal dog of Chevie Kehoe. And now Mr. Liroff tells you they are not the same man and they are not to be judged the same, and I agree. I agree whole heartedly. They are not the same man.

And Chevie Kehoe came from one of the strangest, strangest families I've ever heard of. I sat in amazement listening to what Chevie Kehoe's life had been like. And that's very different from Danny's. Their childhoods were different. Their formative years were different. The factors in their backgrounds were different. But I'm having a real hard time figuring out now how the government, who told you Chevie was the leader, Chevie was the bad guy, Danny was his loyal dog, how they can come to you and say, ladies and gentlemen, I respected your verdict in the Chevie Kehoe case, you did not kill the master, but please kill his dog. I'm having a real hard time understanding that what we are talking about is the Mueller murders, which were supposedly planned by Chevie and Kirby Kehoe, or at least the seed for that was planted by Kirby Kehoe, and the government has all along said that Danny is just a follower, subject to Chevie's whim, and then doesn't convince you that Chevie should die for his crimes but Danny should.

I want to say something else. And it's a horrible thing to say. And I know that it gives no consolation. But it's something that you need to think about when you are doing this

7986

Closing Argument - Compton

weighing process and you get to the part about somebody else who was equally culpable in the crimes did not get the death penalty. Of course, we are all talking about Chevie. Y'all believed by your earlier verdicts either Gloria Kehoe or Cheyne Kehoe, one or the other, and maybe both of them. And it was those two witnesses who told you that Danny was unable to kill Sarah, and Chevie had to do that alone.

Now, you've had this verdict on Chevie. And you know that. You know that from the government's own witnesses. As I say, it's small consolation. But it shows you the same thing that Danny Bishop talked about with Danny's relationship with Mercedes. It shows you the same thing that Carrie talked about with Danny leading her to God. It shows you the same thing that Lea talked about when she told you Danny has a soul. It shows you the same thing Jennifer Thomas talked about when Danny was good and kind to her. It shows you Danny, the proud father. It shows you the kindness Danny showed to Joy Campbell when Sean Haines wouldn't have anything to do with her when she was pregnant with his child, but Danny would. It shows you a spark of hope and faith in Danny Lee. And you know and I know that to give him the death penalty you have to give up on all hope, all faith and any notion of redemption.

And by your verdicts on Chevie, I don't feel there's any way that you can do that. Everybody, nearly everybody that I know, is aware of Dr. Martin Luther King's speech in Washington

Closing Argument - Compton

D.C. in 1963, which is the "I have a dream" speech. I have to find a quote from that because I like the "I have a dream" part, but there's another part that I love. And it's not cited very often. Dr. King said, "We must forever conduct our struggle on the high plane of dignity and discipline." But now listen to this. "Again and again, we must rise to the majestic heights of meeting physical force with soul force." You can do that. You can do that. You can say, yes, yes, he's been bad in the past. You can say, as you've already done, yes, these were horrible crimes. But you can meet physical force with soul force, and you can believe in redemption, and you can believe in hope, and you can believe in faith, and you can believe that the prison system can provide enough structure for Danny where he may be able to exercise that same kind of goodness and same kind of gentleness and same kind of tenderness, and his sense of humor, which you don't get to see, but I do, which is incredible, which is a gift from God, and use all of those attributes inside the system to make somebody feel better or to do some good. He can do that.

I told you in my opening statement that I had heard Mr. De La Cruz talk about Danny Lee, my client, as a dog. And I've told you today that I find that very offensive. I told you the other day that they would be asking you to execute Danny and that I would be begging you not to. And that's basically what I'm doing. I am pleading with you to temper your justice and

Closing Argument - Compton

your verdict with mercy and with faith and with hope. Thank you.

THE COURT: Mr. Stripling.

MR. STRIPLING: May it please the Court. I'm a morning person. And I got up this morning and tried to organize my thoughts a little bit because I knew this time would be coming shortly. My thoughts had been muddled, as often they are. I prepared an outline of the points that I thought I would need to make this morning when I got up here. But, after listening to both of the arguments this morning, both of which were excellent -- you, I guess, have to be in court as much as I've been in through the years to appreciate the quality of the arguments you've had in these cases. Though you've been through a lot, you've been blessed in that, compared to some. But I don't want to cover the points that I thought I did. I want to make just a couple of short basic points and let you folks go make the decision that you have to make.

Ms. Compton has made a lot of Bob De La Cruz' statement about Danny being Chevie's dog. She's made way more of that than is appropriate. If you will recall, Bob made that statement in the course of making a comment about Chevie living at the Shadows Motel -- I'm sorry -- Danny living at the Shadows Motel with Chevie and guarding his property there. That was the only context for that. And Ms. Compton has sort

Closing Argument - Stripling

of seized upon that as the theme of her argument with the idea, I think, that it would inevitably lead you to the decision she's requesting.

I submit to you that the government is not in any way asking you to execute Mr. Lee like a dog. I submit to you that the government has gone out of its way to ensure that Mr. Lee have all the due process that a person can have. I saw some of your reactions yesterday when you heard the amount of money that experts charge the government to come in here and testify and make the points. When you get to hire the experts you want and bring them in and spend all that government money before the issue is presented to a group of people like you to make your decision, you are getting due process. You are not being treated like a dog. You are being treated as well as any human being can be treated.

Danny Lee has had every opportunity to make every point to you folks that's there to make. Bill Mueller didn't have that opportunity. Nancy Mueller didn't have that opportunity. Sarah Powell didn't have that opportunity. They didn't get a bit of due process. What they got was a brutal death. Danny Lee has this opportunity to seek redemption through the Lord in the manner that he deems appropriate. The Muellers didn't get that opportunity. At least they didn't get a significant opportunity to do that.

I believe right now that if the Muellers had the

Closing Argument - Stripling

opportunity, they would be here doing the same thing that Danny Lee is doing here.  As cruel as the punishment is, I believe they would be here asking you to give them life without parole, life without possibility of release.  They don't have that opportunity.  Danny Lee has gotten due process because he got the opportunity to come in to you people.  He had excellent counsel representing him.  He had a very fair judge presiding over the trial.  And he obviously had fair-minded people making the decision.  That's due process, and he's had it.  That's not being treated like a dog.  That's being treated as fairly as you treat anyone, even someone that has committed as brutal a crime as you will ever see.

For the last couple of days, I've been sitting there.  Obviously Mr. Liroff had to come in and handle this part of the trial.  First of all, he's a lot brighter than some of us and can sort of figure out what this testimony was about.  Secondly, we didn't have time to do that given all that we've had to keep up with over the last few weeks.  So he's done most of the work the last couple of days.  That's obvious.  But while he's been doing the work, I've been sitting back there, and I've been thinking, why are we going through this?  Why are we having all of this?  Look at what happened.  This jury heard the facts.  This jury heard about Chevie Kehoe being the leader, as Ms. Compton pointed out.  She's right on that, of course.  This jury heard Professor Sullivan come in.  And

Elaine Hinson, RMR, CCR
United States Court Reporter

Closing Argument - Stripling

Professor Sullivan made an eloquent speech about grace. And he requested that you show grace, that you not show justice.

I'm over there thinking, why is Ms. Compton putting on all this proof, and why do we have to go to the trouble to rebut this proof? It didn't make any sense to me. But it makes sense now after I've heard the arguments. It all made sense to me. Mrs. Compton knew that her situation, even though Chevie Kehoe was the leader, her situation in defending Danny Lee was way different than Professor Sullivan's situation when he tried to argue for the life of Chevie Kehoe. And it was way different because of the Wavra murder. It was way different because Danny Lee had his opportunity before. He had a chance to come in and take a look at his life, as Lane pointed out to you, and say "I will make a change." And he didn't. And I just believe that Ms. Compton realized that given that basic fact she couldn't sell grace to you. She had to go to all this mental stuff, the wiring thing. And I had a great deal of difficulty with the wiring issue, given the fact that Dr. Ryan came down here and said, "I thought I would find the wiring was wrong," to use her analogy. And guess what? He was mistaken. He didn't find it was wrong, even though he expected to.

I submit to you that Mr. Lee has had a full quota of earthly grace. Now, as to heavenly grace, that's between him and his maker. I submit to you, though, that as far as earthly grace is committed, he's had his full quota. I submit to you

Closing Argument - Stripling

that this case, given the brutality of these murders, given the way that Chevie Kehoe and Danny Lee went into that house and killed these people, given all of that, this is a case that cries out for justice. And I submit to you that this is a case, when you weigh all those factors, where the death penalty is fully justified. Thank you.

THE COURT: The Court will be in recess for 15 minutes.

(Recess at 10:27 a.m.)

### CERTIFICATE

I, Elaine Hinson, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of the proceedings in the above-entitled case.

_____

Elaine Hinson, Official Court Reporter

Date:    May 17, 1999

Elaine Hinson, RMR, CCR
United States Court Reporter

7993

Instructions

THE COURT:  All right, ladies and gentlemen, of the jury.  You have heard all the proof and the evidence that the parties have brought forward during the penalty phase of Mr. Lee and you have had the benefit of the very exceptional arguments of the attorneys.  I am not going to give you the full instructions.  The instructions are exactly the same as they were in the Kehoe penalty phase with the exception of that portion that lists the mitigating factors.  The mitigating factors are different, but you will each be given a copy of the instructions which deal with Mr. Lee and you will have them in the jury room to read as you did before.

I am, however, required to give some instructions and instead of the 30-page version I'm going to give you a three-page summary.  Essentially what I want to do is to give you an overview of your duties and remind you of what you're supposed to do.  With respect to each of the three victims, you must follow these steps.

First, you must unanimously agree beyond a reasonable doubt that the defendant was 18 years of age or older at the time he committed the specific offense.  If you do not make this finding, no further deliberations are necessary with respect to that particular victim.

Second, you must unanimously agree beyond a reasonable doubt that the defendant had the requisite mental state at the time he committed the particular offense.  You

Carolyn S. Fant
United States Court Reporter

7994

Instructions

must find at least one of the three mental states set forth in Instruction No. 3. If you do not make this finding, no further deliberations will be necessary with respect to that particular victim.

Third, you must then determine whether the government has proved the existence of any of the alleged aggravating factors -- the statutory aggravating factors -- beyond a reasonable doubt. And, if you recall, the three that the government alleged here were that the murder was committed in expectation of the receipt of something of value; two, that the murder was committed after substantial planning and premeditation; and, three, that the defendant murdered more than one person in a single criminal episode.

Your determination as to each of these alleged statutory factors must be unanimous and beyond a reasonable doubt. If you unanimously agree that the government has proven the existence of at least one statutory aggravating factor with respect to a particular victim beyond a reasonable doubt, then your deliberations as to that victim will continue to the fourth step. If you do not unanimously find that the government has proven at least one of the alleged statutory aggravating factors with respect to a particular victim beyond a reasonable doubt, then no further deliberations will be necessary with respect to that particular victim.

Fourth, after making your findings with respect to

Carolyn S. Fant
United States Court Reporter

7995

Instructions

the alleged statutory aggravating factors, you must then determine whether the government has proven the existence of the alleged non-statutory aggravating factor beyond a reasonable doubt. And, as you recall, in this case as in Mr. Kehoe's case, the non-statutory aggravating factor that the government relies upon is future dangerousness. Your finding must be unanimous and beyond a reasonable doubt with respect to this non-statutory aggravating factor.

Fifth, you must then determine whether the defendant has proven the existence of any of the mitigating factors by a preponderance of the evidence. Your finding need not be unanimous. It is sufficient if one -- any one juror is persuaded of the existence of a mitigating factor.

Sixth, for each particular victim, you must then weigh the aggravating factor or factors you have unanimously found to be proven beyond a reasonable doubt against any mitigating factor or factors any one of you have found to exist by a preponderance of the evidence. This weighing process is discussed in Instruction 11 with which you are already familiar.

Based upon this weighing process, you must determine whether a sentence of death is justified. If you cannot unanimously agree upon a sentence of death, you must then decide whether to return a sentence of life in prison without the possibility of release. Again, your finding with respect

Carolyn S. Fant
United States Court Reporter

7996

Instructions

to a sentence of life in prison without the possibility of release must be unanimous.

If you unanimously agree upon a sentence of death or a sentence of life in prison without the possibility of release, the Court is required to impose that sentence. If you cannot unanimously agree upon either a sentence of death or a sentence of life in prison without the possibility of release, the Court will impose the sentence required by law.

Now, we have prepared for you, as I have already indicated, copies of the 30 pages of instructions, and we have one verdict form with respect to each of the victims. The Special Verdict Form No. 1 is with respect to the murder of William Mueller, and Special Verdict Form No. 2 is with respect to the murder of Nancy Mueller, and Special Verdict Form No. 3 is with respect to the murder of Sarah Powell.

You will take these verdict forms to the jury room with you. Follow the instructions on them. Complete them as required and be careful to sign the certification at the end of the -- each set of verdict forms.

All right, now, I'm going to let you go. Where are the -- the two alternates will remain for the moment.

Let's swear the marshal, please. Where is he? Come forward, please.

(Bailiff sworn.)

THE COURT: Let me ask the attorneys once more if

Carolyn S. Fant
United States Court Reporter

7997

Instructions

there are any exceptions or objections to the manner in which the Court is presenting these issues -- that is, in terms of the content of the capital final instructions or the verdict forms or anything that the Court has now said to the jury in an abbreviated form.  For the government?

MR. LIROFF:  No, Your Honor, thank you.

THE COURT:  For the defendant?

MS. COMPTON:  No, Your Honor.

THE COURT:  Ladies and gentlemen, you may retire except for the alternates.

(Jury retires at 10:55 a.m.)

THE COURT:  Now, the 12 jurors have retired and we have two alternates who have sat through these three months, and it is my obligation to tell you that you will be discharged.  I know that you would probably like to sit in on the deliberations even if you cannot participate, but the law does not permit that to happen.  I wish it did, because I can understand the desire for anyone who's invested so much time and effort in an enterprise to see it through to the end.  I am going to ask you to remain under the rule until the verdict is received and not to discuss the case.  Keep the same admonition in mind.  I'm going to let you leave, however.  I don't know how long the jury will deliberate, but once they have returned their verdicts then you are completely discharged.

I cannot possibly thank you enough for your service

Carolyn S. Fant
United States Court Reporter

7998

to your country as jurors over this protracted period of time. You made a great sacrifice and we all appreciate it.

All right, court will be in recess.

(Recess 11:00 a.m.)

(2:25 p.m.; jury not present.)

THE COURT:  Good afternoon.

I had asked you in here to discuss what the Court should do about sentencing, regardless of the verdict, and to get your views on the necessity for a Presentence Investigation Report, and we will get to those issues.  But just a moment ago after we got down here we received a note, and then a few moments later we received a second note.  So let me read you the first note we received.

The first is: "We have a juror who does not believe in the death penalty - no matter what the crime." Exclamation point.  "No matter what the crime" being underlined.

Second note -- that was the foreperson.  The second note is signed by a juror.  It's a juror rather than the foreperson. "I think we need more time to discuss it."

So the question is: What should we do and how should we respond?  One alternative would be to call in the jury and in effect go back to the instructions we have already given, which is, and I will quote it: "As stated in these instructions, it is your duty to consult with one another and to deliberate with a view to reaching agreement if you can do

Carolyn S. Fant
United States Court Reporter

7999

so without violence to your individual judgments.  Of course, you must not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict.  Each of you must decide the case for himself or herself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, you should not hesitate to re-examine your own views or, indeed, to change your opinion if you are convinced that it was erroneous."

That instruction goes on.  I'm not sure we weren't probably at the same situation in the Kehoe sentencing, but that's just speculation.  But there is the other question whether the Court should advise the jury that if they cannot reach a unanimous verdict for the penalty of death, then they should take up and consider whether they can reach a unanimous verdict of life without parole.  And if they cannot reach either, that would be a hung jury and the Court would then, as advised in the instructions, decide the sentence in accordance with the law.

Instruction No. 11 states: "At the end of your deliberations, if you determine that the defendant be sentenced to death, or life imprisonment without the possibility of release, the Court is required to impose that sentence.

"If you cannot unanimously agree whether the

Carolyn S. Fant
United States Court Reporter

8000

defendant should be sentenced to death or life imprisonment without the possibility of release, the Court will impose a sentence of life imprisonment or a sentence of life imprisonment without the possibility of release as required by law."

So, let me hear from the government first. What is your reaction to the notes? What is your suggestion with respect to the appropriate response?

MR. LIROFF: Your Honor, I would suggest that there is another possibility here. The note as sent to us -- the first note suggests to me that there is one juror who is incapable of following the law that was given to you -- given to them by yourself, and I would suggest that it's appropriate for you to question that juror individually to determine if they are capable of following the law that you gave them. If they indicate --

THE COURT: Go ahead.

MR. LIROFF: I would indicate that I have met this situation before and have seen that heard. If a juror says that they cannot in good conscience follow the law, then you have authority to discharge that juror and substitute an alternate juror. If the juror says merely that in good conscience I'm voting -- in consideration of the law I'm voting the verdict that I think is appropriate, that's one thing. And everything else that the Court proposed to do is fine, but the

Carolyn S. Fant
United States Court Reporter

8001

statement -- the first note says to me that one juror is not considering the law, not deliberating, and not following their duty as a juror, and that's the proposal I suggest.

THE COURT:  Let me ask you:  You said you have met this before.  Where and when did you have this happen and in what court?

MR. LIROFF:  You know that I am recently with the Justice Department.  You know that there are very few federal death penalty cases. I am a California lawyer.  This is an issue that we have hit a number of times in California.  In fact, we specifically instruct the jurors to -- there is a new model jury instruction that was implemented just this past year that literally tells the jury organization if a juror is refusing to deliberate, that's grounds for discipline and they should report that to the Court.

THE COURT:  You're talking about California law?

MR. LIROFF:  I am addressing California law, but I believe this is a principle that would apply to this case; that the note says to me that this juror under no circumstances would impose the death penalty.  If that's true, then the juror is not accepting and following the law that you gave them.

THE COURT:  Well, let me -- I want to hear the rest of you out, but it's my own view that would be a mistrial. There would be no ability to substitute a juror; that you cannot interfere -- we have done the voir dire in which that

was explored in depth and that person indicated that he or she could follow the law even though they had some attitudes maybe against the death penalty.

Now they are in deliberations and the people who are not agreeing with that juror are characterizing his or her view as -- that they do not believe in the death penalty "no matter what the crime."

You know to -- well, I want to hear from the defendant first. I haven't made up my mind how to handle it, but I'm giving you -- my tentative view is we would retry the case or at least the penalty phase of the case. And that would mean impaneling, I guess, a new jury. That would be where I think we end up under the United States law, as opposed to California law. But we haven't briefed it and it may be that California authority would be persuasive here. Anybody else on the government side have any other law or argument or suggestion?

MR. STRIPLING:  No, Your Honor.

THE COURT:  Let me hear, all right, Ms. Compton.

MS. COMPTON:  Your Honor, I cannot cite you any law at all, and I'm not even sure which portion of the statute I'm talking about, but my interpretation, as you might have guessed it, would be that this means this jury cannot reach a verdict in the penalty phase, so the only thing that the Court can do is to impose the lesser sentence, which would be life without,

Carolyn S. Fant
United States Court Reporter

8003

and they can quit now.

If you don't follow that view, then I think the best thing to do is let them alone for awhile and see what happens.

THE COURT:  Yes, especially in light of the last note.  I really don't think any real intervention at this time would be appropriate in the light of this note that says, "I think we need more time to discuss it."

But I was looking beyond that and I was really wondering how we should respond to these notes and if we should go beyond saying yes, I think you should discuss it further in accordance with the Court's instructions, or should we do as I mentioned?  The alternative being if you cannot reach unanimous agreement as to the death penalty, essentially the jury is hung on that issue and then the question would be whether you should take up and consider whether you can unanimously or cannot unanimously agree to life without parole.  And, of course, if you can, then that's the verdict that the Court would have to impose.  If you cannot, then the Court would impose the verdict required by law.

MS. COMPTON:  If you're going to bring them in or send a note back and instruct them of anything, what you just now said would be my preference because I think it does follow although I can't cite which section of the statute says that.

THE COURT:  Mr. De La Cruz.

MR. DE LA CRUZ:  Your Honor, I direct the Court's

Carolyn S. Fant
United States Court Reporter

8004

attention to Federal Rule of Criminal Procedure 23(b), which is juries of less than 12.  And the last sentence reads: "Even absent such a stipulation among the parties to proceed forward with a jury of less than 12, if the Court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the Court a valid verdict may be returned by the remaining 11 jurors."

THE COURT:  Well, of course -- go ahead.

MR. DE LA CRUZ:  If we reach the point where it's determined or the Court determines that there has been a juror who essentially lied during voir dire and misrepresented their views or are attempting to create a mistrial, this Court has the discretion under Rule 23 to discharge that jury -- that juror and to put it to the remaining 11.

MS. COMPTON:  But we have alternates, Your Honor. Before we did that, we could bring an alternate, I would guess.  I also think that that rule and the statutory language of 3593 or 4 -- I think the statute tells you exactly what to do.

THE COURT:  3593(b): "If the attorney for the government has filed a notice as required under subsection (a) and the defendant is found guilty of or pleads guilty to an offense described in section 3591, the judge who presided at the trial or before whom the guilty plea was entered, or another judge if that judge is unavailable, shall conduct a

8005

separate sentencing hearing to determine the punishment to be imposed.  The hearing shall be conducted,

One, before the jury that determined the defendant's guilt;

Two, before a jury impaneled for the purpose of the hearing if:

(A) the defendant was convicted upon a plea of guilty;

The defendant was convicted after a trial before the court sitting without a jury;

The jury that determined the defendant's guilt was discharged for good cause; or,

(D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary, or" -- and major category 3 -- "before the court alone, upon the motion of the defendant and with the approval of the attorney for the government."

"A jury impaneled pursuant to subsection two" -- that is, a jury impaneled for the purpose of the hearing -- "shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate, with the approval of the court, that it shall consist of a lesser number."

So, you know, you can't remove jurors because you disagree with their thinking on the issues presented.  And, you

8006

know, I'm not confident -- we had an agreement here about keeping alternates, but if the decision has to be made by -- I don't know how that works. Well, let me put it this way: I don't see for a moment how I can call in a juror and say, "We understand that you're not agreeing with your fellow jurors because you do not believe in the death penalty no matter what the crime or no matter what the law or what the circumstances. You know, justify your position."

I have been as this business for almost 30 years and the whole idea is an anathema when considering the roles of jurors in our society. True, it may be that a juror got on this jury by misrepresenting his or her views on the death penalty. But, you know, to take up and make that inquiry, investigation at this point is obviously not called for.

In any event, it is clear to me that I need to counsel them, yes, to continue to discuss in an attempt to reach an agreement, so that's what I'm going to do. The question is the format of that, how I should go about it, and, you know, we may later have to face these questions depending upon what happens after they further discuss.

So let me ask the government -- assuming that's the way I'm going to do it, I'm going to in effect instruct them to continue their deliberations in an attempt to reach agreement. Do you want me to -- do you want to suggest the manner in which that should be presented either by a note or by calling them in

Carolyn S. Fant
United States Court Reporter

8007

here and telling them what I think should be done?

MR. STRIPLING:  Your Honor, I think our preference would be that they be called back in and the Court make that point.

THE COURT:  Call them back in?

MR. STRIPLING:  Yes, sir.

THE COURT:  And in making it, do you think it's appropriate that I use the instructions that I read as kind of the predicate for what their obligation is?

MR. STRIPLING:  Yes, Your Honor.  I think probably the Court, using the instructions as the idea behind it, just explained it -- I think it might sound better if the Court weren't reading, and using that to go by, talk to them about the situation here.  I believe that would -- I believe that would help the jury get over this hurdle possibly.

MS. COMPTON:  I don't have any problem with that.

THE COURT:  All right, let's have the jury in, please.

(Jury returns to the courtroom.)

THE COURT:  All right, ladies and gentlemen.  The Court has received two notes.  The first note states: "We have a juror who does not believe in the death penalty - no matter what the crime." The second note is from an individual juror and it states: "I think we need more time to discuss it." I have discussed with the attorneys these notes and have decided

Carolyn S. Fant
United States Court Reporter

8008

that I would call you in and briefly discuss with you where I think we are.

Yes, we are going to be asking you to go back and to continue your discussion.  I want to remind you of some of the instructions that I gave earlier that might more directly bear upon this issue, although you must keep all the instructions in mind as you decide the case.

One of these instructions is: "It is your duty to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgments.  Of course, you must not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict.  Each of you must decide the case for himself or herself, but do so only after impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views or, indeed, to change your opinion if you become convinced that it was erroneous. But do not surrender your honest conviction solely for the purpose of reaching a verdict.

So, those are the outlines of how each individual -- each juror must decide the case for himself or herself.

Now, there is another instruction that I want to

8009

remind you of, and that is, that if at the end of your deliberations you determine that the defendant be sentenced to death or life without the possibility of release, the Court is required to impose that sentence. If you cannot unanimously agree whether the defendant should be sentenced to death or life imprisonment without the possibility of release, the Court will impose the sentence of life imprisonment or a sentence of life imprisonment without the possibility of release as required by law.

So your note suggests that you are deliberating with respect to the death penalty, and, of course, to impose the death penalty you must be unanimous. If you cannot reach unanimous agreement on the death penalty, you must at least consider whether you can reach unanimous agreement on life without parole or release.

If you cannot reach agreement on either one ultimately, if you end up being a hung jury on both issues, the matter is essentially turned back to the Court for its decision under the law. But these are the steps. It seems to me you're involved in the process. You need to continue to do it. You need to keep in mind those instructions -- and, by the way, you have a copy out there in case you want to look through and review them -- but this is a serious matter. You haven't been at it that long. I'm going to send you back now and particularly in light of the note that I've got that more time

Carolyn S. Fant
United States Court Reporter

8010

is requested to discuss it.  Of course, we are going to give you more time.  You are entitled to take as much time as you want to resolve this issue, but do so and try to be conscientious and respect your own honest views, but also give some respect to the views of your fellow jurors.  You may now leave.  Return to the jury room, please, and continue your deliberations.

(Jury leaves courtroom.)

THE COURT:  Now, I know in light of the development the attorneys have other things on their minds, but maybe a little distraction would not be out of order.

Has the government considered the need for any presentence report prior to sentencing?

MR. STRIPLING:  Your Honor, we have not considered it in any great detail and the short discussion that we had, our feeling is that there is no need for one here.  If something comes up, we certainly could reconsider our position.  We haven't given it any in-depth consideration, but off the top of our head we don't see the need for one.

THE COURT:  Have you given any thought to the consideration of the punishment under Counts I and II?

MR. STRIPLING:  We think probably under the law, given the findings on those two counts, that life sentences are the appropriate sentences under those two.

THE COURT:  Let me ask you another thing. What is the

Carolyn S. Fant
United States Court Reporter

8011

difference, if anything, between a life sentence versus life without the possibility of release under a system where there is no parole?  You get life, and this idea that you get 56 days a year for good time, what is that subjected from? Is it not -- isn't a life sentence the same as life without parole?

MR. STRIPLING:  As the system stands now, Your Honor yes.  The only concern that I have had through all of this regarding life as opposed to life without possibility of release is that at some point down the line Congress may go back and review this matter.  And I guess this goes to my personal feelings relating to cases other than capital cases. In the course of my work I see sentences imposed regularly that given the crime, especially in drug cases, Your Honor, appear to me to be quite large given the fact that they only get 56 days off the sentence, and I appreciate the view that Congress has now and appears to be held out for the future, but I would think at some point Congress might go back and reconsider this whole structure.  And were that to occur, I think it might make some difference.  At this point, I really don't think it does.

THE COURT:  Well, the possibility that they might reassess the sentencing guidelines is something that I would hope they would do.  In any event, let me hear from the defendant.  Really, what I'm leading up to is we have the defendants here in Little Rock.  It seems to me that if there is no -- if the sentence is cut and dried if there is no

Carolyn S. Fant
United States Court Reporter

8012

discretion in the Court with respect to the sentence, what in the world is the need for a presentence report and the 75 to 90-day delay that you usually experience in getting one?  So if we didn't need one and the parties agreed we didn't need one and further agreed what the sentence must be, then that could be imposed on Monday.  We have the question of custody, the marshals, we have the expense, and we could go ahead and do that without sending them off somewhere and bringing them back and all of that.

Let me hear from the defendants.  What wants to speak to this?

MS. COMPTON:  Your Honor, I don't know of any difference between life without possibility of release and life, and I don't think there is any need whatsoever for a presentence report.  I don't think this would benefit my client.  I don't know of any way it would, so I have no objection to sentencing on Counts I and II.

MR. HALL:  My only concern, Your Honor, is that I have heard from other defense lawyers that the presentence report can influence where the Bureau of Prisons puts somebody.  They don't have a whole lot of choice in this case where to put Mr. Kehoe, but if there is a difference between maximum security and super max, that's a big difference.  And I think the verdict forms alone in the punishment phase would say a lot more than a presentence report, because I think that

Carolyn S. Fant
United States Court Reporter

8013

might be a determining factor:  the level of intent they found and the mitigating factors.  I hesitate to completely waive the presentence report because of that reason, but I really don't see the point for one when life is the only option the Court has anyway.

THE COURT:  Where is the language, Eva?

The Rule 32 under judgments provides:  "(b), presentence investigation and report.  When made.  The probation officer must make a presentence investigation and submit a report to the court before the sentence is imposed unless, (A), the court finds that the information in the record enables it to exercise its sentencing authority meaningfully under 18 U.S.C. 3553; and, (B), the court explains this finding on the record.

"Notwithstanding the preceding sentence, a presentence investigation and report, or other report containing information sufficient for the court to enter an order of restitution, as the court may direct, shall be required in any case in which restitution is required to be ordered."

So I think the last part doesn't apply, but I think the Court could make a finding that it has no discretion, that the sentence is -- a certain sentence is required and, therefore, it does not need the benefit of any report.

Now, Ms. Higginbotham mentioned to me that probation

Carolyn S. Fant
United States Court Reporter

8014

mentioned to her that, when sentences are so imposed, the Bureau of Prisons can obtain and frequently seeks a report -- a post-sentence report essentially on the background, the same kind of information that's in the presentence report, to be made available to the Bureau of Prisons.  So apparently there is a procedure by which the same information can be and is routinely obtained in those unusual cases where sentences are imposed without the benefit of a presentence report.  She said the only difference in the report is it does not contain the guideline analysis because it is not pertinent to the sentencing.

I think that would cover the concerns that you expressed, Mr. Hall.  So I'm just going to leave it this way for the time being.  My inclination is to bring the defendants in at 9:30 on Monday morning for the purpose of sentencing, so I think you all should be prepared to be here on that occasion.

The question about allocution.  I probably would, as I usually do, call upon the defendants if they have anything to say before the Court imposes the sentence required by law and they would have an opportunity to speak if they wanted to.

Any comments or suggestions in this regard, Mr. Hall?

MR. HALL:  One matter, Your Honor.  The Court may recall back in December I requested the date of the 18th and 19th off for Laura's graduation from college.  I changed my

Carolyn S. Fant
United States Court Reporter

8015

plane ticket to go Saturday with the rest of my family, so I would not be here.  Mr. Hampton will be here, but I will be back next Wednesday night.

THE COURT:  Do you object to Mr. Hampton handling this?

MR. HALL:  No, Your Honor, not at all.

THE COURT:  I can understand.  I didn't know you had changed your ticket, but it can be handled in your absence with the other attorneys.

MR. HALL:  Thank you, Your Honor.

THE COURT:  Anything for the government?

MR. STRIPLING:  No, sir.

THE COURT:  Court will be in recess.

(Recess 3:08 p.m.)

(Verdict of the jury at 4:15 p.m.)

THE COURT:  All right, ladies and gentlemen.  Have you reached your verdict with respect to the penalty to be imposed on Counts III, IV and V of the indictment?

FOREPERSON:  Yes, we have, Your Honor.

THE COURT:  Please hand them to the marshal.

(Handed to the court.)

THE COURT:  All right, there will be no demonstration or outbursts regardless of the verdict.  You may read the verdicts.  You can go directly to the answers and I will ask Ms. Madison to follow through, and if they are the same with

Carolyn S. Fant
United States Court Reporter

8016

Jury Verdict

respect to the other forms when you come to them we can so advise.

COURTROOM DEPUTY: "In the matter of United States of America v. Daniel Lewis Lee, LR-CR-97-243(2). Special Verdict Form No. 1, William Mueller murder. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Daniel Lewis Lee was 18 years of age or older at the time he killed William Mueller, that being January the 11th, 1996?" Answer: "Yes." Juror 100, foreperson.

Under the requisite mental state:

"A: Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Daniel Lewis Lee intentionally killed William Mueller?" Answer: "Yes." Juror 100, foreperson.

"B: Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Daniel Lewis Lee intentionally participated in an act, contemplating that the life of William Mueller would be taken, or intending that lethal force would be used against William Mueller, and William Mueller died as a direct result of that act?" Answer: "No." Juror 100, foreperson.

"C: Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Daniel Lewis Lee intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of

Carolyn S. Fant
United States Court Reporter

8017

Jury Verdict

death to William Mueller, and that participation in the act constituted a reckless disregard for human life and William Mueller died as a direct result of that act?" Answer: "Yes." Juror 100, foreperson.

Three, statutory aggregating factors.

"A: That Daniel Lewis Lee committed the offense of murdering William Mueller in the expectation of receiving something of pecuniary value?" Answer: "Yes." Juror 100, foreperson.

"B: That Daniel Lewis Lee committed the offense of murdering William Mueller after substantial planning and premeditation?" Answer: "No." Juror 100, foreperson.

"C: That Daniel Lewis Lee intentionally killed more than one person in a single criminal episode." Answer: "Yes." Juror 100.  Foreperson.

Four, non-statutory aggravating factor - future dangerousness. "That Daniel Lewis Lee's (a), involvement in the murder of Joseph John Wavra on or about July 24, 1990 in Oklahoma City, Oklahoma; (b), misdemeanor conviction of carrying a concealed weapon in Martin County, Florida on May 3, 1995; and, (c), lack of remorse, as evidenced by his statements made to Gloria Kehoe, establish that Daniel Lewis Lee would be a danger in the future to the lives and safety of other persons." Answer: "Yes."  Juror 100, foreperson.

Five, mitigating factors.  "Daniel Lewis Lee alleges the

8018

Jury Verdict

following mitigating factors:

One, Mr. Lee's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge. Number of jurors, if any, who so find: Zero."

"Two, Mr. Lee was under duress regardless of whether the duress was of such a degree as to constitute a defense to the charge. Number of jurors, if any, who so find: Zero."

"Three, Mr. Lee does not have a significant prior criminal record other than his juvenile record. Number of jurors, if any, who so find: Zero."

"Four, Mr. Lee committed the killing or killings under mental or emotional disturbance. Number of jurors, if any, who so find: Zero."

"Five, another person, equally culpable in the crimes, will not be punished by death. Number of jurors, if any, who so find: Three."

"Six, Mr. Lee was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of parental guidance and protection which he needed. Number of jurors, if any, who so find: Six."

Seven, Mr. Lee suffers from neurological impairments which were identified and which could have been treated when he was a child and adolescent. Number of jurors, if any, who so

Carolyn S. Fant
United States Court Reporter

8019

Jury Verdict

find: Zero."

"Eight, Mr. Lee suffers from brain dysfunction which has impaired his ability to function in the absence of strong support and guidance. Number of jurors, if any, who so find: Zero."

"Nine, Mr. Lee was introduced to drugs and alcohol while still a child. Number of jurors, if any, who so find: Zero."

"Ten, Mr. Lee needs a structured environment and would likely benefit from the structure of a prison. Number of jurors, if any, who so find: One."

"Eleven, Mr. Lee was only 22 years old when the murders were committed. Number of jurors, if any, who so find: Zero."

"Twelve, Mr. Lee is a follower and was under the influence of Chevie Kehoe, and possibly others, at the time of the offense. Number of jurors, if any, who so find: Zero."

"Thirteen, other persons were involved in this racketeering enterprise and conspiracy who will, under the law, receive no sentence or substantially less punishment or were not prosecuted. Number of jurors, if any, who so find: Three."

"Fourteen, Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers. Number of jurors, if any, who so find: Two."

Six, determination. "A, death sentence. We determine, by

Carolyn S. Fant
United States Court Reporter

8020

Jury Verdict

unanimous vote, that a sentence of death shall be imposed for the murder of William Mueller." Answer: "Yes."  And all the jurors have signed it.

Certification.  All the jurors have signed the certification.

THE COURT:  Now to the extent that it is the same, so indicate and anything that's different indicate.

COURTROOM DEPUTY:  On Special Verdict Form No. 2, Nancy Mueller murder, all of the answers are the same.

THE COURT:  And Verdict Form No. 3.

COURTROOM DEPUTY:  On Verdict Form No. 3, Sarah Powell murder, on the requisite mental state: "A, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Daniel Lewis Lee intentionally killed Sarah Powell? Answer: "No."

THE COURT:  All other answers being the same?

COURTROOM DEPUTY:  No.

Under the statutory aggravating factors, "C: That Sarah Powell was a particularly vulnerable victim due to her youth, that being eight years old." Answer: "Yes."  Juror 100, foreperson.

Those are the differences. All the rest are the same.

THE COURT:  And the certification has been signed by all 12 in each case?

COURTROOM DEPUTY:  They have.

Carolyn S. Fant
United States Court Reporter

8021

Jury Verdict

THE COURT:  Now, ladies and gentlemen of the jury, you have heard the clerk read the findings and the death sentence imposed in connection with each of the Counts III, IV, and V.  Are those your findings and your verdicts, each of you individually and all of you together?

(All answer in affirmative.)

THE COURT:  Does any party request the Court poll the jury with respect to the death sentence?

MR. STRIPLING:  No, Your Honor.

MS. COMPTON:  Yes.

THE COURT:  All right, now I'm going to call you by your number and if the verdicts as read were yours, simply state "my verdict" and we'll move right through the jurors in that manner.

Verdict -- excuse me, Juror Number 4.

JUROR 4:  My verdict.

THE COURT:  Juror 507.

JUROR 507:  My verdict.

THE COURT:  934.

JUROR 934:  My verdict.

THE COURT:  748.

JUROR 748:  My verdict.

THE COURT:  222.

JUROR 222:  My verdict.

THE COURT:  100.

Carolyn S. Fant
United States Court Reporter

8022

Jury Verdict

JUROR 100:   My verdict.

THE COURT:   106.

JUROR 106:   My verdict.

THE COURT:   28.

JUROR 28:    My verdict.

THE COURT:   490.

JUROR 490:   My verdict.

THE COURT:   336.

JUROR 336:   My verdict.

THE COURT:   125.

JUROR 125:   My verdict.

THE COURT:   310.

JUROR 310:   My verdict.

THE COURT:   Now, ladies and gentlemen of the jury, the Court wants to thank you for your service to your country as jurors in this very difficult case and particularly thank you for your long months of service and the contribution you have made as citizens to the justice system.  We are now going to discharge you and permit you to go.  I have had a note I have given to each of the jurors and the alternates thanking you for your service.  You may now leave.  Everyone else remain seated.

(Jury leaves courtroom.)

THE COURT:   Now, if anyone wants to leave, they may. I will take up further matters with the attorneys before we

Carolyn S. Fant
United States Court Reporter

8023

Jury Verdict

recess.

We were -- it's difficult to deal with these matters so close upon the verdict, but the question is sentencing and when it should occur, and we have had some discussion but then we were told by Mr. Stripling that the government was reconsidering the necessity for a Presentence Investigation Report because of the issue of recompense for the victims of the crime.

Is that still your view?

MR. STRIPLING:  It is, Your Honor, and I apologize for not having considered this earlier.  I have reviewed the mandatory restitution section of the -- of Title 18.  I have also reviewed Rule 32 regarding the imposition of restitution. It appears from reviewing the statute and the rule that a presentence report is required before restitution can be ordered by the Court.  I realize that it appears that both defendants are indigent and normally would not pursue the matter.

But we also feel that there is a possibility that they might receive funds because of the notoriety involved in this case, and if that were to occur it seems there might be money available for restitution.  And for this reason we feel that we need to pursue the matter.

THE COURT:  What I think we should do in this case then -- the marshal -- is to permit the defendants to be

Carolyn S. Fant
United States Court Reporter

8024

Jury Verdict

removed back to wherever they are to be kept and called back after we resolve this issue of getting the presentence reports.

It is important that Mr. Lee be interviewed before his departure, so I suppose he needs to be interviewed on Monday and departure on Monday or Tuesday. I will leave that up to the Marshal's Service and the probation office to see if they can get that going.

But I also am asking the government, since they are taking the initiative on this, to provide a brief on this issue. If both the defendants are, indeed, indigent, is there any predicate? Do we have authority that the fact they are possibly coming into funds would be a basis for ordering restitution, and for whom is the restitution? The legal heirs? In other words, the son of Mr. Mueller, the father of Ms. Mueller? Who are we talking about? It seems to me you're going to have to make some showing about how that should delay sentencing while we have a complete presentence report when, as we view it, there is no discretion in the Court in sentencing in view of the verdict of the jury. I will let you file some memorandum on that next week and ask the defendants to respond.

Anything else that any of the attorneys wish to take up with the Court before we recess?

For the government?

Carolyn S. Fant
United States Court Reporter

8025

Jury Verdict

MR. STRIPLING:  No, Your Honor.

THE COURT:  For the defendant?

MS. COMPTON:  No.

THE COURT:  Court will be in recess.

(At 4:35 p.m., the above-entitled proceedings were concluded.)

- - -

# C E R T I F I C A T E

I, Carolyn S. Fant, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of proceedings in the above-entitled case.

_____
Carolyn S. Fant

Date: 5/17/99

Carolyn S. Fant
United States Court Reporter