**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| **DANIEL LEWIS LEE,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Case No. 2:19-cv-00468-JPH-DLP** |
| | ) | |
| **WARDEN, USP-TERRE HAUTE,** | ) | **CAPITAL CASE** |
| **UNITED STATES OF AMERICA,** | ) | **EXECUTION SCHEDULED FOR** |
| | ) | **DECEMBER 9, 2019** |
| Respondents. | ) | |

---

## REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

---

MORRIS H. MOON
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Appellant Daniel Lewis Lee

Dated: November 8, 2019

**Preliminary Statement Regarding Citations and Designations**

Petitioner Daniel Lewis Lee shall be referred to throughout this pleading as Petitioner or Mr. Lee. Respondents shall be referred to as the Government. Citations to documents filed in the district court criminal docket, *United States v. Lee*, No. 4:97-cr-00243 (E.D. Ark.), shall be designated as "Doc. No." Citations to the consecutively-paginated trial transcript shall be designated as "Tr." Citations to the previously-filed Petition for Writ of Habeas Corpus (Dkt. 1) shall be designated at "Pet." Citations to exhibits shall be designated as "Exh." Citations to the Government's Response in Opposition to Daniel Lewis Lee's Petition for a Writ of Habeas Corpus (Dkt. 14) shall be designated as "GR."

Mr. Lee attached thirteen exhibits, labeled Exhibits A through M, to his previously-filed Petition to provide supporting factual detail. *See* Dkt. 1-2 through 1-14. Mr. Lee has attached one additional exhibit to the instant pleading, and has consecutively labeled it as Exhibit N.

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………...1

I.    28 U.S.C. § 2241 PROVIDES A REMEDY WHERE A PETITIONER CAN ESTABLISH THAT § 2255 HAS PROVED INADEQUATE OR INEFFECTIVE…………………………………………………………………..2

II.   28 U.S.C. § 2241 ALLOWS THE COURT TO REVIEW MR. LEE'S TRIAL IAC CLAIM…………………………………………………………………...5
.
      A.  The Government Misapplies and Largely Ignores *Martinez/Trevino*……………5

      B.  The Government Misconstrues Mr. Lee's § 2241 Argument……………………..7

      C.  Mr. Lee Was Deprived of His Sixth Amendment Right to Effective Assistance of Counsel at Trial…………………………………………………………………10

          1.  The Government's factual misrepresentations…………………………………10

          2.  The Government's legal inaccuracies…………………………………………..15

III.  THERE IS A "GLITCH" IN § 2255 THAT ALLOWS THE PROSECUTION TO HIDE EVIDENCE MATERIAL TO PUNISHMENT UNTIL IT IS TOO LATE FOR A PRISONER UNDER SENTENCE OF DEATH TO SECURE JUDICIAL REVIEW…………………………………………………………...17

      A.  The Government has Chosen to Knock Down a Strawman rather than Respond to the *Brady* and *Napue* Claims…………………………………………………17

      B.  The Government's Suppression Analysis is Fundamentally Flawed……………19

      C.  The Government Knew or Should Have Known It Presented False Evidence…..21

      D.  The Government's Materiality Analysis does not Withstand Scrutiny………….24

          1.  The Government's trial presentation did not reflect Mr. Lee's "true role" in the Wavra murder…………………………………………………………24

          2.  At best, the Government's response establishes the need for discovery and further fact development…………………………………………………...27

      E.  The *Brady* and *Napue* Claims are Properly Cognizable under § 2241…………..29

IV.    FAILURE TO ALLOW DANIEL LEE THE OPPORTUNITY TO LITIGATE HIS INEFFECTIVENESS AND *BRADY/NAPUE* CLAIMS WOULD AMOUNT TO AN UNCONSTITUTIONAL SUSPENSION OF THE WRIT…………………..31

CONCLUSION…………………………………………………………………………32

CERTIFICATE OF SERVICE…………………………………………………………33

**INTRODUCTION**

Daniel Lee's death sentence was unjustly obtained. It rests on a junk science theory that the Government cannot defend and claims about a prior murder that the facts now refute. Federal district courts in Arkansas have found that if *either* of these misrepresentations had not been made Danny Lee would not have been sentenced to death. But review of both errors in the post-conviction process proved elusive. Mr. Lee now presents this Court with narrow arguments, grounded in the jurisprudence of this Circuit, as to why 28 U.S.C. § 2255 has proved ineffective to address either violation and why, under the unique circumstances at issue, § 2241 remains available.

The Government's Response in Opposition sidesteps both the facts and the law. In a case where the lopsided roles of the two defendants is a significant factor, the Government quietly substitutes a "they" where its record consistently names Kehoe alone. *See* GR at 2 (Chevie Kehoe alone shot and killed the child Sarah Powell); at 9 (Kehoe alone was "flush with cash" and the Muellers' property). Where subsequent disclosures debunked its evidence, the Government rewrites the case the jury actually heard. GR at 11 (portraying the hair, said to physically connect Lee to the crime but now excluding him, as "one small item"); at 40-42, 52-54 (diminishing the prosecution's reliance on the PCL-R when it was the Government that elicited all of that evidence and when it constituted the bulk of the penalty phase testimony; *see United States v. Lee*, 89 F. Supp. 2d 1017, 1019-20, 1023, 1031 (E.D. Ark. Mar. 21, 2000)).

Respondent's engagement with the case law is no more reliable. It ignores the sea change in the law that *Martinez* and *Trevino* wrought and the role that change plays in Mr. Lee's first claim for review. GR at 28, 32. The Government recasts the *Brady* issue to depend on a fee application, *id*. at 17, 36, when that is clearly not Petitioner's claim. It refers to the procedural

history of the Lee case as encompassing "extensive review" when the two violations now before this Court have never been reviewed, due primarily to the Government's urging of procedural blocks or to its withholding of the facts. Where the controlling cases are squarely against it, Respondent merely asserts they were wrongly decided. *Id*. at 27 n4.

This Court is faced with an unusual death penalty case with solid evidence of prejudicial error and a limited argument for § 2241 jurisdiction and review. Mr. Lee submits this reply to clarify the record and the questions before the Court.

**I.    28 U.S.C. § 2241 PROVIDES A REMEDY WHERE A PETITIONER CAN ESTABLISH THAT § 2255 HAS PROVED INADEQUATE OR INEFFECTIVE**.

There is no dispute between the parties that post-conviction challenges to federal convictions and sentences are governed by 28 U.S.C. § 2255. Mr. Lee timely filed a § 2255 motion in Arkansas in 2006. Unfortunately for him, his § 2255 lawyers dropped the ball on a key claim of trial counsel ineffectiveness—the failure to challenge the PCL-R's use at his capital sentencing—right before the Supreme Court changed the law on incompetent lawyering in initial-review collateral proceedings. Also, unfortunately for (and unbeknownst to) Mr. Lee, the Government failed throughout those proceedings to disclose facts contrary to material representations it had made in securing his sentence of death.

Unlike § 2254 cases (where defendants have two opportunities for post-conviction review and federalism concerns are at play), the statute governing federal post-conviction review includes a sub-section, § 2255(e), that explicitly recognizes that there may be times where the federal post-conviction remedy may not be adequate to address a patent injustice. Congress chose not to repeal or modify § 2255(e) when it enacted the AEDPA with its successor provisions. *See* 28 U.S.C. § 2255(h). Thus, contrary to the Government's assertion that § 2255(e)

2

"forecloses" claims, GR at 18, the savings clause remains fully available where litigants can establish inadequacy of the § 2255 remedy.

Before addressing the specific claims for which Mr. Lee seeks § 2241 review, the Government offers two general arguments as to why he cannot prove inadequacy or ineffectiveness here. One is that all cases in the Seventh Circuit finding § 2241 jurisdiction pursuant to the savings clause were wrongly decided. GR at 27 n.4. As it is not the province of this Petitioner or this Court to disregard precedent, Mr. Lee will not take time here to disprove that assertion.

The Government then maintains that jurisdiction is not available here by pointing to three cases—*Davenport*, *Garza,* and *Webster*—and claiming that they represent the three "categories of habeas claims . . . permitted by the § 2255 savings clause." GR at 27. According to the Government, because Mr. Lee's claim does not fall into one of these "narrow categories," he cannot proceed in this Court. *Id*. Section 2241, however, does not lend itself to such a mechanistic approach. The savings clause provides a remedy when § 2255 has proved inadequate or ineffective, an analysis that requires scrutiny of the specific facts and circumstances of a particular case.

The Government's creation of "categories" to apply in assessing § 2241 petitions is not the proper approach and not how the Seventh Circuit proceeds. In 1998, *In re Davenport,* 147 F.3d 605 (7th Cir. 1998) set out a three-part test to determine when § 2241 is available to inmates affected by changes to the Armed Career Criminal Act. If this Court followed the Government's logic, *Davenport* established a "category" of habeas claims allowed by § 2241. But three years later when *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) was decided the Seventh Circuit did not reject it out of hand because it did not fit in the "narrow category" of *Davenport.* Instead, the

3

court examined the particular circumstances of the case to determine whether the essential function of § 2255 was impaired. After determining that it was, the court crafted a remedy under § 2241 to address the inequity in Garza's case.

Similarly, in the more recent case of *Webster v. Daniels,* 784 F.3d 1123 (2015), the *en banc* Seventh Circuit did not merely dismiss Webster's argument by rote application of the case "categories" in *Davenport* and *Garza*. Instead, it again examined the circumstances of the case before it to determine whether § 2255 was inadequate or ineffective. In fact, the Government in *Webster* tried to convince the Seventh Circuit of the same argument it is making before this Court but failed to persuade the circuit. *See Webster v. Caraway*, No 14.1049 (7th Cir. Apr. 30, 2014), Doc. 16 at 44 (Section entitled "Webster's claim is unlike the narrow band of cases that satisfies the savings clause.")[1] Savings clause jurisprudence simply does not bear out the limitations the Government has tried to impose on it. *See, e.g., Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013) (rejecting district court's reliance on *Davenport* to require showing of innocence to invoke § 2241 and finding jurisdiction on sentencing issue); *Beason v. Marske*, 926 F.3d 932 (7th Cir. 2019) (describing the various ways in which § 2241 jurisdiction has been found); *Fulks v. Krueger*, No. 2:15-cv-00033, 2019 WL 4600210, at *14 (S.D. Ind. Sept. 20, 2019) ("The Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found").

Access to the § 2241 remedy depends not on a petitioner raising the identical facts as a prior, differently situated litigant but on whether he has had "a reasonable opportunity to obtain a

---

[1] The Government cannot even seem to accept the court's explicit findings in *Webster*. It describes the relevant documents in that case as unavailable "purportedly because of missteps by the Social Security Administration…" GR at 26. In fact, Judge Lawrence held an evidentiary hearing on the issue on June 18, 2018 and issued a detailed order specifically finding that the Social Security Administration failed to turn over the records despite multiple requests by the defense. *See Webster v. Lockett*, No. 2:12-cv-86-WTL-MJD, Dkt. 117 (S.D. IN. Aug. 31, 2018).

reliable judicial determination" of the legality of his conviction or sentence. *In re Davenport*, 147 F.3d at 609. The standard has been articulated in several ways in this circuit but the focal point has remained the same: some structural problem, some "glitch" or "lacuna" in the implementation of the § 2255 statute, must have prevented the petitioner from securing review of the error. *See Webster,* 784 F. 3d at 1136 (noting variety of iterations in the case law but finding that "[a]ll of these decisions hold, nevertheless, that there must be some kind of structural problem with section 2255 before section 2241 becomes available."); *Beason*, 926 F.3d at 939 (§ 2241 authorizes relief from "fundamental sentencing defects") (citations omitted).

Mr. Lee has established a structural problem precluding effective § 2255 review for both of the claims for which he seeks jurisdiction in this Court.

## II.   28 U.S.C. § 2241 ALLOWS THE COURT TO REVIEW MR. LEE'S TRIAL IAC CLAIM.

The Government argues that the savings clause of § 2255(e) does not permit Mr. Lee to litigate his trial IAC claim in this Court. GR at 28. The Government is incorrect. Its argument conflates legal principles and ignores case law unhelpful to it. It also misstates the underlying issue Mr. Lee has raised in this Court.

### A.  The Government Misapplies and Largely Ignores *Martinez/Trevino*.

The Government attempts to write *Martinez* out of this case entirely. *Martinez v. Ryan*, 566 U.S. 1 (2012); *Trevino v. Thaler*, 569 U.S. 413 (2013). It dedicates an entire section of its briefing to arguing that Mr. Lee's claim was available during his § 2255 proceedings and thus could have been raised previously without mention of the intervening *Martinez* decision. *See* GR at 28-30. In fact, the Government asks this Court to reject Mr. Lee's pleading by relying on cases and language written before the Supreme Court's decisions in *Martinez* and *Trevino. See* GR at

29 (citing *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002) and *United States v. Barrett*, 178 F.3d 34 (1st Cir. 1999)).

When the Government finally does mention *Martinez* and *Trevino*, it simply asserts that they were cases about state prisoners and thus have no relevance. GR at 31-33. In a footnote, the Government informs the Court that it "disagrees with much of [Lee's] discussion and analysis" but because it feels *Martinez* and *Trevino* are "not pertinent" it "does not discuss these matters in detail here." GR at 33 n. 5. Somewhat ironically, in that same footnote, the Government grudgingly admits (contrary to its argument) that the Seventh Circuit has applied *Martinez* and *Trevino* to § 2255 cases. *Id*.

The Government then attempts to explain the Seventh Circuit decision away by selectively citing to tangentially related cases and its own previous briefing. These arguments do not hold water. For example, according to the Government, *Adams v. United States*, 911 F.3d 397 (7th Cir. 2018) distinguishes "*Ramirez* [*v. United States,* 799 F.3d 845 (7th Cir. 2015)] because Ramirez's 'attorney abandoned him.'" This simply misstates the case. The *Adams* court denied the Rule 60 motion not because of some distinction between ineffectiveness and abandonment but rather because there was no procedural error in the case and Adams' claim had been fully resolved on the merits. *Id*. at 411. Contrary to the Government's position, the Seventh Circuit actually noted in *Adams* that the district court had

> erred by relying on a rigid rule that because § 2255 proceedings are civil, there is no constitutional right to counsel and thus no ability to challenge the effectiveness of one's § 2255 counsel. (§ 2255 R. 45 at 5). As we noted in *Ramirez*, 799 F.3d at 848, this would have been correct before the Supreme Court's decisions in *Trevino v. Thaler*, 569 U.S. 413, 429, 133 S. Ct. 1911, 185 L.Ed.2d 1044 (2013); and *Martinez v. Ryan*, 566 U.S. 1, 9, 132 S. Ct. 1309, 182 L.Ed.2d 272 (2012). Those two decisions, however, have changed how courts should view claims of ineffective assistance of counsel at initial-review collateral proceedings. *Ramirez*, 799 F.3d at 848.

6

*Id.* at 411.

The other case the Government cites, *Lombardo v. United States*, 860 F.3d 547 (7th Cir. 2017) resolved a different issue: whether § 2255 counsel's errors can justify equitable tolling of the statute of limitations. The Seventh Circuit held that such an argument was already foreclosed by Supreme Court precedent in *Lawrence v. Florida,* 549 U.S. 327 (2007) and *Holland v. Florida*, 560 U.S. 631 (2010). *Id*. at 557. The Response points to *dicta*, where the panel did suggest that *Ramirez* should be read as resting on attorney abandonment. *Id.* at 559. The Government however fails to mention that this *dicta* is inconsistent with the holdings of cases in the Seventh Circuit and this District. *See e.g. Crutchfield v. Denison,* 910 F.3d 968, 975 (7th Cir. 2018) ("In *Ramirez v. United States,* we held that federal prisoners may use the exception to obtain review of defaulted *Strickland* claims. . . . For these reasons, we held in *Ramirez* that 'the situation of a federal petitioner is the same as the one the Court described in *Trevino*: as a practical matter, the first opportunity to present a claim of ineffective assistance of trial or direct appellate counsel is almost always on collateral review[] in a motion under section 2255.'"); *Brown v. Brown,* 847 F.3d 502, 509-10 (7th Cir. 2017) ("This court applied the *Martinez-Trevino* doctrine to federal prisoners who bring motions for post-conviction relief under § 2255."). *See also Cano v. Warden USP- Terre Haute*, No. 2:17-cv-00441, 2018 WL 3389746, at *4 (S.D. Ind. Aug 8, 2018) (assuming, in light of *Ramirez, Martinez/Trevino* applies to federal prisoners).

The Government's cursory dismissal of *Martinez* and *Trevino's* application to § 2255 cases is simply unsupported by Seventh Circuit law and unhelpful to the decision at issue here.

### B.  The Government Misconstrues Mr. Lee's § 2241 Argument.

The Government tries to convince this Court that § 2241 is an inappropriate vehicle in Mr. Lee's case because he "had the opportunity to raise any ineffective assistance claims he

wanted to assert in his first § 2255 motion." GR at 33. According to the Government, Mr. Lee is arguing that "the only impediment to raising the ineffective assistance claim in his first § 2255 motion was the negligence of his § 2255 lawyers" and § 2241 is therefore not available because "[a]ttorney negligence…is not a 'structural problem' or 'lacuna' in § 2255 that prevented him from raising the [IAC] claim." GR at 34. In opposition to Mr. Lee's argument, the Government presents a parade of horribles, warning this Court that if it rules in favor of Mr. Lee "Petitioners easily could characterize the failure to raise an available claim in a § 2255 motion as negligent so that the claim may be raised in a habeas petition, circumventing § 2255(h)'s gatekeeping provisions for second of successive § 2255 motions." GR at 30.

This is, however, not Mr. Lee's argument. The petition he filed in this Court did not raise a trial IAC claim for the first time. And Mr. Lee is not arguing that the structural impediment of § 2255 is his previous lawyers' ineffectiveness. Whatever the merit of an argument allowing a federal inmate to raise a claim for the very first time in a § 2241 petition based on *Martinez*, it is not what Mr. Lee has presented in his petition. The Government has created a sham argument and responded to it instead.

The problem that rendered § 2255 inadequate in Mr. Lee's case was not his attorney's negligence. The problem was the lack of an existing procedure to remedy the prejudicial error created by his attorneys' ineffectiveness given, as Judge Thomas Eisele noted, the "peculiar and special circumstances of this particular case." *Lee v. United States*, 2008 WL 4079315, *60 (E.D. Ark. Aug. 28, 2008). Mr. Lee is not asking this Court to extend § 2241 to allow the filing of new claims for the first time in this Court. In his case, the § 2255 court was fully aware of his trial IAC claim and had the evidence supporting the claim before it. That court, however, was prevented from reviewing the evidence supporting the merits of the claim due to § 2255

8

counsel's failure to present the evidence in a timely manner. Because of that failure, the court was forced to foreclose review of the merits of the claim.[2]

The "glitch" in the operation of the § 2255 statute in Mr. Lee's case is two-fold. First, *Martinez* and *Trevino* did not exist when the trial court determined that his § 2255 attorneys' errors foreclosed review of the evidence establishing his trial IAC claim. Even though the reviewing court had the evidence before it and clearly recognized the problem caused by Mr. Lee's attorneys, the court had no way to remedy the problem because *Martinez* had yet to be decided. Second, after *Martinez* and *Trevino* were decided Mr. Lee tried to avail himself of their remedy through a Rule 60(b) motion. As explained in his petition, the Eighth Circuit refused to allow him back into court and dismissed his attempts. Thus no further avenues within § 2255 exist by which he may adjudicate his claim.

Contrary to the Government's posturing, the structural problem in Mr. Lee's case is not the ineffectiveness of his § 2255 lawyers. Instead, it is the manner in which, in his particular

---

[2] The Government spends several pages arguing that "procedural default" is a doctrine applicable only to state prisoners and that "federal prisoners do not suffer procedural default for failing to raise ineffective assistance claims prior to their first § 2255 motion." GR at 31-33. This argument is not convincing for several reasons. First, *Martinez*'s concern was the ability to obtain "meaningful review of a claim of ineffective assistance of trial counsel" in an "initial-review collateral proceeding." *Martinez*, 566 U.S. at 12. Its ruling was not based on whether various case law has adopted the technical term "procedural default" in a § 2255 context. A § 2255 is the initial-review collateral proceeding for federal prisoners and ineffective habeas counsel can therefore thwart meaningful review of a trial IAC claim by violating procedural requirements. *See Crutchfield, supra.* The Government never addresses the Supreme Court's actual concern.

Second, the absence of the term "procedural default" of a trial IAC claim in § 2255 case law tells us nothing germane to this case. Prior to the existence of the *Martinez* doctrine there would have been no reason to discuss procedural default in such a context because the effectiveness of habeas counsel had no bearing on a federal inmate's post-conviction case. This is not to say, however, that the doctrine of procedural default was not part of § 2255 jurisprudence. *See e.g. Withrow v. Williams*, 507 U.S. 680 720-21 (1993) (Scalia, J, dissenting) (noting that in § 2255 if a claim is not raised on direct review, "it is procedurally defaulted and the habeas court will not adjudicate it absent countervailing equitable considerations…"). Judge Eisele found that Mr. Lee's § 2255 counsel violated a procedural rule and thus "foreclosed" review of a claim.

case, the timing of Supreme Court decisions and the peculiar operation of § 2255 combined to foreclosure full merits review.[3] Because the operation of the § 2255 statute precluded him from a reasonable opportunity to obtain a reliable judicial determination of his trial Sixth Amendment right, Mr. Lee should be permitted to proceed under § 2241.

### C. Mr. Lee Was Deprived of His Sixth Amendment Right to Effective Assistance of Counsel at Trial.

The Government's response spends great effort arguing that the admission of the PCL-R at Mr. Lee's punishment phase was a result of great lawyering and was not at all prejudicial. GR at 38-59. This wholesale reimagining of Mr. Lee's trial is flatly inaccurate both factually and legally. It attacks arguments that Mr. Lee does not make and conflates the performance and prejudice prongs of *Strickland*. Counsel for Mr. Lee highlights the most egregious errors below.

#### 1.  *The Government's factual misrepresentations.*

According to the Government "[t]he fundamental flaw in Lee's argument is that there was no expert opinion evidence at Lee's trial—by Dr. Ryan or anyone else—that his diagnosis as a psychopath showed he would be a danger to others in prison." GR at 52. This is an astounding position. Throughout appellate review, the Government has always claimed that the psychopathy evidence was properly admitted because it was relevant to a determination of future dangerousness. In fact, the Eighth Circuit agreed with the Government on direct appeal and reversed the district court's grant of a new trial, finding that "Lee's potential psychopathy was probative of his future dangerousness, a subject of the government's case in chief…" *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001).[4]

---

[3] See Pet. at 25 n.25, 29 (discussing procedural rule foreclosing merits review in Mr. Lee's § 2255).

[4] Because trial counsel did not object to the PCL-R's ability to reliably predict future danger in prison, the case went up on direct appeal on the assumption that it could.

In Mr. Lee's case the jurors had two options at sentencing: they could sentence him to life in prison or give him the death penalty. The Government now plays a shell game with the evidence asking this Court to find no prejudice because "the jury never heard any expert opinion testimony linking psychopathy and future dangerousness in prison." GR at 54. This is a specious claim. If the psychopathy evidence was relevant to future dangerousness (which the Government argued on direct appeal) then it was either about Mr. Lee's future dangerousness *in prison* or the Government has been misleading prior courts and the evidence was improperly introduced. *See e.g., United States v. O'Reilly*, 545 F. Supp. 2d. 630, 638 (E. D. Mich. 2008) ("[w]hen the only alternate punishment to death is life imprisonment without the possibility of parole[]…district courts appear to have uniformly held that the government is limited to presenting evidence on future dangerousness [as it applies to life in prison]") (quoting *United States v. Rodriguez*, No. 2:04–CR–55, 2006 WL 487117, at *5 (D.N.D. Feb. 28, 2006)); *United States v. Peoples*, 74 F. Supp. 2d. 930, 932 (W.D. Mo. 1999) ("dangerousness should not be measured in the same manner as if a defendant were to be 'uncaged'; life in prison without parole, a firmly fixed federal requirement, must mean that the focus of the dangerousness analysis is on prison conditions."); *United States v. Llera Plaza*, 179 F. Supp. 2d 464, 487-488 (E.D. Pa. 2001) ("[T[he jury will be instructed that it is to evaluate the defendants' 'future dangerousness' in the context of life imprisonment, and the government will be requested to limit its sentencing phase evidence to that which is relevant to a context of life imprisonment."); *United States v. Tavares*, 424 F. Supp. 2d 446 (E.D. NY. 2006) (excluding allegation of sexual abuse of a minor because of "minimal relevance to the future danger posed by defendant to those whom he is, if convicted, likely to spend the rest of his life—adult guards and male inmates."), *aff'd* at *United States v. Pepin,* 514 F.3d 193, 206 (2d Cir. 2008).; *See also* 1 Leonard b. Sand, *et al.*, *Modern Federal*

11

*Jury Instructions* --- Criminal Inst. 9A-17 (2008) ("You may only consider the non-statutory aggravating factor of future dangerousness in the context of the mandatory life sentence without the possibility of release that must be imposed by the Court if Defendant is not sentenced to death, and the conditions of confinement that may likely be imposed by the United States Bureau of Prisons"). The Government cannot argue on the one hand that the PCL-R was relevant to whether Mr. Lee would be a future danger, but on the other claim it had no effect on the case because no one understood it to be about future dangerousness in prison.

The Government also tries to downplay the importance of the psychopathy testimony during trial stating that it "came in only through Lee's own expert witness," GR at 52, and that the prosecutors' arguments telling the jury how to interpret the PCL-R should be discounted because the jury was instructed that argument is not evidence. GR at 55. The Government further claims that after the defense case, neither Dr. Ryan nor the Government ever mentioned psychopathy again. GR at 42. The Government's reworking of Mr. Lee's trial divorces facts from their relevant context and is, frankly, disingenuous. The opinion of Judge Eisele—who presided over the trial and watched every witness—itself contradicts the Government's protestations. The trial judge found that "it is very questionable whether the jury would have given Defendant Lee the death penalty based on the Government's direct case, a properly confined cross-examination of Dr. Cunningham, and a properly limited rebuttal by the Government." *Lee*, 89 F.Supp.2d at 1031. This finding has never been reversed or disturbed by any subsequent reviewing court.[5]

---

[5] The Government also avers that "Lee does not appear to question the validity of his diagnosis as a psychopath." GR at 50-51. Counsel have no doubt whatsoever that this diagnosis is false and that Mr. Lee is not a psychopath. This diagnosis is called into question by psychological literature examining the PCL-R in general and by specific evidence in Mr. Lee's case including treatment records from his juvenile in-patient programs and other information that precludes such a diagnosis for Mr. Lee. Counsel have not challenged this finding here because it is simply not relevant to the claim before this Court.

Respondent's deceptive characterization of the trial goes on. The Government now seems to suggest that the psychopathy evidence was not a key feature of its case and came in only incidentally during cross-examination of the defense expert. The Government relies in part for this assertion on the fact that the trial prosecutors told the judge that they did not intend to present evidence of the PCL-R until the defense opened the door. GR at 40. The Government's trial arguments alone belie this portrayal. During opening, the prosecution told the jury it would learn an aspect of Mr. Lee's "psychological profile that in the end will convince you that as he sits here today and will be in the future, Mr. Lee is a dangerous man. That ladies and gentleman, is a lot of what this trial will be about." Tr. 7379. The prosecutor went on: "In the end, what the evidence that will be presented will establish is that Mr. Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use." Tr. 7381. And "[w]e will prove in this case to you that Mr. Lee, because of his psychological profile, who he is and who he will be for years to come, is dangerous and will continue to be dangerous." Tr. 7383.

It is simply not believable that the Government did not fully intend to bring in evidence of psychopathy into Mr. Lee's case from the outset. Whether it was their strategy to introduce it through cross-examination or whether they were merely planning to wait until rebuttal is not clear. But no experienced trial attorney promises a jury a medical diagnosis of psychopathy in opening statement without a plan to deliver.

Moreover, the references to this prejudicial evidence did not cease after cross-examination of Dr. Cunningham as the Government would have this Court believe. GR at 42. For example, although the Government may be technically correct that Dr. Ryan "did not testify about his diagnosis of Lee as a psychopath," *id*, this is a highly misleading assertion. First, by the

---

Should this Court be interested in the issue however, given the time counsel would be more than willing to develop the evidence demonstrating that this diagnosis is invalid.

13

time Dr. Ryan took the stand, that was no longer necessary, as the Government had already elicited that information from Dr. Cunningham who was aware of and discussed Dr. Ryan's diagnosis.  Pet. at 7-9. But the prosecution's expert also did discuss and refute Dr. Cunningham's testimony concerning scoring the PCL-R. He simply used veiled language. For example, Dr. Ryan testified he did not agree with Dr. Cunningham and when asked if he believed Dr. Cunningham expressed opinions he considered unscientific, he replied yes. Tr. 7949. Dr. Ryan specifically referenced "scoring a particular test." *Id*.[6] Dr. Ryan told the jury that that author of "this one particular test" scored it differently from Dr. Cunningham; that he believed Dr. Cunningham's approach was wrong; and that there is no literature supporting Dr. Cunningham's opinion "on that one test." Tr. 7949-50. The Government acknowledged, "we're being very oblique, but I appreciate that." *Id*. In context, it doesn't take a genius juror to know that Dr. Ryan and the prosecutor were discussing the PCL-R.

Similarly, the Government claims that the prosecution "also did not mention psychopathy during closing arguments." GR at 42. Even if technically true this statement is extremely misleading in context. During cross-examination of Dr. Cunningham, the Government had established what it considered the key features of psychopathy, including lack of remorse, Tr. 7805, poor behavior control, Tr. 7805-09, being prone to violence, Tr. 7806, and lacking a conscience. Tr. 7784-85. During closing, Prosecutor Liroff repeatedly referenced these features referring to Mr. Lee as "a man without a conscience," Tr. 7958, that he had a "love of violence," Tr. 7957, and was "dedicated to violence," Tr. 7960, and that he could not control his behavior. Tr. 7957. And as if the references were not already clear enough to the jury, he told them: "Can't

---

[6] This questioning directly recalled the Government's cross-examination of Dr. Cunningham where it grilled him about differences in scoring the PCL-R and whether one could be deemed a psychopath with a certain cut-off score. Tr 7796.

14

we all, with the benefit of hindsight, look at this and see, My God, look at what the *diagnosis* was." Tr. 7968 (emphasis added). That "diagnosis" was psychopathy.

### 2. *The Government's legal inaccuracies.*

The Government also rewrites Mr. Lee's claim. According to its Response, to succeed on his claim Mr. Lee must show that "an expert opinion linking psychopathy and future dangerousness in prison would not make it through the gatekeeping requirements for expert opinion testimony," GR at n.7, or that it is inadmissible in general due to its unreliability. GR at 56. Although Mr. Lee has demonstrated the unreliability of the PCL-R in capital sentencing, this is not his claim. All he needs to prove for a *Strickland* claim is that, had his trial lawyers challenged Dr. Ryan with readily available psychological literature, Dr. Ryan would have retracted his conclusions and the jury would not have heard them. *Strickland* does not demand that Mr. Lee prove all courts would exclude the evidence or that no other expert would disagree with him. He must simply show that, if a proper challenge was made, this expert (Dr. Ryan) would have retracted his opinion and the jury would not have heard this prejudicial evidence. *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (deficient performance is "a *context-dependent* consideration of the challenged conduct as seen 'from counsel's perspective at the time.'") (Emphasis added).

Finally, the Government claims that Mr. Lee cannot show his trial lawyers' performance was deficient because challenges to the PCL-R in other cases were not successful. GR at 57-58. This also is both factually and legally incorrect. The *Strickland* performance prong asks whether the trial lawyers' conduct was reasonable in light of the facts of the case and existing criminal defense standards. Mr. Lee has shown that the defense bar was aware of these potential challenges and that defense lawyers were raising them at the time of Mr. Lee's trial. To establish

15

deficient performance, he is not also required to prove that such challenges always succeeded in other cases.[7]

Moreover, the Government's discussion of these other cases is misleading and inaccurate. For example, the Government informs this Court that the § 2255 court in *Stitt* "concluded that Dr. Ryan's later disavowal of this opinion did not provide a basis to grant the defendant a new sentencing hearing." GR at 58 n. 8. The claim in *Stitt,* however, was based solely on Dr. Ryan's recantation and thus the petitioner had to prove different elements from those required for a *Strickland* claim. Even so, in its discussion, the *Stitt* court made clear that Dr. Ryan's PCL-R testimony was erroneous and noted that "[g]iven the nature of Dr. Ryan's testimony about the nature and consequences of Petitioner's psychopathy, the Court finds that it is clear that the jury might have reach[ed] a different verdict." *Stitt v. United States*, 369 F. Supp. 2d 679 (E.D. Va. 2005).[8]

Daniel Lee has a strong claim for access to the § 2241 remedy and for relief on an error that tainted the jury's sentencing verdict.

---

[7] The only scenario where the Government's argument makes sense is if Mr. Lee's lawyers considered the challenge and rejected it because they knew it was unsuccessful elsewhere. This is, however, not what happened. Because Mr. Lee has never received full review of this claim, the record has not been developed. Because the Government contests material facts in this claim, discovery and factual development is necessary.

[8]The Government also claims that in response to his Rule 59 motion, the federal district court rejected the Dr. Ryan claim on the merits finding that Dr. Ryan's Spring 2000 declaration could not have been available to Mr. Lee's trial counsel in 1999. GR 46-47. In his ruling, Judge Eisele made clear that he might have had an evidentiary hearing on this issue but, due to counsel's errors he was "foreclosed by existing legal principle" from considering the evidence. When he later posits the alternative "merits" discussion referred to by the Government it is clear that he was not familiar with the facts in the documents. Although the declaration was signed in 2000, Dr. Ryan states in it that the information about the PCL-R was available in 1998 (a year before Mr. Lee's trial) and that had he known about it he would not have participated in a 1998 trial. There is thus no temporal problem with Mr. Lee's claim and the Government has no argument that Judge Eisele's comments are accurate or defensible. The errors of § 2255 counsel, however, prevented a hearing which could have cleared up this factual error and ensured that this false narrative could not be addressed on appeal. It is unfortunate that the Government continues to muddy the waters with what was clearly a factual error by Judge Eisele.

16

**III.    THERE IS A "GLITCH" IN § 2255 THAT ALLOWS THE PROSECUTION TO HIDE EVIDENCE MATERIAL TO PUNISHMENT UNTIL IT IS TOO LATE FOR A PRISONER UNDER SENTENCE OF DEATH TO SECURE JUDICIAL REVIEW.**

The Government's responses to the misconduct claims raised in Mr. Lee's § 2241 petition are no more illuminating of the issues before the Court.

### A.  The Government has Chosen to Knock Down a Strawman rather than Respond to the *Brady* and *Napue* Claims.

According to the Government, Mr. Lee's allegation is that the prosecution failed to disclose the Oklahoma defense attorney's fee application. GR at 62-63, 66. After setting up this strawman, the Government argues that such a claim cannot be a violation of *Brady* or *Napue* because the fee application was publicly available. *Id*. at 65-67, 74. By reframing Mr. Lee's allegation this way, the Government's Response fails to address the actual questions at hand.

Mr. Lee's *Brady* claim is not that the Government suppressed the fee application. Rather, it is that the Government withheld information in its possession about the real reason the Wavra murder charge was resolved in a plea to robbery: It wasn't because the Oklahoma prosecutors gave Mr. Lee a "gift," it was because an Oklahoma court found there was insufficient evidence to establish even probable cause that Mr. Lee committed murder. The Government consulted with detectives from the Oklahoma City Police Department who were involved with the case, who interrogated the juvenile Danny Lee, and who testified at the preliminary hearing of the actual murderer, David Patton. Mr. Lee alleges that the Government, as part of these or other discussions, must have learned of facts exculpatory to Mr. Lee and failed to disclose them. His claim is that *this* information—*i.e*., the facts surrounding that plea—constitutes *Brady* material.

The Government tried this strawman argument once before and failed. *See* Doc. No. 1303 at 45 n.9. Judge J. Leon Holmes of the Arkansas district court recognized that the fee application

17

is not the basis of the *Brady* claim; rather, it is strong support for Mr. Lee's factual allegations that such exculpatory information exists and was suppressed.[9] The fact that the fee application was publicly available is thus beside the point: The relevant *Brady* material is not that document, but rather the underlying exculpatory facts explaining the plea deal—facts that the prosecution team suppressed.[10]

Moreover, the Government's strawman argument is irrelevant to the *Napue* claim. Even assuming that claim *was* about the fee application and therefore potentially was available to trial counsel, that would not have absolved the Government of its duty to correct false testimony and misleading impressions. And certainly the prosecution was not allowed to bolster such false and misleading evidence during arguments to the jury as it did in Mr. Lee's case. *See United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("But the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false."); *United States v. O'Keefe*, 128 F.3d 885, 894-95 (5th Cir. 1997) ("[E]ven when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument … or the defense is unable to utilize the information … or when the government thereafter asks misleading questions.") (Internal citations omitted).

---

[9] *See* Doc. No. 1313 at 10 ("Lee argues the Government suppressed *the fact* that an Oklahoma state court found at a preliminary hearing that there was insufficient evidence for a first-degree murder charge against him in the Wavra case. … He attaches *in support* an "Application For Attorney Fees"[.]") (emphasis added).

[10] *See* Pet. at 47 n.43 ("The billing record itself is not the subject of Mr. Lee's misconduct claims. Rather, it is offered as proof that the Government withheld information from the defense about what really happened and presented its case in a false light to the jury.").

**B. The Government's Suppression Analysis is Fundamentally Flawed.**

The Government argues that the suppression element cannot be established because the fee application was a public document. This argument relies on the same strawman: that document is not the *Brady* evidence. Indeed, the Government is conspicuously silent regarding Mr. Lee's allegation that the two Oklahoma detectives it enlisted to help develop the Wavra evidence for Mr. Lee's capital trial (1) knew the real reason the essentially inflated murder charge was resolved with a robbery plea, and (2) shared that information with the federal prosecution team. That information is *not* publicly available, and it is undisputed that the Government never disclosed it to the defense.

Moreover, the Government is engaged in burden-shifting. The *Brady* rule is aimed at defining an important *prosecutorial* duty, not the obligations of defense counsel. The Government's attempt to turn that duty on its head is not doctrinally supported and undermines the purpose of *Brady*. In fact, the Supreme Court has explicitly rejected the notion that defense counsel's failure to discover exculpatory information relieves the prosecution of its constitutional duty of disclosure. *See Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."). *See also Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 291 (3d Cir. 2016) ("[T]he concept of 'due diligence' plays no role in the *Brady* analysis."); *Amado v. Gonzalez*, 758 F.3d 1119, 1136-37 (9th Cir. 2014) (finding that the due diligence rule "is contrary to federal law as clearly established by the Supreme Court ... and unsound public policy."); *United States v. Tavera*, 719 F.3d 705, 711 (6th Cir. 2013) ("This 'due diligence' defense places the burden of discovering exculpatory information on the defendant and releases the prosecutor from the duty of disclosure. It relieves the government of its *Brady* obligations. In

19

its latest case on the issue [*Banks v. Dretke*, 540 U.S. 668 (2004)], however, the Supreme Court rebuked the Court of Appeals [for the Fifth Circuit] for relying on such a due diligence requirement to undermine the *Brady* rule . . . . [T]he clear holding in *Banks* should have ended that practice.").

The Government also argues that it was not constitutionally required to disclose any *Brady* material in its possession because Mr. Lee was present at his own preliminary hearing. GR at 67. This argument is flawed for a number of reasons. First, Mr. Lee was a *juvenile* at the time of that hearing. It is widely recognized that young defendants are limited in their capacity to fully grasp the proceedings against them. *See*, *e.g.*, *Graham v. Florida*, 560 U.S. 48, 78 (2010). It is unreasonable to presume that Mr. Lee would have appreciated the nature of a probable cause analysis at the time of the hearing or its role in his plea, much less identify its legal significance years later and communicate those facts to his federal trial counsel.[11] Second, the plea was negotiated by a lawyer, not Mr. Lee. The Government offers no factual basis to conclude that his counsel communicated the rationale behind those negotiations, or that the juvenile Mr. Lee would have understood them. Even adult defendants frequently have limited understanding about convictions by plea beyond the bottom-line of whether they will be incarcerated and for how

---

[11] *See McElroy,* 697 F.2d at 465-66:

> The defendant in a criminal case often mistrusts his counsel who, in most instances, has been assigned and not chosen, or believes that his counsel will best defend him if he is kept ignorant of the facts. Even a defendant who cooperates with his counsel cannot always remember all of the relevant facts, or realize the importance to his defense of seemingly inconsequential police actions. Defense lawyers, as a result, often learn much more about what has happened from government discovery, formal and informal, than they do from their clients. This fact surely is one of the reasons behind the adoption of [Federal Criminal] Rule 16 and other rules which have greatly broadened discovery in criminal cases. Considerations of this kind carry especial weight in the present case. McElroy, at the time of his arrest, was only 18 years old. Even a delinquent who may be too wise for his years in the ways of crime certainly is not educated in the ways of the criminal justice system. Although McElroy might reasonably be expected to tell his attorney something about the offense with which he was charged, he could not be expected to know which facts were relevant to his best defense.

long. *See*, *e.g.*, *Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019) (unreasonable to presume that average defendant convicted of a prior crime "*punishable* by imprisonment for a term exceeding one year," but sentenced only to probation, would realize his status as a felon) (emphasis in *Rehaif*). Indeed, the very reason defendants are entitled to the assistance of counsel during plea negotiations is that they are not presumed to understand what considerations are relevant to their criminal liability and sentencing exposure. *See Lafler v. Cooper*, 566 U.S. 156, 163 (2012); *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948). Finally, even if a defendant and a juvenile must be presumed to understand the legal catalyst for a plea offer, the availability of information through the defendant does not negate the Government's duty to disclose exculpatory information or correct false or misleading evidence. *See United States v. McElroy*, 697 F.2d 459, 465 (2d Cir. 1982); *United States v. Howell*, 231 F.3d 615, 625-26 (9th Cir. 2000).

### C.  The Government Knew or Should Have Known It Presented False Evidence.

As the Government concedes, the relevant standard under *Napue* makes the Government liable not only for what it knew but also for what it *should have known. United States v. Cardena*, 842 F.3d 959, 977 (7th Cir. 2016). Here, the Government obtained the Oklahoma state court records on the Wavra case as part of its pre-trial investigation. Given its focus at the capital sentencing on the Oklahoma incident, its reliance on Oklahoma law enforcement witnesses, and its insistence that Danny Lee had been given a "gift," the Government cannot plausibly argue it should not have known or otherwise have investigated why the Oklahoma court dismissed the murder charge against Mr. Lee.[12] *See United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir.

---

[12] The Government argues that the fee application "is not inconsistent with and does not foreclose Lee's acceptance of a beneficial plea deal." GR at 73. This is a diversion. The relevant issue is not whether Mr. Lee's *robbery* plea was favorable, but rather why the murder charge went away. As the Government concedes, the fee application "states that the court in Oklahoma recommended dismissal of the first-degree murder charge." GR at 73. That alone is sufficient to demonstrate that the Government

1992) ("an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure"); *United States v. Auten,* 632 F.2d 478, 481 (5th Cir.1980) (non-disclosure inexcusable "where prosecution has not sought out information readily available to it").

The Government insists in its response that the knowledge of the two Oklahoma detectives it called to testify should not be imputed to the Government because they were not "part of the prosecution team in the federal case against Lee in Arkansas for murdering the Muellers in 1996." GR at 75-76. The law says otherwise. Here, the Government's penalty phase case-in-chief was almost exclusively devoted to the Wavra murder, and Detective Yarbrough was an "important witness[] in the federal prosecution," *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979), through whom the Government admitted testimony about the Wavra murder investigation and photographs of the crime scene. Tr. 7389-97. As such, he essentially functioned as an "agent[] of the federal government under the principles of agency law utilized in *Giglio* [*v. United States*, 405 U.S. 150 (1972)]." *Antone*, 603 F.2d at 570. [13]

---

*should have known* that the explanation involved a judicial act, and one based on a lack of support for the initial charge, not merely prosecutorial discretion.

[13] The Government narrowly defines the prosecution team as consisting solely of the "federal prosecutors." GR at 74-75. However, under *Brady* and *Napue*, the "prosecution team" includes "both investigative and prosecutorial personnel." *Antone*, 603 F.2d at 569. Thus, any exculpatory information that the FBI and ATF case agents learned must be imputed to the Government, too. *See United States v. Bin Laden*, 397 F.Supp.2d 465, 481 (2d. Cir. 2005) ("[I]t is clear that the investigating case agents on a particular prosecution are part of the prosecution team; their possession of producible material is imputed to the prosecutor regardless of his actual knowledge."); *U.S. ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) (recognizing duty to search files maintained by branches of government "closely aligned with the prosecution"). Nor is it a defense if a case agent hid exculpatory information from the prosecutors. *See Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir. 1964) ("The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.").

Given the level of cooperation between the state authorities and the federal prosecution team, the Government certainly *should have known* that this resolution of Mr. Lee's case involved a judicial finding, not simply a local prosecutor's act of grace.

The Government relies on a transcript of a colloquy between one of the prosecutors and the Arkansas district court to opine that "the prosecutors at Lee's trial plainly believed that Lee pleaded guilty to robbery as a result of a beneficial plea agreement." GR at 74. First, what the prosecutors "believed" is immaterial; the standard is what they *should have known*. Second, the transcript does not bear the weight of the Government's interpretation. The colloquy touches only on the fact of a plea deal, not the reason why it had to be offered. Whether that prosecutor knew more at that time is unknown, and what others may have known is not accounted for.

The Government states that it is not "currently aware" if there is any "basis to dispute" that, at the time, the prosecution team believed that Mr. Lee avoided the murder charge as a result of a favorable plea deal. GR at 74. This is hardly a refutation of Mr. Lee's claims. These facts are also peculiarly within the Government's control: whether or not it has sought out this information is unknown. At best, this statement suggests that further fact development is necessary, not that Mr. Lee's claims lack merit. *See* Section III.D.2, *infra*.

---

To the extent the Government suggests that not "every member of the prosecution team's factual knowledge is attributable to the government," GR at 75, that is flatly incorrect. "[A] prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). *See also Giglio v. United States*, 405 U.S. 150 (1972) (due process violation found where one assistant U.S. Attorney promised immunity to a witness, but failed to tell another assistant in the same office who tried the case and stated in summation that no promises had been made; although second AUSA was not dishonest in his summation, prosecutor's office held to be a single entity, with a promise made by one attributable to all).

### D.  The Government's Materiality Analysis does not Withstand Scrutiny.

A federal judge has already determined that the *Brady* evidence at issue here is material. Doc. No. 1313 at 14 ("[A]ssuming that the Oklahoma state court held a preliminary hearing that the evidence was insufficient to establish probable cause that Lee was guilty of murdering Joey Wavra, *that evidence is material*.") (Emphasis added). The Government has no real answer to this.[14] Instead it argues: (1) the facts presented to the jury about the Wavra murder remain the same regardless of the disposition of the charges, and (2) the claims should be denied at this stage for a lack of proof. The first argument downplays the gravity of Mr. Lee's allegations, and the second fails to appreciate the difference between pleading and proving a claim.

### 1.  *The Government's trial presentation did not reflect Mr. Lee's "true role" in the Wavra murder.*

The Government argues that the facts it presented to the jury regarding Mr. Lee's involvement in the Wavra murder "remain the same regardless of the disposition of the charges against Lee" because those facts were taken directly from Mr. Lee's own testimony at his cousin Patton's preliminary hearing. GR at 71.[15] According to the Government, these facts led the

---

[14] The Government asserts that the Arkansas district court's materiality determination was "not necessary to the court's decision" and "dicta." GR at 70. This is incorrect. The issue before the court was whether <u>material</u> *Brady* claims are subject to the gatekeeping requirements for second or successive § 2255 motions. As its opinion makes clear, materiality was a *threshold* issue. *See* Doc. No. 1313 at 14 ("In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different. *Therefore*, *the Court must address the issue of whether a* Brady *claim based on material evidence is subject to § 2255(b)'s preauthorization requirement*.") (Emphasis added).

[15] To the extent the Government suggests that a *Napue* violation cannot be established because its evidence was not *technically* false, that is plainly incorrect. The Government also commits a due process violation when its omission of material information creates a false impression. *See Alcorta v. Texas*, 355 U.S. 28, 29-30 (1957); *United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979) (*Giglio* does not require a lie, but is implicated when testimony creates a false impression by conveying "something other than the truth."). The point the Government made over and over at trial was not that Danny Lee had accepted a robbery plea but rather that he was guilty of murder and escaped justice due to prosecutorial largesse.

24

Arkansas § 2255 court to hold that "there is nothing before the court to indicate that [Lee's] 'true role' in the murders was anything other than as portrayed during the sentencing trial." GR at 72 (citing *Lee*, 2008 WL 4079315 at *45).

However, that court did not have all of the facts before it and its ruling has little to do with Mr. Lee's current claims. The Oklahoma judge reviewed not only the facts later presented at the Arkansas penalty phase trial but also those at Danny Lee's own preliminary hearing. This judge saw all the witnesses and was able to assess their credibility. On the basis of all this evidence—including the testimony read to the capital jury—that judge determined that the prosecution's case for murder against the teenaged Lee was so weak that it did not even satisfy the low evidentiary standard of "probable cause." *See* 22 OK Stat. §22-258 ("The purpose of the preliminary hearing is to establish probable cause that a crime was committed and probable cause that the defendant committed the crime.").

Indeed, the issue here is not simply that the Government falsely told the jury that Mr. Lee was given a "gift" by the Oklahoma prosecutors, but that the underlying "facts" presented at trial regarding Mr. Lee's alleged involvement in the crime were also clearly untrue. One prime example is the testimony of government witness Brian Compton. Mr. Compton was present at the party where Mr. Wavra was killed and was the only eyewitness the Government chose to present to Mr. Lee's capital jury. There (as reflected in the Government's response), Mr. Compton alleged graphic details used to convince the jury to return a death sentence: that Mr. Lee had severely beaten Joey Wavra, forced him into a manhole, and engaged in a "coin toss" to decide whether he should live or die. Tr. 7413-14. Unlike the Oklahoma judge, the capital sentencing jury did not learn that the witness had previously said he did not see who pushed the victim into the manhole, did not see a severe beating, and returned with Mr. Lee to the house

25

while Mr. Patton mused aloud about killing Mr. Wavra. Exh. N (Preliminary Hearing Testimony of Brian Compton, *State of Oklahoma v. John David Patton*, No. CF-90-4118 (9/28/90)) at 172-77, 184-85. Mr. Compton apparently had ingested LSD at the party and was so impaired that he could not hold a conversation or keep track of time, and the effects were so strong that they lasted into the next day. *Id*. at 189-90.

The Oklahoma judge that presided over Mr. Lee's preliminary hearing, unlike the capital jury in Arkansas, had *all* the conflicting evidence before it. The fact that the murder charge was dismissed unmistakably demonstrates that the quality and gravity of the evidence against Mr. Lee was not what the federal capital jury was led to believe. Indeed, the Oklahoma court's judicial finding cannot be squared with the Government's contention that Mr. Lee was "morally and legally responsible for the Wavra murder." GR at 71.

The newly discovered evidence—showing that there was no "gift" but that the Oklahoma judge instead made a legal determination based on the evidence he saw—undermines the Government's narrative and the veracity of the story presented to the jury at trial. As the Arkansas district court recognized, the Wavra murder played a central role in the Government's penalty phase case against Mr. Lee. Doc. No. 1313 at 8-9 ("Both Judge Eisele and the Eighth Circuit recognized the Wavra evidence was an integral piece of the Government's penalty-phase case. … Judge Eisele acknowledged evidence of Lee's participation in that crime was powerful and likely contributed to or influenced the jury's ultimate decision in favor of a death sentence.") (Internal quotation marks and citation omitted). The suppressed evidence thus wholly undercuts one of the Government's most compelling arguments for death. *See*, *e.g.*, *East v. Johnson*, 123 F.3d 235, 238 (5th Cir. 1997) (finding prejudice where state relied heavily in closing argument on crucial future dangerousness witness without disclosing impeachment evidence). In light of

26

the central role the Wavra murder played at Mr. Lee's capital sentencing and the false testimony and argument that supported it, there is ample proof to establish Mr. Lee's *Brady* and *Napue* claims.[16]

> ### 2. At best, the Government's response establishes the need for discovery and further fact development.

The Government asserts that Mr. Lee's *Brady* and *Napue* claims should be denied because the fee application does not conclusively establish what happened in the Oklahoma case GR at 68-69, 72, 74-75. This argument conflates pleading requirements with ultimate proof.

Mr. Lee is not required to provide full proof of his claims in his initial petition. Instead, he must make allegations supported by specific facts demonstrating that he is entitled to relief. In determining whether Mr. Lee has satisfied this pleading requirement, the court must "accept as true all of the factual allegations in the complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Jackson v. Grondolsky*, No. 09–1112, 2009 WL 2496511 at \*2 (D. N.J. Aug. 11, 2009) (quoting *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir.1997)).[17] If it is "plausible" that Mr. Lee "would succeed if he proved everything in his complaint, the case proceeds." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

---

[16] As the Government concedes, the prejudice standard for a *Napue* violation is not the same as for *Brady*: it is whether there is any likelihood the false testimony could have affected the judgment of the jury. *United States v. Augurs*, 427 U.S. 97, 103 (1976). This standard is "more defense friendly," *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009), and "favors granting relief." *Ford v. Hall*, 546 F.3d 1326, 1333-34 (11th Cir. 2008).

[17] *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)").

At this stage, the only relevant inquiry is whether Mr. Lee has adequately pleaded his claims, not whether he has proved them.[18] Indeed, the Government's attempt to apply a heightened evidentiary standard at the pleading stage gets the process precisely backwards. If Mr. Lee's claims meet the pleading requirements, *then* he should have the opportunity to utilize the available means of discovery and fact development to prove his claims. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a district court acts "prematurely" and "erroneously" when it dismisses a well-pleaded complaint, thereby "preclud[ing] any opportunity for the plaintiffs" to establish their case "by subsequent proof"); *Am. Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 723 (7th Cir.1986) (requiring plaintiff to plead unknown details before discovery would improperly deny plaintiff the opportunity to prove claim); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 404 (7th Cir.1984), *aff'd*, 473 U.S. 606 (1985).

The Government's response concedes as much. It admits that the record is not clear and that further fact development might be necessary to properly assess the merits. *See* GR at 69 ("The government has attempted to ascertain what happened at the preliminary hearing but as of yet has been unable to find anything that sheds light on Lee's allegations."); *id*. at 74 n.11 ("[T]he government has attempted to ascertain additional information about the hearing but thus far has been unsuccessful."). Indeed, the Government's acknowledgment that Mr. Lee's petition has spurred it to conduct a preliminary investigation into the allegations demonstrates, at best, that there are genuine issues of controverted fact, and therefore the litigation should proceed to discovery and fact development.[19]

---

[18] That requirement has been met. Indeed, the Arkansas court already recognized that Mr. Lee's allegations were pleaded with enough specificity that, if true, they would establish meritorious *Brady* and *Napue* violations. Doc. No. 1313 at 14.

[19] A motion for leave to conduct discovery pursuant to Habeas Rule 6, which is applicable to § 2241 proceedings, will be forthcoming shortly.

28

### E.  The *Brady* and *Napue* Claims are Properly Cognizable under § 2241.

Section 2255 was unavailable to Mr. Lee because the Government successfully hid its misconduct long enough to trigger the successor provisions of § 2255 and thus deprive him of a remedy. Indeed, despite defense counsel's multiple requests for *Brady* material as to punishment, requests renewed by § 2255 counsel, the Government did not disclose any knowledge of the favorable information on the judicial findings regarding Mr. Lee's preliminary hearing, or about the real circumstances surrounding his guilty plea. Pet. at 59-60. By the time the suppressed evidence was uncovered, the only mechanism for obtaining § 2255 review of his *Brady* and *Napue* claims was by way of a second or successive motion pursuant to § 2255(h) (1). But the Eighth Circuit has interpreted § 2255(h) (1) to only allow successive claims that challenge a movant's guilt, not those addressing the sentence. Pet. at 59, 61. Thus, although a federal judge has found that the Government violated due process in securing its death sentence against Mr. Lee, this "glitch" makes § 2255 inadequate and ineffective to remedy his unconstitutional sentence.

The Government argues that this is what Congress intended, and that the only permissible successive *Brady* claims are those that establish innocence. GR at 37. Thus, no remedy is available if the Government hides its misconduct until after the first round of § 2255 review, even where the newly discovered evidence establishes (as it does here) that, but for that misconduct, no reasonable factfinder would have sentenced the prisoner to death. This is absurd. As the *Webster* court noted, courts are not powerless to act under such circumstances:

> If one were to disagree with our view, stated earlier, that ordinary principles of
> statutory interpretation lead directly to the result that the savings clause applies
> here, then the next step would be to take into account the fact that a core purpose
> of habeas corpus is to prevent a custodian from inflicting an unconstitutional
> sentence. … [T]here is no reason to assume that our procedural system is
> powerless to act in such a case. It is fairly possible to read section 2255(e) as

encompassing challenges to both convictions and sentences that as a structural matter cannot be entertained by use of the 2255 motion. To hold otherwise would lead in some cases—perhaps Webster's—to the intolerable result of condoning an execution that violates the Eighth Amendment. We decline to endorse such a reading of the statute.

*Webster*, 784 F.3d at 1139.

Taken at face value, the Government's position is that Congress has cut off all post-conviction relief for an entire subset of meritorious *Brady* claims that could not have been effectively brought previously. That is precisely the sort of interpretation of § 2255(e) and § 2241 that would result in a suspension of the writ. *See* Pet. at 63-64; *cf. Scott v. United States*, 890 F.3d 1239, 1251 (11th Cir. 2018).[20]

Mr. Lee has been whipsawed by the Government's misrepresentations. It made repeated assurances on the record—at trial and during the initial § 2255 proceeding—that it had fully complied with its *Brady* obligation, thereby preventing Mr. Lee from having a fair opportunity to litigate any Government misconduct claims under § 2255. Now that it has finally come to light that these prior representations were not true, the Government claims that the successor rules preclude post-conviction relief, and that counsel's reliance on the Government's assurances demonstrates a lack of "diligence." The Government's misconduct should not be rewarded. *See* Pet. at 62.

---

[20] Mr. Lee's position would not open the door to all claims resting on newly discovered evidence bearing on a sentence. Indeed, what distinguishes *Brady* claims is that it is the Government's suppression that precluded the movant from raising the claim previously.

## IV.  FAILURE TO ALLOW DANIEL LEE THE OPPORTUNITY TO LITIGATE HIS INEFFECTIVENESS AND *BRADY/NAPUE* CLAIMS WOULD AMOUNT TO AN UNCONSTITUTIONAL SUSPENSION OF THE WRIT.

The Government does not engage with the suspension concerns Mr. Lee raises. The cases it cites deal with petitioners' attempts to invoke § 2241 after they failed to avail themselves of the § 2255 remedy. *Morales v. Bezy,* 499 F.3d 668, 672 (7th Cir. 2007) (Morales sought § 2241 review after missing § 2255's statute of limitations by more than three years; "A prisoner cannot be permitted to lever his way into section 2241 by making his section 2255 remedy inadequate."); *Taylor v. Gilkey,* 314 F. 3d 832, 834 (7th Cir. 2002) (Gilkey failed to file a notice of appeal). GR at 37.[21] The ways in which § 2255 proved inadequate in his case were not of Mr. Lee's making: he sought to rely on *Trevino* to cure his counsel's default as soon as the case was announced, and it was the Government who hid the truth about the Wavra prosecution through both trial and post-conviction proceedings. *See Poe v. LaRiva*, 834 F.3d 770, 772 (7th Cir. 2016) (savings clause requires structural problem foreclosing "even one round of effective collateral review" unrelated to petitioner's own mistakes) (internal citations omitted). Indeed, in asserting that the Constitution entitles a prisoner only "an opportunity to raise [an] ineffective assistance claim," the Government would read *Martinez v. Ryan* and *Trevino v. Thaler* out of existence altogether. The Supreme Court has now held that that any meaningful opportunity may, as it did in this case, require a lawyer who performs effectively in that initial-review collateral proceeding.

---

[21] Oddly, the other cases cited, *Lindh v. Murphy*, 96 F.3d 856 (7th Cir. 1996) (*en banc*), *rev'd on other grounds*, 521 U.S. 320 (1997), and *Felker v. Turpin*, 518 U.S. 651 (1996) involved initial challenges to the AEDPA when it was first enacted. Both were cases brought pursuant to § 2254—which has no savings clause.

31

"In a case where the Section 2255 procedure is shown to be 'inadequate or ineffective,' [§ 2255(e)] provides that the habeas corpus remedy shall remain." *United States v. Hayman*, 342 U.S. 205, 223 (1952). If Mr. Lee is denied access to § 2241, he will have been denied the opportunity to litigate two fundamental errors, both of which clearly contributed to his sentence of death.

## CONCLUSION

For the reasons given above and in his Petition, Daniel Lee respectfully requests that this Court find that he has satisfied the standard for pursuing relief pursuant to 28 U.S.C. § 2241, that discovery and a hearing are warranted, and that he is entitled to a new capital sentencing proceeding.

Respectfully submitted,

\s\ Morris H. Moon                    \s\ George G. Kouros
Morris H. Moon                       George G. Kouros
Assistant Federal Public Defender    Assistant Federal Public Defender
Federal Capital Habeas Project       Federal Capital Habeas Project
6411 Ivy Lane, Suite 710             6411 Ivy Lane, Suite 710
Greenbelt, MD 20770                  Greenbelt, MD 20770
(713) 880-3556                       (301) 821-0855
Morris_Moon@fd.org                   George_Kouros@fd.org

32

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Indiana using the CM/ECF system on November 8, 2019. I certify that all the participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/Morris H. Moon
MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

Counsel for Daniel Lewis Lee