UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DANIEL LEWIS LEE,           )
                           )
              Petitioner,   )
                           )
        v.                  )        No. 2:19-cv-00468-JPH-DLP
                           )
WARDEN  USP TERRE HAUTE, et al.  )
                           )
              Respondents.  )

**OPINION AND ORDER STAYING EXECUTION OF DANIEL LEWIS LEE**

Daniel Lewis Lee is a federal prisoner on death row at the United States Penitentiary in Terre Haute, Indiana.  He was sentenced to death 20 years ago in the United States District Court for the Eastern District of Arkansas after a jury found him guilty of murdering a gun dealer and the gun dealer's family to steal money and guns.  The conviction and sentence were affirmed on direct appeal.  Mr. Lee sought postconviction relief under 28 U.S.C. § 2255 in the district court where he was convicted and sentenced.  That request was denied by the district court and the court of appeals affirmed.  Mr. Lee filed further § 2255 motions challenging his death sentence in the district court of conviction, but those challenges were denied on procedural grounds.

Mr. Lee now seeks relief from this Court by way of a 28 U.S.C. § 2241 petition alleging ineffective assistance of counsel and newly discovered evidence as the basis for the relief sought.  Mr. Lee first argues that his trial counsel was ineffective during the penalty phase of his trial in violation of his Sixth Amendment rights.  Mr. Lee next argues that newly discovered evidence shows

1

that the United States violated his due process rights when it suppressed material evidence and misled the jury regarding the nature of a prior conviction. Mr. Lee seeks a stay of his execution and asks the Court to authorize him to conduct discovery.

Mr. Lee is entitled to a stay of his execution based on his due process claims.[1] While further factual development is needed for the Court to be able to resolve the claims presented in Mr. Lee's petition, he has shown there is a significant possibility that he can bring these claims in a § 2241 action and substantial grounds for the claims. The other factors necessary to obtain a stay also weigh in Mr. Lee's favor. Accordingly, Mr. Lee's execution is stayed until further order of this Court.

## I.

The following procedural background focuses on the facts relevant to Mr. Lee's due process claims.[2]

### A. The Indictment and Trial

Mr. Lee and his co-defendant Chevie Kehoe were indicted in the United States District Court for the Eastern District of Arkansas. *See United States v. Lee*, No. 4:97-cr-00243-KGB-2 (E.D. Ark. Dec. 12, 1997), Dkt. 1. They were tried

---

[1] The Court does not address or need to reach whether Mr. Lee's ineffective assistance claim warrants a stay.

[2] A complete recitation of the facts and procedural background can be found in the opinions issued by the United States Court of Appeals for the Eighth Circuit following Mr. Lee's appeals. *See United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) ("*Lee I*"); *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004) ("*Lee II*"); *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013) ("*Lee III*"); *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015) ("*Lee IV*").

together and, following a two-month trial, the jury found both guilty of capital murder and racketeering. *Lee II*, 374 F.3d at 643. Mr. Lee and Mr. Kehoe each had a separate trial at the penalty phase.

Mr. Kehoe's penalty phase trial was first, and the jury returned a verdict of life in prison without the possibility of release. *Lee I*, 274 F.3d at 488. The United States informed the District Court that, given this decision, it did not intend to continue pursuing the death penalty for Mr. Lee. *Id.* As later explained by the District Judge, "[t]here was no question that Kehoe was the more culpable of the two with regard to the criminal acts charged in the indictment and proved at trial." Dkt. 1-2 at 3. But the Attorney General denied the United States Attorney's request to withdraw the death penalty with respect to Mr. Lee, *Lee I*, 274 F.3d at 488, so Mr. Lee's penalty phase proceeded. The jury found that the United States established four of the five aggravating factors it presented, Dkt. 1-10 at 5-8, and one or more jurors found that Mr. Lee established five of the fourteen mitigating factors he presented, *id.* at 9-10. The jury returned a verdict of death on May 14, 1999. *Lee I*, 274 F.3d at 488.

### B. Mr. Lee's Appeals and Collateral Attacks on His Conviction and Sentence

Mr. Lee's conviction and sentence were affirmed on direct appeal. *Lee II*, 374 F.3d at 643. He then filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 in the United States District Court for the Eastern District of Arkansas. That motion was denied, and the Eighth Circuit affirmed. *See Lee III*, 715 F.3d at 217; *United States v. Lee*, 2008 WL 4079315 (E.D. Ark.

Aug. 28, 2008). Mr. Lee's Rule 60(b) motion was also denied, and the Eighth Circuit affirmed that decision as well. *Lee IV*, 792 F.3d at 1022; *United States v. Lee*, 2014 WL 1093197, *5-6 (E.D. Ark. Mar. 18, 2014).

On September 10, 2018, Mr. Lee filed another § 2255 motion in the District Court. *United States v. Lee*, No. 4:97-cr-00243-KGB, Dkt. 1297 (E.D. Ark. Sept. 10, 2018). He argued that newly discovered evidence revealed that his due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959) (the "*Brady* and *Napue* claims") were violated during the penalty phase of his trial. These are the claims that Mr. Lee now raises in his § 2241 petition before this Court. Neither claim was raised at the sentencing phase of his trial or in his first § 2255 petition.

On February 26, 2019, the District Court denied the September 2018 § 2255 motion as an unauthorized successive § 2255 motion and denied Mr. Lee a certificate of appealability. *Lee,* No. 4:97-cr-00243-KGB, Dkt. 1313. The District Court held that another § 2255 motion raising material *Brady* claims constitutes a "second or successive" § 2255 motion, and thus Mr. Lee could not proceed without authorization from the Eighth Circuit. *Id.* at 14-17. The parties agree that § 2255(h) does not allow Mr. Lee to obtain this authorization. While Mr. Lee's § 2255 motion was not allowed to proceed, the District Court found that the newly discovered evidence was material, specifically stating that had the evidence been disclosed at trial "it is reasonably likely that . . . the outcome at sentencing would have been different." *Id.* at 14.

4

On July 25, 2019—while Mr. Lee's request for a certificate of appealability was pending before the Eighth Circuit—the Department of Justice set Mr. Lee's execution date for December 9, 2019. On November 4, 2019, the Eighth Circuit denied Mr. Lee's request for a certificate of appealability. *Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019). Judge Kelly dissented, arguing that reasonable jurists could disagree regarding whether a material *Brady* claim in a second § 2255 motion qualifies as an impermissible second or successive § 2255 motion. *Id.* at 1-2.

### C. Mr. Lee's Petition in this Case

Mr. Lee filed the habeas petition in this case under 28 U.S.C. § 2241 on September 26, 2019. Mr. Lee moved to stay his execution on November 8, 2019, the same day his habeas petition was fully briefed. Mr. Lee's discovery motion—seeking to conduct additional discovery to support both of his claims—remains pending.

## II.

This case's procedural posture is unique because Mr. Lee is a plaintiff in a case pending in the United States District Court for the District of Columbia (the "Execution Protocol Litigation"). On November 20, 2019, while the stay request was pending in this case, the United States District Court for the District of Columbia stayed Mr. Lee's execution. *See In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Nov. 20,

2019), Dkt. 50, Dkt. 51.[3]  Mr. Lee then moved to withdraw his motion to stay his execution in this Court.  Dkt. 22.

The United States has appealed the stay entered in the Execution Protocol Litigation.  *Id.*, Dkt. 52.  The appeal is pending before the United States Court of Appeals for the District of Columbia Circuit.  *See In re FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. Nov. 22, 2019).  The United States' request to vacate the stay issued in the Execution Protocol Litigation is pending before the United States Supreme Court.  *See Barr, et al. v. Roane, et al.*, No. 19A615 (Dec. 2, 2019).

It is not known at this time whether the stay issued by the District Court in the District of Columbia will stand or be vacated.  But Mr. Lee's motion for a stay in this case is fully briefed, and considerations of the orderly administration of justice make it appropriate for the Court to rule at this time on Mr. Lee's motion for a stay.

## III.

The standards governing preliminary injunctions apply to motions to stay executions in habeas proceedings.  *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995) ("The law governing stays of death sentences is, in general, the same as that employed in other situations.").  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

---

[3] The Execution Protocol Litigation is a civil rights action involving Mr. Lee's and several other federal death row inmates' challenges to the federal execution protocol.  It has been ongoing since 2005.

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Hill v. McDonough*, 547 U.S. 573, 584 (2006). Additionally, the Court must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004); *see Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007).

In the death penalty context, a stay is warranted only upon "a showing of a significant possibility of success on the merits." *Hill*, 547 U.S. at 584. When, as here, a habeas petition is not a prisoner's first, a stay of execution "should be granted only when there are 'substantial grounds upon which relief might be granted.'" *Garza v. Lappin*, 253 F.3d 918, 920-21 (7th Cir. 2001) (applying this standard to a § 2241 petition).

### A. Mr. Lee has Shown a Significant Possibility of Success on the Merits of his *Brady* and *Napue* Claims

The Court begins with the factual background necessary to understand Mr. Lee's *Brady* and *Napue* claims. The District Court of conviction summarized the background of Mr. Lee's *Brady* and *Napue* claims before ruling that it could not reach the merits:

> To justify a death sentence for Lee when Kehoe had been sentenced to life imprisonment, the Government's penalty-phase case emphasized the future-dangerousness aggravator. The Government argued that Lee's past conduct showed that he was violent and volatile, and that he would present a danger in prison. Focusing on the Wavra murder, the Government introduced evidence showing Lee's role in that crime. Brian Compton, who was at the party when Wavra was killed by John David Patton, testified about Lee's involvement; the transcript of Lee's testimony at John David Patton's Oklahoma preliminary hearing was read aloud; and the responding

Oklahoma detective and the forensic pathologist described Wavra's wounds and cause of death. The jury heard that, at a social gathering in 1990, Lee, then age seventeen, and his cousin, John David Patton, beat Wavra and forced him down a manhole into a storm sewer; that Patton went down into the manhole with Wavra, while Lee retrieved a plastic bag, rope, and knife that he handed down to Patton; that Patton handed Wavra's clothes up to Lee, who put them in the plastic bag; and that Patton then used the knife to repeatedly stab Wavra and slit his throat. Patton was convicted of first-degree murder in an Oklahoma state court, while Lee pled to deferred adjudication on a robbery charge. Other future-dangerousness evidence included (1) Lee's threatening behavior toward a sheriff's deputy, while he was in jail awaiting trial, and (2) a 1995 Florida conviction for carrying a concealed weapon.

In both opening and closing argument, the Government told the jury that Lee "has an earlier murder under his belt." It argued that, even though Patton "wielded that knife," Lee helped him by giving him the knife and rope. The Government argued Lee knew what he was doing when he gave the knife to Patton, and that he both "legally and morally" had "the blood of Joey Wavra" on his hands. The Government contended the robbery plea offer was a "gift" from the Oklahoma prosecutor and an "incredible deal" – and a missed opportunity for Lee to turn his life around. . . .

Both [the District Judge who presided over Mr. Lee's trial] and the Eighth Circuit recognized the Wavra evidence as an integral piece of the Government's penalty-phase case. In finding that Lee was not unfairly prejudiced by expert testimony and then reinstating the death penalty, the Eighth Circuit noted that, "none of the evidence elicited from Dr. Cunningham was likely to inflame the jury as much as testimony about Lee's involvement in the murder of Joey Wavra, which had been part of the government's case." *Lee*, 274 F.3d at 494. Similarly, in rejecting Lee's argument that his trial lawyers should have done more to investigate the Wavra murder, [the District Court] acknowledged evidence of Lee's participation in that crime was "powerful and likely contributed to or influenced the jury's ultimate decision" in favor of a death sentence. *Lee*, 2008 WL 4079315, at *45.

*Lee,* No. 4:97-cr-00243-KGB, Dkt. 1313 at 7-9 (citations omitted).

For his *Brady* claim, Mr. Lee contends that the United States suppressed exculpatory evidence regarding the legal proceedings associated with Mr.

Wavra's murder. For his *Napue* claim, he contends that in the penalty phase of his trial the United States created a false impression to the jury regarding his conviction associated with Mr. Wavra's murder. In support of these claims, Mr. Lee presents as evidence, among other things, a fee application from the defense attorney who represented Mr. Lee during the Oklahoma state court proceedings, including the preliminary hearing on the murder charge. The fee application states: "The matter came on for hearing before Judge Hall; District Attorney called witness; hearing held; Court finds crime of Murder I not established by evidence; Court recommends a Dismissal of Murder I charges and State consider refiling on charge of Robbery I." Dkt. 1-13 at 3. Mr. Lee contends the United States withheld evidence that the murder charge was dropped due to a lack of probable cause and falsely told the jury that Mr. Lee was "legally" responsible for Mr. Wavra's murder.

Because Mr. Lee brings his claims in a § 2241 petition, the Court must first determine whether his claims can pass through the Savings Clause and then evaluate whether he has a significant possibility of success on the merits of his *Brady* and *Napue* claims. *Garza*, 253 F.3d at 920 (cautioning courts not to conflate the two questions). Although these inquiries somewhat overlap in this case, they are distinct. *Id.* at 923. The Court addresses each question in turn.

      1.     Availability of § 2241[4]

---

[4] The undersigned recently confronted similar issues in *Purkey v. United States*, No. 2:19-cv-00414-JPH-DLP (S.D. Ind. Nov. 20, 2019). *Purkey* also involved a federal death row inmate with an upcoming execution date who sought to raise constitutional claims via § 2241. Ultimately, the Court rejected Mr. Purkey's

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019). But Congress created the Savings Clause within § 2255 as a narrow exception to the "general rule" that requires a federal prisoner to bring a collateral attack under § 2255. Determining whether the Savings Clause is met is a "very knotty procedural issue" of "staggering" complexity. *Chazen*, 938 F.3d at 855-56. While it is "hard to identify exactly what [the Savings Clause] requires," *id.* at 863 (Barrett, J., concurring), several guiding principles have emerged from the Seventh Circuit.

Under the Savings Clause, a prisoner can seek a writ of habeas corpus through an action under § 2241 if the prisoner can show "that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). "Only in rare circumstances" is the Savings Clause met. *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014) (citations and quotations omitted). Section 2255 is inadequate or ineffective in a specific case only when there is "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136. A structural problem requires "something more than a lack of success with a section 2255 motion." *Id.* It must "foreclose[] even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) (citation and quotation omitted). At bottom, the Savings Clause is met when a structural problem with § 2255 prevented a federal

---

arguments, concluding that none of his claims could be brought in a § 2241 petition, and denied his petition. *See id.*, Dkt. 76.

prisoner from having "'a reasonable opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Chazen*, 938 F.3d at 856 (alteration in original) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)); *see Davenport*, 147 F.3d at 609 (suggesting that § 2255 is inadequate or ineffective if the prisoner did not have "an unobstructed procedural shot at getting his sentence vacated").

There is a significant possibility that Mr. Lee has met this standard. First, in all three circumstances where the Seventh Circuit has found the Savings Clause met—*Davenport, Garza,* and *Webster*—it recognized that § 2241 is available to challenge the "fundamental legality" of a sentence, not just a conviction. *See Webster*, 784 F.3d at 1136 (discussing this holding in *Davenport* and *Garza*). Mr. Lee seeks to challenge the fundamental legality of his death sentence.

Second, as in *Webster*, Mr. Lee purports to rely on newly discovered evidence to show that his death sentence is unconstitutional. *Webster* suggests that the structure of § 2255 generally, and the language of the Savings Clause in particular, encompasses such claims, especially since § 2255(h) does not authorize raising such a claim in a second or successive § 2255 motion. *See Webster*, 784 F.3d at 1138. If principles of statutory interpretation alone do not lead to this conclusion, *Webster* instructs that the "next step would be to take into account the fact that a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence," which is what Mr. Lee attempts to show here. *Id.* at 1139.

Third, and most importantly, if Mr. Lee is correct that his *Brady* and *Napue* claims rest on newly discovered evidence, he meets the core of the Savings Clause test as described by the Seventh Circuit. Mr. Lee could not have raised these claims until the evidence was discovered, which he says was not until after his initial § 2255 proceedings had concluded. His initial § 2255 thus did not present him with a "'reasonable opportunity . . . to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence,'" *Chazen*, 938 F.3d at 856 (quoting *Davenport*, 147 F.3d at 609), or "an unobstructed procedural shot at getting his sentence vacated," *Davenport*, 147 F.3d at 609, based on these claims. Moreover, an opportunity to pursue these claims is not available in the District Court of conviction. His attempts to raise his *Brady* and *Napue* claims in that court were already denied on procedural grounds, and § 2255(h) forecloses any further attempts to pursue them there. *See Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019); *Lee,* No. 4:97-cr-00243-KGB, Dkt. 1313.

Applied to the facts presented in this case, the structure of § 2255 prevents the District Court of conviction from hearing a claim based on newly discovered evidence that the United States suppressed evidence and misled the jury during Mr. Lee's penalty phase. This could result in an unconstitutional death sentence. These considerations constitute the "something more" necessary to meet the Savings Clause. *Webster*, 784 F.3d at 1136.

While the parties vigorously dispute whether the evidence identified by Mr. Lee qualifies as "newly discovered", this only reinforces the need to stay Mr. Lee's

execution and permit additional discovery.[5]  At this stage, Mr. Lee has shown there is a significant possibility that there is newly discovered evidence to support his claims and that there may be additional discoverable evidence to support them.  Whether Mr. Lee can ultimately prevail by demonstrating that the evidence exists and is newly discovered is a question for another day.  But that determination, particularly in a death penalty case, should be made on a fully developed record.  *See* Dkt. 14 at 72 (the United States agreeing that "the fee application does not exclude the possibility that the hearing took place as Lee imagines"); *id.* at 77 (the United States acknowledging that "it is not clear whether the [Oklahoma] court made that recommendation [to drop the murder charge] at the request or with the acquiescence of the prosecutors as a part of a negotiated plea disposition").

Granting Mr. Lee limited relief, that is, a stay of execution without ruling on the merits of his petition, is essentially what happened in *Webster.*  The Seventh Circuit held that Mr. Webster's claims were not "barred as a matter of law" by the Savings Clause, but it remanded to the District Court for further factual development to determine whether the Savings Clause was met.  *Webster*, 784 F.3d at 1145-46 (ordering the District Court to hold a hearing to determine whether certain facts are true that bear on whether the Savings Clause is met).

2.     *Brady* and *Napue* Claims

---

[5] Mr. Lee's motion for discovery is presently pending before the Court.  The Court will address this motion by separate order.

The Court turns next to whether there is a significant possibility that Mr. Lee will be able to prevail with his *Brady* and *Napue* claims. Although *Brady* and *Napue* claims are distinct, they are related and thus discussed together. *See Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (en banc) ("The *Napue-Giglio* rule is a cousin to the *Brady* doctrine.") The Court begins by setting forth the legal standards governing these claims before discussing whether Mr. Lee has shown a significant possibility that they are meritorious.

The Supreme Court in *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *see Snow v. Pfister*, 880 F.3d 857, 867 (7th Cir. 2018) ("The failure to disclose [exculpatory] evidence is a violation of the accused's due process rights."). To establish a *Brady* violation, a petitioner must show three things: "first, that the evidence at issue was favorable; second, that the evidence was suppressed; and third, that it was material to his defense." *Socha v. Richardson*, 874 F.3d 983, 987 (7th Cir. 2017).

In *Giglio*, the Supreme Court "made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." 405 U.S. at 153. Relatedly, "*Napue* stands for the proposition that prosecutors may not suborn perjury, and holds that a defendant's due-process rights are violated when the government obtains a conviction through the knowing use of false testimony." *United States v.*

*Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017); *see Bland v. Hardy*, 672 F.3d 445, 447 (7th Cir. 2012) ("*Napue* and *Giglio* hold that a prosecutor may not offer testimony that the prosecutor knows to be false."). To establish a due-process violation under *Napue*, Mr. Lee must show "'(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury.'" *United States v. Cardena*, 842 F.3d 959, 976-77 (7th Cir. 2016) (quoting *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011)). Together, the *Brady* and *Napue* doctrines are "two manifestations of the principle that prosecutors must expose material weaknesses in their positions." *Long*, 874 F.3d at 549.

Mr. Lee asserts that he made two separate *Brady* requests—one shortly after trial counsel was appointed and another after the United States moved to amend its notice of intent to seek a death sentence. The United States does not dispute this and responds that it complied with its obligations under *Brady*.

Mr. Lee argues that the United States violated *Brady* by not disclosing that the Oklahoma judge in the Wavra case found probable cause did not exist to support a murder charge against Mr. Lee. He argues that the United States then violated *Napue* by falsely stating to the jury that Mr. Lee was legally responsible for Mr. Wavra's murder and that his robbery plea was a gift from the Oklahoma prosecutor. Dkt. 1 at 46-64.

Some elements of Mr. Lee's *Brady* and *Napue* claims are readily met while others are not as clear. But at this juncture, Mr. Lee's obligation is not to

conclusively prove-up those claims. It is to show a significant possibility that he can do so.

i. Materiality and Favorability Elements

The District Court of conviction previously found that the *Brady* evidence was material (and thus favorable). *Lee*, No. 4:97-cr-00243-KGB, Dkt. 1313 at 14 ("[A]ssuming that the Oklahoma state court held at a preliminary hearing that the evidence was insufficient to establish probable cause that Lee was guilty of murdering Joey Wavra, that evidence is material. In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been discovered at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different."). The Court sees no basis to disagree with that finding at this stage of the proceedings.

As noted above, the Wavra murder was central to the United States' penalty-phase case. And it was at least part of the United States' argument for why Mr. Lee should be sentenced to death even after the jury had sentenced his more culpable co-defendant, Mr. Kehoe, to life. *See, e.g.*, Dkt. 14-6 at 9 (the United States arguing during closing that Mr. Lee's involvement in "the Joey Wavra murder . . . alone illustrates this drastic distinction on several levels between Danny Lee and Chevie Kehoe"); *id.* at 11 (the United States arguing during closing that Mr. Lee "has an earlier murder under his belt," which the jury "should consider in distinguishing Lee from Kehoe because Lee has been

here before").  There is thus a significant possibility Mr. Lee can establish the materiality and favorability elements of his *Brady* claim.

ii. False Evidence that Affected the Judgment of Jury

Mr. Lee has also established a significant possibility that two of the *Napue* elements are met.  First, there is a significant possibility that Mr. Lee may be able to show that the United States misled the jury when it stated during the penalty phase that Mr. Lee was "legally" responsible for Mr. Wavra's murder and that his robbery plea was a "gift" from the Oklahoma prosecutor.  Dkt. 14-6 at 10 ("I would suggest to you both legally and morally the blood of Joey Wavra's hands is on Danny Lee."); Dkt. 14-2 at 45 ("[Mr. Lee] got a gift in [the Wavra] case from the prosecutors in Oklahoma.  They gave him a plea bargain.  And this allowed him to get off with just a robbery.").  The fee application alone—which suggests that an Oklahoma judge determined that probable cause did not exist to charge Mr. Lee with murder—casts significant doubt on whether these statements were true.  Second, for the same reasons the *Brady* materiality element is met, there is a significant possibility that Mr. Lee may be able to show that this narrative affected the judgment of the jury.

iii. Was the Information Suppressed and Did the United States Knowingly Make False Statements

This leaves two intensely disputed issues: whether the United States suppressed information regarding the plea agreement (for the *Brady* claim) and whether the United States knew or should have known that the statements at issue were false (for the *Napue* claim).  Beginning with the former, the United

States argues that this element cannot be met because publicly available information is not considered suppressed for purposes of a *Brady* claim, and the fee application was a "publicly-available document [that] was readily available to Lee." Dkt. 14 at 69; *id.* ("Lee's lawyers were well aware that the government intended to introduce evidence about the Wavra murder at Lee's sentencing hearing and easily could have obtained a copy of the fee application.").

Mr. Lee responds that the information surrounding Mr. Lee's guilty plea to the robbery charge, rather than the fee application, is the *Brady* material. In other words, Mr. Lee says the fee application is only *evidence of* a *Brady* violation. *See* Dkt. 15 at 21 ("The Government consulted with detective from the Oklahoma City Police Department who were involved with the [Wavra] case, who interrogated the juvenile Danny Lee, and who testified at the preliminary hearing of . . . David Patton [Mr. Lee's cousin who was convicted of murdering Mr. Wavra]. Mr. Lee alleges that the Government, as part of these or other discussions, must have learned of facts exculpatory to Mr. Lee and failed to disclose them. [Mr. Lee's] claim is that *this* information—*i.e.*, the facts surrounding that plea—constitutes *Brady* material.").

While further factual development is necessary to resolve these issues, Mr. Lee has presented substantial grounds for his claim that the United States suppressed exculpatory information relating to Mr. Lee's robbery plea. The evidence presented thus far demonstrates a significant possibility that Mr. Lee may be able to show that the United States knew that the robbery plea was

offered to Mr. Lee after an Oklahoma judge determined that probable cause to charge Mr. Lee with murder did not exist.

In addition to the fee application from the Oklahoma case file there is evidence that Federal Bureau of Investigation ("FBI") Agents traveled to Oklahoma "to review and obtain all records" regarding Mr. Wavra's murder, and that they reviewed the local prosecutor's file on the Wavra case.[6] *See* Dkt. 18-1; Dkt. 18-2. The United States does not dispute Mr. Lee's contention that none of the information or records gained from this investigation was disclosed to Mr. Lee. Moreover, the United States acknowledges it does not know much about the circumstances surrounding Mr. Lee's plea agreement in the Wavra case. The United States agrees that "the fee application does not exclude the possibility that the hearing took place as Lee imagines"—that is, that the Oklahoma judge found there was no probable cause to charge Mr. Lee with murder. Dkt. 14 at 72. The United States further acknowledges that "it is not clear whether the [Oklahoma] court made that recommendation at the request or with the acquiescence of the prosecutors as a part of a negotiated plea disposition." *Id.* at 77.

The evidence presented by Mr. Lee, particularly when viewed in the context of what the United States admittedly does not know, is sufficient to demonstrate a significant possibility that Mr. Lee may be able to show that the United States

---

[6] Mr. Lee also points out that one of the Oklahoma detectives who investigated Mr. Wavra's murder testified for the United States during its case-in-chief, Dkt. 14-2 at 51-52, and the United States also consulted with the Oklahoma detective who interrogated Mr. Lee regarding the murder, *id.* at 11-12.

had exculpatory information regarding Mr. Lee's robbery plea, and that it knew or should have known the arguments and statements made at the penalty phase regarding the circumstances surrounding Mr. Lee's plea in the Wavra case were misleading.[7]

While further factual development is necessary for the Court to be able to determine whether Mr. Lee is entitled to habeas relief, he has established substantial grounds for his *Brady* and *Napue* claims. This is sufficient for the immediate remedy he seeks, a stay of execution.

### B. Irreparable Harm

The irreparable harm to Mr. Lee is clear: absent a stay, he could be executed on December 9, 2019, before he can fully litigate his *Brady* and *Napue* claims. *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995) (holding that "irreparable harm is taken as established in a capital case" because "[t]here can be no doubt that a defendant facing the death penalty at the hands of the state faces irreparable injury"). The United States rightfully concedes that Mr. Lee faces irreparable harm. Dkt. 20 at 3.

### C. Balance of Harms

---

[7] As to the United States' argument that publicly available evidence cannot be suppressed under *Brady*, at best, more information is needed to determine whether the alleged *Brady* information was publicly available at the time. All the United States has offered is that the fee application "is listed on the public docket sheet from the Oklahoma case and contained within the publicly-available court file." Dkt. 14 at 69. Whether or not this alone establishes that the fee application was publicly available at the time of Mr. Lee's trial, it says nothing about whether the other alleged *Brady* material was publicly available.

The Court must next balance the harms to the parties. Again, absent a stay, Mr. Lee could be executed even though there is a significant chance his death sentence was obtained in violation of his constitutional rights. The harm to the United States stems from its "strong interest" in "proceeding with its judgment." *Lambert*, 498 F.3d at 452. A stay will delay this outcome.

When considered in the full context of Mr. Lee's challenges to the constitutionality of his death sentence, the harm to Mr. Lee far outweighs the harm to the United States. Much of the twenty-year delay in proceeding with the judgment is attributable to the United States, which demonstrates that it lacked urgency about proceeding with its judgment against Mr. Lee until very recently.

Since he was sentenced to death in 1999, Mr. Lee has been consistently challenging the constitutionality of his death sentence. During that litigation, both Mr. Lee and the United States requested and received several unopposed extensions of time. Significant delays in resolving this litigation, however, fall solely upon the United States. For example, Mr. Lee petitioned the United States Supreme Court for a writ of certiorari on April 13, 2016, and the United States did not file its response until nearly a year later, having obtained nine extensions of time. *See Lee v. United States*, No. 15-8942. This undermines its position that any additional delay will cause significant harm to its interests.

Similarly, the United States waited eight years—from 2011 to 2019—to adopt a new execution protocol. *See In re the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC, Dkt. 50 at 14. Only after it

announced the new execution protocol and scheduled Mr. Lee's execution has the United States exhibited its current level of urgency to enforce its criminal judgments. This too undermines the notion that additional delay will cause significant harm.

Finally, the United States has not acted with the necessary urgency even in this litigation. Mr. Lee filed this action on September 26, 2019, when his execution date was two-and-a-half months away. Given this, the Court gave each party two weeks to file their respective briefs and warned both parties that the Court did not "anticipate extending these deadlines absent extraordinary circumstances." Dkt. 6 at 1. Nevertheless, the United States requested (over Mr. Lee's objection) a twenty-eight-day extension of time because the attorneys assigned to the matter "had previously-existing responsibilities that prevented them from turning their full attention immediately to this case." Dkt. 10 at 3. Failing to adequately staff this case with counsel that could devote their full attention to it such that Court-ordered deadlines must be extended further undermines the notion that the harm to the United States of additional delay would be significant.

Given that the United States has significantly contributed to delays in scheduling Mr. Lee's execution and resolving Mr. Lee's legal challenges, the Court concludes that the additional delay caused by a stay in Mr. Lee's execution will only minimally harm the United States. Such minimal harm is substantially outweighed by the harm to Mr. Lee should a stay not issue. Accordingly, the balance of harms strongly favors staying Mr. Lee's execution.

### D.  Public Interest

While the public has an interest in the enforcement of Mr. Lee's criminal judgment, that interest is significantly diminished in this case.  Mr. Lee has presented substantial grounds for claims that his death sentence is unconstitutional.  The public interest is not served by permitting the execution of Mr. Lee when such potentially meritorious claims have not been evaluated by any court.  Furthermore, while not dispositive to the public interest prong of the preliminary injunction test, several family members of the victims, the lead prosecutor, and the District Judge who presided over the trial all oppose Mr. Lee being executed.  *See* Dkt. 1-2; Dkt. 17-1; Dkt. 17-2; Dkt. 17-3.

### E.  Unnecessary Delay

Before staying an execution, the Court must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson*, 541 U.S. at 649-50; *see Lambert*, 498 F.3d at 451.  "[T]here is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson*, 541 U.S. at 650.

The United States contends that Mr. Lee could have brought his *Brady* and *Napue* claims in 2014 when he was aware of the fee application forming the basis of those claims.  Dkt. 20 at 7.  Mr. Lee maintains he has been diligently and constantly litigating his claims in the Eighth Circuit, and he has been specifically litigating his *Brady* and *Napue* claims long before he had an execution date.  Dkt. 21 at 1-2.

While it is certainly feasible that Mr. Lee could have raised his *Brady* and *Napue* claims earlier than he did in the Eighth Circuit, when considered in the context of the lengthy procedural history of this case, Mr. Lee has been diligently pursing his claims. Mr. Lee's direct appeal concluded in June 2005. *See Lee v. United States*, 545 U.S. 1141 (2005). His § 2255 proceedings concluded over nine years later, in October 2014. *See Lee v. United States*, 135 S. Ct. 72 (2014). Before the § 2255 proceeding concluded, Mr. Lee had already begun litigating the ineffective assistance claims he raises here by way of a post-judgment motion in his original § 2255 proceeding. That litigation concluded in December 2015. *See United States v. Lee*, 811 F.3d 272 (8th Cir. 2015).

Perhaps most importantly, Mr. Lee raised his *Brady* and *Napue* claims in the District Court of conviction in September 2018, long before July 2019, when his execution date was set. Moreover, he raised them in this § 2241 action before he knew with certainty that he did not have an avenue to raise them via § 2255. His application for a certificate of appealability was pending before the Eighth Circuit when his execution date was announced, and it remained pending when he filed this action.

The foregoing is important context for considering whether Mr. Lee has unnecessarily delayed pursuing his claims. Given that (1) the United States has not executed any federal death row prisoner for 16 years; (2) it did not adopt an execution protocol under which it could execute Mr. Lee for 8 years; (3) during the 20 years since Mr. Lee was sentenced to death he has been almost constantly engaged in litigation regarding the constitutionality of his death sentence; (4) Mr.

Lee began litigating his *Brady* and *Napue* claims in his court of conviction well before his execution date was set; and (5) that litigation remained pending when Mr. Lee's execute date was set and when Mr. Lee brought the instant § 2241 petition in this Court, the Court concludes that Mr. Lee has not unnecessarily delayed in bringing his *Brady* and *Napue* claims such that a stay is unwarranted. This is not a case where an inmate waited until an execution date was set or until the eve of his execution to bring claims that could have been brought much earlier. *Cf. Dunn v. Price*, 139 S. Ct. 1312, 1312 (2019); *Price v. Dunn*, 139 S. Ct. 1533, 1535-40 (2019) (Thomas, J., dissenting); *Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam).

## IV.

For the reasons explained above, Daniel Lewis Lee's execution scheduled for December 9, 2019, is **STAYED**. Mr. Lee has demonstrated substantial grounds upon which to challenge the legality of his execution. Specifically, the structure of § 2255 prevents the District Court of conviction from hearing his claims that are based on newly discovered evidence. Mr. Lee has also demonstrated a significant possibility that he may be able to prevail on those claims by showing that the United States suppressed evidence and misled the jury during his penalty phase. In the end, Mr. Lee may not be able to make this showing. For now, he must have a reasonable opportunity to obtain a reliable judicial determination of these challenges to the fundamental legality of his sentence.

Mr. Lee has also established that the other factors the Court must consider before issuing a stay weigh in his favor. This includes the Court's conclusion that Mr. Lee has not unnecessarily delayed pursuing his claims. He was pursuing these claims well before his execution date was set. There is no concern that Mr. Lee waited to raise his claims on the eve of his execution simply as a delay tactic.

A separate order staying Mr. Lee's execution shall issue. Counsel for the United States are responsible for ensuring that the Warden of the United States Penitentiary in Terre Haute, Indiana, the United States Marshal for this District, and all other officials who would have any involvement in Mr. Lee's execution are notified of this stay and comply with its requirements.

**SO ORDERED.**

Date: 12/5/2019

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michael Scott Gordon
US Attorney's Office - Eastern District of Arkansas
michael.gordon@usdoj.gov

George Gust Kouros
FEDERAL CAPITAL HABEAS PROJECT
george_kouros@fd.org

Morris H. Moon
FEDERAL CAPITAL HABEAS PROJECT
Morris_Moon@fd.org

John M. Pellettieri
U.S. DEPARTMENT OF JUSTICE
john.pellettieri@usdoj.gov